## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x
       :
In re:       :    Chapter 11
       :
ZEN JV, LLC, *et al.*,[1]       :    Case No. 25-11195 (JKS)
       :
       Debtors.       :    (Joint Administration Requested)
       :
-------------------------------------------------------- x

## MOTION OF DEBTORS FOR ENTRY
## OF INTERIM AND FINAL ORDERS (A) AUTHORIZING
## DEBTORS TO (I) OBTAIN POSTPETITION FINANCING AND
## (II) USE CASH COLLATERAL, (B) GRANTING LIENS AND PROVIDING
## CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
## (C) GRANTING ADEQUATE PROTECTION, (D) MODIFYING AUTOMATIC
## STAY, (E) SCHEDULING FINAL HEARING, AND (F) GRANTING RELATED RELIEF

Zen JV, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with the non-debtor subsidiaries, the "**Company**"), respectfully represent as follows in support of this motion (this "**Motion**"):

### RELIEF REQUESTED

1.    By this Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**") and a final order (the "**Final Order**"[2] and, together with the Interim Order, the "**DIP Orders**"):

    (a)    authorizing the Debtors to obtain postpetition financing on a senior secured superpriority basis, on the terms and conditions set forth in the Interim Order and the term sheet attached as <u>Exhibit 1</u> to the Interim Order (as

---

[1]    The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number (to the extent applicable), are: Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions, LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding, LLC (9339); and Military Advantage, LLC (9508).  The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

[2]    The Debtors will file the Final Order in advance of the Final Hearing (as defined below).

amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Term Sheet**"), by and among Zen JV, LLC (the "**Borrower**"), each of the other Debtors as secured guarantors with respect to the outstanding DIP Obligations (as defined below) (collectively, the "**Guarantors**" and, together with the Borrower, the "**DIP Loan Parties**"), JMB Capital Partners Lending, LLC (the "**DIP Lender**"), comprised of a senior secured superpriority debtor-in-possession term loan facility (the "**DIP Facility**") in an aggregate principal amount of up to $20.0 million, *plus* applicable fees and premiums (the commitments thereunder, the "**DIP Commitments**" and, the term loans extended thereunder, the "**DIP Loans**"), pursuant to which (i) up to $12.5 million of the DIP Commitments (the "**Interim DIP Loans**") shall be available upon the entry of the Interim Order and (ii) up to the DIP Commitments *less* amount(s) drawn under the Interim DIP Loans (the "**Subsequent DIP Loans**" and, together with the Interim DIP Loans, the "**DIP Borrowings**" and, each, a "**DIP Borrowing**") shall be available upon the entry of the Final Order, in each case solely upon compliance with the Interim Order or Final Order (as applicable), the Approved Budget (as defined in the Interim Order) (subject to Permitted Variances (as defined below)), and the DIP Term Sheet;

(b)     authorizing the Borrower to incur, and the Guarantors to jointly and severally, irrevocably, and unconditionally guarantee, on a superpriority basis, the Payment in Full (as defined in the Interim Order) of all DIP Obligations in accordance with the Interim Order and the DIP Term Sheet;

(c)     authorizing the DIP Loan Parties to: (i) execute, deliver, and perform under the DIP Term Sheet, and to perform all such other and further acts as may be required in connection therewith; (ii) incur all loans, advances, extensions of credit and financial accommodations, and pay all principal, interest, premiums or similar amounts, fees (including, without limitation, the Upfront Fee and the Exit Fee (in each case under and as defined in the DIP Term Sheet)), costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts, whether or not such obligations arose before or after the Petition Date (as defined below), whenever the same shall become due, whether at stated maturity, by mandatory prepayment, declaration, acceleration, or otherwise, in each case, in accordance with the DIP Term Sheet and the Interim Order (collectively, the "**DIP Obligations**"); and (iii) perform such other and further acts as may be necessary, required, or desirable to implement and effectuate the terms of the Interim Order, the DIP Term Sheet, and the transactions contemplated thereunder;

(d)     authorizing the DIP Loan Parties to grant to the DIP Lender the DIP Liens (as defined in the Interim Order) in all DIP Collateral (as defined in the Interim Order), as set forth in the Interim Order, subject to the Carve Out

2

(as defined in the Interim Order) and to the relative priorities set forth in the Interim Order and Exhibit 3 attached thereto;

(e)     authorizing the DIP Loan Parties to grant to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code (as defined below), as well as liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code, as further described in the Interim Order (including in Exhibit 3 attached thereto), on all DIP Collateral and all proceeds thereof (including, subject to the entry of the Final Order, Avoidance Action Proceeds (as defined in the Interim Order)), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (as defined in the Interim Order)) against each of the DIP Loan Parties, on a joint and several basis, in respect of all DIP Obligations, subject to the Carve Out and other priorities, as set forth in the Interim Order;

(f)     authorizing the DIP Loan Parties to use the proceeds of the DIP Facility, the DIP Collateral, and the Prepetition Collateral, including Cash Collateral (as defined in the Interim Order), in accordance with the terms and conditions set forth in the Interim Order and the DIP Term Sheet, and strictly in accordance with the Approved Budget, subject to any variances expressly permitted under the DIP Term Sheet (the "**Permitted Variances**");

(g)     granting adequate protection, as and to the extent set forth in the Interim Order, to the Prepetition Secured Parties (as defined in the Interim Order) to protect against any Diminution in Value of their respective Prepetition Liens (each as defined in the Interim Order) in the Prepetition Collateral (including Cash Collateral) and authorizing the Debtors to make non-refundable and irrevocable adequate protection payments as contemplated in the Interim Order;

(h)     modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise, to the extent necessary, required, or desirable to implement and effectuate the terms and provisions of the Interim Order and the DIP Term Sheet, as set forth therein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, and providing for the immediate effectiveness of the Interim Order;

(i)     approving certain stipulations, waivers, and releases by the Debtors with respect to, among other things, (i) the DIP Lender, the DIP Term Sheet, the

DIP Liens, and the DIP Obligations and (ii) subject to the Interim Order, the Prepetition Secured Parties, the Prepetition Loan Documents (as defined in the Interim Order), the Prepetition Liens, and the Prepetition Secured Obligations (as defined in the Interim Order);

(j)     subject to the entry of the Final Order, approving the DIP Loan Parties' waiver of the right to surcharge the DIP Collateral as to the DIP Lender pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth in the Interim Order;

(k)     subject to the entry of the Final Order, approving the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Lender upon the terms set forth in the Interim Order;

(l)     authorizing and directing the Debtors to make non-refundable, irrevocable, and final payments on account of the principal, interest, fees (including, the Upfront Fee and the Exit Fee), expenses, and other amounts payable under the DIP Term Sheet, each, as applicable, as such become due and payable, all to the extent provided in, and in accordance with, the Interim Order, the Final Order (upon entry), and the applicable DIP Term Sheet; and

(m)     scheduling a final hearing (the "**Final Hearing**") on the Motion to consider entry of the Final Order authorizing the relief requested in the Motion on a final basis and approving the form of notice with respect to such Final Hearing, which order shall be in form and substance and on terms and conditions acceptable in all respects to the DIP Lender.

2.     In support of this Motion, the Debtors will submit the First Day Declaration (as defined below) and the *Declaration of Jesse DelConte in Support of Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Obtain Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection, (E) Modifying Automatic Stay, (F) Scheduling Final Hearing, and (G) Granting Related Relief* before or at the Interim Hearing (the "**DelConte Declaration**").     The Debtors' initial budget reflecting the anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the fifth calendar week following the Petition Date is attached as Exhibit 2 to the Interim Order (the "**Initial Budget**").

## JURISDICTION AND VENUE

3.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

5.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

6.      On June 24, 2025, (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

7.      On the Petition Date, the Debtors filed with the Court a motion requesting joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

8.       The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the circumstances leading to the commencement of the Chapter 11 Cases, will be set forth in detail in the *Declaration of Michael Suhajda, Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"[3] and, together with the *DelConte Decl*aration, the "**Declarations**").[4]

## PRELIMINARY STATEMENT

9.       The Debtors commenced the Chapter 11 Cases to maximize the value of their estates for the benefit of all parties in interest.  As part of that effort, by this Motion, the Debtors seek authorization to access the proposed DIP Facility and to use Cash Collateral, which will, among other things, (a) ensure the Debtors have the runway necessary to consummate value-maximizing sale transactions during the chapter 11 process, (b) avoid value destruction, and (c) make available sufficient funding to pay necessary expenses incurred in connection with the Chapter 11 Cases.  The proposed DIP Facility is the best financing option available to the Debtors at this time and approval of the proposed DIP Facility is crucial to the Debtors' ability to ultimately reach the best outcome for all stakeholders.

10.       The Company is the result of a September 2024 merger between CareerBuilder and Monster, which brought their respective job board and other businesses under one roof (the "**Merger**").  The business plan under the Merger relied on two key assumptions:  (a) the synergy between the two businesses would reduce costs and (b) revenues would need to stop declining and start growing.

---

[3]       Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the First Day Declaration.

[4]       The First Day Declaration and other relevant case information are available on the following website maintained by the Debtors' proposed claims and noticing agent, Omni Agent Solutions, Inc.: https://omniagentsolutions.com/CareerBuilderMonster.

11.     While the Company was able to eventually meet its synergy goals and stabilize costs at a level consistent with the business plan, the Company has faced macroeconomic headwinds, which has resulted in less economic investments globally, less job openings for applicants, and, in turn, less revenues for the Company (as well as its competitors).  Although the Company's performance has improved alongside the general economy in recent months, the prior struggles had already drained the Company's liquidity and required the Company to explore strategic alternatives.

12.     Ultimately, the Debtors and their advisors realized that a chapter 11 proceeding with a section 363 sale process would be necessary given the Company's financial circumstances. In connection therewith, the Debtors and their advisors solicited interest in potential postpetition financing from approximately 20 prospective lenders including existing creditors and third-party financial institutions that routinely provide postpetition financing.

13.     To best position the Debtors to obtain financing on the best terms and within a compressed timeframe, the Debtors first approached the Prepetition Term Loan Lenders and Prepetition Noteholders to provide DIP financing.  While none of those lenders or noteholders were willing to provide additional funding, they did agree to certain concessions, compromises, and consents in furtherance of supporting the Debtors' financing efforts.  Following extensive negotiations, the Debtors were able to reach an agreement with the Prepetition Noteholders and the requisite majority of the Prepetition Term Loan Lenders (the "**Required Prepetition Term Loan Lenders**") to allow for consensual priming and use of cash collateral, with the following terms (the "**Adequate Protection Consent Agreement**"):

- the Debtors shall pay to the Prepetition Term Loan Agent, for further distribution to the Prepetition Term Loan Lenders in accordance with the Prepetition Term Loan Documents, the sum of $1.0 million upon entry of the Interim Order (the "**Consent Fee**").  The Consent Fee shall be used to (x) pay

7

the reasonable fees and expenses (including reasonable counsel fees) of the Prepetition Term Loan Agent and each Prepetition Term Loan Lender incurred in connection with the negotiation and approval of the Interim Order and (y) otherwise distributed to the Prepetition Term Loan Lenders in accordance with the terms of the Prepetition Term Loan Credit Agreement;

- the DIP Liens and DIP Obligations shall be senior to the Prepetition Term Loan Liens and Prepetition Term Loan Obligations with respect to the Prepetition Term Loan Collateral (each as defined in the Interim Order) only to the extent of $1.0 million (inclusive of any Carve Out applicable to the Prepetition Term Loan Collateral), and the Prepetition Term Loan Liens shall be senior to the DIP Liens with respect to the Prepetition Term Loan Collateral for all amounts in excess of $1 million;

- the Prepetition Secured Parties and the Debtors agree that, without prejudice to the rights of other parties, 51% of the proceeds from any sale, transfer, or other disposition of the assets that are the subject of the CBM Stalking Horse Bid (as defined in the Interim Order) (pursuant to the CBM Stalking Horse Bid or otherwise) shall be allocated to the Prepetition Term Loan Collateral (with the Consent Fee credited against such amount), with the remaining 49% allocated to the Prepetition Notes Collateral; and

- subject to entry of the Final Order, the Debtors shall not recover (or seek to recover) more than $75,000 of the reasonable and necessary costs of preserving or disposing the Prepetition Term Loan Collateral pursuant to section 506(c) of the Bankruptcy Code, with any amount in excess thereof being waived.

14.     Nearly all of the prospective lenders were unwilling to provide financing because the size of the proposed facility did not surpass the minimum investment hurdles at their institutions, the potential returns were too low given the short tenor of the proposed facility, and/or the speed of the Debtors' process was too expedited to permit sufficient diligence and negotiations.

15.     Blue Torch Finance LLC ("**Blue Torch**"), however, was interested and was negotiating with the Debtors with respect to a potential $16.5 million DIP facility leading up to, and after, the Petition Date. Following the Petition Date and during those negotiations, the Debtors received a proposal from the proposed DIP Lender for a $20.0 million DIP facility that provided both increased funding and better economic terms than the Blue Torch facility. The Debtors continued negotiating both facilities and ultimately decided that the $20.0 million facility from the proposed DIP Lender was the best financing available and in the best interests of their estates.

16.     With only $2.2 million cash on hand, the Debtors have an immediate need to access the DIP Facility to avoid immediate and irreparable harm.  The Debtors will use the proposed DIP Facility to fund the Chapter 11 Cases, with the ultimate goal of effectuating value-maximizing and expeditious sales of their Media Business, Government Business, and Job Board Business pursuant to section 363 of the Bankruptcy Code, which the Debtors believe will bring about the best outcome for all of their stakeholders.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

17.     Pursuant to Bankruptcy Rules 4001(b), (c), and (d), the following is a concise statement and summary of the proposed material terms of the DIP Term Sheet and DIP Orders:[5]

| Summary of Material Terms | |
| --- | --- |
| **Parties to the Proposed DIP Facility**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Borrower**:  Zen JV, LLC.<br><br>**Guarantors**:  FastWeb, LLC, Military Advantage, LLC, Monster Government Solutions, LLC, Monster Worldwide LLC, Camaro Acquisition, LLC, CareerBuilder, LLC, CareerBuilder France Holding, LLC, CareerBuilder Government Solutions, LLC, and Luceo Solutions, LLC.<br><br>**DIP Lender**:  JMB Capital Partners Lending, LLC.<br><br>*See* DIP Term Sheet, "Borrower," "Guarantors," "DIP Lender." |
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | The Debtors have an immediate and critical need to use Cash Collateral and to obtain postpetition financing pursuant to the DIP Facility, in each case, on an interim basis, in order to, among other things, permit the orderly sale of their businesses, make payroll, pay the costs of administering the Chapter 11 Cases and satisfy other working needs of the Debtors, in the case of each of the foregoing, in accordance with and subject to the terms and conditions of the Interim Order and the DIP Term Sheet, including the Approved Budget (subject to Permitted Variances).  The Debtors' access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the DIP Facility and the use of Cash Collateral is necessary and vital to, among other things, preserve and maximizing the values of the Debtors.<br><br>*See* Interim Order ¶ H(b). |
| **Borrowing Limits**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)A* | In an aggregate principal amount not to exceed $20.0 million, of which $12.5 million shall be available upon the entry of the Interim Order, subject to certain customary terms and conditions.  Upon the entry of the Final Order, subject to certain customary terms and conditions, the Borrower |

---

[5]     This statement is qualified in its entirety by reference to the applicable provisions of the DIP Term Sheet and the DIP Orders.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Term Sheet or the DIP Orders, the provisions of the DIP Term Sheet or the DIP Orders, as applicable, will control.  Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the DIP Term Sheet or the proposed Interim Order.

| Summary of Material Terms | |
|---|---|
| | may request loans in one or more borrowings up to the amount of the DIP Commitment *less* amounts drawn under the Interim DIP Loans.<br><br>*See* DIP Term Sheet, "DIP Credit Facility," "Availability Period." |
| **Initial Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(iii)* | A copy of the Initial Budget is attached as <u>Exhibit 2</u> to the Interim Order. |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | <u>**Interest Rate**</u> Interest will be payable on the unpaid principal amount of all DIP Loans and all overdue interest thereon at a rate per annum equal to 12.00%, payable at the end of such interest period in arrears in kind by adding such interest to the principal amount of such DIP Loans.<br><br><u>**Default Interest**</u>: 2.00% plus the rate otherwise applicable.<br><br>*See* DIP Term Sheet, "Interest Rate," "Default Rate." |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | The earliest to occur of the following: (a) 50 calendar days after the Petition Date; (b) 2 business days after the termination of the Stalking Horse APAs for any reason, other than (i) as a result of (1) any breach of the Stalking Horse APAs by the Purchaser or (2) the Debtors' selection of an alternative bid that either (A) has the consent of the DIP Lender or (2) results in the indefeasible payment in full in cash of the DIP Obligations, in each case, as of the closing of such alternative bid or (ii) a termination to pursue approval of an Third-Party Sale (as defined in the Stalking Horse APAs) that results in the indefeasible payment in full in cash of the DIP Obligations as of the closing of such Third-Party Sale; (c) the date of consummation of any sale of all or substantially all of the assets of any of the Debtors pursuant to section 363 of the Bankruptcy Code; (d) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; (e) entry of an order by the Bankruptcy Court approving (i) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (ii) a motion seeking the appointment or election of a trustee, a responsible officer, or examiner with enlarged powers relating to the operation of the Debtors' business; (f) the date, if any, on which the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a liquidation pursuant to Chapter 7 of the Bankruptcy Code; and (g) the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitments in respect thereof upon the occurrence of an Event of Default.<br><br>*See* DIP Term Sheet, "Maturity Date." |
| **Repayment Features / Roll-Up**<br><br>*Local Rule 4001-2(a)(i)(E) & (O)* | None. |
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | The Interim DIP Loans and the Subsequent DIP Loans are subject to the satisfaction, or waiver by the DIP Lender, of conditions precedent customary for financings of this type.<br><br>*See* DIP Term Sheet, "Conditions Precedent to the Interim DIP Loan," "Conditions Precedent to Subsequent DIP Loans." |
| **Financial Covenants** | The DIP Term Sheet contains customary financial covenants for financings of this type. |

| Summary of Material Terms | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)* | *See* DIP Term Sheet, "Affirmative Covenants." |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | The DIP Term Sheet and the Interim Order each contains customary events of default for financings of this type.<br><br>*See* DIP Term Sheet, "Events of Default"; Interim Order ¶ 20. |
| **Carve Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(F)* | Subject to the terms and conditions contained in the Interim Order, each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to the Carve-Out.<br><br>As used in the Interim Order, the term "**Carve Out**" means an amount equal to the sum of: (a) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717; (b) all unpaid reasonable fees and expenses up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) to the extent allowed by this Court at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all accrued and unpaid fees and expenses (in each case, excluding any restructuring, sale, success, or other transaction fee owed to any investment bankers or financial advisors to the DIP Loan Parties or the Committee Professionals (as defined below) when and if earned pursuant to the terms and conditions of an engagement letter approved by this Court in these Chapter 11 Cases); (d) the fees and expenses of any consumer privacy ombudsman appointed in these Chapter 11 Cases pursuant to section 333 of the Bankruptcy Code (the "**CPOs**"), including any fees and expenses incurred by professionals retained or proposed to be retained by any such consumer privacy ombudsman (the "**CPO Professionals**" and, collectively with the CPOs, the Debtor Professionals, and the Committee Professionals, the "**Professional Persons**"), whether allowed by the court prior to or after delivery of a Carve Out Trigger Notice (collectively, the "**Allowed Professional Fees**"), incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and the Official Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**") at any time before or on the date of delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below); *provided* that the amounts set forth in clauses (c) and (d) shall be subject to the aggregate amounts for Professional Persons in the Approved Budget and any limits under the DIP Orders (provided, that for the avoidance of doubt, Professional Persons may carry forward or roll back budgeted but unused disbursements set forth in the Approved Budget for any week for use in any subsequent or prior week(s), as applicable) (the amounts set forth in clauses (a)-(d) being the "**Pre-Carve Out Trigger Amounts**"); and (e) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $250,000 incurred after the first day following the date of delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (e) being the "**Post-Carve Out Trigger Notice Cap**"); *provided*, *however*, that nothing in the Interim Order shall be construed to impair the ability of any party in interest (including the DIP Lender) to object to the fees, expenses, reimbursement, or compensation described in clauses (a) through (e) on any grounds.  In the event that Allowed Professional Fees exceed or are expected to exceed the amounts provided in the Approved Budget, the parties will negotiate in good faith (but without further obligation) regarding a proposed amendment to the Approved Budget to address such additional Allowed Professional Fees.  The "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to counsel to the Debtors, the U.S. Trustee, and counsel to the Official Committee (if any) with a copy to counsel to the Prepetition Notes Secured Parties, which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event or failure to meet a Milestone stating that the Post-Carve Out Trigger Notice Cap has been invoked. |

| | |
|---|---|
| **Summary of Material Terms** | |

From and after the Petition Date, the Debtors shall, on the Monday of each week, transfer cash proceeds of the DIP Facility or cash on hand into a segregated account (the "**Professional Fees Account**") in an amount equal to the fees and expenses reflected in the Approved Budget for Professional Persons for that week; *provided*, that the first such transfer shall also include any such fees and expenses reflected in the Approved Budget for any prior weeks). The Professional Fees Account, if applicable, shall be held in trust and used solely to satisfy Allowed Professional Fees; *provided*, that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Account. On the day on which a Carve Out Trigger Notice is delivered in accordance with this paragraph (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall constitute a demand to utilize all cash (including Cash Collateral) on hand as of such date, including funds in the Professional Fees Account, if applicable (net of any amounts held on retainer by any Professional Persons), and any available cash thereafter held by any Debtor to fund a reserve (the "**Pre-Carve Out Trigger Notice Reserve**") in an amount equal to the then unpaid amounts of the Pre-Carve Out Trigger Notice Amounts accrued on and prior to the Termination Declaration Date. Upon the occurrence of a Termination Declaration Date, Professional Persons shall have two business days thereafter to deliver fee statements to the Debtors' Professionals and the DIP Lender that cover such Professional Persons' reasonable good faith estimate of the Allowed Professional Fees incurred by such Professional Persons through and including the Termination Declaration Date. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors as of such date to utilize all cash (including Cash Collateral) on hand as of such date (net of any amounts held on retainer by any Professional Persons) to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**"). The Carve Out Reserves shall be deposited in the Professional Fees Account, to be held in trust, and used solely to satisfy Allowed Professional Fees benefitting from the Carve Out in accordance with the terms of the Interim Order until such Allowed Professional Fees are paid in full. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the outstanding obligations set forth in clauses (a) through (d) above (but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap), until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender for application to the DIP Obligations in accordance with the DIP Term Sheet, unless and until the DIP Obligations are Paid in Full. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the outstanding obligations set forth in clause (e) above, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender for application to the DIP Obligations in accordance with the DIP Term Sheet, unless and until the DIP Obligations are Paid in Full. Notwithstanding anything to the contrary in the Interim Order, (x) disbursements by the Debtors from the Carve Out Reserves shall not constitute loans or indebtedness under the DIP Term Sheet or the Prepetition Loan Documents or otherwise increase or reduce the DIP Obligations or the Prepetition Secured Obligations, (y) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (z) nothing contained in the Interim Order shall constitute a cap or limitation on the ability of the Professional Persons to assert a claim on account of Allowed Professional Fees that are due and payable by the Debtors.

Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out on a dollar-for-dollar basis.

Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out and the amounts required to fund the Carve Out Reserves on a dollar-for-dollar basis; *provided*, *however*, prior to repayment from the Carve Out Reserves, any retainers held by Professional Persons shall be applied to repay the obligations set forth in clauses (c) through (e) above prior to repayment of such

| Summary of Material Terms | |
|---|---|

| | obligations from the Carve Out Reserves, and, concurrent with such repayment of such obligations using such retainers, the Carve Out shall permanently be reduced on a dollar for dollar basis.<br><br>None of the DIP Lender or the Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in the Interim Order or otherwise shall be construed to obligate the DIP Lender or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.<br><br>*See* Interim Order ¶ 23. |
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i)* | **DIP Collateral**: All assets and properties of each of the DIP Loan Parties and their estates, of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, and wherever located, including, without limitation, (a) all of the DIP Loan Parties' rights, title, and interests in all Collateral" and Prepetition Collateral (including Cash Collateral) and (b) all money, cash, and cash equivalents, all funds in any deposit accounts, securities accounts, commodities accounts, or other accounts (together with any and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time), all accounts receivable and other receivables (including those generated by intercompany transactions), all rights to payment, contracts and contract rights, all instruments, documents, and chattel paper, all securities (whether or not marketable), all goods, furniture, machinery, plants, equipment, vehicles, inventory, and fixtures, all real property interests, all interests in leaseholds, all franchise rights, all patents, tradenames, trademarks, copyrights, licenses, and all other intellectual property, all general intangibles, tax or other refunds, or insurance proceeds, all equity interests, capital stock, limited liability company interests, partnership interests and financial assets, all investment property, all supporting obligations, all letters of credit and letter of credit rights, all commercial tort claims (including, for the avoidance of doubt, any Cause of Action related thereto), all books and records (including, without limitation, customers lists, credit files, computer programs, printouts, and other computer materials and records), and all rents, products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty, or guaranty payable to any DIP Loan Party from time to time with respect to any of the foregoing; *provided*, that DIP Collateral shall not include Avoidance Actions but shall include, upon the entry of the Final Order, all proceeds of and property that is recovered from or becomes unencumbered as a result of, whether by judgment, settlement, or otherwise, Avoidance Actions ("**Avoidance Action Proceeds**").<br><br>**DIP Liens**:  Shall have the following ranking and priorities (subject in all cases to the Carve Out and paragraph 10(c) of the Interim Order):<br><br>    (a)  First Priority Liens on Unencumbered Property:  Subject to the priorities set forth in Exhibit 3, attached to the Interim Order, pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected, first priority liens and security interests in all DIP Collateral that is not subject to Permitted Prior Liens (including, for purposes of this paragraph, Prepetition Liens), including, for the avoidance of doubt, subject to the Final Order, Avoidance Action Proceeds (collectively, the "**Unencumbered Property**").<br><br>    (b)  Priming DIP Liens and Junior DIP Liens:  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than as described in clause (a) above), which DIP Liens (i) shall be subject and subordinate to Permitted Prior Liens, (ii) shall be subject to the priorities set forth in |

| Summary of Material Terms |
|---|

|  |  |
|---|---|
|  | Exhibit 3 attached to the Interim Order, and (iii) shall be senior to any and all other liens and security interests in the DIP Collateral, including, without limitation, all liens and security interests in the Prepetition Collateral or any DIP Collateral (subject to the Carve Out and to the extent provided in Exhibit 3 attached to the Interim Order) that would otherwise constitute Prepetition Collateral (including, without limitation, Adequate Protection Liens (as defined below) and Prepetition Liens in Prepetition Collateral). |
|  | (c) DIP Liens Senior to Other Liens: Except to the extent expressly permitted under the Interim Order, the DIP Liens and the DIP Superpriority Claims shall not be made subject or subordinate to or *pari passu* with (i) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, including any lien, security interest, or claim granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the Debtors, (ii) any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (iii) any intercompany or affiliate claim, lien, or security interest of the DIP Loan Parties or their affiliates, or (iv) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
|  | **DIP Superpriority Claims**: Pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code, the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors in each of their respective Chapter 11 Cases and any Successor Cases on account of the DIP Obligations, with priority over any and all other administrative expense claims and all other claims against the Debtors (other than as set forth on Exhibit 3 attached to the Interim Order), now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any adequate protection claims, including the Adequate Protection Claims, and all administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507, 546, 726, 1113, or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. The DIP Superpriority Claims shall (x) for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and (y) be subject to and subordinate to the Carve Out and the relative priorities set forth in Exhibit 3 attached to the Interim Order. The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral, subject only to the Carve Out and the relative priorities set forth in Exhibit 3 attached to the Interim Order. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that the Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. |
|  | *See* Interim Order ¶¶ 6,7. |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv); Local Rule 4001-2(a)(i)(K) & (P)* | The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e) and 507 of the Bankruptcy Code, to adequate protection of their respective Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows: <br><br> (a) **Adequate Protection for Prepetition Term Loan Secured Parties**: The Prepetition Term Loan Secured Parties are hereby granted the following adequate protection of their Prepetition Term Loan Liens in the Prepetition Term Loan Collateral (including Cash Collateral): <br><br>     i. Term Loan Adequate Protection Claims: The Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, is granted, to the extent and in the amount of any Diminution in Value of the Prepetition Term Loan Liens in the Prepetition Term Loan Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors that are Prepetition Term Loan |

| | | |
|---|---|---|
| **Summary of Material Terms** | | |

Parties in each of their respective Chapter 11 Cases (the "**Term Loan Adequate Protection Claims**"), which shall be payable by each of those Debtors on a joint and several basis. The Term Loan Adequate Protection Claims shall be (1) subject and subordinate to the Carve Out and the DIP Superpriority Claims (in an aggregate amount not to exceed $1.0 million) and (2) subject to the relative priorities set forth in <u>Exhibit 3</u> attached to the Interim Order.

ii. <u>Term Loan Adequate Protection Liens</u>: The Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, is granted, effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation, or filing of any pledge, collateral, or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition Term Loan Liens in the Prepetition Term Loan Collateral, valid, binding, enforceable, and perfected postpetition liens and security interests in all DIP Collateral other than Prepetition Notes Collateral held by Debtors that are Prepetition Term Loan Parties  (the "**Term Loan Adequate Protection Liens**"). The Term Loan Adequate Protection Liens shall be (1) subject and subordinate to the Carve Out (in an aggregate amount not to exceed $1.0 million), the DIP Liens, and the Permitted Prior Liens and (2) subject to the relative priorities set forth in <u>Exhibit 3</u> attached to the Interim Order.

