## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
                       :

In re:                    :     Chapter 11
                       :

ZEN JV, LLC, *et al.*,[1]       :     Case No. 25-11195 (JKS)
                       :

           Debtors.     :     (Joint Administration Requested)
                       :

------------------------------------------------------- x

## DECLARATION OF JESSE DELCONTE
## IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY
## OF INTERIM AND FINAL ORDERS (A) AUTHORIZING
## DEBTORS TO (I) OBTAIN POSTPETITION FINANCING AND
## (II) USE CASH COLLATERAL, (B) GRANTING LIENS AND PROVIDING
## CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
## (C) GRANTING ADEQUATE PROTECTION, (D) MODIFYING AUTOMATIC
## STAY, (E) SCHEDULING FINAL HEARING, AND (F) GRANTING RELATED RELIEF

I, Jesse DelConte, hereby declare as follows under penalty of perjury:

1.      I am a Partner and Managing Director at AlixPartners LLP ("**AlixPartners**"), which maintains its principal office at 909 3rd Avenue, New York, New York 10022, as well as other offices located throughout the world.  AlixPartners is the proposed financial advisor to the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" and, together with the non-debtor subsidiaries, the "**Company**").

2.      I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  I am not being specifically compensated for this testimony other than through payments

---

[1]    The Debtors in these cases, along with the last four (4) digits of each debtor's federal tax identification number (to the extent applicable), are: Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding, LLC (9339); and Military Advantage, LLC (9508).  The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

received by AlixPartners, as a proposed professional to be retained by the Debtors.  If called upon to testify, I could and would testify as to the facts set forth herein.

3.      I submit this declaration ("**Declaration**") on behalf of the Debtors in support of the *Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Obtain Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief* (the "**DIP Motion**"), filed contemporaneously herewith.[2]

4.      The DIP Motion seeks, among other items, authorization for the Debtors to enter into a senior secured superpriority priming debtor-in-possession term loan credit facility in an aggregate principal amount of $20 million, consisting of (a) interim funding in the aggregate principal amount of $12.5 million, available upon entry of the Interim Order and (b)  final funding in the aggregate principal amount of $7.5 million, available upon entry of the Final Order.  In addition, the DIP Motion seeks authorization for the use of Cash Collateral of the Prepetition Secured Parties and provides adequate protection for the Prepetition Secured Parties to the extent of any diminution in value of its interests in the Prepetition Collateral (including Cash Collateral) resulting from any diminution in value resulting from the imposition of the Automatic Stay, the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of its interests in the Prepetition Collateral (including Cash Collateral).

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion and the *Declaration of Michael Suhajda, Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**").

5.      Unless otherwise stated herein, all statements set forth in this Declaration are based upon (a) my experiences in chapter 11 cases, including with postpetition financing facilities, (b) the DIP Motion, (c) the First Day Declaration, (d) certain of the Debtors' financial statements and reports, (e) documents related to the proposed DIP Facility, (f) AlixPartners' analyses regarding the proposed DIP Facility and DIP financings in other chapter 11 cases, (g) discussions with the Debtors' management concerning the Debtors' business and finances, (h) discussions with, and proposals by, prospective sources of DIP financing, (i) discussions with certain other professionals at AlixPartners and other advisors to the Debtors, and/or (j) my opinions based upon my experience and knowledge.

6.      As further explained below, based on my experience with raising DIP financing, current market conditions, the Debtors' circumstances, and the negotiations around the proposed DIP Facility, I believe that the proposed DIP Facility represents the best option currently available to address the Debtors' liquidity needs so that the Debtors can complete a sale process during these Chapter 11 Cases and consummate sales for the benefit of all stakeholders.

## BACKGROUND AND QUALIFICATIONS

7.      On May 22, 2025, the Debtors engaged AlixPartners to assist the Debtors in addressing and preserving its limited liquidity, prepare for a chapter 11 filing, raise debtor-in-possession financing, and support as necessary the sales process, among other responsibilities. AlixPartners has a wealth of experience providing advisory and interim management services for companies undergoing transformations, turnarounds, and restructurings, having one of the largest and most experienced practices in these areas within the United States and globally.  Its clients include companies, creditors, corporate parents, and financial sponsors as well as acquirers of underperforming businesses.   AlixPartners and its professionals have extensive experience

