**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------- x
                   :

In re:                             :    Chapter 11
                   :

ZEN JV, LLC, *et al.*,[1]             :    Case No. 25-11195 (JKS)
                   :

         Debtors.          :    (Joint Administration Requested)
                   :

--------------------------------------------------------- x

**DECLARATION OF MICHAEL SUHAJDA, CHIEF FINANCIAL OFFICER,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Michael Suhajda, declare under penalty of perjury as follows:

1.      I have served as the Chief Financial Officer ("**CFO**") of Debtor Zen JV, LLC (collectively with the other above-captioned debtors, the "**Debtors**," and together with the non-debtor subsidiaries, the "**Company**") since its establishment on September 16, 2024 as part of the merger between CareerBuilder and Monster (the "**Merger**"). As CFO, I am responsible for overseeing and, thus, familiar with, the Debtors' financial affairs.

2.      I first joined Monster in 2002, eventually becoming CFO of the North America business in 2017 and the global Monster business in 2021. I have more than 20 years of experience across all aspects of corporate finance. I am a Certified Public Accountant in Wisconsin. I have a bachelor's degree in business and finance from Concordia University and an MBA from the Keller Graduate School of Management.

3.      I am authorized to submit this declaration (this "**First Day Declaration**") on behalf of the Debtors. I submit this First Day Declaration in support of the Debtors' voluntary petitions

---

[1]   The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number (to the extent applicable), are: Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding, LLC (9339); and Military Advantage, LLC (9508). The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

for relief and the First Day Motions (as defined below).  Unless noted, I have personal knowledge of the matters herein or have gained such knowledge from others who report to me in the ordinary course of business.  If called, I would testify competently to all facts in this First Day Declaration.

**INTRODUCTION**

4.      Two iconic pillars of online job recruiting and former industry rivals, CareerBuilder and Monster, merged in September 2024 with the intention of creating a single source for employers and job seekers to navigate the talent search/employment landscape. The hallmarks of the two brands, utilizing advanced and proprietary technology to provide employers with the ability to manage and source candidates, job seekers to post resumes and search for employment opportunities, and the forum for both parties to connect, together with the apparent synergies, were a driving force in motivating the companies to merge. Titans in the space, the resulting 2024 Merger brought their respective job board business and other businesses under one roof.

5.      The Company has three primary businesses:

- Monster Media Properties (the "**Media Business**"), which is comprised of www.military.com (which connects service members, military families, and veterans to all the benefits of service) and www.fastweb.com (which provides online resources for paying and preparing for college);

- Monster Government Services (the "**Government Business**"), which provides human capital management software services to state and federal governments; and

- the CareerBuilder + Monster job board business (the "**Job Board Business**"), which provides a talent marketplace connecting employers with job candidates.

6.      As expected when combining two large standalone companies, time is needed to achieve the synergies necessary. Unfortunately, since the Merger, the Company has faced

2

significant challenges that made it unable to achieve the various synergies needed to position it to withstand macroeconomic headwinds and resulting liquidity issues. Specifically, the Company faced an uncertain economic environment with reduced corporate hiring and the inability to evolve at the pace necessary to combat the competitive landscape with the rise of job aggregators and AI driven hiring tools. Indeed, the Company operates in a highly competitive market that is technologically complex and requires the ability to adapt quickly to an evolving employment landscape. The industry specific headwinds led to the Company achieving lower revenues than were needed to sustain the post-Merger business plan. While the Company's performance has improved in recent months, the slower-than-expected turnaround has strained the Company's liquidity and required it to explore strategic alternatives.

7.     The operational challenges in combining two behemoths combined with negative market trends that eroded earnings and liquidity caused the Company to be in urgent need of liquidity a few months after the closing of the Merger. In February 2025, the Company's liquidity forecast reflected an immediate need for a capital infusion to pay for ongoing operations. With limited options for a lending source, particularly due to having limited unencumbered assets to offer as security interests and timing needs, the Company was able to negotiate receipt of incremental funding of approximately $20 million from the holders of the Monster Note. Importantly, the rescue financing provided the Company with a runway to implement certain strategic alternatives to address its financial distress.

