## EXHIBIT B

**TSA**

*Execution Version*

**CONFIDENTIAL**

**TRANSITION SERVICES AGREEMENT**

BY AND BETWEEN

RANDSTAD N.V.

AND

MONSTER WORLDWIDE, LLC


DATED SEPTEMBER 16, 2024

**TRANSITION SERVICES AGREEMENT**

This TRANSITION SERVICES AGREEMENT, dated September 16, 2024 (this "Agreement"), is made and entered into by and between Randstad N.V. a corporation organized under the laws of the Netherlands ("Randstad") and Monster Worldwide, LLC, a Delaware limited liability company ("Monster Core Entity"). Capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to such terms in the Contribution Agreement (as defined below).

<u>RECITALS</u>

A.      Pursuant to the Contribution and Sale Agreement, dated June 28, 2024 (the "Contribution Agreement"), by and among Randstad MWW Inc., a Delaware corporation ("Zen HoldCo"), Randstad MWW Solutions Inc., a Delaware corporation ("Zen NewCo"), Camaro Holdings, LLC, a Delaware limited liability company, Camaro Parent, LLC, a Delaware limited liability company, AP Special Sits Camaro Holdings, LLC, a Delaware limited liability company, Randstad North America, Inc., a Delaware corporation, Randstad Holding Luxembourg Sàrl, a private limited liability company (*Société à responsabilité limitée*) incorporated under the laws of Luxembourg, Randstad and Zen JV, LLC, a Delaware limited liability company (the "Company"), among other things, (i) Zen NewCo, has agreed to sell, transfer, assign, convey and deliver to the Company and the Company has agreed to purchase, all right, title and interest in and to 100% of the membership interests in each of the Non-Core Entities (as defined below) and (ii) Zen HoldCo has agreed to contribute, transfer, assign, convey and deliver, and the Company has agreed to accept and receive, all right, title and interest in and to 100% of the membership interests in Monster Core Entity (the foregoing (i) and (ii), the "Contemplated Transactions").

B.      In connection with the Contemplated Transactions, (i) Randstad agrees to provide or cause to be provided to Monster Core Entity and its Subsidiaries and permitted assigns, (ii) Monster Core Entity and its Subsidiaries and permitted assigns desire to receive or cause to be received from Randstad and (iii) the Parties intend to provide to the Non-Core Entities on a pass-through basis, certain services, including access to Systems, and other assistance on a transitional basis and in accordance with the terms and subject to the conditions set forth herein (Monster Core Entity and its Subsidiaries collectively hereinafter referred to as the "Monster Recipients" and each, a "Monster Recipient").

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and mutual agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties, intending to be legally bound, agree as follows:

ARTICLE I
SERVICES, DURATION AND SERVICES MANAGERS

Section 1.01.  <u>Services</u>.

(a)      Upon the terms and subject to the conditions of this Agreement, Randstad shall provide, or cause to be provided, to the Monster Recipients (including on a pass-through

basis to the Non-Core Entities and, as set forth in <u>Section 1.01(b)</u>, the Company), the services, including access to Systems, set forth on <u>Schedule A</u> attached hereto (the "<u>Services</u>"). Randstad may use an Affiliate to perform any of its obligations herein; <u>provided,</u> that the provision of any Service by such Affiliates shall not decrease the availability, level, scope and quality of Service in any material respect as a result thereof; <u>*provided, further,*</u> that Randstad shall be liable for any act or omission, performance of Services and compliance with the terms of this Agreement by any such Affiliate as if such Affiliate were a party to this Agreement.

(b)     All Services will be for the sole use and benefit of the relevant Monster Recipient; <u>provided</u>, that the Non-Core Entities and, solely to the extent used to support the Monster Recipients and the Non-Core Entities, the Company, may receive Services on a pass-through basis through any Monster Recipient.

Section 1.02.   <u>Duration of Services</u>.   Upon the terms and subject to the conditions of this Agreement, Randstad shall provide, or cause to be provided, to the relevant Monster Recipient (including on a pass-through basis to the Non-Core Entities and, as set forth in <u>Section 1.01(b)</u>, the Company) each Service until the earliest to occur of, with respect to each such Service, (a) the expiration of the period of duration for such Service as set forth in <u>Schedule A</u> (with respect to each Service, a "<u>Service Period</u>"), (b) the date on which such Service is terminated in accordance with <u>Article VIII</u>, and (c) the date on which this Agreement is terminated in accordance with <u>Article VIII</u>; <u>provided</u>, that Monster Core Entity will use its reasonable efforts in good faith to transition itself and the Non-Core Entities and the Company to a replacement service, system or facility with respect to each Service as soon as reasonably practicable during the period for such Service as set forth in <u>Schedule A</u> prior to the termination of any such Service pursuant to this <u>Section 1.02</u>.

Section 1.03.   <u>Additional Unspecified Services</u>.   It is understood that Monster Core Entity and Randstad have used commercially reasonable efforts to identify the Services required by the Monster Recipients for the Term of this Agreement.   After the date hereof, if Monster Core Entity identifies a service that (a) Randstad or its Affiliates provided to the Monster Recipients or the Non-Core Entities prior to the Closing and (b) a Monster Recipient reasonably determines (x) that it, the Non-Core Entities or the Company (solely in the capacity set forth in <u>Section 1.01(b)</u>) needs such service in order for the Business to continue to operate in substantially the same manner as the Business operated in the 12 months prior to the Closing (the "<u>Reference Period</u>") or (y) such service is necessary to integrate the Business with business of the Company pursuant to the Contemplated Transactions, and, in each case, such service was not included in <u>Schedule A</u> (other than those services listed on <u>Schedule B</u> (the "<u>Excluded Services</u>")), Monster Core Entity may request such additional service (each additional service as described in this <u>Section 1.03</u>, an "<u>Additional Service</u>").   Subject to <u>Section 2.01</u>, if an Additional Service is requested within 60 days (or on the 60th day) following the Closing, such Additional Service shall be provided, or caused to be provided, by Randstad, and the Parties will promptly negotiate in good faith the terms and conditions (including cost and duration) upon which such Additional Service shall be provided.   If an Additional Service is requested more than 60 days after the Closing, Randstad shall consider in good faith if such Additional Service can and should be provided, and upon the mutual written consent of each of the Parties, the Parties will promptly negotiate in good faith the terms and conditions (including cost and duration) upon which such Additional Service may be provided.   <u>Schedule A</u> shall be supplemented to describe in reasonable

2

detail the nature, scope, Service Period(s), Service Charges, termination provisions and Termination Charges and such other terms applicable to any such Additional Service in a manner similar to that which the Services are described in Schedule A. Each supplement to Schedule A, as agreed to in writing by the Parties, will be deemed part of this Agreement as of the date of such agreement and the Additional Service set forth therein will be deemed "Services" provided under this Agreement, in each case subject to the terms and conditions of this Agreement. Notwithstanding the foregoing, Randstad will not be obligated to provide, or cause to be provided, any particular Additional Service if neither Randstad nor any of its Affiliates is (at the time of the request) providing to Randstad or its Affiliates, as the case may be, such requested Additional Service, unless agreed otherwise by the Parties in writing. If the Parties are, acting reasonably and in good faith, unable within 45 days of such request to agree on either the cost of the Additional Service or the duration for which such Additional Service will be provided (which in any event will not be later than 15 months from the date of this Agreement unless extended in accordance with Section 8.04), Randstad will be under no obligation to continue to provide, or cause to be provided, the proposed Additional Service and such proposed Additional Service will not be an Additional Service or Service hereunder and the cost of any such Additional Service provided prior to such date will be the fully loaded cost of Randstad to provide such Additional Service. For the avoidance of doubt, any failure by the Parties to amend Schedule A to include an Additional Service that has been agreed in accordance with this Section 1.03 shall not excuse Randstad from any obligation to provide such Additional Service or a Monster Recipient from paying any fees for any such Additional Service that has actually been provided to such Monster Recipient.

Section 1.04.    Transition Services Managers.

(a)    Randstad hereby appoints and designates Veronica Rusu to act as its initial services manager (the "Randstad Services Manager"), who will be directly responsible for coordinating and managing the delivery of the Services and have authority to act on Randstad's behalf with respect to all matters relating to this Agreement. The Randstad Services Manager will work with the personnel of Randstad to periodically address issues and matters raised by Monster Core Entity or Monster Services Manager relating to this Agreement. Except as set forth in Section 9.06, all communications from Monster Core Entity to Randstad pursuant to this Agreement (other than regarding routine matters) involving the Services set forth in Schedule A will be made through the Randstad Services Manager, or such other individual as specified by the Randstad Services Manager in advance in writing and delivered to Monster Core Entity by e-mail, with receipt confirmed. Randstad will notify Monster Core Entity in advance in writing of the appointment of a different Randstad Services Manager.

(b)    Monster Core Entity hereby appoints and designates Leonard Kardon to act as its initial services manager (the "Monster Services Manager"), who will be directly responsible for coordinating and managing the delivery of the Services and have authority to act on Monster Core Entity's behalf with respect to all matters relating to this Agreement. The Monster Services Manager will work with the personnel of the Monster Recipients to periodically address issues and matters raised by Randstad or the Randstad Services Manager relating to this Agreement. Except as set forth in Section 9.06, all communications from Randstad to Monster Core Entity pursuant to this Agreement (other than regarding routine matters) involving the Services set forth in Schedule A will be made through the Monster Services Manager, or such other individual as specified by the Monster Services Manager in advance in writing and delivered to Randstad by e-

mail, with receipt confirmed.  Monster Core Entity will notify Randstad in advance in writing of the appointment of a different Monster Services Manager.

Section 1.05.  <u>Limitations on Provision of Services</u>.  Notwithstanding anything to the contrary set forth in this Agreement, Randstad will not be required to provide or cause to be provided any Service for use in, and the Monster Recipients (including the Non-Core Entities and the Company) will not use any Service in or for, any business other than the Business, and the Services will be available to Monster Core Entity (including on a pass-through basis to the Non-Core Entities and, as set forth in <u>Section 1.01(b)</u>, the Company) only for purposes of conducting the Business; <u>provided</u>, that, notwithstanding the foregoing, the Monster Recipients (including on a pass-through basis to the Non-Core Entities and, as set forth in <u>Section 1.01(b)</u>, the Company) may also use any Service in or for the integration of the Business with the business of the Company pursuant to the Contemplated Transactions.

