## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ZEN JV, LLC, *et al.*,[1] | Case No. 25-11195 (JKS) |
| Debtors. | (Jointly Administered) |

## PROOF OF PUBLICATION

Attached hereto as Exhibit A is the Proof of Publication for the *Notice of Sale, Bidding Procedures, Potential Auction, and Sale Hearing* as follows:

| Publication | Publication Date |
|---|---|
| **The Wall Street Journal** | **July 14, 2025** |

/s/ Randy Lowry
Randy Lowry
Omni Agent Solutions, Inc.
5955 DeSoto Avenue, Suite 100
Woodland Hills, California 91367
(818) 906-8300
*Claims, Noticing, and Administrative Agent for the Debtors*

---

[1] The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding LLC (9339); and Military Advantage LLC (9508). The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

# **EXHIBIT A**

# AFFIDAVIT

**STATE OF NEW JERSEY** )
) ss:
**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX** )

I, Keith Oechsner, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout the United States, and that the notice attached to this Affidavit has been regularly published in THE WALL STREET JOURNAL for National distribution for

1   insertion(s) on the following date(s):

JUL-14-2025;

ADVERTISER: Zen JV, LLC;

and that the foregoing statements are true and correct to the best of my knowledge.

*Keith Oechsner*

Sworn to before me this
14   day of   July         2025

Notary Public



IAN C. MARTIN
NOTARY PUBLIC
ID # 50086494
COMMISSION EXPIRES
07/18/2028
STATE OF NEW JERSEY

# BUSINESS NEWS

# Perks Airbnb Offers Unnerve Some Hosts

**Property owners fret about liabilities and not getting a cut from services**

BY ALLISON POHLE

Airbnb not only wants to rent you a vacation home this summer—it wants to help you add a private chef or massage session.

The hosts who own the condos, cottages and houses aren't so sure.

The short-term rental giant in May introduced a new "services" offering, letting travelers book in-home add-ons that Airbnb says can make a trip more unique. For the company, it is another way to compete with hotels, which offer perks like gym access or spa appointments.

Hosts, though, don't get a cut of the commissions from services booked for their rentals, and aren't alerted if one is booked at their place. Their properties are automatically enrolled in Airbnb's program, requiring hosts to opt out.

"Most hosts don't need more headaches, and that's what this feels like," says Rhonda Stephens, who lists on Airbnb her historic farmhouse near Nashville, Tenn. She has changed the rules on her listing to explicitly state that services aren't permitted.

The services are part of CEO Brian Chesky's goal to make the company the "Airbnb of anything." This spring, it reintroduced "Experiences," geared toward one-of-a-kind excursions like an Italian bike tour with an Olympian. Chesky predicted services bookings could become bigger than Airbnb's core short-term rental business.

An Airbnb spokesman says the launch is in the early stages, and will over time benefit hosts by boosting bookings and making Airbnb more attractive and valuable for guests. The company says it couldn't comment on guests' initial use of the services ahead of its August earnings report.

Charging extra at vacation rentals for perks like bike rentals or fridge stocking isn't new.

But the option hasn't been as available to smaller operators who rely on platforms like Airbnb to drive bookings, says Jamie Lane, chief economist of market-research firm AirDNA.

Betsy Sawicky books stays at her rural home in Michigan through Airbnb and Vrbo. Services aren't currently available in the secluded area, she says, but if they launch nearby, she has no issues with guests booking personal chefs or other providers.



Marie Moreau has done massages for Orlando-area guests.

"If they found a massage therapist that would come to the house, those would be wonderful services," Sawicky says. But overall she thinks the services make the most sense in more urban areas.

Some hosts, Lane says, worry about the added liability that comes from a third-party provider entering the space. Airbnb says it vets service providers for quality and reputation as well as requiring them to submit licenses and credentials before letting them on the platform.

The added verification hasn't convinced Amy Maynor to permit services at her three Airbnb properties in the Jacksonville, Fla., area. Maynor has superhost status, an Airbnb designation for top performers. She says she aims for a concierge level of attention, including personalized recommendations and arranging for extras like surfboard rentals and deliveries.

But Maynor says there is no way for her to independently vet the services or check if a service provider is properly licensed or insured. She says her own homeowners insurance policy only covers registered guests—not, say, a massage therapist.

"I don't want to get the oils all over the couch or the beds, or what have you," Maynor says.

Other hosts cited fears over personal chefs starting kitchen fires or people damaging floors by dropping weights during personal training sessions.

On Reddit forums and in Facebook groups for Airbnb hosts, posts about opting out of services have generated hundreds of comments. People share messages—in some cases written by ChatGPT— they sent to Airbnb to request that no services be allowed on their properties.

Airbnb didn't comment on the number of hosts who have opted out, but says those who do won't be penalized in search results. Hosts also can choose to only allow specific services.

Airbnb says service providers must have liability insurance appropriate for their business. The company's AirCover policy also includes liability coverage. Hosts say the policy has many exceptions.

Marie Moreau has done massages for tourists staying at vacation rentals in the Orlando, Fla., area for years, long before Airbnb approached her about listing her mobile massage business on the platform.

