IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
                                                           :
In re:                                                     :  Chapter 11
                                                           :
ZEN JV, LLC, *et al.*,[1]                                  :  Case No. 25-11195 (JKS)
                                                           :
         Debtors.                                          :  (Jointly Administered)
                                                           :
                                                           :  **Re: Docket Nos. 28 & 110**
---------------------------------------------------------- x

**DECLARATION OF JAMES LILLY IN SUPPORT OF THE DEBTORS' SALES**

I, James Lilly, hereby declare under penalty of perjury:

1.  I am a Managing Director in the Strategic Advisory Group at PJT Partners ("**PJT**"), a global investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017. PJT is the proposed investment banker to the above-captioned debtors and debtors-in-possession (the "**Debtors**").

2.  I submit this declaration (this "**Declaration**") on behalf of the Debtors in support of their request for entry of orders approving the sales of their assets pursuant to the Bidding Procedures approved by the Court [Docket No. 110] (the "**Bidding Procedures Order**").[2]

3.  PJT is a leading global financial advisory firm with more than 1,100 employees in fifteen offices in the United States, Europe, and Asia. The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, and fund placement. PJT is an

---

[1] The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number (to the extent applicable), are: Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions, LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding, LLC (9339); and Military Advantage, LLC (9508). The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the Bidding Procedures Order.

RLF1 33349129v.2

industry leader and has advised companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including the representation of debtors in connection with M&A transactions. PJT is a registered broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

4. I have thirteen years of investment banking experience, advising companies and investors across the vertical information, software and media sectors. I have experience handling a variety of public and private M&A transactions, including carve-out transactions, cross-border mergers, and take-private transactions. I also have experience in mandates involving activism and defense, special committees, corporate restructurings, and capital raising.

5. I have been employed by PJT since 2023. Prior to joining PJT, I spent over 10 years at Evercore in the Information & Media group. I received a BA from Wesleyan University and an MBA from the Stanford Graduate School of Business.

6. On or around April 4, 2025, the Debtors initially retained PJT as their investment banker in connection with a potential sale of the Debtors' MGS business and/or the Debtors' MMP business. Such engagement was subsequently amended to include a sale of all or any portion of the Debtors' assets, including the sale of all business segments of the Debtors.

7. In these roles (as well as PJT's prior role in connection with CareerBuilder's merger with Monster Worldwide, Inc. in September 2024), PJT has, among other things, (a) conducted diligence on the Debtors' businesses, (b) developed marketing materials and prepared a data room, (c) conducted extensive marketing and outreach to third party strategic and financial sponsors, (d) supported the diligence of interested parties, (e) solicited preliminary indications of interest

from potential buyers, (f) negotiated, along with the Debtors' counsel, the terms of the third-party stalking horse bids, (g) assisted the Debtors in developing the proposed Bidding Procedures for their postpetition marketing process, (h) assisted the Debtors and their counsel in the preparation for the commencement of these chapter 11 cases, and (e) negotiated, along with the Debtors' counsel, the terms of additional bids from non-stalking horse buyers, including in connection with the Debtors' auction. Throughout PJT's engagement with the Debtors, it has worked closely with the Debtors' management and their other advisors and has become well-acquainted with the Debtors' assets, marketing efforts, capital structure, liquidity needs, and business operations.

8. Unless otherwise indicated, all statements included in this Declaration are based upon (a) my personal knowledge of the matters set forth herein, (b) information gathered from my review of relevant documents, (c) information supplied to me by other members of the Debtors' management, the Debtors' advisors and partners and employees of PJT working directly with me and under my supervision, direction, or control, and/or (d) my opinions based upon my experience and knowledge.

9. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being specifically compensated for this testimony other than through payments received by PJT, as a proposed professional to be retained by the Debtors.[3] If called upon to testify, I could and would testify as to the facts set forth herein.

### The Debtors' Marketing Process

10. In support of the Debtors' request for entry of the Bidding Procedures Order, I submitted a declaration on July 7, 2025 [Docket No. 95] (the "**Bidding Procedures**

---

[3] Pursuant to PJT's engagement letter with the Debtors and subject to Court approval thereof, PJT will be entitled to receive certain fees in connection with the transactions described herein.