(b) **Adequate Protection for Prepetition Noteholders**:  The Prepetition Noteholders are hereby granted the following adequate protection of their Prepetition Notes Liens in the Prepetition Notes Collateral (including Cash Collateral):

i. <u>Notes Adequate Protection Claims</u>:  The Prepetition Noteholders are granted, to the extent and in the amount of any Diminution in Value of the Prepetition Notes Liens in the Prepetition Notes Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors in each of their respective Chapter 11 Cases (the "**Notes Adequate Protection Claims**"), which shall be payable by each of those Debtors that are guarantors of the Prepetition Notes, on a joint and several basis.  The Notes Adequate Protection Claims shall be (1) subject and subordinate to the Carve Out and the DIP Superpriority Claims and (2) subject to the relative priorities set forth in <u>Exhibit 3</u> attached to the Interim Order.

ii. <u>Notes Adequate Protection Liens</u>:  The Prepetition Noteholders are granted, effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation, or filing of any pledge, collateral, or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition Notes Liens in the Prepetition Notes Collateral, valid, binding, enforceable, and perfected postpetition liens and security interests in all DIP Collateral other than Prepetition Term Loan Collateral held by Debtors that are guarantors of the Prepetition Notes (the "**Notes Adequate Protection Liens**"). The Notes Adequate Protection Liens shall be (1) subject and subordinate to the Carve Out, the DIP Liens, and the Permitted Prior Liens and (2) subject to the relative priorities set forth in <u>Exhibit 3</u> attached to the Interim Order.

(c) **Additional Provisions Regarding Adequate Protection**: In consideration for the consent of the Prepetition Noteholders and the consent of the Required Lenders under the

| Summary of Material Terms | |
|---|---|
| | Prepetition Term Loan Credit Agreement to the use of cash collateral and the DIP Facility, and notwithstanding anything to the contrary in the Interim Order: |
| | i. the Debtors shall pay to the Prepetition Term Loan Agent, for further distribution to the Prepetition Term Loan Lenders in accordance with the Prepetition Term Loan Documents, the sum of $1.0 million upon entry of the Interim Order (the "**Consent Fee**"). The Consent Fee shall be used to (x) pay the reasonable fees and expenses (including reasonable counsel fees) of the Term Loan Agent and each Term Loan Lender incurred in connection with the negotiation and approval of the Interim Order and (y) otherwise distributed to the Term Loan Lenders in accordance with the terms of the Prepetition Term Loan Credit Agreement; |
| | ii. the DIP Liens and DIP Obligations shall be senior to the Prepetition Term Loan Liens and Prepetition Term Loan Obligations with respect to the Prepetition Term Loan Collateral only to the extent of $1.0 million (inclusive of any Carve Out applicable to the Prepetition Term Loan Collateral), and the Prepetition Term Loan Liens shall be senior to the DIP Liens with respect to the Prepetition Term Loan Collateral for all amounts in excess of $1 million; |
| | iii. the Prepetition Secured Parties and the Debtors agree that, without prejudice to the rights of other parties, 51% of the proceeds from any sale, transfer, or other disposition of the assets that are the subject of the CBM Stalking Horse Bid (pursuant to the CBM Stalking Horse Bid or otherwise) shall be allocated to the Prepetition Term Loan Collateral (with the Consent Fee credited against such amount), with the remaining 49% allocated to the Prepetition Notes Collateral; and |
| | iv. subject to entry of the Final Order, the Debtors shall not recover (or seek to recover) more than $75,000 of the reasonable and necessary costs of preserving or disposing the Prepetition Term Loan Collateral pursuant to section 506(c) of the Bankruptcy Code, with any amount in excess thereof being waived. |
| | *See* Interim Order ¶ 10. |
| **Marshalling**<br><br>*Local Rule 4001-2(a)(i)(X)* | In no event shall the DIP Lender or Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Obligations, and all proceeds of the DIP Collateral shall be received and applied in accordance with the Interim Order (including <u>Exhibit 3</u> attached to the Interim Order) and the DIP Term Sheet; *provided*, that the foregoing shall be subject to the terms of the Final Order granting such relief.<br><br>*See* Interim Order ¶ 27. |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii); Local Rule 4001-2(a)(i)(B)* | **Stipulations, Releases and Acknowledgements Regarding DIP Lender**:<br>(a) <u>No Control</u>: The DIP Lender does not control the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims (as defined below), the DIP Collateral, the DIP Obligations, the DIP Term Sheet, or the transactions contemplated thereunder.<br>(b) <u>No Claims, Defenses, or Causes of Action</u>: As of the date of entry of the Interim Order, there exist no claims, defenses, or any other Cause of Action of any nature or description whatsoever that may be asserted by the Debtors, their respective estates, predecessors, successors, and assigns, against the DIP Lender or its current, former, and future affiliates, subsidiaries, funds or managed accounts, officers, directors, managers, members, equity holders, partners, principals, employees, representatives, agents, attorneys, advisors, consultants, and other professionals, and the predecessors in interest, successors, and |

| | |
|---|---|
| | **Summary of Material Terms** |

assigns of each of the foregoing (collectively, the "**Representatives**"), in their capacities as such, in each case, arising from, in connection with, or related to the Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Term Sheet, or the transactions contemplated thereunder.

(c) Releases:  Effective as of the date of entry of the Interim Order, the Debtors, on behalf of themselves and their respective estates, to the maximum extent permitted by applicable law, absolutely, unconditionally, and irrevocably release and forever discharge and acquit the DIP Lender and its Representatives (in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors, and assigns at any time had, now have, or that their successors and assigns may have against the DIP Lender and its Representatives for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time prior to the date of the Interim Order, in each case, arising under, in connection with or related to the Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Term Sheet or the transactions contemplated thereunder, including, without limitation, (i) any claim or Cause of Action seeking avoidance, whether under chapter 5 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute, common law or otherwise ("**Avoidance Actions**"), (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or Causes of Action arising under the Bankruptcy Code, (iv) any claims or Causes of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge, recovery, or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to the Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Term Sheet or the transactions contemplated thereunder, or (v) any claim or Cause of Action with respect to the validity, enforceability, extent, amount, perfection, or priority of the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Term Sheet, or the transactions contemplated thereunder; *provided*, *however*, that nothing contained in subparagraph E(c) of the Interim Order shall relieve the DIP Lender from fulfilling any of their commitments under, and in accordance with, the DIP Term Sheet.

**Stipulations, Releases and Acknowledgements Regarding Prepetition Secured Parties**: Subject to the expiration of the Challenge Deadline:

(a) Validity and Enforceability of Prepetition Secured Obligations and Prepetition Liens:  As of the Petition Date, (i) the Prepetition Liens in the Prepetition Collateral (1) have been properly recorded and were valid, binding, enforceable, non-avoidable, and fully perfected liens and security interests in the Prepetition Collateral, (2) were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or the financial commitments and other financial accommodations or consideration secured or obtained thereby, (3) with respect to the Prepetition Term Loan Liens, are senior with priority over any and all other liens on or security interests in the Prepetition Term Loan Collateral, subject only to liens and security interests that were expressly permitted to be incurred under the Prepetition Term Loan Documents, and (4) with respect to the Prepetition Notes Liens, are senior with priority over any and all other liens on or security interests in the Prepetition Notes Collateral, subject only to liens and security interests that were expressly permitted to be incurred under the Prepetition Notes Documents (solely, in each case of clauses (3) and (4), to the extent such permitted liens and security interests were (A) in existence on the Petition Date, (B) valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), and (C) senior in priority to the applicable Prepetition Liens), (ii) the

| Summary of Material Terms |
|---|

Prepetition Secured Obligations constitute legal, valid, non-avoidable, and binding obligations of each of the applicable Prepetition Loan Parties, enforceable in accordance with the terms of the applicable Prepetition Loan Documents (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); (iii) no portion of the Prepetition Liens or the Prepetition Secured Obligations, and no payments made at any time to any of the Prepetition Secured Parties, is subject to any contest, attack, objection, challenge, defense, claim, counterclaim, or Cause of Action, including, without limitation, any Avoidance Action or any claim or Cause of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery, or any other claim or Cause of Action of any nature or description, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation, or otherwise, in each case, that may be asserted by the Debtors, their respective estates or any other person or entity; and (iv) the Prepetition Secured Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code against each of the Prepetition Loan Parties and their respective estates.

(b) Intercreditor or Subordination Agreements:  Pursuant to section 510(a) of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents (if any), (i) shall remain in full force and effect, (ii) continue to govern the relative obligations, priorities, rights, and remedies of the Prepetition Secured Parties with respect to any shared or common Prepetition Collateral, and (iii) shall not be deemed to be amended, altered, or modified by the terms of the Interim Order except to the extent expressly set forth in the Interim Order.

(c) No Claims, Defenses, or Causes of Action.  As of the date hereof, there exist no claims, defenses, or any other Cause of Action of any nature or description whatsoever that may be asserted by the Debtors, their respective estates, predecessors, successors, and assigns, against any of the Prepetition Secured Parties or any of their respective Representatives, in each case, arising from, in connection with, or related to the Interim Order, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents, or the Prepetition Collateral.

(d) Releases:  Effective as of the date of entry of the Interim Order, on behalf of themselves and their respective estates, to the maximum extent permitted by applicable law, hereby absolutely, unconditionally, and irrevocably release and forever discharge and acquit the Prepetition Secured Parties and each of their respective Representatives (in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors and assigns at any time had, now have, or that their successors and assigns may have against any of the Prepetition Secured Parties and their respective Representatives for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time prior to the date of the Interim Order, in each case, arising under, in connection with, or related to the Interim Order, the Prepetition Loan Documents, the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations, or the transactions contemplated thereunder or hereunder, including, without limitation, (i) Avoidance Actions, (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or Causes of Action arising under the Bankruptcy Code, or (iv) any claims or Causes of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge, recovery, or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to the Interim Order, the Prepetition Loan Documents, the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations, or the transactions contemplated thereunder or hereunder.

(e) Cash Collateral:  Any and all of the DIP Loan Parties' cash, whether existing on the Petition Date or thereafter, wherever located (including, without limitation, all cash, cash

| Summary of Material Terms | |
|---|---|
| | equivalents, and other amounts on deposit or maintained by the DIP Loan Parties in any accounts with any depositary institution), whether as original Prepetition Collateral, arising from the sale or other disposition of Prepetition Collateral, or proceeds of other Prepetition Collateral, or cash, rents, income, offspring, products, proceeds, or profits generated from the Prepetition Collateral, constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"). |
| | The "**Challenge Deadline**" means the date that is the earlier of (a) confirmation of any chapter 11 plan of reorganization in these bankruptcy cases, (b)(i) as to any Official Committee, 90 calendar days after the appointment of the Official Committee (if any) and (2) as to any party in interest with requisite standing other than the Official Committee (if any), 105 calendar days after the entry of the Interim Order, (c) as to each of the Prepetition Loan Documents, such later date as has been agreed to, in writing, by the requisite Prepetition Secured Parties, as applicable, under the applicable Prepetition Loan Documents solely with respect to the Challenges pertaining to such Prepetition Loan Document, and (d) any such later date as has been ordered by the Court, for cause shown, upon a motion filed and served within the time period set forth in clause (b). |
| | *See* Interim Order ¶ E, F, 24. |
| **Waiver or Modification of Automatic Stay** *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The automatic stay imposed by section 362(a) of the Bankruptcy Code is vacated and modified, without further notice to or order of this Court, to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Lender may request to assure the perfection and priority of the DIP Liens; (b) the DIP Loan Parties to incur all liabilities and obligations, including all of the DIP Obligations, to the DIP Lender as contemplated under the Interim Order and the DIP Term Sheet; (c) the DIP Loan Parties to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such acts as the Prepetition Agents may request to assure the perfection and priority of the Adequate Protection Liens; (d) the DIP Loan Parties to incur all liabilities and obligations, including all Adequate Protection Obligations, to the Prepetition Secured Parties as contemplated under the Interim Order and the applicable Prepetition Loan Documents; (e) the DIP Loan Parties to pay all amounts required under the Interim Order and under the DIP Term Sheet; (f) the DIP Lender to retain and apply payments made in accordance with the terms of the Interim Order and the DIP Term Sheet; (g) subject to paragraph 20(b) of the Interim Order, the DIP Lender to exercise, upon the occurrence and during the continuance of any DIP Termination Event, all rights and remedies provided for in the Interim Order, the DIP Term Sheet, or applicable law; (h) to perform under the Interim Order and the DIP Term Sheet, and to take any and all other actions that may be required, necessary, or desirable for the performance by the Debtors under the Interim Order and the DIP Term Sheet and the implementation of the transactions contemplated thereunder; and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of the Interim Order and the DIP Term Sheet. *See* Interim Order ¶ 14. |
| **Milestones** *Fed. R. Bankr. P. 4001(c)(1)(B)(vi); Local Rule 4001-2(i)(a)(H)* | Annex A of the Interim Order contains the following Milestones: (a) No later than 17 calendar days after the Petition Date, the Court shall have entered an order approving the bid procedures (the "**Bid Procedures Order**") for the sale of all or substantially all of the Debtors' assets (such assets, the "**Acquired Assets**"), which order shall be in form and substance acceptable to the DIP Lender in its sole discretion; (b) No later than 28 calendar days after the Petition Date, the Debtors shall commence one or more auctions for the Acquired Assets, in accordance with the Bid Procedures; *provided* that if there is no higher or better offer submitted in comparison to the Stalking Horse Bids for the acquisition of the applicable Acquired Assets in accordance with the Bid Procedures, no auction shall be held with respect to such Acquired Assets; (c) No later than 35 calendar days after the Petition Date: i. the Court shall have entered the Final Order, subject to the availability of the Court to conduct a Final Hearing on the DIP Facility; |

| Summary of Material Terms | |
|---|---|
| | ii. the Court shall have entered one or more orders approving the winning bid(s) and the ultimate sale of the applicable Acquired Assets, which order or orders shall be in form and substance acceptable to the DIP Lender in its sole discretion; and<br>iii. the Debtors shall have consummated the sale of the Acquired Assets to one or more Successful Bidders and/or Backup Bidders.<br><br>*See* Interim Order, Annex A. |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The Borrower shall indemnify, pay, and hold harmless the DIP Lender (and its directors, officers, members, employees, and agents) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the bad faith, gross negligence, willful misconduct, or fraud of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).<br><br>*See* DIP Term Sheet, "Other Bankruptcy Matters." |
| **Section 506(c) Waiver**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(C)* | Except to the extent of the Carve Out or as provided in the Interim Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Lender or the Prepetition Secured Parties, respectively, upon the DIP Collateral or the Prepetition Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to the DIP Lender, or the Prepetition Collateral as to the Prepetition Secured Parties, where pursuant to section 506(c) of the Bankruptcy Code, any other legal or equitable doctrine (including unjust enrichment) or otherwise, without the prior written consent of the DIP Lender with respect to the DIP Collateral, or the requisite Prepetition Secured Parties under the Prepetition Loan Documents with respect to the Prepetition Term Loan Collateral, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in the Interim Order (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the DIP Lender, or any of the Prepetition Secured Parties; *provided*, that the foregoing shall be subject to the terms of the Final Order granting such relief.<br><br>*See* Interim Order ¶ 26. |
| **Liens on Avoidance Actions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(U)* | Subject to the entry of the Final Order granting such relief, liens are granted on proceeds or property recovered from Avoidance Actions (but not the Avoidance Actions themselves).<br><br>*See* Interim Order ¶ 6(b). |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1); Local Rule 4001-2(a)(i)(B)* | The Debtors are authorized and directed to pay, as and when due, any and all (a) fees, premiums or other payments payable under the DIP Term Sheet (including, without limitation, the Upfront Fee and the Exit Fee), and in any separate letter agreements between any of the Debtors, on the one hand, and the DIP Lender, on the other hand, including, without limitation, put option premiums, commitment payments, unused facility payments, early termination, prepayment or exit payments, unused facility payments, administrative agent's, collateral agent's or trustee's fees, or other amounts referred to therein.<br><br>*See* Interim Order ¶ 2.<br><br>**Upfront Fee**: 3.00% on the total DIP Commitment, earned, non-refundable, and allowed upon the entry of the Interim Order (the "**Upfront Fee**"). The Upfront Fee will be paid in kind by adding such Upfront Fee to the principal amount of the DIP Loans. |

| Summary of Material Terms | |
|---|---|
| | **Exit Fee**: 6.00% on the total DIP Commitment, earned, non-refundable, and allowed upon the entry of the Interim Order (the "**Exit Fee**"). The Exit Fee will be paid in cash upon the repayment of the DIP Loans, the termination of the DIP Commitments, or upon the acceleration of the DIP Loans following an Event of Default. <br><br> *See* DIP Term Sheet, "Fees." |
| **Cross-Collateralization** <br><br> *Local Rule 4001-2(a)(i)(N)* | None. |
| **Provisions Governing Joint Liability** <br><br> *Local Rule 4001-2(a)(i)(J)* | Nothing in the Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for all obligations (including all DIP Obligations and all Adequate Protection Obligations) under the Interim Order and the DIP Term Sheet. <br><br> *See* Interim Order ¶ 37. |

## PREPETITION CAPITAL STRUCTURE

18.    *Prepetition Term Loan Facility*.  Debtor CareerBuilder, LLC is the borrower under that certain *Amended and Restated First Lien Credit Agreement*, dated as of April 19, 2023, with Wilmington Trust, N.A. as administrative agent (the "**Prepetition Term Loan Agent**") and other entities party thereto (as amended, supplemented, or modified from time to time, the "**Prepetition Term Loan Credit Agreement**," such facility, the "**Prepetition Term Loan Facility**," and the lenders under such facility, the "**Prepetition Term Loan Lenders**").  Debtors Camaro Acquisition LLC, CareerBuilder Government Solutions LLC, and Luceo Solutions LLC (collectively with CareerBuilder, LLC, the "**Prepetition Term Loan Parties**") are guarantors under the Prepetition Term Loan Credit Agreement.  The Prepetition Term Loan Facility matures on July 31, 2026.  The Prepetition Term Loan Facility is secured by substantially all assets of the Prepetition Term Loan Parties, subject to customary exceptions.  As of May 31, 2025, the amount outstanding under the Prepetition Term Loan Facility is approximately $135.2 million.

19.    *Prepetition Notes*.  Debtor Zen JV, LLC is the issuer under (a) that certain *Amended and Restated Senior Secured Note*, dated as of December 27, 2024, (b) that certain *Amended and*

*Restated Additional Senior Secured Note*, dated as of February 20, 2025, and (c) that certain *Amended and Restated Third Senior Secured Note*, dated as of December 27, 2024 (collectively, as amended, supplemented, or modified from time to time, the "**Prepetition Notes**" and, the holders of such notes, the "**Prepetition Noteholders**").   Debtors Monster Worldwide LLC, Military Advantage LLC, FastWeb LLC, and Monster Government Solutions LLC are guarantors under the Prepetition Notes (collectively with Zen JV, LLC, the "**Prepetition Notes Loan Parties**").  The Prepetition Notes mature on July 31, 2026 and September 16, 2029 (depending on the tranche).  The Prepetition Notes are secured by substantially all assets of the Prepetition Notes Loan Parties, subject to customary exceptions.  As of May 31, 2025, the amount outstanding under the Prepetition Notes is approximately $226.1 million.

20.     The Debtors also have approximately $31.2 million in other debt obligations, such as unsecured trade claims.  The Debtors' prepetition debt is summarized as follows:

|  | Approx. Amount Outstanding | Maturity Date |
|---|---|---|
| **Prepetition Term Loan Facility** | $135.2 million | July 31, 2026 |
| **Prepetition Notes** | $19.2 million | July 31, 2026 |
|  | $206.9 million | Sept. 16, 2029 |
| *Total Funded Debt* | **$361.3 million** | |
| *General Unsecured Debt* | **$31.2 million** | |
| *Total Debt* | **$392.5 million** | |

## LIQUIDITY NEEDS AND FINANCING EFFORTS

**I.    DEBTORS HAVE IMMEDIATE NEED TO ACCESS PROPOSED DIP FACILITY AND USE CASH COLLATERAL**

21.    Before the commencement of the Chapter 11 Cases, the Debtors, in consultation with their advisors, implemented internal cost reductions and carefully considered a number of other potential options to conserve capital and improve liquidity.  Ultimately, such measures were insufficient and the Debtors' best financing source now (with only $2.2 million of cash on hand) is the proposed DIP Facility.  The Debtors believe that even with unrestricted access to Cash Collateral, they require an immediate capital infusion in the form of the proposed DIP Facility in order to preserve their estates for the benefit of all stakeholders.  As the Debtors' financial forecasts and the Initial Budget reveal, the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs, working capital needs, and the projected costs of these Chapter 11 Cases absent immediate funding.

22.    The Debtors have a critical need to use the proposed DIP Facility proceeds and the Cash Collateral to preserve the value of their assets.  The Debtors' business requires cash to satisfy unavoidable obligations to vendors and employees.  Access to the proposed DIP Facility and the Cash Collateral will provide the Debtors with immediate access to liquidity, which will permit the Debtors to:  (a) preserve their customer relationships for stalking horse bidders and potential buyer(s) during these Chapter 11 Cases; (b) fund payments to their remaining workforce; (c) pay and continue to maintain relationships with their vendors and suppliers at the planned reduced level of activity; (d) fund other general corporate purposes; (e) fund the payments authorized by the Court pursuant to the "first day motions" filed contemporaneously with the DIP Motion; (f) operate the Cash Management System as described in the Cash Management Motion; and (g) satisfy administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases.

23.    The Debtors have worked closely with their advisors to evaluate their cash requirements for their businesses.  As part of such evaluation, the Debtors and their advisors reviewed and analyzed the Debtors' near-term weekly and long-term cash flow forecasts and prepared the Initial Budget.  These forecasts consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest associated with postpetition financing, professional fees, and customer and vendor obligations, as well as the expected operational performance of the Debtors' businesses and the cost of the proposed DIP Facility.  The Debtors believe that the Initial Budget provides an accurate reflection of the Debtors' funding requirements over the identified period and is reasonable and appropriate under the circumstances.

24.    Ultimately, in order to pursue a value-maximizing chapter 11 process, the Debtors require sufficient funding to administer the Chapter 11 Cases and, absent immediate access to the proposed DIP Facility, the Debtors will be forced to consider conversion to a chapter 7 proceeding, which would likely result in all Stalking Horse APAs (as defined in the DIP Term Sheet) being terminated, destroying significant value for these estates.  Accordingly, immediate access to the proposed DIP Facility is essential so the Debtors can best maximize value for all stakeholders.  To avoid those outcomes, it is imperative that the Debtors have access to the proposed DIP Facility from the outset of these cases in order to signal to the Debtors' stakeholders, including their employees, potential bidders, and customers, that they have the liquidity necessary to proceed over a competitive 363 sale process.

II.    **PROPOSED DIP FACILITY REPRESENTS BEST POSTPETITION FINANCING OPTION CURRENTLY AVAILABLE TO DEBTORS UNDER CIRCUMSTANCES**

25.    Given the Debtors' prepetition capital structure and the challenges facing their business, the proposed DIP Facility (including the Adequate Protection Consent Agreement) represents the best available postpetition financing option.

26.    Concurrently with the Debtors' prepetition sale process, the Debtors' financial advisor, AlixPartners LLP ("**AlixPartners**"), solicited interest in potential postpetition financing from an extensive set of prospective lenders, including existing creditors and third parties.  In total, AlixPartners contacted 20 potential lenders and held initial calls with over 17 of such parties. Thereafter, seven potential lenders executed non-disclosure agreements and received confidential information through access to a virtual data room.  However, the Debtors only received two initial proposals for postpetition financing, one of which was from a third-party bidder and the other of which was from Blue Torch.  After engaging in multiple rounds of discussions with both potential financing partners and carefully considering each proposal, the Debtors ultimately determined that only the proposal submitted by Blue Torch was actionable.  The other proposal was significantly less attractive because it was subject to substantial financing contingency and execution risk.