working with financially troubled companies across a variety of industries in complex financial restructurings, both out of court and in chapter 11 cases. Major in-court restructurings in which AlixPartners has been involved include, among others: NanoString Technologies, Inc., Case No. 24-10160 (CTG) (Bankr. D. Del. 2024); Western Global Airlines, Inc., Case No. 23-11093 (KBO) (Bankr. D. Del. 2023); iMedia Brands, Inc., Case No. 23-10852 (KBO) (Bankr. D. Del. 2023); Benefytt Techs., Inc., Case No. 23-90566 (CML) (Bankr. S.D. Tex. 2023); Legacy Cares, Inc., Case No. 23-02832 (DPC) (Bankr. D. Ariz. 2023); FedNat Holding Co., Case No. 22-19451 (PDR) (Bankr. S.D. Fla. 2023); Altera Infrastructure L.P., Case No. 22-90129 (MI) (Bankr. S.D. Tex. 2022); SAS AB, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. 2022); Pareteum Corp., Case No.22-10615 (LGB) (Bankr. S.D.N.Y. 2022); Armstrong Flooring, Inc., Case No. 22-10426 (MFW) (Bankr. D. Del. 2022); GWG Holdings, Inc., Case No. 22-90032 (MI) (Bankr. S.D. Tex. 2022); and Ion Geophysical Corp., Case No. 22-30987 (MI) (Bankr. S.D. Tex. 2022).

8.      I have held the position of Partner and Managing Director at AlixPartners since January 2021. I also served as a Director at AlixPartners from 2018 to 2020. Prior to AlixPartners purchasing Zolfo Cooper, LLC ("**Zolfo Cooper**") in 2018, I was employed by Zolfo Cooper, a financial advisory and interim management company that provided restructuring services to companies and their stakeholders, for ten years. During the last three years that I was employed by Zolfo Cooper, I served as a Senior Director. During this time, I advised numerous companies through successful in-court and out-of-court restructurings, where I was responsible for all aspects of the restructuring, including cash flow forecasting, business plan development, lender negotiations, and reporting requirements. Prior to Zolfo Cooper, I spent approximately five years as an analyst at Seneca Financial Group, Inc., where I provided restructuring advisory services to companies, lenders, and trustees as well as litigation support services to various litigants.

I received a B.S. with distinction in Commerce from the McIntire School of Commerce at the University of Virginia and hold the Chartered Financial Analyst designation.

9.      Since 2003, I have served as an advisor in the transformation, turnaround, and restructuring of numerous stagnant or underperforming companies, advising management teams, board of directors, equity sponsors, and creditor constituents across numerous industries, including life sciences, airlines, retail/apparel, technology, energy, automotive, industrial and business services, and industrial manufacturing.   Among other aspects, I have advised companies with respect to corporate restructurings, the raising of postpetition and exit financing, the forecasting of cash flows, and development of business plans.   During the course of my career, I have been involved representing companies and constituents in numerous large and complex restructurings in which I served a lead role, including, but not limited to, NanoString Technologies, Inc., Case No. 24-10160 (CTG) (Bankr. D. Del. 2024); Clovis Oncology, Inc., Case No. 22-11292 (JKS) (Bankr. D. Del. 2022); Purdue Pharma L.P, Case No. 19-23649 (SHL) (Bankr. S.D.N.Y. 2019), GOL Linhas Aereas Inteligentes S.A., Case No. 24-10118 (MG) (Bankr. S.D.N.Y. 2024); FullBeauty Brands Holdings Corp., Case No. 19-22185 (RDD) (Bankr. S.D.N.Y. 2019); Aearo Technologies LLC, Case No. 22-02890-JJC-11 (Bankr. S.D. Ind. 2022); and Endo International plc, Case No. 22-22549 (Bankr. S.D.N.Y. 2022).

10.      I am a member of the AlixPartners professional team assisting the Debtors in analyzing their business affairs, assets, financial position, contractual arrangements, sale efforts and proposed strategic transactions. In connection with these various workstreams we have become well-acquainted with the Debtors' liquidity needs, capital structure and operations. I and members of the AlixPartners team participated directly in discussions, due diligence, and negotiations with lenders in connection with use of Cash Collateral and with potential sources of

DIP financing, including with regard to the proposed DIP Facility.  In doing so, I worked closely with the Debtors' management, external legal counsel, and other advisors.