8.     A condition of the February 2025 financing was for the Company to launch a sale process for its non-core assets. The Company engaged PJT Partners, its investment banker, to conduct an extensive marketing and sale process of certain business segments. Beginning in early April 2025, PJT conducted a broad outreach to approximately 200 financial and strategic parties.

3

In early 2025, due to a confluence of pressures that shortened the runway available to achieve an out-of-court sale, the sale efforts were accelerated. Fortunately, the sale process resulted in the receipt of several bids and the Debtors commenced the Chapter 11 Cases with stalking horse purchase agreements with (i) Valnet Inc. for the sale of the Media Business for $22.5 million in cash, (ii) Valsoft Corporation for the sale of the Government Business for $6 million in cash, and (iii) JobGet, Inc. for the sale of the Job Board Business for $7 million in cash, in each case, subject to the terms of such agreements (the "**Stalking Horse Agreements**," and such sales, the "**Sales**"). The interest from potential buyers throughout the sale process and the bidders that are counterparties to the Stalking Horse Agreements make it clear that the Debtors have valuable assets that can be maximized for the benefit of their estates. The Debtors expect the Sales, if consummated, will preserve hundreds of jobs and generate $35.5 million in cash consideration (if not more, from any higher bids that may result during the auction process) for the benefit of the Debtors and their stakeholders.

9.    Together with this First Day Declaration, the Debtors are filing a motion that seeks approval of the Debtors' entry into the Stalking Horse Agreements and the Debtors' proposed bid procedures, including a **proposed bid deadline of July 15, 2025**. Subject to Court approval and the receipt of any higher or otherwise better bids, the Debtors intend to close the Sales no later than July 31, 2025, given the Debtors' limited liquidity. To fund these Chapter 11 Cases and bridge to the closing of the Sales, the Debtors have obtained a priming, senior secured debtor-in-possession financing facility with JMB Capital Partners Lending, LLC (the "**DIP Lender**") in an amount up to $20 million (the "**JMB DIP Facility**"). Importantly, as is set forth in greater detail in the declaration filed in support of the JMB DIP Facility [Docket No. 32] (the "**DIP Declaration**"), the Debtors' prepetition lenders (the "**Prepetition Lenders**") have reached an

agreement (the "**Lender Consent**") among themselves, the Debtors and the DIP Lender that provides for the consensual priming of the liens and claims of the Prepetition Lenders.  Without the Lender Consent, and the support of the Debtors' other key stakeholders, it would not be possible to consummate the Sales and preserve the Debtors' workforce and customer base.

10.     The remainder of this First Day Declaration is organized as follows:

- Part I provides a general overview of the Debtors and their businesses;

- Part II describes the circumstances leading to these Chapter 11 Cases;

- Part III explains the Debtors' plans and goals for these Chapter 11 Cases; and

- Part IV provides evidentiary support for the Debtors' first-day motions filed contemporaneously herewith.

## I.      COMPANY AND OPERATIONS

### A.      Corporate History and Organization

11.     The Debtors are all organized under the laws of the state of Delaware.  An organizational chart of the Debtors and their foreign non-Debtor affiliates is attached hereto as Exhibit A.

12.     In September 2024, Monster and CareerBuilder—both of which were in the business of providing job boards to connect employers with potential candidates—merged to create a combined enterprise, ultimately owned by the Debtor Zen JV, LLC ("**Zen**").

13.     Zen is the resulting joint venture formed in the Merger, which combined Monster, acquired in 2016 by Randstad Holding nv, with CareerBuilder, a portfolio company majority-owned by funds managed by affiliates of Apollo Global Management, Inc. Zen is the ultimate parent of the Company with 51% of the Class A LLC units of Zen held by Camaro Holdings, LLC, an entity affiliated with Apollo Global Management, and the remaining 49% held by Randstad MWW Inc. The management team following the Merger is comprised of senior leaders from both

RLF1 33199889v.1

companies. Zen directly and indirectly owns the Company's "CareerBuilder" entities on one side of the corporate enterprise and the Company's "Monster" entities on the other side.