Section 1.06.  <u>Migration</u>.    Monster Core Entity will, as soon as reasonably practicable, develop a plan with the reasonable cooperation and assistance of Randstad for the migration away from each Service being provided to the Monster Recipients (the "<u>Transition Plan</u>").  The specific transition assistance and timing thereof will be as mutually agreed to by the Parties, acting in good faith.  Subject to agreement by the parties on Migration Costs, as described below, Randstad will provide, or cause to be provided, the Monster Recipients (including on a pass-through basis to the Non-Core Entities and, as set forth in <u>Section 1.01(b)</u>, the Company) with reasonable assistance to migrate each of the Services to the Monster Recipients (including on a pass-through basis to the Non-Core Entities and, as set forth in <u>Section 1.01(b)</u>, the Company) or a successor service provider in accordance with the Transition Plan.  Such transition assistance may include providing information regarding the specific Services being provided and the systems, software and data formats and data organization being used for the Services, coordination and other reasonable assistance with test runs of replacement systems and processes and other reasonable access to relevant information (including, for the avoidance of doubt, subject to <u>Section 9.03</u> (*Confidential Information*)).  Prior to, and as a condition precedent to, Randstad or its Affiliates providing any such transition assistance, Randstad will provide Monster Core Entity cost estimates for reasonable and documented out of pocket costs and expenses of Randstad and its Affiliates related to such transition assistance (such costs and expenses, the "<u>Migration Costs</u>"), and the Parties will mutually agree on such Migration Costs and Monster Core Entity will reimburse Randstad for such agreed Migration Costs.

ARTICLE II
THIRD PARTY CONSENTS AND LICENSES

Section 2.01.  <u>Third Party Consents and Licenses</u>.  The Parties will reasonably cooperate and use reasonable best efforts to obtain all third-party consents, licenses (or other appropriate rights), waivers, sublicenses and approvals necessary for Randstad or its Affiliates to provide, or a Monster Recipient (including on a pass-through basis to the Non-Core Entities and, as set forth in <u>Section 1.01(b)</u>, the Company) to receive, Additional Services, or Services for which either Party desires a reasonable modification (including, by way of example and not by way of limitation, rights to use, duplicate and distribute third-party software necessary for the receipt of the Services) (each, a "<u>Required Consent</u>"); <u>provided</u>, <u>however</u>, that (a) no Party hereto or its Subsidiaries or Affiliates or any such Person's portfolio companies will be required to compromise

any right, asset or benefit (other than a *de minimis* right, asset or benefit), incur any Liabilities (other than costs and expenses) or commence or participate in any Proceedings in order to obtain such Required Consents and (b) Randstad and its Affiliates, as applicable, will not be required to seek broader rights or more favorable terms for Monster Core Entity than those applicable to Randstad or its Affiliates, respectively, as of such time; provided, further, that Randstad shall not enter into any amendment, renewal, waiver or other modification of any Contract with a third-party (which does not include, for the avoidance of doubt, a unilateral modification by such third party to a service or the terms thereof for which Randstad's consent or approval is not required) that would prohibit or otherwise materially and adversely affect the provision of a Service and Randstad shall use commercially reasonable efforts to, and to cause its Affiliates to, renew and/or replace any Contract required for the provision of a Service that expires in accordance with its terms. Notwithstanding the foregoing, Randstad shall not be obligated to use any efforts to renew or replace any Contract with any shared vendor listed on Schedule A to the extent the Service provided thereunder has been provided to the Monster Recipients for at least six months post-Closing; provided, that Randstad shall provide Monster Core Entity with at least ninety (90) days prior written notice of any such expiration. Randstad shall provide written evidence of receipt of such Required Consents that have been obtained to Monster Core Entity promptly upon request by Monster Core Entity. In the event a TSA Vendor Contract Termination occurs, the Parties will cooperate in good faith and use reasonable best efforts to identify a commercially reasonable alternative to the Service(s) impacted thereby. If the Parties are unable to identify such an alternative, Randstad and its Affiliates will not be obligated to provide any such Services (to the extent such TSA Vendor Contract Termination impacts the provision thereof), but the Parties will be obligated to continue to use reasonable best efforts to seek out a commercially reasonable alternative to the Services so impacted. Subject to Randstad's obligations under this Section 2.01, Randstad will not be obligated to provide, or cause to be provided, all or a portion of any Service (to the extent such TSA Vendor Contract Termination impacts the provision thereof) implicated in a TSA Vendor Contract Termination (provided, that, subject to Randstad's lack of an obligation to provide, or cause to be provided, any service for which a requisite consent is not obtained, if there is a replacement or substitution of any Contract subject to such TSA Vendor Contract Termination by Randstad for purposes of providing services to Randstad which would reasonably be expected to be sufficient to replace or substitute the Services previously provided to Monster Core Entity, Randstad shall provide, or cause to be provided, such services to Monster Core Entity in replacement or substitution of the Service subject to such TSA Vendor Contract Termination).

ARTICLE III
ADDITIONAL AGREEMENTS

Section 3.01.  Randstad Computer-Based and Other Resources

(a)     As of the date hereof, unless required in connection with the performance, receipt or delivery of a Service, the Monster Recipients will cease to use and will have no further access to, and Randstad will have no obligation to otherwise provide, or cause to be provided, Randstad's or any of its Affiliates' intranet and other owned or licensed information technology related resources, including software, networks, hardware or technology of Randstad or its Affiliates and will have no access to, and Randstad will have no obligation to otherwise provide, computer-based resources (including e-mail and access to its or its Affiliates' computer networks and databases) which require a password or are available on a secured access basis. From and

after the date hereof, the Monster Recipients will direct all of their personnel having access to Randstad's or its Affiliates' intranet or such other information technology related resources, including software (owned or licensed), networks, hardware, technology or computer based resources (collectively, the "Systems") in connection with performance, receipt or delivery of a Service to (i) comply with bona fide all security guidelines applicable to third parties accessing Randstad Systems generally (including physical security, network access, internet security, confidentiality and personal data security guidelines, policies, standards and similar requirements) of Randstad or its applicable Affiliates that have been communicated to the Monster Recipients in writing and (ii) not tamper with, intentionally compromise or intentionally circumvent any security or audit measures employed by Randstad or its applicable Affiliates. Monster Core Entity will use commercially reasonable efforts to ensure that such access will be used by such personnel only for the purposes contemplated by, and subject to the terms of, this Agreement, and such personnel will access and use only those Systems for which Monster Core Entity has been granted the right to access and use. Monster Core Entity will use commercially reasonable efforts to prevent unauthorized access, use, destruction, alteration or loss of information contained in the Systems by means of Monster Recipients' access to such Systems. The Parties agree to use their respective commercially reasonable efforts to cooperate and fully implement this Section 3.01(a).

(b)    In the event of a cyber incident for which Randstad reasonably believes it or any of its Affiliates' intranet or other information technology-related resources have been or could be compromised by a malicious threat actor, Monster Core Entity agrees that Randstad may take all steps it deems necessary and/or advisable in its sole and absolute discretion, with or without advance notice, to remediate the cyber incident, including temporarily terminating or blocking the Monster Recipients' and their personnel's access and connectivity to the Systems. If Randstad reasonably believes any of the Monster Recipients or their personnel has failed to comply with the security guidelines of Randstad or its Affiliates, as applicable, that any unauthorized Monster Recipient personnel has accessed the Systems, or that any personnel of a Monster Recipient is a security concern or has engaged in activities that may lead to the unauthorized access, use, destruction, alteration or loss of data, information or software of Randstad or any of its Affiliates, Monster Core Entity agrees that Randstad may terminate or block such Monster Recipients' or such personnel's, as applicable, access and connectivity to the Systems until such time as the Monster Recipients have remedied such non-compliance in a manner satisfactory to Randstad in its reasonable discretion. The Monster Recipients will use, and will cause their personnel to use, reasonable best efforts to cooperate with Randstad in investigating any apparent unauthorized access to the Systems for which the Monster Recipients or their personnel's cooperation is reasonable necessary for such investigation. Randstad will implement any blocking of access or other action affecting the Services as narrowly as reasonably possible to address the issue leading to such blocking or other actions, as determined by Randstad in its reasonable discretion, and upon resolution of any issues described in this Section 3.01(b), Randstad will cease any blocking or other action affecting the Services that was taken in response to such issue.

(c)    For as long as Services are provided hereunder, Randstad shall, and shall cause its relevant Affiliates to, maintain backup, business continuation and disaster recovery plans consistent with the then current practices of Randstad and its Affiliates.

Section 3.02.    Access.    As a condition to Randstad's obligations to provide, or cause to be provided, the Services hereunder, the Monster Recipients will make available on a

timely basis to Randstad all information and materials reasonably requested by Randstad to enable Randstad to provide, or cause to be provided, the Services.

Section 3.03.  <u>Title and Control</u>.  All procedures, methods, systems, strategies, tools, equipment, facilities and other resources used by Randstad and any of its Affiliates in connection with the provision of Services hereunder which are the property of Randstad or its Affiliates will remain the property of Randstad and its Affiliates and will at all times be under the sole direction and control of Randstad and its Affiliates.

ARTICLE IV
SERVICE CHARGES; PASS THROUGH CHARGES; NO RIGHT OF SET OFF; TAX MATTERS

Section 4.01.  <u>Service Charges</u>.  Monster Core Entity will pay to Randstad the charges for each of the Services as set forth in <u>Schedule A</u> (the "<u>Service Charges</u>") in accordance with this Agreement.

Section 4.02.  <u>Pass Through Charges</u>.  In addition to any other charges agreed between the Parties pursuant to <u>Section 1.03</u> or this <u>Article IV</u>, Monster Core Entity will reimburse Randstad for all reasonable and documented out-of-pocket costs and expenses incurred by a third-party and billed to Randstad or any of its Affiliates in connection with providing any Services ("<u>Pass Through Charges</u>", and together with the Services Charges, the "<u>Service Fees</u>"). Randstad will promptly notify Monster Core Entity of the incurrence of any such Pass Through Charges.

Section 4.03.  <u>Payments & Invoices</u>. Randstad shall use commercially reasonable efforts to deliver invoices to Monster Core Entity for the Service Fees, Transaction Taxes, the Migration Costs and any other applicable third-party costs and expenses due under this Agreement for each calendar month of the Term, which invoices shall be delivered on or prior to the 45th Business Day following the end of each calendar month during the Term.  Monster Core Entity (or their designees) shall pay, or cause to be paid, the amount of such invoice by wire transfer of immediately available funds to Randstad (or its designees) within 45 days of the date of such invoice.