So far, she says, she has had a few bookings through the platform, and they all went smoothly.

Moreau says she understands why hosts might be hesitant to allow third-party providers. "But the more restrictions you put on something, the more it doesn't really look appealing to the public," she says.

Airbnb, which has active listings in more than 150,000 cities and towns, debuted its offering with 10 categories of services in 260 cities. The company has said it plans to eventually include hundreds of service categories in new cities.

Locals also can request services at their own homes or book an activity that requires going to a spa or gym.

Other online travel companies, like **Expedia** and Booking.com, offer experiences, but in-home services sets Airbnb apart, says Kevin Kopelman, an analyst at TD Cowen.

The challenge for Airbnb will be convincing travelers to embrace the offering, Kopelman says.

# Apple Makes an Offer for Formula One U.S. Rights

BY ISABELLA SIMONETTI

**Apple** has offered Formula One as much as $150 million a year for the U.S. rights to air its races and is the top contender to secure a deal, according to people familiar with the matter.

The bid puts F1—which **Liberty Media** purchased in 2017—on track for a significantly more lucrative deal than it has with its current partner, **Walt Disney**'s ESPN.

Though F1's popularity has grown dramatically in the U.S., the company had seen lukewarm interest in a rights package for which it was seeking between $150 million and $180 million, The Wall Street Journal previously reported.

ESPN is paying around $90 million a year. Its deal ends this fall, after the current racing season. ESPN told F1 to explore other options around the time its exclusive bargaining window lapsed at the end of 2024.

Signing a deal with Apple— which owns the Apple TV+ streaming service—would allow F1 to lock in a big payday but risks limiting the exposure the sport can get with a major brand like ESPN. Last year, ESPN averaged roughly 1.1 million live U.S. viewers for F1 races.

The Financial Times earlier reported that Apple had bid for the U.S. rights.



Apple bid up to $150 million a year to broadcast F1 races in the U.S. after the sport's deal with Walt Disney's ESPN expires later this year.

Apple landed a major win with its "F1" film, distributed by Warner Bros. and released last month. So far, the film, starring Brad Pitt, has grossed $309 million worldwide, according to Box Office Mojo.

ESPN isn't planning to submit a counteroffer, according to a person familiar with the matter. That person said the network is focused on fiscal responsibility and felt the price Formula One was seeking was too high.

# Private-Markets Giant Blue Owl Tries 401(k)s

BY MIRIAM GOTTFRIED

Wall Street firms that invest in private assets are angling for a bigger role in Americans' retirement accounts.

Investment firm **Blue Owl Capital** is working with retirement-services provider **Voya Financial** to develop products aimed at bringing private markets to 401(k)s and other defined-contribution plans, the companies said.

The partnership will initially focus on creating vehicles that are essentially the building blocks of all-in-one funds known as target-date funds. These will incorporate investments in private credit and private real estate that mirror Blue Owl's existing funds for wealthy individuals, and should be available before the end of the year, executives at the investment firm said.

"The power of the partnership is they have the ecosystem," said Blue Owl Co-CEO Marc Lipschultz. "We have the actual content that has historically not been available to individuals."

The biggest players in private markets have been pushing to get private investments into the hands of individual investors as growth in allocations by institutional investors such as pensions and endowments slows. Firms see tapping the $12.4 trillion market for 401(k)-type plans as the holy grail.

Private investments are harder to value and typically require locking up money for longer periods of time. They also come with higher fees, one of the main reasons employers have been hesitant to incorporate them into 401(k) plans.

But momentum around the effort has been growing. The 401(k) giant Empower said in May it will start allowing private credit, equity and real estate in some of the accounts it administers later this year. State Street and Apollo Global Management in April introduced a target-date fund with a 10% allocation to private investments.

Meanwhile, the White House is expected to sign an executive order in the coming weeks that would instruct the Labor Department and Securities and Exchange Commission to provide guidance easing the inclusion of private investments in 401(k) plans, according to people familiar with the matter.

## PUBLIC NOTICES

**NOTICE TO CREDITORS**
RE: NOTICE OF CLAIMS PROCESS FOR OAK AND FORT CORP., 1282339 B.C. LTD., OAK AND FORT US GROUP, INC., OAK AND FORT ENTERPRISE (U.S.), INC., NYM MERGER HOLDINGS LLC, and OAK AND FORT CALIFORNIA, LLC (collectively, the "O&F Entities") PURSUANT TO THE COMPANIES' CREDITORS ARRANGEMENT ACT (the "CCAA")