RLF1 33349129v.2

**Declaration**"), which summarized the Debtors' prepetition and postpetition marketing efforts. I incorporate the statements in my Bidding Procedures Declaration as if set forth in this Declaration. In short, I believe that the Debtors' marketing efforts were fulsome and provided the Debtors the opportunity to maximize value under the circumstances.

11. The Bidding Procedures Order set a Bid Deadline of July 15, 2025. The Debtors received nine bids by the Bid Deadline, in addition to the three Stalking Horse Bids. After reviewing the bids and consulting with the Consultation Parties, the Debtors determined that all nine bids were Qualified Bids, resulting in twelve total Qualified Bids, as follows:

| Purchased Assets | Stalking Horse Bidder | Additional Qualified Bidders |
|---|---|---|
| **Monster Media Properties** | 1. Valnet | 2. Tributary Media |
| **Monster Government Solutions** | 3. Valsoft | 4. PartnerOne<br>5. Arsenal Growth Equity |
| **Job Board** | 6. JobGet | 7. Hidden Talent LLC<br>8. Enduring Ventures<br>9. Spectraforce Technologies<br>10. ZipRecruiter<br>11. Bold Holdings<br>12. Array Max |

**The Auction Bids**

12. On July 17, 2025, the Debtors commenced an auction (the "**Auction**") in accordance with the Bidding Procedures to determine the highest and best bids for each of the Purchased Assets. The Auction was held at the New York office of the Debtors' proposed counsel, Latham & Watkins LLP, and also via Zoom. I attended the Auction in person, along with other representatives of the Debtors. The Auction was also attended in person and telephonically by, among others, representatives of the twelve Qualified Bidders and the Consultation Parties.

13. The Auction was conducted in good faith and involved extensive arms'-length negotiations with each participating bidder. Over the course of the Auction, the Debtors and their advisors, including PJT, engaged in a variety of discussions and negotiations with potential bidders in an attempt to obtain the highest and best bids for the Debtors' assets in an effort to maximize value for the benefit of all stakeholders. The aggregate value of the Successful Bids yielded a total of $67 million (net of the applicable stalking horse bid protections payable), reflecting an incremental $31.7 million more than the aggregate value of the Stalking Horse Bids.

14. ***Monster Media Properties (MMP).*** The Stalking Horse Bid for the MMP assets was for $22.5 million from Valnet. Prior to the Bid Deadline, the Debtors received a Qualified Bid from Tributary Media for $24.15 million for the MMP assets, which became the baseline bid for purposes of the Auction with respect to the MMP assets. During the Auction, the Debtors received an additional seven bids from Valnet and Tributary Media; the final bid was submitted by Valnet with a cash purchase price of $27.25 million. Tributary Media declined to submit a bid that exceeded the last bid submitted by Valnet.

15. After consultation with the Consultation Parties and in an exercise of their business judgment, the Debtors determined that the $27.25 million bid from Valnet was the Successful Bid with respect to the MMP assets because, among other things, it maximized the value of the Debtors' estates. The Debtors determined that Tributary Media would be the Backup Bidder with respect to the MMP assets, with its final bid of $27.55 million (which would result in net proceeds of $26.8 million after payment of bid protections to Valnet as a Stalking Horse Bidder).

16. ***Monster Government Solutions (MGS).*** The Stalking Horse Bid for the MGS assets was for $6.0 million from Valsoft. Prior to the Bid Deadline, the Debtors received Qualified Bids from Arsenal Growth Equity and PartnerOne, before selecting the $7.5 million bid from

PartnerOne as the baseline bid for purposes of the Auction with respect to the MGS assets. During the Auction, the Debtors received an additional six bids from Valsoft, Arsenal, and PartnerOne (two each) before the Debtors, after consultation with the Consultation Parties, instructed each bidder to submit a sealed best-and-final bid to the Debtors.