27.    Following the Debtors' receipt of an initial term sheet from Blue Torch on June 15, 2025, the Debtors and their advisors engaged in significant negotiations with Blue Torch, including the exchanges of several drafts of term sheets and key documents.  Shortly after the Debtors filed their chapter 11 petitions, as the Debtors endeavored to finalize the terms of a proposed $16.5 million postpetition financing package with Blue Torch, the Debtors received a $20 million proposal from the DIP Lender to provide postpetition financing on more favorable terms.

28.    The Debtors commenced discussions with the DIP Lender in earnest and ultimately secured the DIP Lender's commitment to provide the DIP Financing pursuant to the DIP Term

Sheet.   Throughout this process, both the Debtors and the DIP Lender were represented by experienced advisors, all participating in arm's-length negotiations.   The proposed DIP Facility is the product of hard-fought and good-faith negotiations and, taken as a whole, is reasonable and fair under the present circumstances of these Chapter 11 Cases.   The proposed DIP Facility offers terms more favorable than the proposal from Blue Torch (including, among other thing, greater loan commitments, a lower interest rate, lesser fees, a longer tenor, fewer milestones, less onerous financial covenants, fewer conditions precedent to lending, and more relaxed reporting obligations) and is the best financing option available.

29.     During AlixPartner's discussions with prospective lenders, a handful of concerns were consistently voiced, including:  (a) the size of the proposed postpetition financing not meeting such lenders' minimum investment hurdles; (b) the potential return as measured as a multiple on invested capital was too low for such lenders given the short tenor of the proposed postpetition financing; and (c) the speed of the Debtors' process to file for chapter 11 precluded the normal amount of diligence such lenders would normally perform on the sales process, the stalking horse bidders, and the Company's underlying assets and business.  Further, no prospective financing partner, including the DIP Lender, would agree to:  (a) provide postpetition financing on an unsecured, junior-lien, or *pari passu* basis to the Prepetition Secured Parties or (b) otherwise refinance the Prepetition Secured Debt.  In addition, the Debtors have few, if any, unencumbered assets which could otherwise be used to collateralize postpetition financing.

30.     Ultimately, the Debtors and their advisors believe the proposed DIP Facility, which provides up to $20.0 million in postpetition financing for the Debtors' estates, is on terms that were negotiated and are, taken as a whole, reasonable and fair and is thus the best postpetition financing option currently available to the Debtors under the circumstances.

## BASIS FOR RELIEF REQUESTED

**I.    DEBTORS SHOULD BE AUTHORIZED TO ACCESS PROPOSED DIP FACILITY**

31.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

32.    In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (a) the debtor obtains the consent of such parties or (b) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1).    Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

33.    In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors including whether:

> a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.    the credit transactions are necessary to preserve assets of the estate;

      c.      the terms of the credit agreement are fair, reasonable, and adequate;

      d.      the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

      e.      the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d) of the Bankruptcy Code).

34.    No lender, including the DIP Lender, ultimately agreed to:  (a) provide postpetition financing on an unsecured, junior-lien, or *pari passu* basis to the Prepetition Secured Parties or (b) otherwise refinance the Prepetition Secured Debt.  Accordingly, the Debtors believe that, given the Debtors' circumstances, the proposed DIP Facility with the DIP Lender is the Debtors' best source for the liquidity they need to navigate the chapter 11 process and position themselves to run a value-maximizing transaction process.

35.    Absent the proposed DIP Facility, which will provide the Debtors with access to liquidity to administer the Chapter 11 Cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Without postpetition financing, the Debtors lack sufficient funds to continue operations, pay their debts as they come due, and cover the projected costs of the Chapter 11 Cases.  In addition, the Prepetition Secured Parties support the priming of their Prepetition Liens in exchange for a favorable adequate protection package.

36.    Under the circumstances, the Debtors believe that the terms of the proposed DIP Facility, taken as a whole, are fair and reasonable.  For the reasons discussed herein, including,

among other things, the terms of the proposed DIP Facility, the unavailability of alternative sources of financing on more favorable terms than the proposed DIP Facility, and the Prepetition Secured Parties' consent to the proposed DIP Facility, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

### A. Debtors Cannot Obtain Postpetition Financing on More Favorable Terms

37.     In demonstrating that credit is not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) of the Bankruptcy Code to obtain less onerous terms where debtor approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (holding "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (holding the debtor satisfied its burden to show an inability to obtain credit on other terms through its time and effort spent trying to obtain credit on alternative terms and conditions).

38.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

39.     Given their current financial condition and capital structure, the Debtors were unable to identify alternative sources of interim and long-term financing on terms more favorable than the proposed DIP Facility, and were not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.

40.     Among other issues, the Debtors have few, if any, unencumbered assets which could otherwise be used to collateralize postpetition financing.  Such unencumbered assets are insufficient to secure the magnitude of financing required to meet the Debtors' working capital needs.  The Debtors believe that new credit is unavailable to the Debtors without providing the DIP Superpriority Claims and the DIP Liens on the DIP Collateral, as provided in the DIP Term Sheet and the DIP Orders.

**B.     Proposed DIP Facility Is Necessary to Preserve Value of Debtors' Estates**

41.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize the value of their estates.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).  The Proposed DIP Facility, if approved, will provide working capital critical to funding the Debtors' day-to-day operations and the Chapter 11 Cases, which provide a path for the Debtors to sell their assets pursuant to section 363 of the Bankruptcy Code.  Without access to the Proposed DIP Facility, immediate and irreparable harm to Debtors would occur since the Debtors would also be unable to administer their Chapter 11 Cases or seek a value maximizing transaction.  As noted above, the Proposed DIP Facility will allow the Debtors to, among other things:  (a) preserve their customer relationships for the stalking horse bidders and potential buyer(s) during these Chapter 11 Cases; (b) fund payments to their remaining workforce; (c) pay and continue to maintain relationships with their vendors and suppliers at the planned reduced level of activity; (d) operate the Cash Management System as described in the Cash Management Motion; and (e) satisfy administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases,

each of which is essential to the Debtors' continued viability and to maximizing the value of the Debtors' estates through planned sales. Because the Debtors' available and projected Cash Collateral is insufficient to preserve and maximize the value of their assets, the credit to be provided under the proposed DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

### C. Terms of Proposed DIP Facility Are Fair, Reasonable, and Adequate Under Circumstances

42.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender. *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (stating that approval of postpetition financing requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See Transcript of Record* at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [postpetition financing] pricing terms are, I find the provisions [of a postpetition financing that included a roll-up of prepetition secured debt] reasonable here and now.").

43.     As described above, the Debtors require immediate access to additional financing to fund the Chapter 11 Cases. Moreover, prior to the Petition Date, the Debtors solicited interest in potential postpetition financing from an extensive set of prospective lenders. Ultimately, the Debtors engaged with the DIP Lender and successfully negotiated the proposed DIP Facility. The

Debtors believe that the economic terms of the proposed DIP Facility: (a) were the subject of arm's-length negotiations with the DIP Lender; (b) are an integral component of the overall terms of the proposed DIP Facility; and (c) were required by the DIP Lender as consideration for the proposed DIP Facility. The Debtors and DIP Lender focused on the DIP size necessary to fund these Chapter 11 Cases and run a fulsome process for sales of all or substantially all of the Debtors' assets to third party bidders pursuant to section 363 of the Bankruptcy Code. The DIP Lender ultimately agreed to provide the proposed DIP Facility, in accordance with the terms and conditions set forth in the DIP Term Sheet and the DIP Orders.

44.    The Debtors believe the DIP Lender agreed to provide the DIP Loans with the specific intent to both fully fund the Debtors' chapter 11 proceeding while simultaneously keeping the postpetition financing narrowly tailored to meet the Debtors' needs at appropriate times. The DIP Lender and the Debtors, along with their advisors, extensively negotiated the terms of the proposed DIP Facility. Such negotiations included exchanges of several drafts of key documents, including the proposed Interim Order and the DIP Term Sheet, between the parties, as well as extensive discussions both amongst key principals and advisors. As discussed above, after significant negotiations, the Debtors and the DIP Lender ultimately agreed to a postpetition financing package on terms substantially more favorable to the Debtors than their only other alternative, including in terms of size, tenor, pricing, covenants, and reporting obligations. Accordingly, the Debtors, as well as their Board and independent Strategic Review Committee, believe that the terms of the proposed DIP Facility, including the fees and conditions contained therein, represent the best available terms for the Debtors.

45.    Given the Debtors' urgent need to obtain financial stability for the benefit of all parties in interest, the terms of the proposed DIP Facility are fair, appropriate, reasonable, and in

the best interests of the Debtors, their estates, and their creditors.  The DIP Term Sheet and Interim

Order were negotiated extensively by the Debtors and the DIP Lender, in good faith and at arm's-

length as required by section 364(e) of the Bankruptcy Code, with all parties represented by

experienced advisors.

### D. Entry into DIP Term Sheet Reflects Debtors' Reasonable Business Judgment

46. A debtor's decision to enter into a postpetition lending facility under section 364 of

the Bankruptcy Code is governed by the business judgment standard.  *See In re Trans World*

*Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable

facility and asset based facility were approved because they "reflect[ed] sound and prudent

business judgment reasonable under the circumstances and in the best interests of TWA and its

creditors"); *Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's

discretion under section 364 is to be utilized on grounds that permit reasonable business judgment

to be exercised so long as the financing agreement does not contain terms that leverage the

bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit

parties in interest"); *Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S.

523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business

judgments should be left to the board room and not to the Court."); *In re Lifeguard Indus., Inc.*, 37

B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

47. Bankruptcy courts typically defer to the debtors' business judgment on the decision

to borrow money unless such decision is arbitrary and capricious.  *See In re Trans World Airlines,*

*Inc.*, 163 B.R. at 974.  In fact, "[m]ore exacting scrutiny would slow the administration of the

debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private

control of administration of the estate and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

48.     The Debtors submit that the entry into the proposed DIP Facility is a reasonable exercise of their business judgment because, among other things, the proposed DIP Facility is the best postpetition financing available to the Debtors, was negotiated at arm's-length, represents fair terms under the circumstances, and provides the Debtors with desperately needed liquidity not otherwise available.

### E.    Proposed Adequate Protection Is Appropriate

49.     To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a postpetition lending facility. Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief.   What constitutes adequate protection must be decided on a case-by-case basis.  *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

50.     The proposed adequate protection provided to the Prepetition Secured Parties comprises the following, in each case as set forth in greater detail in the Interim Order and subject to the terms therein:    (a) superpriority administrative expense claims as provided by section 507(b) of the Bankruptcy Code against each of the Debtors that are guarantors under the Prepetition Term Loan Facility or the Prepetition Notes, as applicable, immediately junior to the

claims of the DIP Lender and the Carve-Out; (b) a perfected security interest in and lien on the DIP Collateral (other than Prepetition Notes Collateral or Prepetition Term Loan Collateral, as applicable) held by each of the Debtors that are guarantors under the Prepetition Term Loan Facility or the Prepetition Notes, as applicable, which shall be immediately junior in priority (except as set forth in the Interim Order) to the DIP Liens, the Carve Out, and Permitted Prior Liens (as defined in the Interim Order) but with priority over all other liens on the applicable DIP Collateral; and (c) certain fees and proceeds from the disposition of certain Prepetition Collateral pursuant to the terms of the Interim Order.

51.     The adequate protection provided to the Prepetition Secured Parties, as described above, is consensual and appropriately safeguards the Prepetition Secured Parties from the diminution in the value (if any) of their interests in the Prepetition Collateral.  The provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**F.     Debtors Should Be Authorized to Pay Fees and Payments Required by DIP Lender Under DIP Term Sheet**

52.     In addition to the various reimbursement obligations specified under the DIP Term Sheet and the Interim Order, the Debtors have agreed, subject to Court approval, to pay certain fees and other payments to the DIP Lender.  In particular, as noted above, the Debtors have agreed to pay to the DIP Lender the following fees:  (a) an upfront fee equal to 3.00% of the total DIP Commitments, due and payable in kind to the DIP Lender, earned, non-refundable, and allowed upon entry of the Interim Order and (b) an exit fee equal to 6.00% of the total DIP Commitments, payable in cash, earned, non-refundable, and allowed upon entry of the Interim Order upon the repayment or termination of the DIP Facility or acceleration of the DIP Loans.

53.     It is understood and agreed by all parties, including the Debtors, that such fees are an integral component of the overall terms of the proposed DIP Facility and were required by the DIP Lender as consideration for the extension of postpetition financing after arm's-length and good faith negotiations.  Accordingly, the Court should authorize the Debtors to pay the fees to the DIP Lender.

## II.    APPROVAL OF USE OF CASH COLLATERAL IS APPROPRIATE

54.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

55.     The Debtors have an urgent need for the immediate use of the Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Term Sheet.  The Debtors need the Cash Collateral to pay operating expenses, as well as fund the Chapter 11 Cases so they can pursue a value-maximizing chapter 11 process.  Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

56.     The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable. Furthermore, the Prepetition Secured Parties consented (or is deemed to consent) to the Debtors' use of the Cash Collateral subject to the terms and conditions of the DIP Term Sheet and the DIP Orders.  Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Term Sheet and the DIP Orders.

### III.    DIP LENDER SHOULD BE DEEMED GOOD-FAITH LENDERS

57.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

58.    The DIP Term Sheet and the Interim Order are the result of:  (a) the Debtors' reasonable judgment that the DIP Lender provided the best postpetition financing alternative available under the circumstances and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lender.  The Debtors submit that the terms and conditions of the DIP Term Sheet and the Interim Order are reasonable under the circumstances, and the proceeds of the proposed DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections thereby.

### IV.    MODIFICATION OF AUTOMATIC STAY

59.    The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent set forth in the Interim Order and necessary to permit the Debtors and their affiliates, the DIP Lender, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order, the DIP Term Sheet, and, upon entry, the Final Order and to deliver any notices of termination described below

and as further set forth in the Interim Order.  However, the DIP Lender must provide the Debtors and various other parties with five business days' notice before exercising any enforcement rights or remedies in respect of their collateral.  During such period, the Debtors and other parties in interest may contest whether a DIP Termination Event (as defined in the Interim Order) has occurred and is continuing.

60.    Stay modification provisions of this sort are common features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the DIP Term Sheet and the Interim Order and Final Order.

## V.    APPROVAL OF INTERIM RELIEF

61.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2); (c)(2).

62.    As described above, with only $2.2 million of cash on hand, the Debtors have an urgent and immediate need for cash in order to pay employees and to satisfy the general costs of these cases, so that the Debtors can continue with their sale efforts and consummate either their three stalking horse bids or any better bids.  Failure to receive approval of the DIP Facility would likely result in conversion to a chapter 7 proceeding.  Given the immediate and irreparable harm to be suffered by the Debtors, their estates, and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing (the "**Interim Hearing**") that is as soon as practicable to consider the interim relief requested in this Motion.

## VI.     REQUEST FOR FINAL HEARING

63.     The Interim Order requires that a final order approving this Motion be entered within 30 days after the Petition Date.  As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 30 days following the Petition Date, and fix the time and date before the Final Hearing for parties to file objections to this Motion.

### BANKRUPTCY RULE 6003 HAS BEEN SATISFIED
### AND BANKRUPTCY RULE 6004 SHOULD BE WAIVED

64.     Certain aspects of the relief requested herein may, if granted, be subject to Bankruptcy Rule 6003, which governs the availability of certain types of relief within 21 days after the Petition Date.  Pursuant to Bankruptcy Rule 6003, a court may grant such relief if it is necessary to avoid immediate and irreparable harm.  The Debtors submit that the facts set forth herein and in the Declarations demonstrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and, thus, Bankruptcy Rule 6003 has been satisfied.

65.     Additionally, to the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), to the extent not satisfied, and of the 14-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their business and preserve the value of their estates.  Accordingly, the Debtors submit that the requested waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the 14-day stay imposed by Bankruptcy Rule 6004(h) is appropriate.

## RESERVATION OF RIGHTS

66.     Nothing contained herein is or should be construed as:  (a) an admission as to the validity of any claim against the Debtors or the existence of any lien against the Debtors' property; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (f) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the DIP Orders once entered.  Nothing contained in the DIP Orders will be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

## NOTICE

67.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware, (b) the holders of the 30 largest unsecured claims against the Debtors, (c) Norton Rose Fulbright US LLP and Young Conaway Stargatt & Taylor LLP, as counsel to the DIP Lender, (d) Seward & Kissel LLP, as counsel to the Prepetition Term Loan Agent, (e) Schulte Roth & Zabel LLP, as counsel to the Required Prepetition Term Loan Lenders, (f) Jones Day, as counsel to the Prepetition Noteholders, (g) the United States Attorney's Office for the District of Delaware, (h) the Internal Revenue Service, (i) the state attorneys general for states in which the Debtors conduct business, and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, the Debtors will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m).  The Debtors believe that no further notice is required.

WHEREFORE the Debtors respectfully request entry of the DIP Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 26, 2025
      Wilmington, Delaware

**LATHAM & WATKINS LLP**

Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:  ray.schrock@lw.com
        candace.arthur@lw.com

- and -

Jonathan C. Gordon (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
Email:  jonathan.gordon@lw.com

*/s/ Zachary I. Shapiro*

**RICHARDS, LAYTON & FINGER, P.A.**

Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Huiqi Liu (No. 6850)
Clint M. Carlisle (No. 7313)
Colin A. Meehan (No. 7237)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:  defranceschi@rlf.com
      shapiro@rlf.com
      liu@rlf.com
      carlisle@rlf.com
      meehan@rlf.com