**THE PROPOSED DIP FACILITY**
**REPRESENTS THE BEST POSTPETITION FINANCING OPTION**
**CURRENTLY AVAILABLE TO THE DEBTORS UNDER CIRCUMSTANCES**

11.     Leading up to the Petition Date and concurrently with ongoing sale efforts, the Debtors and their advisors moved expeditiously to seek the best DIP financing proposals available in the market given the Debtors' limited liquidity, clear need for financing and the lack of immediate additional funding available on an out-of-court basis.

12.     From the outset of the Debtors' efforts to secure financing, it was evident that they would face challenges due to limited (if any) unencumbered assets of material value.  Accordingly, to transact with third parties outside of their capital structure, the Debtors would need consent from their existing Prepetition Term Loan Lenders and Prepetition Noteholders to "prime" their liens. I, along with other members of the AlixPartners team, explored a variety of potential financing solutions, including:  (a) a potential purchaser acquiring all or some of the Debtors' assets also providing DIP financing; (b) DIP financing on a junior basis; and (c) priming DIP financing.

13.     To best position the Debtors to obtain financing on the most favorable terms and within a compressed timeframe, the Debtors first approached the Prepetition Term Loan Lenders and Prepetition Noteholders to provide DIP financing.  None of those lenders or noteholders were willing to provide additional funding, however, they did agree to certain concessions, compromises and consents in furtherance of supporting the Debtors' financing efforts.  Following extensive negotiations, the Debtors were able to reach an agreement with the Prepetition Noteholders and the requisite majority of the Prepetition Term Loan Lenders to allow for consensual priming and use of cash collateral (the "**Prepetition Lender Consent Agreement**").  Under that agreement:

- The Prepetition Noteholders agreed to consensual use of cash collateral and the priming of their liens on the Prepetition Notes Collateral (as defined in the Interim Order), which generally constitutes the Media Business and the Government Business and a portion of the Job Board Business (each as defined in the First Declaration);

- The requisite majority of the Prepetition Term Loan Lenders agreed to consensual use of cash collateral and the priming of their liens on the Prepetition Term Loan Collateral (which generally constitutes a portion of the Job Board Business) plus the reasonable and necessary costs of preserving or disposing of the Prepetition Term Loan Collateral of not more than $75,000 (the amount, the "**Surcharge Cap**");

- Any amount in excess of the Surcharge Cap and recoverable by the Debtors pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law will be waived, upon entry of the Final Order;

- The Prepetition Term Loan Lenders will receive a consent fee in the aggregate amount of $1 million ("**Consent Fee**"), with such Consent Fee payable by the Debtors in cash upon entry of the Interim Order; and

- The Prepetition Noteholders will receive 49% and the Prepetition Term Loan Lenders will receive 51% of the net proceeds from the sale of the Job Board Business, subject to applying credit of the Consent Fee against any amounts due to the Prepetition Term Loan Lenders.

14.     The Prepetition Lender Consent Agreement was critical to the Debtors being able to address a fundamental challenge in obtaining new third party secured financing. Absent reaching such agreement I believe, based on my experience and remarks made by potential lenders during the negotiation process, the Debtors would not have been able to find a lender to provide DIP Financing in the requisite time frame, in the amount needed, and in a junior secured position. With the necessary and critical Prepetition Lender Consent Agreement in hand, I, together with other members of the AlixPartners team launched a financing process to solicit potential proposals for DIP financing.

15.     In total, I and other members of the AlixPartners team contacted approximately 20 potential lenders and held initial calls with over 17 of such parties.  Thereafter, 7 potential lenders executed non-disclosure agreements and received confidential information through access

7

to a virtual data room. The primary considerations in negotiations involved obtaining (i) the quantum needed to maintain sufficient liquidity for operating the Debtors' business through the completion of an orderly court-supervised sale process and the wind down thereafter, (ii) competitive pricing to ensure the Debtors would receive the maximum benefit of the new capital infusion, and (iii) case milestones that were aligned with the Debtors' chapter 11 goals and needs.