## B.   Business Operations

14.   As noted above, the Company has three primary businesses:  the Media Business, the Government Business, and the Job Board Business.  Each business is discussed in detail below.

### 1.   *Media Business*

15.   The Media Business is comprised of www.military.com and www.fastweb.com. Military.com was founded by a Navy veteran to inform and connect the military and veteran community.  Since 1999, Military.com, which is a news and information website for U.S. service members, veterans and their families, has been dedicated to empowering its 10 million members by connecting them with vital resources to help them thrive.  The military.com website is the most-read military news and information site globally and its newsletters reach more than 2 million readers each month.  Military.com has been honored with top awards for reporting on the military community, including the Gerald R. Ford Journalism Prize for Distinguished Reporting on National Defense and the Joe Galloway Award, presented by Military Reporters and Editors.

16.   Fastweb.com is the leading scholarship database, designed to simplify the scholarship search for high school, trade school, and college students.  Fastweb allows students to create a profile and get personalized scholarship recommendations and also provides students and their parents with information to help them navigate their educational journeys—from college, trade school, and/or graduate school and into their careers.

17.   Fastweb (which stands for **F**inancial **A**id **S**earch **T**hrough the **Web)** was founded in May 1995 and was the very first college scholarship website ever created.  Today, what sets Fastweb apart from other college scholarship search sites is its team of researchers. Every scholarship in the Fastweb database has been researched and vetted by a team of people who work

6

to ensure that the database is free of scholarship scams, that scholarship information is up-to-date and that new scholarships are added daily.

18. Fastweb also helps students find internships and part time jobs. Fastweb members are matched to internships when they create a free profile, and they can also tap into Monster's job search network in order to find part time jobs on the Fastweb website.

**2.** *Government Business*

19. The Government Business provides human capital management software services to state and federal governments, helping governments acquire talent, track applicants, provide onboarding, and manage compliance reporting.  The Government Business is one of the few programs certified compliant with the Federal Risk and Authorization Management Program.

20. Customers of the Government Business span across nearly all cabinet-level federal agencies and departments to state and local government employers to state workforce agencies and local workforce boards. The Government Business team includes workforce experts and former government employees who have domain knowledge of both federal, as well as, state policies and programs.  Experts work directly with customers to provide support in strategy, implementation, and training, as well as provide human capital services such workforce analysis, hiring process optimization, and a range of customized offerings.

**3.** *Job Board Business*

21. The Job Board Business provides a premier job board platform connecting employers with job candidates, through the monster.com and careerbuilder.com websites.  The platform, created with proprietary technology, serves as a virtual meeting point connecting businesses and potential candidates through various touch points. The Debtors' job boards provide employers with a global forum to post jobs, review applications, contact candidates and track

applications. For those individuals searching for employment, the job boards are a vehicle for browsing listings and promoting their skills and experience through resume posting functions. Ultimately, the Debtors' technology, including utilizing advanced tools and integrating multiple platforms, improves the hiring process. The U.S. dedicated website receives approximately 7 million views each month. The resume search tools, application tracking features and ability to personalize job matching, have positioned the Debtors to be competitive in the job searching market.