Section 4.04.  <u>No Right to Set-Off; Right to Dispute Amounts</u>.  The Parties will pay the full amount of any charges for Service Fees, the Migration Costs and Termination Charges owing under this Agreement and will not set off, counterclaim or otherwise withhold any amount owed (or to become due and owing) to the other Party on account of any obligation owed (or to become due and owing) by either Party or any of their Affiliates to the other Party that has not been finally adjudicated, settled or otherwise agreed upon by the Parties in writing.

Section 4.05.  <u>Tax Matters</u>.

(a)    <u>Sales Tax or Other Transfer Taxes</u>.  Monster Core Entity will bear any and all sales, use, excise, value added, transaction and transfer taxes and other similar charges (and any related interest and penalties) (the "<u>Transaction Taxes</u>") imposed on, or payable with respect to, any charges for Service Fees payable by Monster Core Entity pursuant to this Agreement. Randstad shall include the amount of any applicable Transaction Taxes in each invoice delivered to Monster Core Entity pursuant to <u>Section 4.03</u>.

(b)      <u>Withholding Tax or Other Similar Taxes</u>.  The charges and fees payable by Monster Core Entity to Randstad for the provision of the Services hereunder shall be made without withholding or deduction for any taxes imposed by a Governmental Entity on the performance or delivery of any Services, except as otherwise required by applicable Law.  If Monster Core Entity reasonably determines that any such withholding or deduction is required by Law, then Monster Core Entity shall be entitled to make such deductions or withholdings and pay such amounts to the relevant Governmental Entity pursuant to applicable Law.  In the event amounts in the nature of Transaction Taxes are so withheld or deducted and paid to such relevant Governmental Entity, Monster Core Entity will gross up the amount payable such that Randstad receives an amount equal to the amount of the fees owed hereunder in respect of those Services, net of the withholding or deduction (the "<u>Gross Up</u>").  Any amounts not in the nature of Transaction Taxes so withheld or deducted and paid to such relevant Governmental Entity shall be treated as having been paid to Randstad for all purposes of this Agreement.  If any withholding or deduction from any payment under this Agreement by Monster Core Entity in relation to any Service is required in respect of any taxes pursuant to any applicable Law in accordance with the foregoing provisions, Monster Core Entity will  timely pay the deducted amount to the relevant Governmental Entity and promptly forward to Randstad a withholding tax certificate (to the extent applicable) or other document evidencing that payment.

(c)      <u>Employee Withholding Taxes</u>.  Randstad shall be solely responsible for timely withholding and remitting to the applicable Governmental Entity any employment, income or other taxes required to be withheld in respect of its employees related to the sale, performance, provision or delivery of Services.

ARTICLE V
STANDARD FOR SERVICE

Section 5.01.  <u>Standard for Service</u>.    Except as otherwise provided in this Agreement or <u>Schedule A</u>, Randstad agrees to provide, or cause to be provided, the Services such that the nature, quality, standard of care and the service levels at which such Services are performed are not materially less than the nature, quality, standard of care and service levels at which substantially the same services were performed by or on behalf of Randstad during the Reference Period; <u>provided</u>, that nothing in this Agreement will require Randstad to favor any Monster Recipient's operation of its business over Randstad's own business operations.  Monster Core Entity acknowledges and agrees that certain of the Services to be provided hereunder were, prior to the Closing, performed for Monster Core Entity by individuals who may no longer be employed by Randstad.  Consequently, the Parties agree (a) to cooperate in good faith to ensure that the manner of Services provided, or caused to be provided, by Randstad are provided in a manner not materially less than the manner in which such services were provided during the Reference Period and (b) that such cooperation may include Monster Core Entity's directing the relevant employees to provide such Services.

Section 5.02.  [Reserved].

Section 5.03.  <u>Services Shortfall</u>. If, in the sole discretion of Monster Core Entity (acting reasonably and in good faith), the timing or quality of performance fails to meet a Services

standard pursuant to this Agreement (a "Services Shortfall"), Monster Core Entity may provide written notice to Randstad of such Services Shortfall and Randstad shall have 10 Business Days to respond in writing to Monster Core Entity to such Services Shortfall (a "Shortfall Response"), such Shortfall Response which shall set out in sufficient detail (a) Randstad's position on the alleged Services Shortfall, (b) a plan to implement changes to the Services to rectify such Services Shortfall (if Randstad agrees a Services Shortfall exists) and (c) a timeframe for the rectification of such Services Shortfall (if Randstad agrees a Services Shortfall exists).  In response to such notice, if Randstad agrees such Services Shortfall exists, or, if Randstad disputes such Services Shortfall pursuant to Article VI and the resolution results in a determination that a Services Shortfall exists (a "Shortfall Determination"), Randstad will use commercially reasonable efforts to rectify such Services Shortfall as soon as reasonably possible.  Within 10 Business Days of any Shortfall Determination, Randstad will deliver to the Monster Core Entity the items described in clauses (b) and (c) of this Section 5.03.

Section 5.04.   Level and Manner of Use.  Except as otherwise expressly provided in this Agreement and without the prior written consent of Randstad, the Monster Recipients' use of any Service will neither (i) exceed in any material respect the level of use, nor (ii) differ in any material respect in the manner of use, by the Monster Recipients (including the Non-Core Entities) consistent with past practice during the course of the Reference Period; provided, that a difference in any material respect in the manner of use of any Services shall not be deemed (x) solely as a result of the use of such Service in connection with the integration of the Business with the business of the Company pursuant to the Contemplated Transactions and in accordance with Section 1.01(b), or (y) if such difference in use is a direct result of a modification by Randstad in its provision of such Service.  In no event will any Monster Recipient be entitled to materially increase its use of any of the Services above such level of use without the prior written consent of Randstad.

Section 5.05.   [Reserved].

Section 5.06.   Abandonment; Maintenance.  Randstad shall not Abandon (as defined below) any of the Services.  "Abandon" or "Abandonment" means the threatened or actual intentional refusal by Randstad to provide or perform any material element(s) of the Services in breach of its obligations under this Agreement.  Notwithstanding the foregoing, without limiting any other rights or agreements hereunder, including Section 5.05, Section 5.08, Section 5.10 and Section 8.03, Randstad and its Affiliates will have the right to shut down temporarily the operation of any facilities or systems providing any Service if, in Randstad's judgment, acting reasonably and in good faith, such action is necessary for general maintenance or emergency purposes; provided, however, Randstad will (a) to the extent possible, provide reasonable prior written notice to Monster Core Entity prior to any such shut down and (b) use its commercially reasonable efforts to schedule non-emergency maintenance so as to not materially disrupt the business or operations of Monster Core Entity.  With respect to the Services dependent on the operation of such facilities or systems, Randstad will be relieved of its obligations hereunder to provide such Services during the period that such facilities or systems are so shut down in compliance with this Agreement, but will use commercially reasonable efforts to minimize each period of shut down.

Section 5.07.   [Reserved].

Section 5.08.   <u>Modifications</u>.  Randstad may modify a Service without the consent of Monster Core Entity only (a) if such modification is done reasonably and in a manner that does not materially adversely affect the quality or availability of Services or increase the cost of such Services, (b) if provision of such Service is or becomes prohibited or restricted by applicable Law, (c) as a result of the termination (x) by a third party of any third-party contract used to provide all or part of such Service or (y) of any third-party contract used to provide all or part of such Service in connection with the bankruptcy, dissolution or winding up of such third party (each of (x) and (y), a "<u>TSA Vendor Contract Termination</u>" and for the avoidance of doubt, the expiration at the end of a contract's stated term shall not be considered a TSA Vendor Contract Termination) or, (d) if, in Randstad's judgment, acting reasonably and in good faith, such Service puts Randstad's or its Affiliates' existing employee plans or benefits at risk; <u>provided</u>, that, in the event of the foregoing clauses (a) through (d), (i) Randstad shall provide no less than 15 days' notice of such modification, (ii) Randstad will use its commercially reasonable efforts to limit the disruption to the business or operations of Monster Core Entity caused by such modification and (iii)  Monster Core Entity may terminate such Service (in whole or in part) immediately upon notice to Randstad upon receipt of notice of such proposed modification from Randstad.  In the event Monster Core Entity determines that the applicable Monster Recipient will continue to receive such modified Service it will pay Randstad for any increased cost with respect to such Services. Randstad's responsibilities set forth herein will be amended as reasonably necessary to conform to any such modifications made pursuant to this <u>Section 5.08</u> and the Parties will use commercially reasonable efforts to comply with any such amendments.  Subject to the terms in this Agreement, in providing the Services hereunder, Randstad may use any information systems, hardware, software, processes and procedures it deems necessary or desirable in its reasonable discretion.

Section 5.09.   <u>Disclaimer of Warranties</u>.  Except as expressly set forth herein, the Parties acknowledge and agree that the Services are provided on an as-is, where-is basis, that the Monster Recipients assume all risks and liability arising from or relating to their use of and reliance upon the Services and Randstad makes no representation or warranty with respect thereto. EXCEPT AS EXPRESSLY SET FORTH HEREIN, RANDSTAD HEREBY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, COMMERCIAL UTILITY, MERCHANTABILITY, FITNESS OF THE SERVICES FOR A PARTICULAR PURPOSE OR USE, TITLE, NON-INFRINGEMENT, ACCURACY, AVAILABILITY, TIMELINESS, COMPLETENESS, THE RESULTS TO BE OBTAINED FROM SUCH SERVICES OR ARISING FROM COURSE OF PERFORMANCE, DEALING, USAGE OR TRADE, AND MONSTER CORE ENTITY, ON ITS BEHALF AND ON BEHALF OF ALL OF ITS AFFILIATES (INCLUDING THE OTHER MONSTER RECIPIENTS), HEREBY ACKNOWLEDGES SUCH DISCLAIMER AND MONSTER CORE ENTITY SPECIFICALLY DISCLAIMS THAT IT IS RELYING UPON OR HAS RELIED UPON ANY SUCH REPRESENTATION OR WARRANTY.  NEITHER RANDSTAD NOR ANY OF ITS AFFILIATES GUARANTEES OR WARRANTS THE CORRECTNESS, COMPLETENESS, CURRENTNESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY DATA OR OTHER INFORMATION PROVIDED TO MONSTER CORE ENTITY OR ITS AFFILIATES (INCLUDING THE OTHER MONSTER RECIPIENTS) OR ITS

REPRESENTATIVES IN CONNECTION WITH THE SERVICES; PROVIDED, THAT THIS AGREEMENT SHALL NOT IN ANY WAY LIMIT THE REPRESENTATIONS AND WARRANTIES OF, OR INDEMNITIES PROVIDED TO, ANY PERSON UNDER ANY OTHER TRANSACTION DOCUMENT.