**PLEASE TAKE NOTICE** that on July 4, 2025, the Supreme Court of British Columbia issued an order (the "Claims Process Order") in the CCAA Proceedings of the O&F Entities, requiring that all Persons who assert a Claim against the O&F Entities, whether unliquidated, contingent or otherwise, and all Persons who assert a Claim against Directors and Officers of the O&F Entities (i) authorizing and approving bidding procedures (the "Bidding Procedures") in connection with one or more sales or dispositions (collectively, the "Sale") of all or substantially all of the Debtors' assets (the "Assets"), (iii) establishing certain dates and deadlines for the sale process, including scheduling an auction of the Assets (the "Auction"), if applicable, in accordance with the Bidding Procedures, and the hearing with respect to the approval of the Sale (the "Sale Hearing"), (iv) approving the form and manner of notice of the Auction, if any, the Sale and the Sale Hearing, (v) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale and approving the form and manner of notice thereof, and (vi) granting related relief; and (b) one or more orders (each, a "Sale Order"), as applicable, (i) authorizing and approving (a) the Sale of the Assets to the Stalking Horse Bidders or otherwise Successful Bidder(s), as applicable (the "Buyer"), free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse Agreements or asset purchase agreement(s) with the otherwise Successful Bidder(s), as applicable (the "Asset Purchase Agreements") and (b) the assumption and assignment of the Selected Assigned Contracts as set forth in the Asset Purchase Agreements, and (ii) granting related relief.

**Any persons interested in making an offer to purchase the Assets should contact the Debtors' investment banker as soon as possible: PJT Partners, 280 Park Ave, New York, NY 10017, Attn: Avi Robbins (Robbins@pjtpartners.com) and James Lilly (James.Lilly@pjtpartners.com).**

**Important Dates and Deadlines:**

• **Qualified Bid Deadline.** The deadline to submit a Qualified Bid is **July 15, 2025 at 5:00 p.m. (prevailing Eastern Time)**.

• **Auction.** If one or more Qualified Bids (other than the Stalking Horse Bid) is received by the Qualified Bid Deadline, the Debtors will conduct the Auction, which shall take place on **July 17, 2025 at 10:00 a.m. (Eastern Time)** (i) by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors. If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid), the Debtors will not conduct the Auction and will designate the Stalking Horse Bids as the Successful Bids.

• **Objection Deadlines.** The deadline to file an objection with the Court to the consummation of the Sale (excluding objections relating solely to the conduct of the Auction or identity of the Successful(s) Bidder other than the Stalking Horse Bidders or DIP Lender) is **July 16, 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"). If the Auction is held, objections relating solely to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidders) and/or adequate assurance of future performance provided by the Successful Bidder(s) (other than the Stalking Horse Bidders) must be filed with the Court by **12:00 p.m. (prevailing Eastern Time) one day prior to the date of the Sale Hearing** (the "Post-Auction Objection Deadline"). Any objections not resolved prior to the Sale Hearing shall be argued at the Sale Hearing or such other time as set by the Court.

• **Sale Hearing.** The Sale Hearing to consider the proposed Sale will be held before the Honorable J. Kate Stickles on **July 24, 2025 at 1:00 p.m. (prevailing Eastern Time)**, or such other date as determined by the Court, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom No. 6, Wilmington, Delaware 19801.

**Filing Objections.** Objections to the Sale or conduct of the Auction, if any, must (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all orders of the Court entered in the Chapter 11 Cases, and (iii) be filed with the Court by the Sale Objection Deadline or Post-Auction Objection Deadline, as applicable.

**Consequences of Failing to Timely File an Objection. ANY PARTY WHO FAILS TO MAKE A TIMELY SALE OBJECTION ON OR BEFORE THE SALE OBJECTION DEADLINE OR, SOLELY WITH RESPECT TO OBJECTIONS RELATED TO THE IDENTITY OF THE SUCCESSFUL BIDDER(S) (OTHER THAN THE STALKING HORSE BIDDER) OR ADEQUATE ASSURANCE OF FUTURE PERFORMANCE PROVIDED BY THE SUCCESSFUL BIDDER(S) (OTHER THAN THE STALKING HORSE BIDDERS), POST-AUCTION OBJECTION DEADLINE, AS APPLICABLE, IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY SALE OBJECTION, INCLUDING WITH RESPECT TO THE TRANSFER OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS.**

**Personally Identifiable Information.** THE DEBTORS MAY SEEK TO SELL CERTAIN PERSONALLY IDENTIFIABLE INFORMATION TO THE SUCCESSFUL BIDDER, DEPENDING ON THE TERMS OF THEIR BIDS. THE DEBTORS BELIEVE ANY SUCH SALE IS CONSISTENT WITH THEIR DATA PRIVACY POLICIES.

**Obtaining Additional Information.** Copies of the Bidding Procedures Motion, the Bidding Procedures, the Bidding Procedures Order, the Stalking Horse Agreements and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at https://omniagentsolutions.com/CareerBuilderMonster, or can be requested by calling the Debtors' claims and noticing agent, Omni Agent Solutions, Inc., at (888) 841 – 0521 (US & Canada) or (818) 924 – 2298 (International).

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE COURT IN THE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number (to the extent applicable), are: Zen JV LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding LLC (9339); and Military Advantage LLC (9508). The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

1. Copies of the Stalking Horse Agreements are filed at Docket No. 28-4 (Exhibits 2(a), 2(b), and 2(c)).
2. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.
3. To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.
4. The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

**ADVERTISEMENT**

**The Marketplace**
To advertise: 800-366-3975 or WSJ.com/classifieds