17. Following the submission of such sealed bids and in an exercise of their business judgment, the Debtors determined that PartnerOne was the Successful Bidder with respect to the MGS assets with a purchase price of $13,000,079 (resulting in net proceeds of $12,280,079 after payment of bid protections to Valsoft as a Stalking Horse Bidder), plus offers of employment to substantially all MGS employees on terms at least as favorable as their current employment, because such bid maximized the value of the Debtors' estates and provided certainty of employment to many of the Debtors' employees. The Debtors determined that Valsoft was the Backup Bidder with respect to the MGS assets with a purchase price of $9.51 million in cash, plus the same commitment to provide offers of employment.

18. ***Job Board.*** The Stalking Horse Bid for the Job Board assets was for $7.0 million from JobGet. Prior to the Bid Deadline, the Debtors received Qualified Bids from six other Qualified Bidders, before selecting the $7.96 million bid from Hidden Talent as the baseline bid for purposes of the Auction with respect to the Job Board assets. During the Auction, the Debtors received an additional fifteen bids from the Job Board bidders; the final bid was submitted by BOLD Holdings with a purchase price of $28.376 million in cash (resulting in net proceeds of $27.716 million after payment of bid protections to JobGet as a Stalking Horse Bidder), plus offers of employment to no less than 350 full-time employees. At the time of such bid, JobGet was the only other remaining bidder, and JobGet did not wish to submit a bid that matched or exceeded the BOLD bid.

19. After consultation with the Consultation Parties and in an exercise of their business judgment, the Debtors determined that such bid from BOLD was the Successful Bid with respect to the Job Board assets because, among other things, it maximized the value of the Debtors' estates and provided certainty of employment offers to many of the Debtors' employees. The Debtors determined that JobGet would be the Backup Bidder with respect to the Job Board assets, with its final bid of $27.55 million (which would result in net proceeds of $26.8 million after payment of bid protections to Valnet as a Stalking Horse Bidder).

### The Auction Negotiations

20. Having personally attended the Auction, I believe that the process employed by the Debtors, on the one hand, and Valnet, PartnerOne, and BOLD (collectively, the "**Purchasers**"), on the other hand, including, without limitation, the Auction, the negotiation and submission of bids and purchase agreements, was non-collusive and conducted in good faith and at arm's-length. Each Purchaser and each other Qualified Bidder represented on the record at the Auction that they had not engaged in any collusion. Based on my participation in the marketing and sale process and the Auction, I believe the Debtors and the Purchasers have complied in all respects with the Bidding Procedures, as may have been modified, and the Bidding Procedures Order. I believe that the process has been substantively and procedurally fair to all parties in interest. I believe that all parties that expressed an interest in purchasing the Debtors' Assets had an opportunity to participate in the sale process and the Auction. I believe each party acted in good faith and without collusion or fraud of any kind.

21. I believe that the Successful Bids are the highest and best offers with respect to the Purchased Assets and provide the best opportunity for the Debtors to maximize the value of their estates under the circumstances. The Purchased Assets were subject to an extensive marketing

process and a competitive auction. I am not aware of any other higher or otherwise better offers to purchase the Purchased Assets.

22. I understand that the Purchasers would not have entered into their applicable purchase agreements and would not consummate the transactions contemplated thereby if, without limitation, (a) the transfer of the Purchased Assets were not free and clear of all Encumbrances, or (b) the Purchasers would, or in the future could, be liable for or subject to any such Encumbrances. I understand that the Purchasers will not consummate the transactions contemplated by the Purchase Agreements, including, without limitation, the Sale, unless this Court expressly orders that none of the Purchasers, their respective affiliates, their respective present or contemplated members or shareholders, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff (except for setoffs exercised prior to the Petition Date), or otherwise, directly or indirectly, any Encumbrances.

23. Based on my understanding of the Debtors' business and cash flow forecast, I believe it is imperative to be able to close the sales as soon as possible following the Court's approval, so that the Debtors can minimize the costs of these cases (including with respect to workforce obligations) and transition their businesses to the Purchasers as soon as possible.

*[Remainder of page left intentionally blank]*

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

| | |
|---|---|
| Dated: July 24, 2025<br>New York, New York | */s/  James  Lilly*<br>James Lilly PJT<br>Partners LP |