*Proposed Co-Counsel for Debtors and Debtors in Possession*

**EXHIBIT A**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- x
                                            :  Chapter 11
In re:                                      :
                                            :  Case No. 25-11195 (JKS)
ZEN JV, LLC, et al.,¹                       :
                                            :  (Jointly Administered)
              Debtors.                      :
                                            :  Docket Ref. No. ____
------------------------------------------------------- x
```

**INTERIM ORDER (A) AUTHORIZING
DEBTORS TO (I) OBTAIN POSTPETITION FINANCING AND
(II) USE CASH COLLATERAL, (B) GRANTING LIENS AND PROVIDING
CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(C) GRANTING ADEQUATE PROTECTION, (D) MODIFYING AUTOMATIC
STAY, (E) SCHEDULING FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**") of the debtors and debtors-in-possession (collectively,

the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to

sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local

Rules of Bankruptcy Procedure (the "**Local Rules**") promulgated by the United States Bankruptcy

Court for the District of Delaware (the "**Court**"), seeking entry of an interim order (this "**Interim**

**Order**") and a Final Order (as defined below), among other things:

      (a)     authorizing the Debtors to obtain postpetition financing on a senior secured
superpriority basis, on the terms and conditions set forth herein and the term sheet
attached as **Exhibit 1** hereto (as amended, restated, amended and restated,
supplemented, or otherwise modified from time to time in accordance with the
terms thereof, the "**DIP Term Sheet**"), by and among Zen JV, LLC

---

¹    The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number (to
the extent applicable), are:  Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster
Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder
Government Solutions, LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding, LLC (9339);
and Military Advantage, LLC (9508).  The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

(the "**Borrower**"), each of the other Debtors as secured guarantors with respect to the outstanding DIP Obligations (as defined below) (collectively, the "**Guarantors**" and, together with the Borrower, the "**DIP Loan Parties**"), JMB Capital Partners Lending, LLC (the "**DIP Lender**"), comprised of a senior secured superpriority debtor-in-possession term loan facility (the "**DIP Facility**") in an aggregate principal amount of up to $20.0 million, *plus* applicable fees and premiums (the commitments thereunder, the "**DIP Commitments**" and, the term loans extended thereunder, the "**DIP Loans**"), pursuant to which (i) up to $12.5 million of the DIP Commitments (the "**Interim DIP Loans**") shall be available upon the entry of the Interim Order and (ii) up to the DIP Commitments *less* amount(s)drawn under the Interim DIP Loans (the "**Subsequent DIP Loans**" and, together with the Interim DIP Loans, the "**DIP Borrowings**" and, each, a "**DIP Borrowing**") shall be available upon the entry of the Final Order, in each case solely upon compliance with the Interim Order or Final Order (as applicable), the Approved Budget (as defined below) (subject to Permitted Variances (as defined below)), and the DIP Term Sheet;

(b)     authorizing the Borrower to incur, and the Guarantors to jointly and severally, irrevocably, and unconditionally, guarantee, on a superpriority basis, the Payment in Full of all DIP Obligations in accordance with this Interim Order and the DIP Term Sheet;

(c)     authorizing the DIP Loan Parties to: (i) execute, deliver, and perform under the DIP Term Sheet, and to perform all such other and further acts as may be required in connection therewith; (ii) incur all loans, advances, extensions of credit and financial accommodations, and pay all principal, interest, premiums or similar amounts, fees (including, without limitation, the Upfront Fee and the Exit Fee (in each case under and as defined in the DIP Term Sheet)), costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts, whether or not such obligations arose before or after the Petition Date (as defined below), whenever the same shall become due, whether at stated maturity, by mandatory prepayment, declaration, acceleration, or otherwise, in each case, in accordance with the DIP Term Sheet and the Interim Order (collectively, the "**DIP Obligations**"); and (iii) perform such other and further acts as may be necessary, required, or desirable to implement and effectuate the terms of this Interim Order, the DIP Term Sheet, and the transactions contemplated thereunder;

(d)     authorizing the DIP Loan Parties to grant to the DIP Lender the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in this Interim Order, subject to the Carve Out (as defined below), and subject to the relative priorities set forth in this Interim Order and **Exhibit 3** attached hereto;

(e)     authorizing the DIP Loan Parties to grant to the DIP Lender, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, as well as liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy

Code, as further described herein (including in **Exhibit 3** hereto), on all DIP Collateral and all proceeds thereof (including, subject to entry of Final Order, Avoidance Action Proceeds (as defined below)), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral) against each of the DIP Loan Parties, on a joint and several basis, in respect of all DIP Obligations, subject to the Carve Out and other priorities, as set forth in this Interim Order;

(f)     authorizing the DIP Loan Parties to use the proceeds of the DIP Facility, the DIP Collateral and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), in accordance with the terms and conditions set forth in this Interim Order and the DIP Term Sheet, and strictly in accordance with the Approved Budget, subject to any variances expressly permitted under the DIP Term Sheet (the "**Permitted Variances**");

(g)     granting adequate protection, as and to the extent set forth herein, to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined below) of their respective Prepetition Liens (as defined below) in the Prepetition Collateral (including Cash Collateral), and authorizing the Debtors to make non-refundable and irrevocable adequate protection payments as contemplated in the DIP Orders;

(h)     modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the DIP Term Sheet, as set forth herein or therein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(i)     approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, (i) the DIP Lender, the DIP Term Sheet, the DIP Liens, and the DIP Obligations, (ii) subject to paragraph 24 hereof, the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Liens and the Prepetition Secured Obligations (each as defined below);

(j)     subject to entry of the Final Order, approving the DIP Loan Parties' waiver of the right to surcharge the DIP Collateral as to the DIP Lender pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth herein;

(k)     subject to entry of the Final Order, approving the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Lender upon the terms set forth in this Interim Order;

(l) authorizing and directing the Debtors to make non-refundable, irrevocable, and final payments on account of the principal, interest, fees (including, the Upfront Fee and the Exit Fee, in each case under and as defined in the DIP Term Sheet), expenses and other amounts payable under the DIP Term Sheet, each as applicable, as such become due and payable, all to the extent provided in, and in accordance with, this Interim Order, the Final Order (upon entry) and the DIP Term Sheet; and

(m) scheduling a final hearing (the "**Final Hearing**") on the Motion to consider entry of a final order (the "**Final Order**") authorizing the relief requested in the Motion on a final basis and approving the form of notice with respect to such Final Hearing, which order shall be in form and substance and on terms and conditions acceptable in all respects to the DIP Lender.

The Court, having considered the Motion, the DIP Term Sheet, the exhibits attached thereto, the declarations filed in support thereof, the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on _____, 2025 (the "**Interim Hearing**"), and upon the record of the Chapter 11 Cases; and due and proper notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b)-(d) and 9014 and all applicable Local Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors, and represents a sound exercise of the Debtors' business judgment, and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]**

A.      *Petition Date*.  On June 24, 2025 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these Chapter 11 Cases.

B.      *Debtors-in-Possession*.  The Debtors continue to manage and operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.      *Committee Formation*.  As of the date hereof, the Office of the United States Trustee (the "**U.S. Trustee**") has not appointed an official statutory committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "**Official Committee**").

D.      *Jurisdiction and Venue*.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013 and 9014, and Local Rules 2002-1, 4001-2 and 9013-1.

---

[2]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.    *Debtors' Stipulations, Releases and Acknowledgements Regarding DIP Lender*.  In requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Lender to provide the DIP Facility, the Debtors, for themselves, their estates, and all representatives of such estates, admit, stipulate, acknowledge and agree as follows:

(a)    No Control.  The DIP Lender does not control the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims (as defined below), the DIP Collateral, the DIP Obligations, the DIP Term Sheet, or the transactions contemplated thereunder or hereunder.

(b)    No Claims, Defenses, or Causes of Action.  As of the date hereof, there exist no claims, defenses or any other Cause of Action[3] of any nature or description whatsoever that may be asserted by the Debtors, their respective estates, predecessors, successors and assigns, against the DIP Lender or any of their respective current, former and future affiliates, subsidiaries, funds or managed accounts, officers, directors, managers, members, equity holders, partners, principals, employees, representatives, agents, attorneys, advisors, consultants and other professionals, and the predecessors in interest, successors and assigns of each of the foregoing (collectively, the "**Representatives**"), in their capacities as such, in each case, arising from, in connection with, or related to this Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Term Sheet, or the transactions contemplated thereunder or hereunder.

(c)    Releases.  Effective as of the date of entry of this Interim Order, the Debtors, on behalf of themselves and their respective estates, to the maximum extent permitted by applicable law, hereby absolutely, unconditionally and irrevocably release and forever discharge and acquit the DIP Lender and its Representatives (in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors and assigns at any time had, now have or that their successors and assigns may have against the DIP Lender and its Representatives for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in each case, arising under, in connection with or related to this Interim Order, the DIP

---

[3]    The term "**Cause of Action**" means any action, cause of action, claim, counter-claim, cross-claim, defense, account, objection, challenge, offset, setoff, demand, liability, responsibility, dispute, remedy, indebtedness, obligation, guaranty, right, interest, indemnity, assertion, allegation, suit, controversy, proceeding, loss, damage, injury, reimbursement obligation, attorneys' fees, costs, expenses or judgments of every type, whether known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, whether assertable directly or derivatively, including, without limitation, all legal and equitable theories of recovery, arising under the Bankruptcy Code or applicable non-bankruptcy law, whether local, state of federal U.S. or foreign common law, statute, law, rule, regulation, or by contract, of every nature or description whatsoever.

Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Term Sheet or the transactions contemplated thereunder or hereunder, including, without limitation, (i) any claim or Cause of Action seeking avoidance, whether under chapter 5 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute, common law or otherwise ("**Avoidance Actions**"), (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or Causes of Action arising under the Bankruptcy Code, (iv) any claims or Causes of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge, recovery or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to this Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Term Sheet or the transactions contemplated thereunder or hereunder, or (v) any claim or Cause of Action with respect to the validity, enforceability, extent, amount, perfection or priority of the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Term Sheet or the transactions contemplated thereunder or hereunder; provided, however, that nothing contained in this subparagraph (c) shall relieve the DIP Lender from fulfilling any of their commitments under, and in accordance with, the DIP Term Sheet.

F.      *Debtors' Stipulations, Releases and Acknowledgements Regarding Prepetition Secured Parties*.  In requesting the DIP Facility and the use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lender to provide the DIP Facility, and in exchange for and in recognition of the priming of the Prepetition Liens and the consent (and/or deemed consent) of the Prepetition Secured Parties to the use of their Cash Collateral, the Debtors, for themselves, their estates and all representatives of such estates, admit, stipulate, acknowledge and agree as follows (subject to paragraph 24 of this Interim Order) (collectively, the admissions, stipulations, and acknowledgments and agreements set forth in this paragraph F, the "**Stipulations**"):

(a)      Prepetition Term Loan Facility.

(i)      *Prepetition Term Loan Credit Agreement*.  Pursuant to that certain *Amended and Restated First Lien Credit Agreement*, dated as of April 19, 2023 (as amended by that certain *Amendment No. 1 to Amended and Restated Credit Agreement*, dated as of March 26, 2024, as further amended by that certain *Amendment No. 2 to Amended and Restated Credit Agreement*, dated as of April 29, 2024, as further amended by that certain *Amendment No. 3 to Amended and Restated Credit Agreement*, dated as of

7

May 30, 2024, as further amended by that certain *Amendment No. 4 to Amended and Restated Credit Agreement*, dated as of June 28, 2024, as further amended by that certain *Resignation, Waiver, Amendment and Appointment Agreement*, dated as of October 11, 2024, as further amended by that certain *Amendment No. 6 to Amended and Restated Credit Agreement*, dated as of February 24, 2025, as further amended by that certain *Amendment No. 7 to Amended and Restated Credit Agreement*, dated as of March 31, 2025, and as further amended by that certain *Amendment No. 8 to Amended and Restated Credit Agreement*, dated as of April 29, 2025 (as it may be further amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date in accordance with the terms thereof, the " **Prepetition Term Loan Credit Agreement**", and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition Term Loan Credit Agreement), collectively, the "**Prepetition Term Loan Documents**"), by and among CareerBuilder, LLC, as borrower (the "**Prepetition Term Loan Borrower**"), Camaro Acquisition, LLC, as a guarantor (the "**Prepetition Term Loan Holdings**"), certain subsidiaries of the Prepetition Term Loan Borrower, as guarantors (together with the Prepetition Term Loan Holdings, the "**Prepetition Term Loan Guarantors**", and together with the Prepetition Term Loan Holding and the Prepetition Term Loan Borrower, collectively, the "**Prepetition Term Loan Parties**"), Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, the "**Prepetition Term Loan Agent**"), and the lenders party thereto from time to time (collectively, the "**Prepetition Term Loan Lenders**", and together with the Prepetition Term Loan Agent, the "**Prepetition Term Loan Secured Parties**"), the Prepetition Term Loan Lenders provided a term loan credit facility (the "**Prepetition Term Loan Facility**" and the loans thereunder the "**Prepetition Term Loans**" and the claims thereunder "**Prepetition Term Loan Claims**") to the Prepetition Term Loan Parties.  Pursuant to the Prepetition Term Loan Documents, each of the Prepetition Term Loan Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the Payment in Full of all of the Prepetition Term Loan Secured Obligations (as defined below).

(ii)     *Prepetition Term Loan Secured Obligations*.  As of the Petition Date, the Prepetition Term Loan Parties were justly and lawfully indebted to the Prepetition Term Loan Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of not less than $135,177,000 on account of principal amounts (including capitalized interest added thereto) outstanding under the Prepetition Term Loan Facility, *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all Obligations (as defined in the Prepetition Term Loan Credit Agreement) and all other amounts that may be due or owing under the Prepetition Term Loan Documents (collectively, the "**Prepetition Term Loan Secured Obligations**").

(iii)     *Prepetition Term Loan Liens*.  Pursuant to the Prepetition Term Loan Documents, the Prepetition Term Loan Parties granted to the Prepetition Term Loan

Agent, for the benefit of itself and the other Prepetition Term Loan Secured Parties, properly perfected continuing liens on and security interests in (collectively, the "**Prepetition Term Loan Liens**") substantially all of the assets of the Prepetition Term Loan Parties, including, without limitation, all "Collateral" (as defined in the Prepetition Term Loan Credit Agreement) (the "**Prepetition Term Loan Collateral**").

    (b)    <u>Prepetition Notes</u>.

    (i)    *Prepetition Notes*.  Pursuant to (i) that certain Amended and Restated Senior Secured Note, dated as of December 27, 2024, as amended and restated, amended and restated, supplemented or otherwise modified prior to the Petition Date in accordance with the terms thereof, the "**Prepetition Initial Note**", and together with all other agreements, guarantees, pledges, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection with the Prepetition Initial Note, including, without limitation, the Note Documents (as defined in the Prepetition Initial Note), collectively, the ("**Prepetition Initial Note Documents**"), by and among Zen JV, LLC, as the issuer (the "**Prepetition Notes Issuer**"), the holders party thereto (collectively, the "**Prepetition Initial Note Holders**"), and Randstad MWW Solutions Inc., as collateral agent (the "**Prepetition Initial Note Agent**"), (ii) that certain Amended and Restated Additional Senior Secured Note, dated as of February 20, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date in accordance with the terms thereof, the "**Prepetition Additional Note**", and together with all other agreements, guarantees, pledges, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection with the Prepetition Additional Note, including, without limitation, the Note Documents (as defined in the Prepetition Additional Note), collectively, the "**Prepetition Additional Note Documents**"), by and among the Prepetition Notes Issuer, the holders party thereto (collectively, the "**Prepetition Additional Note Holders**"), and Randstad MWW Solutions Inc., as collateral agent (the "**Prepetition Additional Note Agent**") and (iii) that certain Amended and Restated Third Senior Secured Note, dated as of December 27, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date in accordance with the terms thereof, the "**Prepetition Third Note**", and together with all other agreements, guarantees, pledges, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection with the Prepetition Third Note, including, without limitation, the Note Documents (as defined in the Prepetition Third Note), collectively, the "**Prepetition Third Note Documents**"; the Prepetition Third Note Documents, the Prepetition Additional Note Documents, and the Prepetition Initial Note Documents are referred to herein, collectively, as the "**Prepetition Notes Documents**"; and the Prepetition Initial Note, the Prepetition Additional Note, and the Prepetition Third Note are referred to herein, collectively, as the "**Prepetition Notes**"), by and among the Prepetition Notes Issuer, the holders party thereto (collectively, the "**Prepetition Third Note Holders**" and, together with the Prepetition Initial Note Holders and the Prepetition Additional Note Holders, the "**Prepetition Noteholders**"), and Randstad MWW Solutions Inc., as collateral agent (the "**Prepetition Third Note Agent**" and, in its collective capacity as the Prepetition Initial Note Agent, the Prepetition

Additional Note Agent, and the Prepetition Third Note Agent, the "**Prepetition Notes Agent**"), the Prepetition Noteholders provided loans (the "**Prepetition Notes Loans**" and the claims thereunder "**Prepetition Notes Claims**") to the Prepetition Notes Issuer. Pursuant to the Prepetition Notes Documents, certain subsidiaries of the Prepetition Notes Issuer (the "**Prepetition Notes Guarantors**" and, together with the Prepetition Notes Issuer, collectively, the "**Prepetition Notes Loan Parties**"), among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the Payment in Full of all of the Prepetition Notes Obligations (as defined below).

(ii)     *Prepetition Notes Obligations*.     As of the Petition Date, the Prepetition Notes Parties were justly and lawfully indebted to the Prepetition Noteholders and the Prepetition Notes Agent (collectively, the "**Prepetition Notes Secured Parties**"), on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of not less than $226,069,460 on account of principal amounts (including capitalized interest added thereto) outstanding under the Prepetition Notes, *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Secured Obligations" (as defined in each Prepetition Note) and all other amounts that may be due or owing under the Prepetition Notes Documents (collectively, the "**Prepetition Notes Obligations**").

(c)     *Prepetition Notes Liens*.     Pursuant to the Prepetition Notes Documents, the Prepetition Notes Loan Parties granted to the Prepetition Notes Agent, for the benefit of itself and the other Prepetition Notes Secured Parties, properly perfected continuing liens on and security interests in (collectively, the "**Prepetition Notes Liens**") substantially all of the assets of the Prepetition Notes Loan Parties, including, without limitation, all "Collateral" (as defined in each of the Prepetition Notes) (the "**Prepetition Notes Collateral**").

(d)     Certain Definitions.

(i)     "**Adequate Protection Liens**" means the Term Loan Adequate Protection Liens and Notes Adequate Protection Liens, collectively.

(ii)     "**DIP Orders**" means the Interim Order and the Final Order, collectively.

(iii)     "**Prepetition Agents**" means the Prepetition Term Loan Agent and the Prepetition Notes Agent, collectively.

(iv)     "**Prepetition Claims**" means the Prepetition Term Loan Claims and the Prepetition Notes Claims, collectively.

(v)     "**Prepetition Collateral**" means the Prepetition Term Loan Collateral and the Prepetition Notes Collateral, collectively.

(vi)    "**Prepetition Liens**" means the Prepetition Term Loan Liens and the Prepetition Notes Liens, collectively.

(vii)    "**Prepetition Loan Documents**" means the Prepetition Term Loan Documents and the Prepetition Notes Documents, collectively.

(viii)    "**Prepetition Loan Parties**" means the Prepetition Term Loan Parties and the Prepetition Notes Loan Parties, collectively.

(ix)    "**Prepetition Secured Obligations**" means the Prepetition Term Loan Secured Obligations and the Prepetition Notes Obligations, collectively.

(x)    "**Prepetition Secured Parties**" means the Prepetition Term Loan Secured Parties and the Prepetition Notes Secured Parties, collectively.

(e)    Validity and Enforceability of Prepetition Secured Obligations and Prepetition Liens. As of the Petition Date, (i) the Prepetition Liens in the Prepetition Collateral (A) have been properly recorded and were valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Prepetition Collateral, (B) were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or the financial commitments and other financial accommodations or consideration secured or obtained thereby, (C) with respect to the Prepetition Term Loan Liens, are senior with priority over any and all other liens on or security interests in the Prepetition Term Loan Collateral, subject only to liens and security interests that were expressly permitted to be incurred under the Prepetition Term Loan Documents and (D) with respect to the Prepetition Notes Liens, are senior with priority over any and all other liens on or security interests in the Prepetition Notes Collateral, subject only to liens and security interests that were expressly permitted to be incurred under the Prepetition Notes Documents (solely, in each case of clause (C) and (D) to the extent such permitted liens and security interests were (1) in existence on the Petition Date, (2) valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), and (3) senior in priority to the applicable Prepetition Liens);[4] (ii) the Prepetition Secured Obligations constitute legal, valid, non-avoidable and binding obligations of each of the applicable Prepetition Loan Parties, enforceable in accordance with the terms of the applicable Prepetition Loan Documents (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); (iii) no portion of the Prepetition Liens or the Prepetition Secured Obligations, and no payments

---

[4]    Nothing contained herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing contained herein shall prejudice the rights of any party in interest, including, but not limited to the Debtors, the DIP Lender, the Prepetition Secured Parties, or any Official Committee, in each case, to the extent such party has standing to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Prior Lien (subject to the terms of this Interim Order). For the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) is not a Permitted Prior Lien.

made at any time to any of the Prepetition Secured Parties, is subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including, without limitation, any Avoidance Action or any claim or Cause of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery, or any other claim or Cause of Action of any nature or description, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, in each case, that may be asserted by the Debtors, their respective estates or any other person or entity; and (iv) the Prepetition Secured Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code against each of the Prepetition Loan Parties and their respective estates.

(f)     Intercreditor or Subordination Agreements.  Pursuant to section 510(a) of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents (if any), (A) shall remain in full force and effect, (B) continue to govern the relative obligations, priorities, rights, and remedies of the Prepetition Secured Parties with respect to any shared or common Prepetition Collateral, and (C) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order except to the extent expressly set forth herein.

(g)     No Claims, Defenses, or Causes of Action.  As of the date hereof, there exist no claims, defenses or any other Cause of Action of any nature or description whatsoever that may be asserted by the Debtors, their respective estates, predecessors, successors and assigns, against any of the Prepetition Secured Parties or any of their respective Representatives, in each case, arising from, in connection with, or related to this Interim Order, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents or the Prepetition Collateral.

(h)     Releases.  Effective as of the date of entry of this Interim Order, but subject to paragraph 24 hereof, the Debtors, on behalf of themselves and their respective estates, to the maximum extent permitted by applicable law, hereby absolutely, unconditionally, and irrevocably release and forever discharge and acquit the Prepetition Secured Parties and each of their respective Representatives (in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors and assigns at any time had, now have, or that their successors and assigns may have against any of the Prepetition Secured Parties and their respective Representatives for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time prior to the date of this Interim Order, in each case, arising under, in connection with, or related to this Interim Order, the Prepetition Loan Documents, the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations, or the transactions contemplated thereunder or hereunder, including, without limitation, (i) Avoidance Actions, (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or Causes of Action arising under the Bankruptcy Code, or (iv) any claims or Causes of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge, recovery, or any other challenge arising under the Bankruptcy Code

12

or applicable non-bankruptcy law with respect to this Interim Order, the Prepetition Loan Documents, the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations, or the transactions contemplated thereunder or hereunder.

(i)    Cash Collateral.  Any and all of the DIP Loan Parties' cash, whether existing on the Petition Date or thereafter, wherever located (including, without limitation, all cash, cash equivalents and other amounts on deposit or maintained by the DIP Loan Parties in any accounts with any depositary institution), whether as original Prepetition Collateral, arising from the sale or other disposition of Prepetition Collateral, or proceeds of other Prepetition Collateral, or cash, rents, income, offspring, products, proceeds or profits generated from the Prepetition Collateral, constitutes "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code of either the Prepetition Term Loan Secured Parties (the "**Term Loan Cash Collateral**") or the Prepetition Notes Secured Parties (the "**Notes Cash Collateral**" and, together with the Term Loan Cash Collateral, the "**Cash Collateral**").

G.    **Findings Regarding Corporate Authority.**  Each of the Debtors has all requisite power and authority to execute and deliver the DIP Term Sheet to which it is a party and to perform its obligations thereunder.

H.    **Findings Regarding DIP Facility and Use of Cash Collateral.**

(a)    *Good Cause.*  Good and sufficient cause has been shown for the entry of this Interim Order.

(b)    *Need for Postpetition Financing and Use of Cash Collateral.*  The Debtors have an immediate and critical need to use Cash Collateral and to obtain postpetition financing pursuant to the DIP Facility, in each case, on an interim basis, in order to, among other things, permit the orderly continuation and operation of their businesses, maintain business relationships with customers, vendors and suppliers, make payroll, pay the costs of administering the Chapter 11 Cases and satisfy other working capital and operational needs of the Debtors, in the case of each of the foregoing, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Term Sheet, including the Approved Budget (subject to Permitted Variances). The Debtors' access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the DIP Facility and the use of Cash Collateral is necessary

and vital to, among other things, preserve and maximizing the values of the Debtors. The Debtors and their estates will be immediately and irreparably harmed if the financing under the DIP Facility is not obtained pursuant to the terms of this Interim Order and, as applicable, the DIP Term Sheet, or if the Debtors are unable to use Cash Collateral. Entry of this Interim Order is necessary and appropriate to avoid such harm to the Debtors, their estates, and other parties in interest.

(c)     *No Credit Available on More Favorable Terms*. The Debtors are unable to obtain financing or other financial accommodations from sources other than the DIP Lender on terms more favorable than those provided under the DIP Facility, the DIP Term Sheet and this Interim Order. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate secured credit for money borrowed under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the DIP Loan Parties granting (a) the DIP Liens on all DIP Collateral, (b) the DIP Superpriority Claims, (c) the rights, benefits and protections to the DIP Lender, and (d) the respective Adequate Protection Liens, Adequate Protection Claims and other Adequate Protection Obligations (as defined below) to the Prepetition Secured Parties, in the case of each of the foregoing, upon the terms and conditions set forth in this Interim Order and in the DIP Term Sheet. After considering all available alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best source of debtor-in-possession financing available to them at this time and is in the best interests of all of their stakeholders.

(d)     *Sale Process*. The DIP Lender's willingness to make the DIP Loans and the Prepetition Secured Parties' willingness to consent to the use of their respective Cash Collateral (each on the terms and subject to the conditions set forth in the DIP Term Sheet and this Interim

14

Order) is predicated upon (i) the Debtors requesting authority to sell all or substantially of their assets to one or more buyers pursuant to section 363 of the Bankruptcy Code by filing a motion (the "**Sale Motion**") in accordance with the Milestones (as defined below) to approve bidding and sale procedures and the sale of the Debtors' assets, (ii) the satisfactory filing, review, and approval of irrevocable stalking horse bids for those assets described in that certain Stalking Horse Agreement, dated as of June 23, 2025, by and among Zen JV, LLC, the other sellers party thereto and Valnet US Inc., as buyer (the "**MMP Stalking Horse Bid**"), those assets described in that certain Stalking Horse Agreement, dated as of June 23, 2025, by an among Zen JV, LLC, the other sellers party thereto and ValSoft Corporation, Inc., as buyer (the "**MGS Stalking Horse Bid**"), and those assets described in that certain Stalking Horse Agreement, dated as of June 23, 2025, by an among Zen JV, LLC, the other sellers party thereto, CBM Acquisition, LLC, as buyer, and JobGet Inc., as buyer parent (the "**CBM Stalking Horse Bid**") (together the "**Stalking Horse Bids**") totaling at least $35.5 million, and on terms otherwise satisfactory to the DIP Lender in its sole discretion, (iii) unless and until the DIP Obligations have been Paid in Full, subject to the Adequate Protection afforded to the Prepetition Secured Parties provided herein, the priorities set forth on Exhibit 3 hereto, and the Carve Out, all cash proceeds derived from such sale of the Debtors' assets shall be immediately paid to the DIP Lender on account of its DIP Obligations, and (iv) the Debtors' adherence to the Milestones as set forth in the DIP Term Sheet. Absent such arrangements, the DIP Lender and the Prepetition Secured Parties would not have agreed to make the DIP Loans or consent to the use of Cash Collateral as provided in the DIP Term Sheet and this Interim Order.

(e)    *Use of Proceeds of DIP Facility and Cash Collateral.* As a condition to providing the DIP Facility and their consent to the use of Cash Collateral, each of the DIP Lender