16.     During AlixPartners' discussions with potential financing partners, some permutation of the same concerns were voiced as a basis for their inability to commit to providing the requested DIP financing, including:  (a) the size of the proposed postpetition financing not meeting the lender's minimum investment hurdles; (b) the potential return as measured as a multiple on invested capital was too low given the short tenor of the proposed postpetition financing; and (c) the speed of the Debtors' process to file for chapter 11 precluded the level of diligence such lenders would typically perform on the sales process, the number of transactions required to complete the sale of substantially all of the assets in order to be repaid, and the Debtors' underlying assets and business that were securing the financing.

17.     In addition, in light of the fact that the Debtors have few, if any, unencumbered assets which could otherwise be used to collateralize postpetition financing in an amount sufficient to meet the Debtors' working capital needs, it became clear that no potential financing partner was willing to agree to either:  (a) provide postpetition financing on an unsecured, junior-lien, or *pari passu* basis to the Prepetition Secured Parties (except under the Adequate Protection Settlement, as defined in the Interim DIP Order) or (b) otherwise refinance the Prepetition Secured Debt.

18.     The Debtors were, however, able to receive two senior priming DIP financing proposals prior to the Petition Date: one from Blue Torch Finance, LLC and one from a potential bidder.  After engaging in multiple rounds of discussions with both potential financing partners

and carefully considering each proposal, the Debtors ultimately determined that only the Blue Torch proposal was actionable. The other proposal was significantly less attractive because it was subject to substantial financing contingency and execution risk.

19.     After the Debtors received an initial term sheet from Blue Torch on June 15, 2025, the Debtors and their advisors engaged in significant negotiations with Blue Torch, including the exchanges of several drafts of term sheets and key documents. Shortly after the Debtors commenced the chapter 11 cases and as they endeavored to finalize the terms of a proposed $16.5 million postpetition financing package with Blue Torch, the Debtors received a $20 million proposal from JMB Capital (the proposed DIP Lender) to provide postpetition financing on more favorable terms.

20.     Recognizing that the proposed DIP financing from JMB Capital was the Debtors' best alternative to funding a value maximizing sale process that is the underpinning of these chapter 11 cases, the Debtors commenced discussions with the potential DIP Lender in earnest. The Debtors, in consultation with their advisors, and following arm's length and good faith negotiations, ultimately secured the DIP Lender's commitment to provide the DIP Financing in accordance with the DIP Term Sheet. The negotiated DIP Lender's proposal is significantly more favorable than the terms offered to the Debtors under the Blue Torch proposal:

|  | **Blue Torch** | **JMB** |
|---|---|---|
| **Amount** | $16.5 million | $20 million |
| **Interest** | SOFR + 9.5% | 12% |
| **Upfront Fee** | 5% ($868,421), payable in kind on the date of funding | 3% ($600,000), payable in kind on the date of funding |
| **Exit Fee** | 5% ($868,421) | 6% ($1,200,000) |
| **Agency Fee** | $250,000 | $0 |

| **DIP Budget Testing** | 12.5% variance<br><br>Tested on receipts, disbursements, and professionals | 20% variance<br><br>Tested on disbursements |
|---|---|---|
| **Priority** | First priority senior secured liens over the Prepetition Term Loan Collateral up to $1 million (plus certain fees and amounts);<br><br>Junior priority on balance of Prepetition Term Loan Collateral<br><br>First priority senior secured liens over the Prepetition Notes Collateral | Same |

21.    In summary, I believe that the proposed DIP Facility represents the best postpetition financing option currently available to the Debtors.  There are no significant unencumbered assets to lend against and there are no lenders willing to lend on a fully junior basis or refinance the Prepetition Secured Debt.  In light of the Debtors' inability to gain access to financing on more favorable terms from other potential financing partners, I believe that, given the Debtors' circumstances, the proposed DIP Facility with the DIP Lender is the Debtors' best source for the liquidity they need to navigate the chapter 11 process and position themselves to complete their value-maximizing sale process.

**THE ECONOMIC TERMS OF THE**
**PROPOSED DIP FACILITY, TAKEN AS A WHOLE,**
**ARE FAIR AND REASONABLE AND WERE NECESSARY**
**INDUCEMENT FOR THE DIP LENDER TO PROVIDE PROPOSED DIP FACILITY**

22.    Based on my knowledge of the Debtors' financial position and the financing market at this time, I believe that the economic terms of the proposed DIP Facility (summarized above): (a) were the subject of arm's-length negotiations with the DIP Lender; (b) are an integral

component of the overall terms of the proposed DIP Facility; and (c) were required by the DIP Lender as consideration for the proposed DIP Facility.  The Debtors and DIP Lender focused on the DIP size necessary to fund these Chapter 11 Cases and complete a fulsome process for the sales of all or substantially all of the Debtors' assets to third party bidders pursuant to section 363 of the Bankruptcy Code.  The DIP Lender ultimately agreed to provide the proposed DIP Facility, in accordance with the terms and conditions set forth in the DIP Term Sheet and the DIP Orders.