**C.      Prepetition Debt**

22.     The Debtors' funded debt is separated between their CareerBuilder and Monster business segments.

23.     *CareerBuilder Term Loan*.  Debtor CareerBuilder, LLC is the borrower under that certain Amended and Restated Credit Agreement dated April 19, 2023, with Wilmington Trust, N.A. as administrative agent and other entities party thereto (as amended, supplemented, or modified from time to time, the "**CareerBuilder Term Loan Agreement**" and such facility, the "**CareerBuilder Term Loan Facility**").  Debtors Camaro Acquisition, LLC, CareerBuilder Government Solutions LLC, and Luceo Solutions LLC (collectively with CareerBuilder, LLC, the "**CareerBuilder Loan Parties**") are guarantors under the CareerBuilder Term Loan Agreement. The CareerBuilder Term Loan Facility matures on July 31, 2026.  The CareerBuilder Term Loan Facility is secured by substantially all assets of the CareerBuilder Loan Parties, subject to customary exceptions.  As of May 31, 2025, the amount outstanding under the CareerBuilder Term Loan Facility is approximately $135.2 million.

24.     *Monster Seller Notes*.  Zen is the issuer under (i) that certain Amended and Restated Senior Secured Note, dated as of December 27, 2024, (ii) that certain Amended and Restated Additional Senior Secured Note, dated as of February 20, 2025, and (iii) that certain Amended and

Restated Third Senior Secured Note, dated as of December 27, 2024 (collectively, as amended, supplemented, or modified from time to time, the "**Monster Notes**"), with Randstad MWW Solutions Inc. as the noteholder thereunder (the "**Monster Noteholder**").   Debtors Monster Worldwide LLC, Military Advantage, LLC, FastWeb, LLC, and Monster Government Solutions, LLC are guarantors under the Monster Notes (collectively with Zen, the "**Monster Note Parties**"). The Monster Notes mature on July 31, 2026 and September 16, 2029 (depending on the tranche). The Monster Notes are secured by substantially all assets of the Monster Note Parties, subject to customary exceptions.  As of May 31, 2025, the amount outstanding under the Monster Notes is approximately $226.1 million.

25.     The Debtors also have approximately $31.2 million in other debt obligations, such as unsecured trade claims.  The Debtors' prepetition debt is summarized as follows:

| | Approx. Amount Outstanding | Maturity Date |
|---|---|---|
| **CareerBuilder Term Loan Facility** | $135.2 million | July 31, 2026 |
| **Monster Notes** | $19.2 million | July 31, 2026 |
| | $206.9 million | Sept. 16, 2029 |
| *Total Funded Debt* | **$361.3 million** | |
| *General Unsecured Debt* | **$31.2 million** | |
| *Total Debt* | **$392.5 million** | |

**D.     Governance**

26.     Prior to June 11, 2025, the Zen board contained seven managers: three managers affiliated with and appointed by Camaro Holdings, LLC; three managers affiliated with and appointed by Randstad MWW Inc.; and one independent manager (Mr. Kenneth Shea) appointed by Camaro Holdings, LLC.  On June 11, 2025, in connection with the Debtors' restructuring

9

efforts, the board and equity holders of Zen (i) expanded the board to nine managers; (ii) appointed Mr. Daniel Silvers and Ms. Anna Phillips to the board as independent managers to fill the two new board seats; and (iii) created a "Strategic Review Committee" composed of the three independent managers—Mr. Shea, Mr. Silvers, and Ms. Phillips.

27.     The Strategic Review Committee was given the power and authority to review, consider, evaluate, negotiate, and recommend to the Board any potential sale, refinancing, restructuring, or other related transaction (the "**Committee Authority**"), and the Board retained the ultimate authority to approve and consummate a transaction.

28.     The Board further delegated the Committee Authority to (i) Ms. Phillips solely with respect to the Media Business, the Government Business, and the Monster Notes and (ii) Mr. Silvers solely with respect to the Job Board Business and the CareerBuilder Term Loan.  Mr. Shea serves as Chair of the Strategic Review Committee with Committee Authority over all matters.