Section 5.10.  <u>Compliance with Laws and Regulations</u>.  Each Party will be responsible for its and its Affiliates' own compliance with any and all applicable Laws with respect to their performance under this Agreement.  No Party or its Affiliates will take any action in violation of any such applicable Law that would reasonably be likely to result in liability being imposed on the other Party or its Affiliates, as the case may be.  Randstad will not be obligated to provide any Service which, if provided, would violate any applicable Law.

Section 5.11.  <u>No Reporting Obligations</u>.  Notwithstanding anything to the contrary contained in this Agreement or in any Schedule hereto, neither Randstad nor any of its Affiliates, nor any of their respective Representatives, will be obligated, pursuant to this Agreement or any Schedule hereto, as a result of storing or maintaining any data referred to herein or in any Schedule hereto, or otherwise, to prepare or deliver any notification or report to any Governmental Entity or other Person on behalf of Monster Core Entity or any of its Affiliates (including the other Monster Recipients), or any of their respective Representatives.

Section 5.12.  <u>Records and Audit</u>.  Each Party shall maintain true and correct records of all receipts, invoices, reports and other documents relating to the provision and receipt of Services in accordance with their respective standard accounting practices and procedures, consistently applied, and shall provide each other with reasonable access to such records, subject to applicable Law and the obligations of <u>Section 9.03</u>.

ARTICLE VI
DISPUTE RESOLUTION

Section 6.01.   <u>Initial Dispute Resolution</u>.  In the event of any dispute, controversy or claim arising out of or relating to this Agreement, or the validity, interpretation, breach or termination of any provision of this Agreement, or calculation or allocation of the costs of any Service, including any Transaction Taxes, Gross Up, and indemnification claims and claims seeking redress or asserting rights under any applicable Law, whether in contract, tort, common law, statutory law, equity or otherwise, including any question regarding the negotiation, execution or performance of this Agreement (each, a "<u>TSA Dispute</u>"), Randstad and Monster Core Entity agree that the Randstad Services Manager and the Monster Services Manager (or such other people as Randstad and Monster Core Entity may designate) will negotiate in good faith in an attempt to resolve such TSA Dispute promptly and amicably.  If, such TSA Dispute cannot be resolved to the mutual satisfaction of Randstad and Monster Core Entity, then such TSA Dispute will be resolved in accordance with the dispute resolution process set forth below in this <u>Article VI</u>.

Section 6.02.  <u>Governing Law, Fees</u>.   By execution and delivery of this Agreement, each Party agrees any Proceeding relating to this Agreement will be brought solely in the Court of Chancery in the City of Wilmington, New Castle County, Delaware, except where such court lacks subject matter jurisdiction then such Proceeding will be brought solely in the federal district court sitting in the City of Wilmington, Delaware and if such court lacks subject

matter jurisdiction, then any state or federal court located in Delaware. Each Party irrevocably (i) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (ii) agrees that it will not bring any Proceeding relating to this Agreement in any other court. Each of the Parties irrevocably and unconditionally waives (and agrees not to plead or claim) any objection to the laying of venue of any dispute arising out of this Agreement in the state and federal courts of the State of Delaware, or that any such dispute brought in any such court has been brought in an inconvenient or improper forum.

Section 6.03. <u>Charge Adjustments</u>. If any TSA Dispute regarding the amount of any charges for Service Fees (including any applicable Gross Up), Transaction Taxes or the Migration Costs or Termination Charges under this Agreement is finally adjudicated pursuant to the dispute resolution and/or judicial process set forth in this <u>Article VI</u> and it is determined that Randstad have invoiced Monster Core Entity for such charge and that Monster Core Entity has paid to Randstad an amount which is greater or less than the amount that the such charge should have been, then: (a) if it is determined that Monster Core Entity has overpaid such charge, Randstad will, within five Business Days after such determination, reimburse Monster Core Entity an amount of cash equal to such overpayment; and (b) if it is determined that Monster Core Entity has underpaid such charge, Monster Core Entity will within five Business Days after such determination reimburse Randstad an amount of cash equal to such underpayment.

ARTICLE VII
LIMITED LIABILITY AND INDEMNIFICATION

Section 7.01. <u>Limitation of Liability</u>.

(a)     Randstad will not have any liability in contract, tort or otherwise, for or in connection with any Services rendered or to be rendered by Randstad, its Affiliates or Representatives (each, a "<u>Randstad Indemnified Party</u>") pursuant to this Agreement, the transactions contemplated by this Agreement or any Randstad Indemnified Party's actions or inactions in connection with any such Services, to Monster Core Entity or its Affiliates (including the other Monster Recipients) or Representatives, except to the extent that Monster Core Entity or its Affiliates or Representatives suffer a Loss that results from such Randstad Indemnified Party's Deliberate Breach, gross negligence or willful misconduct in connection with such transactions, actions or inactions, or provision of such Services.

(b)     Monster Core Entity will not have any liability in contract, tort or otherwise, for or in connection with the receipt of any Services by Monster Core Entity, its Affiliates or Representatives (each, a "<u>Monster Indemnified Party</u>") pursuant to this Agreement, the transactions contemplated by this Agreement or any Monster Indemnified Party's actions or inactions in connection with the receipt of any such Services, except to the extent that a Randstad Indemnified Party suffer a Loss that results from such Monster Indemnified Party's Deliberate Breach, gross negligence or willful misconduct in connection with such transactions, actions or inactions, or receipt of such Services.

(c)     Notwithstanding any other provision contained in this Agreement, no Party will be liable for any consequential (except to the extent reasonably foreseeable), special, incidental, indirect or punitive damages, any amount calculated based upon any multiple of

12

earnings, book value or cash flow, or diminution in value, lost profits or similar items (including loss of revenue, business interruption, income or profits, diminution of value or loss of business reputation or opportunity or loss of customers, goodwill or use) regardless of whether such items are based in contract, breach of warranty, tort or negligence or any other theory. The Parties acknowledge that the Services to be provided hereunder are subject to, and that the remedies under this Agreement are limited by, the applicable provisions of Article V, including the limitations on representations and warranties with respect to the Services.

(d)    Monster Core Entity acknowledges that Randstad and its Affiliates are not in the business of providing Services of the type contemplated under this Agreement and the Services are to be provided on a transitional basis to the Monster Recipients (including on a pass-through basis to the Non-Core Entities and, as set forth in Section 1.01(b), the Company) with respect to the businesses of the Monster Recipients (including the businesses of the Non-Core Entities and, as set forth in Section 1.01(b), the Company). Accordingly, the aggregate liability and indemnification obligations of any Party with respect to this Agreement, the Services or the transactions contemplated by this Agreement will not exceed, in the aggregate, the aggregate amount of any charges for Service Fees, the Migration Costs and Termination Charges, if any, paid or payable to Randstad hereunder during the Term and, if applicable, during any Service Period actually extended beyond the Term pursuant to this Agreement.

Section 7.02.    Monster Core Indemnification Obligation.  Subject to the limitations set forth in Section 7.01, Monster Core Entity will indemnify, defend and hold harmless each relevant Randstad Indemnified Party from and against any and all Losses, and will reimburse each relevant Randstad Indemnified Party for all reasonable expenses as they are incurred, whether or not in connection with pending litigation and whether or not any Randstad Indemnified Party is a Party, to the extent caused by, resulting from or in connection with any of the Services rendered or to be rendered by or on behalf of Randstad pursuant to this Agreement.

Section 7.03.    Randstad Indemnification Obligation.  Subject to the limitations set forth in Section 7.01, Randstad will indemnify, defend and hold harmless the Monster Indemnified Parties from and against any and all Losses, and will reimburse each Monster Indemnified Party for all reasonable expenses as they are incurred, whether or not in connection with pending litigation and whether or not any Monster Indemnified Party is a Party, to the extent caused by, resulting from, or arising out of or in connection with Randstad's Deliberate Breach, gross negligence or willful misconduct in providing any of the Services rendered or to be rendered by or on behalf of Randstad pursuant to this Agreement.

Section 7.04.    Satisfaction of Indemnity Claims.

(a)    Subject to the limitations set forth herein, any Losses for which a Monster Indemnified Party is finally determined to be entitled to indemnification pursuant to this Agreement will be satisfied solely and exclusively by the transfer by Zen HoldCo for no consideration to Camaro Holdings, LLC of a number of Randstad Units equal to the quotient of the aggregate amount of such Losses divided by the Fair Market Value of such Randstad Units as of the date such transfer is required hereunder, in accordance with Section 8.08 of the Contribution Agreement, *mutatis mutandis*.

(b)     Subject to the limitations set forth herein, any Losses for which a Randstad Indemnified Party is finally determined to be entitled to indemnification pursuant to this Agreement will be satisfied solely and exclusively by cash settlement by wire transfer of immediately available funds to or at the direction of such Randstad Indemnified Party within ten (10) Business Days of such final determination.

Section 7.05.    Liability for Payment Obligations.  Nothing in this Article VII will be deemed to eliminate or limit, in any respect, Monster Core Entity's express obligation in this Agreement to pay charges for Service Fees (including any applicable Gross Up), Transaction Taxes, the Migration Costs and Termination Charges rendered in accordance with this Agreement or Randstad's obligation to reimburse any overpayment pursuant to Section 6.03(a).

Section 7.06.    Exclusion of Other Remedies.  Other than (a) for actual, knowing and intentional fraud, (b) the remedies pursuant to Section 5.08 and Article VIII or (c) the seeking of specific performance or other injunctive relief pursuant to Section 9.16, the indemnification expressly provided in this Article VII and Article VIII of the Contribution Agreement will be the sole and exclusive remedy of any Indemnified Party for any claim, Loss, damage, expense or liability, whether arising from statute, principle of common or civil law, principles of strict liability, tort, contract or otherwise arising under this Agreement, or in respect of the Services or actions taken by Parties in connection with the transactions contemplated by this Agreement.

Section 7.07.    Mitigation.  Each Indemnified Party will use its commercially reasonable efforts to mitigate any Loss for which such Indemnified Party seeks indemnification under this Agreement.