and the Prepetition Secured Parties (as applicable) requires, and the Debtors have agreed, that all proceeds of the DIP Loans and all Cash Collateral shall be used and/or applied solely for the purposes and in the amounts expressly permitted in the Approved Budget (subject to Permitted Variances), including, without limitation, (i) to pay the costs of administration of the Chapter 11 Cases, (ii) for general corporate and working capital purposes, (iii) to pay adequate protection payments to the extent set forth herein, and (iv) to pay professional fees and expenses in accordance with this Interim Order, in the case of (i) through (iii), in accordance with and subject to the terms and conditions of this Interim Order and the DIP Term Sheet, including the Approved Budget (subject to Permitted Variances).

(f)    *Adequate Protection*.  Pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, the Prepetition Secured Parties are entitled to adequate protection against any post-petition diminution in value of the Prepetition Secured Parties' respective liens and interests in their respective Prepetition Collateral (including Cash Collateral) resulting from, any diminution in the value of their respective liens or interests in the Prepetition Collateral (collectively, the "**Diminution in Value**"), as set forth in this Interim Order and the DIP Term Sheet.  Based on the Motion and the evidence filed in support of the Motion, and the record presented to the Court in connection with the Interim Hearing, the terms of the adequate protection arrangements and the use of Prepetition Collateral (including Cash Collateral) set forth herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral).

(g)    *Consents*.

(i)    *Prepetition Term Loan Secured Parties Consent*.  The "Required Lenders" under the terms of the Prepetition Term Loan Credit Agreement have consented to the Debtors' use of Prepetition Term Loan Collateral (including Cash Collateral), the DIP Loan Parties' entry into the DIP Facility, the incurrence of the

DIP Liens, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, in each case, in accordance with and subject to the terms and conditions set forth in this Interim Order and the DIP Term Sheet, subject to paragraph 10(c) hereof.

(ii)    *Prepetition Notes Secured Parties Consent*.  The Prepetition Notes Secured Parties have consented to the Debtors' use of Prepetition Notes Collateral (including Cash Collateral), the DIP Loan Parties' entry into the DIP Facility, the incurrence of the DIP Liens, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, in each case, in accordance with and subject to the terms and conditions set forth in this Interim Order and the DIP Term Sheet, subject to paragraph 10(c) hereof.

(h)    *Limitation on Charging Expenses against Collateral*.  As a material inducement to the DIP Lender's agreement to provide the DIP Facility, and in exchange for the DIP Lender's agreement to subordinate their DIP Liens to the Carve Out and any liens and security interests, other than the Prepetition Liens, that were valid, non-avoidable, and properly perfected as of the Petition Date (or that were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (such liens, "**Permitted Prior Liens**"), subject to entry of the Final Order, (a) the DIP Loan Parties have waived their right to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise and (b) the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

(i)    *Proper Exercise of Business Judgment*.  Based on the Motion, the evidence submitted, and the record presented to the Court at the Interim Hearing, (a) the terms of the DIP Facility, (b) the terms of adequate protection granted to the Prepetition Secured Parties hereunder, and (c) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash

Collateral) pursuant to this Interim Order, (i) were negotiated in good faith and at arm's length among the Debtors, the DIP Lender and the Prepetition Secured Parties, (ii) are fair, reasonable, and the best available to the Debtors under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration. Absent access to the DIP Facility and the ability to continue to use Cash Collateral upon the terms set forth in this Interim Order, the DIP Term Sheet, including the Approved Budget (subject to Permitted Variances), the Debtors, their estates, their creditors, and other parties-in-interest will be seriously, immediately and irreparably harmed.

(j)     *Good Faith*.  The DIP Facility and the terms of the DIP Term Sheet, the terms on which the Prepetition Secured Parties have consented to the Debtors' use of their respective Cash Collateral, and this Interim Order have been negotiated in good faith and at arm's length among the Debtors, the DIP Lender, the Prepetition Secured Parties and each of their respective Representatives, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility, the DIP Term Sheet and this Interim Order, including, without limitation, all loans, advances, extensions of credit and other financial accommodations made to and guarantees issued by the Debtors pursuant to the DIP Term Sheet, shall each be deemed to have been extended by the DIP Lender, the Prepetition Secured Parties (as applicable) and each of their respective affiliates, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by sections 364(e) and/or 363(m) of the Bankruptcy Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the DIP Lender and the Prepetition Secured Parties (and each of the successors and assigns thereof) pursuant to this Interim Order and the DIP

Term Sheet (including, without limitation, all DIP Obligations, DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Claims, and Adequate Protection Obligations), shall be entitled to the full protection of sections 364(e) and/or 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(k)     *Initial Budget.*  The Debtors have prepared and delivered to the DIP Lender the initial itemized cash flow forecast set forth on **Exhibit 2** attached hereto (the "**Initial Budget**"), reflecting, on a line item, cumulative and aggregate basis, (i) the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors, in each case, for each calendar week during the period from the calendar week ending on the Saturday of the calendar week in which the Petition Date occurs through and including the end of the thirteenth (13th) calendar week thereafter, (ii) the sum of weekly unused availability under the DIP Facility, *plus* unrestricted cash on hand, (iii) the weekly outstanding principal balance of amounts outstanding under the DIP Facility, and (iv) a professional fee budget with respect to the accrued and anticipated professional fees and expenses to be incurred by each applicable professional advisor during such period (the "**Professional Fee Budget**").  The Initial Budget is an integral part of this Interim Order, and the DIP Lender and the Prepetition Secured Parties are relying, in part, upon the Debtors' agreement to comply (subject to Permitted Variances) with the Approved Budget, in determining to enter into the DIP Facility and to allow the Debtors' use of proceeds of the DIP Facility and Cash Collateral in accordance with the terms of this Interim Order and the DIP Term Sheet.

(l)     *Notice.*  Notice of the Motion and the Interim Hearing constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code,

Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

(m) *Immediate Entry*. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and 6003 and the Local Rules. Unless the relief set forth in this Interim Order is granted, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and the use of Prepetition Collateral (including Cash Collateral) upon the terms set forth in this Interim Order and the DIP Term Sheet are in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) and the Local Rules. The Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-1(b).

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the Motion, the declarations filed in support of the Motion, the evidence adduced at the Interim Hearing and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1. *Motion Granted*. The Motion is hereby granted, on an interim basis, upon the terms and conditions set forth in this Interim Order and the DIP Term Sheet. Any objections or other statements with respect to any of the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights inconsistent with this Interim Order, are hereby denied and overruled. This Interim Order shall become effective and enforceable immediately upon its entry.

2.      *Authorization of DIP Facility and DIP Term Sheet.*

(a)      <u>Authorization of DIP Term Sheet</u>.  The DIP Facility is hereby approved on an interim basis.  The Debtors are hereby authorized to (i) execute, deliver and perform all of their obligations under the DIP Term Sheet and this Interim Order; and (ii) execute, deliver and perform under any and all other instruments, certificates, agreements and other documents (including, without limitation, the execution and/or recordation of collateral, pledge and security documents, mortgages and deeds of trust (if applicable) and financing statements), and perform all such other and further acts that, may be necessary, required or desirable for the Debtors to perform their obligations under the DIP Facility, the DIP Term Sheet and this Interim Order and to implement the transactions contemplated thereunder and hereunder.

(b)      <u>Authorization to Borrow; Use of Cash Collateral</u>.  The Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guarantee, on a joint and several basis, up to the principal amount of $20.0 million (*plus* applicable interest, premiums (including, without limitation, the Upfront Fee and the Exit Fee), fees (including professional fees and expenses), costs, expenses, charges and other amounts payable hereunder and under the DIP Term Sheet), subject to the terms and conditions (including any payment priorities and any availability limitations and conditions precedent to such DIP Borrowing) set forth in the DIP Term Sheet and this Interim Order.  The Debtors are hereby authorized to use the proceeds of all DIP Borrowings under the DIP Facility and all Cash Collateral solely in the manner and for the purposes expressly permitted in the Approved Budget (subject to Permitted Variances), the DIP Term Sheet and this Interim Order.

(c)      <u>DIP Fees and Expenses; Indemnification</u>.  The Debtors are hereby authorized and directed to pay, as and when due, any and all (i) fees, premiums or other payments

payable under the DIP Term Sheet (including, without limitation, the Upfront Fee and the Exit Fee), and in any separate letter agreements between any of the Debtors, on the one hand, and the DIP Lender, on the other hand, including, without limitation, put option premiums, commitment payments, unused facility payments, early termination, prepayment or exit payments, unused facility payments, administrative agent's, collateral agent's or trustee's fees, or other amounts referred to therein, (ii) amounts due (or that may become due) in respect of the indemnification obligations under the DIP Term Sheet, which are hereby approved, and (iii) costs, expenses and disbursements of the DIP Lender payable under the DIP Term Sheet and this Interim Order, including, without limitation, the reasonable and documented fees and expenses of (A) Norton Rose Fulbright US LLP, as counsel to the DIP Lender, (B) Young Conaway Stargatt & Taylor, LLP, as local counsel to the DIP Lender, and (C) any other accountants, consultants, attorneys, advisors, appraisers, or other professionals that may be retained by the DIP Lender with the consent of the Debtors, such consent not to be unreasonably withheld or delayed (the foregoing subclauses (A)-(C), the "**DIP Lender Advisors**"), in the case of each of the foregoing clauses (i)-(iii), whether or not such payments, premiums, fees, costs, expenses or other amounts arose before or after the Petition Date and whether or not the transactions contemplated herein or in the DIP Term Sheet are consummated, without the need to file fee or retention applications with the Court, without the need to comply with the U.S. Trustee's fee guidelines, and all such payments, premiums, fees, costs, expenses and other amounts are hereby approved (and, to the extent paid prior to the entry of this Interim Order, ratified in full), shall be non-refundable and irrevocable, and shall not be subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including any Avoidance Action, or any other claim or Cause of Action seeking the reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable,

contractual or otherwise), reclassification, disgorgement, disallowance, impairment, surcharge, recovery, or any other claim or Cause of Action of any nature and description whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.  In the case of the foregoing clause (iii), any invoices submitted for payment may be in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall be promptly paid by the Debtors, on a monthly basis as appropriate, upon receipt of any such invoices, subject to paragraph 11 with respect to fees and expenses incurred after the Interim Closing Date (as defined in the DIP Term Sheet).

3.      *DIP Obligations.*

(a)     Upon execution and delivery of the DIP Term Sheet, the DIP Term Sheet shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the Debtors, and shall be fully enforceable against each of the Debtors, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "**Successor Cases**"), in each case, in accordance with the terms of the DIP Term Sheet and this Interim Order.

(b)     Upon execution and delivery of the DIP Term Sheet, the DIP Loan Parties shall be jointly and severally liable for all DIP Obligations, including, without limitation, all loans,

advances, extensions of credit, financial accommodations, principal, interest, premiums or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts, whether or not such obligations arose before or after the Petition Date, whenever the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, in each case, which may now or from time to time be owing by any of the Debtors to the DIP Lender under the DIP Term Sheet or this Interim Order. The DIP Obligations shall be due and payable, without notice or demand, the DIP Commitments shall automatically terminate, and the use of Cash Collateral shall automatically cease, on the DIP Termination Date (as defined below) (subject to paragraph 20(b) hereof).

(c)     All obligations incurred, payments made, and transfers or grants of security and liens set forth in this Interim Order and the DIP Term Sheet by the Debtors are granted to or for the benefit of the Debtors for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby. No obligation, payment, transfer, or grant of liens and security interests under this Interim Order or the DIP Term Sheet to the DIP Lender or the Prepetition Secured Parties (including, without limitation, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, or the Adequate Protection Obligations) shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including any Avoidance Action or any other claim or Cause of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise),

24

reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery, or any other claim or Cause of Action of any nature and description whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (in each case in accordance with and subject to the fee review procedures set forth in paragraph 11 hereof).

4.      *No Obligation to Extend Credit*.  The DIP Lender shall have no obligation to make any loan or advance under the DIP Term Sheet, unless all of the conditions precedent to the making of such loan or advance by the DIP Lender under the DIP Term Sheet and this Interim Order have been satisfied in full (or waived) in accordance with the terms of the DIP Term Sheet and this Interim Order, as applicable.  Notwithstanding anything contained in this Interim Order or the DIP Term Sheet to the contrary, in no event shall the aggregate principal amount of the DIP Loans available or outstanding under the DIP Term Sheet at any time (after giving effect to all DIP Borrowings previously made or requested) exceed the total DIP Commitments.

5.      *No Duty to Monitor Compliance*.  None of the DIP Lender or the Prepetition Secured Parties shall have any obligation or responsibility to monitor the Debtors' use of DIP Collateral, Prepetition Collateral or Cash Collateral, and each of the DIP Lender and Prepetition Secured Parties may rely upon the Debtors' representations that the use of DIP Collateral, Prepetition Collateral and Cash Collateral complies with and is in accordance with the requirements of this Interim Order and the DIP Term Sheet.

6.      *DIP Liens.*

(a)      <u>DIP Liens</u>.  Effective upon entry of this Interim Order, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation,

entering into any lockbox or deposit account control agreements or other action to take possession or control of any DIP Collateral), as security for the prompt and complete payment and performance of all DIP Obligations when due (whether at stated maturity, by acceleration or otherwise), the DIP Lender is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "**DIP Liens**") in all DIP Collateral, subject and subordinate to the Carve Out and Permitted Prior Liens, and subject to the relative priorities set forth in paragraph 6(c) and **Exhibit 3** of this Interim Order.

(b)     DIP Collateral.  The term "**DIP Collateral**" means all assets and properties of each of the DIP Loan Parties and their estates, of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, and wherever located, including, without limitation, (i) all of the DIP Loan Parties' rights, title and interests in all DIP Collateral (as defined in the DIP Term Sheet) and Prepetition Collateral (including Cash Collateral) and (ii) all money, cash and cash equivalents, all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with any and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time), all accounts receivable and other receivables (including those generated by intercompany transactions), all rights to payment, contracts and contract rights, all instruments, documents and chattel paper, all securities (whether or not marketable), all goods, furniture, machinery, plants, equipment, vehicles, inventory and fixtures, all real property interests, all interests in leaseholds, all franchise rights, all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property, all general intangibles, tax or other refunds, or insurance

proceeds, all equity interests, capital stock, limited liability company interests, partnership interests and financial assets, all investment property, all supporting obligations, all letters of credit and letter of credit rights, all commercial tort claims (including, for the avoidance of doubt, any Cause of Action related thereto), all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records), and all rents, products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to any DIP Loan Party from time to time with respect to any of the foregoing; *provided* that, DIP Collateral shall not include Avoidance Actions but shall include, upon entry of the Final Order, all proceeds of and property that is recovered from or becomes unencumbered as a result of, whether by judgment, settlement or otherwise, Avoidance Actions ("**Avoidance Action Proceeds**").

(c)      Priority of DIP Liens.[5]   The DIP Liens shall have the following ranking and priorities (subject in all cases to the Carve Out and paragraph 10(c) hereof):

(i)      *First Priority Liens on Unencumbered Property*.   Subject to the priorities set forth in **Exhibit 3**, attached hereto, pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to Permitted Prior Liens (including, for purposes of this paragraph, Prepetition Liens) including, for the avoidance of doubt, subject to a Final Order, Avoidance Action Proceeds (collectively, the "**Unencumbered Property**").

(ii)      *Priming DIP Liens and Junior DIP Liens*.   Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than as described in subparagraph (c)(i) of this paragraph 6), which DIP Liens (A) shall be subject and subordinate to Permitted Prior

---

[5]    In the event of any conflict between the terms set forth in this paragraph 6(c) and **Exhibit 3** attached hereto, **Exhibit 3** shall govern.

Liens, (B) shall be subject to the priorities set forth in **Exhibit 3** attached hereto, and (C) shall be senior to any and all other liens and security interests in the DIP Collateral subject to the Carve Out and to the extent provided in **Exhibit 3** attached hereto, including, without limitation, all liens and security interests in the Prepetition Collateral or any DIP Collateral that would otherwise constitute Prepetition Collateral (including, without limitation, Adequate Protection Liens (as defined below) and Prepetition Liens in Prepetition Collateral).

(iii)    *DIP Liens Senior to Other Liens*.  Except to the extent expressly permitted hereunder, the DIP Liens and the DIP Superpriority Claims shall not be made subject or subordinate to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, including any lien, security interest or claim granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the DIP Loan Parties or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.

(d)    To the fullest extent permitted by the Bankruptcy Code, any provision of any lease, license, contract or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest, or proceeds thereof or other collateral related thereto, shall have no force or effect with respect to the transactions granting the DIP Liens or the Adequate Protection Liens in any such fee, leasehold, interest, or other collateral, or in the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lender or the Prepetition Secured Parties in accordance with the DIP Term Sheet and this Interim Order.

7.    *DIP Superpriority Claims*.  Pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code, the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors in each of their respective Chapter 11 Cases and any

Successor Cases on account of the DIP Obligations, with priority over any and all other administrative expense claims and all other claims against the Debtors (other than as set forth on **Exhibit 3** attached hereto), now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any adequate protection claims, including the Adequate Protection Claims, and all administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "**DIP Superpriority Claims**").  The DIP Superpriority Claims shall (x) for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and (y) be subject and subordinate to the Carve Out and the relative priorities set forth in **Exhibit 3** attached hereto. The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral, subject only to the Carve Out and the relative priorities set forth in **Exhibit 3** attached hereto.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

       8.     *Use of DIP Collateral, Prepetition Collateral and Cash Collateral.*

      (a)     The Debtors are hereby authorized to use the proceeds of DIP Loans and all Cash Collateral solely to the extent expressly permitted under the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions set forth in the DIP Term Sheet and this Interim Order.  Unless otherwise agreed to by the DIP Lender, except on the terms and

conditions of this Interim Order and the DIP Term Sheet, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court.

        (b)        Without the prior written consent of the DIP Lender, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as expressly permitted by the DIP Term Sheet. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied to repay the DIP Obligations as required by this Interim Order and the DIP Term Sheet. The Debtors are authorized and directed, upon the closing of a sale of any of the DIP Collateral, to (subject to the priorities set forth on **Exhibit 3** attached hereto) immediately pay all proceeds of any such sale to the DIP Lender to satisfy the DIP Obligations in accordance with this Interim Order and the DIP Term Sheet until the DIP Obligations are Paid in Full,[6] and any order approving the sale of such DIP Collateral shall provide that the sale is conditioned upon such payment of DIP Obligations (except to the extent otherwise agreed in writing by the DIP Lender), in each case subject to the Carve Out and the priorities set forth on **Exhibit 3** attached hereto. For the avoidance of doubt, notwithstanding anything to the contrary in any other order or agreement (written, verbal, or otherwise), all cash proceeds derived from the sale, transfer, lease, encumbrance, or other disposition of any portion of the DIP Collateral (or entry into any binding agreement to do so) of the Debtors' assets shall be used for the satisfaction of the DIP Obligations until the DIP Obligations have been Paid in Full, and none of the cash proceeds derived from such sale, transfer,

---

[6]    The term "**Paid in Full**" or "**Payment in Full**" means the indefeasible payment in full in cash of all DIP Obligations or Prepetition Secured Obligations, as the case may be, other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder have been terminated or expired.

lease, encumbrance, or other disposition of any portion of the DIP Collateral (or entry into any binding agreement to do so) may be used for (x) the payment of any fees or expenses of any Professional Persons or (y) the payment of any fees, expenses, or costs of the sale transaction until the DIP Obligations have been Paid in Full.  Notwithstanding the foregoing, this paragraph (b) shall be subject to the priorities set forth on **Exhibit 3** attached hereto.

9.      *Budget and Variance Reporting*.

(a)      The Debtors shall comply with the budget and variance reporting obligations set forth in the DIP Term Sheet.

10.     *Adequate Protection*.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e) and 507 of the Bankruptcy Code, to adequate protection of their respective Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in this paragraph 10, are collectively referred to herein as the "**Adequate Protection Obligations**"):

(a)      Adequate Protection for Prepetition Term Loan Secured Parties.   The Prepetition Term Loan Secured Parties are hereby granted the following adequate protection of their Prepetition Term Loan Liens in the Prepetition Term Loan Collateral (including Cash Collateral):

(i)      *Term Loan Adequate Protection Claims*.   The Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, is hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition Term Loan Liens in the Prepetition Term Loan Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors that are Prepetition Term Loan Parties in each of their respective Chapter 11 Cases (the "**Term Loan Adequate Protection Claims**"), which shall be payable by each of those Debtors on a joint and several basis. The Term Loan Adequate Protection Claims shall be (a) subject and subordinate to the Carve Out and the DIP Superpriority Claims (in an aggregate amount not to exceed $1 million), and (b) subject to the relative priorities set forth in **Exhibit 3** attached hereto.

(ii)    *Term Loan Adequate Protection Liens*.  The Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, is hereby granted, effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition Term Loan Liens in the Prepetition Term Loan Collateral, valid, binding, enforceable and perfected post-petition liens and security interests in all DIP Collateral other than Prepetition Notes Collateral held by Debtors that are Prepetition Term Loan Parties  (the "**Term Loan Adequate Protection Liens**").  The Term Loan Adequate Protection Liens shall be (a) subject and subordinate to the Carve Out, the DIP Liens (in an aggregate amount not to exceed $1 million), and the Permitted Prior Liens, and (b) subject to the relative priorities set forth in **Exhibit 3** attached hereto.

(b)    Adequate Protection for Prepetition Noteholders.    The Prepetition Noteholders are hereby granted the following adequate protection of their Prepetition Note Liens in the Prepetition Note Collateral (including Cash Collateral):

(i)    *Notes Adequate Protection Claims*.  The Prepetition Noteholders are hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition Note Liens in the Prepetition Note Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors in each of their respective Chapter 11 Cases (the "**Notes Adequate Protection Claims**"), which shall be payable by each of those Debtors that are guarantors of the Prepetition Notes, on a joint and several basis.  The Notes Adequate Protection Claims shall be (a) subject and subordinate to the Carve Out and the DIP Superpriority Claims, and (b) subject to the relative priorities set forth in **Exhibit 3** attached hereto.

(ii)    *Notes Adequate Protection Liens*.  The Prepetition Noteholders are hereby granted effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition Note Liens in the Prepetition Note Collateral, valid, binding, enforceable and perfected post-petition liens and security interests in all DIP Collateral other than Prepetition Term Loan Collateral held by Debtors that are guarantors of the Prepetition Notes (the "**Notes Adequate Protection Liens**").  The Notes Adequate Protection Liens shall be (a) subject and subordinate to the Carve

32

Out, the DIP Liens, and the Permitted Prior Liens, and (b) subject to the relative priorities set forth in **Exhibit 3** attached hereto.

(c)     Additional Provisions Regarding Adequate Protection.  In consideration for the consent of the Prepetition Noteholders and the consent of the Required Lenders under the Prepetition Term Loan Credit Agreement to the use of cash collateral and the DIP Facility, and notwithstanding anything to the contrary herein:

(i)     the Debtors shall pay to the Prepetition Term Loan Agent, for further distribution to the Prepetition Term Loan Lenders in accordance with the Prepetition Term Loan Documents, the sum of $1 million upon entry of this Interim Order (the "**Consent Fee**").  The Consent Fee shall be used to (x) pay the reasonable fees and expenses (including reasonable counsel fees) of the Term Loan Agent and each Term Loan Lender incurred in connection with the negotiation and approval of this Interim Order and (y) otherwise distributed to the Term Loan Lenders in accordance with the terms of the Prepetition Term Loan Credit Agreement;

(ii)     the DIP Liens and DIP Obligations shall be senior to the Prepetition Term Loan Liens and Prepetition Term Loan Obligations with respect to the Prepetition Term Loan Collateral only to the extent of $1 million (inclusive of any Carve Out applicable to the Prepetition Term Loan Collateral), and the Prepetition Term Loan Liens shall be senior to the DIP Liens with respect to the Prepetition Term Loan Collateral for all amounts in excess of $1 million;

(iii)     the Prepetition Secured Parties and the Debtors agree that, without prejudice to the rights of other parties, 51% of the proceeds from any sale, transfer, or other disposition of the assets that are the subject of the CBM Stalking Horse Bid (pursuant to the CBM Stalking Horse Bid or otherwise) shall be allocated to the Prepetition Term Loan Collateral (with the Consent Fee credited against such amount), with the remaining 49% allocated to the Prepetition Notes Collateral; and

(iv)     subject to entry of the Final Order, the Debtors shall not recover (or seek to recover) more than $75,000 of the reasonable and necessary costs of preserving or disposing the Prepetition Term Loan Collateral pursuant to section 506(c) of the Bankruptcy Code, with any amount in excess thereof being waived.

(d)     Notwithstanding anything to the contrary contained herein, no party may seek to enforce, collect upon, or liquidate the Term Loan Adequate Protection Claims, Term Loan Adequate Protection Liens, Notes Adequate Protection Liens, or Notes Adequate Protection Claims until the DIP Obligations have been indefeasibly Paid in Full (or otherwise paid to the

33

extent of their priority entitlement).  In the event the DIP Obligations have not been Paid in Full, each of the Prepetition Note Agent, the Prepetition Noteholders, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders agree, pursuant to section 1129(a)(9) of the Bankruptcy Code, that such junior superpriority claims may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the value of such claims after taking into account all claims that are senior to, or structurally senior to, such claims.

11.    *Fees and Expenses*.  The invoices with respect to the professional fees and expenses payable under paragraph 2(c) of this Interim Order shall not be required to comply with the U.S. Trustee guidelines, nor shall the applicable professionals be required to file fee applications with the Court with respect to any fees or expenses payable hereunder, and all invoices therefor may be in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall, by email, be provided to counsel to the Debtors, counsel to any Official Committee and the U.S. Trustee (the "**Fee Notice Parties**"); provided, however, if no formal objection to payment of the requested fees and expenses is made in writing by any of the Fee Notice Parties within five (5) calendar days after delivery of such invoices (the "**Fee Objection Period**"), then, upon the expiration of the Fee Objection Period, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors and, in any event, no later than three (3) business days after expiration of the Fee Objection Period; provided,

further, however, that if a formal objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, the undisputed portion shall promptly be paid by the Debtors, and in any event, no later than three (3) business days after expiration of the Fee Objection Period, and the disputed portion shall only be paid upon resolution of such objection by the applicable parties or by order of the Court.  Any hearing on an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice shall be limited to reasonableness of the fees, costs and expenses that are the subject of such objection.  Subject to this paragraph 11, none of the adequate protection payments required to be made pursuant to this Interim Order shall be subject to claim, counterclaim, challenge, setoff, subordination, recharacterization, defense, avoidance or disgorgement in the Chapter 11 Cases or any Successor Cases.

12.     *Reservation of Rights*.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Lender to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Lender under the DIP Term Sheet, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code; (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers; or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lender or the Prepetition Secured Parties.  Notwithstanding anything contained herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or

35

implicitly, the Debtors' or any party in interest's right to oppose (on an emergency basis if need be) any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order.

13.     *Amendments*.  Without the need for further notice to or approval of this Court, the Debtors are authorized to execute, deliver and perform under, one or more amendments, waivers, consents, or other modifications (including, for the avoidance of doubt, the payment of any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection therewith) to and under the DIP Term Sheet, in each case, in accordance with the provisions of the DIP Term Sheet governing amendments thereto (and otherwise in form and substance acceptable to the DIP Lender); provided, however, that any amendment that (a) shortens the maturity of the extensions of credit thereunder; (b) increases the aggregate commitments thereunder; or (c) increases the rate of interest or any fee (other than any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection with such amendment) payable thereunder (each, a "**Material DIP Amendment**") shall be provided (which may be by electronic mail) to any counsel to any Official Committee and the U.S. Trustee and filed with the Court no later than three (3) business days prior to the anticipated date of effectiveness of any such Material DIP Amendment (or such shorter period if authorized by the Court following the filing of a motion to shorten notice), and if no formal objection to the Material DIP Amendment is made within such three (3) business day period, then, without further notice or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; provided, however, if a formal objection is made within such three (3) business day period, then such Material DIP Amendment shall be subject to approval of the Court.