23.     I believe that the terms of the proposed DIP Facility—which are superior to the terms proposed by any other potential lender—are, taken as a whole and given the Debtors' capital structure, based on my prior experience, reasonable and fair under the circumstances of these Chapter 11 Cases, and the best terms currently available to the Debtors.

24.     In addition, the Debtors and the Prepetition Secured Parties engaged in exhaustive, arm's-length negotiations that culminated in the agreed upon terms of the proposed adequate protection package in the proposed DIP Facility as reflected in paragraph 10(c) of the Interim Order, in exchange for the Prepetition Secured Parties' consent to the use of cash collateral and the DIP Facility.  I believe that the terms of the proposed adequate protection package and concessions made therein, taken as a whole, are appropriate and reasonable under the circumstances, particularly in light of my view that no alternative financing is currently available.

### THE PROPOSED DIP FACILITY WAS
### NEGOTIATED IN GOOD FAITH AND AT ARM'S LENGTH

25.     AlixPartners, along with the Debtors' other advisors, actively negotiated the terms and provisions of the proposed DIP Facility on behalf of the Debtors.  Based on the negotiations amongst the Debtors and the DIP Lender—of which I was involved—it is my understanding that the DIP Lender agreed to provide the DIP Loans with the specific intent to both fully fund the Debtors' sale process while simultaneously keeping the postpetition financing narrowly tailored

to meet the Debtors' needs at appropriate times.  The DIP Lender and the Debtors, along with their advisors, extensively negotiated the terms of the proposed DIP Facility.  Such negotiations included exchanges of several drafts of key documents, including the proposed Interim Order and the DIP Term Sheet.

26.     In connection with the negotiation of the proposed DIP Facility (including in connection with the Blue Torch DIP facility), I had a substantial number of discussions and meetings with the Strategic Review Committee and the Debtors' management team and advisors regarding the quantum of capital needed, the potential forms that a financing and/or restructuring could take, and the terms of the proposed DIP Facility.  Based on those discussions and meetings, my restructuring experience and familiarity with DIP financings, I believe that the proposed DIP Facility was negotiated at arm's length and in good faith and is reasonable and fair under the circumstances of these Chapter 11 Cases.

## IMMEDIATE ACCESS TO CASH COLLATERAL AND INTERIM DIP FINANCING IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

27.     I believe that it is essential to the ultimate success of these Chapter 11 Cases that the Debtors receive immediate authority and access to use Cash Collateral and obtain access to the DIP Facility, particularly on an interim basis, to avoid immediate and irreparable harm.  The Debtors have only $2.2 million of cash on hand, which is insufficient for the Debtors to continue these chapter 11 cases.  If the Debtors do not obtain access to Cash Collateral and the DIP Facility, the Debtors will have no choice but to terminate their workforce, cease the sale process, and convert these cases to chapter 7, which would immediately and irreparably harm the Debtors' estates and all stakeholders.

Case 25-11195-JKS    Doc 32    Filed 06/26/25    Page 13 of 13

**CONCLUSION**

28.     As described herein, I believe that the proposed DIP Facility represents the best postpetition financing option available to the Debtors to provide for the Debtors' immediate liquidity needs under the circumstances of these Chapter 11 Cases and that the terms and conditions of the proposed DIP Facility, taken as a whole, are fair and reasonable.  I believe that the terms of the proposed adequate protection package, taken as a whole, are reasonable under the circumstances.  I believe that the terms of the DIP Facility were negotiated in good faith and at arm's length.  And I believe that the Debtors must obtain access to Cash Collateral and the DIP Facility to continue their sale process in these chapter 11 cases, so that the Debtors can maximize value for stakeholders.  Accordingly, I respectfully submit that the Court should approve the proposed DIP Facility.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: June 26, 2025

*/s/ Jesse DelConte*
Jesse DelConte
Partner and Managing Director
AlixPartners LLP