**E.      Workforce**

29.     As of the Petition Date, the Company employs approximately 935 employees (with 371 in the United States and 564 outside the United States) and 123 contractors (with 18 in the United States and 105 outside the United States)—for a total workforce of 1,058 individuals (excluding individuals on unpaid leave).  The Company's headquarters is located in Chicago, Illinois, but the Company's workforce generally works remote.  Prior to the commencement of the Chapter 11 Cases, the Company made the difficult decision to terminate the employment of approximately 120 employees. The decision reflected, among other things, operational needs, constrained finances, and the realities of the Company's future needs – albeit uncertain to a degree - as it navigated a sale process that involved the disposition of all or substantially all of its assets. Fortunately, as supported by the Stalking Horse Agreements and the transition of assets to the

10

buyers, these Chapter 11 Cases provide the Debtors with the opportunity to provide hundreds of jobs to their employees if the Sales are consummated.

## II. THE CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

### A. The Debtors' Business Challenges

30. Prior to the Merger, CareerBuilder and Monster were each struggling financially. CareerBuilder was burdened by excessive debt that it could not address, and Monster was burning cash at an unsustainable rate. Both businesses were also experiencing declining revenues, while competing with other companies such as ZipRecruiter and Indeed.

31. Through the Merger, the business plan of the combined Company relied on two key assumptions: (i) the synergy between the two businesses would need to reduce costs and (ii) revenues would need to stop declining and then start growing. The Company was able to eventually meet its synergy goals and stabilize costs at a level consistent with the Merger's business plan.

32. Unfortunately, however, the Company has faced macroeconomic headwinds, including an uncertain economy in late 2024 (due largely to an uncertain political landscape) and early 2025 (due to continued macroeconomic uncertainty), which has resulted in less economic investments globally, less job openings for applicants, and in turn less revenues for the Company (as well its competitors). More specifically, there has been volatility in financial markets as a result of a number of factors, including, but not limited to, banking instability, global conflict inflation, changes in interest rates, and volatile markets. Economic uncertainty generally causes employers to curtail spending in the Company's marketplace. Adverse effects to financial performance reduces the demand for the Company's services and corresponding revenue.

33. In recent months, the Company's performance has improved alongside the general economy. But the prior struggles had already drained the Company's liquidity and required the

RLF1 33199889v.1

Company to explore strategic alternatives, as the Company simply did not have sufficient liquidity to complete its turnaround.

### B.    Exploration of Strategic Alternatives

34.    Leveraging the sale process from the Merger, the Company attempted to sell its European business in the fourth quarter of 2024 and the first quarter of 2025, but such efforts were unsuccessful.  In February 2025, the Monster Noteholder extended $20 million additional liquidity to the Company under the Monster Notes, in an effort to boost the Company's insufficient liquidity and fund working capital.  As liquidity continued to diminish, PJT Partners (as the Company's investment banker) then began reaching out in April 2025 to strategic and financial parties to solicit potential interest from third parties in purchasing the Company's Media Business and/or Government Business.  PJT contacted approximately 75 parties for the Media Business and 120 parties for the Government Business and began providing diligence information to those parties that expressed interest and signed an NDA.  As that process progressed, the Company's liquidity unfortunately continued to dwindle.

35.    On May 22, 2025, the Debtors hired Latham & Watkins LLP as restructuring counsel and AlixPartners LLP as financial advisor, to assist the Debtors in liquidity preservation and strategic alternatives.  Shortly thereafter, PJT Partners began outreach to potential bidders for the Job Board Business, while continuing to discuss a sale of the Media Business and/or Government Business with potential bidders.

36.    Simultaneously, the Debtors (with the assistance of Latham and Alix) engaged in discussions with their secured lenders under the CareerBuilder Term Loan Facility and the Monster Notes to address the Debtors' limited liquidity and looming events of default.  On May 29, 2025, the CareerBuilder Loan Parties entered into a forbearance agreement with "Required Lenders" under the CareerBuilder Term Loan Facility, under which the lenders agreed to forbear from

12

exercising remedies through July 31, 2025 with respect to the Debtors' failure to make a May 30 interest payment and failure to satisfy a $2 million minimum liquidity covenant.