ARTICLE VIII
TERM AND TERMINATION; EXTENSION OF SERVICE PERIOD

Section 8.01.    Term and Termination.

(a)     This Agreement will commence immediately upon the Closing and will terminate upon the earlier to occur of: (i) fifteen months from the date of this Agreement or December 31, 2025, whichever comes later, (ii) the last date on which Randstad is obligated to provide any Service to the Monster Recipients (including on a pass-through basis to the Non-Core Entities and, as set forth in Section 1.01(b), the Company) in accordance with the terms hereof; and (iii) the mutual written agreement of the Parties to terminate this Agreement in its entirety (such period between the Closing Date and the earliest to occur of (i) through (iii), the "Term"). Notwithstanding anything to the contrary in the foregoing, if a Service Period is extended beyond the Term pursuant to Section 8.04, this Agreement will terminate upon the earlier to occur of (ii) and (iii), solely with respect to any such Services.

(b)     Without prejudice to Monster Core Entity's rights with respect to a Force Majeure Event, Monster Core Entity may terminate this Agreement with respect to any Service, in whole or in part (including with respect to scope of any Service): (i) for any reason or no reason upon providing at least 30 days' prior written notice to Randstad of such termination, in each case, subject to the obligation to pay Termination Charges, as provided for under Section 8.02; or (ii) if Randstad has failed to perform any of its material obligations under this Agreement with respect

14

to such Service, and such failure continues to exist 30 days after receipt by Randstad of written notice of such failure from Monster Core Entity.

(c)     Randstad may terminate this Agreement with respect to one or more Services (by Service line item), at any time if Monster Core Entity has failed to perform any of its material obligations under this Agreement relating to such Services and such failure will continue to exist for a period of 30 days after receipt by Monster Core Entity of a written notice of such failure from Randstad.

(d)     Both Parties (in the case of clause (i)) or either Party (in the case of clause (ii)) may terminate this Agreement with respect to one or more Services (i) immediately upon mutual written agreement or (ii) immediately upon written notice to the other Party in the event that such other Party: (A) commences, or has commenced against it, proceedings under bankruptcy, insolvency or debtor's relief applicable Laws or similar applicable Laws in any other jurisdiction; (B) makes a general assignment for the benefit of its creditors; or (C) is liquidated or dissolved.

(e)     Schedule A will be updated to reflect any terminated Service.  In the event that the effective date of the termination of any Service is a day other than the last day of a period, any periodic charge associated with such Service will be pro-rated appropriately.

Section 8.02.   Effect of Termination of Services.

(a)     Upon termination (for any reason) or reduction of any Service (in whole or in part) pursuant to this Agreement (other than a termination in connection with Section 5.08(a), (c), or (d)), Monster Core Entity will pay to Randstad all applicable Termination Charges, which will be invoiced and paid as provided in Article IV.  Furthermore, upon termination (for any reason) or reduction of any Service (in whole or in part) pursuant to this Agreement, the Monster Recipients will comply in good faith with any reasonable contractual obligations associated with the termination of such Service, to the extent practicable and not otherwise prohibited by applicable Law.

(b)     Upon termination of any Service pursuant to this Agreement, Randstad will have no further obligation to provide such terminated Service, and the relevant Monster Core Entity will have no obligation to pay any Service Fees, future Pass Through Charges or other charges relating to any such Service; provided, that Monster Core Entity will remain obligated to Randstad for the (i) Pass Through Charges, Service Charges, Transaction Taxes, Gross Up and Migration Costs owed and payable in respect of Services provided prior to the effective date of termination, including any such fees, costs or expenses that are billed in arrears and (ii) except as set forth in Section 8.02(a), Termination Charges as validly invoiced by Randstad to the relevant Monster Recipient in accordance with this Agreement.  In connection with termination of any Service, the provisions of this Agreement not relating solely to such terminated Service will survive any such termination.  In connection with a termination of this Agreement, Section 3.03, Article IV, Section 5.09, Section 5.12, Article VI, Article VII (including liability in respect of any indemnifiable Losses under this Agreement arising or occurring on or prior to the date of termination), this Article VIII, Article IX and Article X will continue to survive indefinitely.

Section 8.03.  <u>Force Majeure</u>.  Neither Party (nor any Person acting on its behalf) will be liable to the other Party for any Loss as a result of any delay or failure in the performance of any obligation hereunder which is due to fire, flood, war, acts of God, strikes, riots, plague, Governmental Entity, or other causes beyond its reasonable control (a "<u>Force Majeure Event</u>"); <u>provided</u>, that the Party so affected will notify the other Party in writing promptly upon the onset of any Force Majeure Event, will use commercially reasonable efforts to mitigate and minimize the effect of any Force Majeure Event, and notify the other Party in writing promptly upon the termination of any Force Majeure Event.  In the event that Randstad is unable to provide any Service due to a Force Majeure Event, Monster Core Entity will be relieved of its obligation to pay for any such Service to the extent not provided; <u>provided</u>, <u>further</u>, that a Force Majeure Event will not relieve Monster Core Entity from any payment obligations under this Agreement with respect to the Services actually performed hereunder.

Section 8.04.  <u>Extension of Service Period</u>.  Upon 30 days' advance written notice prior to the expiration of the Service Period for any Service, Monster Core Entity may request an extension of a Service (in whole or in part) (a "<u>Service Extension</u>"); <u>provided</u>, that Randstad (a) shall consider any request for a Service Extension in good faith and (b) will, in its sole and absolute discretion, grant or deny the Service Extension request.  If for any reason, other than a Force Majeure Event, a Service Extension is granted, then Monster Core Entity will pay Randstad a charge equal to the Service Fees for such extended Service Period for such Service plus (i) in the case of a Service extended from one to three months after the original Service Period, an additional fifteen percent (15%) premium for the period which extends beyond such original Service Period, (ii) in the case of a Service extended from four to six months after the original Service Period, an additional twenty-five percent (25%) premium for the period which extends beyond such original Service Period and (iii) in the case of a Service extended by more than six months after the original Service Period, an additional forty percent (40%) premium for the period which extends beyond such original Service Period.

ARTICLE IX
GENERAL PROVISIONS

Section 9.01.  <u>Independent Contractors</u>.  Nothing contained herein is intended or will be deemed to make any Party or its respective Affiliates the agent, employee, partner or joint venture of any other Party or its Affiliates or be deemed to provide such Party or its Affiliates with the power or authority to act on behalf of the other Party or its Affiliates or to bind the other Party or its Affiliates to any contract, agreement or arrangement with any other individual or entity. Randstad and its Affiliates, as applicable, will act as independent contractors and not as agents of any Monster Recipient in performing such Service, maintaining control over their employees, their subcontractors and their employees and complying with all withholding of income at source requirements, whether federal, state, local or foreign.

Section 9.02.  <u>Subcontractors</u>.  Randstad may hire or engage one or more subcontractors to perform any or all of its obligations under this Agreement; <u>provided</u>, that (a) Randstad will use the same degree of care in selecting any such subcontractor as it would if such subcontractor was being retained to provide similar services to Randstad; and (b) Randstad will in all cases remain solely responsible for all of its obligations hereunder with respect to the scope of the Services, the standard for Services as set forth in <u>Article V</u> and the content of the Services

16

provided to the Monster Recipients (including on a pass-through basis to the Non-Core Entities and, as set forth in <u>Section 1.01(b)</u>, the Company).

Section 9.03.   <u>Treatment of Confidential Information</u>.

(a)   The Parties will not, and will cause all other Persons providing or receiving Services hereunder not to, disclose to any other Person, except for purposes of this Agreement, any Confidential Information of the other Party; <u>provided</u>, that each Party may disclose Confidential Information of the other Party, to the extent permitted by applicable Law: (i) to its Representatives on a need-to-know basis in connection with the performance of such Party's obligations under this Agreement; (ii) in any report, statement, testimony or other submission required to be provided to any Governmental Entity having jurisdiction over the disclosing Party; or (iii) in order to comply with applicable Law, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the disclosing Party in the course of any litigation, investigation or administrative proceeding.  In the event that a Party becomes legally compelled (based on advice of counsel) by judicial or administrative process to disclose any Confidential Information of the other Party, such disclosing Party (to the extent legally permitted) will provide the other Party with prompt prior written notice of such requirement, and, to the extent reasonably practicable, cooperate with the other Party (at such other Party's expense) to obtain a protective order or similar remedy to cause such Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege.  In the event that such protective order or other similar remedy is not obtained, the disclosing Party will furnish only that portion of the Confidential Information that has been legally compelled, and will exercise its commercially reasonable efforts (at such other Party's expense) to obtain assurance that confidential treatment will be accorded such Confidential Information.

(b)   Each Party will, and will cause its Representatives to, protect the Confidential Information of the other Party by using the same degree of care to prevent the unauthorized disclosure of such Confidential Information as the Party uses to protect its own confidential information of a like nature.

(c)   Each Party will inform its Representatives and Affiliates of the confidential nature of the information and direct them to abide by the terms hereof in advance of the disclosure of any such Confidential Information to them.  Such disclosing Party will be responsible for any breach of this Agreement by such Representatives or Affiliates, as if such Representatives or Affiliates were party hereto.

(d)   Each Party will comply with all applicable Laws (including state, federal and foreign privacy and Data Protection Legislation) that are or that may in the future be applicable to the provision of Services hereunder, including as related to any Personal Information.

Section 9.04.   <u>Further Assurances</u>.  From time to time following the Closing until termination of this Agreement in accordance with its terms, the Parties will, and will cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and such instruments, and will take such reasonable actions as may be necessary or appropriate to make effective the transactions

contemplated hereby as may be reasonably requested by the other Party; provided, that nothing in this Section 9.04 will require either Party or its Affiliates to pay money to, commence or participate in any action or proceeding with respect to, or offer or grant any accommodation (financial or otherwise) to, any third-party following the date hereof.