14.    *Modification of Automatic Stay.*  The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without further notice to or order of this Court, to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Lender may request to assure the perfection and priority of the DIP Liens; (b) the DIP Loan Parties to incur all liabilities and obligations, including all of the DIP Obligations, to the DIP Lender as contemplated under this Interim Order and the DIP Term Sheet; (c) the DIP Loan Parties to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such acts as the Prepetition Agents may request to assure the perfection and priority of the Adequate Protection Liens; (d) the DIP Loan Parties to incur all liabilities and obligations, including all Adequate Protection Obligations, to the Prepetition Secured Parties as contemplated under this Interim Order and the applicable Prepetition Loan Documents; (e) the DIP Loan Parties to pay all amounts required hereunder and under the DIP Term Sheet; (f) the DIP Lender to retain and apply payments made in accordance with the terms of this Interim Order and the DIP Term Sheet; (g) subject to paragraph 20(b) of this Interim Order, the DIP Lender to exercise, upon the occurrence and during the continuance of any DIP Termination Event (as defined below), all rights and remedies provided for in this Interim Order, the DIP Term Sheet or applicable law; (h) to perform under this Interim Order and the DIP Term Sheet, and to take any and all other actions that may be required, necessary, or desirable for the performance by the Debtors under this Interim Order and the DIP Term Sheet and the implementation of the transactions contemplated hereunder and thereunder; and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Term Sheet.

15.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    This Interim Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted hereunder and under the DIP Term Sheet, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Lender and the Prepetition Secured Parties to the priorities granted herein (each, a "**Perfection Act**") (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

(b)    Without in any way limiting the automatically effective perfection of the liens granted hereunder and the DIP Term Sheet (including, without limitation, the DIP Liens and the Adequate Protection Liens), the DIP Lender and each of the Prepetition Agents, at the direction of the requisite Prepetition Term Loan Lenders or the Prepetition Noteholders, as applicable, are hereby authorized, but not required, in the case of the Prepetition Agents, at the direction of the requisite Prepetition Term Loan Lenders or the Prepetition Noteholders, as applicable, as they may determine for any reason, to execute, file and record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of submission, to the maximum extent permitted under applicable law) or otherwise effectuate any Perfection Act or to take any other action in order to attach, validate, perfect, preserve and enforce the liens and security interests

granted to them hereunder or under the DIP Term Sheet to otherwise evidence such liens and security interests in all DIP Collateral; provided, however, that, whether or not the DIP Lender or either of the Prepetition Agents determine to execute, file, record or otherwise effectuate any Perfection Act with respect to any liens or security interests granted hereunder, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to objection, challenge, dispute, avoidance, recharacterization or subordination as of the entry of this Interim Order.  Upon the request of the DIP Lender, without any further consent of any party, the DIP Lender and the Debtors are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Lender to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the entry of this Interim Order.

(c)     A certified copy of this Interim Order may be (but need not be) filed with or recorded in filing or recording offices in addition to or in lieu of any security documents, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Lender or the Prepetition Agents, at the direction of the requisite Prepetition Term Loan Lenders or the Prepetition Noteholders, as applicable, to take all actions, as applicable, referenced in this paragraph.

16.     *Protection of DIP Lender's Rights.*

(a)     Until the DIP Obligations are Paid in Full (or to the extent of their priority), the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon,

or recover in connection with, the liens or security interests granted to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents or this Interim Order or otherwise seek to exercise or enforce any rights or remedies against any DIP Collateral, Prepetition Collateral or Prepetition Loan Party (as applicable), including, without limitation, any exercise of setoff or recoupment; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens or claims on, such DIP Collateral or and the proceeds thereof, to the extent such transfer, disposition, sale, or release is authorized hereunder, or under the DIP Term Sheet and the proceeds thereof are applied in accordance with the priorities set forth in this Interim Order and **Exhibit 3** attached hereto; (iii) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Lender has filed financing statements or other documents in respect of the liens granted pursuant to this Interim Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or securities interests as of the Petition Date; (iv) may not credit bid their respective obligations for any of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or otherwise, unless such credit bid provides that the DIP Obligations (or the DIP Obligations having priority with respect to the assets to be sold) will be Paid in Full upon consummation of any sale; and (v) deliver or cause to be delivered, at the Debtors' cost and expense (for which the Prepetition Agents shall be reimbursed upon submission to the Debtors of invoices or billing statements), any termination statements, releases and/or assignments in favor of the DIP Lender or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of DIP Collateral subject to any sale or disposition authorized hereunder or under the DIP Term Sheet.  No Prepetition Secured Party may, directly or indirectly,

(A) contest, or support any other Person in contesting, in any proceeding, the extent, validity, attachment, priority, or enforceability of any DIP Lien held by the DIP Lender in the DIP Collateral (or the extent, validity, allowability, or enforceability of any DIP Obligations secured thereby or purported to be secured thereby) or the provisions of the DIP Term Sheet or this Interim Order, (B) take any action that would restrain, hinder, limit, delay or otherwise interfere with the exercise of any rights or remedies by the DIP Lender, or (C) contest, object to or support any other Person in contesting or objecting to the manner in which the DIP Lender seeks to enforce or collect the DIP Obligations, the DIP Superpriority Claims or the DIP Liens or any amendment, waiver or modification of the DIP Term Sheet (including **Exhibit 3** attached hereto).

(b)    To the extent any Prepetition Secured Party has been noted as a secured party on any security document or otherwise has possession of or control with respect to any Prepetition Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Lender, and such Prepetition Secured Party shall comply with the instructions of the DIP Lender with respect to the exercise of such possession or control, subject to the priorities set forth on **Exhibit 3**.

(c)    In the event that any person or entity that holds a lien on or security interest in DIP Collateral that is junior or otherwise subordinate to the DIP Liens receives any DIP Collateral or proceeds of DIP Collateral, or receives any payment on account of such lien or security interest in the DIP Collateral, (whether in connection with the exercise of any right or remedy (including setoff), payment or distribution from the Debtors, mistake, or otherwise), prior to the Payment in Full of all DIP Obligations (or the portion of the DIP Obligations having priority with respect to such payment), such person or entity shall be deemed to have received, and shall

hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Lender, and shall immediately turn over all such proceeds on account of DIP Obligations having priority to the DIP Lender in the same form as received, with any necessary endorsements, for application in accordance with the DIP Term Sheet and this Interim Order.  The DIP Lender is hereby authorized to make any such endorsement as agent for the Prepetition Agents or any Prepetition Secured Party.  This authorization is coupled with an interest and is irrevocable.

(d)     Except as expressly provided herein or in the DIP Term Sheet, no claim or lien having a priority senior to or *pari passu* with those granted to the DIP Lender or Prepetition Secured Parties by this Interim Order shall be granted or permitted while any of the DIP Obligations remain outstanding.  Except as expressly provided in this Interim Order or the DIP Term Sheet, each of the DIP Liens and the DIP Superpriority Claims: (A) shall not be made junior or subordinated to or *pari passu* with (i) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, whether under section 364(d) of the Bankruptcy Code or otherwise, (ii) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (iii) any lien arising after the Petition Date including, without limitation, any lien or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (iv) any intercompany or affiliate lien or claim; and (B) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

17.     *Maintenance of DIP Collateral*.  Until such time as all DIP Obligations are Paid in Full (or as otherwise agreed in writing by the DIP Lender), the Debtors shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Term Sheet.

Upon the entry of this Interim Order, the DIP Lender shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (including all property damage and business interruption insurance policies of the Debtors, whether expired, currently in place, or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, *first*, to the Payment in Full of all DIP Obligations, and *second*, to the payment of the Prepetition Secured Obligations.  Notwithstanding the foregoing, the Debtors and/or the Prepetition Agents shall take any actions reasonably requested by the DIP Lender to have the DIP Lender added as an additional insured and lenders loss payee on each such insurance policy.

18.    *Cash Management*.  Until such time as all DIP Obligations are Paid in Full, the Debtors shall maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order and any order of the Court authorizing the continued use of the cash management system that is acceptable to the DIP Lender.  The Debtors shall not open any new deposit or securities account that is not subject to the liens and security interests of each of the DIP Lender (in which case it shall be subject to the lien priorities and other provisions set forth in this Interim Order), excluding any Professional Fees Account.

19.    *Reporting; Access to Records*.  The Debtors shall provide the DIP Lender and DIP Lender Advisors with all reporting, management calls, access to books and records and other information required to be provided to the DIP Lender under the DIP Term Sheet.  Without limiting the requirements contained herein or in the DIP Term Sheet, the Debtors shall (a) provide the DIP Lender, counsel to the Prepetition Notes Secured Parties and any Official Committee (and each of their respective advisors) with (i) all reports, documents, and information required to be delivered

under the DIP Term Sheet (contemporaneously when the same is required to be delivered thereunder), and (ii) reasonable access, upon reasonable notice and during regular business hours, to the Debtors' books and records, assets and properties, for purposes of monitoring the Debtors' businesses and operations and the value of the DIP Collateral, and (b) reasonably cooperate and consult with, and provide information reasonably requested by the DIP Lender or any Official Committee (and their respective advisors) concerning the Debtors' businesses, financial condition, properties, business operations and assets.  Copies of all reports provided by the Debtors to the DIP Lender shall also be provided to the Prepetition Agents.

20.     *DIP Termination Events; Exercise of Remedies.*

(a)     <u>DIP Termination Events</u>.  The occurrence of any of the following shall constitute a "DIP Termination Event" under this Interim Order (each a "**<u>DIP Termination Event</u>**," and the date upon which such DIP Termination Event occurs, the "**<u>DIP Termination Date</u>**"), unless waived in writing by the DIP Lender:

(i)     the occurrence of an "Event of Default" under and as defined in the DIP Term Sheet;

(ii)     the occurrence of the "Maturity Date" under and as defined in the DIP Term Sheet;

(iii)     the entry of the Interim Order or Final Order in form or substance that is not acceptable to the DIP Lender;

(iv)     any of the Debtors seeks authorization from the Court for (or the Court enters an order authorizing or approving) any amendment, modification, or extension of this Interim Order, the Final Order or the DIP Term Sheet without the prior written consent of the DIP Lender (and no such consent shall be implied by any other action or inaction of any of the DIP Lender);

(v)     the failure of the Debtors to make any payment required under this Interim Order or the DIP Term Sheet to the DIP Lender or the Prepetition Secured Parties as and when due and payable hereunder or thereunder;

(vi)    the failure by any of the Debtors to timely perform or comply in any material respect, with any of the other terms, provisions, conditions or other obligations under the DIP Orders;

(vii)    the failure of any Milestone to be satisfied;

(viii)    the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) or the granting by the Court of any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest, or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens, excluding the liens that are DIP Liens arising under the DIP Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Lender;

(ix)    the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders) against the DIP Lender or any of its agents and employees to subordinate or avoid any liens made in connection with the DIP Orders;

(x)    (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement, or otherwise modify any DIP Order, or the disallowance of the DIP Obligations, in whole or in part or (b) any provision of the DIP Orders, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Lender);

(xi)    the filing of the Sale Motion or some other motion for approval to sell some or all of the Debtors' assets or to establish bidding procedures for the sale of some or all the Debtors' assets that is not in form and substance acceptable to the DIP Lender in its sole discretion;

(xii)    the filing of a motion seeking approval of a sale under section 363 for one or all of the Debtors business lines (or the designation by the Debtors of any bid, other than the Stalking Horse Bids, as the successful bid) that do not contemplate indefeasible Payment in Full (through sources reasonably acceptable to the DIP Lender) to the DIP Lender of DIP Obligations and all other amounts outstanding under this DIP Facility or the DIP Orders on the closing of such sale;

(xiii)    the filing with the Court of a plan of reorganization or liquidation in any of the Chapter 11 Cases that does not provide for indefeasible Payment in Full (through sources reasonably acceptable to the DIP Lender) to the DIP Lender of DIP Loans and all other amounts outstanding under this DIP Facility or the DIP Orders on the effective date of such plan;

(xiv)    the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(xv)    the granting of relief from the automatic stay by the Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral;

(xvi)    the conversion of any of the Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code;

(xvii)    the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code;

(xviii)  a dismissal of any of the Chapter 11 Cases; or

(xix)    the effective date of a chapter 11 plan of any of the Debtors.

(b)    <u>Remedies Upon DIP Termination Event</u>.  Upon the occurrence and during the continuation of a DIP Termination Event, without further notice to, hearing, or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to: (i) deliver to the Borrower a notice declaring the occurrence of a DIP Termination Event; (ii) declare the termination, reduction or restriction of the DIP Commitments (to the extent any such commitment remains), whereupon the DIP Commitments shall be terminated, reduced, or restricted; (iii) declare the DIP Obligations then outstanding to be due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the DIP Loan Parties; (iv) declare the reduction or restriction on the DIP Facility or the DIP Term Sheet, whereupon the DIP Facility or the DIP Term Sheet shall be reduced or restricted; (v) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral; (vi) charge interest at the default rate under the DIP Facility; (vii) freeze all monies or balances in any deposit accounts of the Debtors; (viii) immediately exercise any and all rights of set-off; (ix) exercise any right or remedy

against the DIP Collateral, including, without limitation, the foreclosure on or disposition of DIP

Collateral for application towards the DIP Obligations; (x) file a motion, to which the Debtors may

not object, seeking Court authority to sell all or substantially all of the Debtors' assets pursuant to

section 363 of the Bankruptcy Code; or (xi) take any other action or exercise any other right or

remedy permitted under the DIP Term Sheet, this Interim Order or applicable law; provided that,

in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (v), (viii),

(ix), (x) and (xi) of this paragraph 20(b), the DIP Lender shall provide counsel to the Debtors,

counsel to the Prepetition Notes Secured Parties, counsel to any Official Committee and the U.S.

Trustee five business days' prior written notice (the "**Remedies Notice**")[7] (which may be provided

by email or other electronic means), and during such five business day notice period (the

"**Remedies Notice Period**"), the Debtors and/or any Official Committee shall be permitted to

request an emergency hearing before the Court (which request must be made prior to the

conclusion of the Remedies Notice Period, and shall seek consideration of such request on an

expedited basis); provided, however, that, during the Remedies Notice Period, the Debtors are

permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value

of the Debtors' businesses and fund the Carve Out Reserves (as defined below).  For the avoidance

of doubt, in the case of the enforcement of rights against the DIP Collateral pursuant to clauses

(v), (viii) (ix), (x), and (xi) of this paragraph 20(b), the Debtors shall be deemed to have granted

the DIP Lender standing to pursue such actions.

(c)    Unless the Court finds during the Remedies Notice Period that a DIP

Termination Event has not occurred, following the expiration of the Remedies Notice Period,

---

[7]    For the avoidance of doubt, the Remedies Notice, or any other notice contemplated under this paragraph 20 may
be included in the Carve Out Trigger Notice.

without further notice to, hearing or order from the Court, the automatic stay of section 362 of the Bankruptcy Code shall automatically be vacated and modified for the purposes of permitting the DIP Lender to exercise any and all rights and remedies available to them under this Interim Order, the DIP Term Sheet, and applicable law.

21.    *Milestones*.  As a condition to the use of the DIP Facility and Cash Collateral, and as further adequate protection to the DIP Lender, the DIP Lender is hereby entitled to performance of the following milestones set forth on **Annex A** hereto (or such later date as may be agreed by the DIP Lender, which may be documented by the DIP Lender Advisors via e-mail) (the "**Milestones**"), and for the avoidance of doubt, absent the consent of the DIP Lender, the failure of the Debtors to comply with any of the Milestones shall constitute an immediate Event of Default under the DIP Term Sheet and this Interim Order and permit the DIP Lender to exercise its rights and remedies provided for in this Interim Order and the DIP Term Sheet.

22.    *No Waiver by Failure to Seek Relief*.  The rights and remedies of the DIP Lender and the Prepetition Secured Parties specified herein, are cumulative and not exclusive of any rights or remedies that the DIP Lender or the Prepetition Secured Parties may have under the DIP Term Sheet, the Prepetition Loan Documents, applicable law or otherwise.  The failure or delay on the part of the DIP Lender or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Term Sheet, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order, the DIP Term Sheet or the Prepetition Loan Documents shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order, the DIP Term

Sheet and the Prepetition Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the DIP Term Sheet and the requisite parties under the Prepetition Loan Documents, as applicable.  No consents required hereunder by the DIP Lender or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by the DIP Lender or the Prepetition Secured Parties (as applicable).

      23.    *Carve Out.*

      (a)    <u>Carve Out</u>.  As used in this Interim Order, the term "**Carve Out**" means an amount equal to the sum of: (i) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717; (ii) all unpaid reasonable fees and expenses up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed by this Court at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all accrued and unpaid fees and expenses (in each case, excluding any restructuring, sale, success, or other transaction fee owed to any investment bankers or financial advisors to the DIP Loan Parties or the Committee Professionals (as defined below) when and if earned pursuant to the terms and conditions of an engagement letter approved by this Court in these Chapter 11 Cases); (iv) the fees and expenses of any consumer privacy ombudsman appointed in these Chapter 11 Cases pursuant to section 333 of the Bankruptcy Code, (the "**CPOs**"), including any fees and expenses incurred by professionals retained or proposed to be retained by any such consumer privacy ombudsman (the "**CPO Professionals**" and, collectively, with the CPOs, the Debtor Professionals and the Committee Professionals, the "**Professional Persons**") whether allowed by the court prior to or after delivery of a Carve Out

Notice, (collectively, the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and the Official Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**") at any time before or on the date of delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below); provided that the amounts set forth in clauses (iii) and (iv) shall be subject to the aggregate amounts for Professional Persons in the Approved Budget and any limits under the DIP Orders (provided, that for the avoidance of doubt, Professional Persons may carry forward or roll back budgeted but unused disbursements set forth in the Approved Budget for any week for use in any subsequent or prior week(s), as applicable) (the amounts set forth in clauses (i)-(iv) being the "**Pre-Carve Out Trigger Notice Amounts**"); and (v) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $250,000 incurred after the first day following the date of delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (v) being the "**Post-Carve Out Trigger Notice Cap**"); provided, however, that nothing herein shall be construed to impair the ability of any party in interest (including the DIP Lender) to object to the fees, expenses, reimbursement, or compensation described in clauses (i) through (v) of this paragraph 23(a) on any grounds.  In the event that Allowed Professional Fees exceed or are expected to exceed the amounts provided in the Approved Budget, the parties will negotiate in good faith (but without further obligation) regarding a proposed amendment to the Approved Budget to address such additional Allowed Professional Fees.  The "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to counsel to the Debtors, the U.S. Trustee and counsel to the Official Committee (if any) with a copy to counsel to the

Prepetition Notes Secured Parties, which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event or failure to meet a Milestone stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      Carve Out Reserves.  From and after the Petition Date, the Debtors shall, on Monday of each week, transfer cash proceeds of the DIP Facility or cash on hand into a segregated account (the "**Professional Fees Account**") in an amount equal to the fees and expenses reflected in the Approved Budget for Professional Persons for that week (provided, that the first such transfer shall also include any such fees and expenses reflected in the Approved Budget for any prior weeks).  The Professional Fees Account, if applicable, shall be held in trust and used solely to satisfy Allowed Professional Fees; provided, that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Account.  On the day on which a Carve Out Trigger Notice is delivered in accordance with this paragraph 23(b) of this Interim Order (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash (including Cash Collateral) on hand as of such date, including funds in the Professional Fees Account, if applicable (net of any amounts held on retainer by any Professional Persons), and any available cash thereafter held by any Debtor to fund a reserve (the "**Pre-Carve Out Trigger Notice Reserve**") in an amount equal to the then unpaid amounts of the Pre-Carve Out Trigger Notice Amounts accrued on and prior to the Termination Declaration Date.  Upon the occurrence of a Termination Declaration Date, Professional Persons shall have two (2) business days thereafter to deliver fee statements to the Debtors' Professionals and the DIP Lender that cover such Professional Persons' reasonable good faith estimate of the Allowed Professional Fees incurred by such Professional Persons through and including the Termination Declaration Date.  On the Termination Declaration Date,

the Carve Out Trigger Notice shall also constitute a demand to the Debtors as of such date to utilize all cash (including Cash Collateral) on hand as of such date (net of any amounts held on retainer by any Professional Persons) to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**").  The Carve Out Reserves shall be deposited in the Professional Fees Account, to be held in trust, and used solely to satisfy Allowed Professional Fees benefitting from the Carve Out in accordance with the terms hereof until such Allowed Professional Fees are paid in full.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the outstanding obligations set forth in clauses (i) through (iv) of paragraph 23(a) (but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap), until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender for application to the DIP Obligations in accordance with the DIP Term Sheet, unless and until the DIP Obligations are Paid in Full.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the outstanding obligations set forth in clause (v) of paragraph 23(a), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender for application to the DIP Obligations in accordance with the DIP Term Sheet, unless and until the DIP Obligations are Paid in Full.  Notwithstanding anything to the contrary in this Interim Order, (x) disbursements by the Debtors from the Carve Out Reserves shall not constitute loans or indebtedness under the DIP Term Sheet or the Prepetition Loan Documents or otherwise increase or reduce the DIP Obligations or the Prepetition Secured Obligations, (y) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (z) nothing contained herein

shall constitute a cap or limitation on the ability of the Professional Persons to assert a claim on account of Allowed Professional Fees that are due and payable by the Debtors.

(c)    <u>Payment of Allowed Professional Fees Prior to Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out on a dollar-for-dollar basis.

(d)    <u>Payment of Carve Out on or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out and the amounts required to fund the Carve Out Reserves on a dollar-for-dollar basis; <u>provided</u>, <u>however</u>, prior to repayment from the Carve Out Reserves, any retainers held by Professional Persons shall be applied to repay the obligations set forth in clauses (iii) through (v) of paragraph 23(a) prior to repayment of such obligations from the Carve Out Reserves, and, concurrent with such repayment of such obligations using such retainers, the Carve Out shall permanently be reduced on a dollar for dollar basis.[8]

(e)    <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  None of the DIP Lender or the Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender or the

---

[8]    For the avoidance of doubt, to the extent any cash collateral comprising Prepetition Term Loan Collateral (including any such cash collateral on which the Prepetition Term Loan Agent holds a Term Loan Adequate Protection Lien) is used to fund any Carve Out Reserve, the $1 million priority afforded to the DIP Obligations and DIP Liens pursuant to paragraph 10(c)(ii) hereof shall be reduced dollar for dollar.

Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

24.     *Effect of the Debtors' Stipulations on Third Parties.*

(a)     The Debtors' Stipulations contained in paragraph F of this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes immediately upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon any Official Committee, all other creditors, and all parties-in-interest and each of their respective successors and assigns, in all circumstances and for all purposes, unless (i) the Official Committee or such party-in-interest (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) obtains requisite standing pursuant to an order of the Court entered prior to the Challenge Deadline (as defined below) and has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "**Challenge Proceeding**") by no later than the Challenge Deadline, (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, or otherwise objecting to or challenging any of the admissions, stipulations, findings or releases included in the Debtors' Stipulations, (B) asserting or prosecuting any so-called "lender liability" claims, Avoidance Actions or any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action seeking reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement,

disallowance, impairment, marshalling, surcharge or recovery with respect to the Prepetition Liens, the Prepetition Secured Obligations or the Prepetition Loan Documents, and (C) asserting or prosecuting any other claim or Cause of Action of any nature or description whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Prepetition Secured Parties or their Representatives (subclauses (A)-(C), collectively, the "**Challenges**", and each, a "**Challenge**"), and (ii) there is entered a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such timely Challenge in any duly-filed Challenge Proceeding; provided, however, that as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date; provided, further, however, that any pleadings filed in connection with any Challenge Proceeding, including any motion filed with the Court seeking requisite standing and authority to pursue a Challenge, shall include a draft complaint attached thereto and shall set otherwise forth with specificity the basis for each such Challenge, and any Challenge not so specified in a Challenge Proceeding timely and properly filed prior to the Challenge Deadline shall be deemed forever, waived, released and barred.

(b)     If no such Challenge Proceeding is timely and properly filed by the Challenge Deadline, or if the Court does not rule in favor of the plaintiff in any such Challenge Proceeding, then, without further notice or order of the Court, (i) each of the admissions, stipulations, findings and releases contained in the Debtors' Stipulations shall be binding on all parties-in-interest, including, without limitation, any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), (ii) the Prepetition Secured Obligations shall constitute allowed claims against each of the Debtors in the Chapter 11 Cases

and any Successor Cases, and the Prepetition Liens shall be deemed to be legal, valid, non-avoidable, binding, continuing, perfected and enforceable, as of the Petition Date, against each of the Debtors in the Chapter 11 Cases and any Successor Cases, (iii) the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Loan Documents shall not be subject to any other or further Challenge, contest, attack, objection, challenge, defense, claim, counterclaim, reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), and (iv) all Challenges against any of the Prepetition Secured Parties or any of their Representatives (in their capacities as such) shall be deemed forever waived, released and barred.

(c)     If any such Challenge Proceeding is timely filed by the Challenge Deadline, the Debtors' Stipulations shall nonetheless remain binding and preclusive on any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), except to the extent that any of the admissions, stipulations, findings or releases contained in the Stipulations were expressly challenged in such Challenge Proceeding (and solely as to the plaintiff party that timely filed such Challenge Proceeding and <u>not</u>, for the avoidance of doubt, any other party-interest).

56

(d)    The "**Challenge Deadline**" means the date that is the earlier of (i) confirmation of any chapter 11 plan of reorganization in these bankruptcy cases, (ii) (x) as to any Official Committee, ninety (90) calendar days after the appointment of the Official Committee (if any) and (y) as to any party in interest with requisite standing other than the Official Committee (if any), one-hundred and five (105) calendar days after the entry of this Interim Order, (iii) as to each of the Prepetition Loan Documents, such later date as has been agreed to, in writing, by the requisite Prepetition Secured Parties, as applicable, under the applicable Prepetition Loan Documents solely with respect to the Challenges pertaining to such Prepetition Loan Document, and (iv) any such later date as has been ordered by the Court, for cause shown, upon a motion filed and served within the time period set forth in clause (ii) of this paragraph 24(d).

(e)    For the avoidance of doubt, the Debtors' stipulations, waivers, agreements and releases contained in paragraph E of this Interim Order shall <u>not</u> be subject to Challenge, and shall be binding upon the Debtors and their estates, and any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or selected in any of the Chapter 11 Cases or any Successor Cases), any Official Committee, all other creditors and all parties-in-interest and each of their respective successors and assigns, in all circumstances and for all purposes, immediately upon entry of this Interim Order.

(f)    Nothing in this Interim Order vests or confers on any person or entity, including any Official Committee, standing or authority to pursue any Challenge belonging to the Debtors or their estates, and all rights to object to any request for such standing are expressly reserved.