37.     The Debtors also entered into a forbearance agreement with the Monster Noteholder on June 18, 2025, under which the Monster Noteholder agreed (i) to forbear from exercising remedies through July 31, 2025 based on the cross-default under the CareerBuilder Term Loan Facility, (ii) for interest to be paid in kind rather than cash and (iii) to permit cash to be transferred from the Monster business to the CareerBuilder business (which had limited liquidity), provided that such cash was not used to pay the CareerBuilder Term Loan Facility.

38.     Despite those temporary concessions, the Debtors and their advisors realized that a chapter 11 proceeding would be necessary given the Debtors' financial circumstances and thus pivoted to a "stalking horse" process for purposes of a section 363 sale.  After setting a prepetition bid deadline of June 10, 2025 and continuous, hard fought, good-faith negotiations with various bidders, the Debtors entered into the Stalking Horse Agreements on June 23, 2025.

39.     As of the Petition Date, the Debtors have approximately $2.2 million in cash.  Thus, concurrently with the prepetition marketing process, the Debtors solicited interest in potential DIP financing from nearly 20 parties, including their current lenders and other third parties.  The parties generally voiced a number of concerns, including that (a) the size of the DIP facility did not meet minimum investment hurdles in their funds; (b) the potential return as measured as a multiple on invested capital was too low for their funds given the short tenor of the DIP facility; and (c) the speed of the Debtors' process to file for bankruptcy precluded the normal amount of diligence.

40.     Notwithstanding those concerns, Blue Torch Finance, LLC ("**Blue Torch**"), indicated a willingness to provide a senior secured priming DIP facility in an amount of $16.5 million.  Prior to the Petition Date, the Debtors and Blue Torch generally agreed on the terms of a

RLF1 33199889v.1

priming DIP facility (the "**Blue Torch DIP Facility**"), subject to final documentation. The Blue Torch DIP Facility, like the JMB DIP Facility, also included the Lender Consent, which allowed for the consensual priming of the Prepetition Lenders' liens and claims. Subsequent to the Petition Date, however, the DIP Lender proposed the $20 million JMB DIP Facility, which has superior terms to the Blue Torch DIP Facility. Among other things, and as is set forth in greater detail in the DIP Declaration, the JMB DIP Facility provides the Debtors with greater access to cash and has less fees, lower interest, and a longer maturity date. The JMB DIP Facility, once finalized, will help bridge the Debtors' liquidity until the sale closings.

## III.     THE CHAPTER 11 CASES

41.     As detailed above, the Debtors explored many paths in an attempt to address their liquidity concerns, including engaging professionals to explore a sale and advise on liquidity preservation options. However, when those efforts proved unsuccessful, the Debtors concluded that an expedited asset sale pursuant to section 363 of the Bankruptcy Code is the most likely path to promote the interests of, and maximize value for, all stakeholders under the circumstances, while liquidating all or substantially all of the Debtors' assets.

42.     Throughout that process, the Debtors' key stakeholders supported the Debtors and also made significant concessions to maintain the Debtors' businesses and jobs. Moreover, through the Debtors' efforts, the Debtors, in a short amount of time, were able to negotiate and finalize three separate Stalking Horse Agreements and negotiate two DIP facilities, including the JMB DIP Facility, which has materially better terms than the initial Blue Torch DIP Facility.

43.     Those feats, while challenging under any circumstances, were made even more challenging by the Debtors' severely constrained liquidity. Through the combined efforts of the Debtors and their advisors and stakeholders, the Debtors are now well positioned to close the Sales and save their businesses and jobs.

14

44.     To do that, however, the Debtors' proposed timeline must be maintained.  As set forth in greater detail in the Debtors' proposed bidding procedures, the Debtors are seeking a bid deadline of July 15, 2025, with an auction and hearing shortly thereafter, and closings no later than July 31, 2025.  This timeline, while expedited, is necessary given the Debtors' limited liquidity (which is expected to last only until late July 2025) and is appropriate given the Debtors' extensive prepetition marketing (which started in April 2025, resulted in outreach to approximately 200 parties, and returned multiple bids for the Debtors' assets).