Section 9.05.   Construction.   The descriptive headings herein are inserted for convenience of reference only and are not intended to be a substantive part of or to affect the meaning or interpretation of this Agreement.   Whenever required by the context, any pronoun used in this Agreement will include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs will include the plural and vice versa.   Reference to any agreement, document, or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof.   The use of the words "include" or "including" in this Agreement will be by way of example rather than by limitation.   The use of the words "or," "either" or "any" will not be exclusive.   References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.   The words "dollar" or "$" will mean U.S. dollars. References to statutes include all regulations promulgated thereunder, and references to any Law will be construed as such Law as in effect on the Closing Date.   The word "day" means calendar day unless Business Day is expressly specified.   Any reference to the masculine, feminine or neuter gender will include such other genders, and any reference to the singular or plural will include the other, in each case unless the context otherwise requires.   If any action under this Agreement is required to be done or taken on a day that is not a Business Day, then such action will be required to be done or taken not on such day but on the first succeeding Business Day thereafter.   The provisions of this Agreement will be construed neither for nor against any Party irrespective of which Party caused such provisions to be drafted.   Each of the Parties acknowledges that it has been represented by counsel in connection with the preparation and execution of this Agreement. Except as otherwise expressly provided elsewhere in this Agreement, any provision herein which contemplates the agreement, approval or consent of, or exercise of any right of, a Party, such Party may give or withhold such agreement, approval or consent, or exercise such right, in its sole and absolute discretion, the Parties hereby expressly disclaiming any implied duty of good faith and fair dealing or similar concept.

Section 9.06.   Notices.   Except as otherwise provided in this Agreement, all notices, requests, permissions, and waivers hereunder must be in writing and will be deemed to have been duly given (a) when delivered, if delivered personally to the intended recipient, (b) one Business Day following sending by overnight delivery via a national courier service or (c) on the date delivered if sent by email (provided, that confirmation of email receipt is obtained), and, in each case, addressed to a Party at the following address for such Party, or to such address(es) as will be furnished in writing by any such Party to the other Party in accordance with the provisions of this Section 9.06:

If to Randstad:

c/o Randstad N.V.
Diemermere 25, NL-1112 TC
Diemen, Netherlands

Email: fiona.van.lede@randstad.com
Attention: Fiona van Lede, General Counsel

with a copy to (which will not constitute notice):

Jones Day
1221 Peachtree Street
Atlanta, Georgia 30361
E-mail: tmann@jonesday.com; pbaldwin@jonesday.com
Attention: Tim Mann and Patrick Baldwin

If to Monster Core Entity:

CareerBuilder, LLC
200 N. LaSalle St., Suite 900
Chicago, IL 60601
Telephone:  (312) 698-1052
Email:  mark.pacioni@careerbuilder.com
Attention:  Mark Pacioni, General Counsel

with copies to (which will not constitute notice):

Sidley Austin LLP
787 Seventh Avenue
New York, NY  10019
Telephone:    (212) 839-5736
Email:        tfeuerstein@sidley.com

Section 9.07.  Severability.  It is the desire and intent of the Parties that the provisions of this Agreement be enforced to the fullest extent permissible under the applicable Laws applied in each jurisdiction in which enforcement is sought.  The Parties agree that the provisions of this Agreement will be severable in the event that any of the provisions hereof are adjudicated by a court of competent jurisdiction to be invalid, void or otherwise unenforceable and the remaining provisions will remain valid and enforceable to the fullest extent permitted by applicable Law without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it will, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 9.08.   Assignment.  This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  Neither Party may assign (whether by operation of law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Party, except that Randstad may assign any or all of its rights and obligations under this Agreement in connection with a sale or disposition of any assets or lines of business of Randstad; provided,

that the transferee of such assets will agree in writing to be bound by the terms of this Agreement as if named as a "Party" hereto; provided, further, that Monster Core Entity, without its prior written consent, will not be obligated to materially increase the scope, volume, or duration or materially change the nature of the Services it receives under this Agreement as a result of any such sale or disposition.

Section 9.09.  No Third Party Beneficiaries.  Except as expressly otherwise provided in Article VII with respect to the Indemnified Parties, this Agreement is solely for the benefit of the Parties and does not confer on third parties (including any employees of the respective Parties or their Affiliates, except with respect to indemnity under Article VII) any remedy, claim, reimbursement, claim of action or other right in addition to those existing without reference to this Agreement.

Section 9.10.  Entire Agreement.  This Agreement, including the Schedules hereto, as well as any other agreements and documents referred to herein and therein, including the Contribution Agreement, will together constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and will supersede all prior negotiations, agreements and understandings of the Parties of any nature, whether oral or written, with respect to such subject matter and will supersede all prior negotiations, agreements and understandings of the parties hereto of any nature, whether oral or written, with respect to such subject matter.

Section 9.11.  Amendment; Waivers.

(a)  This Agreement (including Schedule A) may be amended and any provision of this Agreement may be waived; provided, that except as provided in Section 1.03, Section 5.08 and Section 8.01, any such amendment or waiver will be binding upon a Party only if such amendment or waiver is set forth in a writing executed by such Party.  No course of dealing between or among any Persons having any interest in this Agreement will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Party under or by reason of this Agreement.

(b)  No delay or failure in exercising any right, power or remedy hereunder will affect or operate as a waiver thereof; nor will any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power or remedy preclude any further exercise thereof or of any other right, power or remedy.  The rights and remedies hereunder are cumulative and not exclusive of any rights or remedies that any Party would otherwise have.  Any waiver, permit, consent or approval of any kind or character of any breach or default under this Agreement or any such waiver of any provision of this Agreement must satisfy the conditions set forth in Section 9.11(a) and will be effective only to the extent in such writing specifically set forth.

Section 9.12.  Governing Law.  The validity, interpretation and enforcement of this Agreement will be governed by the Laws of the State of Delaware, without giving effect to any choice of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the applicable Laws of any jurisdiction other than the State of Delaware to be applied. Randstad will cause the Randstad Indemnified Parties, and Monster Core Entity will cause the

Monster Indemnified Parties, to comply with the foregoing and with <u>Article VII</u> as though such Indemnified Parties were a Party to this Agreement.

Section 9.13.   <u>Waiver of Jury Trial</u>.   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (III) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.13</u>.

Section 9.14.   <u>Non-Recourse</u>.   All claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as Parties to this Agreement. No Person who is not a Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or Representative of, and any financial advisor or lender to, any Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or Representative of, and any financial advisor or lender to, any of the foregoing ("<u>Nonparty Affiliates</u>"), will have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach; and, to the maximum extent permitted by applicable Law, each Party hereby waives and releases all such liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates. References herein to obligations of the Monster Recipients will mean that Monster Core Entity will cause the applicable Monster Recipients to take such applicable actions or will restrict the applicable Monster Recipients from taking such applicable actions.

Section 9.15.   <u>Counterparts; Effectiveness</u>.   This Agreement may be executed in two or more counterparts (delivery of which may be via email as a portable document format (.pdf or other electronic means including DocuSign)), each of which will be deemed an original, and it will not be necessary in making proof of this Agreement or the terms of this Agreement to produce or account for more than one of such counterparts.

Section 9.16.   <u>Specific Performance</u>.   Each Party acknowledges and agrees that in the event it (a) breaches (or threatens to breach) or (b) fails (or threatens to fail), in the case of each of the foregoing (a) and (b) whether overtly, through course of conduct, inadvertently or otherwise, to perform, observe or discharge any of its obligations or liabilities under this Agreement, the Parties (including their Affiliates) may be irreparably harmed and no remedy at law will provide adequate relief to the other Parties hereto, and agrees that the other Parties hereto will be entitled to specific performance or temporary and permanent injunctive relief in any such case without the necessity of proving actual damages or posting bond, this being in addition to any other remedy to which such Party is entitled at law or in equity.

ARTICLE X
DEFINITIONS

Section 10.01. <u>Certain Defined Terms</u>.   The following capitalized terms used in this Agreement will have the meanings set forth below:

"<u>Abandon</u>" or "<u>Abandonment</u>" has the meaning set forth in <u>Section 5.06</u>.

"<u>Additional Service</u>" has the meaning set forth in <u>Section 1.03</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person which, at the time of determination, directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with such Person.  For purposes of this Agreement, "control", "controlled by", "under common control with" and "controlling" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Business</u>" means the business and operations of the entities contributed by Zen HoldCo pursuant to the Contribution Agreement (including, for the avoidance of doubt, the business and operations of Monster Core Entity and its Subsidiaries, the Non-Core Entities and their Subsidiaries, and Monster Worldwide Italia Srl), in each case, as conducted during the Reference Period.

"<u>Confidential Information</u>" means any information furnished or obtained in connection with or as a result of this Agreement or performance or receipt of Services hereunder that is non-public, confidential or proprietary about a Person, its Affiliates and any of their respective businesses, operations, clients, customers, prospects, personnel, properties, processes or products, financial, technical, commercial or other information (regardless of the form or format of the information (written, verbal, electronic or otherwise) or the manner or media in or through which it is furnished to or otherwise obtained by another Person or its Affiliates or Representatives), including all materials derived from, reflecting or incorporating, in whole or in part, any such information.  "Confidential Information" will not include information that (i) at the time of disclosure or thereafter is generally available to and known by the public (other than as a result of its disclosure directly or indirectly by the Person receiving such information or by any of its Affiliates or Representatives in violation of this Agreement), (ii) was available to the Person receiving such information on a non-confidential basis from a from a source (other than a Party to

this Agreement or its Affiliates or Representatives) that is not and was not bound by a confidentiality agreement with respect to such information or otherwise prohibited from transmitting such information by a contractual, legal, or fiduciary obligation, (iii) was in the possession of the Person receiving such information before receiving such information under this Agreement; <u>provided</u>, that such information is not and was not subject to another confidentiality agreement and is not and was not prohibited from being disclosed by any other contractual, legal, or fiduciary obligation, or (iv) has been independently acquired or developed by a Person without reference to the Confidential Information and without violating any of its obligations under this Agreement.

"Contemplated Transactions" has the meaning set forth in the Recitals.

"Data Protection Legislation" means all applicable national, federal, state, and local laws and regulations relating to processing of personal data, data security breaches and privacy, in the jurisdiction from or to which the Services are being provided.

"Deliberate Breach" means (a) a material breach of a representation or warranty that the Party making the representation or warranty had actual knowledge was false at the time such representation or warranty was made or (b) a material breach of a covenant by a Party where such Party had actual knowledge at the time that the action so taken or omitted to be taken by such Party constituted breach of such covenant.

"Force Majeure Event" has the meaning set forth in Section 8.03.

"Governmental Entity" means any federal, state, provincial, municipal, local or non-U.S. governmental authority or entity, including any agency, board, bureau, commission, court, department, stock exchange or self-regulatory authority, subdivision or instrumentality thereof, or any arbitrator or arbitration panel.