25.    *Limitations on Use of DIP Collateral, Cash Collateral, Carve Out or Other Funds*. Notwithstanding anything contained in this Interim Order or any other order of the Court to the

contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of

the foregoing, any portion of the Carve Out, or any other funds, may be used (nor shall any

professional fees, costs, or expenses be paid or applied in connection therewith) by any of the

Debtors, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases,

or any other party-in-interest (including without limitation any chapter 7 trustee or chapter 11

trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any

Successor Cases), directly or indirectly:

(a)     to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, initiate, assert, commence, support or prosecute (or finance the initiation or prosecution of) any claim, counterclaim, cross-claim, Cause of Action, suit, arbitration, proceeding, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any nature or description (whether for monetary, injunctive, affirmative relief or otherwise) against the DIP Lender or the Prepetition Secured Parties or their respective Representatives, including, without limitation, (i) any objection or challenge to the amount, validity, enforceability, extent, perfection or priority in the DIP Term Sheet, the DIP Obligations (including, for the avoidance of doubt, the Upfront Fee and the Exit Fee), the DIP Liens, the DIP Collateral, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, (ii) any Avoidance Actions, (iii) any so-called "lender liability" claims, (iv) any claim or Cause of Action seeking the invalidation, reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery with respect to the DIP Liens, the DIP Obligations (including, for the avoidance of doubt, the Upfront Fee and the Exit Fee), the DIP Term Sheet, the DIP Collateral, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents or the Prepetition Collateral, (vi) any other claim or Cause of Action of any nature and description whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, against the DIP Lender or the Prepetition Secured Parties or their respective Representatives;

(b)     objecting to, appealing or otherwise challenging this Interim Order, the DIP Facility, the DIP Obligations (including, for the avoidance of doubt, the Upfront Fee and the Exit Fee,), the DIP Liens, the DIP Term Sheet or the transactions contemplated hereunder or thereunder;

(c)      objecting to or seeking to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections, or benefits granted to the DIP Lender or the Prepetition Secured Parties under this Interim Order or the DIP Term Sheet (other than to contest whether a DIP Termination Event has occurred and is continuing);

(d)      objecting to or seeking to prevent, hinder, interfere with or otherwise delay the DIP Lender's or the Prepetition Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral or Prepetition Collateral (as applicable) in accordance with this Interim Order, the DIP Term Sheet or the Prepetition Loan Documents (as applicable) (other than to contest whether a DIP Termination Event has occurred and is continuing);

(e)      seeking or requesting authorization to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code, or otherwise, unless such financing is sufficient to cause the Payment in Full of all DIP Obligations and Prepetition Secured Obligations contemporaneously with the closing of such financing (or as otherwise agreed in writing by the DIP Lender and the requisite Prepetition Secured Parties, as applicable);

(f)      seeking or requesting authorization to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under the DIP Term Sheet) in any portion of the DIP Collateral that are senior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens or the Prepetition Secured Obligations unless all DIP Obligations and Prepetition Secured Obligations have been Paid in Full (or as otherwise agreed in writing by the DIP Lender or the requisite Prepetition Secured Parties, as applicable);

(g)      seeking or requesting to use Cash Collateral or sell or otherwise dispose of DIP Collateral (without the prior written consent of the DIP Lender) other than as provided herein and in the DIP Term Sheet; or

(h)      seeking to pay any amount on account of any claims arising prior to the commencement of these Chapter 11 Cases, unless such payments are agreed to in writing by the DIP Lender (or are otherwise included in the Approved Budget);

provided, however, that no more than $25,000 of the DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out or any other funds may be used for allowed fees and expenses incurred by any Official Committee prior to the Challenge Deadline to investigate (but not to litigate, contest, initiate, assert, join, commence, support or prosecute any claim, Cause of Action or Challenge, including by way of discovery, with respect to), the validity, enforceability, extent, perfection or priority of the Prepetition Liens, the Prepetition Secured Obligations and the Prepetition Loan Documents.

26.     *Limitation on Charging Expenses*.  Except to the extent of the Carve Out or as provided in this Interim Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Lender or the Prepetition Secured Parties, respectively, upon the DIP Collateral or the Prepetition Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to the DIP Lender, or the Prepetition Collateral as to the Prepetition Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code, any other legal or equitable doctrine (including unjust enrichment) or otherwise, without the prior written consent of the DIP Lender with respect to the DIP Collateral, or the requisite Prepetition Secured Parties under the Prepetition Loan Documents with respect to the Prepetition Term Loan Collateral, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in this Interim Order (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by the DIP Lender, or any of the Prepetition Secured Parties; provided, however, that the foregoing shall be subject to the terms of the Final Order granting such relief.

27.     *No Marshaling*.  In no event shall the DIP Lender or Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Obligations, and all proceeds of the DIP Collateral shall be received and applied in accordance with this Interim Order (including **Exhibit 3** attached hereto) and the DIP Term Sheet; provided, however, that the foregoing shall be subject to the terms of the Final Order granting such relief.

28.    *Right to Credit Bid*.  The DIP Lender or its designee (which may be an acquisition vehicle formed by the DIP Lender), shall have the unqualified right to credit bid up to the full amount of the applicable priority DIP Obligations in any sale of all or any portion of DIP Collateral (including, for the avoidance of doubt, any asset for which the DIP Collateral is limited to the proceeds thereof as a result of applicable law prohibiting encumbrances from being attached to such asset) subject to and in accordance with the DIP Term Sheet, without the need for further order of the Court authorizing same, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise.  The DIP Lender shall have the absolute right to assign, transfer, sell, or otherwise dispose of its rights to credit bid (subject to this Interim Order) to any acquisition vehicle formed in connection with such bid or other designee.

29.    *Binding Effect; Successors and Assigns*.  Immediately upon entry of this Interim Order, subject to paragraph 24 of this Interim Order, the provisions of the DIP Term Sheet and this Interim Order, including all findings and conclusions of law herein, shall be binding upon all parties in interest in the Chapter 11 Cases and any Successor Cases, including without limitation, the DIP Lender, the Prepetition Secured Parties, any Official Committee or any other committee appointed or formed in the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors, the DIP Lender and the Prepetition Secured Parties and their respective successors and assigns; provided, for the avoidance of doubt,

that the DIP Lender and the Prepetition Secured Parties shall have no obligation to make any loan, permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

30.     *No Modification of Interim Order.*  Until and unless the DIP Obligations and the Prepetition Secured Obligations have been Paid in Full, the Debtors irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Lender, (i) any modification, stay, vacatur or amendment to this Interim Order, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the DIP Superpriority Claims (other than the Carve Out), (iii) the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the DIP Liens, except as expressly permitted hereunder or under the DIP Term Sheet, or (iv) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is inconsistent with this Interim Order; or (b) without the prior written consent of the Prepetition Agents, acting at the direction of the requisite Prepetition Term Loan Lenders or the Prepetition Noteholders, as appliable, (i) any modification, stay, vacatur or amendment to this Interim Order that adversely affects the rights, remedies, benefits or protections of the applicable Prepetition Secured Parties, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the Adequate Protection Claims (other than the Carve Out and the DIP Superpriority Claims), or (iii) the grant of any lien or security interest on any DIP Collateral or Prepetition Collateral with priority equal to or superior to the Adequate Protection Liens, except as expressly permitted hereunder or under the DIP Term Sheet.

31.     *Proceeds of Subsequent Financings.*  Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the Payment in Full of all of the DIP Obligations, either the Debtors, the Debtors' estates, any chapter 11 trustee, chapter 7 trustee or examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Term Sheet, then, unless otherwise agreed in writing by the DIP Lender, all of the cash proceeds derived from such credit or debt intended to refinance the DIP Obligations shall immediately be paid to the DIP Lender on account of its DIP Obligations pursuant to the DIP Term Sheet.

32.     *Preservation of Rights Granted Under Interim Order.*

(a)     Good Faith Under Section 364(e) of the Bankruptcy Code.  The DIP Lender and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order, the DIP Facility and the DIP Term Sheet, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and upon the record made at the Interim Hearing and during these Chapter 11 Cases, the DIP Lender and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order or the DIP Term Sheet are hereafter reversed, modified, vacated or stayed by a subsequent judgment or order of this Court or any other court, any such reversal, stay, modification or vacatur shall not affect (i) the validity or enforceability of advances previously made hereunder or under the DIP Term Sheet by the DIP Lender to the Debtors, (ii) the validity or enforceability of any obligation, indebtedness or liability incurred under this Interim Order or the DIP Term Sheet by the Debtors to the DIP Lender, (ii) the validity, enforceability, or perfection of any of the claims, liens, security interests, rights, privileges or benefits granted

63

hereunder or under the DIP Term Sheet, or (iii) the payment of any fees, costs, expenses or other amounts, in the case of each of the foregoing, prior to the actual receipt of written notice by the DIP Lender, to be sent as of the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification or vacatur, any such claim, lien, or security interest, right, privilege, remedy or benefit shall be governed in all respects by the original provisions of this Interim Order and the DIP Term Sheet.

(b)      Survival.  Notwithstanding anything contained herein or in the DIP Term Sheet to the contrary, the terms and provisions of this Interim Order and the DIP Term Sheet (including, without limitation, all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the DIP Lender and the Prepetition Secured Parties under this Interim Order and the DIP Term Sheet), and any actions taken pursuant hereto or thereto, shall survive, shall continue in full force and effect, shall remain binding on all parties-in-interest, and shall be governed by the original provisions of this Interim Order and maintain their priorities as set forth in this Interim Order, and shall not be modified, impaired, or discharged by, entry of any order that may be entered (i) confirming any chapter 11 plan in any of the Chapter 11 Cases, (ii) converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, (iii) dismissing any or all of the Chapter 11 Cases, (iv) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases, or (v) approving the sale or disposition of any DIP Collateral (except as expressly permitted in the DIP Term Sheet), in each case, until all of the DIP Obligations, the Adequate Protection Obligations and the Prepetition Secured Obligations have been Paid in Full (unless the DIP Lender and/or the requisite Prepetition Secured Parties have otherwise agreed in writing in respect of the applicable obligations owed to each of them).

(c)     <u>Dismissal/Conversion</u>.  If any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that (i) all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Lender and the Prepetition Secured Parties hereunder and under the DIP Term Sheet shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations, Adequate Protection Obligations and Prepetition Secured Obligations have been Paid in Full (and that all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections, notwithstanding such dismissal or conversion, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes of enforcing this Interim Order, the DIP Term Sheet, and all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Lender and the Prepetition Secured Parties hereunder or thereunder.

33.     *Loss or Damage to Collateral*.  So long as the DIP Lender complies with its obligations under the DIP Term Sheet, (a) the DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the Debtors.

34.    *Proofs of Claim*.  The DIP Lender and the Prepetition Secured Parties shall not be required to file proofs of claim or request for payment of administrative expenses in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment in respect of the DIP Obligations or the Prepetition Secured Obligations.    The Debtors' Stipulations, acknowledgments and provisions of this Interim Order are deemed sufficient to and do constitute timely filed proofs of claim or request for payment of administrative expenses in respect of such claims arising under the DIP Obligations, the Adequate Protection Obligations, and the Prepetition Secured Obligations against each of the applicable Debtors.  Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Chapter 11 Cases shall not apply to the DIP Lender, the Prepetition Secured Parties, the DIP Obligations or the Prepetition Secured Obligations; provided, however, that, notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Lender or any of the Prepetition Agents (on behalf of themselves and the applicable Prepetition Secured Parties (as applicable)), in their discretion, may (but are not required to) file (and amend and/or supplement) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any Successor Cases, and any such proof of claim may (but is not required to be) filed as one consolidated master proof of claim in the Debtors' lead Chapter 11 Case against all of the Debtors, which shall be deemed to have been filed against each and every Debtor.  Such consolidated or master proofs of claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable party, which instruments, agreements, or other documents will be provided upon reasonable written request to the DIP Lender or the applicable Prepetition Agents, as the case may be.  Any proof of claim filed by or on behalf of the DIP Lender or the Prepetition Secured Parties shall be

deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

35.    *Limitation of Liability*.  Nothing in this Interim Order, the DIP Term Sheet or any documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Parties of any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the Debtors and their respective affiliates in the operation of their businesses, their restructuring efforts or in connection with the administration of these Chapter 11 Cases.  In determining to make any loan or extension of credit, or permit the use of Cash Collateral, or in exercising any rights or remedies hereunder, under the DIP Term Sheet or the Prepetition Loan Documents, neither the DIP Lender nor the Prepetition Secured Parties shall (a) be deemed to be in control of the operations of the Debtors, (b) owe any fiduciary duty to the Debtors or their creditors, shareholders or estates, or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S. §§ 9601 et seq., as amended, or any similar federal or state statute).

36.    *Payments Free and Clear*.  Subject to the Carve Out, any and all payments or proceeds remitted to the DIP Lender or the Prepetition Secured Parties pursuant to the DIP Term Sheet, this Interim Order, the Final Order (if and when entered) or any subsequent order of this Court shall be irrevocable (subject, solely in the case of certain professional fees, the fee review procedures set forth in paragraph 11 of this Interim Order), received free and clear of any claim,

charge, assessment or other liability, including without limitation, any claim or charge asserted or assessed by, through or on behalf of the Debtors (subject to paragraph 26 hereof) or otherwise.

37.     *Joint and Several Liability.*   Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for all obligations (including all DIP Obligations and all Adequate Protection Obligations) under this Interim Order and the DIP Term Sheet.

38.     *Third Party Beneficiary.*   Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect, or incidental beneficiary.

39.     *Interim Order Controls.*   In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order and the DIP Term Sheet, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the DIP Term Sheet, the terms and provisions of this Interim Order shall govern and control.   Notwithstanding anything contained in any other order entered by this Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Term Sheet, including, without limitation, the Approved Budget (subject to Permitted Variances).

40.     *Effectiveness.*   This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry hereof.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, any Local Rule, or Rule 62(a) of the Federal

Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

41.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

42.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.  When used in this Interim Order, the word "including" shall not imply limitation.

43.     *Necessary Action*.  The Debtors are authorized to take any and all such actions as are necessary, required, or appropriate to implement and effectuate the terms of this Interim Order, the DIP Term Sheet and the transactions contemplated hereunder and thereunder.

44.     *Retention of Jurisdiction*.  The Court retains jurisdiction to hear, determine and, if applicable, enforce the terms of any and all matters arising from or related to the DIP Facility, the DIP Term Sheet, and this Interim Order, and the Court's jurisdiction shall survive confirmation and consummation of any chapter 11 plan for any of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

45.     *Final Hearing*.  The Final Hearing shall be held on _____, 2025 at _____ (prevailing Eastern Time), and any objections to the final relief sought in the Motion shall be filed with the Court no later than _____, 2025 at _____ (prevailing Eastern Time) and served upon the following: (a) counsel to the DIP Lender, at (i) Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019, Attn:    Robert  M.  Hirsh  (robert.hirsh@nortonrosefulbright.com)  and  James  Copeland (james.copeland@nortonrosefulbright.com) and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street Wilmington, Delaware 19801, Attn: Matthew Lunn, Esq.

(mlunn@ycst.com) and Robert Poppiti (rpoppiti@ycst.com); (b) proposed co-counsel to the Debtors, (i) Latham & Watkins LLP, (i) 1271 Avenue of the Americas, New York, New York 10020, Attn: Ray C. Schrock (ray.schrock@lw.com) and Candace M. Arthur (candace.arthur@lw.com) and 330 North Wabash Avenue, Suite 2800 Chicago, Illinois 60611, Attn: Jonathan Gordon (jonathan.gordon@lw.com); and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn:  Daniel J. DeFranceschi (defranceschi@rlf.com) and Zachary I. Shapiro (shapiro@rlf.com); (c) counsel to the Prepetition Notes Parties, at (i) Jones Day, 1221 Peachtree Street NE, Suite 400, Atlanta, Georgia 30361, Attn: Daniel J. Merrett, Esq. (dmerrett@jonesday.com), Carl E. Black, Esq. (ceblack@jonesday.com), and Patrick Baldwin, Esq. (pbaldwin@jonesday.com), and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn: Robert J. Dehney, Esq. (rdehney@morrisnichols.com); and (d) counsel for the Prepetition Term Loan Required Lenders, at Schulte Roth & Zabel LLP, 9119 Third Avenue, New York, New York 10022, Attn:  Adam Harris, Esq. (adam.harris@srz.com); and (e) counsel for the Prepetition Term Loan Agent, at Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn:  Ronald A. Hewitt, Esq. (hewitt@sewkis.com).

46.    *Notice of Entry of Interim Order*.  The Debtors shall promptly serve copies of this Interim Order to the parties that have been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Official Committee (if appointed).

### Annex A

**Milestones**

a.  No later than 17 calendar days after the Petition Date, the Court shall have entered an order approving bid procedures (the "**Bid Procedures**") for the sale of all or substantially all of the Debtors' assets (such assets, the "**Acquired Assets**"), which order shall be in form and substance acceptable to the DIP Lender in its sole discretion;

b.  No later than 28 calendar days after the Petition Date, the Debtors shall commence one or more auctions for the Acquired Assets, in accordance with the Bid Procedures; provided that if there is no higher or better offer submitted in comparison to the Stalking Horse Bids for the acquisition of the applicable Acquired Assets in accordance with the Bid Procedures, no auction shall be held with respect to such Acquired Assets;

c.  No later than 35 calendar days after the Petition Date:

   o  The Court shall have entered the Final Order, subject to the availability of the Court to conduct a Final Hearing on the DIP Facility;

   o  The Court shall have entered one or more orders approving the winning bid(s) and the ultimate sale of the applicable Acquired Assets, which order or orders shall be in form and substance acceptable to the DIP Lender in its sole discretion; and

   o  The Debtors shall have consummated the sale of the Acquired Assets to one or more Successful Bidders and/or Backup Bidders.

## <u>Exhibit 1</u>

**Draft DIP Term Sheet**

**ZEN JV, LLC**

**Senior Secured Superpriority**
**Debtor-in-Possession Credit Facility Term Sheet**

**Dated as of June 25, 2025**

This Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet (this "**Term Sheet**") describes the principal terms and conditions of a proposed senior secured superpriority debtor-in-possession term loan facility (the "**DIP Credit Facility**") to be provided by the DIP Lender (as defined below) to Zen JV, LLC, a Delaware limited liability company (the "**Borrower**") in connection with cases (collectively, the "**Chapter 11 Cases**") filed by the Borrower and the Guarantors (as defined below) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") on June 24, 2025 (the "**Petition Date**"). The DIP Credit Facility is being provided by the DIP Lender in reliance upon the promulgation and consummation of the 363 Sale Process (as defined below).

This Term Sheet is being provided on a confidential basis and it, along with its contents and existence, may not be distributed, disclosed or discussed with any other party other than (i) the Debtors' directors, officers, employees, accountants, attorneys and other professional advisors retained by any of the Debtors in connection with the transactions contemplated hereby and (ii) in a Bankruptcy Court filing in connection with the Chapter 11 Cases. This Term Sheet is not an offer for the purchase, sale, or subscription or invitation of any offer to buy, sell or to subscribe for any securities. The terms and conditions set forth in this Term Sheet do not constitute or create an agreement, obligation or commitment of any kind by or on behalf of any party, unless and until executed by each of the undersigned parties hereto. Each of the Borrower and the DIP Lender agree and acknowledge that the failure to enter into definitive documentation with respect to the transactions contemplated hereby (such documentation, the "**Definitive Documentation**") shall in no event have an impact on, or operate in derogation of, the binding nature and the enforceability of this Term Sheet except as set forth under the heading "Conditions Precedent to Final DIP Loan."

| | |
|---|---|
| **BORROWER:** | Zen JV, LLC, a Delaware limited liability company, in its capacity as a debtor and debtor-in-possession under the Bankruptcy Code. |
| **GUARANTORS:** | FastWeb, LLC, a Delaware limited liability company, Military Advantage, LLC, a Delaware limited liability company, Monster Government Solutions, LLC, a Delaware limited liability company, Monster Worldwide LLC, a Delaware limited liability company, Camaro Acquisition, LLC, a Delaware limited liability company, CareerBuilder, LLC, a Delaware limited liability company, CareerBuilder France Holding LLC, a Delaware limited liability company, CareerBuilder Government Solutions LLC, a Delaware limited liability company, and Luceo Solutions, LLC a Delaware limited liability company (collectively, the "**Guarantors**" and each, individually, a "**Guarantor**"). |
| **DIP LENDER:** | JMB Capital Partners Lending, LLC (the "**DIP Lender**"). |
| **DIP CREDIT FACILITY:** | The DIP Lender agrees to make senior secured superpriority debtor-in-possession loans to the Borrower consisting of delayed-draw term |

| | |
|---|---|
| | loans to be made from time to time during the Availability Period (as defined below) in accordance with the Draw Schedule set forth below in an aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $20,000,000 (the "**DIP Commitment**"), upon compliance with the conditions set forth in this Term Sheet under the heading "Conditions Precedent to Subsequent DIP Loans". |
| **AVAILABILITY PERIOD:** | The DIP Credit Facility shall be available from the Interim Closing Date to the earliest of (i) the Maturity Date (as defined below) and (ii) the date of the termination of the DIP Credit Facility pursuant to the terms hereof or the DIP Orders (as defined below) (the "**Availability Period**").  Borrower may request draws under the DIP Credit Facility in accordance with the following schedule by delivering a notice of borrowing to the DIP Lender (the "**Notice of Borrowing**"), duly executed by an authorized officer of Borrower (the "**Draw Schedule**"): <br><br> (a)  Interim DIP Loan:  On or after the date of an order approving the DIP Credit Facility on an interim basis (the "**Interim Order**"), Borrower may request loans in an amount not to exceed $12,500,000, subject to the provisions of this Term Sheet, the Interim Order, and the Approved Budget (as defined below) (the "**Interim DIP Loans**"); and <br><br> (b)  Subsequent DIP Loans:  On or after the date of an order approving the DIP Credit Facility on a final basis (the "**Final Order**"), Borrower may request loans in one or more borrowings up to amounts, not to exceed the DIP Commitment, less amounts drawn under the Interim DIP Loans (the "**Subsequent DIP Loans**" and, together with the Interim DIP Loans, the "**DIP Loans**"), subject to the provisions of this Term Sheet, the Final Order, and the Approved Budget. <br><br> The proceeds of the DIP Loans shall be funded into a deposit account of the Borrower.  Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Lender, which shall be perfected pursuant to the DIP Orders. |
| **USE OF PROCEEDS:** | The DIP Loans will be used strictly in accordance with the Approved Budget (subject to the Permitted Variances (as defined below)), for (i) working capital and general corporate purposes of the Debtors, (ii) for bankruptcy-related costs and expenses, and (iii) for costs and expenses related to the DIP Credit Facility. |
| **APPROVED BUDGET; APPROVED CASH FLOW PROJECTION; VARIANCE REPORTS:** | The Debtors have delivered to the DIP Lender a weekly budget on a consolidated basis for the 13-week period commencing on the Petition Date, which is hereby approved by the DIP Lender (the "**Approved Budget**"). |

By no later than 11:59 PM (Eastern Time) on Thursday after the second (2nd) full calendar week following the Petition Date (the "**First Testing Date**"), and no later than 11:59 PM (Eastern Time) on each Thursday thereafter (together with the First Testing Date, each a "**Testing Date**"), the Debtors shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report comparing the Debtors' actual receipts and disbursements by line item for the prior calendar week, beginning with the fourth (4th) week after the Petition Date, and the prior four (4) calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such week and, beginning with the fourth (4) calendar week after the Petition Date, the prior four (4) calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks (the "**Weekly Variance Report**").

By not later than 11:59 PM Eastern Time on the First Testing Date and on each Thursday thereafter that is the four-week (4-week) anniversary of the First Testing Date (each such date, a "**Monthly Variance Testing Date**" and each such four-week period, the "**Monthly Testing Period**"), the Debtors shall provide to the Lender a report detailing (i) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Monthly Testing Period for all operating disbursements; and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Monthly Testing Period by the Debtors against the aggregate disbursements for the Monthly Testing Period, as set forth in the applicable Approved Budget (a "**Monthly Variance Report**," together with the Weekly Variance Report, the "**Approved Variance Reports**").

The Debtors shall comply with the following (collectively, the "**Permitted Variances**"):

As of any Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, the Debtors shall not allow: all operating disbursements (excluding professional fees and restructuring charges arising on account of the Chapter 11 Cases (including United States Trustee fees and professional fees and expenses incurred by the DIP Lender or any privacy ombudsman)) to be greater than 120% of the estimated disbursement for such items in the Approved Budget, each for such Monthly Testing Period.

Additional variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to the DIP Lender's approval. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

Commencing at 11:59 P.M. (Eastern Time) on the Thursday of the fourth full calendar week after the Petition Date, and continuing at

3

| | |
|---|---|
| | 11:59 P.M. (Eastern Time) on the Thursday of every fourth (4th) week thereafter, the weekly budget shall be updated (provided that the Debtors may submit an updated budget more frequently as the Debtors deem appropriate), and if such updated budget is in form and substance reasonably satisfactory to the Lender, it shall become the "Approved Budget" for purposes of this Term Sheet and the DIP Orders.  Any amendments, supplements, or modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior written approval of the DIP Lender prior to the implementation thereof.  If the DIP Lender has not objected, in writing, to a proposed updated budget, or an amendment, supplement, or modification to the Approved Budget or an Approved Variance Report, within five (5) business days after the DIP Lender's receipt thereof, such proposed updated budget, amendment, supplement, or modification shall be deemed acceptable to and approved by the DIP Lender.  Until any such updated budget, amendment, supplement, or modification has been approved by the DIP Lender, the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect. |
| **DIP LENDER CALLS:** | The Borrower shall participate in a weekly call with the DIP Lender and the DIP Lender's advisors at a time to be mutually agreed to discuss the Borrower's business, operations, sale process and general case status. |
| **PREPETITION LIENS** | (i)   Amended and Restated Senior Secured Note, dated as of September 16, 2024 (the "**A&R Note**", and the obligations to the A&R Holders (as defined below) in their capacity as such thereunder, the "**A&R Obligations**"), by and among Borrower, Randstad MWW Solutions Inc., a Delaware corporation, as collateral agent for the Secured Parties (as defined therein) (in such capacity, the "**A&R Agent**") and the other Holders (as defined therein) from time to time party thereto (the "**A&R Holders**"). <br><br> (ii)  Amended and Restated Additional Senior Secured Note, dated as of February 20, 2025 (the "**Additional Note**", and the obligations to the Additional Note Holders (as defined below) in their capacity as such thereunder, the "**Additional Note Obligations**"), by and among Borrower, Randstad MWW Inc., a Delaware corporation, as collateral agent for the Secured Parties (as defined therein) (in such capacity, the "**Additional Note Agent**") and the Holders (as defined therein) from time to time party thereto (the "**Additional Note Holders**"). <br><br> (iii) Amended and Restated Third Senior Secured Note, dated as of December 27, 2024 (the "**Third Note**", and together with the A&R Note and the Additional Note, collectively, the "**Prepetition Notes**", and the obligations to the Third Note Holders (as defined below) in their capacity thereunder, the |

4

"**Third Note Obligations**", and together with the A&R Obligations and the Additional Note Obligations, collectively, the "**Prepetition Notes Obligations**"), by and among Borrower, Randstad MWW Solutions Inc., a Delaware corporation, as collateral agent for the Secured Parties (as defined therein) (in such capacity, the "**Third Note Agent**", and together with the A&R Agent and the Additional Note Agent, collectively, the "**Prepetition Note Agents**") and the Holders (as defined therein) from time to time party thereto (the "**Third Note Holders**", and together with the A&R Holders and the Additional Note Holders, collectively, the "**Prepetition Notes Secured Parties**"). The liens created under the Prepetition Notes, the "**Prepetition Notes Liens**" and the collateral secured thereby, the "**Prepetition Notes Collateral**")

(iv) Amended and Restated First Lien Credit Agreement, dated as of April 19, 2023 (as amended by that certain Amendment No. 1 to Amended and Restated Credit Agreement, dated as of March 26, 2024, as further amended by that certain Amendment No. 2 to Amended and Restated Credit Agreement, dated as of April 29, 2024, as further amended by that certain Amendment No. 3 to Amended and Restated Credit Agreement, dated as of May 30, 2024, as further amended by that certain Amendment No. 4 to Amended and Restated Credit Agreement, dated as of June 28, 2024, as further amended by that certain Resignation, Waiver, Amendment and Appointment Agreement, dated as of October 11, 2024, as further amended by that certain Amendment No. 6 to Amended and Restated Credit Agreement, dated as of February 24, 2025, as further amended by that certain Amendment No. 7 to Amended and Restated Credit Agreement, dated as of March 31, 2025, and as further amended by that certain Amendment No. 8 to Amended and Restated Credit Agreement, dated as of April 29, 2025 (the "**Prepetition Credit Agreement**" and the obligations thereunder the "**Prepetition Term Loan Obligations**" and together with the Prepetition Notes Obligations, the "**Prepetition Obligations**"), by and among CareerBuilder, LLC, as borrower, the guarantors from time to time party thereto, Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, the "**Prepetition Term Loan Agent**"), and the lenders party thereto from time to time (collectively, the "**Prepetition Term Loan Lenders**", and together with the Prepetition First Lien Agent, the "**Prepetition Term Loan Secured Parties**" and together with the Prepetition Notes Secured Parties, the "**Prepetition Secured Parties**"). The liens created under the Prepetition Credit Agreement, the "**Prepetition Term Loan Liens**" and together with the Prepetition Notes Liens, the "**Prepetition Liens**", and the