45.     The Debtors' expectation is that, after the closing of the Sales, there will be sufficient sale proceeds remaining to confirm and consummate a plan of liquidation.

## IV.     **FIRST DAY MOTIONS**

46.     The Debtors have filed the following motions (the "**First Day Motions**"), to facilitate a smooth transition into these cases and minimize disruption to the Debtors' operations:

- *Joint Administration Motion.* Motion of Debtors for Entry of Order Directing Joint Administration of Related Chapter 11 Cases [Docket No. 3];

- *Claim and Noticing Agent Application.* Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and (II) Granting Related Relief [Docket No. 4];

- *Motion to Redact Certain Personal Identification Information.* Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personal Identification Information for Individuals and (II) Granting Related Relief [Docket No. 5];

- *Cash Management Motion.*  Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Operating Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Waiving Certain Requirements Under Section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines, and (III) Granting Related Relief [Docket No. 23];

- *Wages Motion.*  Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Payment of Certain Prepetition Workforce Obligations,

15

(B) Authorizing Continuance of Workforce Programs, (C) Authorizing Payment of Withholding and Payroll-Related Taxes, (D) Authorizing Payment of Prepetition Claims Owing to Administrators, and (E) Granting Related Relief [Docket No. 27];

- *Motion to Shorten Bid Procedures Motion.* Motion of the Debtors and Debtors in Possession for Entry of an Order Shortening Notice and Objection Periods for Debtors' Bidding Procedures Motion [Docket No. 29]; and

- *DIP Financing Motion.* Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Obtain Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (C) Granting Adequate Protection, (D) Modifying Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief [Docket No. 31]

47.     I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with the Debtors' advisors to ensure that I understand each First Day Motion and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

48.     Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions, is (i) necessary to enable the Debtors to transition into chapter 11 with minimal disruption; (ii) critical to the Debtors' maximizing the value of their estates through the liquidation of substantially all their assets; and (iii) in the best interest of the Debtors' estates and their stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

## V.     <u>CONCLUSION</u>

49.     The Debtors' ultimate goal in these Chapter 11 Cases is to maximize value for the benefit of all stakeholders through a Court-supervised liquidation of all or substantially all of the

Debtors' assets.  In the near term, the Debtors' immediate objective is to preserve asset value during the early stage of these Chapter 11 Cases so that they can consummate value-maximizing sales.  The Debtors believe that the runway provided by the JMB DIP Facility and the framework provided by the Stalking Horse Agreements and a section 363 sale process, including the ability to convey assets free and clear to a potential acquirer, is likely to maximize the value of the Debtors' estates, preserve as many jobs as possible for those employees that may transition to the buyers, and lead to a successful resolution of these Chapter 11 Cases.

[*Remainder of page left intentionally blank*]

RLF1 33199889v.1

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: June 26, 2025

/s/ Michael Suhajda
Michael Suhajda
Chief Financial Officer

18

RLF1 33199889v.1

# EXHIBIT A

## Organizational Chart

RLF1 33199889v.1

**Company Organizational Chart**

*As of June 19, 2025*

**Legend**

- Debtor-Borrower under $135m First Lien Term Loan
- Debtor-Guarantor under $135m First Lien Term Loan
- Debtor-Issuer under $225m Senior Secured Notes
- Debtor-Guarantor under $225m Senior Secured Notes
- Non-Debtor Guarantor under $225m Senior Secured Notes
- Non-Debtor

**Debt Facilities**

**~$135mm First Lien Term Loan**
- ABR Borrowings: ABR + 5.75%
- SOFR Borrowings: Adjusted Term SOFR Rate + 6.75%
- Term B-3 Facility Maturity Date: July 31, 2026

**~$225mm Senior Secured Notes**
- 10% interest for all notes
- A&R Seller Note and A&R Third Seller Note Maturity Date: September 16, 2029
- A&R Additional Setter Note:
  - Tranche 1 Maturity Date: September 16, 2029
  - Tranche 2/3 Maturity Date: July 31, 2026