"Gross Up" has the meaning set forth in Section 4.05(b).

"Indemnified Party" means a Randstad Indemnified Party or a Monster Indemnified Party, as the context may require.

"Loss" means all losses, liabilities, claims, deficiencies, demands, judgments, damages, interest, fines, penalties, suits, actions, causes of action, assessments, awards and reasonable out-of-pocket and documented costs and expenses (including reasonable out-of-pocket and documented costs of investigation and defense and attorneys and other professionals' fees, disbursements and expenses).

"Migration Cost" has the meaning set forth in Section 1.06.

"Monster Core Entity" has the meaning set forth in the Preamble.

"Monster Indemnified Party" has the meaning set forth in Section 7.01(b).

"Monster Recipient" or "Monster Recipients" has the meaning set forth in the Recitals.

"Monster Services Manager" has the meaning set forth in Section 1.04(b).

"Non-Core Entities" means, collectively, Military Advantage, LLC, a Delaware limited liability company, FastWeb, LLC, a Delaware limited liability company and Monster Government Solutions, LLC, a Delaware limited liability company.

"Nonparty Affiliates" has the meaning set forth in Section 9.14.

"Party" means Randstad and Monster Core Entity individually, and "Parties" means Randstad and Monster Core Entity collectively, and, in each case, their respective successors and permitted assigns.

"Pass Through Charges" has the meaning set forth in Section 4.02.

"Person" means any natural person and any corporation, firm, partnership, trust, estate, limited liability company, or other entity resulting from any form of association.

"Personal Information" means information that constitutes "personal data," "personally identifiable information," "individually identifiable health information," "protected health information" or "personal information" (or any analogous term) under any applicable Data Protection Legislation.

"Proceeding" means governmental, judicial or adversarial proceedings (public or private), litigation, suits, arbitration, disputes, audits, examinations, notices of assessment, claims, causes of action or investigations before or by any court or other Governmental Entity.

"Randstad" has the meaning set forth in the Preamble.

"Randstad Indemnified Party" has the meaning set forth in Section 7.01(a).

"Randstad Services Manager" has the meaning set forth in Section 1.04(a).

"Representative" means, with respect to any Person, any of its directors, officers, agents, managers, consultants, legal counsels and accounting and financial advisors and other representatives, and employees.

"Service Charges" has the meaning set forth in Section 4.01.

"Service Fees" has the meaning set forth in Section 4.02.

"Service Period" has the meaning set forth in Section 1.02.

"Services" has the meaning set forth in Section 1.01(a).

"Systems" has the meaning set forth in Section 3.01(a).

"Termination Charges" means, in respect of any Service which is extended by Randstad at the direct request of Monster Core Entity, without duplication of any Service Charges or Pass Through Charges, all fees or expenses actually paid, directly or indirectly, to any

unaffiliated, third-party provider or other unaffiliated third party as a result of expiration of the Service Period duration or any early termination or reduction of a Service which was extended by Randstad at the direct request of Monster Core Entity (which costs, fees and expenses may include, but are not limited to, breakage fees, early termination fees or charges, minimum volume charges with respect to terminated Services, fees arising from remaining fixed costs and charges to (i) terminate users, (ii) disable interfaces or (iii) decommission hardware).

"Transaction Taxes" has the meaning set forth in Section 4.05(a).

"Transition Plan" has the meaning set forth in Section 1.06.

"TSA Dispute" has the meaning set forth in Section 6.01.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date first written above by their respective duly authorized signatories.

**RANDSTAD N.V.**

By: _____
Name: Sander van 't Noordende
Title: CEO


By: _____
Name: Jorge Vazquez
Title: CFO


**MONSTER WORLDWIDE, LLC**


By: _____
Name: Evan Kornrich
Title: Secretary

*[Signature Page to Transition Services Agreement]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date first written above by their respective duly authorized signatories.

**RANDSTAD N.V.**

By:_____
Name: Sander van 't Noordende
Title: CEO

By:_____
Name: Jorge Vazquez
Title: CFO

**MONSTER WORLDWIDE, LLC**

By:_____
Name: Evan Kornrich
Title: Secretary

*[Signature Page to Transition Services Agreement]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date first written above by their respective duly authorized signatories.

**RANDSTAD N.V.**

By:_____
Name: Sander van 't Noordende
Title: CEO


By:_____
Name: Jorge Vazquez
Title: CFO


**MONSTER WORLDWIDE, LLC**

By:_____
Name: Evan Kornrich
Title: Secretary

*[Signature Page to Transition Services Agreement]*

<u>**Schedule A**</u>

**Services**

<u>**Definitions / Notes**</u>
- Provider = Randstad
- Recipient = Monster Recipients

| SERVICE DESCRIPTION | SERVICE PERIOD (MONTH-TO-MONTH) | MONTHLY COST | COUNTRIES EXCLUDED |
|---|---|---|---|
| **Facilities Services** | | | |
| Monster may continue to use the local Randstad office as the registered office for its local Monster entities, and Randstad will process mail for Monster received at addresses in the following countries: Austria, Belgium, Canada, Germany, Luxembourg, Spain, Switzerland, the UK. | TBD | NA | All not noted under service description |
| Randstad to identify and note one Facilities Services owner | | | |
| **Payroll Services** | | | |
| All payroll services, inclusive of those noted below, will be provided at each office in a manner consistent with Provider's practices at such location prior to the Closing. <br><br> <u>Description of services for North America</u> <br> • Payroll administration based on legacy payroll software, calendar and timing including, but not limited to, processing of severance, SPP sales and SPB taxation, as needed, and the processing of all payroll items in the payroll folder each pay period <br> • Processing of terminations in ADP and software troubleshooting and maintenance, as required <br> • Randstad HRIS to set up interfaces that are compatible with Recipient's new systems <br> • Collation and input of all payroll-related information <br> • Management and resolution of employee payroll queries <br> • Creation of payroll payment information <br> • Processing and filing of payroll tax returns <br> • Existing Provider payroll policies, scheduled hours, payroll schedule, overtime rules, etc., to be followed <br> • Provision of payslips/payroll and required tax records to employees <br> • Provision of payroll reporting to relevant authorities | Through 2025 | $18,800 | All but US and Canada |

| SERVICE DESCRIPTION | SERVICE PERIOD (MONTH-TO-MONTH) | MONTHLY COST | COUNTRIES EXCLUDED |
|---|---|---|---|
| • Provide historical payroll records<br>• Assistance in migrating to newco payroll systems<br>• Multi jurisdiction setup and reporting<br>• Wage garnishment administration<br>• Employee access to online pay statements and corporate access to reporting portal<br>• New hire reporting services<br>• Group Term Life automated calculation services<br>• Tax compliance and reporting including calculations, filing, depositing, reconciliation, and issuing of statements<br>• Payroll data interfaces<br>• Payroll security management<br>• Ensure all interfaces are received and processed for accurate payroll processing<br>• Continued evaluation of earnings and deduction codes to ensure compliance with governing legislation<br>• Reporting of payroll files to company G/L<br>• Issue payments in alignment with entered severance agreements<br>• Administration of payroll for company expatriates including tax equalization and shadow payroll, if relevant (no expats today)<br>• Payroll debt administration according to governing legislation to include, but not limited to employee notification, payment collection, and payroll record corrections included amended employee and employer tax forms<br>• Processing of non-routine pay components to include, but not limited to commissions, relocation, and tuition reimbursements<br>• Tax jurisdiction account maintenance to include account establishment and closures as appropriate<br>• Pay administration for short term disability plan<br>• Ensure compliance with all pay statement laws<br>• Initiate and audit all interfaces to ensure compliance to company plans and changes in legislation working with the appropriate IT, Benefits, and/or Compensation teams as appropriate<br>• Process and balance share purchase plan activity as submitted by the Retirement team | | | |

| SERVICE DESCRIPTION | SERVICE PERIOD (MONTH-TO-MONTH) | MONTHLY COST | COUNTRIES EXCLUDED |
|---|---|---|---|
| • Provider and Recipient to transition power of attorney from ADP to Recipient; Recipient to provide reasonable support to Provider to help dissolving the relationship between the provider and ADP<br>• Employees and former employees will have access to ADP records for however long ADP permits<br>• Canada specific items:<br>   o Produce ROE statements<br>   o T4 and Releve1 tax issuance | | | |
| Description of services that Randstad Luxembourg, payroll provider, will continue to provide to Recipient (currently three personnel):<br>• Payroll related services for personnel in Luxembourg consistent with current practice, including but not limited to the following:<br>   o Creating monthly pay slips<br>   o Creating payroll journals<br>   o Create payout lists for employees<br>   o Create payout lists for social securities, taxes and benefits<br>   o Adapt to changes in Luxembourg employee laws that impact employee taxes and benefits<br>   o Annualized filing obligations relating to payroll matters<br>• Additional, reasonable services requested by Recipient will be provided by Provider and pricing for such services will be consistent with previous commercial terms<br>• Recipient shall continue to share requisite data (e.g., employee data including salary and commission information) with the Provider to enable it to continue to render services consistent with those it provided pre-Closing<br>• Recipient will continue to be the payor to employees and authorities | Through 2025 | $250 | All but Luxembourg |
| Randstad payroll services owners: Ben Elliot (N. America) and Luc Feipel (Luxembourg) | | | |

| Human Resources Services | | | |
|---|---|---|---|
| Provider will provide services in a manner consistent with its practices prior to the Closing. | 12 months, except that | Services priced | India/Austra |

| | | | |
|---|---|---|---|
| Description of services:<br>1. HR systems support as needed by Recipient (e.g., for Peakon, Connect), if needed.<br>2. HR Reward support regarding any queries or matters that arise from employees of the Recipient related to the Randstad PSP or SPP programs.<br>3. Executive HR support to provide assistance in initial HR implementation and set up of Zen JV, LLC, for up to 10 hours per week or 40 hours per month .<br>4. Services, as needed, from one Provider employee to conclude Recipient's legal and administrative matters pertaining to a previous reduction in force in Europe<br>5. The continuation of services from personnel assigned to the Recipient as part of the Management Trainee program at Randstad. These assignments will cease at the end of their 12-month rotation with the Recipient and no later than 12 months post-closing.<br>6. Management for car service (outsourced driver service) in the Netherlands [6] | the Service Period for Item 3 shall end on December 31, 2024.<br><br>Items 3 and 4 begin October 1, 2024 | hourly are only required on an as needed basis<br><br>1. €50/hour<br>2. €60/hour<br>3. €8,000/month<br>4. €60/hour<br>5. €5.5k<br>6. €60/hour | lia |
| Randstad HR Services Owner: Claire Barnes | | | |
| **Treasury and Finance Services** | | | |
| Description of services:<br>● Treasury<br>  ○ Administration of North American bank accounts (Bank of America & TD Bank)<br>  ○ Uploading and approvals of North American payroll files | 12 months | $2.7k | None |