5

| | |
|---|---|
| | collateral secured by the Prepetition Term Loan Liens, the "**Prepetition Term Loan Collateral**")) |
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations owed to the DIP Lender under or in connection with this Term Sheet and the Interim Order and/or Final Order, (collectively, the "**DIP Obligations**"), in all cases subject to the Carve-Out (as defined below), shall be:<br><br>(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code;<br><br>(ii)    pursuant to sections 364(c)(2) secured by a perfected first-priority lien on the DIP Collateral (as defined below) granted in favor of the DIP Lender, to the extent that such DIP Collateral is not subject to the Prepetition Permitted Liens (as defined below);<br><br>(iii)    pursuant to section 364(c)(3), secured by a perfected junior lien on DIP Collateral granted in favor of the DIP Lender, to the extent such DIP Collateral is subject to a Prepetition Permitted Lien; and<br><br>(iv)    pursuant to section 364(d)(1), secured by a perfected first-priority priming lien on DIP Collateral granted in favor of the DIP Lender, provided that such lien shall be subject to the Prepetition Permitted Liens but senior to all other liens (including the Prepetition Liens (as defined above)), but subject to the Adequate Protection Settlement (as defined below) (collectively, the liens described in clauses (ii), (iii) and (iv), the "**DIP Liens**").<br><br>Notwithstanding anything to the contrary herein (the following, the "**Adequate Protection Settlement**"):<br><br>(a)    the Debtors shall pay to the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Lenders, the sum of $1 million upon entry of the Interim Order (the "**Consent Fee**");<br><br>(b)    the DIP Liens and DIP Obligations shall be senior to the Prepetition Term Loan Liens and Prepetition Term Loan Obligations with respect to the Prepetition Term Loan Collateral only to the extent of $1 million, with the Prepetition Term Loan Liens being senior to the DIP Liens for the value of Prepetition Term Loan Collateral in excess thereof;<br><br>(c)    the Prepetition Secured Parties and the Debtors agree that, without prejudice to the rights of other parties, 51% of the proceeds from any sale, transfer or other disposition of the assets |

| | |
|---|---|
| | that are the subject of the CBM Stalking Horse Bid (as defined in the Interim Order) (pursuant to the CBM Stalking Horse Bid or otherwise) shall be allocated to the Prepetition Term Loan Collateral (with the Consent Fee credited against such amount), with the remaining 49% allocated to the Prepetition Secured Notes Collateral and: |
| | (d) subject to entry of the Final Order, the Debtors shall not recover more than $75,000 of the reasonable and necessary costs of preserving or disposing the Prepetition Term Loan Collateral pursuant to section 506(c) of the Bankruptcy Code, with any amount in excess thereof being waived. |
| | "**Carve-Out**" has the meaning set forth in the Interim Order or Final Order, as applicable, and for the avoidance of doubt, such amounts shall be subject in all respects to the Approved Budget (subject to the terms of the Interim Order or Final Order, as applicable). As used herein, "**Prepetition Permitted Liens**" shall mean certain liens senior by operation of law and otherwise permitted by the Prepetition Indebtedness (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the liens securing the Prepetition Obligations as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) other than, in each case, the Prepetition Liens. |
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets of each Debtor and its bankruptcy estate of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, real property, books and records, and all proceeds, rents, profits, and offspring of the foregoing, other than (i) assets, contracts, leases, and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases, and other licenses shall be DIP Collateral and (ii) avoidance actions under chapter 5 of the Bankruptcy Code, provided that DIP Collateral shall include proceeds of avoidance actions upon entry of the Final Order. |
| | All of the liens granted to the DIP Lender in the DIP Collateral shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements.  Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lender may reasonably request, to at all times maintain the validity, perfection, enforceability, and priority of the security |

| | |
|---|---|
| | interest and liens of the DIP Lender in the DIP Collateral, or to enable the DIP Lender to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral. |
| **FEES:** | 3% upfront fee on total DIP Commitment, earned, non-refundable, and allowed upon entry of the Interim Order (the "**Upfront Fee**"). The Upfront Fee will be paid in kind by adding such Upfront Fee to the principal amount of the DIP Loans. |
| | 6% exit fee on the total DIP Commitment, earned, non-refundable, and allowed upon entry of the Interim Order and paid in cash upon the repayment of the DIP Loans (including voluntary prepayments), the termination of the DIP Commitments, or upon the acceleration of the DIP Loans following an Event of Default (the "**Exit Fee**"). |
| **INTEREST RATE:** | Interest will be payable on the unpaid principal amount of all DIP Loans and all overdue interest thereon at a rate per annum equal to 12%, payable and the end of such interest period in arrears in kind by adding such interest to the principal amount of such DIP Loans. All interest and fees under this Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid. |
| **DEFAULT RATE:** | At all times automatically following the occurrence and during the continuance of an Event of Default, principal, interest, and all other amounts due on the DIP Loans shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above. |
| **363 SALE PROCESS:** | The Debtors shall continue a public sale process with respect to their assets pursuant to section 363 of the Bankruptcy Code (the "**Sales**"). In connection with the Sales, Valsoft Corporation, Inc., JobGet Inc., and Valnet US Inc. will serve as the stalking horse purchasers (the "**Stalking Horse Purchasers**") under the asset purchase agreements provided to the DIP Lender on June 24, 2025 (the "**Stalking Horse APAs**"). |
| | The process set forth above, designation of the Stalking Horse Purchasers, and use of the Stalking Horse APAs shall collectively be referred to as the "**363 Sale Process**." |
| **MATURITY DATE:** | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"): |
| | (i)   50 calendar days after the Petition Date; |
| | (ii)   two (2) business days after the termination of the Stalking Horse APAs for any reason, other than (a) as a result of (1) any |

breach of the Stalking Horse APAs by the Purchaser or (2) the Debtors' selection of an alternative bid that either has (A) the consent of the DIP Lender or (2) results in the indefeasible payment in full in cash of the DIP Obligations, in each case, as of the closing of such alternative bid or (b) a termination to pursue approval of an Third-Party Sale (as defined in the Stalking Horse APAs) that results in the indefeasible payment in full in cash of the DIP Obligations as of the closing of such Third-Party Sale;

(iii)    the date of consummation of any sale of all or substantially all of the assets of any of the Debtors pursuant to section 363 of the Bankruptcy Code;

(iv)    the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court;

(v)    entry of an order by the Bankruptcy Court approving (a) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (b) a motion seeking the appointment or election of a trustee, a responsible officer, or examiner with enlarged powers relating to the operation of the Debtors' business;

(vi)    the date, if any, on which the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a liquidation pursuant to Chapter 7 of the Bankruptcy Code; and

(vii)    the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitments in respect thereof upon the occurrence of an Event of Default (as defined below).

Notwithstanding anything in this Term Sheet or the DIP Orders to the contrary, simultaneously with the consummation of any Third-Party Sale that results in the occurrence of the Maturity Date pursuant to clause (iii) above, the Debtors shall pay (or cause to be paid) the outstanding amount of the DIP Loans (together with all other DIP Obligations) from the proceeds of such Third-Party Sale, reserving proceeds (x) sufficient to pay accrued, unpaid, and allowed administrative expenses (as of the date of the closing of such Third-Party Sale) to the extent set forth in the Approved Budget and (y) in an amount negotiated in good faith by the DIP Lender and the Debtors that is necessary to fund costs for the wind-down of Debtors' bankruptcy estates following the closing of such Third-Party Sale.

| | |
|---|---|
| **OPTIONAL PREPAYMENTS:** | The Debtors may prepay the DIP Loans in whole or in part at any time upon delivery of written notice to the DIP Lender no later than 1:00 PM (Eastern Time) three (3) business days prior to the date of |

| | |
|---|---|
| | such prepayment (or such later time as the DIP Lender may agree to acting reasonably); *provided* any such prepayments shall be subject to the Exit Fee on the portion of the DIP Loans so repaid. All optional prepayments shall be applied to the DIP Loans in accordance with the application of payment provisions set forth in the "Mandatory Prepayments" section below. Any amounts so prepaid may not be reborrowed. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PAYMENTS:** | Prior to the occurrence of an Event of Default, upon receipt of proceeds described in clauses (i) through (iii) below, the Debtors shall remit to the DIP Lender to pay or prepay, to the extent provided below, the DIP Obligations (together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) in each case owed to applicable DIP Lender specified in clauses (i) through (iii) below, ratably and to the extent specified below, until such obligations are paid in full as follows:

(i)   100% of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code (other than Sales to the Stalking Horse Purchasers pursuant to the Stalking Horse APAs) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds sufficient to pay accrued, unpaid, and allowed administrative expenses (as of the closing of such Sale) to the extent set forth in the Approved Budget;

(ii)  100% of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for (a) asset sales approved by an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the DIP Lender or (b) asset sales in the ordinary course of business) to be applied to the prepayment of the DIP Loans and all other DIP Obligations (including any interest on amounts prepaid and together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) in each case owed to the DIP Lender;

(iii) 100% of the net cash proceeds of extraordinary receipts (including the proceeds of tax refunds in excess of $2.0 million, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by any of the Debtors as set forth in the Approved Budget) by any Debtor to be applied to the prepayment of the DIP Loans and all other DIP Obligations (including any interest on amounts prepaid and together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) in each case owed to the DIP Lender; and |

10

| | |
|---|---|
| | (iv) 100% of the net cash proceeds received as a result of the Borrower or any Guarantor incurring or issuing any Indebtedness that is not expressly permitted to be incurred or issued pursuant to this Term Sheet.<br><br>Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the DIP Lender. |
| **CONDITIONS PRECEDENT TO THE INTERIM DIP LOAN:** | The obligations of the DIP Lender to make the Interim DIP Loans in accordance with the Draw Schedule will be subject to satisfaction, or written waiver, by the DIP Lender, of each of the following conditions precedent in connection with each draw request (the date on which such conditions shall have been satisfied or waived in accordance with this Term Sheet, the ("**Interim Closing Date**").<br><br>(i)    Debtors shall have timely delivered to the DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet;<br><br>(ii)    Debtors shall have delivered to the DIP Lender a Notice of Borrowing in connection with such draw request no later than 1:00 PM (Eastern Time) one business day prior to the requested funding date for the Interim DIP Loan (or such later time as the DIP Lender may agree to);<br><br>(iii)    the Interim Order (in form and substance acceptable to the DIP Lender) has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed, or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Lender and the Debtors shall be in compliance in all respects with the Interim Order;<br><br>(iv)    the DIP Lender shall be reasonably satisfied that the liens and security interests of the DIP Lender in the DIP Collateral have been perfected by the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements and shall constitute first-priority liens (subject only to Prepetition Permitted Liens);<br><br>(v)    no Default or Event of Default under the DIP Credit Facility or under the Interim Order or Final Order, as applicable, shall have occurred and be continuing on the Interim Closing Date or after giving effect to the Interim DIP Loan;<br><br>(vi)    all representations and warranties of the Debtors hereunder shall be true and correct in all material respects (except those |

|  | qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects); |
|---|---|
|  | (vii)  subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver, and perform its obligations under this Term Sheet and the Interim Order and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery, or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this Term Sheet and the Interim Order except for consents, authorizations, and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations, and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below); and |
|  | (viii) substantially concurrently with the Interim Closing Date, all fees and out-of-pocket expenses of the DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) to the extent a summary invoice has been delivered to the Borrower. |
|  | Modifications of the Interim Order shall require the prior written consent of the DIP Lender. |
|  | For the purposes of this Term Sheet, "**Material Adverse Change**" shall mean: since the Petition Date, a material adverse change in, (a) the business, operations, properties, liabilities, or financial condition of Borrower and its subsidiaries, taken as a whole, (b) the ability of any of the Borrower and the Debtors to perform its obligations under the Term Sheet, (c) the validity or enforceability against any of the Borrower and the Debtors of the Term Sheet, or (d) the rights and remedies of the DIP Lender hereunder or thereunder. |
| **CONDITIONS PRECEDENT TO SUBSEQUENT DIP LOANS:** | The obligations of the DIP Lender to make a Subsequent DIP Loans shall be subject to satisfaction or waiver of each of the following conditions: |
|  | (i) the receipt by the DIP Lender of a Notice of Borrowing no later than 1:00 PM (Eastern Time) one (1) business days prior to the requested funding date for such Final DIP Loan; |
|  | (ii) all representations and warranties being true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects); |

|  | (iii) no Default or Event of Default under the DIP Credit Facility, or Interim Order or Final Order, as applicable, then existing or after giving effect to such Final DIP Loan; and<br><br>(iv) the proceeds of such Subsequent DIP Loans shall be applied in a manner consistent with the Approved Budget and any Permitted Variances thereto. |
|---|---|
| **REPRESENTATIONS AND WARRANTIES:** | On the date hereof, the Borrower represents and warrants to the DIP Lender that:<br><br>(i)   Subject to any restrictions arising on account of any Borrower or any of its Debtor subsidiaries' status as a "debtor" under the Bankruptcy Code and the entry of the DIP Orders, each of the Borrower and its Subsidiaries (a) is a limited liability company organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business in each jurisdiction where such qualification is required, except where the failure so to qualify would not reasonably be expected to have a material adverse effect, and (d) has the power and authority to execute, deliver, and perform its obligations under this Term Sheet and, in the case of the Borrower, to borrow and otherwise obtain credit hereunder.<br><br>(ii)  Subject to any restrictions arising on account of the Borrower or any of its Debtor subsidiaries' status as a "debtor" under the Bankruptcy Code and the entry of the DIP Orders, the execution, delivery, and performance by the Borrower and each Guarantor of this Term Sheet and the borrowings hereunder (a) have been duly authorized by all limited liability company action required to be obtained by the Borrower and its subsidiaries and (b) will not violate (1) any provision of law, statute, rule, or regulation applicable to the Borrower or its subsidiaries, (2) the certificate or articles of incorporation or other constitutive documents of the Borrower or its Subsidiaries, or (3) any applicable order of any court or any rule, regulation or order of any governmental authority applicable to the Borrower or any of its subsidiaries.<br><br>(iii) This Term Sheet has been duly executed and delivered by the Borrower and each Guarantor and constitutes, upon entry of the applicable DIP Order, a legal, valid, and binding obligation of the Borrower or such Guarantor, enforceable against the Borrower and the Guarantors, in accordance with its terms, subject to (a) any restrictions arising on |

US-DOCS\161034655.6

account of any Borrower or Guarantors' status as a "debtor" under the Bankruptcy Code and the entry of the DIP Orders and the effects of other bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance, or other similar laws affecting creditors' rights generally, (b) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), (c) implied covenants of good faith and fair dealing, and (d) any foreign laws, rules and regulations as they relate to pledges of equity interests of foreign subsidiaries that are not party hereto.

(iv)     Subject to any restrictions arising on account of any Borrower or any of its Debtor subsidiaries' status as a "debtor" under the Bankruptcy Code and the entry of the DIP Orders other than the Chapter 11 Cases, (a) there are no actions or suits or proceedings at law or in equity or by or on behalf of any governmental authority or in arbitration now pending, or, to the knowledge of the Borrower, threatened in writing against the Borrower or any of its Debtor subsidiaries or any business, property, or rights of any such person that would reasonably be expected to have, individually or in the aggregate, a material adverse effect and (b) none of the Borrower, its Debtor Subsidiaries and their respective properties or assets is in violation of any law, rule, or regulation or is in default with respect to any judgment, writ, injunction, or decree of any governmental authority, where such violation or default would reasonably be expected to have, individually or in the aggregate, a material adverse effect.

(v)      Neither the making of any loan hereunder nor the use of proceeds thereof will violate the provisions of Regulation T, Regulation U or Regulation X of the Federal Reserve Board.

(vi)     None of the Borrower or any of its Debtor subsidiaries is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(vii)    (a) The Borrower and each of its Debtor subsidiaries is in compliance in all material respects with the material provisions of the USA PATRIOT Act, (b) none of the Borrower or any of its Guarantors, nor to the knowledge of the Borrower, any director, officer, agent, employee or affiliate of the Borrower or any of the Guarantors is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. Treasury Department, the European Union or relevant member states of the European Union, the United Nations Security Council or His Majesty's Treasury,

14

| | |
|---|---|
| | and (c) the Borrower will not directly or indirectly use the proceeds of the loans or otherwise make available such proceeds to any person, for the purpose of financing the activities of any person that is currently the target of any sanctions. |
| | (viii)　(a) The Borrower its Subsidiaries, and to the knowledge of the Borrower, any of their directors, officers, agents or employees, are in compliance with the U.S. Foreign Corrupt Practices Act of 1977 in all material respects and (b) no part of the proceeds of the loans made hereunder will be used to make any unlawful bribe, rebate, payoff, influence, payment, kickback or other unlawful payment. |
| **AFFIRMATIVE COVENANTS:** | The Borrower covenants and agrees that, as of the date hereof until the termination of this Term Sheet, unless the DIP Lender shall otherwise consent in writing, that the Borrower will, and will cause each of the Guarantors and their subsidiaries to: |
| | (i)　(a) Do or cause to be done all things necessary to preserve, renew, and keep in full force and effect its legal existence and (b) except where failure to do so would not reasonably be expected to have a material adverse effect, do or cause to be done all things necessary to (1) lawfully obtain, preserve, renew, extend, and keep in full force and effect the permits, franchises, authorizations, intellectual property, licenses and rights with respect thereto necessary to the normal conduct of its business and (2) at all times maintain, protect and preserve all property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted), from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times. |
| | (ii)　Comply with all laws, rules, regulations and orders of any governmental authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a material adverse effect. |
| **NEGATIVE COVENANTS:** | The Borrower covenants and agrees that, as of the date hereof until the termination of this Term Sheet, unless the DIP Lender shall otherwise consent in writing, the Borrower will not, and will not permit any of its subsidiaries to: |
| | (i)　Incur, create, assume, or permit to exist any indebtedness for borrowed money except: (a) indebtedness created under this Term Sheet, (b) indebtedness of the Borrower and its |

|   | subsidiaries in existence prior to the date hereof, (c) indebtedness among the Borrower or any Guarantor to the Borrower or any Guarantor and (d) the deferred purchase price of goods and services in the ordinary course of business. |
|---|---|
| (ii) | Create, incur, assume, or permit to exist any lien securing obligations for borrowed money of the Borrower or any Subsidiary, except (a) any liens created under the Term Sheet and (b) liens on property or assets of the Borrower and its subsidiaries in existence prior to the date hereof. |
| (iii) | Purchase or otherwise acquire (a) all or substantially all of the property and assets or business of another person or (b) assets constituting a business unit, line of business or division of such person or otherwise make an investment in any person except (1) investments amongst the Borrower and Guarantors (2) investments in existence prior to the date hereof, and (3) the extension of trade credit in the ordinary course of business. |
| (iv) | Declare or pay any dividend or make any other distribution except for payments made by the Borrower and the Guarantors to the Borrower or any Guarantor. |
| (v) | Sell or transfer any property or assets to or purchase or acquire any property or assets from, or otherwise engage in any other transaction with any of its affiliates except for transactions that are on terms that are substantially no less favorable to the Borrower or such subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an affiliate. |
| (vi) | Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred except sales or transfers of any property or assets that are worn out or obsolete in the ordinary course of business. |
| (vii) | Engage at any time to any material respect in any business or business activity substantially different from any business or business activity conducted by the Borrower and its subsidiaries on the date of the Interim Order. |

16

| EVENTS OF DEFAULT: | Each of following shall constitute an "**Event of Default**":<br><br>(i)   the entry of an Interim Order or Final Order in form or substance that is not acceptable to the DIP Lender in its discretion;<br><br>(ii)   failure by any Debtor to be in compliance in all respects with provisions of this Term Sheet and/or the DIP Orders;<br><br>(iii)   any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration, or vacatur of a DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender;<br><br>(iv)   failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made;<br><br>(v)   the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest, or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the DIP Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Lender;<br><br>(vi)   the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders) against the DIP Lender or any of its agents and employees to subordinate or avoid any liens made in connection with the DIP Orders;<br><br>(vii)   (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement, or otherwise modify any DIP Order or the Term Sheet, or the disallowance of the DIP Obligations, in whole or in part or (b) any material provision of the DIP Orders or Term Sheet, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Lender);<br><br>(viii)   the filing with the Bankruptcy Court of a motion seeking approval of a sale under section 363 (other than as contemplated by the Stalking Horse APAs) or a plan of |
|---|---|

17

|  | reorganization or liquidation in any of the Chapter 11 Cases that, in either case, does not provide for indefeasible payment in full in cash to the DIP Lender of DIP Loans and all other amounts outstanding under this Term Sheet or the DIP Orders on closing of such sale or the effective date of such plan; |
|--|--|
|  | (ix)  the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); |
|  | (x)  the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral; |
|  | (xi)  the conversion of any of the Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code; |
|  | (xii)  the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code; |
|  | (xiii)  a dismissal of any of the Chapter 11 Cases; |
|  | (xiv)  failure to pay principal, interest, or other DIP Obligations in full when due, including without limitation, on the Maturity Date; |
|  | (xv)  any representation or warranty made or deemed made by the Borrower or any Guarantor herein shall prove to have been false or misleading in any material respect when so made or deemed made; |
|  | (xvi)  failure to comply with any covenant set forth herein and such failure shall remain unremedied for a period of five days; |
|  | (xvii)  Debtors' failure to satisfy a Milestone (as defined below). |
| **REMEDIES UPON EVENT OF DEFAULT:** | (i)  Declare that the DIP Commitments are terminated, whereupon the DIP Commitments shall be terminated; |
|  | (ii)  Declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; or |
|  | (iii)  Take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Order, or |

| | |
|---|---|
| | by applicable law. |
| | Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Orders. |
| **OTHER BANKRUPTCY MATTERS:** | All out-of-pocket prepetition and postpetition reasonable and documented fees, costs, and expenses of the DIP Lender relating to the DIP Credit Facility, the Stalking Horse APAs, and the Chapter 11 Cases (including, without limitation, prepetition and postpetition reasonable and documented fees and disbursements of counsel and advisors), subject to the DIP Orders, shall be payable by Borrower following written demand and without the requirement for Bankruptcy Court approval. |
| | Borrower shall indemnify, pay, and hold harmless the DIP Lender (and each of their respective directors, officers, members, employees, and agents) against any loss, liability, cost, or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the bad faith, gross negligence, willful misconduct, or fraud of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). |
| | The DIP Orders shall contain releases and exculpations for the DIP Lender (in any capacity), in form and substance satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions. |
| | The DIP Lender may credit bid any or all of the outstanding DIP Obligations (and any other applicable obligations) in connection with the Sale or any other non-ordinary course sale of the DIP Collateral pursuant to section 363 of the Bankruptcy Code, any plan or otherwise, including any deposit in connection with such sale, and such credit bidding rights shall not be limited for cause pursuant to section 363(k) of the Bankruptcy Code or otherwise. The Prepetition Agents at the direction of the Prepetition Secured Parties under the Prepetition Indebtedness shall have the right to credit bid any or all of the Prepetition Obligations in connection with the Sale, including any deposit in connection with such sale, or any other non-ordinary course sale of the Prepetition Collateral pursuant to section 363 of the Bankruptcy Code, any plan or otherwise, and such credit bidding rights shall not be limited for cause pursuant to section 363(k) of the Bankruptcy Code or otherwise. |
| **MILESTONES** | No later than 17 days after the Petition Date:  entry of an order approving the Debtors' bid procedures for the 363 Sale Process, in form and substance satisfactory to the DIP Lender. |
| | No later than 28 days after the Petition Date:  commencement of an auction for the Debtors' assets; provided that if there are no bids |

US-DOCS\161034655.6

| | |
|---|---|
| | better than the Stalking Horse Bids for the applicable assets, then no auction shall be held with respect to such assets.<br><br>No later than 35 days after the Petition Date: (i) entry of the Final Order; (ii) entry of an order approving one or more sale of the Debtors' assets in the 363 Sale Process; and (iii) consummation of one or more sales of the Debtors' assets in the 363 Sale Process.<br><br>Debtors and DIP Lender may extend such dates via written agreement, which may be via email among counsel. |
| **DIP ORDERS GOVERN:** | To the extent of any conflict or inconsistency between this Term Sheet and the DIP Orders, the DIP Orders shall govern. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet.<br><br>Debtors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |
| **COUNTERPARTS AND ELECTRONIC TRANSMISSION:** | This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| **COUNSEL TO DIP LENDER:** | Norton Rose and Fulbright US LLP |

[*Remainder of page intentionally left blank*]

**<u>DIP LENDER</u>**:

**JMB CAPITAL PARTNERS LENDING, LLC**

By: _____
     Name:  Vikas Tandon
     Title:   Chief Investment Officer

**DEBTORS**:

**ZEN JV, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**FASTWEB, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**MILITARY ADVANTAGE, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**MONSTER GOVERNMENT SOLUTIONS, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**MONSTER WORLDWIDE LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**CAMARO ACQUISITION, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

[*Signature Page to Senior Secured Super-Priority Debtor-in-Possession Credit Facility Term Sheet*]

**CAREERBUILDER, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**CAREERBUILDER FRANCE HOLDING LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**CAREERBUILDER GOVERNMENT SOLUTIONS, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**LUCEO SOLUTIONS, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**Exhibit 2**

**Initial Budget**

*($ in millions)*

| | Post Petition | | | | | | 5-Weeks |
|---|---|---|---|---|---|---|---|
| **Week:** | **1** | **2** | **3** | **4** | **5** | | |
| **Type:** | **Fcst** | **Fcst** | **Fcst** | **Fcst** | **Fcst** | | **Fcst** |
| **Period Starting** | **6/24/2025** | **6/28/2025** | **7/5/2025** | **7/12/2025** | **7/19/2025** | | |
| **Period Ending:** | **6/27/2025** | **7/4/2025** | **7/11/2025** | **7/18/2025** | **7/25/2025** | | |
| **Operating Receipts** | | | | | | | |
| Monster Collections | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.2 | $ 1.3 | | $ 6.4 |
| CB Collections | 0.8 | 0.5 | 0.5 | 0.5 | 0.5 | | 2.7 |
| **Total Operating Receipts** | **2.1** | **1.8** | **1.8** | **1.6** | **1.8** | | **9.1** |
| **Operating Disbursements** | | | | | | | |
| Accounts Payable | (1.2) | (2.2) | (1.8) | (1.8) | (1.4) | | (8.3) |
| US Payroll | (0.0) | (2.0) | - | (2.2) | - | | (4.2) |
| International Funding | - | - | - | (0.5) | - | | (0.5) |
| **Total Operating Disbursements** | **(1.2)** | **(4.2)** | **(1.8)** | **(4.5)** | **(1.4)** | | **(13.0)** |
| **Net Operating Cash Flow** | **0.9** | **(2.4)** | **0.0** | **(2.8)** | **0.5** | | **(3.9)** |
| **Non Operating Cash Flow** | | | | | | | |
| Sale Proceeds | - | - | - | - | 33.9 | | 33.9 |
| DIP Interest | - | - | - | - | (0.1) | | (0.1) |
| Professional Fees | - | (1.5) | (0.8) | (0.9) | (1.5) | | (4.7) |
| RIF Costs (Severance, PTO, Benefits etc) | (0.4) | - | - | (0.8) | - | | (1.2) |
| CB Lender Consent Fee | (1.0) | - | - | - | - | | (1.0) |
| Funding to Wind Down Trust | - | - | - | - | - | | - |
| Other | - | - | (0.6) | - | 0.6 | | - |
| **Total Non Operating Cash Flow** | **(1.4)** | **(1.5)** | **(1.4)** | **(1.7)** | **32.9** | | **26.9** |
| **Net Cash Flow** | **$ (0.5)** | **$ (3.9)** | **$ (1.4)** | **$ (4.5)** | **$ 33.3** | | **$ 23.0** |
| BOP US Cash Balance | $ 0.4 | $ 12.4 | $ 8.5 | $ 7.1 | $ 10.1 | | $ 0.4 |
| Net Cash Flow | (0.5) | (3.9) | (1.4) | (4.5) | 33.3 | | 23.0 |
| DIP Draw / (Repayment) | 12.5 | - | - | 7.5 | (21.8) | | (1.8) |
| **EOP US Cash Balance** | **$ 12.4** | **$ 8.5** | **$ 7.1** | **$ 10.1** | **$ 21.6** | | **$ 21.6** |

AlixPartners

**Exhibit 3**

**(in descending order of priority)**

| Priority | DIP Collateral Comprised of Prepetition Term Loan Collateral | DIP Collateral Comprised of Prepetition Notes Collateral | Unencumbered Property | Superpriority Claims Against Prepetition Notes Loan Parties | Superpriority Claims Against Prepetition Term Loan Parties |
|---|---|---|---|---|---|
| *First* | Carve Out and Permitted Prior Liens | Carve Out and Permitted Prior Liens | Carve Out | Carve Out | DIP Superpriority Claims up to $1 million in the aggregate (inclusive of any Carve Out) and the Carve Out |
| *Second* | DIP Liens and Obligations (inclusive of any Carve Out) up to $1 million in the aggregate | DIP Liens | DIP Liens | DIP Superpriority Claims | Term Loan Adequate Protection Claims |
| *Third* | Prepetition Term Loan Liens | Prepetition Notes Liens | Permitted Prior Liens | Notes Adequate Protection Claims | DIP Superpriority Claims in excess of $1 million Adequate Protection Claims and all other administrative expense claims |
| *Fourth* | Term Loan Adequate Protection Liens | Notes Adequate Protection Liens | Adequate Protection Liens | Prepetition Notes Obligations | Prepetition Term Loan Obligations |
| *Fifth* | DIP Liens and Obligations in excess of $1 million | | | | |