| | | | None |
|---|---|---|---|
| Systems Support | | | |
| o  Coupa | 12 months | $1.3k admin and $4.7k  license and Saas fees | |
|    o  Recipient to continue to receive administrative support, particularly for system upgrades | | | |
| o  HFM administrative support | | $25k | |
|    o  Administration of Hyperion application | 12 months | | |
|    o  Administration of Hyperion users | | | |
|    o  Support team assisting with month-end processes | | | |
|    o  Activating and deactivating of batches from Oracle to Hyperion | | | |
|    o  Loading of annual FX budget rates and monthly actual rates | | | |
|    o  Hyperion GPS Services to be provided Monster | | | |
|       o  Loading actuals from HFM into GPS (including validation process) | | | |
|       o  Mid-month headcount loading from oracle HR output report | | | |
|       o  Ad-hoc requests including but not limited to: | | | |
|         ■  System changes / restructuring | | | |
|          ●  Creating / moving accounts in GPS | | | |
|          ●  Creating / manipulating new or existing hierarchies, including roll-ups based on department / entity / account | | | |
|         ■  Initial point of contact for anything incident response related | | | |
|         ■  Other ad hoc projects to support forecasting and analysis such as building out logic and scrip to allow GPS to run actual rates | | | |
|       o  Loading of Budget and Forecast from working scenario into the latest LE / budget version | | | |
|       o  Rolling forward GPS to allow for future year input; includes running various budget logic for team as a starting point | | | |
| o  Automation Anywhere | 12 months | $1.4k | |
|    o  Administration of the AA cloud | | | |
|    o  Administration of users | | | |
| o  If Provider and Recipient agree to move to separate instances of (i) Coupa, (ii) HFM or (iii) Automation Anywhere, in each case Provider will provide Recipient reasonable support to transition to its own instance. | | | |

| | | | |
|---|---|---|---|
| Randstad Owners:<br>    ○  Treasury: Ben Elliott/Marcela Grammatico-Elliott<br>    ○  Coupa Administration: Ben Elliott/Greg Madden<br>    ○  HFM Support: Ben Elliott/Jason Larrabee<br>    ○  Automation Anywhere: Ben Elliott/Chioma Bishop | | | |
| **Tax** | | | |
| Description of services:<br>1.  Sales tax returns assuming billing on Monster current system. (US only)<br>2.  Property tax returns assuming fixed assets in the current system. (US only)<br>3.  Miscellaneous returns for various states/cities/countries will have TBD as the due dates come. (US only)<br>4.  Assistance with royalty withholding tax returns<br>5.  Assistance with income tax returns for 2024 and historical periods<br>6.  Assistance with quarterly tax accounting through year-end 2024<br>7.  Tax audit and compliance support for pre and post-closing periods<br>8.  Assistance with transfer pricing in relation to Randstad-Monster and Monster-Monster for transactions that occur pre-Closing | Through 2024 filings | $14,175 for bullets 1-6<br><br>$150/hr for *Tax audit and compliance support for pre- and post-closing periods* | None |
| Randstad Tax Owners: Rob Calabro and Ray Zaniewski | | | |
| **Legal** | | | |
| Description of services:<br>•   Continued privacy support | 6 months | $10K | None |
| Randstad Legal Owner: Jay Ferguson | | | |
| **Commercial Services** | | | |
| Description of services:<br><br>•   Continued access to Provider's RMI tool. | Through September 30, 2024, provided, that if Textkernel and a CB entity enter into a contract under which Monster may continue to access data under the Randstad-Textkernel contract through end of 2025, then | € 4.2K | NA |

| | through end of 2025 | | |
|---|---|---|---|
| Randstad RMI Owner: Niels van Weeren | | | |
| **IT/Data Security Services** | | | |
| Description of services:<br>● Penetration testing, if Recipient determines this is needed | 6 months | $15,000 per penetration test requested and provided. | None |
| Randstad Corporate Info Security Owner: Gretchen Hiley | | | |
| **Debt Guarantees** | | | |
| Description of services:<br>● Citibank<br>　○ Provide a parent guarantee to Citi for the purpose of the direct debit functionality.<br>● Bank of America:<br>　○ Provide a parent guarantee or similar obligation to Bank of America for the purpose of the credit card program. | Through end of 2024 | Per Randstad guarantee policy | None |
| **Support for Shared Vendors** | | | |
| Description of services for Shared Vendors:<br>● Provider agrees to the following services:<br>　○ Provide Recipient with relevant data about a shared vendor, including but not limited to, contracts, commercial rates, services/past consumption and will respond to Recipient inquiries.<br>　○ Each party agrees to advise the other on any known risks related to either party transitioning its service or contractual terms with a shared vendor.<br>● For vendors that will continue to be shared though contract expiry date:<br>　○ Assist Recipient with vendor relations including problem resolution and inquiries (e.g., service disruptions, billing matters).<br>　○ Make reasonable efforts jointly with Recipient to accommodate inquiries or requests from one another about the shared vendor and will include the other party in communications with the third party.<br>● In the event that there is work required to operationally separate the Provider and | 6 months post-closing or expiry date of shared contract, whichever occurs later (subject to the term of the TSA and the exceptions provided below for specified vendors). | $625/day, only upon request from Recipient. | None |

| | | | |
|---|---|---|---|
| Recipient (e.g., if they are on one shared instance from a vendor), the parties agree to work in good faith to assist one another in separating and shall only charge one another at a to be mutually agreed hourly rate if one party is performing work for the sole benefit of the other party. | | | |
| Randstad owner is Yvonne Moya | | | |
| **Shared Vendors** | | | |
| Continued access to the following shared vendors:<br>● Procurement<br>   ○ Coupa (All BUs)<br>● Travel<br>   ○ Egencia (All)<br><br>● HR<br>   ○ Connect (Happeo) (All)<br>   ○ Udemy (All)<br>   ○ LinkedIn (All)<br>   ○ Peakon (Workday) (All)<br>   ○ Centraal Beheer PPI<br>   ○ Werksarztzentrum Deutschland GmbH<br>   ○ SpeakUp<br>● Car Service Providers<br>   ○ Alphabet (NL & DE)<br>   ○ Athlon (NL)<br>   ○ Arval (NL)<br>   ○ Leaseplan (AT)<br>● Finance<br>   ○ Automation Anywhere (All)<br>   ○ Crest (Cloud 9) (All)<br>   ○ Tagetik CPM (All) | 6 months post-closing or expiry date of shared contract, whichever occurs later (subject to the term of the TSA), with the following exceptions:<br><br>● **Udemy** – through end of 2024<br>● **Tagetik** – through end of 2024<br>● **CloudHealth** – until Monster transitions off of Randstad's contract with either AWS or Google Cloud<br>● **SpeakUp** – for one month post-closing<br>● **Centraal Beheer PPI** – through October 1, 2024<br>● **Coupa** – for 6 months post-closing<br>● **Bank of America** – through end of 2024<br>● **Textkernel** – through September 30, 2024, provided, that if Textkernel | Third party costs attributable to Recipient will continue to be billed to Recipient | None. |

|  |  |  |  |
|---|---|---|---|
| <ul><li>○ Tagetik IFRS16 lease tool (All)</li><li>○ Bank of America (banking/treasury services) (All)</li></ul><ul><li>● Sales<ul><li>○ Salesforce Licenses, including Tableau (Core, IAF)</li><li>○ RFPIO (MGS)</li></ul></li><li>● Marketing<ul><li>○ GroupM (f/k/a Greenhouse) (Core)</li><li>○ Salesforce Marketing (Core)</li></ul></li><li>● Product<ul><li>○ Lightcast (f/k/a, Burning Glass) APIs (US+CA) and datafeeds (US) (Core)</li><li>○ Textkernel: datafeeds (BE, CA, DE, FR, IT, UK) salary data (FR, DE) (Core)</li><li>○ JobDigger datafeed (NL) (Core)</li><li>○ Jobtech: datafeed (SE) (Core)</li><li>○ Dun & Bradstreet: Company (MI) data (Core, MGS)</li><li>○ Figma (Core)</li><li>○ Twilio (Core)</li><li>○ Geopostcodes (Core)</li></ul></li><li>● IT/Data Security<ul><li>○ One Trust (All)</li><li>○ Auth0/Okta (All)</li></ul></li><li>● Technology<ul><li>○ Amazon Web Services (All)</li><li>○ Google Cloud Platform (including Looker) (Core)</li><li>○ Google workspace licenses (All)</li><li>○ Cisco Meraki (Core, MGS)</li><li>○ Cloudhealth (Core, MGS, IAF)</li><li>○ Splunk (Core, MGS)</li></ul></li></ul> | and a CB entity enter into a contract under which Monster may continue to access data under the Randstad-Textkernel contract through end of 2025, then through end of 2025 |  |  |

**Schedule B**

**Excluded Services**

**Definitions**
- Provider = Randstad
- Recipient = Monster

| SERVICE DESCRIPTION |
| --- |
| **Services** |

- PSP and SPP programs
- Support from Global Insurance and Access to the Randstad global insurance program including workers compensation insurance in the US, other than access as expressly provided in Section 6.11(c) of the Contribution and Sale Agreement
- Global Treasury support other than the specific service line items mentioned in TSA Schedule A
- Tax Support (including the items listed below) other than the specific service line items mentioned in TSA Schedule A
  - Transfer pricing documentation, services and support (including Master File & Local File 2024 and onwards)
  - Country by country reporting (2024 and onwards)
- IP management support
- Global Marketing Support
- Global Talent & Client delivery support
- Global Information Security support
- Legal support other than the specific service line items mentioned in TSA Schedule A
- Corporate development and M&A support
- Human resources support other than the specific service line items mentioned in TSA Schedule A
- Business risk and audit support other than the specific service line items mentioned in TSA Schedule A
- Procurement support other than the specific service line items mentioned in TSA Schedule A

| **Shared Vendors** |
| --- |

- AON
- Dialpad
- Crunchr
- Intellum
- Dynata
- AMEX

1