**<u>EXHIBIT 1</u>**

**Final Valnet Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------- x
                                                   :
In re:                                             :    Chapter 11
                                                   :
ZEN JV, LLC, et al.,¹                              :    Case No. 25-11195 (JKS)
                                                   :
                Debtors.                           :    (Jointly Administered)
                                                   :
                                                   :    Re: Docket Nos. 28, 110, 194
-------------------------------------------------- x
```

**ORDER (I) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY
INTO AN ASSET PURCHASE AGREEMENT WITH VALNET US, INC.,
(II) AUTHORIZING THE SALE OF THE PURCHASED ASSETS FREE AND
CLEAR OF ALL ENCUMBRANCES, (III) APPROVING THE ASSUMPTION
AND ASSIGNMENT OF THE SELECTED ASSIGNED CONTRACTS,
AND (IV) GRANTING RELATED RELIEF**

Upon the motion [Docket No. 28] (the "**Motion**"),[2] of the above-captioned debtors and

debtors in possession (collectively, the "**Debtors**") for entry of an order (this "**Order**"), among

other things, (a) authorizing and approving the Debtors' entry into and performance under the

Purchase Agreement (as defined below) with the Buyer (as defined below), (b) authorizing the

Sale Transaction (as defined below), free and clear of any Encumbrances (as defined below),

(c) authorizing and approving the assumption and assignment of the Assumed Agreements in

connection with the Sale Transaction, and (d) granting related relief; and this Court having

previously entered the *Order (I) Authorizing and Approving (A) the Bidding Procedures for Sale*

*of the Debtors' Assets Free and Clear, (B) the Scheduling of an Auction and Sale Hearing, (C) the*

---

[1]    The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number (to
       the extent applicable), are:  Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster
       Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder
       Government Solutions, LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding, LLC (9339);
       and Military Advantage, LLC (9508).  The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms
       in the Motion or the Purchase Agreement (as defined below), as applicable.

*Form and Manner of Notice of Sales, Auctions, and Sale Hearings, (D) the Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) the Designation of Stalking Horse Bidders, and (F) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Authorizing Designation of Stalking Horse Bidders, and (III) Granting Related Relief* [Docket No. 110] (the "**Bidding Procedures Order**"), authorizing and approving, among other things, Bidding Procedures for the Assets; and the Auction having been held from July 17, 2025 through July 19, 2025 for the Assets, including the Purchased Assets, in accordance with the Bidding Procedures Order; and the Debtors having executed that certain *Asset Purchase Agreement*, dated as of July 17, 2025 (the "**Purchase Agreement**"), by and among certain of the Debtors and Buyer (together with any assignees permitted under Section 10.4 of the Purchase Agreement, the "**Buyer**"), a copy of which is attached hereto as **Exhibit 1**, contemplating the Sale of the Purchased Assets identified therein (the "**Sale Transaction**") free and clear of any Encumbrances, the assumption and assignment to the Buyer of the Assumed Agreements and the Assumed Real Property Leases; and the Debtors having filed the *Notice of (I) Auction Transcript and (II) Successful and Backup Bids* [Docket No. 194] (the "**Notice of Successful Bids**"), announcing that, in accordance with the Bidding Procedures Order and after consultation with the Consultation Parties, the Debtors decided, in their reasonable business judgment, to designate the Buyer as the highest or otherwise best bidder for the Purchased Assets pursuant to the Purchase Agreement following the Auction; and this Court having conducted a hearing on July 28, 2025, to consider approval of the Sale Transaction (the "**Sale Hearing**") in accordance with the Bidding Procedures Order; and this Court having reviewed and considered (i) the Motion and the exhibits thereto, (ii) the Bidding Procedures Order, (iii) the Purchase Agreement, (iv) the Declaration of James Lilly in Support of the Debtors' Sales (the "**PJT Declaration**"), (v)

2

the results of the Auction, (vi) the objections and other responses to approval of the Sale

Transaction, and (vii) the arguments and representations of counsel made, and the evidence

proffered or adduced at, the Sale Hearing; and all parties in interest having been heard or having

had the opportunity to be heard regarding the Sale Transaction and the relief requested in the Motion

and provided in this Order; and due and sufficient notice of the Sale Hearing and the relief sought

therein having been given under the particular circumstances of the Chapter 11 Cases (as defined

herein) and in accordance with the Bidding Procedures Order; and it appearing that no other or

further notice need be provided; and it appearing that the relief requested in the Motion and

provided in this Order is in the best interests of the Debtors, their estates, their creditors, and all

parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further

appearing that the legal and factual bases set forth in the Motion, the PJT Declaration, and at the

Sale Hearing, establish just cause for the relief granted herein; and after due deliberation thereon,

### THE COURT HEREBY FINDS AND DETERMINES THAT:[3]

A.    **Jurisdiction and Venue.** This Court has jurisdiction to hear and determine the

Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference*

from the United States District Court for the District of Delaware dated as of February 29, 2012,

and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of the Chapter 11 Cases

is proper in this District and this Court under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory and Legal Predicates.** The statutory and legal predicates for the relief

requested in the Motion are sections 105, 363 and 365 of the Bankruptcy Code. Such relief is

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. All findings of fact and conclusions of law announced by this Court at the Sale Hearing are hereby incorporated to the extent not inconsistent herewith.

also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, and 9006 and Local Rules 2002-1 and 6004-1.

C.     **Final Order.** This Order is intended to constitute a final and appealable order within the meaning of 28 U.S.C. § 158(a).

D.     **Notice.** On June 24, 2025 (the "**Petition Date**")**,** the Debtors commenced with the Court voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (this "**Court**"). The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

E.     On July 2, 2025, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed [Docket No. 65] the official committee of unsecured creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code.

F.     The Debtors gave due and proper notice of the proposed Sale, Auction, and Sale Hearing on July 8, 2025 [Docket No. 111] (the "**Sale Notice**"). The Sale Notice constituted good, sufficient, and appropriate notice of the Sale under the particular circumstances and no further notice need be given with respect to the proposed Sale. As provided by the Sale Notice, a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities. Other parties interested in bidding on the Purchased Assets were provided, pursuant to the Bidding Procedures Order, sufficient information to make an informed judgment on whether to bid.

G.     **Notice of Assumption and Assignment.** The Debtors gave due and proper notice of the proposed assumption and assignment of the Assumed Agreements and any applicable

4

Cure Payments. On July 3, 2025, the Debtors filed the *Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 82] (the "**Initial Cure Notice**"). On July 11, 2025, the Debtors filed the *Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 123] (the "**Supplemental Cure Notice**"). On July 14, 2025, the Debtors filed the *Amended Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 129] (the "**Amended Cure Notice**," together with the Initial Cure Notice and the Supplemental Cure Notice, the "**Cure Notices**") which identified the Executory Contracts and Unexpired Leases that may be assumed and assigned as part of the Sale Transaction. On July 16, 2025, the Debtor filed a *Notice of Amendment to Contracts Schedule of Potentially Assigned Contracts* [Docket No. 186] which modified the Cure Payments associated with certain of the Executory Contracts and Unexpired Leases.

H.      The Cure Notices constituted good, sufficient, and appropriate notice of the potential assumption and assignment of the Assumed Agreements under the particular circumstances and no further notice need be given. As provided by the Cure Notices, a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.

I.      As evidenced by the affidavits of service [Docket Nos. 68, 117, 118, 136, 148, 176, 187, 190, and 195] previously filed with this Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing, the Assumption and Assignment Procedures, the Purchase Agreement, this Order, the Notice of Successful Bids, and the Sale Transaction has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy

5

Rules 2002, 9006, 9007, and 9014, and Local Rules 2002-1 and 6004-1. The Debtors have complied with all obligations to provide notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing, the Assumption and Assignment Procedures, the Purchase Agreement, this Order, the Notice of Successful Bids, and the Sale Transaction as required by the Bidding Procedures Order. The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures Order, the Assumption and Assignment Procedures, the Auction, the Sale Hearing, the Purchase Agreement, this Order, the Notice of Successful Bids, or the Sale Transaction is or shall be required.

J.      A reasonable opportunity to object or be heard regarding the relief requested in the Motion and provided in this Order was afforded to all parties in interest.

K.      **Compliance with the Bidding Procedures Order.** As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors have complied in all material respects with the Bidding Procedures Order. The Debtors and their professionals have adequately and appropriately marketed the Purchased Assets in compliance with the Bidding Procedures and the Bidding Procedures Order, and in accordance with the Debtors' fiduciary duties. Based upon the record of these proceedings, creditors, other parties in interest, and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Purchased Assets.

L.      The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Purchased Assets. The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures.

6

M.     The Buyer is the designated Successful Bidder, and the Purchase Agreement is designated the Successful Bid for the Purchased Assets enumerated therein in accordance with the Bidding Procedures Order.

N.     The Purchase Agreement, including the form and total consideration to be realized by the Debtors under the Purchase Agreement, (a) constitutes the highest or otherwise best offer received by the Debtors for the Purchased Assets; and (b) is fair and reasonable.

O.     **Business Judgment.** The Debtors' determination that the consideration provided by the Buyer under the Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets is reasonable and constitutes a valid and sound exercise of the Debtors' business judgment.

P.     The Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Sale Transaction and the performance of their obligations under the Purchase Agreement, including, but not limited to, the fact that (a) the consideration provided by the Buyer under the Purchase Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, including a separate liquidation of the Purchased Assets; and (b) unless the Sale Transaction is concluded expeditiously as provided for in the Motion and pursuant to the Purchase Agreement, creditor recoveries will be diminished.

Q.     **Good Faith.** The sale process engaged in by the Debtors and the Buyer, including, without limitation, the Auction, which was conducted in accordance with the Bidding Procedures and the Bidding Procedures Order, and the negotiation of the Purchase Agreement was at arm's length, non-collusive, in good faith, and substantively and procedurally fair to all parties in interest. Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the

7

Purchase Agreement or the Sale Transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

R.      The Debtors and the Buyer have complied, in good faith, in all respects with the Bidding Procedures Order and the Bidding Procedures. The Debtors and the Buyer each actively participated in the bidding process and in the Auction, and each acted in good faith and without collusion of fraud of any kind. The Buyer subjected its bid to competitive bidding in accordance with the Bidding Procedures and was designated the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures and the Bidding Procedures Order.

S.      The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision in respect of the Sale Transaction and each term of the Purchase Agreement (and any ancillary documents executed in connection therewith) and each term of this Order, and otherwise has proceeded in good faith in all respects in connection with this proceeding. Neither the Debtors nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code. The Debtors were free to deal with any other party interested in buying or selling some or all of the Purchased Assets on behalf of the Debtors' estates. The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale Transaction and the Buyer and would not consummate the Sale Transaction without such protections.

T.      The form and total consideration to be realized by the Debtors under the Purchase Agreement constitutes fair value, fair, full, and adequate consideration, reasonably equivalent value, and reasonable market value for the Purchased Assets.

U.      **Buyer is Not an Insider.** Neither the Buyer nor any of its affiliates, officers, directors, managers, shareholders, members or any of their respective successors or assigns is an

8

"insider" of the Debtors, as that term is defined under section 101(31) of the Bankruptcy Code. No common identity of directors, managers, controlling shareholders, or members exists between the Debtors and the Buyer.

      V.    **No Fraudulent Transfer.** The consideration provided by the Buyer for the Purchased Assets pursuant to the Purchase Agreement (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Purchased Assets, (c) will provide a greater recovery for the Debtors' creditors and estates than would be provided by any other practical available alternative, and (d) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, and each state, territory, possession, and the District of Columbia.

      W.    The Purchase Agreement was not entered into, and neither the Debtors nor the Buyer has entered into the Purchase Agreement or propose to consummate the Sale Transaction, for the purpose of (a) escaping liability for any of the Debtors' debts, or (b) hindering, delaying or defrauding the Debtors' present or future creditors, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

      X.    **Free and Clear.** The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Buyer with all right, title, and interest of the Debtors in the Purchased Assets free and clear of all claims (including, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof), liens (including, without limitation, any statutory, mechanic's, builders, materialmen's or similar lien on real and/or personal property and any and all "liens" as that term is

9

defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights, and encumbrances relating to, accruing, or arising any time prior to the Closing Date, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets (except for offsets exercised prior to the Petition Date), contract rights, rights of setoff (except for setoffs exercised prior to the Petition Date), rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, to the greatest degree allowed by applicable law environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court (other than this Court) or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, senior or subordinated, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims

10

otherwise arising under any theory, law or doctrine of successor or transferee liability or related theories (all of the foregoing, but excluding Assumed Liabilities and the Permitted Encumbrances, collectively being referred to in this Order as "**Encumbrances**").

Y.    Those holders of Encumbrances who did not object or who withdrew their objections to the Motion, are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

Z.    The Debtors, to the extent permitted by applicable law, may transfer the Purchased Assets free and clear of all Encumbrances, including, without limitation, rights or claims based on any successor or transferee liability, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

AA.    The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code.

BB.    The Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction, if (a) the transfer of the Purchased Assets were not free and clear of all Encumbrances, or (b) the Buyer would, or in the future could, be liable for or subject to any such Encumbrances.

CC.    The Buyer will not consummate the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction, unless this Court expressly orders that none of the Buyer, its respective affiliates, its respective present or contemplated members or shareholders, or the Purchased Assets will have any liability whatsoever with respect to, or be

11

required to satisfy in any manner, whether at law or equity, or by payment, setoff (except for setoffs exercised prior to the Petition Date), or otherwise, directly or indirectly, any Encumbrances.

DD.    Not transferring the Purchased Assets free and clear of all Encumbrances would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Encumbrances would be of substantially less benefit to the Debtors' estates.

EE.    As a result of any action taken in connection with the Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Purchased Assets, (a) neither the Buyer nor any of its affiliates shall be deemed to be a mere continuation of any of Debtors or their estates, nor shall there be deemed to be a continuity or common identity between the Buyer, any of the Debtors, or any of their respective affiliates, or any continuity of enterprise between the Buyer, any of the Debtors, or any of their respective affiliates; (b) neither the Buyer nor any of its affiliates shall be deemed to be holding themselves out to the public as a continuation of any of the Debtors; and (c) neither the Buyer nor any of its affiliates are to be deemed a successor to any of the Debtors or their estates and none of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction amounts to a consolidation, merger, or *de facto* merger of the Buyer or any of its affiliates with or into any of the Debtors.

FF.    Without limiting the generality of the foregoing, and other than as may be set forth in the Purchase Agreement, none of the Buyer, its affiliates, the present or contemplated members or shareholders of the Buyer, and its affiliates, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff (except for setoffs exercised prior to the Petition Date), or otherwise, directly

or indirectly, any Encumbrances relating to any U.S. federal, state or local income tax liabilities, that the Debtors may incur in connection with consummation of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction, or that the Debtors have otherwise incurred prior to the consummation of the transactions contemplated by the Purchase Agreement.

GG.    **Validity of Transfer.** The consummation of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) thereof, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Purchase Agreement.

HH.    The Purchase Agreement has been duly and validly executed and delivered by the Debtors and, subject to the terms of the Purchase Agreement, shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with its terms. The Purchase Agreement, the Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

II.    **Compelling Circumstances for an Immediate Sale.** To maximize the value of the Purchased Assets, it is essential that the transactions contemplated by the Purchase Agreement occur within the time constraints set forth therein. Time is of the essence in consummating the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale

Transaction. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

JJ.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction. The transactions contemplated by the Purchase Agreement neither impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictates the terms of a chapter 11 plan for the Debtors, and therefore, do not constitute a *sub rosa* plan.

KK.     **Assumption, Assignment and/or Transfer of the Assumed Agreements or Assumed Real Property Leases**. The Debtors have demonstrated (a) that it is an exercise of their sound business judgment to assume and assign the Assumed Agreements or Assumed Real Property Leases to the Buyer, in connection with the consummation of the Sale Transaction and (b) that the assumption and assignment of the Assumed Agreements or Assumed Real Property Leases to the Buyer is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Assumed Agreements or Assumed Real Property Leases being assigned to the Buyer is an integral part of the Purchased Assets being purchased by the Buyer and, accordingly, such assumption, assignment and cure of any defaults under the Assumed Agreements or Assumed Real Property Leases are reasonable and enhance the value of the Debtors' estates. Each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, has been or will be satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code. Any non-Debtor counterparty to an Assumed Agreement or Assumed Real

14

Property Lease that has not filed with the Court an objection to such assumption and assignment in accordance with the terms of the Motion is deemed to have consented to such assumption and assignment.

LL.    To the extent necessary or required by applicable law, the Debtors have or will have as of the Closing: (a) cured, or provided adequate assurance of cure, of any default existing prior to the Closing with respect to the Assumed Agreements or Assumed Real Property Leases, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (b) provided compensation, or adequate assurance of compensation, to any party for any actual pecuniary loss to such party resulting from such default, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

MM.    The promise of the Buyer to perform the obligations first arising under the Assumed Agreements or Assumed Real Property Leases after the assumption and assignment to the Buyer constitutes adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparty to the Assumed Agreement or Assumed Real Property Lease.

NN.    The legal and factual bases set forth in the Motion and presented at the Sale Hearing establish just cause for the relief granted herein.

OO.    **Consumer Privacy.** The Buyer satisfies and shall comply with the following "qualified buyer" criteria: (a) the Buyer concentrates in the same line of business as the Debtor; (b) the Buyer will be Debtor's successor-in-interest as to the Personal Information (as defined in the Purchase Agreement) acquired from the Debtor; (c) the Buyer will not disclose, sell, or transfer Personal Information acquired from Debtor to any third party in a manner inconsistent with the relevant Debtor's privacy policy without providing notice and obtaining consent from the

15

individual to whom the Personal Information relates where required by applicable law; (d) the Buyer will be responsible for any violation of the relevant Debtor's privacy policy following the Closing Date (provided that, Buyer reserves the right to update the applicable privacy policies consistent with the requirements of applicable law).

PP.    Following entry of this Order, Debtor shall (a) provide a notice via email to relevant consumers regarding the change of control over their Personal Information and advising them of the rights that may be available to them under applicable U.S. state privacy laws, and (b) post a similar notice on the relevant Debtor websites and mobile applications.

QQ.    To the extent reasonably feasible, Buyer and Debtor agree to cooperate with respect to maintaining records with respect to Colorado consumer requests for a period of twenty-four (24) months following the entry of this Order to help ensure compliance with the Colorado Privacy Act.

RR.    Following entry of this Order, the Buyer shall file with this Court a statement under oath that it has fully complied with the conditions imposed to protect Personal Information, including that the Buyer is able to satisfy the "qualified buyer" criteria set forth above.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    The Motion is granted as provided herein, and entry into and performance under, and in respect of, the Purchase Agreement attached hereto as **Exhibit 1** and the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, is authorized and approved.

2.    Any objections and responses to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such objections and responses, are overruled on the merits and denied with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the

16

relief granted herein, including for purposes of sections 363(f)(2), 365(c)(1), and 365(e)(2) of the Bankruptcy Code.

A.     **Approval of the Purchase Agreement**

3.     The Debtors are authorized to enter into the Purchase Agreement (and all ancillary documents), all of the terms and conditions thereof, and all of the transactions contemplated therein including, without limitation, any amendment to the Purchase Agreement that the Debtors and the Buyer determines is necessary or desirable in connection with the transactions.  The consummation of the transactions is hereby authorized under sections 363(b) and 365 of the Bankruptcy Code.

4.     The Debtors and their respective officers, employees and agents are authorized to take any and all actions necessary, appropriate or reasonable to perform, consummate, implement and close the Sale Transaction, including, without limitation, (a) the sale to the Buyer of all Purchased Assets, in accordance with the terms and conditions set forth in the Purchase Agreement and this Order, and (b) execution, acknowledgment and delivery of such deeds, assignments, conveyances and other assurance, documents and instruments of transfer and any action for purposes of assigning, transferring, granting, conveying and confirming to the Buyer, or reducing to possession, the Purchased Assets, all without further order of this Court. The Debtors are further authorized to pay, without further order of this Court, whether before, at or after the Closing Date, any expenses or costs that are required to be paid by the Debtors under the Purchase Agreement, this Order, or the Bidding Procedures Order, in order to consummate the Sale Transaction or perform their obligations under the Purchase Agreement.

5.     All persons and entities, including, without limitation, the Debtors, the Debtors' estates, any and all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants,

17

trustees, trade creditors, and any other creditors (any or affiliate, agent, successor, or assign of any of the foregoing) who may or do hold claims or other Encumbrances against the Debtors or the Purchased Assets, arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation or ownership of the Purchased Assets by the Debtors prior to the Closing Date, or the Sale Transaction, are hereby prohibited, forever barred and estopped from asserting or pursuing such claims or other Encumbrances against the Buyer, its affiliates, successors, assigns, or property, or the Purchased Assets, including, without limitation, taking any of the following actions with respect to any claims or other Encumbrances: (a) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against the Buyer, its affiliates, successors, assigns, Purchased Assets (including the Purchased Assets), and/or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer, its affiliates, successors, assigns, Purchased Assets (including the Purchased Assets), and/or properties; (c) creating, perfecting, or enforcing any claim or other Encumbrance against the Buyer, its affiliates, any of their respective successors, assigns, Purchased Assets (including the Purchased Assets), and/or properties; (d) asserting a claim or other Encumbrance as a setoff (except for setoffs exercised prior to the Petition Date), or right of subrogation, of any kind against any obligation due against the Buyer, its affiliates or any of their respective successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order, the Purchase Agreement, or the agreements or actions contemplated or taken in respect thereof, including the Debtors' ability to transfer the Purchased Assets to the Buyer in accordance with the terms of this Order and the Purchase Agreement. No such Person shall assert or pursue any such claim or other Encumbrance against the Buyer or its affiliates, successors or assigns.

18

6.     The sale of the Purchased Assets to the Buyer under the Purchase Agreement constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and laws of all applicable jurisdictions, including, without limitation, the laws of each jurisdiction in which the Purchased Assets are located, and the sale of the Purchased Assets to the Buyer may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

**B.     Transfer of the Purchased Assets Free and Clear**

7.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be sold free and clear of all Encumbrances, with all such Encumbrances to attach to the proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Purchased Assets, subject to any rights, claims, and defenses the Debtors, the Debtors' estates or any trustee for any Debtor, or any statutory committee or any party (to the extent any such rights, claims, and defenses exist), as applicable, may possess with respect thereto; *provided*, *however*, that setoff rights will be extinguished to the extent there is no longer mutuality after the consummation of the Sale Transaction, except for setoffs exercised prior to the Petition Date.

8.     On the Closing Date, all of the Debtors' right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in the Buyer pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code free and clear of any and all Encumbrances. Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest the Buyer with, all of the Debtors' right, title and interest in and to, and possession of the Purchased

19

Assets. All person or entities, presently or on or after the Closing Date, in possession of some or all of the Purchased Assets are authorized to surrender possession of the Purchased Assets to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

9.      This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

10.     Except as otherwise expressly provided in the Purchase Agreement or this Order, all persons and entities (and their respective successors and assigns), including, but not limited to, any and all debt security holders, equity security holders, affiliates, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, employees, former employees, trade creditors, litigation claimants and other creditors holding claims or other Encumbrances against the Debtors or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the Debtors, the Debtors' predecessors or affiliates, the Purchased Assets, the ownership, sale or operation of the Purchased Assets prior to Closing Date or the transfer of the Purchased Assets to the Buyer, are hereby forever barred and estopped  from asserting or prosecuting any cause of action or any process or other act or seeking to collect, offset (except for offsets exercised prior to the Petition Date), or recover on account of any claims or

20

other Encumbrances against the Buyer, its successors or assigns, their property or the Purchased

Assets. Following the Closing Date, no holder of any claim shall interfere with the Buyer's title to

or use and enjoyment of the Purchased Assets based on or related to any such Claim, or based on

any action or omission of any Debtor, including any action or omission of any Debtor in these

Chapter 11 Cases.

11.     The Debtors are authorized to execute such documents as may be necessary to

release any Encumbrances of any kind against the Purchased Assets as such Encumbrances may

have been recorded or may otherwise exist. If any person or entity that has filed financing

statements, mechanic's liens, *lis pendens* or other documents or agreements evidencing

Encumbrances against or in the Purchased Assets shall not have delivered to the Debtors prior to

the Closing Date of the Sale Transaction, in proper form for filing and executed by the appropriate

parties, termination statements, instruments of satisfaction, releases of all Encumbrances that such

person or entity has with respect to the Purchased Assets, (a) the Debtors are hereby authorized to

execute and file such statements, instruments, releases and other documents on behalf of such

person or entity with respect to the Purchased Assets; (b) the Buyer is hereby authorized to file,

register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise

recorded, shall constitute conclusive evidence of the release of all such Encumbrances against the

Buyer and the applicable Purchased Assets; (c) the Debtors' creditors and the holders of any

Encumbrances are authorized to execute such documents and take all other actions as may be

necessary to terminate, discharge or release their Encumbrances in the Purchased Assets; and (d)

the Buyer may seek in this Court or any other court to compel appropriate parties to execute

termination statements, instruments of satisfaction and releases of all such Encumbrances with

respect to the Purchased Assets. This Order is deemed to be in recordable form sufficient to be

21

placed in the filing or recording system of each and every federal, state, or local government agency, department or office, and such agencies, departments and offices are authorized to accept this Order for filing or recording. Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Encumbrances shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

12.    To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, authorized to be transferred to the Buyer with respect to the Purchased Assets as of the Closing Date. To the extent the Buyer cannot operate under any such license, permit, registration and governmental authorization or approval in accordance with the previous sentence, then to the maximum extent permitted under applicable law, such licenses, permits, registrations and governmental authorizations and approvals shall be in effect while the Buyer, with assistance from the Debtors (and at the Buyer's sole cost and expense), works promptly and diligently to apply for and secure all necessary government approvals for new issuance of such licenses, permits, registrations and governmental authorizations and approvals to the Buyer.

13.    No governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale Transaction to the extent that any such

action by a governmental unit or any representative thereof would violate section 525 of the Bankruptcy Code

### C.  No Successor Liability

14.    Upon the Closing Date, except as provided in the Purchase Agreement, the entry of this Order and the approval of the terms of the Purchase Agreement shall mean that the Buyer (and any of its affiliates, successors, or assigns), as a result of any action taken in connection with the Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Purchased Assets, shall not be deemed to: (a) be a legal successor or successor employer to any Debtor (including with respect to any health or benefit plans), or otherwise be deemed a successor to any Debtor, and shall instead be, and be deemed to be, a new employer with respect to all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have, *de facto*, or otherwise, merged or consolidated with or into any Debtor; or (c) be an alter ego or a mere continuation or substantial continuation of any Debtor or the enterprise of any Debtor, including, in the case of each of (a)-(c), without limitation, (i) within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.) ("**WARN**"), to the greatest degree allowed by applicable law the Comprehensive Environmental Response Compensation and Liability Act ("**CERCLA**"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq. or (ii) in respect of (1) to the greatest degree allowed by applicable law any environmental liabilities, debts, claims or obligations arising from conditions first

existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, (2) any liabilities, penalties, costs, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or (3) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

15.    Without limiting the generality of the foregoing, and except as otherwise provided in the Purchase Agreement and this Order, neither the Buyer nor any of its affiliates shall have any responsibility for any (a) liability or other obligation of the Debtors related to the Purchased Assets, or (b) claims against the Debtors or any of their predecessors or affiliates. By virtue of the Buyer's purchase of the Purchased Assets, neither the Buyer nor any of its affiliates shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or its predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, to the greatest degree allowed by applicable law environmental (including, but not limited to CERCLA), successor or transferee liability, de facto merger or substantial continuity, labor and employment (including, but not limited to, WARN) or products liability law, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of the Debtors' employment agreements or health or benefit plans, any settlement or injunction or any liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the

24

operation of the Purchased Assets prior to the Closing Date (collectively, with the potential claims set forth in paragraph 14 "**Successor Liability**"). The Buyer would not have acquired the Purchased Assets but for the foregoing protections against Successor or Transferee Liability.

D.    **Assumption and Assignment of Assumed Agreements and Assumed Real Property Leases.**

16.    Subject to paragraph 32, notwithstanding any provision of any contract governing the Purchased Assets, including any Assumed Agreement or Assumed Real Property Lease to be assumed and assigned to the Buyer as of the Closing pursuant to section 365(f) of the Bankruptcy Code or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Purchased Assets, including any Assumed Agreements or Assumed Real Property Leases, at the Closing, the Debtors shall, in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, (i) assign the Purchased Assets to the Buyer and (ii) assume and assign the Assumed Agreements or Assumed Real Property Leases to the Buyer as of the Closing, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, subject to the terms of the Purchase Agreement, this Order, the Bidding Procedures Order, or as otherwise provided by a separate order of this Court.

17.    To the fullest extent permitted by the Bankruptcy Code, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the counterparty to an Assumed Agreement or Assumed Real Property Lease is forever barred from raising or asserting against Buyer any assignment fee, rent acceleration, rent increase on account of assignment, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to an Assumed Agreement or Assumed Real Property Lease, existing as of the date that such an Assumed Agreement or Assumed Real Property Lease is assumed, assigned and sold or arising by reason of the Closing. Notwithstanding any term of any Assumed Agreement or Assumed Real Property Lease to the contrary, any extension or

25

renewal options or other rights contained in such an Assumed Agreement or Assumed Real Property Lease that purport to be personal only to, or exercisable only by, the Debtors, a named entity, or an entity operating under a specific trade name, may, in each case, be freely exercised to their full extent by the Buyer subject to the other applicable terms of the an Assumed Agreement or Assumed Real Property Lease.

18.     Payment of the Cure Payments as set forth in the Cure Notices (or such other amount or such other terms as may be agreed to by the Debtors, the non-Debtor counterparties to the applicable Assumed Agreements, and the Buyer) in accordance with the Purchase Agreement is hereby authorized. All defaults or other obligations shall be deemed cured and shall no longer exist by the payment or satisfaction by the Buyer or the Debtors of the applicable Cure Payments. Other than the applicable Cure Payments, there are no defaults existing under the Assumed Agreements, nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default. Notwithstanding anything to the contrary in this Order, a counterparty to an Assumed Agreement or Assumed Real Property Lease shall not be barred from seeking additional Cure Payments on account of any defaults occurring between the Contract Objection Deadline and the assumption of such Contract; *provided*, *however*, that any such amounts shall be asserted no later than seven (7) days after the Debtors file and serve a notice of the Closing of the Sale Transaction.

19.     Promptly after the Closing Date, the Debtors shall file with the Court a notice indicating the Sale Transaction has closed, and such notice shall contain a complete list of all Assumed Agreements assigned to Buyer.

**E.      Good Faith; Arm's Length Sale**

26

20.     The Purchase Agreement has been negotiated and executed, and the transactions contemplated thereby, including, without limitation, the Sale Transaction, are and have been undertaken, by the Debtors, the Buyer and their respective representatives at arm's length, without collusion and in "good faith," as such term is defined in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction or any term of the Purchase Agreement, and shall not permit the unwinding of the Sale Transaction. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections under section 363(m) of the Bankruptcy Code.

21.     Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement or the transactions contemplated thereby, including, without limitation, the Sale Transaction, to be avoided, or for costs, or damages or costs, to be imposed, under section 363(n) of the Bankruptcy Code. The consideration provided by the Buyer for the Purchased Assets under the Purchase Agreement is fair and reasonable, and the Sale Transaction may not be avoided under section 363(n) of the Bankruptcy Code.

## F.    Related Relief

22.     Notwithstanding anything to the contrary in this Order or the Purchase Agreement, no Contract between the Debtor and Oracle America, Inc.,  ("**Oracle**") will be assumed and/or assigned without (1) Oracle's prior written consent; (2) cure of any default under such contract; (3) the provision to Oracle of satisfactory adequate assurance of future performance by the assignee; and (4) execution by the Debtor or its successor and the assignee of mutually agreeable assignment documentation in a final form to be negotiated after entry of this Order.  In addition, no provision of this Order or the Transition Services Agreement shall authorize (1) the transfer of any Oracle license agreement to any third party; or (2) use of any Oracle license agreement that is inconsistent with the relevant license grant including, but not limited

to, exceeding the number of authorized users, shared use or license splitting, absent Oracle's express prior written consent.

23.     To the extent this paragraph 23 conflicts with this Order or any asset purchase agreement, this paragraph 23 controls.  None of the Debtors' owned or leased property in a data center owned, controlled, or operated by Equinix, Inc. or its affiliates (an "**Equinix Data Center**") are Purchased Assets. Absent further order of the Court, no executory contract with Equinix, Inc. or its affiliates relating to an Equinix Data Center is an Assumed Agreement to be assumed and assigned to the Buyer in connection with the Sale Transaction, and no such contract is assumed and assigned to the Buyer.

24.     Pursuant to the DIP Orders and the Bidding Procedures Order, all cash proceeds generated from the Sale of the Purchased Assets shall be paid to the DIP Lender upon closing of the Sale Transaction for permanent application against any outstanding DIP Obligations until such time as all DIP Obligations have been paid in full in cash in accordance with the terms of the DIP Orders and DIP Documents.

25.     In connection with the Sale Transaction and pursuant to the Purchase Agreement, the Buyer and the Debtors shall enter into a transition services agreement in the form attached to this Order as **Exhibit 2** pursuant to which, effective as of the Closing, the Buyer and the Debtors may provide certain services to each other for a transitional period following the Closing (the "**Transition Services Agreement**"). The Buyer and the Debtors are hereby authorized to execute and deliver the Transition Services Agreement and any additional documentation contemplated by the Purchase Agreement or in furtherance of the Sale, and to perform all such other and further acts as may be required in connection with the negotiation, execution, and performance of the Purchase Agreement, any ancillary documents or the Transaction Services Agreement, including providing transition services and making any applicable payments without further order of the Court.

28

26.     Notwithstanding anything to the contrary herein, except as set forth in the Purchase Agreement or the Transition Services Agreement, the Debtors and any other party to the Transition Services Agreement shall make commercially reasonable efforts to only provide Personal Information (as defined in the Purchase Agreement) to Buyer that is directly related to the Purchased Assets. In the event any data not directly related to the Purchased Assets is shared with Buyer, the Debtors and the other parties to the Transition Services Agreement agree that Buyer may delete such data and is not responsible for the Debtors' compliance with any Privacy Laws and Security Requirements (as defined in the Purchase Agreement) or any other requirements related to the retention of such records with respect to such data and the Buyer is not assuming any obligations of the Debtors as related thereto.

27.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction contemplated by the Purchase Agreement.

28.     No governmental unit may revoke or suspend any right, license, copyright, patent, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the sale of the Purchased Assets to the extent that any such action by a governmental unit would violate section 525 of the Bankruptcy Code.

29.     Except as expressly provided in the Purchase Agreement, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment),

29

claim, cause of action, defense, offset or counterclaim in respect of any Purchased Assets or liabilities not constituting an Asset.

30.    No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions with the Debtors that are approved by this Order, including, without limitation, the Purchase Agreement and the Sale Transaction.

31.    This Order and the Purchase Agreement shall be binding in all respects upon all pre-petition and post-petition creditors of the Debtors, all interest holders of the Debtors, any Court-appointed committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Purchase Agreement and Sale Transaction shall not be subject to rejection or avoidance under any circumstances by any party.

32.    *Provisions Regarding the United States*. Notwithstanding any provision to the contrary in this Order, the Purchase Agreement, or any other document related to the Sale Transaction, nothing shall: (i) release, nullify, preclude or enjoin the enforcement of any police or regulatory power or any liability that any entity would be subject to as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the date of entry of this Order; (ii) affect the setoff or recoupment rights of the United States; (iii) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (iv) authorize the assumption, assignment, sale or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider

30

transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "**Federal Interests**") without compliance by the Debtors and the Buyer with all terms of the Federal Interests and with all applicable non-bankruptcy law; (v) be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the sale, assumption, assignment or other transfer of any Federal Interests; (vi) waive, alter or otherwise limit the United States' property rights; or (vii) expand the scope of 11 U.S.C. § 525.  In the event of an inconsistency or conflict between any provision of the Purchase Agreement and any provision of this Order, as to the United States, the provisions of this Order and federal law shall govern; additionally, subject to this paragraph, the Buyer may continue to seek the United States' consent to the assumption and assignment of any Federal Interests following the Closing Date.

33.     This Court retains jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

34.     The Purchase Agreement, the Transition Service Agreement, and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court; provided, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates; provided, further, that, any materially modified Purchase Agreement shall be filed with the Court and any material modification, amendment, or supplement shall

require the consent of all persons or entities affected thereby or be approved by this Court upon further notice and hearing.

35.    This Order is intended to constitute a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (a) the terms of this Order shall be immediately effective and enforceable upon its entry and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtors and the Buyer may, each in its discretion and without further delay, take any action and perform any act authorized under this Order.

36.    The provisions of this Order are non-severable and mutually dependent.

37.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

**Exhibit 1**

**APA**

**AMENDED AND RESTATED
STALKING HORSE AGREEMENT**

**BY AND AMONG**

**ZEN JV, LLC, AS THE SELLER,**

**EACH OF THE AFFILIATES OF THE SELLER LISTED ON <u>SCHEDULE I</u>**

**AND**

**VALNET US INC., AS THE BUYER**

**DATED AS OF JULY 17, 2025**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ....................................................................................................6

    Section 1.1    Definitions.............................................................................6
    Section 1.2    Construction.........................................................................20

ARTICLE II PURCHASE AND SALE .................................................................................20

    Section 2.1    Purchase and Sale of Assets................................................20
    Section 2.2    Excluded Assets...................................................................22
    Section 2.3    Assumed Liabilities .............................................................24
    Section 2.4    Excluded Liabilities ............................................................25
    Section 2.5    Assumption and Assignment of Certain Contracts.............26
    Section 2.6    Designation of Assets and Liabilities..................................28
    Section 2.7    Consents to Certain Assignments .......................................28
    Section 2.8    Wrong Pockets ....................................................................29

ARTICLE III PURCHASE PRICE; DEPOSIT ....................................................................29

    Section 3.1    Purchase Price.....................................................................29
    Section 3.2    Deposit Escrow ...................................................................29
    Section 3.3    Allocation............................................................................30

ARTICLE IV THE CLOSING ..............................................................................................31

    Section 4.1    Time and Place of the Closing.............................................31
    Section 4.2    Deliveries by the Seller.......................................................31
    Section 4.3    Deliveries by the Buyer ......................................................32

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLING
ENTITIES .............................................................................................................................32

    Section 5.1    Organization, Standing and Corporate Power ....................33
    Section 5.2    Reserved..............................................................................33
    Section 5.3    Authority; Execution and Delivery; Enforceability............33
    Section 5.4    No Conflicts........................................................................33
    Section 5.5    Legal Proceedings and Orders ...........................................34
    Section 5.6    Permits................................................................................34
    Section 5.7    Compliance with Law .........................................................35
    Section 5.8    Absence of Certain Developments.......................................35
    Section 5.9    Financial Statements ...........................................................35
    Section 5.10    Employee Benefit Plans.......................................................36
    Section 5.11    Material Contracts...............................................................37
    Section 5.12    Intellectual Property; Information Technology ...................38
    Section 5.13    Data Privacy........................................................................39

i

Section 5.14    Taxes ...................................................................................................40
Section 5.15    Insurance .............................................................................................40
Section 5.16    Title to Assets; Real Property .............................................................41
Section 5.17    Environmental Matters ........................................................................41
Section 5.18    Brokers .................................................................................................41
Section 5.19    OFAC; Foreign Corrupt Practices Act; Anticorruption Laws .................41
Section 5.20    Material Customers; Material Suppliers ...................................................42
Section 5.21    Affiliate Transactions ..........................................................................42
Section 5.22    Employment Matters ............................................................................43

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ...................44

Section 6.1     Organization and Good Standing ........................................................44
Section 6.2     Authority Relative to this Agreement ...................................................45
Section 6.3     No Violation; Consents ........................................................................45
Section 6.4     Legal Proceedings and Orders .............................................................46
Section 6.5     Brokers .................................................................................................46
Section 6.6     Solvency ...............................................................................................46
Section 6.7     Financial Capability ............................................................................46
Section 6.8     Certain Arrangements ..........................................................................46

ARTICLE VII COVENANTS OF THE PARTIES ...................................................47

Section 7.1     Conduct of Business of Selling Entities ................................................47
Section 7.2     Conduct of Business of the Buyer ........................................................48
Section 7.3     Access to and Delivery of Information; Maintenance of Records ............48
Section 7.4     Expenses ...............................................................................................50
Section 7.5     Further Assurances ...............................................................................51
Section 7.6     Public Statements .................................................................................51
Section 7.7     Governmental Authority Approvals and Cooperation ..............................52
Section 7.8     Employee Matters .................................................................................54
Section 7.9     Tax Matters ...........................................................................................55
Section 7.10    Submission for Bankruptcy Court Approval .........................................56
Section 7.11    Overbid Procedures; Adequate Assurance .............................................57
Section 7.12    Termination Fee; Expense Reimbursement .............................................58
Section 7.13    Transfer of Purchased Assets; Substitution of Letters of Credit;
                Payments Received ...............................................................................59
Section 7.14    Intellectual Property Matters ................................................................60
Section 7.15    Purchased Assets "AS IS;" Certain Acknowledgements ..........................60
Section 7.16    Release .................................................................................................62
Section 7.17    Limitation of Damages .........................................................................63
Section 7.18    Transition Services Agreement .............................................................64
Section 7.19    Withholding ..........................................................................................64
Section 7.20    Termination of Existing Tax Sharing Agreements ..................................65
Section 7.21    Privacy Matters ....................................................................................65

ARTICLE VIII CONDITIONS TO CLOSING ...............................................................65

    Section 8.1    Conditions to Each Party's Obligations to Effect the Closing ..................65
    Section 8.2    Conditions to Obligations of the Buyer ....................................................65
    Section 8.3    Conditions to Obligations of the Selling Entities .....................................66
    Section 8.4    Frustration of Closing Conditions .............................................................67

ARTICLE IX TERMINATION; WAIVER ..................................................................67

    Section 9.1    Termination ...............................................................................................67
    Section 9.2    Procedure and Effect of Termination ........................................................69
    Section 9.3    Extension; Waiver .....................................................................................70

ARTICLE X MISCELLANEOUS PROVISIONS .........................................................70

    Section 10.1    Amendment and Modification ..................................................................70
    Section 10.2    Survival ...................................................................................................70
    Section 10.3    Notices ....................................................................................................70
    Section 10.4    Assignment ..............................................................................................72
    Section 10.5    Severability .............................................................................................72
    Section 10.6    Governing Law ........................................................................................73
    Section 10.7    Acknowledgement and Release; Non-Recourse .......................................73
    Section 10.8    Submission to Jurisdiction; WAIVER OF JURY TRIAL ........................73
    Section 10.9    Counterparts ............................................................................................74
    Section 10.10 Incorporation of Schedules and Exhibits .................................................74
    Section 10.11 Entire Agreement .....................................................................................75
    Section 10.12 Specific Performance ...............................................................................75
    Section 10.13 Bulk Sales or Transfer Laws ....................................................................75
    Section 10.14 Seller Disclosure Schedule ......................................................................75
    Section 10.15 Privileged Communications .....................................................................76
    Section 10.16 Mutual Drafting; Headings; Information Made Available .......................77
    Section 10.17 Approval of the Bankruptcy Court ...........................................................77

US-DOCS\161371711.3

SCHEDULES

Schedule I             Other Selling Entities
Schedule II            Excluded Entities

EXHIBITS

Exhibit A             Escrow Agreement

iv

## AMENDED AND RESTATED STALKING HORSE AGREEMENT

This Amended and Restated Stalking Horse Agreement (as amended, modified or supplemented from time to time, this "Agreement") is made and entered into as of July 17, 2025, by and among Zen JV, LLC, a Delaware limited liability company (the "Seller"), the Affiliates of the Seller listed on Schedule I (such Affiliates, together with the Seller, the "Selling Entities"), and Valnet US Inc., a Delaware corporation (the "Buyer").  Each of the Selling Entities and the Buyer are referred to herein as a "Party" and collectively as the "Parties."  Capitalized terms used but not otherwise defined herein have the meanings set forth in Article I.

## RECITALS

**WHEREAS,** on June 23, 2025, the Selling Entities and the Buyer entered into that certain Stalking Horse Agreement (the "Original Agreement");

**WHEREAS**, pursuant to Section 10.1 of the Original Agreement, the Original Agreement may be amended, modified or supplemented only by a written instrument signed by the Seller, on behalf of each of the Selling Entities, and the Buyer;

**WHEREAS,** on June 23, 2025, Seller has entered into an escrow agreement attached hereto as Exhibit A (the "Escrow Agreement") with Citibank, N.A. (the "Escrow Agent");

**WHEREAS**, the Seller and the other Debtor Entities commenced voluntary cases under the Bankruptcy Code in the Bankruptcy Court on or about June 24, 2025 (such filing date, the "Petition Date");

**WHEREAS**, each of the Seller and the other Debtor Entities continues to be in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

**WHEREAS**, the Buyer desires to purchase from the Selling Entities, and the Selling Entities desire to sell to the Buyer, certain of the Selling Entities' assets related to the Business, and the Buyer desires to assume from the Selling Entities, certain specified liabilities, in each case pursuant to the terms and subject to the conditions set forth herein;

**WHEREAS**, concurrently with the execution of this Agreement, and as a condition and inducement to the Selling Entities' willingness to enter into this Agreement, Valnet, Inc., a Canadian corporation (the "Guarantor"), has delivered to the Selling Entities the duly executed guaranty (the "Guarantee") in favor of the Selling Entities pursuant to which the Guarantor has, among other matters, guaranteed the obligations of the Buyer in connection with this Agreement;

**WHEREAS**, the Selling Entities and the Buyer have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Selling Entities to the Buyer shall be effected pursuant to sections 105, 363 and 365 of the Bankruptcy Code;

**WHEREAS**, in connection with the Bankruptcy Case and subject to the terms and conditions contained herein, following entry of the Sale Order finding the Buyer as the prevailing bidder at the Auction, the Selling Entities shall sell and transfer to the Buyer, and the Buyer shall

5

purchase and acquire from the Selling Entities, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets, and the Buyer shall assume from the Selling Entities the Assumed Liabilities, all as more specifically provided herein and in the Sale Order; and

**WHEREAS**, the Parties desire to amend and restate the Original Agreement in its entirety.

**NOW**, **THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.    A defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined.  As used in this Agreement, the following terms have the meanings specified below:

"Accounting Firm" has the meaning given to such term in Section 3.3.

"Accounts Receivable" means any and all (a) accounts receivable, notes receivable, trade receivables and other amounts receivable generated by the Business or owed to the Selling Entities (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all causes of action pertaining to the collection of amounts payable, or that may become payable, to the Selling Entities with respect to products sold or services performed and (b) license and royalty receivables payable, or that may become payable, to the Selling Entities with respect to products sold or services performed.

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person; provided that, other than in the case of the definition of "Seller Related Parties" and for purposes of Section 2.2(c), Section 7.6, Section 7.7, Section 7.14, Section 7.16, Section 10.7), in no event shall Seller, the Selling Entities, or any of their respective Subsidiaries be considered an Affiliate of Apollo Global Management, Inc. ("Apollo") or any portfolio company or investment fund affiliated with or managed by affiliates of Apollo, nor shall Apollo or any portfolio company or investment fund affiliated with or managed by affiliates of Apollo, be considered to be an Affiliate of Seller, the Selling Entities, or any of their respective Subsidiaries.  For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the management or affairs of another Person by reason of ownership of voting stock, as general partner or managing member or by Contract or otherwise.

"Agreement" has the meaning given to such term in the Preamble hereto.

"Allocation" has the meaning given to such term in Section 3.3.

6

"<u>Anticorruption Laws</u>" means all Laws of any jurisdiction applicable to the Selling Entities, or the Business from time to time concerning or relating to bribery or corruption.

"<u>Assignment and Assumption Agreement</u>" means one or more Assignment and Assumption Agreements to be executed and delivered by the Buyer, and the Selling Entities at the Closing, in form and substance reasonably acceptable to the Buyer and the Seller.

"<u>Assumed Agreements</u>" has the meaning given to such term in <u>Section 2.1(c)</u>.

"<u>Assumed Liabilities</u>" has the meaning given to such term in <u>Section 2.3</u>.

"<u>Auction</u>" has the meaning given to such term in the Bidding Procedures.

"<u>Back-up Bidder</u>" has the meaning given to such term in the Bidding Procedures.

"<u>Balance Sheet Date</u>" has the meaning given to such term in <u>Section 5.9(a)</u>.

"<u>Bankruptcy Case</u>" means the Seller's and the Debtor Entities' cases commenced under Chapter 11 of the Bankruptcy Code jointly administered under Case No. 25-11195 (JKS) in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

"<u>Bankruptcy Court</u>" means United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Bankruptcy Case.

"<u>Bidding Procedures</u>" means the bidding procedures approved pursuant to the Bidding Procedures Order.

"<u>Bidding Procedures Motion</u>" means the motion filed at Docket Number 28 in the Bankruptcy Case.

"<u>Bidding Procedures Order</u>" means the order of the Bankruptcy Court approving the Bidding Procedures Motion and the Bidding Procedures.

"<u>Bill of Sale</u>" means one or more Bills of Sale to be executed and delivered by the Selling Entities to the Buyer at the Closing, in and form and substance reasonably acceptable to the Buyer and the Seller.

"<u>Business</u>" means the internet, performance marketing and advertising & fees business, as conducted through the operation of the websites FastWeb.com and Military.com, by the Selling Entities as of the date hereof in the United States, but excluding the Excluded Businesses.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York.

"<u>Business IP</u>" means, collectively, all Seller IP other than the Seller Marks, in each case, primarily related to the Business.

"<u>Business Marks</u>" means all Trademarks in all classes of goods and services containing, in whole or in part, the names, terms or logos listed on <u>Section 1.1(c)</u> of the Seller Disclosure Schedule, or any combinations or variation thereof.

"<u>Business Names</u>" means "Military Advantage" and "FastWeb".

"<u>Buyer</u>" has the meaning given to such term in the Preamble hereto.

"<u>Buyer Default Termination</u>" has the meaning given to such term in <u>Section 3.2</u>.

"<u>Buyer Fundamental Representations</u>" has the meaning given to such term in <u>Section 8.3(b)</u>.

"<u>Buyer Related Parties</u>" means, collectively, the Buyer and its Affiliates and each of their respective directors, officers, managers, employees, owners, advisors and representatives.

"<u>Buyer Releasing Party</u>" has the meaning given to such term in <u>Section 7.16(a)</u>.

"<u>Buyer Transition Services</u>" has the meaning given to such term in <u>Section 7.18(b)</u>.

"<u>Cash</u>" means any cash and cash equivalents (including checks, deposits, demand deposits, money markets or similar accounts, escrow accounts, checking account balances, marketable securities, short-term instruments, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts or deposits, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held by or on behalf of any Person), including all cash and cash equivalents posted to support letters of credit, performance bonds or other similar obligations, in each case calculated in accordance with the accounting principles or standards used to prepare the Seller Financial Statements.

"<u>Cash Purchase Price</u>" means an amount equal to (a) twenty-seven million two hundred fifty thousand dollars ($27,250,000.00) <u>minus</u> (b) the Deposit (including any interest accrued on the amount deposited by the Buyer with the Escrow Agent pursuant to <u>Section 3.2</u>).

"<u>CB Business</u>" means the business of the Excluded Entities to the extent conducted in connection with an online, or other digital and mobile job advertising, platform allowing and connecting Persons in the recruitment industry, providing applicant search and screening services, including job postings, employers branding, resume database access, employee search and screening services, organizing job fairs, leveraging digital, social and mobile solutions, including through careerbuilder.com and other job advertising websites.

"<u>Claim</u>" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

"<u>Closing</u>" has the meaning given to such term in <u>Section 4.1</u>.

"<u>Closing Date</u>" has the meaning given to such term in <u>Section 4.1</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

8

"<u>Confidentiality Agreement</u>" means the Confidentiality Agreement, by and between Zen JV, LLC and Valnet, Inc. dated April 8, 2025.

"<u>Consent</u>" means any approval, consent, ratification, designation, permission, clearance, waiver or other authorization.

"<u>Contract</u>" means, with respect to any Person, any oral or written lease, sublease, contract, deed of trust, deed to secure debt, note, bond, indenture, guarantee, mortgage, license, sublicense or other legally enforceable agreement, instrument or obligation to which such Person is a party or by which such Person is bound.

"<u>Contract Notice Period</u>" has the meaning given to such term in <u>Section 2.5(d)</u>.

"<u>Cure Payments</u>" has the meaning given to such term in <u>Section 2.5(f)</u>.

"<u>Cure Schedule</u>" has the meaning given to such term in <u>Section 7.10(b)</u>.

"<u>D&O Claims</u>" means all rights, claims and causes of action against any current or former director, officer, equityholder or Transferred Employee of any Selling Entity and all rights, claims and causes of action under director and officer, fiduciary, employment practices and similar insurance policies maintained by any Selling Entity.

"<u>Debtor Entities</u>" means (a) the Seller, (b) Monster Worldwide LLC, (c) Military Advantage, LLC, (d) FastWeb, LLC, (e) Monster Government Solutions, LLC, (f) Camaro Acquisition, LLC, (g) CareerBuilder, LLC, (h) CareerBuilder France Holding LLC, (i) CareerBuilder Government Solutions LLC and (j) Luceo Solutions, LLC .

"<u>Deposit</u>" has the meaning given to such term in <u>Section 3.2</u>.

"<u>DIP Obligations</u>" has the meaning given to such term in the DIP Order.

"<u>DIP Order</u>" means an order of the Bankruptcy Court approving, among other things, the Debtor Entities' use of cash collateral and entry into any debtor-in-possession financing facility, including the interim order at Docket Number 56 in the Bankruptcy Case and any related "final order" entered by the Bankruptcy Court.

"<u>Documentary Materials</u>" has the meaning given to such term in <u>Section 2.1(e)</u>.

"<u>DOJ</u>" has the meaning given to such term in <u>Section 7.7(a)</u>.

"<u>DOL</u>" has the meaning given to such term in <u>Section 5.10(b)</u>.

"<u>E.O. 11246</u>" has the meaning given to such term in <u>Section 5.22(f)</u>.

"<u>E.O. 13706</u>" has the meaning given to such term in <u>Section 5.22(f)</u>.

"<u>Employees</u>" means all employees of the Selling Entities, including those on short-term disability or an approved leave of absence, whether paid or unpaid, as of the date hereof.

9

"Encumbrance" means any charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, encroachment or similar restriction or other encumbrance affecting any right or title to the Purchased Assets.

"Enforceability Exceptions" has the meaning given to Section 5.3.

"Environmental Laws" means Laws relating to pollution, natural resources, Hazardous Materials, or the protection of the environment or to occupational health and safety.

"Environmental Permits" means any permit, certificate, consent, registration, notice, approval, identification number, license or other authorization required under any applicable Environmental Law.

"ERISA" has the meaning given to such term in Section 5.10(a).

"ERISA Affiliate" has the meaning given to such term in Section 5.10(e).

"Escrow Agent" has the meaning given to such term in Section 3.2.

"Escrow Agreement" has the meaning given to such term in the Recitals.

"Excluded Assets" has the meaning given to such term in Section 2.2.

"Excluded Businesses" means the Monster Core Business, the CB Business and the MGS Business.

"Excluded Entities" means the entities set forth on Schedule II.

"Excluded Liabilities" has the meaning given to such term in Section 2.4.

"Expense Reimbursement" has the meaning given to such term in Section 7.12(a).

"FCPA" has the meaning given to such term in Section 5.19(b).

"Final Allocation" has the meaning given to such term in Section 3.3.

"Final Order" means a judgment or order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to in writing to by the Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of

which such proceeding or order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"Fraud" means an act committed by (a) the Selling Entities, in the making to the Buyer of the representations and warranties expressly contained in Article V (as qualified by the Seller Disclosure Schedule and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 8.2(b), and (b) the Buyer, in the making to the Selling Entities of the representations and warranties expressly contained in Article VI (in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 8.3(b), in any such case, with intent to both (x) deceive the other Party and (y) to induce such other Party hereto to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with Knowledge that such representation or warranty is false; (iii) with an intention to induce the Party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) causing that Party, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing such Party to suffer damage by reason of such reliance, which together constitutes common law actual and intentional fraud under Delaware Law (and does not in any case include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

"FTC" has the meaning given to such term in Section 7.7(a).

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" means any transnational, federal, municipal, state, provincial, local or foreign governmental, quasi-governmental, administrative or regulatory authority, department, agency, board, bureau, commission or body (including any court, arbitral body or similar tribunal), including the Bankruptcy Court.

"Governmental Authorization" means any Permit or Consent issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"Government Contract" has the meaning set forth in Section 5.11(a)(vii).

"Guarantee" has the meaning given to such term in the Recitals.

"Guarantor" has the meaning given to such term in the Recitals.

"Hazardous Materials" means any material, substance or waste that is listed, classified, regulated, characterized or otherwise defined as "hazardous," "toxic," "radioactive," a "pollutant," or "contaminant," (or words of similar intent or meaning) under any Environmental Laws, including any quantity of asbestos in any form, urea formaldehyde, PCBs, radon gas, mold, crude

11

oil or any fraction thereof, all forms of natural gas, petroleum products, petroleum breakdown products, petroleum by-products or petroleum derivatives.

"HSR Act" has the meaning given to such term in Section 7.7(a).

"Intellectual Property" means any and all intellectual or proprietary rights, which may exist or be created under the Laws of any jurisdiction in the world, including all: (a) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, moral and similar attribution rights and copyrights and copyrightable works, whether published or unpublished, and all registrations and applications for registration thereof; (b) Trademarks; (c) proprietary rights in internet domain names, internet domain name registrations, IP addresses, social media account names and handles, and other digital identifiers, all associated with web addresses, URLs, websites and webpages, social media pages, and all content and data thereon; (d) trade secret rights including know-how, inventions and invention disclosures (whether or not patented or patentable and whether or not reduced to practice), ideas, discoveries, improvements, technology, technical information, data, databases, data compilations and collections, tools, methods, processes, formulae, strategies, prototypes, techniques, plans, drawings, blue prints, schematics, flow charts, models, business information, customer and supplier lists and records, pricing and cost information, financial, sales, and marketing plans and proposals, and all other confidential or proprietary information); (e) patents and patent applications, industrial design and other industrial property rights; (f) proprietary rights in software, including computer programs, operating systems, applications, firmware, and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; (g) rights in or relating to any and all registrations, issuances, provisionals, reissuances, continuations, continuations-in-part, revisions, substitutions, reexaminations, renewals, extensions, combinations, divisionals, and reissues of, and applications for, any of the foregoing rights; and (h) rights to prosecute, sue, enforce, or recover or retain damages, costs, or attorneys' fees with respect to the past, present and future infringement, misappropriation, dilution, unauthorized use or disclosure, or other violation of any of the foregoing.

"IP Assignment Agreements" means the intellectual property assignment agreements to be executed and delivered by the Selling Entities and the Buyer, in form and substance reasonably acceptable to the Buyer and the Seller.

"IRS" means the U.S. Internal Revenue Service.

"IT Systems" means any and all information, payment and communications technologies owned and controlled by the Selling Entities and primarily used in the conduct of the Business, including all computers, hardware, software (whether in object or source code form), databases, servers, workstations, routers, hubs, switches, data communication lines, networks and all other information technology systems, included therein.

"Job-Board Technology" means the proprietary software which enables a job advertising platform where employers can post jobs and job seekers can search for jobs.

"Knowledge" means, as to a particular matter, the actual knowledge, such knowledge such person would be expected to have after reasonable investigation, of (a) with respect to the

US-DOCS\161371711.3

Buyer, Yury Smagorinsky and Rony Arzoumanian and (b) with respect to any Selling Entity, Mark Nelson, Michael Suhajda, and Dinesh Arora, in each case after reasonable inquiry.

"Law" means any federal, state, local, municipal or foreign law, statute, legislation, common law, rule, regulation, ruling, directive or other similar requirement having the effect of law issued, enacted, adopted, promulgated, implemented or otherwise put into effect by any Governmental Authority.

"Liability" means any indebtedness, obligation, commitment, lien, loss, damage, claim, fine, penalty, judgment, duty, responsibility, expense (including reasonable attorneys' fees and reasonable costs of investigation and defense) or liability of any nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, direct or indirect, fixed, absolute or contingent, matured or unmatured, ascertained or ascertainable, disputed or undisputed, secured or unsecured, joint or several, vested or unvested, due or to become due, executory, determined or determinable, whether in contract, tort, negligence, strict liability, or otherwise and whether or not the same would be required to be reflected in financial statements or disclosed in the notes thereto.

"Material Adverse Effect" means any matter, event, change, condition, circumstance, development, occurrence or effect that has had, individually or in the aggregate, a material adverse effect on the Business or the Purchased Assets and the Assumed Liabilities, taken as a whole; *provided, however*, that none of the following events, changes, conditions, circumstances, developments, occurrences or effects shall be taken into account, individually or in the aggregate, in determining whether a "Material Adverse Effect" has occurred: (a) the announcement of the signing of this Agreement or the filing of the Petitions (including any action or inaction by the customers, suppliers, landlords, employees, consultants of the Selling Entities and their respective Affiliates as a result thereof) or compliance with any obligation (including any obligation to not take action) expressly required by this Agreement; (b) (i) the commencement or pendency of the Bankruptcy Case, (ii) any objections in the Bankruptcy Court to (A) this Agreement or any of the Transactions or thereby, (B) the Sale Order or the reorganization of the Selling Entities and their Affiliates, (C) the Bidding Procedures Motion or the Bidding Procedures Order or (D) the assumption or rejection of any Assumed Agreements, or (iii) any Order of the Bankruptcy Court or any actions or omissions of the Debtor Entities in compliance therewith; (c) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of the Buyer or the Buyer's plans with respect to the Purchased Assets and the Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of the Selling Entities with employees, customers, lessors, suppliers, distributors, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (d) (i) actions or omissions taken or not taken by or on behalf of the Selling Entities or any of their respective Affiliates at the express written request of the Buyer or its Affiliates or (ii) the failure to take any action if such action is expressly prohibited by this Agreement; (e) actions taken by the Buyer or its Affiliates; (f) actions not taken by or on behalf of the Selling Entities or any of their Affiliates which (i) require the approval of the Buyer, and (ii) with respect to which the Selling Entities have requested the approval of the Buyer and such approval was not timely provided; (g) failure of any Selling Entity to meet any internal or published projections, forecasts, budgets, estimates, performance metrics, operating statistics or predictions (it being understood that the foregoing shall not preclude any assertion that the facts or occurrences giving

13

rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect should be deemed to constitute, or be taken into account in determining whether there has been, or would reasonably be expected to be, a Material Adverse Effect); (h) changes in applicable Law, the interpretation or enforcement thereof by Governmental Authorities, or GAAP, or in the interpretation, directives or enforcement of any of the foregoing, or any changes or prospective changes in general legal, regulatory or political conditions; (i) volcanoes, tsunamis, pandemics, earthquakes, fires, floods, storms, hurricanes, tornadoes, severe weather conditions, power outages or electrical blackouts or other natural disasters; (j) changes in domestic, regional foreign of global economic conditions, tariffs, securities, currency exchange rates or United States or international debt or equity markets; (k) events or conditions generally affecting the industry or markets in which the Selling Entities operate; (l) geopolitical conditions or any outbreak or escalation of hostilities, acts of terrorism or war, civil unrest, regional, national or international emergency or any action taken by any Governmental Authority, including any action taken in response to any of the foregoing and sanctions or similar restrictions imposed in connection with the dispute between the Russian Federation and Ukraine or the disputes between or among Israel, Hamas, Hezbollah, Lebanon, Yemen, Iran and other Persons in the Middle East; and (m) any pandemic or epidemic, including outbreaks or additional waves of outbreaks and any escalation or worsening thereof, of any contagious diseases and any direct or indirect consequence thereof; *provided further*, *however*, that any event, occurrence, fact, condition or change referred to in clauses (h) through (m) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates (in which case the incremental disproportionate and adverse effect(s) may be taken into account in determining whether there has been, or would reasonably be expected to be, a Material Adverse Effect).

"Material Contract" has the meaning given to such term in Section 5.11(a).

"Material Customers" has the meaning given to such term in Section 5.20(a).

"Material Suppliers" has the meaning given to such term in Section 5.20(b).

"MGS Business" means the business of the Excluded Entities to the extent conducted in connection with acting as a recruitment and workforce solution provider to the public sector.

"Monster Core Business" means the business of the Excluded Entities to the extent conducted in connection with the online/mobile job advertising platform connecting people in the recruitment industry, providing applicant search and screening services, including job postings, employer branding, resume database access, employee search services, leveraging digital, social and mobile solutions, through Monster.com and other websites

"Non-Real Property Contracts" means the Contracts (including any open purchase orders) primarily related to the Business, including Contracts relating to Intellectual Property to which any Selling Entity is a party or by which any Selling Entity is bound and primarily relate to the Business (including all licenses or sublicenses, development or co-development agreements, coexistence agreements, covenants not to sue, waivers, releases and permissions.

14

"<u>Non-Released Parties</u>" means the Prepetition Secured Parties (as defined in the DIP Order), Affiliates of the Prepetition Secured Parties, equityholders of the Debtor Entities, Affiliates of the equityholders of the Debtor Entities, the Debtor Entities' non-debtor Affiliates, the Debtor Entities' Subsidiaries, and Representatives of the Debtor Entities and any of the foregoing.

"<u>OFAC</u>" has the meaning given to such term in <u>Section 5.19(a)</u>.

"<u>Offered Employee</u>" has the meaning given to such term in <u>Section 7.8(a)</u>.

"<u>Order</u>" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or other award made, issued, entered or rendered by or with any Governmental Authority, whether preliminary, interlocutory or final, including any Order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"<u>Ordinary Course of Business</u>" means, with respect to the Business, the ordinary and usual course of day-to-day operations of the Business (including acts and omissions of the Selling Entities and their Affiliates in respect of the Business in the ordinary and usual course) through the date hereof, consistent with past practice and operations, including during the pendency of the Bankruptcy Case.

"<u>Outside Date</u>" has the meaning given to such term in <u>Section 9.1(h)</u>.

"<u>Party</u>" or "<u>Parties</u>" has the meaning given to such term in the Preamble hereto.

"<u>Permits</u>" has the meaning given to such term in <u>Section 5.6</u>.

"<u>Permitted Encumbrances</u>" means: (a) liens for Taxes, special assessments or other governmental charges not yet delinquent or that are being contested in good faith or the non-payment of which is permitted or required by the Bankruptcy Code, (b) statutory liens and rights of set-off of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen, customs brokers or agencies, suppliers and materialmen, and other Encumbrances imposed by Law, in each case for amounts not yet delinquent or that are being contested in good faith or such Encumbrances which have been filed of record but which have been bonded over or otherwise insured against, (c) deposits and pledges securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits (other than valid obligations incurred in respect of any defined benefit pension plan), (ii) the performance of bids, tenders, leases, Contracts (other than for payment of money), statutory obligations, licenses and other similar obligations, or (iii) obligations on performance, surety or appeal bonds, (d) licenses of or other grants of rights to use Intellectual Property, (e) Laws now or hereafter in effect relating to real property, leases, license agreements and other occupancy agreements, (f) Encumbrances that are zoning regulations, building codes, entitlements and easements and similar Encumbrances, and other similar matters affecting title to such real property and other title defects which do not have a Material Adverse Effect on the current use by the Selling Entities of the real property subject thereto, (g) statutory liens creating a security interest in favor of landlords with respect to property of the Selling Entities which do not interfere with the current use of such leased real property by the Selling Entities in any material respect, (h) Encumbrances arising from applicable Laws of general application which do not interfere with the current operation of the Business in any material respect, (i) Encumbrances granted by the Buyer to any lender, investor or other financing

15

source at the Closing in connection with any financing for or obtained by the Buyer with respect to the Transactions, (j) Encumbrances contained in or created by the Assumed Agreements, (k) purchase money liens and Encumbrances securing rental payments under capital lease arrangements, (l) Encumbrances to be released at or prior to Closing, and (m) the Encumbrances disclosed on Section 1.1(e) of the Seller Disclosure Schedule.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or Governmental Authority. References to any Person include such Person's successors and permitted assigns.

"Personal Information" means, in addition to any definition provided by applicable Laws for any similar term (e.g., "personal data," "personally identifiable information," or "PII,"), information regarding or capable of being associated with an identified or identifiable individual. Personal Information may relate to any individual, including a current, prospective, or former customer, user, or employee of the Selling Entities. Personal Information includes information in any form, including paper, electronic, and other forms.

"Petition" means the voluntary petition under Chapter 11 of the Bankruptcy Code filed by the Debtor Entities with the Bankruptcy Court.

"Petition Date" has the meaning given to such term in the Recitals.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period ending on or prior to the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"Privacy Laws and Security Requirements" means, to the extent applicable to the Selling Entities or the conduct of the business and relating to the access, collection, storage, transmission, transfer (including cross-border transfer), disclosure, use, security, disposal, or other processing of Personal Information or otherwise relating to the privacy, or security of Personal Information, or security breach notification requirements: (i) the Selling Entities' own external policies, and procedures, including any current Privacy Policy and any other publicly posted statements regarding privacy and data security; (ii) all applicable Laws, including those applicable to the processing of Personal Information in the context of communications by email, telephone, text message, and fax; and (iii) obligations under Contracts into which a Selling Entity has entered or by which it is otherwise bound.

"Privacy Policy" means any published policy, notice or statement relating to privacy or the processing of Personal Information.

"Privileged Communications" means any attorney-client communications, confidences, files, work product or other communications related to matters for which the Seller has engaged Latham & Watkins LLP or Richards, Layton & Finger, PA, in connection with a possible negotiated transaction involving any of the Selling Entities and a third party, whether such

16

negotiated transaction occurs out-of-court or pursuant to a state or federal bankruptcy or insolvency proceeding, or any financing transaction.

"Proceeding" has the meaning given to such term in Section 5.5.

"Professional Services" has the meaning given to such term in Section 2.4(b).

"Purchase Price" has the meaning given to such term in Section 3.1(a).

"Purchased Assets" has the meaning given to such term in Section 2.1.

"Purchased Avoidance Actions" has the meaning given such term in Section 2.1(o).

"Registered IP" means all Business IP that is registered, filed or issued under the authority of, with or by any Governmental Authority and all applications for any of the foregoing.

"Regulatory Laws" has the meaning given to such term in Section 7.7(b).

"Release" means disposing, discharging, injecting, spilling, leaking, pumping, pouring, leaching, dumping, emitting, escaping or emptying into or upon the indoor or outdoor environment, including any soil, sediment, subsurface strata, surface water, drinking water, ground water, ambient air, the atmosphere or any other media.

"Representatives" means, with respect to a particular Person, any director, officer, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, consultants, financial advisors and agents and restructuring advisors.

"Retained Employee" has the meaning given to such term in Section 7.8(a).

"Retained Records" has the meaning given to such term in Section 2.2(c).

"Sale Hearing" means the hearing at which the Bankruptcy Court considers entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court, in form and substance reasonably acceptable to the Seller and the Buyer, which shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Selling Entities of this Agreement, (ii) the sale of the Purchased Assets to the Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances) and (iii) the performance by the Selling Entities of their respective obligations under this Agreement, (b) authorize each of the Selling Entities and the Buyer to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Encumbrances that any Person has with respect to the Purchased Assets, and (c) order that the Buyer is receiving good and marketable title to all of the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances).

"Section 503" has the meaning given to such term in Section 5.22(f).

"Seller" has the meaning given to such term in the Preamble hereto.

"Seller Compensation and Benefit Program" has the meaning given to such term in Section 5.10(a).

"Seller Disclosure Schedule" has the meaning given to such term in the Preamble to Article (vii).

"Seller Financial Statements" has the meaning given to such term in Section 5.9(a).

"Seller Fundamental Representations" has the meaning given to such term in Section 8.2(b).

"Seller IP" means all Intellectual Property (including the goodwill of the Selling Entities) owned by the Selling Entities.

"Seller Marks" means all trademarks, tradenames and other source identifiers of Seller and its Affiliates that are not Business Marks and those that incorporate the terms or associated logos of "Monster" and "CareerBuilder" either alone or in combination with other words and all marks, trade dress, logos, domain names and other source identifiers confusing similar to or embodying any of the foregoing either alone or in combination with other words.

"Seller Related Party" means, collectively, the Selling Entities, their respective Affiliates and shareholders, and their respective directors, officers, managers, shareholders, partners, employees, owners, advisors and representatives.

"Seller Released Party" has the meaning given to such term in Section 7.16(a).

"Seller Transition Services" has the meaning given to such term in Section 7.18(a).

"Selling Entities" has the meaning given to such term in the Preamble hereto.

"Service Provider" has the meaning given to such term in Section 5.10(a).

"Specified Employee" has the meaning given to such term in Section 7.8(a).

"Straddle Period" means any taxable period that includes, but does not end on, the Closing Date.

"Subsidiary" means, with respect to any Person, (a) any corporation or similar entity of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation or similar entity, is held, directly or indirectly by such Person and (b) any partnership, limited liability company or similar entity of which (i) such Person is a general partner or managing member or has the power to direct the policies, management or affairs or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"Successful Bidder" has the meaning given to such term by the Bidding Procedures Order.

"Tax" means all U.S. federal, state, local or non-U.S. income, gross receipts, capital gains, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, alternative or add-on minimum, estimated, or similar taxes imposed by any Governmental Authority (to the extent the foregoing are taxes or in the nature of a tax), and including any interest, penalty, or addition thereto.

"Tax Return" means any return, claim for refund, declaration, report, statement, information return or other similar document (including any related or supporting information, amendments, schedule or supplements of any of the foregoing) required to be filed with any Governmental Authority with respect to Taxes.

"Termination Fee" has the meaning given to such term in Section 7.12(a).

"Third-Party" means a Person other than the Buyer or an Affiliate of the Buyer.

"Third-Party Buyer" means an acquiror of any Excluded Business.

"Third-Party Sale" means a sale of all or substantially all of the Purchased Assets to a Third-Party.

"Trademarks" means any and all trade names, corporate names, logos, slogans, trade dress, trademarks, service marks, acronyms, tag-lines, and other source origin or business identifiers and general intangibles of a like nature (whether registered or unregistered), and trademark and service mark registrations and applications therefor and all goodwill associated with the foregoing, whether protected, created, or arising under the laws of the United States (including common law) or any other jurisdiction or under any international convention.

"Transaction Documents" means this Agreement, the Transition Services Agreement, the Assignment and Assumption Agreement, the Bill of Sale, the IP Assignment Agreements and any other Contract to be entered into by the Parties in connection with the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of the Purchased Assets in exchange for the Purchase Price and the assumption of the Assumed Liabilities.

"Transfer Taxes" has the meaning given to such term in Section 7.9(a).

"Transferred Employees" has the meaning given to such term in Section 7.8(a).

"Transition Services Agreement" means an agreement among the Buyer, the Seller, and/or each Third-Party Buyer as further described in Section 7.18.

"Union" has the meaning given to such term in Section 5.22(a).

19

"VEVRAA" has the meaning given to such term in Section 5.22(f).

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (1988) and any similar Laws, including Laws of any country, state or other locality that is applicable to a termination of employees.

"Wind-Down" has the meaning given to such term in Section 7.14.

Section 1.2    Construction.  The terms "hereby," "herein," "hereto," "hereunder" and any similar terms as used in this Agreement refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  The terms "including," "includes" or similar terms when used herein shall mean "including, without limitation", and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.  The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.  The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, if applicable, and such phrase does not mean simply "if".  The word "will" shall be construed to have the same meaning as the word "shall".  Any reference to "days" means calendar days unless Business Days are expressly specified.  References to "written" or "in writing" include in electronic form.  The meaning of defined terms shall be equally applicable to the singular and plural forms of the defined terms, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  Any reference to any federal, state, provincial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Unless otherwise indicated, references to (a) Articles, Sections, Schedules and Exhibits refer to Articles, Sections, Schedules and Exhibits of and to this Agreement, (b) references to $ (dollars) are to United States Dollars and (c) a Contract means such Contract as amended from time to time.  Any reference to any Person shall include such Person's successors and assigns.  All accounting terms used in this Agreement and not otherwise defined herein have the meanings assigned to them under GAAP.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.  All references to dates and times herein, except as otherwise specifically noted, shall refer to New York City time.

**ARTICLE II**
**PURCHASE AND SALE**

Section 2.1    Purchase and Sale of Assets.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Selling Entities shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall purchase and acquire from the Selling Entities, all of the Selling Entities' right, title and interest, free and clear of all Liabilities and Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances), in and to all of the properties, rights, interests and other tangible and intangible assets of the Selling Entities of every nature primarily related to the Business (wherever located, whether real, personal or mixed, whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any assets acquired by

20

the Selling Entities after the date hereof but prior to the Closing (collectively, the "Purchased Assets"); *provided*, *however*, that notwithstanding anything to the contrary herein, the Purchased Assets shall not include any Excluded Assets. Without limiting the generality of the foregoing, the Purchased Assets shall include all of the Selling Entities' right, title and interest in and to the following (except to the extent listed as, or otherwise constituting, an Excluded Asset, including to the extent primarily related to an Excluded Business):

(a)    all Accounts Receivable of the Selling Entities primarily related to the Business arising under the Assumed Agreements and under open purchase orders with customers, distributors, suppliers and vendors that constitute Purchased Assets, following the Closing, except as set forth in Section 2.2(h);

(b)    (i) all royalties, advances, prepaid assets, security and other deposits, prepayments and other current assets relating to the Business, the Assumed Agreements, or (ii) any other prepaid and deferred items relating to the Business or the Purchased Assets (including all prepaid rentals and unbilled charges, fees and deposits), in each case of the Selling Entities as of the Closing other than Cash as provided in Section 2.2(a);

(c)    all Non-Real Property Contracts listed on Section 2.1(c) of the Seller Disclosure Schedule (as amended from time to time in accordance with Section 2.5 hereof, the "Assumed Agreements") assumed and assigned to the Buyer pursuant to Section 2.5;

(d)    all Business IP;

(e)    all books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items of the Selling Entities as of the Closing (except as otherwise described in Section 2.2), including customer, distributor, supplier and vendor lists and mailing lists, in each case primarily related to the Business (collectively, the "Documentary Materials");

(f)    all data, files, and credentials of the Selling Entities related to and/or associated with online advertising platforms of the Business, including account access, campaign management, performance monitoring, optimization, and audience management, including all Google Ads account-related credentials, data and information;

(g)    all goodwill associated with, or relating to, the Business or the Purchased Assets;

(h)    subject to Section 2.8(b), all rights to the websites, domain names, telephone and facsimile numbers and e-mail addresses used by each Selling Entity, in each case primarily related to the Business;

(i)    all rights of the Selling Entities under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current Employees, former Employees or current or former directors, consultants, independent contractors and agents of any of the Selling Entities, in each case primarily related to the Business;

21

(j)       all of the rights and benefits accruing under all Permits, all deposits and prepaid expenses held by third parties and/or, to the extent transferable, any Governmental Authorization and, to the extent transferable, all bank and deposit accounts of the Business;

(k)       any credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff (other than against the Selling Entities) arising out of or relating to any of the Purchased Assets as of the Closing, except for any Accounts Receivable;

(l)       all of the Selling Entities' rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(m)       any rights, claims or causes of action as of the Closing of any Selling Entity (including any D&O Claims) relating to or arising against counterparties to any Assumed Agreement in respect of the assets, properties, conduct of business or operations of such Selling Entity that arise from and after the Petition Date or relate to events, facts and circumstances first existing after the Petition Date, in each case primarily related to the Business and excluding any rights, claims or causes of action that relate to any Excluded Assets or Excluded Liabilities and excluding any Accounts Receivable;

(n)       all claims (including claims for infringement or misappropriation or other violation of Business IP) and causes of action of the Selling Entities against Persons other than the Selling Entities (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by the Selling Entities (regardless of whether such rights are currently exercisable) to the extent related to the Purchased Assets and the Business, in each case excluding (i) any rights, claims or causes of action that relate to any Excluded Assets or Excluded Liabilities, (ii) any Accounts Receivable or (iii) any rights, claims or causes of action in respect of Section 2.1(l);

(o)       all preference or avoidance claims and actions of the Debtor Entities (including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar applicable Law), solely to the extent related to the Purchased Assets and the Business (the "Purchased Avoidance Actions"); for the avoidance of doubt, the Purchased Assets shall not include preference claims or avoidance claims and actions (including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar applicable Law) against any Non-Released Parties. Notwithstanding the foregoing, neither the Buyer, nor any Person claiming by, through or on behalf of the Buyer (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute, or commence an action based on, assert, sell, convey, assign, or file any claim that relates to the Purchased Avoidance Actions, or assert or use any such Purchased Avoidance Actions for defensive purposes;  and

(p)       the assets listed on Section 2.1(p) of the Seller Disclosure Schedule.

Section 2.2       Excluded Assets.  Notwithstanding any provision herein to the contrary, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

22

(a)      all Cash of the Selling Entities as of the Closing;

(b)      any records, documents or other information relating to current or former Employees that are not Transferred Employees, and any materials to the extent containing information about any Employee (including any Transferred Employee), disclosure of which would violate applicable Law or such Employee's reasonable expectation of privacy;

(c)      the Selling Entities' (i) minute books and other corporate books and records relating to their organization and existence and the Selling Entities' books and records relating to Taxes of the Selling Entities, including Tax Returns filed by or with respect to the Selling Entities, (ii) books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items exclusively relating to any Excluded Assets or Excluded Liabilities, and (iii) all correspondences or communications prior to the Closing among the Seller and any of its Affiliates and their respective Representatives and their counsel or any other third party that relate to the negotiation of Transactions or any other transaction relating to the sale of the assets of the Seller or any of their Affiliates (including any archival copies of such communications) (this clause (iii), the "Retained Records");

(d)      the Selling Entities' rights under this Agreement and the other Transaction Documents, and all cash and non-cash consideration payable or deliverable to the Selling Entities pursuant to the terms and provisions hereof;

(e)      any Contracts other than the Assumed Agreements;

(f)      all rights, claims and causes of action of any Selling Entity and all rights of indemnity, warranty rights, rights of contribution, rights to refunds or prepayments, rights of reimbursement and other rights of recovery, including rights to insurance proceeds (including in all cases the proceeds of D&O Claims), of any Selling Entity (regardless of whether such rights are currently exercisable), in each case (i) related to any Excluded Asset or Excluded Liability or (ii) not related to the Purchased Assets; for the avoidance of doubt, the Excluded Assets shall include commercial tort claims and all other claims, causes of action, lawsuits, judgements, privileges, counterclaims, defenses, rights of recovery, rights of setoff, rights of subrogation, and all other rights of any kind of the Debtor Entities against any Non-Released Parties;

(g)      any shares of capital stock or other equity interests of any of the Selling Entities, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any of the Selling Entities;

(h)      (i) all Accounts Receivable of the Selling Entities arising under any Contract, other than Accounts Receivable of the Selling Entities arising under Assumed Agreement or under open purchase orders with customers, distributors, suppliers and vendors that constitute Purchased Assets, following the Closing, and (ii) intercompany Accounts Receivable and other amounts receivable of any Selling Entity owed to it, and any other intercompany obligations owed to any Selling Entity, by any other Selling Entity, or any of their respective Affiliates;

23

(i)      any Seller Compensation and Benefit Program or stock option, restricted stock or other equity-based benefit plan of the Selling Entities, and the Selling Entities' right, title and interest in any assets of or relating thereto;

(j)      all preference or avoidance claims and all other causes of action of the Selling Entities (including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar applicable Law) to the extent not constituting Purchased Avoidance Actions; for the avoidance of doubt, the Excluded Assets shall include preference claims or avoidance claims and actions (including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar applicable Law) against any Non-Released Parties;

(k)      all Tax refunds, overpayments, credits or other attributes with respect to Taxes that are Excluded Liabilities;

(l)      (i) a "tail" policy providing directors' and officers' liability insurance coverage for the benefit of those Persons who are covered by the Selling Entities' directors' and officers' liability insurance policies as of the date hereof or at the Closing with respect to matters occurring prior to the Closing;

(m)      the Selling Entities' right, title and interest to the other assets, if any, set forth in Section 2.2(m) of the Seller Disclosure Schedule;

(n)      all current and prior insurance policies of the Selling Entities, including for the avoidance of doubt all director and officer insurance policies; and

(o)      any assets that are primarily related to any of the Excluded Businesses.

Section 2.3    Assumed Liabilities.  Subject to the terms and conditions of this Agreement, effective as of the Closing, the Buyer shall assume and agree to pay, perform and discharge when due in accordance with their respective terms the Assumed Liabilities.  For purposes of this Agreement, "Assumed Liabilities" means, without duplication, only the following Liabilities (to the extent not paid prior to the Closing):

(a)      all Liabilities arising out of the conduct of the Business or relating to the Purchased Assets (including any accounts payable or other amounts payable), in each case, to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing;

(b)      all Liabilities of the Selling Entities primarily related to the Business arising under the Assumed Agreements;

(c)      all Liabilities assumed by the Buyer pursuant to Section 7.8;

(d)      any Liability for (i) Taxes with respect to the Purchased Assets for any Post-Closing Tax Period (as determined in accordance with Section 7.9(b)), or (ii) any Transfer Taxes; and

24

(e)    the Cure Payments.

Section 2.4    <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary herein, the Buyer shall not assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Proceeding against, the Selling Entities, other than the Assumed Liabilities (all such Liabilities that the Buyer is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>").  The Excluded Liabilities include the following, other than the Assumed Liabilities:

(a)    all Liabilities for Taxes (i) with respect to the Purchased Assets for any Pre-Closing Tax Period (as determined in accordance with <u>Section 7.9(b)</u>) and (ii) of the Selling Entities, in each case excluding any Transfer Taxes, which shall be assumed by Buyer in accordance with <u>Section 7.9(a)</u>;

(b)    all Liabilities of the Selling Entities relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("<u>Professional Services</u>") performed in connection with this Agreement and any of the transactions contemplated hereby, and any pre-Petition or post-Petition Claims for such Professional Services;

(c)    all Liabilities of the Selling Entities with respect to current and former Employees, Service Providers, and current and former directors and officers of the Selling Entities (including Liabilities under or relating to any Seller Compensation and Benefit Program and any workers compensation related Liabilities), other than all Liabilities assumed by the Buyer pursuant to <u>Section 7.8</u>;

(d)    (i) the Liabilities of the Selling Entities arising under the Assumed Agreements to the extent such Liabilities arise prior to the Petition Date or relate to events, facts and circumstances first existing prior to the Petition Date; and (ii) all other Liabilities arising out of the conduct of the Business or relating to the Purchased Assets (other than the Liabilities arising under the Assumed Agreements), to the extent such Liabilities arise prior to the Closing or relate to events, facts and circumstances first existing prior to the Closing, in the case of each of clauses (i) and (ii), other than any Cure Payment and any Assumed Liabilities;

(e)    all Liabilities primarily relating to Excluded Assets;

(f)    all Liabilities of any Selling Entity in respect of indebtedness for borrowed money, except for any Assumed Liabilities;

(g)    all Liabilities of any Selling Entity to any current, former or prospective shareholder or other holder of equity securities or equity-linked securities of such Selling Entity, including all Liabilities of such Selling Entity related to the right to or issuance of any capital stock or other equity securities or the payment of any dividend or other distribution on or in respect of any capital stock or other equity securities;

(h)    all Liabilities related to any breach or alleged breach of any Environmental Law;

US-DOCS\161371711.3

(i)     all Liabilities relating to the WARN Act occurring prior to the Closing Date; and

(j)     the Liabilities listed on Section 2.4(j) of the Seller Disclosure Schedule.

Section 2.5     Assumption and Assignment of Certain Contracts.  The Sale Order shall provide for the assumption by the Buyer, and the Sale Order shall, to the extent permitted by Law, provide for the assignment by the Selling Entities to the Buyer, effective upon the Closing, of the Assumed Agreements on the terms and conditions set forth in the remainder of this Section 2.5.

(a)     The Debtor Entities shall use commercially reasonable efforts to provide timely and proper written notice of the Sale Hearing to all parties to any executory Contracts or unexpired leases to which any Debtor Entity is a party that are (or may be) the Assumed Agreements and take all other actions reasonably necessary to cause such Contracts to be assumed by the Debtor Entities and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code. At the Closing, the Debtor Entities shall assign to the Buyer the Assumed Agreements that may be assigned by any such Debtor Entity to the Buyer pursuant to sections 363 and 365 of the Bankruptcy Code.  Section 2.5(a) of the Seller Disclosure Schedule sets forth the Seller's good faith estimate (on a vendor by vendor basis) as of the date of this Agreement of the amounts necessary to cure defaults, if any, with respect to each counterparty to any of the Assumed Agreements set forth on Section 2.1(c) of the Seller Disclosure Schedule, in each case as determined by the Seller based on the Seller's books and records and good faith judgment.  The Seller shall provide an update of such good faith estimate not less than two (2) Business Days prior to the Closing Date.

(b)     From and after the date of this Agreement until three (3) Business Days prior to the Closing, the Buyer may, in its sole discretion, designate any Contract of any Selling Entity as an Assumed Agreement  or remove any such Contract from Section 2.1(c) of the Seller Disclosure Schedule, respectively, such that it is not an Assumed Agreement by providing written notice of such designation or removal to the Seller (with email to the Seller's bankruptcy counsel being sufficient), in which case Section 2.1(c) of the Seller Disclosure Schedule, as applicable, shall automatically be deemed to be amended to include or remove, as applicable, such Contract as an Assumed Agreement without any adjustment to the Purchase Price (other than any Cure Payment). To the extent that any Cure Objection (as defined in the Bidding Procedures Order) cannot be resolved by the Buyer and the applicable contract counterparty, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Buyer's reasonable discretion. If a Cure Objection is not satisfactorily resolved, the Buyer may determine that such Contract should not be an Assumed Agreement and should be removed from Section 2.1(c) of the Seller Disclosure Schedule and not assigned by providing written notice of such removal to the Seller (with email to the Seller's bankruptcy counsel being sufficient), in which case the Buyer will not be responsible for any Cure Payment in respect of such Contract.

(c)     In the case of any amendment by the Buyer of Section 2.1(c) of the Seller Disclosure Schedule pursuant to Section 2.5(b), the Seller shall give notice to the other parties to any Contract to which such amendment relates of the removal or addition of such Contract from Section 2.1(c) of the Seller Disclosure Schedule.

US-DOCS\161371711.3

(d)    From and after the date of this Agreement until the Closing, subject to providing the Buyer with not less than five (5) Business Days prior written notice ("Contract Notice Period"), the Seller may move to reject any Contract which is not an Assumed Agreement; *provided, however*, that the Buyer may, at any time prior to the entry of an order by the Bankruptcy Court authorizing the motion to reject the Contract, designate such Contract as an Assumed Agreement in accordance with Section 2.5(b) and the Seller shall not thereafter reject or seek to reject such Contract; *provided*, *further*, that the Seller may move to reject any such Contract if the Buyer does not so timely designate such Contract at prior to the entry of an order by the Bankruptcy Court authorizing the motion to reject the Contract or if the Buyer ultimately does not designate such Contract as an Assumed Agreement.

(e)    The Debtor Entities shall file and serve the Cure Schedule no later than the deadline established by the Bidding Procedures Order in accordance with the Bidding Procedures Order.  Pursuant to the Bidding Procedures Order, the Bankruptcy Court shall deem any non-debtor party to a Contract included on the Cure Schedule that does not timely file an objection with the Bankruptcy Court pursuant to the procedures set forth in the Bidding Procedures Order and prior to the applicable deadline set forth in the Bidding Procedures Order to have given any required Consent to the assumption of such Contract by the Debtor Entity and assignment to the Buyer if, and to the extent that, pursuant to the Sale Order or other order of the Bankruptcy Court, the applicable Debtor Entity is authorized to assume and assign the Contract to the Buyer and the Buyer is authorized to accept such Assumed Agreement pursuant to section 365 of the Bankruptcy Code.

(f)    In connection with the assumption and assignment to the Buyer of any Assumed Agreement pursuant to this Section 2.5, in addition to the Purchase Price, the Buyer shall pay all of the cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Agreements (such amounts, collectively, the "Cure Payments"); *provided*, that to the extent such Cure Payments are not made prior to the Closing, all Liabilities related to such Cure Payments shall be assumed by the Buyer at the Closing as Assumed Liabilities.  No Selling Entity shall have any liability for such Cure Payments. For the avoidance of doubt, the Buyer will not be deemed to have assumed liability for any Cure Payment which relates to a Contract which (i) is not assumed and assigned to the Buyer based on a failure to obtain any Governmental Authorization or Consent pursuant to Section 2.5(h) or (ii) if any Cure Objection is filed and not resolved within a reasonable time and to the full satisfaction of the Buyer.

(g)    The Seller shall use its commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Agreements to the Buyer designated by the Seller on the terms set forth in this Section 2.5.  In the event the Selling Entities are unable to assign any such Assumed Agreement to the Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use commercially reasonable efforts prior to the Closing to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations from Governmental Authorities and third parties necessary to assume and assign such Assumed Agreement to the Buyer; *provided, however*, that the Seller shall not be required to pay any amount or incur any obligation to any Person from whom any such Consent or Governmental Authorization may be required in order to obtain such Consent.

27

(h)     Notwithstanding the foregoing, a Contract shall not be an Assumed Agreement hereunder and shall not be assigned to or assumed by the Buyer to the extent that such Contract (i) is rejected by a Debtor Entity or terminated by a Selling Entity or the other party thereto, or terminates or expires by its terms, prior to the Closing and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to the Buyer of the Debtor Entities' rights under such Contract, if such Consent or Governmental Authorization has not been obtained prior to the Closing.

Section 2.6     Designation of Assets and Liabilities.  At any time on or prior to the third (3rd) Business Day prior to the Closing, the Buyer may, in its sole discretion by written notice to the Seller, (a) designate any of the Purchased Assets as additional Excluded Assets and/or (b) designate any of the Excluded Liabilities as additional Assumed Liabilities, which notice shall set forth in reasonable detail the assets or Liabilities so designated; *provided*, that there shall be no increase or reduction in the Purchase Price in connection with any such designation by the Buyer. Notwithstanding any other provision hereof, the Liabilities of the Selling Entities under or related to any Purchased Asset excluded under this paragraph shall constitute Excluded Liabilities.

Section 2.7     Consents to Certain Assignments.  If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the commercially reasonable efforts of the Selling Entities and Buyer pursuant to Section 2.5(g), any Consent or Governmental Authorization is not obtained prior to Closing and as a result thereof the Buyer shall be prevented by a third party from receiving the rights and benefits with respect to a Purchased Asset intended to be transferred hereunder, or (ii) any Purchased Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Selling Entities shall, prior to the closing of the Bankruptcy Case and subject to any approval of the Bankruptcy Court that may be required and at the request of the Buyer, cooperate with the Buyer in any lawful and commercially reasonable arrangement under which the Buyer would, to the extent practicable, obtain (for no additional cost or consideration) substantially similar economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer, and the Buyer shall assume any related burden and obligation with respect to such Purchased Asset to the extent such burden and obligation would constitute an Assumed Liability if such Purchased Asset was transferred at Closing; *provided*, that the Selling Entities' cooperation obligations contemplated by this Section 2.7 shall not include any obligation by any Selling Entity or any of its Affiliates to pay money (advance or otherwise) to any third party or to incur out-of-pocket expenses unless the Buyer funds such amounts; *provided*, *further*, that the Buyer and Guarantor shall indemnify and hold harmless all Seller Related Parties from and against any and all Liabilities suffered or incurred by them in connection with the provision of any such cooperation provided or any such activities taken in connection therewith.  The Buyer shall cooperate with the Selling Entities in order to enable the Selling Entities to provide to the Buyer the benefits contemplated by this Section 2.7.  The Selling Entities shall as promptly as practicable pay to the Buyer when received all monies received by the Selling Entities attributable to such Purchased Asset from and after the Closing Date and the Buyer shall promptly pay the Selling Entities for all reasonable and documented out-of-pocket costs incurred by the applicable Selling Entities associated with, arising or resulting from such arrangement.

28

Section 2.8    <u>Wrong Pockets</u>.

(a)    During the six (6) month period following the Closing, if either the Buyer or any Selling Entity becomes aware that any right, property or asset forming part of the Purchased Assets has not been transferred to the Buyer or that any right, property or asset forming part of the Excluded Assets or primarily related to the Excluded Businesses has been transferred to the Buyer, such Party shall promptly notify the other Party and the Parties shall, as soon as reasonably practicable thereafter, cause such right, property or asset (and any related Liability) to be transferred at the expense of the Party that is seeking the assets to be transferred to it and with any necessary prior Consent, to (i) the Buyer, in the case of any right, property or asset forming part of the Purchased Assets which was not transferred to the Buyer at or in connection with the Closing, or (ii) the acquiror of the applicable Excluded Asset or Excluded Business, in the case of any right, property or asset forming part of the Excluded Assets or Excluded Businesses which was transferred to the Buyer at the Closing.

(b)    From and after the Closing, if either the Buyer or any Selling Entity or any of their respective Affiliates receives any (i) funds or property that is, in the reasonable determination of the receiving Party, intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall promptly (A) notify and (B) forward such funds or property to, the other Party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such funds or property, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise) or (ii) mail, courier package, facsimile transmission, purchase order, invoice, service request or other document that is, in the reasonable determination of the receiving Party, intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall promptly use commercially reasonable efforts to (A) notify and (B) forward such document or property to, the other Party.

## ARTICLE III
## PURCHASE PRICE; DEPOSIT

Section 3.1    <u>Purchase Price</u>.

(a)    The consideration for the sale and transfer of the Purchased Assets from the Selling Entities to the Buyer shall be: (i) an amount in cash equal to the Cash Purchase Price (including the Deposit) and (ii) the assumption of the Assumed Liabilities by execution of the Assignment and Assumption Agreement (collectively, the "<u>Purchase Price</u>").

(b)    On the Closing Date, the Buyer shall pay or cause to be paid to the Seller or its designee(s), by wire transfer of immediately available funds to an account or series of accounts designated by the Seller prior to the Closing, (i) an amount or amounts in cash equal, in the aggregate, to the Cash Purchase Price, less (ii) the Deposit (which shall be paid to the Seller in accordance with <u>Section 3.2</u>).

Section 3.2    <u>Deposit Escrow</u>. Concurrently with the execution of the Original Agreement, Buyer deposited into escrow with the Escrow Agent an amount equal to two million

29

two hundred fifty thousand dollars ($2,250,000). Concurrently with the execution of this Agreement, Buyer shall deposit any additional amounts required to be deposited following the Auction pursuant to the terms of the Bidding Procedures Order (the amounts so deposited pursuant to the foregoing sentences, together with any interest accrued thereon prior to the Closing Date, the "Deposit") by wire transfer of immediately available funds pursuant to the terms of this Agreement and the Escrow Agreement. The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any of the Parties; *provided,* that the Seller's right to receive the Deposit in accordance with the terms of this Agreement shall be subject to the liens securing the DIP Obligations; *provided, however*, that the Deposit shall not be subject to the lien securing the DIP Obligations or any other lien against Seller. The Deposit shall become payable to the Seller upon the earlier of (i) the Closing, (ii) the termination of this Agreement by (A) the Seller pursuant to Section 9.1(d) or Section 9.1(i), or (B) the Buyer pursuant to Section 9.1(b) or Section 9.1(h) at a time when the Seller could have terminated this Agreement pursuant to Section 9.1(d) (any such termination described in the foregoing clauses (ii)(A) or (ii)(B), a "Buyer Default Termination") or (iii) the event of Fraud by any Buyer Related Party. If the Closing occurs, the Seller shall instruct the Escrow Agent to deliver no later than the Closing Date the Deposit to an account designated by the Seller by wire transfer of immediately available funds as payment of a portion of the Purchase Price. If the Deposit becomes payable to the Seller by reason of a Buyer Default Termination, then either (A) Seller shall instruct the Escrow Agent to disburse, or (B) the Seller shall deliver to the Escrow Agent a final and non-appealable written Order from a court of competent jurisdiction directing the Escrow Agent to disburse, the Deposit to the Seller, in each case in accordance with the Escrow Agreement, and the Escrow Agent shall, within two (2) Business Days after receiving such written instruction or Order, as the case may be, disburse the Deposit to an account designated by the Seller by wire transfer of immediately available funds to the account designated in writing by the Seller to be retained by the Seller for its own account. If this Agreement or the transactions contemplated herein are terminated other than for a termination which constitutes a Buyer Default Termination, the Seller shall instruct the Escrow Agent to, and the Escrow Agent shall, within two (2) Business Days after such instruction, return to the Buyer the Deposit by wire transfer of immediately available funds to the account designated in writing. The Escrow Agent's escrow fees and charges shall be paid by the Seller.

Section 3.3    Allocation. The Buyer shall, not later than sixty (60) days after the Closing Date, prepare and deliver to the Seller an allocation of the Purchase Price (and the Assumed Liabilities and other relevant items, to the extent properly taken into account for Tax purposes) among the Purchased Assets (the "Allocation") in accordance with Section 1060 of the Code, the Treasury Regulations thereunder and other applicable Law for the Seller's review and approval (such approval not to be unreasonably withheld, conditioned or delayed). The Allocation shall be conclusive and binding on the Parties unless the Seller notifies the Buyer in writing that the Seller objects to one or more items reflected in the Allocation, and specify the reasonable basis for such objection, within ten (10) days after delivery to the Seller of the Allocation. In the case of such an objection, the Seller and the Buyer shall negotiate in good faith to resolve any disputed items. Any resolution by the Seller and the Buyer shall be conclusive and binding on the parties once set forth in writing (any such conclusive and binding Allocation, the "Final Allocation"). If the Seller and the Buyer are unable to resolve all disputed items within fifteen (15) days after the delivery of the Seller's written objection to the Buyer, the Buyer and the Seller shall jointly retain a mutually agreed independent internationally recognized accounting firm (the "Accounting Firm") (which may in turn select an appraiser, if needed) to resolve any disputed item(s). The costs, fees and

expenses of the Accounting Firm shall be borne equally by the Buyer and the Seller. The Accounting Firm shall resolve any such dispute within thirty (30) days after the retention, and the Final Allocation shall be adjusted to reflect any such resolution of any disputed item(s). The Parties agree to (and shall cause their affiliates to) file all Tax Returns (including the filing of IRS Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the date of the Closing) consistent with, and shall not take any position in connection with Tax matters that is inconsistent with, the Final Allocation unless otherwise required by a final determination within the meaning of Section 1313 of the Code or any corresponding provision of state, local or non-U.S. Law or as the Buyer or the Seller (as applicable) determines is necessary to settle a dispute with a Tax authority after making good faith efforts to defend the Final Allocation. In the event that a Governmental Authority disputes the Final Allocation, the Party receiving notice of such dispute shall promptly notify the other Party hereto, and the Seller and the Buyer shall, and shall cause their respective Affiliates to, use their reasonable best efforts to defend such Final Allocation in any applicable proceeding. Notwithstanding the foregoing, in administering the Bankruptcy Case, the Bankruptcy Court shall not be required to apply the Final Allocation, and neither the Debtor Entities, nor any other parties in interest, shall be bound by such Final Allocation, for purposes of determining the manner in which the Purchase Price should be allocated either, as between the Selling Entities and their respective estates, or as among the Purchased Assets themselves, for non-tax purposes.

## ARTICLE IV
## THE CLOSING

Section 4.1    Time and Place of the Closing. Upon the terms and subject to the satisfaction or, to the extent permitted by applicable Law, waiver of the conditions contained in Article VIII of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place at the offices of Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, at 8:00 a.m. (eastern time) as promptly as practicable, and at no time later than the third (3rd) Business Day following the date on which the conditions set forth in Article VIII have been satisfied or, to the extent permitted by applicable Law, waived by the applicable Party in writing (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of such conditions at or prior to the Closing), or at such other place and time as the Buyer and the Seller may mutually agree. The date on which the Closing actually occurs is herein referred to as the "Closing Date."

Section 4.2    Deliveries by the Seller. At or prior to the Closing, the Seller shall deliver or cause to be delivered the following to the Buyer:

(a)    the Bill of Sale, duly executed by the Selling Entities;

(b)    the Assignment and Assumption Agreement, duly executed by the Selling Entities;

(c)    the IP Assignment Agreements, duly executed by the applicable Selling Entities;

31

(d)    a copy of the Sale Order as entered by the Bankruptcy Court;

(e)    the certificate contemplated by Section 8.2(c);

(f)    a properly executed IRS Form W-9 from each Selling Entity (or, if applicable, its regarded owner for U.S. federal income tax purposes);

(g)    all analytics accounts, social media accounts, video sharing accounts, web services accounts, domain name accounts, monetization accounts, advertising platform accounts (including Google Ads accounts), and all other accounts of a similar nature primarily related to, or primarily used in, the Business, as set forth on Schedule 4.2(g) of the Seller Disclosure Schedules, including but not limited to full account ownership and access, account related credentials, data and information; and

(h)    the Transition Services Agreement, in form and substance as set forth in Section 7.18, duly executed by the Seller or its appliable Affiliate(s).

Section 4.3    Deliveries by the Buyer.

(a)    At or prior to the Closing, the Buyer shall deliver or cause to be delivered the following to the Seller:

(i)    the Cash Purchase Price, payable in accordance with Section 3.1(b);

(ii)    the Deposit in accordance with Section 3.2;

(iii)    the Bill of Sale, duly executed by the Buyer;

(iv)    the Assignment and Assumption Agreement, duly executed by the Buyer;

(v)    the IP Assignment Agreements, duly executed by the Buyer;

(vi)    the certificate contemplated by Section 8.3(c); and

(vii)    the Transition Services Agreement, in form and substance as set forth in Section 7.18, duly executed by the Buyer.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLING ENTITIES

Except (a) as set forth in the disclosure schedule delivered by the Seller to the Buyer (the "Seller Disclosure Schedule") on the date hereof (with specific reference to the representations and warranties in this Article V to which the information in such schedule relates; *provided*, *however*, that, disclosure in the Seller Disclosure Schedule as to a specific representation or warranty shall qualify any other sections of this Article V to the extent (notwithstanding the absence of a specific cross reference) it is reasonably apparent from the face of such disclosure

that such disclosure relates to such other sections) and (b) such exceptions that result from the filing and commencement of the Bankruptcy Case, including the entry of the Sale Order and any other Orders of the Bankruptcy Court necessary to consummate the Transactions, each Selling Entity hereby represents and warrants to the Buyer (in the case of any assets or liabilities of the Selling Entities, solely with respect to the Purchased Assets and Assumed Liabilities) as follows:

Section 5.1    Organization, Standing and Corporate Power.  Each Selling Entity is a corporation or other entity duly organized, validly existing and, to the extent applicable, in good standing (or its equivalent) under the laws of the jurisdiction of its incorporation or organization and has the requisite corporate or other entity power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted.  Prior to the commencement of the Bankruptcy Case, each Debtor Entity is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified, has not had, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.2    Reserved.

Section 5.3    Authority; Execution and Delivery; Enforceability.  Each of the Selling Entities has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform and comply with each of its obligations hereunder and thereunder and, upon entry and effectiveness of the Sale Order, in accordance with the terms hereof and thereof, will have all necessary corporate or similar authority to consummate the Transactions.  The execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which any Selling Entity is a party, the performance and compliance by the Selling Entities with each of their obligations herein and therein, and the consummation by it of the Transactions have been duly and validly authorized and approved by all necessary corporate or other action on the part of the Selling Entities, and no other corporate or other Proceedings on the part of the Selling Entities and no other stockholder votes are necessary to authorize the execution of this Agreement or the other Transaction Documents, or the performance or consummation by the Selling Entities of the Transactions.  Each Selling Entity has duly and validly executed and delivered this Agreement and will (as of the Closing) duly and validly execute and deliver the other Transaction Documents to which it is a party and, assuming the due authorization, execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is party, and by the other parties to the Transaction Documents, this Agreement constitutes and the other Transaction Documents will constitute (as of the Closing) legal, valid and binding obligations of each Selling Entity, enforceable against such Selling Entity in accordance with its terms, subject in all cases to (a) bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) general equitable principles, whether considered in a proceeding at law or in equity (such exceptions described in the foregoing clauses (a) and (b), collectively, the "Enforceability Exceptions").

Section 5.4    No Conflicts.

(a)     The authorization, execution and delivery of this Agreement and the other Transaction Documents does not and will not, and the performance by the Selling Entities of this Agreement and the other Transaction Documents will not, except to the extent excused by or unenforceable as a result of the filing of the Bankruptcy Case and except for the entry and effectiveness of the Sale Order, with or without notice, lapse of time or both, (i) conflict with or violate any provision of any Selling Entity's organizational or governing documents, (ii) assuming that all consents, approvals, authorizations and permits described in <u>Section 5.4(b)</u> have been obtained and all filings and notifications described in <u>Section 5.4(b)</u> have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law, Permit or Order applicable to any Selling Entity or by which any property or asset of any Selling Entity is bound or affected or (iii) except as set forth in <u>Section 5.4(a)</u> of the Seller Disclosure Schedule, require any consent or approval under, result in any breach of or any loss of any benefit under, constitute a change of control or default (or an event which with notice or lapse of time or both would become a default) under or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of a Encumbrance (other than a Permitted Encumbrance), in each case on or with respect to any Purchased Assets pursuant to or under, any Material Contract or material Permit to which any Selling Entity is party, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which are not, individually or in the aggregate, material to the Business.

(b)     Assuming the accuracy of the representations and warranties of the Buyer in <u>Section 6.3(a)</u>, the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents does not and will not, and the consummation by the Selling Entities of the Transactions and compliance by the Selling Entities with any of the terms or provisions hereof will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) compliance with any applicable requirements under the Regulatory Laws, (ii) the entry of the Sale Order by the Bankruptcy Court and (iii) such other Consents where the failure to obtain such Consents are not, individually or in the aggregate, material to the Business.

Section 5.5    <u>Legal Proceedings and Orders</u>.  Except as described in <u>Section 5.5</u> of the Seller Disclosure Schedule, other than in connection with the Bankruptcy Case, there is no material pending or, to the Knowledge of the Seller, threatened action, suit, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) or investigation pending or being heard by or before, or otherwise involving, any Governmental Authority (each a "<u>Proceeding</u>") against or affecting the Selling Entities, and as of the date hereof, no Person has commenced or, to the Knowledge of the Seller, threatened in writing to commence any Proceeding (a) that relates to and would reasonably be expected to materially and adversely affect any of the Purchased Assets, or (b) that would reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with any of the transactions contemplated by this Agreement.  To the Knowledge of the Seller, except as described in <u>Section 5.5</u> of the Seller Disclosure Schedule, there is no material Order to which any of the Selling Entities, or any of the Purchased Assets is subject.

Section 5.6    <u>Permits</u>.  Except as set forth in <u>Section 5.6</u> of the Seller Disclosure Schedule, other than in connection with or as a result of the Bankruptcy Case, each of the Selling Entities, has all material federal, state, provincial, local and foreign governmental licenses,

franchises, permits, certificates, registrations, consents, certificates, rights, agreements, approvals, orders, exemptions, billing, qualifications and authorizations ("Permits") necessary for the conduct of their business and the use of their properties and assets, as presently conducted and used, and each of the Permits is valid, subsisting and in full force and effect, except as are not material to the Business.

Section 5.7    Compliance with Law.    Each of the Selling Entities is in material compliance and since January 1, 2023, has been in material compliance with all Laws and Orders relating to the Purchased Assets (including the use thereof), except (a) for such past noncompliance as has been remedied and imposes no continuing current or future obligations or costs on such Selling Entity, or (b) except as set forth in Section 5.7 of the Seller Disclosure Schedule.  None of the Selling Entities has received any written citation, complaint, Order, or other communication since January 1, 2023 from a Governmental Authority that alleges that such Selling Entity is not in compliance with any Law or Order, except where any non-compliance, individually or in the aggregate, is not material to the Business.

Section 5.8    Absence of Certain Developments.    Since the Balance Sheet Date, (a) no Material Adverse Effect has occurred, and (b) except as set forth in Section 5.8 of the Seller Disclosure Schedule and other than in connection with the Bankruptcy Case, the Business been conducted, in all material respects in the Ordinary Course of Business.

Section 5.9    Financial Statements.

(a)    Section 5.9(a) of the Seller Disclosure Schedule contains: (i) the Business's consolidated unaudited balance sheet as of March 31, 2025 (such date, the "Balance Sheet Date"), and the related statements of income for the three (3)-month period then ended, and (ii) the Business's consolidated unaudited balance sheet and statements of income for the fiscal year ended December 31, 2024 (all such financial statements referred to in (i) and (ii), the "Seller Financial Statements").  Except as set forth on Section 5.9(a) of the Seller Disclosure Schedule, the Seller Financial Statements present fairly in all material respects the financial condition and results of operations of the Selling Entities as of the times and for the periods referred to therein in all material respects in accordance with GAAP, consistently applied (subject in the case of the unaudited financial statements to (x) the absence of footnote disclosures and other presentation items, and (y) changes resulting from year-end adjustments). Section 5.9(a) of the Seller Disclosure Schedule is qualified by the fact that throughout the period covered by the Seller Financial Statements, (i) the Business has not operated as a standalone entity, but rather as a line of business intermingled with the Excluded Businesses, (ii) the Seller Financial Statements includes allocated figures as between the Business and the Excluded Businesses and (iii) the Seller Financial Statements are not necessarily indicative of what the results of operations or financial position of the respective Excluded Businesses will be in the future.

(b)    The Selling Entities do not have any Liabilities required by GAAP to be reflected or reserved on a consolidated balance sheet of the Seller (or the notes thereto) except (i) as disclosed, reflected or reserved against in the most recent balance sheet included in the Seller Financial Statements or the notes thereto, (ii) for Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date, (iii) for Liabilities arising out of or in connection with this Agreement or the other Transaction Documents, the Transactions or disclosed in Section 5.9(b) of

35

the Seller Disclosure Schedule, (iv) for Liabilities that, individually or in the aggregate, are not material in amount, or (v) Liabilities that will be or are Liabilities of the Selling Entities as debtors in the Bankruptcy Case, and that will not result in any Encumbrance (other than a Permitted Encumbrance) on the Purchased Assets following the entry of the Sale Order.

Section 5.10    Employee Benefit Plans.

(a)    Section 5.10(a) of the Seller Disclosure Schedule sets forth a true and complete list of each material (i) "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to ERISA, (ii) end of service or severance, termination protection, retirement, pension, profit sharing, deferred compensation, phantom, equity or equity-based, health or welfare, employment, independent contractor, vacation, change in control, transaction, retention, bonus or other incentive, fringe benefit, paid time off or similar plan, agreement, arrangement, program or policy, or (iii) other plan, Contract, policy or arrangement providing compensation or benefits, in each case whether or not written, in the case of clauses (i)-(iii), that is sponsored, maintained, administered, contributed to or entered into by any Selling Entity, for the benefit of any of its current or former directors, officers, employees or individual independent contractors (each, a "Service Provider"), (the "Seller Compensation and Benefit Programs").

(b)    With respect to each Seller Compensation and Benefit Program, the Seller has made available to the Buyer, as of the date hereof, or as reasonably practicable thereafter, to the extent applicable, true, correct and complete copies of (i) the current Seller Compensation and Benefit Program document, including any amendments thereto, and all related trust documents, insurance contracts or other funding vehicles, (ii) a written description of such Seller Compensation and Benefit Program if such plan is not set forth in a written document, (iii) the most recent summary plan description together with the summary or summaries of all material modifications thereto, (iv) the most recent IRS determination or opinion letter, (v) the most recent annual report (Form 5500 or 990 series and all schedules and financial statements attached thereto), and (vi) all material and non-routine correspondence to or from the IRS, the United States Department of Labor ("DOL"), the Pension Benefit Guaranty Corporation or any other Governmental Authority received in the last three (3) years prior to the date hereof with respect to such Seller Compensation and Benefit Program.

(c)    Each Seller Compensation and Benefit Program has been administered in accordance with its terms and all applicable Laws in all material respects, including ERISA and the Code. No material Proceeding has been brought, or to the Knowledge of the Seller is threatened, against or with respect to any Seller Compensation and Benefit Program, including any audit or inquiry by any Governmental Authority (other than routine claims for benefits and appeals thereof).

(d)    Each Seller Compensation and Benefit Program that is intended to be qualified under Section 401(a) of the Code has received or is the subject of a favorable determination, opinion or advisory letter from the IRS regarding its tax-qualified status, and to the Knowledge of Seller, nothing has occurred that could reasonably be expected to cause the revocation of such determination letter from the IRS or the unavailability of reliance on such opinion letter from the IRS, as applicable.

(e)      Neither the Selling Entities nor any trade or business that, together with any Selling Entity, would be deemed a single employer within the meaning of Section 414 of the Code, Section 4001 of ERISA or other applicable Laws (each an "ERISA Affiliate") maintains, contributes to, or sponsors (or has in the past six years maintained, contributed to or sponsored), or otherwise has any direct or indirect Liability in respect of, a multiemployer plan as defined in Section 3(37) of ERISA or plan subject to Title IV or Section 302 of ERISA or Section 412 of the Code or other applicable Laws.  No Seller Compensation and Benefit Program provides post-employment health or welfare benefits for any current or former Service Provider (or their dependents), in any jurisdiction, other than as required under Section 4980B of the Code at the participant's sole expense or as required by other applicable Law.

(f)      All contributions, premiums and payments that are due for each Seller Compensation and Benefit Program have been made within the periods prescribed by the terms of each such program and as required by applicable Law.

(g)      No amount that would be received (whether in cash or property or the vesting of property), as a result of the consummation of the transactions contemplated by this Agreement (alone or in conjunction with any other event, including any termination of employment), by any employee, officer, director or other Person with respect to any Selling Entity who is a "disqualified individual" (as such term is defined in proposed Treasury Regulation Section 1.280G-1) under any Seller Compensation and Benefit Program would reasonably be expected to be characterized as an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code).  No Seller Compensation and Benefit Program provides for the gross-up or reimbursement of Taxes under Section 4999 or Section 409A of the Code or otherwise.

(h)      Except as set forth in Section 5.10(h) of the Seller Disclosure Schedule, none of the Selling Entities is a party to, or otherwise bound by, any collective bargaining agreement or other Contract with a Union.  No Employee (in such capacity) is represented by a Union.  To the Knowledge of the Seller, there are no Union organizing activities or demands of any Union for recognition or certification pending or threatened against any Selling Entity, and there have been no such activities or demands for the past three (3) years prior to the date hereof.

Section 5.11    Material Contracts.

(a)      Section 5.11(a) of the Seller Disclosure Schedule sets forth a list of each Material Contract as of the date of this Agreement.  For purposes of this Agreement, "Material Contract" means any of the following types of the Contracts to which a Selling Entity is a party or by which a Selling Entity is bound:

(i)      any Contract for the employment of any officer, individual employee or other person on a full-time or consulting basis providing for base compensation in excess of $150,000 per annum that is not terminable by such Selling Entity upon notice of sixty (60) days or less;

(ii)      any material license of any material Intellectual Property that involves payments (by or to any Selling Entity) in excess of $150,000 per annum and is

37

not terminable by such Selling Entity (other than (x) licenses of commercially available, off-the-shelf software and (y) licenses entered into in the Ordinary Course of Business);

(iii)     any Contract or group of related Contracts with the same party for the purchase of products or services, in either case, under which the aggregate undelivered balance of such products and services has a selling price in excess of $500,000 and which is not terminable by such Selling Entity upon notice of ninety (90) days or less (other than purchase orders entered into in the Ordinary Course of Business);

(iv)     any Contract that contains any provision (A) limiting, in any material respect, the right of the Selling Entities to engage in any business, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated upon notice of ninety (90) days or less, or (y) customer Contracts entered into in the Ordinary Course of Business granting exclusive rights to certain of the Selling Entities' services or containing "most favored nation" provisions with respect to certain of the Selling Entities' products;

(v)     any Contract relating to any acquisition or disposition by such Selling Entity of any business (whether by asset or stock purchase or otherwise) or any merger, consolidation or similar business combination transaction, in each case, pursuant to which such Selling Entity has an outstanding obligation to pay purchase price in excess of $1,000,000;

(vi)     any Contract with any Material Customer or Material Supplier;

(vii)     all Contracts with any Governmental Authority ("Government Contracts"); or

(viii)     any material joint venture or partnership Contract.;

(b)     Each Material Contract is a valid and binding obligation of each Selling Entity thereto, as applicable, and, to the Knowledge of the Seller, the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, (i) as such enforceability may be limited by the Enforceability Exceptions, (ii) as set forth in Section 5.11(b) of the Seller Disclosure Schedule, or (iii) as would not be material to the Business.

(c)     None of the Selling Entities is, and to the Knowledge of the Seller, the other parties thereto are not, in breach of the Material Contracts, and none of the Selling Entities has waived any material rights under any Material Contracts, except, in each case, (i) as a result of the Bankruptcy Case, (ii) as would not be material to the Business, (iii) as set forth in Section 5.11(c) of the Seller Disclosure Schedule, (iv) as may be cured upon entry of the Sale Order and payment of the Cure Payments, or (v) for Contracts that have been or will be rejected in the Bankruptcy Case.

Section 5.12     Intellectual Property; Information Technology.

38

(a)     Section 5.12(a) of the Seller Disclosure Schedule sets forth, as of the date of this Agreement, a complete and accurate list of all material (i) Registered IP, including the Business Marks, and (ii) domain names included in the Business IP, in each case, listing for each entry (as applicable). Except as has not had, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, none of the Registered IP is involved in any opposition, cancellation, nullity, reissue, reexamination or other proceeding or action challenging the validity, enforceability or ownership of such Registered IP.

(b)     To the Knowledge of the Seller, except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, the Business IP together with all Intellectual Property licensed or made available to the Selling Entities pursuant to the Assumed Agreements include all of the material Intellectual Property necessary and sufficient to enable the Buyer to conduct the Business from and after Closing in substantially the same manner as currently conducted by the Seller and its Subsidiaries.

(c)     To the Knowledge of the Seller, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, neither of the Selling Entities is infringing, misappropriating, diluting, or otherwise violating any Intellectual Property rights of any Person. Except as would not reasonably be expected to have a Material Adverse Effect, there is no Proceeding pending and none of the Selling Entities has received any charge, complaint, claim, demand, or notice since January 1, 2023 (or earlier, if presently not fully resolved) alleging: either (i) any such infringement, misappropriation, dilution, or violation or (ii) challenging the use, validity, ownership, or enforceability of any Business IP.

(d)     To the Knowledge of the Seller, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Person is infringing, misappropriating, diluting or otherwise violating any Business IP. No Selling Entity has made or asserted any charge, complaint, claim, demand or notice since January 1, 2023 alleging any such infringement, misappropriation, dilution, or violation.

(e)     Except as, individually or in the aggregate, has not had, or would not reasonably be expected to have, a Material Adverse Effect, to the Knowledge of the Seller, the IT Systems operate as required by the Selling Entities. The Selling Entities have implemented, maintained, and complied with commercially reasonable written information security, business continuity, and backup and disaster recovery programs, plans and procedures that are intended to comply with industry best practices and the Privacy Laws and Security Requirements.

Section 5.13     Data Privacy.  The execution, delivery and performance by the Selling Entities of this Agreement and the Transaction Documents, and the consummation of the Transactions, will not materially violate any Privacy Laws and Security Requirements. The Selling Entities are, and since January 1, 2022 have been, in material compliance with all Privacy Laws and Security Requirements. No Selling Entity has experienced any material breach of security or unauthorized disclosure of any Personal Information. Since January 1, 2022, Selling Entities have not suffered any error, breakdown, failure, security breach, or other incident that has caused any material loss of data, material disruption or material damage to such Selling Entity's operations, or that was reportable to any Governmental Authority or any affected Person. Since January 1, 2022, there have been no written claims, allegations, investigations, inquiries, or complaints, or to

39

the Knowledge of Seller, investigations or inquiries (whether by a Governmental Authority, a Selling Entity customer or website visitor, or any other Person) against any Selling Entity alleging material non-compliance with Privacy Laws and Security Requirements, and to the Knowledge of the Selling Entities there are no facts or circumstances which could form the basis for any such material non-compliance.  The Selling Entities have implemented and maintained commercially reasonable safeguards designed to protect from unauthorized or unlawful access, use, transmittal, interruption, corruption, or modifications to the IT Systems used by the Selling Entities to store, process, or transmit Personal Information within its possession or control as required by applicable Privacy Laws and Security Requirements.

Section 5.14    Taxes.  Except as set forth in Section 5.14 of the Seller Disclosure Schedule:

(a)    all material Tax Returns relating to the Business or the Purchased Assets that are required by applicable Law to be filed by or with respect to any Selling Entity have been timely filed (taking into account any extension of time within which to file), and all such Tax Returns are true, complete, and accurate in all material respects;

(b)    each of the Selling Entities has timely paid all material Taxes relating to the Business or the Purchased Assets due and owing by it (whether or not shown on any Tax Return), including any material Taxes required to be withheld from amounts owing to, or collected from, any employee, creditor, or other third party, other than Taxes not due as of the date of the filing of the Bankruptcy Case as to which subsequent payment was not required by reason of the Bankruptcy Cases or Taxes that are being contested in good faith in appropriate Proceedings, and has complied with all information reporting and backup withholding provisions of applicable Law;

(c)    no deficiencies for material Taxes relating to the Business or the Purchased Assets have been claimed, proposed or assessed by any Governmental Authority in writing against the Selling Entities except for deficiencies which have been fully satisfied by payment, or have been settled or withdrawn;

(d)    there are no audits, examinations, investigations or other proceedings ongoing or pending against or with respect to the Selling Entities with respect to any material Taxes relating to the Business or the Purchased Assets and no written notification has been received by the Selling Entities  that such an audit, examination, investigation or other proceeding has been proposed;

(e)    there are no Encumbrances for material Taxes relating to the Business or the Purchased Assets upon any property or assets of the Selling Entities, except for Permitted Encumbrances; and

(f)    none of the Selling Entities is, and none has been, a party to, or a promoter of, a "listed transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b)(2).

Section 5.15    Insurance.  The Selling Entities are insured with policies in such amounts and with such deductibles and covering such risks as such Selling Entities reasonably believe are generally deemed adequate and customary for their respective industries.  Except as set forth in Section 5.15 of the Seller Disclosure Schedule, all premiums due and payable under the applicable

40

insurance policies of the Selling Entities primarily relating to the Business have been timely paid as of the date of this Agreement. No Selling Entity has been denied in writing any insurance coverage for which it has applied, except as would not have, or would not reasonably be expected to have, a Material Adverse Effect.

Section 5.16    Title to Assets; Real Property.

(a)    The Selling Entities have good and valid title to, or have good and valid leasehold interests in, all tangible personal property that is included in the Business (other than the Excluded Assets), free and clear of all Encumbrances other than Permitted Encumbrances, and except (i) to the extent that such Encumbrances will not be enforceable against such tangible personal property following the Closing in accordance with the Sale Order, (ii) as set forth in Section 5.16(a) of the Seller Disclosure Schedule or (iii) as has not had, or would not reasonably be expected to result in a Material Adverse Effect.

(b)    None of the Selling Entities owns any real property.

Section 5.17    Environmental Matters.

(a)    Except as has not had, or would not reasonably be expected to result in a Material Adverse Effect, none of the Selling Entities has received any written notification of any allegation of actual or potential responsibility for any Release or threatened Release regarding any Hazardous Materials, the subject matter of which has not been resolved.

(b)    Except as has not had, or would not reasonably be expected to result in a Material Adverse Effect, none of the Selling Entities has any material unresolved obligations pursuant to any consent decree or consent order or is otherwise subject to any material unresolved obligations pursuant to any judgment, decree, or judicial or administrative order, in each case, relating to compliance with Environmental Laws, Environmental Permits or to the investigation, sampling, monitoring, treatment, remediation, response, removal or cleanup of Hazardous Materials.

(c)    Except as has not had, or would not reasonably be expected to result in a Material Adverse Effect, neither the Selling Entity has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, released, nor, to the Knowledge of the Seller, exposed any Person to, any Hazardous Materials except in compliance in all material respects with Environmental Laws.

Section 5.18    Brokers.    Except as set forth in Section 5.18 of the Seller Disclosure Schedule, none of the Selling Entities have used any investment banker, broker, finder or similar agent in connection with the Transactions, and no Person is entitled to any investment banker, brokerage, financial advisory, finder's or other similar fee or commission payable by any Selling Entity in connection with the Transactions.

Section 5.19    OFAC; Foreign Corrupt Practices Act; Anticorruption Laws.

(a)    Except as has not had, or would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect, no Selling Entity or, to the Knowledge of

41

Seller, any director, officer, or employee acting on behalf of such Selling Entity, is currently, or during the past three (3) years prior to the date hereof has been, subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

(b) Except as has not had, or would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect, no Selling Entity or, to the Knowledge of the Seller, any director, officer, agent, employee or other person acting on behalf of such Selling Entity has during the past three (3) years prior to the date hereof, in the course of its actions for, or on behalf of, such Selling Entity (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any domestic government official or "foreign official" (as defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (collectively, the "FCPA")) or employee from corporate funds; (iii) violated or is in violation of any provision of the FCPA or any applicable non-U.S. anti-bribery statute or regulation; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

(c) Except as has not had, or would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect, the Selling Entities have implemented and maintain in effect policies and procedures that are designed to ensure material compliance by the Selling Entities with Anticorruption Laws.

Section 5.20    Material Customers; Material Suppliers.

(a) Section 5.20(a) of the Seller Disclosure Schedule sets forth a list of the ten largest customers (measured by revenue) of the Selling Entities, taken as a whole (collectively, the "Material Customers") during the twelve (12) month period ended December 31, 2024. Except as set forth in Section 5.20(a) of the Seller Disclosure Schedule, there has been no written or, to the Knowledge of the Seller, oral notice received from any such party of any termination, cancellation or limitation of, or any materially adverse modification or change in, the business relationship of the Selling Entities with any Material Customer.

(b) Section 5.20(b) of the Seller Disclosure Schedule sets forth a list of the ten largest vendors and suppliers (measured by fees paid or payable) of the Selling Entities, taken as a whole (collectively, the "Material Suppliers") during the twelve (12) month period ended December 31, 2024. Except as set forth in Section 5.20(b) of the Seller Disclosure Schedule, there has been no written or, to the Knowledge of the Seller, oral notice received from any such party of any termination, cancellation or limitation of, or any materially adverse modification or change in, the business relationship of the Selling Entities with any Material Suppliers.

Section 5.21    Affiliate Transactions.  Except as set forth in Section 5.21 of the Seller Disclosure Schedule, no Affiliate of the Seller (other than the Selling Entities), or any officer or director of the Selling Entities (a) is a party to any agreement or transaction with the Selling Entities having a potential or actual value or a contingent or actual liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of the Selling Entities for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course of Business, (ii) employment arrangements in the Ordinary Course of Business and (iii)

42

the Seller Compensation and Benefit Programs, (b) has any material interest in any material property used in the Business by the Selling Entities or (c) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a supplier or customer of the Selling Entities.

Section 5.22    Employment Matters.

(a)    Section 5.22(a) of the Seller Disclosure Schedule contains a list of all persons who are employees, independent contractors or consultants of the Business as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full-time or part-time); (iii) hire or retention date; (iv) current annual base compensation rate or contract fee; and (v) commission, bonus or other incentive-based compensation. As of the date hereof, all compensation, including wages, commissions, bonuses, fees and other compensation, payable and due to all employees, independent contractors or consultants of the Business for services performed on or prior to the date hereof have been paid in full, and there are no outstanding agreements, understandings or commitments of Selling Entities with respect to any overdue compensation, commissions, bonuses or fees, in each case, subject to the treatment in the Bankruptcy Cases.

(b)    Except as set forth in Section 5.22(b) of the Seller Disclosure Schedule, Selling Entities are not, and have not been for the past six (6) years, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "Union"), and there is not, and has not been for the past six (6) years, any Union representing or, to the Selling Entities' Knowledge, purporting to represent any employee of Selling Entities, and, to the Selling Entities' Knowledge, no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. In the past three (3) years, there has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar material labor disruption or dispute affecting any employees of the Business or, with respect to the Business, the Seller.

(c)    Selling Entities are and, for the past six (6) years, have been in material compliance with all material applicable Laws pertaining to employment and employment practices to the extent they relate to employees, volunteers, interns, consultants and independent contractors of the Business, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave and unemployment insurance. All individuals characterized and treated by the Selling Entities as consultants or independent contractors of the Business are properly treated as independent contractors under all applicable Laws in all material respects. All employees of the Business classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified in all material respects. Seller is in material compliance with and has materially complied with all immigration laws, including Form I-9 requirements and any applicable mandatory E-Verify obligations.

43

(d)        There are no Proceedings against Selling Entities pending, or to the Selling Entities' Knowledge, threatened to be brought or filed against Selling Entities, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern, or independent contractor of the Business, including, without limitation, any charge, investigation, or claim relating to unfair labor practices, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, employee classification, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave, unemployment insurance or any other employment related matter arising under applicable Laws.

(e)        Selling Entities are in material compliance with the WARN Act.

(f)        With respect to each Government Contract, Selling Entities are and have been in material compliance with Executive Order No. 11246 of 1965 ("E.O. 11246"), as amended, Section 503 of the Rehabilitation Act of 1973 ("Section 503") and the Vietnam Era Veterans' Readjustment Assistance Act of 1974 ("VEVRAA"), and Executive Order 13706 (Establishing Paid Sick Leave for Federal Contractors) ("E.O. 13706"), each including all implementing regulations.  The Seller maintains and complies with affirmative action plans in material compliance with E.O. 11246, Section 503 and VEVRAA, including all implementing regulations. Seller is not, and has not been for the past three (3) years, the subject of any audit, investigation or enforcement action by any Governmental Authority in connection with any Government Contract or related compliance with E.O. 11246, Section 503, VEVRAA, or E.O. 13706.  The Selling Entities have not been debarred, suspended or otherwise made ineligible from doing business with the United States government or any government contractor.

(g)        The Buyer expressly disclaims any intention to become or status as a successor employer to the Seller with respect to any labor union representing the Selling Entities' Employees or former Employees, and will not assume any obligation to recognize or bargain with any such union, unless otherwise provided or required by applicable Law. Buyer shall establish its own employment terms and conditions for all hired employees, which may differ from those currently in place under Selling Entities' collective bargaining agreement.  Notwithstanding the foregoing, Buyer agrees that, to the extent permitted by Law, Buyer or one of its Affiliates shall be the successor-in-interest to the Selling Entities' immigration petitions solely with respect to the Business.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer hereby represents and warrants to the Selling Entities as follows:

Section 6.1        Organization and Good Standing.        The Buyer is a corporation duly organized, validly existing and, to the extent applicable, in good standing (or its equivalent) under the jurisdiction of its incorporation or organization and has the requisite corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is being conducted on the date hereof.  The Buyer is duly licensed or qualified to do business in each

44

jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except for those licenses or qualifications the absence of which would not prevent or materially delay the consummation of the Transactions.

Section 6.2    <u>Authority Relative to this Agreement</u>.  The Buyer has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is party, to perform and comply with each of its obligations hereunder and thereunder and to consummate the Transactions.  The execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is party, the performance and compliance by the Buyer with each of its obligations herein and therein and the consummation by the Buyer of the Transactions have been duly and validly authorized and approved by all necessary corporate or other action on the part of the Buyer and no other corporate or other proceedings on the part of the Buyer and no stockholder votes are necessary to authorize this Agreement, the other Transaction Documents to which it is party or the performance or consummation by the Buyer of the Transactions.  The Buyer has duly and validly executed and delivered this Agreement, and the other Transaction Documents to which it is party will be duly executed and delivered by the Buyer and, assuming the due and valid authorization, approval, execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents, this Agreement and the other Transaction Documents to which the Buyer is party constitutes or will constitute the Buyer's legal, valid and binding obligation, enforceable against the Buyer in accordance with its terms, subject to the Enforceability Exceptions.

Section 6.3    <u>No Violation; Consents</u>.

(a)    The authorization, execution and delivery of this Agreement or the other Transaction Documents by the Buyer does not and will not, and the performance by the Buyer of this Agreement and the other Transaction Documents to which it is party will not, with or without notice, lapse of time or both, (i) conflict with or violate any provision of the organizational documents of the Buyer, (ii) assuming that all consents, approvals, authorizations and permits described in <u>Section 6.3(b)</u> have been obtained and all filings and notifications described in <u>Section 6.3(b)</u> have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law or Order applicable to the Buyer or its Affiliates, or by which any property or asset of the Buyer is bound or affected or (iii) require any consent or approval under, result in any breach of or any loss of any benefit under, constitute a change of control or default (or an event which with notice or lapse of time or both would become a default) under or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of an Encumbrance on any property or asset of the Buyer, pursuant to, any Contract or Permit to which the Buyer is a party, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which would not reasonably be expected, individually or in the aggregate, to prevent or materially delay the consummation of the Transactions.

(b)    Assuming the accuracy of the representations and warranties of the Selling Entities in <u>Section 5.4(a)</u>, the execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is party does not and will not, and the consummation by the Buyer of the Transactions and compliance by the Buyer with any of the terms or provisions hereof

45

will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) compliance with any applicable requirements under the Regulatory Laws, (ii) the entry of the Sale Order by the Bankruptcy Court or (iii) such other Consents where failure to obtain such Consents would not reasonably be expected, individually or in the aggregate, to prevent or materially delay the Transactions.

Section 6.4    <u>Legal Proceedings and Orders</u>.  Except for the Bankruptcy Case, there is no Proceeding pending, or, to the Knowledge of the Buyer, threatened that, individually or in the aggregate, would reasonably be expected to prevent or materially delay the Transactions, and the Buyer is not subject to any outstanding Order that, individually or in the aggregate, would reasonably be expected to prevent or materially delay the Transactions.

Section 6.5    <u>Brokers</u>.  The Buyer has not used any investment banker, broker, finder or similar agent in connection with the Transactions, and no Person is entitled to any investment banker, brokerage, financial advisory, finder's or other similar fee or commission payable by the Buyer or any of its Affiliates in connection with the Transactions.  Any such fees shall be paid in full by the Buyer.

Section 6.6    <u>Solvency</u>.  Immediately after giving effect to the Transactions, the Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of the Buyer or the Seller.  In connection with the Transactions, the Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 6.7    <u>Financial Capability</u>.  The Buyer (a) has as of the date hereof, and on the Closing Date will have, sufficient funds available to pay the Purchase Price, including the Assumed Liabilities, and any expenses incurred by the Buyer in connection with the Transactions, (b) has as of the date hereof, and on the Closing Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and the other Transaction Documents, and (c) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

Section 6.8    <u>Certain Arrangements</u>.  As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between the Buyer, on the one hand, and any Affiliate or member of the management of the Selling Entities or their respective boards of directors or board of managers (or applicable governing body of any Affiliate of the Selling Entities), any holder of equity or debt securities of the Selling Entities, or any lender or creditor of the Selling Entities or any of their Affiliates, on the other hand, (a) relating in any way to the acquisition of the Purchased Assets, the assumption of the Assumed Liabilities or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Selling Entities to entertain, negotiate or participate in any of the Transactions.

## ARTICLE VII
## COVENANTS OF THE PARTIES

Section 7.1    Conduct of Business of Selling Entities.  Except (u) as set forth on Section 7.1 of the Seller Disclosure Schedule, (v) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (w) as required by applicable Law, Order or a Governmental Authority, (x) to the extent related to an Excluded Asset, an Excluded Liability or an Excluded Business, (y) as contemplated or required by the terms of any Transaction Document, or (z) as otherwise consented to in writing by the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms:

(a)    each of the Selling Entities shall, use commercially reasonable efforts to (taking into account in each case (A) the fact that the Bankruptcy Case has commenced, (B) the fact that the Business will be operated while in bankruptcy, (C) the fact that the operation of the Business may require additional financing, and (D) the fact that the continuing operation of the Business, including payments to suppliers, will be subject to the approval of the Bankruptcy Court) (i) operate the Business in the Ordinary Course of Business and (ii) preserve in all material respects the Purchased Assets; and

(b)    the Selling Entities shall not:

(i)    acquire any material assets, securities, properties, interests or businesses for the conduct of the Business, tangible or intangible, other than in the Ordinary Course of Business (including in respect of any Accounts Receivable);

(ii)    sell, lease (as lessor), transfer or otherwise dispose of (or permit to become subject to any additional material Encumbrance, other than (A) Permitted Encumbrances, (B) Encumbrances arising under any Order of the Bankruptcy Court relating to the use of cash collateral (as defined in the Bankruptcy Code) or (C) Encumbrances arising in connection with any debtor-in-possession financing of the Selling Entities) any material Purchased Assets, in each case, except for (1) non-exclusive licenses of Business IP granted in the Ordinary Course of Business, (2) the collection of receivables or the payment of payables, (3) the use of prepaid assets or amounts and Documentary Materials in the conduct of the Business and (4) the replication and transfer of any software or data contained in the Business IP which is used in an Excluded Business as of the Closing for purposes of the transfer and use of such software and data to and by a subsequent acquiror of a Excluded Business;

(iii)    incur or make any material capital expenditures that would be an Assumed Liability, except (A) to the extent permitted by the terms of the Selling Entities' existing financing arrangements (including any existing debtor-in-possession financing), (B) capital expenditures made in the Ordinary Course of Business or (C) capital expenditures that are provided for in any Selling Entity's budget for calendar year 2025;

47

(iv)    amend in any material and adverse respect or voluntarily terminate any Assumed Agreement other than in the Ordinary Course of Business; *provided*, that no Selling Entity shall be required to enter into any extension or amendment with respect to any Assumed Agreement that would otherwise terminate prior to the Closing;

(v)    merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(vi)    amend the certificate of incorporation, bylaws or comparable organizational documents of any Selling Entity in a manner that materially delay or impede the Selling Entities' ability to consummate the Transactions;

(vii)    incur any material indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness, in each case that would constitute an Assumed Liability, other than (A) the DIP Obligations, (B) in accordance with the DIP Order or (C) accounts payable or other amounts payable in the Ordinary Course of Business;

(viii)    make any material loans, advances or capital contributions to, or investments in, any other Person (other than any other Selling Entity) with respect to the Business;

(ix)    make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP;

(x)    commence, settle or propose to settle any material Proceedings that could reasonably be expected to materially diminish the value of the Purchased Assets or impair title thereto, in each case other than (A) any Proceeding in respect of which any related liability is covered by an insurance policy, (B) any Proceeding involving an amount less than $500,000 or (C) any Proceeding that would otherwise be settled in the Ordinary Course of Business;

(xi)    materially change any Tax accounting elections, methods, principles or practices relating to the Business or the Purchased Assets, except insofar as may be required by applicable Law or GAAP; or

(xii)    authorize any of the foregoing, or commit or agree to do any of the foregoing.

Section 7.2    <u>Conduct of Business of the Buyer</u>.  The Buyer agrees that, between the date of this Agreement and the Closing, it shall not, and shall cause its Affiliates not to, directly or indirectly, take any action that would, or would reasonably be expected to, individually or in the aggregate, prevent or impede, interfere with or delay the consummation of the Transactions, except as required by any Order of the Bankruptcy Court, as required by applicable Law, or as otherwise consented to in writing by the Seller.

Section 7.3    <u>Access to and Delivery of Information; Maintenance of Records</u>.

(a)     From the entry of the Sale Order until the earlier of the Closing and the termination of this Agreement, to the extent permitted by applicable Law, the Selling Entities shall, during ordinary business hours and upon reasonable prior notice (i) give the Buyer and the Buyer's Representatives reasonable access to the Seller's accountants, counsel, financial advisors and other authorized outside representatives, officers and senior management in their respective principal places of business, all books, records and other documents and data in the locations in which they are normally maintained, and all offices and other facilities of the Selling Entities related to the Business; *provided, however*, that, in connection with such access, the Buyer and the Buyer's Representatives shall minimize disruption to the Business and shall not disrupt the Bankruptcy Case and the Auction; *provided, further,* that in connection with the Buyer's and/or the Buyer's Representatives' access of such offices and other facilities, the Buyer and/or the Buyer's Representatives shall be accompanied at all times by a representative of the Selling Entities unless the Seller otherwise agrees, shall not materially interfere with the use and operation of such offices and other facilities, and shall comply with all reasonable safety and security rules and regulations for such offices and other facilities, (ii) permit the Buyer and the Buyer's Representatives to make such reasonable inspections and copies of all books, records and other documents of the Selling Entities related to the Business as the Buyer may reasonably request and (iii) furnish the Buyer with such reasonably available financial and operating data and other information as the Buyer and the Buyer's Representatives may from time to time reasonably request. Notwithstanding anything to the contrary set forth in this Section 7.3, no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client, attorney work product or other privilege, or would reasonably be expected to breach or violate any Contract to which any Selling Entity is a party (or is bound by or whose assets or properties are bound by or subject to) or any applicable Law. The Buyer agrees to, and will cause its Representatives to, sign any access letters required in connection with any such provision of information or access or the conduct of any such investigation or examination contemplated by this Section 7.3(a) and Section 7.3(b). Notwithstanding anything to the contrary herein, in no event shall any of the Selling Entities or their respective Affiliates be required to provide the Buyer or any of its Affiliates or their respective Representatives with access to or copies of any trade secrets related to the Business at any time prior to the Closing,

(b)     Between the Closing Date and the complete dissolution and liquidation of the Selling Entities, the Buyer and the Buyer's Representatives shall have reasonable access to the Selling Entities' books and records, including all information pertaining to the Assumed Agreements in the possession of the Selling Entities to the extent that (i) such books, records and information relate to any period prior to the Closing Date and are not already in the possession of the Buyer or the Buyer's Representatives and (ii) such access is reasonably required by the Buyer in connection with the Assumed Liabilities, the operation of the Business following the Closing or the Purchased Assets. Such access shall be afforded by the Seller upon receipt of reasonable advance notice and during normal business hours and without undue disruption to its business or that of any other Selling Entity. If any of the Selling Entities shall desire to dispose of any books and records constituting Excluded Assets prior to its dissolution, the Seller shall (x) give the Buyer at least thirty (30) days prior written notice of such disposition and (y) give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records exclusively relating to the Purchased Assets and the Assumed Liabilities as the Buyer may select and/or to copy at the Buyer's sole cost and expense such books and records exclusively relating to the Purchased Assets and the Assumed Liabilities as the Buyer may select. Notwithstanding anything

49

to the contrary set forth in this <u>Section 7.3(b)</u>, no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client, attorney work product or other privilege, or would breach or violate any Contract to which any Selling Entity is a party (or is bound by or whose assets or properties are bound by or subject to) or any applicable Law (including the Retained Records).

        (c)      Between the Closing Date and the complete dissolution and liquidation of the Selling Entities, the Selling Entities and their Representatives shall have reasonable access to all of the books and records of the Selling Entities delivered to the Buyer at Closing or pursuant to <u>Section 7.3(b)</u> above, including all Documentary Materials and all other information pertaining to the Assumed Agreements to the extent that (i) such books, records and information relate to any period prior to the Closing Date or the winding down of any of the remaining business, assets or liabilities of the Selling Entities, the dissolution and liquidation of the Selling Entities, the performance of the obligations of the Selling Entities hereunder and under the other Transaction Documents or any Excluded Asset or Excluded Liability and (ii) such access is reasonably required by the Debtor Entities in connection with the Bankruptcy Case, the Excluded Liabilities or the Excluded Assets.  Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours and without undue disruption to its business, and the Buyer shall permit the Selling Entities and their Representatives to make such reasonable copies of such books, records and information as they may reasonably request.

        (d)      Between the Closing Date and the complete dissolution and liquidation of the Selling Entities, the Selling Entities and their Representatives shall have reasonable access to, and the reasonable assistance of, the employees of the Buyer, and to the assets, software and systems of the Buyer, in connection with the winding down of any remaining business and assets of the Selling Entities, the dissolution and liquidation of the Selling Entities, and the performance of the obligations of the Selling Entities hereunder and under the other Transaction Documents, and the Buyer shall cooperate, to the extent reasonably requested, therewith; *provided, however*, that such access or assistance does not interfere in any material respect with the operation of the Business following the Closing; and *provided, further,* that should the Selling Entities request assistance above and beyond that contemplated by this <u>Section 7.3(d)</u> (e.g., as to the incurrence by the Buyer of out-of-pocket expenses), the Buyer will cooperate reasonably with the Selling Entities subject to the Selling Entities' reimbursement of such actual out-of-pocket expenses.

        (e)      Except as expressly contemplated by this Agreement, the Buyer and its Affiliates and their respective Representatives (including counsel, accountants and financial advisors) shall not contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of the Selling Entities prior to the Closing with respect to the Selling Entities, the Business or the Transactions, without the prior written consent of the Seller for each such contact, such consent not to be unreasonably withheld, conditioned or delayed.

        (f)      All information obtained by the Buyer or the Buyer's Representatives pursuant to this <u>Section 7.3</u> shall be subject to the terms of the Confidentiality Agreement.

        Section 7.4    <u>Expenses</u>.  Except to the extent otherwise specifically and expressly provided herein or in the Sale Order, whether or not the Transactions are consummated, all costs

US-DOCS\161371711.3

and expenses incurred in connection with this Agreement and the Transactions shall be borne by the Party incurring such costs and expenses.

Section 7.5    <u>Further Assurances</u>.

(a)    Subject to the terms and conditions of this Agreement, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with its terms, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions.

(b)    From time to time, on or after the Closing Date until the dissolution and liquidation of the Selling Entities, as and when requested by either Party and at such requesting Party's expense, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Purchased Assets that may be in the possession of the Selling Entities or their Affiliates to the Buyer).

(c)    Except as set forth herein, nothing in this <u>Section 7.5</u> shall (i) require the Selling Entities to make any expenditure or incur any obligation on their own or on behalf of the Buyer, (ii) prohibit any Selling Entity from ceasing operations or winding up its affairs following the Closing, or (iii) prohibit the Selling Entities from taking such actions as are necessary to conduct the Auction, as are required by the Bankruptcy Court or as would otherwise be permitted under <u>Section 7.1</u>.

Section 7.6    <u>Public Statements</u>.  Unless (a) in the reasonable judgment of the disclosing Party after consultation with counsel, otherwise required by or necessary to comply with applicable Law, the rules or regulations of any applicable securities exchange or as may be requested by a Governmental Authority (provided that, to the extent reasonably practicable and legally permissible, the disclosing party consults with the other party prior to making such disclosure), (b) except for disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and any filings or notices related thereto, or (c) except for any such press release or announcement that is consistent with previous public statements made jointly by or otherwise agreed between the Buyer and the Selling Entities, the Buyer, on the one hand, and the Selling Entities, on the other hand, shall consult with and provide each other the opportunity to review and comment before issuing any press release or otherwise making any public statement with respect to this Agreement, the Transactions or the activities and operations of the other Parties and shall not issue any such release or make any such statement without the prior written consent of the Seller or the Buyer, respectively (such consent not to be unreasonably withheld, conditioned or delayed).  Notwithstanding the foregoing and subject to <u>Section 7.3(f)</u>, the Selling Entities and their Affiliates may, without such consultation or consent, in the ordinary course of business make confidential communications to existing or prospective general and limited partners, equity holders, members, managers and investors of such Person or any Affiliates of such Person, in each case, who are subject to customary confidentiality restrictions.

51

Section 7.7    <u>Governmental Authority Approvals and Cooperation</u>.

(a)    Each of the Buyer and the Seller shall, as promptly as reasonably practicable after the date of this Agreement (and, in any event, within ten (10) Business Days), file with the United States Federal Trade Commission (the "<u>FTC</u>") and the United States Department of Justice (the "<u>DOJ</u>") the notification and report form, to the extent the Parties determine that such filing is required to be filed with respect to the transactions contemplated hereby and any supplemental information requested in connection therewith pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>").  Any such notification and report form and supplemental information shall be in substantial compliance with the requirements of the HSR Act.  In addition, each party agrees to make, or to cause to be made, as promptly as reasonably practicable any filing that may be required under any other Regulatory Law.  The Buyer shall pay all filing fees and other charges for the filing required under any Regulatory Law by the Buyer and the Selling Entities.  Each of the Buyer and the Seller shall (and shall cause their respective Affiliates to) furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the HSR Act.  The Seller and the Buyer shall keep each other apprised of the status of any substantive communications with, and any inquiries or requests for additional information from, the FTC and the DOJ relating to the transactions contemplated hereby.  If such a filing is made, each of the Buyer and the Seller shall use its reasonable best efforts to obtain any clearance required under the Regulatory Laws for the consummation of the transactions contemplated hereby as promptly as practicable.

(b)    The Buyer shall use reasonable best efforts to resolve such objections, if any, as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other applicable United States federal or state or foreign Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition or any Laws with respect to foreign investment (collectively, the "<u>Regulatory Laws</u>").  Notwithstanding anything to the contrary provided herein, the Buyer agrees to use its reasonable best efforts, and to take any and all steps necessary, to eliminate each and every impediment under any Regulatory Law that is asserted by any Governmental Authority or any other Person so as to enable the Parties hereto to expeditiously close the transactions contemplated hereby, prior to the Outside Date, including (i) proposing, negotiating, committing to and effecting, by hold separate orders, or otherwise, the sale, divesture or disposition of its assets, properties or businesses or any of the Purchased Assets, or entering into any consent decree or settlement agreement with any Governmental Authority, (ii) agreeing to limitations on the operation or conduct of the Buyers' or the Selling Entities' businesses or operations, including the Business, or (iii) waiving any of the applicable conditions to this Agreement set forth in Article VIII; provided however, the Buyer shall not be required to take or agree or commit to take any action, or to limit or agree to limit its freedom of action or that of the Seller, that would, in the reasonable good faith judgment of the Buyer, be reasonably likely to materially impair the benefits or advantages it expects to receive from the transactions contemplated hereby. Without limiting the foregoing, the Buyer further agrees to use its reasonable best efforts to defend through litigation on the merits any claim asserted in court by any party in order to avoid entry of, or to have vacated

52

or terminated, any decree, order or judgment (whether temporary, preliminary or permanent) that would prevent the Closing from occurring prior to the Outside Date.

(c)     Each Party (i) shall cooperate with each other Party in connection with the filings and Consents contemplated by this <u>Section 7.7</u>, (ii) shall promptly inform each other Party of any substantive communication received by such Party from any Governmental Authority (other than the Bankruptcy Court) concerning this Agreement, the Transactions and any filing, notification or request for Consent related thereto, and (iii) shall permit each other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority (other than the Bankruptcy Court) in response thereto and in good faith consider the other Party's reasonable comments on drafts of any such communication or information.  In addition, none of the Selling Entities or the Buyer shall (and shall ensure that their respective Affiliates do not) agree to participate in any substantive meeting, discussion, telephone call or conference with any Governmental Authority (other than the Bankruptcy Court) in respect of any filings, investigation or other inquiry with respect to this Agreement, the Transactions or any such filing, notification or request for Consent related thereto unless it consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority and applicable Law, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable.  The Selling Entities and the Buyer shall, and shall cause their respective Affiliates to, furnish the Buyer or the Selling Entities (and the Buyer's Representatives and the Seller's Representatives, as applicable), as the case may be, copies of all material correspondence, filings and communications between it and its Affiliates (and the Buyer's Representatives and the Seller's Representatives, as applicable) on the one hand, and the Governmental Authority (other than the Bankruptcy Court) or members of its staff on the other hand, with respect to this Agreement, the Transactions or any such filing, notification or request for Consent related thereto (in each case, excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine).  Each of the Selling Entities and the Buyer shall (and shall cause their respective Affiliates to) furnish each other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with its preparation of necessary filings, registrations or submissions of information to any Governmental Authority in connection with this Agreement, the Transactions and any such filing, notification or request for Consent related thereto.

(d)     The Buyer shall not take any action, or refrain from taking any action, or permit any action to be taken or not taken, that would reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with the ability of the Parties to consummate any of the Transactions.  Without limiting the generality of the foregoing, the Buyer shall not, and shall not permit any of its Affiliates to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation could reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or order of any Governmental Authority necessary to consummate any of the Transactions or the expiration or termination of any applicable

waiting period, (ii) increase the risk of any Governmental Authority entering an order prohibiting the consummation of the Transactions or (iii) delay the consummation of the Transactions.

Section 7.8    <u>Employee Matters</u>.

(a)    Commencing on Closing, at the Buyer's sole discretion, the Buyer may, or may cause one of its Affiliates to, make an offer of employment to any or all of the Employees (each such Employee, an "<u>Offered Employee</u>"), and such offer shall provide for sufficiently comparable employment as in effect immediately prior to Closing so as to not constitute an "employment loss" (as defined under the WARN Act) for such Offered Employee. The employment of each Employee by Buyer or Buyer's Affiliate shall be subject to Buyer's reasonable screening procedures and compliance with Buyer's or Buyer's Affiliate's standard employment practices.  The Selling Entities shall cooperate with and use their commercially reasonable efforts to assist the Buyer in its efforts to secure satisfactory employment arrangements with the Offered Employees. Each Offered Employee who accepts such an offer of employment with the Buyer or an Affiliate is referred to herein as a "<u>Transferred Employee</u>", and the Buyer or an Affiliate shall employ each Transferred Employee in accordance with such accepted offer as of the Closing.  Each Offered Employee who is not a Transferred Employee, shall be referred to herein as a "<u>Specified Employee</u>." Seller agrees that its officers shall not, and its representatives shall be instructed not to, make any representations or statements in an official capacity, whether oral or written, to any Employees regarding (i) the terms and conditions that may be offered by the Buyer or Buyer's Affiliates, or (ii) whether any such Employee will be offered employment by, or become employed by, the Buyer or Buyer's Affiliates following Closing, that are not consistent with this Agreement.  Seller agrees that all written communications with Employees and all presentation materials for town hall or similar broad-based meetings with Employees regarding potential employment with Buyer or Buyer's Affiliates shall be subject to prior review and written approval by the Buyer, with such approval not to be unreasonably withheld, conditioned or delayed and which approval shall be required to occur within two (2) days following the request thereof, and the absence of which shall be deemed approval.

(b)    The Selling Entities may elect to continue the employment of any Specified Employee following the Closing (such an Employee, a "<u>Retained Employee</u>").  Effective at or prior to the Closing, the Selling Entities shall terminate the employment of each Specified Employee (other than a Retained Employee).

(c)    Buyer or one of its Affiliates, to the extent permitted by Law, shall be the successor-in-interest to the Selling Entities' immigration petitions solely with respect to the Transferred Employees.

(d)    Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.

54

(e)     Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Notwithstanding the foregoing, to the extent required by applicable Law, the Buyer shall assume, pay and discharge the Liabilities of the Selling Entities under Section 4980B of the Code ("COBRA") (and any comparable state law) for all individuals who are "M&A qualified beneficiaries," as such term is defined in U.S. Treasury Regulation Section 54.4980B-9, from and after the Closing. The Buyer hereby acknowledges that it will be a "successor employer" for purposes of U.S. Treasury Regulation Section 54.4980B-9 . Seller also shall remain solely responsible for all workers' compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date.

(f)     Transferred Employees shall receive credit for all purposes (including for purposes of eligibility to participate, vesting, future benefit accrual and eligibility to receive benefits) under any Buyer benefit plan under which each Transferred Employee may be eligible to participate on or after the Closing to the same extent recognized by the Seller under comparable Seller Compensation and Benefit Programs as of the date hereof; provided, however, that such crediting of service shall not operate to duplicate any benefit or the funding of any such benefit or grant service credit with respect to benefit accrual under any defined benefit pension plan.

(g)     Nothing in this Agreement is intended to (i) be treated as an amendment to any particular Seller Compensation and Benefit Program, (ii) prevent the Buyer or its Affiliates, after the Closing, from terminating the employment of any Transferred Employee or other Service Provider, or (iii) create any third-party beneficiary rights in any Employee or Service Provider employee, any beneficiary or dependent thereof, or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any Employee or Service Provider or under any Seller Compensation and Benefit Program or any other plan maintained by the Buyer or its Affiliates.

Section 7.9     Tax Matters.

(a)     Any sales, use, goods and services, harmonized sales, property transfer or gains, documentary, stamp, registration, recording, value added, or similar Tax payable in connection with the sale or transfer of the Purchased Assets and the assumption of the Assumed Liabilities ("Transfer Taxes") shall be borne and paid by the Buyer.  The Buyer shall pay any Transfer Taxes either to the appropriate Selling Entities or to the relevant Governmental Authorities as required by applicable Law.  The Selling Entities and the Buyer shall (and shall cause their respective Affiliates to) use their commercially reasonable efforts and cooperate in good faith to minimize the incidence of any Transfer Taxes.  The Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes to the extent permitted under applicable Tax Law.  The Buyer shall reimburse the Seller and its Affiliates for any Transfer Taxes borne by the Seller or such Affiliates.

(b)     For purposes of this Agreement, all Taxes and Tax Liabilities with respect to the Business and the Purchased Assets that relate to the Straddle Period shall be apportioned

between the Pre-Closing Tax Period and Post-Closing Tax Period as follows: (i) in the case of property and similar Taxes on a per-diem basis, and (ii) in the case of all other Taxes (other than Transfer Taxes), as though the taxable year terminated at the close of business on the Closing Date.

(c)     The Seller and the Buyer agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance as is reasonably necessary for the filing of Tax Returns, the making of any election relating to Taxes, the preparation for any audit or other proceeding by Governmental Authority and the prosecution or defense of any claim, suit or other proceeding relating to any Tax.  Such information and assistance shall include providing reasonable access to any of the books and records of the Selling Entities retained by the Selling Entities or delivered to the Buyer at Closing or provided pursuant to Section 7.3(b).  Access to books and records shall be afforded upon receipt of reasonable advance notice and during normal business hours.

(d)     The Parties agree to treat any payment made from one Party to another pursuant to this Agreement that is not reflected as part of the Purchase Price under this Agreement as an adjustment to the Purchase Price for all income Tax purposes, unless otherwise required by applicable Law.

Section 7.10    Submission for Bankruptcy Court Approval.

(a)     All of the Parties shall use their respective commercially reasonable efforts to have the Sale Hearing no later than thirty (30) days from the Petition Date and to have the Sale Order entered no later than three (3) Business Days after the conclusion of the Sale Hearing.  The Buyer agrees that it will promptly take such actions as are reasonably requested by the Debtor Entities to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Buyer under this Agreement and any Assumed Agreements and demonstrating that the Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. The Debtor Entities shall give notice under the Bankruptcy Code of the request for entry of the Sale Order to all Persons entitled to such notice, including all Persons that have asserted Encumbrances in the Purchased Assets and all non-debtor parties to the Assumed Agreements, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement or the Transactions.  The Debtor Entities shall be responsible for making all appropriate filings relating to this Agreement or the Transactions with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to the Buyer prior to their filing with the Bankruptcy Court for the Buyer's prior review.

(b)     An initial list of the agreements, contracts and other leases that may ultimately constitute the Assumed Agreements (as amended, modified or supplemented from time to time, the "Cure Schedule") shall be filed no later than the deadline established by the Bidding Procedures Order.  The Cure Schedule shall describe the potential Assumed Agreements in sufficient detail to provide adequate notice to the non-debtor parties to such Contracts.  Upon revision of Section 2.1(c) of the Seller Disclosure Schedule in accordance with Section 2.5(b), the Seller shall add any Assumed Agreements to the Cure Schedule or remove any Assumed

56

Agreements (other than Assumed Agreements irrevocably designated for assumption pursuant to Section 2.5(d)) from such exhibit, as applicable.  The Cure Schedule shall set forth the amounts necessary to cure defaults under each Assumed Agreement shown thereon, as reasonably determined in good faith by the Seller.  In cases in which the Seller is unable to establish that a default exists, the relevant cure amount shall be set at $0.00.

(c)    Each Debtor Entity and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect, the Bankruptcy Court's entry of the Sale Order.

(d)    If the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order and the Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Selling Entities and the Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion, in each case, that will facilitate consummation of the Transactions.

Section 7.11   Overbid Procedures; Adequate Assurance.

(a)    The Selling Entities and the Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval.  The Buyer and the Selling Entities acknowledge that the Selling Entities must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Selling Entities and other interested parties, providing information about the Selling Entities' business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "Auction").

(b)    The bidding procedures to be employed with respect to this Agreement and any Auction shall be those set forth in the Bidding Procedures Order.  The Buyer agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as approved by the Bankruptcy Court; *provided*, that the Bidding Procedures Order shall require any overbid to equal or exceed the Purchase Price plus the sum of the Termination Fee and Expense Reimbursement plus an incremental bid of three-hundred thousand dollars ($300,000). The Buyer agrees and acknowledges that the Selling Entities and their Affiliates and the Seller's Representatives are and may continue soliciting inquiries, proposals or offers for the Purchased Assets in connection with any alternative transaction pursuant to the terms of the Bidding Procedures Order and agrees and acknowledges that the bidding procedures contained in the Bidding Procedures Order may be supplemented by other customary procedures not inconsistent with the matters otherwise set forth therein and the terms of this Agreement.

(c)    If an Auction is conducted, and the Buyer is not the prevailing bidder at the Auction but is the next highest bidder at the Auction, the Buyer shall serve as a back-up bidder (the "Back-up Bidder") and keep the Buyer's bid to consummate the Transactions on the terms

and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable, notwithstanding any right of the Buyer to otherwise terminate this Agreement pursuant to Article IX hereof.  Following the Sale Hearing, if the prevailing bidder in the Auction fails to consummate the Third-Party Sale as a result of a breach or failure to perform on the part of such prevailing bidder and the purchase agreement with such prevailing bidder is terminated, the Back-up Bidder (as the next highest bidder at the Auction) will be deemed to have the new prevailing bid, and the Selling Entities will be authorized, without further order of the Bankruptcy Court, to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with the Back-up Bidder so long as the Buyer has not previously terminated this Agreement in accordance with its terms; *provided, however*, that if Buyer is designated as the Back-up Bidder, its offer to consummate the Transactions as set forth herein shall automatically expire on the thirtieth (30th) day following the Auction, unless such time period is extended in writing by Buyer.

(d)     The Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by the Buyer of each Assumed Agreement.  The Buyer agrees that it will, and will cause its Affiliates to, promptly take all actions required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Agreements, including furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making the Buyer's Representatives available to testify before the Bankruptcy Court.

(e)     The Selling Entities and the Buyer agree, and relevant Bankruptcy Court filings shall reflect, the fact, that the provisions of this Agreement, including this Section 7.11 and Section 7.12, are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best price for the Purchased Assets.

(f)     Nothing in this Agreement, including this Section 7.11, shall require any director or officer of any Selling Entity to violate their fiduciary duties to such Selling Entity.  No action or inaction on the part of any director or officer of any Selling Entity that such director or officer reasonably believes is required by their fiduciary duties to such Selling Entity shall be limited or precluded by this Agreement; *provided, however*, that no such action or inaction shall prevent the Buyer from exercising any termination rights it may have hereunder as a result of such action or inaction.

Section 7.12     Termination Fee; Expense Reimbursement.

(a)     The Buyer shall be entitled to receive from Seller, without further order of the Bankruptcy Court, an amount in cash equal to four-hundred fifty-thousand dollars ($450,000) (the "Termination Fee") plus an amount of cash equal to the reasonable, actual, necessary and documented costs and out-of-pocket expenses incurred by Buyer in connection with its legal, accounting and business due diligence and the preparation and negotiation of this Agreement up to a maximum of three-hundred thousand dollars ($300,000) (the "Expense Reimbursement") if an Auction takes place and the Buyer is not identified as the Successful Bidder, (i) at the time the Successful Bidder is identified, the Buyer is not in material breach of this Agreement (or, in the event that the Buyer is identified as Back-Up Bidder, the Buyer is not in material breach of this

58

Agreement at the time the Termination Fee would otherwise be payable), (ii) the Buyer has not terminated this Agreement (other than in accordance with Section 9.1(f)(i)) and (iii) a sale of all or substantially all of the Purchased Assets to a Person (a "Third-Party") other than the Buyer or an Affiliate of the Buyer (a "Third-Party Sale") is consummated.

(b)    If the Termination Fee or Expense Reimbursement becomes payable pursuant to this Section 7.12, such Termination Fee or Expense Reimbursement shall be made by wire transfer of immediately available funds to an account designated by the Buyer, solely from the proceeds of the applicable Third-Party Sale, and such payment shall be made on or before the fifth (5th) Business Day following the consummation of such Third-Party Sale. The claim of the Buyer in respect of the Termination Fee or Expense Reimbursement, as applicable, shall constitute a super-priority administrative expense claim, senior to all other administrative expense claims of the Selling Entities, as administrative expenses under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case and shall be paid in cash, prior to delivery of any sale proceeds to any Third-Party including any secured lender; *provided*, that such super-priority claim shall be junior to the Adequate Protection Superpriority Claims granted under the DIP Order in respect of the DIP Obligations, and the adequate protection payments and other obligations set forth in the DIP Order.

(c)    The Parties acknowledge and agree that the Buyer's entitlement to the Termination Fee and Expense Reimbursement under Section 7.12(a) and Section 7.12(b) will constitute liquidated damages (and not a penalty) and then notwithstanding anything to the contrary contained herein, such Termination Fee and Expense Reimbursement shall be the sole and exclusive remedy available to the Buyer and any other Person against the Seller Related Parties in connection with this Agreement, the Transaction Documents and the Transactions (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and the Seller Related Parties shall not have any further Liability relating to or arising out of this Agreement, the Transaction Documents or the Transactions.  For the avoidance of doubt, (i) under no circumstances shall the Buyer or any of its Affiliates be entitled to monetary damages other than receipt of the Termination Fee under Section 7.12(a) and the Expense Reimbursement under Section 7.12(b), (ii) no Termination Fee or Expense Reimbursement shall be payable, and the Buyer shall not seek payment of any Termination Fee or Expense Reimbursement, prior to consummation of a Third-Party Sale, and (iii) and in no event shall the Seller be obligated to pay the Termination Fee or Expense Reimbursement on more than one occasion.

Section 7.13    Transfer of Purchased Assets; Substitution of Letters of Credit; Payments Received.

(a)    The Buyer will make all necessary arrangements for the Buyer to take possession of the Purchased Assets, and, at the Buyer's expense, to transfer the same to a location owned or operated by the Buyer, to the extent necessary, as promptly as practicable following the Closing.

(b)    On the Closing Date, the Buyer shall, at its sole cost and expense, (i) replace any letters of credit, banker's acceptance or similar credit transaction that secure any Liabilities of any Selling Entity relating to the Business and (ii) cause such letters of credit, banker's acceptance

or similar credit transaction to be released and returned to the Seller or other Selling Entities, as applicable.

Section 7.14    Intellectual Property Matters.

(a)    Seller Name Changes.  Promptly (but in no event later than one hundred eighty (180) days) following the Closing Date (or such reasonable longer period as necessary to effectuate the orderly wind-down of Selling Entities in accordance with applicable law (the "Wind-Down") or any dissolution of such entity if a Selling Entity is winding down or dissolving), the Selling Entities shall, and shall cause their respective Affiliates to, use commercially reasonable efforts to obliterate, mask or remove all Business Names from all public facing assets that are owned by (or in the possession, custody, or control of) the Selling Entities or any of their respective Affiliates.  The Seller and its Affiliates shall be permitted to use the Business Names (a) as a former name for legal and noticing purposes in connection with the Bankruptcy Case in other legal documents, in connection with the filing of Tax Returns and for the Wind-Down or in other legal documents related to the foregoing and (b) to otherwise reference the historic relationship between the Seller, its Affiliates and the Business.

(b)    Use of Seller Marks.  Except as expressly set forth in this Section 7.14(b), after the Closing, Buyer shall not, and shall not permit any of its Affiliates to, use any of the Seller Marks.  Buyer, for itself and its Affiliates, acknowledges and agrees that, neither Buyer nor any of its Affiliates shall have any rights in any of the Seller Marks and neither Buyer  nor any of its Affiliates shall contest or challenge the ownership or validity of any rights of Seller or any of its Affiliates in or to any of the Seller Marks.  Seller acknowledges that the Seller Marks may have been utilized prior to the Closing in connection with the Business and that the continued use of the Seller Marks for a period not to exceed one-hundred and eighty (180) days following the Closing by Buyer, solely in connection with the operation of the Business in substantially the same manner and with the same quality as prior to Closing and solely in the manner in which they currently appear shall, subject to the remainder of this Section 7.14(b) shall not be deemed a breach of this Section 7.14(b).  Any and all goodwill generated by the use of the Seller Marks shall inure solely to the benefit of Seller or the subsequent owner of such Seller Marks.  In any event, Buyer shall not, and shall cause its Affiliates not to, use the Seller Marks in any manner that may damage or tarnish the reputation of the owner of the Seller marks or the goodwill associated with the Seller Marks.

Section 7.15    Purchased Assets "AS IS;" Certain Acknowledgements.

(a)    The Buyer agrees, warrants and represents that (i) the Buyer is purchasing the Purchased Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on the Buyer's own investigation of the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities and the Business, and (ii) neither the Selling Entities nor any of the Seller's Representatives has made, and the Buyer has not relied on, any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Business, the financial performance of the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Business, or the physical condition of the Purchased Assets, except as expressly set forth in Article V (as modified

60

by the Seller Disclosure Schedule) or in the other Transaction Documents.  The Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by the Selling Entities and the Buyer after good-faith arms-length negotiation in light of the Buyer's agreement to purchase the Purchased Assets "AS IS" and "WITH ALL FAULTS." The Buyer agrees, warrants and represents that, except for the express representations and warranties of the Selling Entities set forth in Article V of this Agreement (as modified by the Seller Disclosure Schedule) or in the other Transaction Documents, the Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that the Buyer assumes all risks with respect thereto.  EXCEPT AS SET FORTH IN ARTICLE (vii) OF THIS AGREEMENT (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULE) OR IN THE OTHER TRANSACTION DOCUMENTS, THE SELLING ENTITIES MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE BUSINESS OR THE SELLING ENTITIES, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, THE EXCLUDED ASSETS, THE EXCLUDED LIABILITIES OR THE BUSINESS.

(b)     The Buyer acknowledges and agrees that it (i) has had an opportunity to discuss the Business with the management of the Seller and has been afforded the opportunity to ask questions of and receive answers from management of the Seller, (ii) has had reasonable access to the books and records of the Selling Entities, and (iii) has conducted its own independent investigation of the Selling Entities, the Business, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities and the Transactions.  In connection with the investigation by the Buyer, the Buyer has received or may receive from the Selling Entities certain projections, forward-looking statements and other forecasts and certain business plan information. The Buyer acknowledges and agrees neither the Selling Entities nor any other Person will have or be subject to any Liability or indemnification obligation to the Buyer or any other Person resulting from the distribution to, or use by, the Buyer or any of its Affiliates or any of the Buyer's Representatives of any information provided to the Buyer or any of its Affiliates or any of the Buyer's Representatives by the Selling Entities or any of the Seller's Representatives, including any information, documents, projections, forward-looking statements, forecasts or business plans or any other material made available in any "data room," any confidential information memoranda or any management presentations in expectation of or in connection with the Transactions.

(c)     Except for the representations and warranties contained in Article (vii) (as modified by the Seller Disclosure Schedule), the Buyer acknowledges that none of the Selling Entities nor any other Person on behalf of any Selling Entity makes any express or implied representation or warranty with respect to the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Business, or with respect to any information provided to the Buyer or any of its Affiliates or any Representative of the Buyer, and the Selling Entities hereby disclaim any other representations or warranties made by the Selling Entities or any other Person with respect to the execution and delivery of this Agreement, the other Transaction Documents, the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities, the Business or the Transactions.  The Buyer has not relied on any representation, warranty or other statement by any Person on behalf of the Selling Entities, other than the representations and warranties of the Selling Entities expressly contained

61

in Article (vii) (as modified by the Seller Disclosure Schedule). The Buyer acknowledges and agrees that the representations and warranties set forth in Article (vii) (as modified by the Seller Disclosure Schedule) are made solely by the Selling Entities, and no Affiliate of the Selling Entities, Representative of the Seller or other Person shall have any responsibility or Liability related thereto.

(d)     Notwithstanding anything to the contrary herein or otherwise, the Buyer and the Buyer Related Parties will not have any rights or remedies hereunder or any other Transaction Document regarding any breach of a representation or warranty made (i) at the time this Agreement was executed and delivered, if at such time the Buyer had knowledge of such breach, (ii) at the time this Agreement was executed and delivered, if at or before the Closing, the Buyer obtained knowledge of such breach and the Buyer proceeded with the Closing when the Buyer instead had the right hereunder to refuse to proceed with the Closing or (iii) in connection with the Closing, if at the time immediately before Closing, the Buyer had knowledge of such breach and the Buyer proceeded with the Closing when the Buyer instead had the right hereunder to refuse to proceed with the Closing.

Section 7.16    Release.

(a)     Effective as of the Closing, the Buyer, on behalf of itself and the Buyer Related Parties (each, a "Buyer Releasing Party") hereby unconditionally and irrevocably and forever releases and discharges the Seller Related Parties and their respective present or former directors, managers, shareholders, partners, officers, employees, owners, advisors, representatives or agents (each, a "Seller Released Party"), of and from, and hereby unconditionally and irrevocably waive and dismiss, with prejudice, any and all claims, debts, losses, expenses, proceedings, covenants, liabilities, suits, judgments, damages, actions and causes of action, obligations, accounts, and liabilities of any kind or character whatsoever, known or unknown, suspected or unsuspected, in contract, direct or indirect, at law or in equity, including in each case any of the foregoing that are Purchased Assets or Assumed Liabilities under this Agreement that such Buyer Releasing Party ever had, now has or ever may have or claim to have against any Seller Released Party, for or by reason of any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising prior to the Closing (including in respect of the management or operation of the Business); provided, that nothing in this Section 7.16(a) shall release, waive, discharge, relinquish or otherwise affect the rights or obligations of any party hereto to the extent arising out of this Agreement or the Transaction Documents. The Buyer hereby covenants to, and to cause each other Buyer Releasing Party to, not sue any Seller Released Party in any Proceeding for any of the items released in the preceding sentence, and the Buyer agrees that in the event that any such Proceeding shall be commenced, the covenant not to sue contained in this Section 7.16(a) shall constitute a complete defense to any such Proceeding so instituted.

(b)     Effective as of the Closing, the Seller, on behalf of itself and the Seller Related Parties (each, a "Seller Releasing Party") hereby unconditionally and irrevocably and forever releases and discharges the Buyer Related Parties and their respective present or former directors, managers, shareholders, partners, officers, employees, owners, advisors, representatives or agents (each, a "Buyer Released Party"), of and from, and hereby unconditionally and irrevocably waive and dismiss, with prejudice, any and all claims, debts, losses, expenses, proceedings, covenants, liabilities, suits, judgments, damages, actions and causes of action,

obligations, accounts, and liabilities of any kind or character whatsoever, known or unknown, suspected or unsuspected, in contract, direct or indirect, at law or in equity that such Seller Releasing Party ever had, now has or ever may have or claim to have against any Buyer Released Party, for or by reason of any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising prior to the Closing; provided, that nothing in this Section 7.16(b) shall release, waive, discharge, relinquish or otherwise affect the rights or obligations of any party hereto to the extent arising out of this Agreement or the Transaction Documents.  The Seller hereby covenants to, and to cause each other Seller Releasing Party to, not sue any Buyer Released Party in any Proceeding for any of the items released in the preceding sentence, and the Seller agrees that in the event that any such Proceeding shall be commenced, the covenant not to sue contained in this Section 7.16(b) shall constitute a complete defense to any such Proceeding so instituted.

(c)     Without limiting the foregoing, each of the Buyer, on behalf of itself and the other Buyer Releasing Parties, and the Seller, on behalf of the other Seller Releasing Parties, expressly waives and releases any and all rights and benefits under Section 1542 of the California Civil Code (or any analogous law of any other state), which reads as follows: "A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." Each of the Buyer, on behalf of itself and the other Buyer Releasing Parties, and the Seller, on behalf of itself and the other Seller Releasing Parties, expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims.  Each of the Buyer, on behalf of itself and the other Buyer Releasing Parties, and the Seller, on behalf of itself and the other Seller Releasing Parties, understands the significance of this release of unknown claims and waiver of statutory protection against a release of unknown claims, and acknowledges and agrees that this waiver is an essential and material term of this Agreement.  Each of the Buyer, on behalf of itself and the other Buyer Releasing Parties, and the Seller, on behalf of itself and the other Seller Releasing Parties, acknowledges that each Seller Released Party or Buyer Released Party, as applicable, will be relying on the waivers and releases provided in this Section 7.16 in connection with entering into this Agreement and that this Section 7.16 is intended for the benefit of, and will grant express third party beneficiary rights to each Seller Released Party and Buyer Released Party to enforce this Section 7.16.

(d)     Notwithstanding anything to the contrary herein or otherwise, each beneficiary of a release under this Section 7.16 shall be an express third party beneficiary of this Section 7.16 with the full power to enforce the terms of this Section 7.16 as if it were a party to this Agreement for such purpose.

Section 7.17  Limitation of Damages.    NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, NO PARTY SHALL BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES (INCLUDING LOSS OF REVENUE, INCOME OR PROFITS BUT ONLY TO THE EXTENT THE SAME ARE NOT DIRECT DAMAGES), DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY OF ANY OTHER PARTY OR ANY OF SUCH PARTY'S AFFILIATES, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE; PROVIDED, HOWEVER, THAT SUCH LIMITATIONS SHALL NOT LIMIT ANY PARTY'S RIGHT TO RECOVER CONTRACT DAMAGES IN

CONNECTION WITH THE OTHER PARTY'S FAILURE TO CLOSE IN VIOLATION OF THIS AGREEMENT.

Section 7.18    Transition Services Agreement.  From and after the date hereof, the Seller, the Buyer shall negotiate in good faith with each Third-Party Buyer a Transition Services Agreement whereby:

(a)    the applicable Third Party Buyer shall provide to the Buyer, with respect to the Business, (i) a license for no less than twenty-four (24) months to use the Job-Board Technology in substantially the same manner used in the Business as of Closing, and (ii) information technology services (including maintenance and updates in the ordinary course of business) that were provided by the Seller or its Affiliates with respect to the Business prior to Closing and are necessary to permit the Buyer to operate the products and services of the Business in substantially the same manner as operated as of Closing (but for the avoidance of doubt, not including any back-office, corporate or administrative services) for no less than twelve (12) months, for fees equal to the provider's cost of providing the service without any mark-up (the "Seller Transition Services"), and

(b)    the Buyer shall provide to the applicable Third Party Buyer, with respect to the business of the Seller acquired by such Third Party Buyer, information technology services (including maintenance and updates in the ordinary course of business) that were provided by the Seller or its Affiliates with respect to the business acquired by the applicable Third Party Buyer prior to Closing and are necessary to permit the applicable Third Party Buyer to operate the products and services of such acquired business in substantially the same manner as operated as of Closing (but for the avoidance of doubt, not including any back-office, corporate or administrative services) for fees equal to the Buyer's cost of providing the service without any mark-up (the "Buyer Transition Services").

The Seller shall coordinate with all Third-Party Buyers to negotiate the Transition Services Agreement in good faith and document the Seller Transition Services and Buyer Transition Services (and any other services which may be agreed among the Buyer and each Third Party Buyer) in schedules to be attached thereto.  The Buyer may not (and the Seller shall procure that each Third Party Buyer may not) withhold its agreement to such Transition Services Agreement so long as it meets the criteria set forth in this Section 7.18.

Section 7.19    Withholding.  Notwithstanding anything herein to the contrary, any Selling Entity, the Buyer or any of their respective Affiliates shall be entitled to deduct and withhold from any amounts payable by them pursuant to this Agreement such amounts (and only such amounts) as it is required to deduct and withhold with respect to such payment under any provision of U.S. federal, state, local or non-U.S. Tax Law. The Buyer shall notify the Seller of its intention to deduct or withhold no later than five (5) Business Days prior to any such deduction or withholding, and shall cooperate in good faith with the Seller and its Affiliates to minimize any such deduction and withholding.  Any amounts so deducted and withheld in accordance with this Section 7.19 and timely paid over to the appropriate Governmental Authority shall be treated for all purposes of this Agreement as having been paid to the Party that would otherwise have received such amount but for the required deduction or withholding.

Section 7.20   <u>Termination of Existing Tax Sharing Agreements</u>. Following the Closing (i) the Purchased Assets shall not be subject to any obligations pursuant to any Tax sharing agreements (whether written or not) between or among the Selling Entities and their Affiliates (excluding any commercial Contracts not primarily relating to Taxes) and (ii) none of any Selling Entities, Seller nor any of Seller's Affiliates and their respective Representatives shall have any further rights or liabilities thereunder.

Section 7.21   <u>Privacy Matters</u>. From and after the Closing Date, the Buyer shall only use, collect, or otherwise process any Personal Information included in the Purchased Assets for purposes consistent with those set forth in the relevant Selling Entity's Privacy Policy (including via the applicable Selling Entity's website), as made available to Buyer. Prior to making any material changes to the terms of any Selling Entity's Privacy Policy or processing any Personal Information in a materially inconsistent manner than set forth in the relevant Selling Entity's Privacy Policy (in each case, as made available to Buyer), the Buyer will notify impacted individuals.

**ARTICLE VIII**
**CONDITIONS TO CLOSING**

Section 8.1   <u>Conditions to Each Party's Obligations to Effect the Closing</u>.  The respective obligations of each Party to consummate the Closing shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver in a joint writing by the Buyer and the Seller, at or prior to the Closing, of the following conditions:

(a)   (i) no Law or final, non-appealable Order shall have been enacted, entered, promulgated, adopted, issued or enforced by the Bankruptcy Court or any other Governmental Authority having competent jurisdiction that is then in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise prohibiting the consummation of the transactions contemplated hereby, and (ii) no temporary restraining order, preliminary or permanent injunction or other Order issued by any court of competent jurisdiction or other similar legal restraint shall be in effect that has the effect of prohibiting the consummation of any of the transactions contemplated by this Agreement

(b)   if applicable, all filing and waiting periods applicable (including any extensions thereof) to the consummation of the Transactions under the HSR Act shall have expired or been terminated; and

(c)   the Bankruptcy Court shall have entered a Sale Order, in form and substance reasonably acceptable to the parties and such Sale Order shall be unstayed and in full force and effect.

Section 8.2   <u>Conditions to Obligations of the Buyer</u>.  The obligation of the Buyer to consummate the Closing shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver at or prior to the Closing of the following additional conditions:

(a)   the Selling Entities shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Selling Entities on or prior to the Closing Date;

65

(b)        (i) the representations and warranties of the Selling Entities set forth in Article (vii) (other than the Seller Fundamental Representations), disregarding for these purposes any exception in such representations and warranties relating to materiality or a Material Adverse Effect, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date), except for such failures to be true and correct would not reasonably be expected to have a Material Adverse Effect, (ii) the representations and warranties set forth in Section 5.1 (*Organization, Standing and Corporate Power*), Section 5.3 (*Authority; Execution and Delivery; Enforceability*) and Section 5.18 (*Brokers*) (collectively, the "Seller Fundamental Representations"), disregarding for these purposes any exception in such representations and warranties relating to materiality or a Material Adverse Effect, shall be true and correct, except with respect to de minimis matters, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date) and (iii) the representations and warranties set forth in Section 5.8(a) (Absence of Certain Developments) shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c)        the Buyer shall have received a certificate from an officer of the Seller to the effect that, to such officer's knowledge, the conditions set forth in Sections 8.2(a) and (b) have been satisfied;

(d)        the Buyer shall have received the other items to be delivered to it pursuant to Section 4.2;

(e)        from the date of this Agreement, there shall not have occurred any Material Adverse Effect; and

(f)        the Parties shall have agreed upon and executed a Transition Services Agreement that meets the requirements set forth in Section 7.18.

Any condition specified in this Section 8.2 may be waived by the Buyer; *provided, however*, that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

Section 8.3        Conditions to Obligations of the Selling Entities.  The obligation of the Selling Entities to consummate the Closing shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver at or prior to the Closing of the following additional conditions:

(a)        the Buyer shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date;

(b)        (i) the representations and warranties of the Buyer set forth in Article (a) (other than the Buyer Fundamental Representations), disregarding for these purposes any

66

exception in such representations and warranties relating to materiality, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date), except for such failures to be true and correct as would not reasonably be expected to have a material adverse effect on the Buyer or its ability to consummate the Transactions, and (ii) the representations and warranties set forth in Section 6.1 (*Organization and Good Standing*), Section 6.2 (*Authority Relative to this Agreement*) and Section 6.5 (*Brokers*) (collectively, the "Buyer Fundamental Representations"), disregarding for these purposes any exception in such representations and warranties relating to materiality, shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date);

(c)     the Seller shall have received a certificate from an officer of the Buyer to the effect that, to such officer's knowledge, the conditions set forth in Section 8.3(a) and (b) have been satisfied; and

(d)     the Seller shall have received the other items to be delivered to it pursuant to Section 4.2(h).

Any condition specified in this Section 8.3 may be waived by the Seller; *provided*, *however*, that no such waiver shall be effective against the Seller unless it is set forth in a writing executed by the Seller.

Section 8.4     Frustration of Closing Conditions.  None of the Selling Entities or the Buyer may rely on or assert the failure of any condition set forth in Article VIII to be satisfied if such failure was proximately or primarily caused by such Party's failure to comply with this Agreement in all material respects.

**ARTICLE IX**
**TERMINATION; WAIVER**

Section 9.1     Termination.  Subject to Section 7.11(c), this Agreement may be terminated at any time prior to the Closing by:

(a)     mutual written consent of the Seller and the Buyer;

(b)     the Seller or the Buyer, if (i) there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or (ii) consummation of the Transactions would violate any nonappealable Final Order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction; *provided*, that the Party seeking to terminate this Agreement pursuant to this Section 9.1(b) shall have used its reasonable best efforts to challenge such Law, order, decree or judgment; *provided*, *further*, that no termination may be made by a Party under this Section 9.1(b) if the issuance of such Order, decree or judgment was primarily attributable to such Party's breach of any of its representation, warranties, covenants or agreements hereunder;

67

(c)      the Seller, if following the entry of the Bidding Procedures Order but prior to the entry of Sale Order, the Bidding Procedures Order ceases to be in full force and effect, or is revoked, rescinded, vacated, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(d)      the Seller, if:

(i)      any of the representations and warranties of the Buyer contained in Article VI shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date prior to the Closing Date (as if made on and as of such date prior to the Closing Date), such that the condition set forth in Section 8.3(b) would not then be satisfied; or

(ii)      the Buyer shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Buyer prior to the Closing Date, such that the condition set forth in Section 8.3(a) would not then be satisfied;

*provided, however,* that if an inaccuracy in any of the representations and warranties of the Buyer or a failure to perform or comply with a covenant or agreement by the Buyer is curable by the Buyer within thirty (30) days after the date of written notice from the Seller to the Buyer of the occurrence of such inaccuracy or failure, then the Seller may not terminate this Agreement under this Section 9.1(d) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Buyer or during the thirty (30) day period commencing on the date of delivery of such notice or (y) following such thirty (30) day period, if such inaccuracy or failure shall have been fully cured during such thirty (30) day period; *provided*, *further*, that that no termination may be made by the Seller under this Section 9.1(d) if the Seller is in breach of any of its representations, warranties, covenants or agreements hereunder that would give rise to a failure of a condition set forth in Section 8.1 or Section 8.2;

(e)      the Buyer, if:

(i)      any of the representations and warranties of the Selling Entities contained in Article V shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date prior to the Closing Date (as if made on and as of such date prior to the Closing Date), such that the condition set forth in Section 8.2(b) would not then be satisfied; or

(ii)      the Selling Entities shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Selling Entities prior to the Closing Date, such that the condition set forth in Section 8.2(a) would not then be satisfied;

(iii)      the Bankruptcy Court enters an order pursuant to Section 362 of the Bankruptcy Code lifting or modifying the automatic stay with respect to any material portion of the Purchased Assets;

68

(iv)    a trustee or examiner with expanded powers is appointed in the Bankruptcy Case;

(v)    Buyer is not the winning bidder or Back-Up Bidder following the Auction;

(vi)    Seller withdraws or amends the Bidding Procedures Order or Sale Order, or the Sale Order is reversed or vacated;

*provided, however*, that if an inaccuracy in any of the representations and warranties of the Selling Entities or a failure to perform or comply with a covenant or agreement by any of the Selling Entities is curable by it within thirty (30) days after the date of written notice from the Buyer to the Seller of the occurrence of such inaccuracy or failure, then the Buyer may not terminate this Agreement under this Section 9.1(e) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Seller or during the thirty (30) day period commencing on the date of delivery of such notice or (y) following such thirty (30) day period, if such inaccuracy or failure shall have been fully cured during such thirty (30) day period; *provided, further*, that that no termination may be made by the Buyer under this Section 9.1(e) if the Buyer is in breach of any of its representations, warranties, covenants or agreements hereunder that would give rise to a failure of a condition set forth in Section 8.1 or Section 8.3;

(f)    the Buyer or the Seller, if (i) a Third-Party Sale is consummated or (ii) the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the Transactions;

(g)    the Seller, if the Seller or the board of directors (or similar governing body) of the Seller determines, in good faith and after consultation with its legal and other advisors, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)    the Buyer or the Seller, if the Closing has not occurred on or prior to 5:00 p.m. Eastern Time, on September 15, 2025 (the "Outside Date"); *provided*, that the right to terminate this Agreement under this Section 9.1(h) shall not be available to any Party if such Party is then in breach of this Agreement and such breach is the primary cause of the failure of the Closing to occur prior to such date; or

(i)    the Seller, if (i) all of the conditions set forth in Section 8.1 and Section 8.2 have been satisfied or waived (other than those conditions to Closing that by their terms or their nature are to be satisfied at the Closing, but subject to such conditions being satisfied assuming a Closing would occur), (ii) the Seller has confirmed in writing that it is ready, willing and able to consummate the Closing, and (iii) the Buyer has failed to consummate the Closing by the date the Closing is required to have occurred pursuant to Section 4.1.

Section 9.2    Procedure and Effect of Termination.  In the event of termination of this Agreement by either the Seller or the Buyer pursuant to Section 9.1, written notice thereof shall forthwith be given by the terminating Party to the other Party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the

69

Parties; *provided, however*, that (a) a Party shall not be relieved of or released from any Liability arising from any intentional breach by such Party of any provision of this Agreement by such Party, (b) no Party shall be relieved of, or released from, any Liability arising from Fraud by such Party, and (c) this <u>Section 9.2</u>, <u>Section 3.2</u>, <u>Section 7.3(e)</u>, <u>Section 7.12</u> <u>Article X</u> (other than <u>Section 10.12</u>) and the Confidentiality Agreement shall remain in full force and effect and survive any termination of this Agreement.

Section 9.3    <u>Extension; Waiver</u>.  At any time prior to the Closing, the Seller (on behalf of each of the Selling Entities), on the one hand, or the Buyer, on the other hand, may, to the extent permitted by applicable Law (a) extend the time for the performance of any of the obligations or other acts of the Buyer (in the case of an agreed extension by the Seller) or the Seller (in the case of an agreed extension by the Buyer), (b) waive any inaccuracies in the representations and warranties of the Buyer (in the case of a wavier by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein or in any document delivered pursuant hereto, (c) waive compliance with any of the agreements of the Buyer (in the case of a wavier by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein, or (d) waive any condition to its obligations hereunder.  Any agreement on the part of the Seller, on the one hand, or the Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of the Seller or the Buyer, as applicable.  The failure or delay of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any rights hereunder.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

Section 10.1    <u>Amendment and Modification</u>.  This Agreement may be amended, modified or supplemented only by a written instrument signed by the Seller, on behalf of each of the Selling Entities, and the Buyer.

Section 10.2    <u>Survival</u>.  None of the representations and warranties of the Parties in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules or Exhibits attached hereto shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing.  None of the covenants or agreements of the Parties in this Agreement shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such covenant or agreement from or after the Closing, other than (a) the covenants and agreements of the Parties contained in <u>Article III</u>, <u>Article IV</u> and this <u>Article X</u> (b) those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Closing, which shall survive the consummation of the Transactions until fully performed in accordance with their respective terms, (c) any rights or remedies of any Person for breach of any such surviving covenant or agreement and (d) any Liability on account of Fraud.

Section 10.3    <u>Notices</u>.  All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) when sent if delivered or

70

transmitted by email (*provided*, no "bounce back" or notice of non-delivery is generated), (c) upon receipt after dispatch by registered or certified mail, return receipt requested on postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

    (a)    If to any Selling Entity or the Selling Entities, to:

> Zen JV, LLC
> c/o Apollo Management X, L.P.
> 9 West 57th Street
> 43rd Floor
> New York, New York 10019
> Attention:    Robert Kalsow-Ramos
>                    Maxwell David;
>                    Whitney Chatterjee
>
> Email:  rkalsow-ramos@apollo.com
>          mdavid@apollo.com
>          wchatterjee@apollo.com

> with a mandated copy (which shall not constitute notice) to:

> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, NY 10020
> Attention:    Ray Schrock
>                    Candace Arthur
>                    Rick Press
>                    Michael Anastasio
>
> Email:  ray.schrock@lw.com
>          candace.arthur@lw.com
>          eric.press@lw.com
>          michael.anastasio@lw.com

> with a mandated copy (which shall not constitute notice) to:

> Richards, Layton & Finger, PA
> 920 N. King St.
> Wilmington, DE 19801
> Attention: Zachary Shapiro
> Email:  shapiro@rlf.com

    (b)    If to the Buyer, to:

> Valnet Us Inc.

7405 Transcanada Highway, Suite 100
Saint-Laurent, Quebec H4T 1Z2
Email: yury.s@valnetinc.com; rony.a@valnetinc.com
Attention:      Yury Smagorinsky
                Rony Arzoumanian

with a mandated copy (which shall not constitute notice) to:

Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Email:         steven.boender@stoel.com
Attention:     Steven Boender

or to such other address as any party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated or personally delivered. Any Party may notify any other Party of any changes to the address or any of the other details specified in this Section 10.3; *provided* that such notification shall only be effective on the date specified in such notice or five (5) Business Days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 10.4    Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any Party (whether by operation of Law or otherwise) without the prior written consent of the other Parties, and any such assignment shall be null and void. No assignment by any Party shall relieve such Party of any of its obligations hereunder. Any attempted or purported assignment in violation of this Section 10.4 will be deemed void *ab initio*. Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, including, in the case of the Selling Entities, the trustee in the Bankruptcy Case. Notwithstanding the foregoing, (a) the Selling Entities may assign some or all of their respective rights or delegate some or all of their respective obligations hereunder to a chapter 7 trustee, chapter 11 trustee, liquidating trust, liquidating trustee, or any other successor entities pursuant to a chapter 11 plan confirmed by the Bankruptcy Court, and (b) prior to the Closing Date, the Buyer may, without the prior written consent of the Seller or an Selling Entity, assign all or any portion of its rights under this Agreement to one or more of its Affiliates; provided, however, that in the case of the clause (b), notwithstanding such assignment, Buyer shall remain liable for any default of any of its obligations hereunder; provided, further that no such assignment will result in incremental unreimbursed withholding or other Taxes which may be economically borne by Seller or any of its Affiliates.

Section 10.5    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in

72

any manner materially adverse to any Party.  Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 10.6    Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and all claims and causes of action arising out of, based upon, or related to this Agreement or the negotiation, execution or performance hereof, shall be governed by, and construed, interpreted and enforced in accordance with, the Laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any Laws other than the Laws of the State of Delaware.

Section 10.7    Acknowledgement and Release; Non-Recourse.

(a)    Each Party acknowledges that the other Parties are the sole Persons bound by, or liable with respect to, the obligations and Liabilities of such Parties under this Agreement and the other Transaction Documents, and that no Affiliate of any such Party or any of their respective subsidiaries or any current or former officer, director, stockholder, agent, attorney, employee, representative, advisor or consultant of any such Party or any such other Person shall be bound by, or liable with respect to, any aspect of this Agreement, the other Transaction Documents and the Transactions; *provided*, *however*, that no Person shall be relieved of, or released from, any Liability arising from Fraud by such Person.  This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and no other Person that is not a party hereto shall have any liability for any Liabilities of the parties to this Agreement or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, the Transactions or in respect of any oral representations made or alleged to be made in connection herewith.  In no event shall any party hereto or any of its Affiliates, and the Parties hereby agree not to and to cause their respective Affiliates not to, seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages from, any Person not a party to this Agreement.

(b)    Notwithstanding anything to the contrary herein or otherwise, each beneficiary of this Section 10.7 shall be an express third party beneficiary of this Section 10.7 with the full power to enforce the terms of this Section 10.7 as if it were a party to this Agreement for such purpose.

Section 10.8    Submission to Jurisdiction; WAIVER OF JURY TRIAL.

(a)    Any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be brought solely in the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court).  Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) in respect of any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or any of the rights and

73

obligations arising hereunder, and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided*, *however*, that, if the Bankruptcy Case is closed or dismissed, any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or the Transactions shall be heard and determined solely in a state or federal court located in the State of Delaware and any state appellate court therefrom within the State of Delaware.    Each Party hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such action, claim, suit or Proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with <u>Section 10.3</u>, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, action or Proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or Proceeding is improper or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts.    Each Party agrees that notice or the service of process in any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder or thereunder, shall be properly served or delivered if delivered in the manner contemplated by <u>Section 10.3</u>.

(b)    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT SUCH PARTY MAY HAVE TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) BETWEEN THE PARTIES HERETO ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF OR THEREOF.

Section 10.9    <u>Counterparts</u>.    This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a photographic, photostatic, facsimile, portable document format (.pdf), DocuSign, electronic signature or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.    No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail or that any signature is in facsimile or electronic format (including .pdf or DocuSign) as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 10.10 <u>Incorporation of Schedules and Exhibits</u>.    All Schedules, the Seller Disclosure Schedule and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

US-DOCS\161371711.3

Section 10.11 <u>Entire Agreement</u>.  This Agreement (including all Schedules, the Seller Disclosure Schedule and all Exhibits), the Confidentiality Agreement and the other Transaction Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the Parties with respect thereto.

Section 10.12 <u>Specific Performance</u>.  Each Party agrees that irreparable damage may occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement.  It is accordingly agreed that, subject to <u>Section 3.2</u>, (i) each Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which such Party is entitled, at law or in equity, (ii) each Party waives any requirement for the securing or posting of any bond in connection with the obtaining of any specific performance or injunctive relief and (iii) each Party will waive, in any action for specific performance, the defense of adequacy of a remedy at Law.  A Party's pursuit of specific performance at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such Party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such Party in the case of a breach of this Agreement.

Section 10.13 <u>Bulk Sales or Transfer Laws</u>.  The Buyer hereby waives compliance by the Selling Entities with the provisions of the bulk sales or transfer Laws of all applicable jurisdictions.

Section 10.14 <u>Seller Disclosure Schedule</u>.  The Seller Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement, and it is expressly understood and agreed that (a) the disclosure of any fact or item in any section of the Seller Disclosure Schedule shall be deemed disclosure with respect to any other Section or subsection of the Seller Disclosure Schedule to the extent the applicability of the disclosure to such other Section or subsection is readily apparent on the face of such disclosure without the need for a cross-reference, (b) the disclosure of any matter or item in the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, (c) the mere inclusion of an item in the Seller Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception, any violation of Law or breach of Contract or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect, (d) the information and disclosures contained therein shall not be construed or otherwise deemed to constitute, any representation, warranty, covenant or obligation of the Selling Entities or any other Person except to the extent explicitly provided in this Agreement, and (e) the disclosures set forth in the Seller Disclosure Schedule shall not be deemed to expand the scope of any, or create any new, representation, warranty, covenant or agreement set forth herein.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Seller Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and neither Party will use the fact of the setting of the amounts

75

or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Seller Disclosure Schedule or Exhibits hereto is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on the Seller Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item.  The information contained in this Agreement, in the Seller Disclosure Schedule and Exhibits hereto is disclosed solely for purposes of this Agreement.  The Selling Entities may (but shall not be obligated to) supplement or amend the Seller Disclosure Schedule to reflect (i) any fact, event or condition arising after the date hereof and prior to the Closing which, if existing or occurring as of the date of this Agreement, would have been required to be described in the Seller Disclosure Schedule in order to avoid any representation or warranty of the Selling Entities contained in this Agreement from being untrue or inaccurate and (ii) any fact, event or condition which first became known to a Knowledge party of any Selling Entity listed in clause (b) of the definition of "Knowledge" after the date hereof which, if known to such person prior to the date of this Agreement, would have been required to be described in the Seller Disclosure Schedule in order to avoid any representation or warranty of the Selling Entities contained in this Agreement which is subject to the Knowledge of the Seller or any other Selling Entity from being untrue or inaccurate.  Any such supplement or amendment of the Seller Disclosure Schedule shall be deemed to cure the breach of any such representation or warranty and amend and/or supplement the Seller Disclosure Schedule, as applicable, for all purposes hereunder, except for purposes of determining whether or not the condition set forth in Section 8.2(b) has been satisfied.

Section 10.15  Privileged Communications.

(a)    The Selling Entities and the Buyer hereby acknowledge and agree that notwithstanding any provision of this Agreement, neither the Buyer nor any of its Affiliates shall have access to (and each hereby waives any right of access it may otherwise have with respect to) any Privileged Communications, whether or not the Closing occurs.  Without limiting the generality of the foregoing, the Buyer hereby acknowledges and agrees, upon and after the Closing: (i) neither the Buyer nor any of its Affiliates shall be a holder of, or have any right, title or interest to the Privileged Communications, (ii) only the Selling Entities shall hold property rights in the Privileged Communications and shall have the right to waive or modify such property rights and (iii) the Selling Entities shall have no duty whatsoever to reveal or disclose any Privileged Communications to the Buyer or any of its Affiliates.

(b)    To the extent that any Privileged Communications are disclosed or made available to the Buyer, the Parties hereby agree (i) that the disclosure, receipt and/or review of such Privileged Communication is entirely inadvertent and shall not waive, modify, limit or impair in any form or fashion the protected nature of the Privileged Communications, (ii) it is their desire, intention and mutual understanding that the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, common interest privilege, work product doctrine or other applicable privilege and (iii) the Selling Entities shall have the right in their sole discretion and at any time to require the return and/or destruction of the Privileged Communications.

US-DOCS\161371711.3

Section 10.16 <u>Mutual Drafting; Headings; Information Made Available</u>.    The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.    The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.    To the extent this Agreement refers to information or documents to be made available (or delivered or provided) to the Buyer or its Representatives, the Selling Entities shall be deemed to have satisfied such obligation if the Seller or any of its Representatives has made such information or document available as of 12:01 a.m. on the date hereof, been uploaded to and is accessible to the Buyer in (and has not been removed from) the virtual data room maintained by Datasite titled "Mars".

Section 10.17 <u>Approval of the Bankruptcy Court</u>.  Notwithstanding anything herein to the contrary, any and all rights, interests or obligations under this Agreement are subject to approval of the Bankruptcy Court.

* * * * *

US-DOCS\161371711.3

IN WITNESS WHEREOF, the Parties hereto have caused this Amended and Restated Stalking Horse Agreement to be executed as of the date first written above.

**SELLER**

**ZEN JV, LLC**

By: _____
Name: Jeffrey Furman
Title: Authorized Signatory

**AFFILIATES OF SELLER**

**MILITARY ADVANTAGE, LLC**
**FASTWEB, LLC**

By: _____
Name: Jeffrey Furman
Title:  Authorized Signatory

**BUYER**

**VALNET US INC.**

By: _Yury Smagorinsky_____
Name: Yury Smagorinsky
Title: Director

[Signature Page to A&R Stalking Horse Agreement]

## **<u>Schedule I</u>**

1. Military Advantage, LLC

2. FastWeb, LLC

## <u>Schedule II</u>

1. Zen JV, LLC

2. Monster Worldwide LLC

3. Monster Government Solutions, LLC

4. Camaro Acquisition LLC

5. CareerBuilder, LLC

6. CareerBuilder France Holding LLC

7. CareerBuilder Government Solutions LLC

8. Luceo Solutions, LLC

**Exhibit 2**

**Form TSA**

**Transition Services Agreement**

This Transition Services Agreement (this "<u>Agreement</u>") is made and entered into as of [ ● ], 2025 (the "<u>Effective Date</u>"), by and among Zen, JV, LLC (the "<u>Seller</u>"), Bold Holdings LLC ("<u>Core Buyer</u>"), Sherrill-Lubinski, LLC and ETI-NET INC. (collectively, "<u>MGS Buyer</u>") and Valnet US Inc. ("<u>MMP Buyer</u>").  The Seller, Core Buyer, MGS Buyer and MMP Buyer are each individually referred to herein as a "<u>Party</u>" or collectively as the "<u>Parties</u>".

**WHEREAS**, the Seller and the other Selling Entities (as defined in the applicable Purchase Agreement (as defined below)) are party to (i) that certain Asset Purchase Agreement, dated July 22, 2025 with Core Buyer, (ii) that certain Amended and Restated Stalking Horse Agreement, dated July 17, 2025 with MGS Buyer and (iii) that certain Asset Purchase Agreement, dated July 17, 2025 with MMP Buyer (each such Agreement, individually, a "<u>Purchase Agreement</u>" and, collectively, the "<u>Purchase Agreements</u>");

**WHEREAS**, each of the Parties specified in <u>Exhibit A</u> as a provider (each such Party, a "<u>Provider</u>") has agreed to provide, and to cause certain of its Affiliates and  third-party providers to provide, to each of the Parties specified in <u>Exhibit A</u> as a recipient (each such Party, a "<u>Recipient</u>") and its Affiliates during the Term (as defined below) certain services of a type provided by the Seller or its Affiliates and its Personnel to the applicable Business of each Recipient prior to the Closing and set forth on <u>Exhibit A</u>;

**WHEREAS**, the Parties desire to enter into this Agreement simultaneously with the Closing of the transactions contemplated by the Purchase Agreements;

**NOW THEREFORE**, in consideration of the foregoing and of the representations, warranties, covenants and agreements of the Parties contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1      <u>Definitions</u>.  A defined term has its defined meaning throughout this Agreement and in each Exhibit to this Agreement regardless of whether it appears before or after the place where it is defined. As used in this Agreement, the following terms have the meanings specified below:

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person; provided that in no event shall the Seller be considered an Affiliate of Apollo Global Management, Inc. ("<u>Apollo</u>") or any portfolio company or investment fund affiliated with or managed by affiliates of Apollo, nor shall Apollo or any portfolio company or investment fund affiliated with or managed by affiliates of Apollo, be considered to be an Affiliate of Seller.  For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the management or affairs of another Person by reason of ownership of voting stock, as general partner or managing member or by contract or otherwise.

"<u>Bankruptcy Case</u>" means the Seller's and certain of its Affiliates' cases commenced under Chapter 11 of the Bankruptcy Code jointly administered under Case No. 25-11195 in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

1

"Bankruptcy Court" means United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Bankruptcy Case.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York.

"Businesses" mean (i) with respect to Core Buyer, (x) the business of the Seller and its Affiliates to the extent conducted in connection with the online/mobile job advertising platform connecting people in the recruitment industry, providing applicant search and screening services, including job postings, employer branding, resume database access, employee search services, leveraging digital, social and mobile solutions, through Monster.com and other websites and (y) the business of the Seller and its Affiliates to the extent conducted in connection with an online, or other digital and mobile job advertising platform allowing and connecting Persons in the recruitment industry, providing applicant search and screening services, including job postings, employers branding, resume database access, employee search and screening services, organizing job fairs, leveraging digital, social and mobile solutions, including through careerbuilder.com and other job advertising websites, in each case, as conducted by the Seller and its Affiliates as of June 23, 2025 in the United States, including, for the avoidance of doubt, any personnel, infrastructure, systems, or assets, regardless of location, that materially support sales, account management, marketing, technical operations, or other functions of such Business, (ii) with respect to MGS Buyer, the business of acting as a recruitment and workforce solution provider to the public sector, including the products and services provided under the "Monster Government Solutions" brand and the business, operations and activities conducted by the Seller and its Affiliates through what is, as of June 23, 2025, known as the "Monster Government Solutions" business unit, but excluding the Job-Board Technology, and (iii) with respect to MMP Buyer, the internet, performance marketing and advertising and fees business, as conducted through the operation of the websites FastWeb.com and Military.com, by the Seller and its Affiliates as of June 23, 2025 in the United States.  For the avoidance of doubt, each of the Businesses set forth in (i)-(iii) excludes the other two Businesses, such that there is no overlap between such Businesses.

"Closing" means the sale of assets and assumption of liabilities contemplated by the applicable Purchase Agreement.

"Governmental Authority" means any transnational, federal, municipal, state, provincial, local or foreign governmental, quasi-governmental, administrative or regulatory authority, department, agency, board, bureau, commission or body (including any court, arbitral body or similar tribunal), including the Bankruptcy Court.

"Improvements" derivative works, improvements, modifications and enhancements to the applicable Software or documentation.

"Intellectual Property" means any and all intellectual or proprietary rights, which may exist or be created under the Laws of any jurisdiction in the world, including all: (i) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, moral and similar attribution rights and copyrights and copyrightable works, whether published or unpublished, and all registrations and applications for registration thereof; (ii) any and all trade names, corporate names, logos, slogans, trade dress, trademarks, service marks, acronyms, tag-lines, and other source origin or business identifiers and general intangibles of a like nature (whether registered or unregistered), and trademark and service mark registrations and applications therefor and all goodwill associated with the foregoing, whether protected, created, or arising under the laws of the United States (including common law) or any other jurisdiction or under any international convention; (iii) proprietary rights in internet domain names, internet domain name registrations, IP addresses, social media account names and handles, and other digital identifiers, all associated with web addresses, URLs, websites and webpages, social media pages, and all content and data

thereon; (iv) trade secret rights including know-how, inventions and invention disclosures (whether or not patented or patentable and whether or not reduced to practice), ideas, discoveries, Improvements, technology, technical information, data, databases, data compilations and collections, tools, methods, processes, formulae, strategies, prototypes, techniques, plans, drawings, blue prints, schematics, flow charts, models, business information, customer and supplier lists and records, pricing and cost information, financial, sales, and marketing plans and proposals, and all other confidential or proprietary information; (v) patents and patent applications, industrial design and other industrial property rights; (vi) proprietary rights in Software, including computer programs, operating systems, applications, firmware, and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; (vii) rights in or relating to any and all registrations, issuances, provisionals, reissuances, continuations, continuations-in-part, revisions, substitutions, reexaminations, renewals, extensions, combinations, divisionals, and reissues of, and applications for, any of the foregoing rights; and (viii) rights to prosecute, sue, enforce, or recover or retain damages, costs, or attorneys' fees with respect to the past, present and future infringement, misappropriation, dilution, unauthorized use or disclosure, or other violation of any of the foregoing.

"Job-Board Technology" means the proprietary software (including in source code and object code form, together with all documentation) which enables a job advertising platform consisting of applicant search and screening services, including job postings, employers branding, resume database access, and employee search services.

"Law" means any federal, state, local, municipal or foreign law, statute, legislation, common law, rule, regulation, ruling, directive or other similar requirement having the effect of law issued, enacted, adopted, promulgated, implemented or otherwise put into effect by any Governmental Authority.

"Software" means computer programs, operating systems, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof.

"Tax" means all U.S. federal, state, local or non-U.S. income, gross receipts, capital gains, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, alternative or add-on minimum, estimated, or similar taxes imposed by any Governmental Authority (to the extent the foregoing are taxes or in the nature of a tax), and including any interest, penalty, or addition thereto.

## ARTICLE II
## SERVICES

2.1     Services.

(a)     Services.  Provider agrees to provide, or cause to be provided, as applicable, those services that were provided to the Businesses by the Seller or its Affiliates prior to Closing as set forth on Exhibit A attached hereto and incorporated by reference herein for substantially the same purpose and in substantially the same manner as used by such Business prior to Closing (collectively, the "Services") in exchange for payment of the Fees (as defined below) and on the terms and subject to the conditions set forth in this Agreement.  The Services are for the benefit of, and may only be used by, Recipient and its Affiliates in the operation of its respective Business.  Subject to third party limitations and restrictions, Recipient shall be entitled to allow any Person, other than Recipient or one if its Affiliates, that is engaged as a contractor, subcontractor or otherwise by Recipient to perform work or provide any goods or services to or on behalf of Recipient (such Person, a "Third-Party Recipient") to access the Services to the extent

required or reasonably useful to perform any work or provide any goods or services to or on behalf of Recipient.  Recipient shall procure that each relevant Affiliate or Third-Party Service Recipient complies with the applicable terms of this Agreement and shall be liable for the acts and omissions of any such Third-Party Recipient. The termination of a third-party contract for a reason other than Provider's breach or Provider's termination of such contract shall terminate Provider's obligation to provide the corresponding Service, provided that (i)  Provider  uses commercially reasonable efforts to find a replacement third-party service within a reasonable time period designed to minimize disruption; and (ii) Provider uses, commercially reasonable efforts to prevent and/or seek available remedies in connection with such termination.

2.2     Program Coordinator.  Each of the Parties shall nominate one representative set forth on Exhibit B hereto to act as the primary contact person for the coordination of this Agreement and the Services (the "Program Coordinators").  Each of the Parties agree that all communications relating to the provision of the Services shall be directed to the applicable the Program Coordinators, and each of the Parties may treat an act of the Program Coordinator of the other Parties as being authorized by such other Party; provided, however, that no such Program Coordinator has authority to amend this Agreement.  Each Party shall advise the other Parties in writing of any change in any Program Coordinator.

2.3     Conditions.

(a)     Access by Provider and Cooperation.  To the extent reasonably necessary for the provision of the Services, Recipient shall grant Provider reasonable access to Recipient's facilities, subject to Recipient's reasonable facility access and security policies and procedures that are generally applicable to Recipient's employees or service providers which are provided to Provider in writing in advance. Provider will comply with said facility access and security policies and procedures.  Recipient shall cooperate with Provider as is reasonably necessary to carry out the Services, including providing such access to systems, networks, data and other confidential information as is reasonably necessary in connection with the provision of such Services.  Provider shall be excused from performing its obligations hereunder to the extent hindered by Recipient's failure to provide such access and cooperation in connection with such obligations; provided, however, Provider shall notify Recipient in writing of any such failure, and Recipient shall have ten (10) Business Days to cure such failure.

(b)     Quality.  Provider shall provide the Services (including with respect to Core Buyer as the Provider, the Job-Board Technology), and shall cause the Services to be provided, substantially in the same manner and with the same nature, quality and timeliness in which they were provided prior to Closing (the "Service Standard").  Provider agrees to assign sufficient resources and qualified personnel as are reasonably required to perform the Services in accordance with the standards set forth in the preceding sentence.  For the avoidance of doubt, and by way of example, with respect to the Job Board Technology, Provider shall provide ongoing maintenance of the Job-Board Technology in a commercially reasonable manner. It being understood that the Provider shall not be required to make any improvements to the Job Board Technology during the 12-month term specified in Section 4.2.

(c)     Required Consents.  To the extent Provider is required to obtain any third-party consents or pay cure costs in order to provide the Services, Provider shall use commercially reasonable efforts to obtain such consent, and any and all costs and expenses associated with obtaining such consents shall be borne by Provider.  In the event that such a third-party consent is not obtained by Provider (despite Provider using its commercially reasonable efforts), or has expired, is terminated or revoked (despite Provider using its commercially reasonable efforts to avoid such expiration, termination or revocation) during the Service Term of the relevant Service, Provider shall notify Recipient as soon as reasonably practicable and use commercially reasonable efforts to procure, at Provider's cost, an alternative

4

arrangement for continuing the provision of the relevant Service in substantially the same manner and shall reasonably cooperate with Recipient in connection therewith.

2.4    <u>Personnel</u>.  Provider may provide all or part of the Services through its employees, subcontractors, consultants, an outsourcing or other third-party provider arrangement or through one or more of its Affiliates (collectively "<u>Personnel</u>").  Subject to the Service Standard, Provider will have the right, in its sole discretion, to (i) designate which Personnel it will assign to perform the Services and (ii) remove and replace such Personnel at any time.  Provider will remain liable for the acts and omissions of its Personnel in their performance hereunder as if they were the acts and omissions of Provider, including any breach of this Agreement by any Personnel.  All Personnel of Provider shall be deemed for all purposes (including compensation and employee benefits) to be employees or representatives solely of Provider and not to be employees or representatives of Recipient.  In performing their respective duties hereunder, all such Personnel of Provider shall be under the direction, control and supervision of Provider (and not of Recipient).

2.5    <u>Compliance with Law</u>.  Provider shall provide, and shall procure that each relevant Affiliate or third party, as applicable, provides, all Services in compliance with applicable Law; provided that Provider shall not provide, and shall not be obligated to cause to provide, any Service to the extent that the provision of such Service would require Provider, its Affiliates or subcontractors, or any of their respective officers, directors, employees, agents or representatives to violate any applicable Law, any published privacy policies or Contract to which Provider, its Affiliates or subcontractors (as applicable) are party.

2.6    <u>Wrong Pockets</u>.

(a)    If any Party or its Affiliates becomes aware that (i) any right, property or asset forming part of the Purchased Assets (as defined in the applicable Purchase Agreement) has not been transferred or delivered to the applicable Buyer in error or (ii) any right, property or asset forming part of the Excluded Assets (as defined in the applicable Purchase Agreement) has been transferred or delivered to the wrong Party or its Affiliates in error, then (i) such Party or its Affiliates, as applicable, shall promptly notify the other Parties and the Parties (and their Affiliates) shall take such steps, as soon as reasonably possible, as may be required to transfer and deliver, or cause to be transferred and delivered, such Purchased Asset or Excluded Asset, as applicable, to the correct applicable Party, at the expense of the Party seeking the transfer and/or delivery and (ii) the Parties shall execute such documents or instruments of conveyance or assumption and take such further acts which are reasonably necessary or desirable to effect the transfer of such Purchased Asset or Excluded Asset, as applicable, to the correct Party.

(b)    If, on or after the Effective Date, any Party shall receive any payments or other funds due to another Party or any of its Affiliates (as reasonably determined by the receiving Party), then the Party receiving such funds shall promptly notify the other Party and forward such funds to the proper Party or its Affiliate.  If, after the Effective Date, either Party shall receive any invoice from a third party with respect to any accounts payable of another Party, then the Party receiving such invoice shall promptly deliver such invoice to the proper Party.

**ARTICLE III**
**COMPENSATION FOR SERVICES**

3.1    <u>Fees</u>.

(a)    Recipient agrees, in consideration for the performance of the Services by Provider, to pay to Provider such Recipient's applicable allocation set forth in Exhibit A of (i) all direct third party costs, and (ii) in the case of Services provided by Provider employees, the fully burdened costs of all such employees required to be retained by Provider in order to provide such Service as set forth on Exhibit A. The Fees will be passed-through by Provider at costs without any markup and are exclusive of any and all value-added, excise, sales, goods and services and other similar taxes, and any related interest and penalties, in each case, imposed on or payable with respect to the Fees payable by, or Services provided to, Recipient ("Sales Taxes"). Recipient shall bear and be solely responsible for the payment of Sales Taxes, subject to the receipt of a valid invoice to the extent required by Law to be issued in connection with such Sales Taxes.

(b)    If any withholding or deduction from any payment under this Agreement by a Recipient to Provider in relation to any Service is required in respect of any Taxes pursuant to any applicable Law, Recipient will: (i) make any such required withholding or deduction from the amount payable to Provider and (ii) timely pay the withheld or deducted amount referred to in clause (i) to the relevant Governmental Authority in accordance with applicable Law; and (iii) promptly forward to Provider a withholding tax certificate or other available documentation evidencing such payment by Recipient to the Governmental Authority.

(c)    For the avoidance of doubt, Provider is solely responsible for the payment of all Taxes based on the net income of Provider arising out of the receipt of the Fees paid to Provider pursuant to this Agreement.

(d)    Recipient and Provider will take reasonable steps to cooperate to minimize the imposition of, and the amount of, any Taxes incurred in connection with this Agreement.

3.2    Invoicing and Payment. Within thirty (30) days following the end of each calendar month during the Term, Provider shall deliver to Recipient a detailed invoice setting forth the Services provided and the Fees incurred for each of the Services provided, or caused to be provided, by Provider to Recipient during the prior calendar month (collectively, the "Monthly Amounts"). Each invoice shall be accompanied by supporting documentation for the Fees reasonably sufficient to enable Recipient to verify the information contained in such invoice. Recipient shall pay to Provider the undisputed Monthly Amounts reflected in an invoice therefor within thirty (30) days following Recipient's receipt of such invoice; provided, however, if the Agreement is terminated prior to the expiration of any such payment deadline, then Recipient shall pay Provider for any Services that have been performed as of the date of such termination.

**ARTICLE IV**
**DATA AND INTELLECTUAL PROPERTY**

4.1    Ownership of Data. Recipient shall own all right, title and interest in and to all data generated on its or its Affiliates' behalf in the performance of the Services.

4.2    License Grants. Subject to the terms and conditions of this Agreement, Core Buyer hereby grants to MGS Buyer and MMP Buyer a nonexclusive, worldwide, royalty-free, fully paid-up, non-transferable (except in accordance with Section 11.1), non-sublicensable license to use, for twelve (12) months, the Job-Board Technology for substantially the same purpose and in substantially the same manner that the applicable Businesses used the Job-Board Technology prior to Closing. To the extent necessary for Recipient to receive the full benefit of the Services and the Provider to provide the Services in accordance with this Agreement, each Provider and Recipient hereby grants to the other, a non-exclusive license to reproduce, modify, prepare derivative works of, and otherwise use the Intellectual Property used in connection with the provision or receipt of the Services. Such license may be exercised only to the extent

6

and for the duration necessary for Provider to provide, and Recipient to receive, the applicable Service as permitted by this Agreement, subject to any third-party license terms and restrictions that are placed on the licensor, as communicated to the licensee.

      4.3     <u>Ownership of Intellectual Property</u>.  As between the Parties, Core Buyer retains all right, title, and interest, including all Intellectual Property rights, in and to the Job-Board Technology and any Improvements thereto.  Except as set forth in <u>Section 4.2</u> or otherwise agreed by the Parties in writing, Provider (including its Affiliates) and Recipient shall each retain all right, title and interest in and to their respective Intellectual Property rights, and no other license (other than to the extent necessary for the provision or the receipt of the Services) or other right, express or implied, is granted hereunder (by implication, estoppel or otherwise) by any Party to its Intellectual Property rights.  Provider and Recipient shall execute or cause the execution of any documents, provide such cooperation, and take or cause the taking of any other actions reasonably requested by the other Party to effectuate the purposes of this <u>Section 4.3</u>, including the assignment of any rights hereunder.

**ARTICLE V**
**CONFIDENTIAL INFORMATION**

      5.1     For purposes of this Agreement, "<u>Confidential Information</u>" shall mean any non-public proprietary information disclosed by a Party to another Party in the performance hereunder, including methods of operation, customers, customer lists, products, prices, fees, costs, technology, inventions, trade secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; <u>provided</u>, <u>however</u>, "<u>Confidential Information</u>" does not include, and there shall be no obligation hereunder with respect to, information that (a) is or becomes generally available to the public, other than as a result of a disclosure not otherwise permissible hereunder, (b) is subsequently acquired by a Party from third-party sources not in breach of any confidentiality obligation of which such Party is aware, (c) is independently developed by a Party without use of or any reference to the confidential information of another Party, or (d) was already lawfully known by a Party receiving the Confidential Information prior to its disclosure to that Party from another Party.  The Parties shall, and shall cause their respective Affiliates, Third-Party Recipients, and representatives to, keep confidential this Agreement and all Confidential Information provided to it by or on behalf of a Party or otherwise obtained by it in connection with this Agreement and/or any of the transactions contemplated by it and not disclose such Confidential Information to any third-party; provided, however, that a Party may disclose Confidential Information to its and its Affiliates' officers, directors, employees, representatives, and contractors who have a need to know such information in connection with the receipt or provision of Services and who have been informed of the confidential nature of the Confidential Information and have agreed to keep such information confidential and not to use such information except in accordance with the terms of this Agreement.  Notwithstanding the foregoing, the Parties and their respective officers, directors, employees or Affiliates shall have no obligation to keep confidential any Confidential Information if and to the extent disclosure thereof is specifically required by applicable Law; <u>provided</u>, <u>however</u>, that in the event disclosure is required by applicable Law, the Party required to disclose shall, to the extent reasonably possible and legally permissible, (x) provide the other Party with prompt written notice of such requirement prior to making any disclosure so that the other Party may seek an appropriate protective order, (y) disclose only that information that is required to be furnished, and (z) use its best endeavours to obtain assurance that such disclosed Confidential Information will be accorded confidential treatment.

7

## ARTICLE VI
## IT AND COMPUTER SYSTEMS AND SERVICES

6.1     <u>Use of Systems</u>.  In connection with the provision of the Services hereunder, Recipient may have access to one or more systems of Provider, including computer systems and Software, data processing systems and communication systems of Provider, as identified on <u>Exhibit A</u> (collectively, the "<u>Systems</u>").  Recipient acknowledges that its use of the Systems may provide Recipient with access to Confidential Information or other data or information that is not related to the business of Recipient, and Recipient agrees that Recipient shall not use any Systems to access any such Confidential Information or other data or information not related to the business of Recipient.

6.2     <u>Employee Access to Systems</u>.  Recipient shall use commercially reasonable efforts to (i) ensure that only those of its personnel who are specifically authorized by Recipient or its Affiliates in accordance with this Agreement to have access to the Systems gain such access, and (ii) prevent unauthorized access, use, destruction, alteration or loss of information contained therein.  Recipient shall (i) inform its personnel using any of the Systems of the use restrictions set forth in this Article VI and require them to abide by the terms of this Article VI and (ii) be responsible for any use of such Systems in violation of this Article VI by any of its personnel.

6.3     <u>Policies</u>.  While using any Systems of Provider, Recipient shall adhere in all material respects to Provider's written policies, procedures and requirements (including policies with respect to protection of proprietary information) as well as any applicable third-party agreements, in each case regarding the use of such Systems as in effect from time to time and provided in advance in writing to Recipient.  Without limiting the foregoing, Recipient shall not tamper with, compromise or circumvent any security or audit measures employed by Provider with respect to the Systems.  If, at any time, Provider determines in its good faith business judgment that any personnel of Recipient has attempted to circumvent, or has circumvented, any of the written security policies, procedures or requirements of Provider or its Affiliates or has engaged in activities that may reasonably lead to the unauthorized access, use, destruction, alteration or loss of data, information or Software, then, notwithstanding anything in this Agreement to the contrary, Provider may, without any liability whatsoever under this Agreement or otherwise, immediately terminate such personnel's access to the applicable Systems.

6.4     <u>Remediation</u>.  Recipient shall use commercially reasonable efforts to prevent the introduction or transmission of any viruses, worms, malware, adware, ransomware, malicious code, data bombs or any other similar threats into the Systems, or permit any unauthorized access, breach or exfiltration of any Systems, or otherwise cause any breach or vulnerability in any of the Systems, in each case, caused directly by Recipient or any of Recipient's or its Affiliates' or Third-Party Recipients' personnel.  In the event that any of the foregoing occurs, Provider or its Affiliates may take any and all actions to eliminate, remediate or otherwise address, in Provider's reasonable discretion, any such threat, vulnerability or unauthorized access, breach or exfiltration and Provider's reasonable and documented costs associated with such elimination and remediation shall be reimbursed by Recipient.

6.5     <u>Recipient's IT Systems</u>.  Provider will not access Recipient's information technology systems except to provide the Services.  To the extent Provider will need to access Recipient's information technology systems to provide the Services, Provider shall use commercially reasonable efforts to (i) ensure that only those of its personnel who are specifically authorized by Provider or its Affiliates in accordance with this Agreement to have access to said systems gain such access, and (ii) prevent unauthorized access, use, destruction, alteration or loss of information contained therein.  Provider shall (i) inform its personnel using any of said systems of the use restrictions set forth in this Article VI and require them to abide by the terms of this Article VI and (ii) be responsible for any use of said systems in violation of this Article VI by any of its personnel.  While using any said systems, Provider shall adhere in all material respects to

8

Recipient's written policies, procedures and requirements (including policies with respect to protection of proprietary information) as well as any applicable third-party agreements, in each case regarding the use of such systems as in effect from time to time and provided in advance in writing to Provider.  Without limiting the foregoing, Provider shall not tamper with, compromise or circumvent any security or audit measures employed by Recipient with respect to said systems.  If, at any time, Recipient determines in its good faith business judgment that any personnel of Provider has attempted to circumvent, or has circumvented, any of the written security policies, procedures or requirements of Recipient or its Affiliates or has engaged in activities that may reasonably lead to the unauthorized access, use, destruction, alteration or loss of data, information or software, then, notwithstanding anything in this Agreement to the contrary, Recipient may, without any liability whatsoever under this Agreement or otherwise, immediately terminate such personnel's access to the applicable systems.  Provider shall use commercially reasonable efforts to prevent the introduction or transmission of any viruses, worms, malware, adware, ransomware, malicious code, data bombs or any other similar threats into the systems, or permit any unauthorized access, breach or exfiltration of any of Recipient's information technology systems, or otherwise cause any breach or vulnerability in any of said systems, in each case, caused directly by Provider or any of Provider's or its Affiliates' or third-party recipients' personnel.  In the event that any of the foregoing occurs, Recipient or its Affiliates may take any and all actions to eliminate, remediate or otherwise address, in Recipient's reasonable discretion, any such threat, vulnerability or unauthorized access, breach or exfiltration and Recipient's reasonable and documented costs associated with such elimination and remediation shall be reimbursed by Provider.

6.6     <u>Data Processing Addendum</u>.  Provider will comply with the Data Processing Addendum set out in Exhibit C.

## ARTICLE VII
## TERM AND TERMINATION

7.1     <u>Term</u>.  The term of this Agreement shall begin on the date hereof and shall remain in full force and effect, unless sooner terminated pursuant to <u>Section 7.2</u>, for so long as a Service described in <u>Exhibit A</u> remains in effect pursuant to the terms therein (the "<u>Term</u>", and the period specified as the service term for each Service set out in <u>Exhibit A</u>, the "<u>Service Term</u>"), provided, however, that (i) no Service will exceed a date that is twelve (12) months after the Effective Date, (ii) the license to the Job-Board Technology will continue for the period set forth in <u>Section 4.2</u> notwithstanding any expiration of the Term and (iii) <u>Section 2.6</u> and <u>Articles IV</u>, <u>V</u>, <u>VII</u>, <u>VIII</u>, <u>IX</u>, and <u>X</u> shall survive the expiration of the Term or the termination of this Agreement.

7.2     <u>Termination</u>.

(a)     In the event of an uncured material breach of this Agreement by either Provider or Recipient, the affected non-breaching Party may terminate this Agreement (but only with respect to the Service(s) to which such breach relates) upon written notice to the breaching Party specifying in reasonable detail the nature of such breach, subject to the following: (i) the breaching Party and affected non-breaching Party shall first engage in the dispute resolution process set forth in <u>Section 11.5</u>; and (ii) in the event that the breaching Party and affected non-breaching Party agree that a material breach has occurred, then the breaching Party shall have a period of forty-five (45) days to cure such breach; provided, that if the breaching Party is working in good faith to resolve such breach and such breach cannot be resolved within such initial forty-five (45) day period, the breaching Party shall have an additional forty-five (45) days to cure such breach (provided that the breaching Party gives the affected non-breaching Party a written notice as soon as practicable of its exercise of its option and certifying that it is working in good faith to resolve such breach).

9

(b)       Recipient may terminate its right to receive any Service upon not less than fifteen (15) days' written notice to Provider (unless a shorter time is mutually agreed upon amongst the applicable Recipient and Provider or as otherwise provided on Exhibit A) setting forth the Service(s) that Recipient desires to terminate (such Service, a "Terminated Service"); provided that if the provision of another Service is dependent on the continued provision of the Terminated Service and not specified in Exhibit A as an interdependent Service, then Provider shall provide written notice thereof within five (5) Business Days of receipt of the request to terminate a Terminated Service from Recipient, then Recipient shall terminate both the Terminated Service and such other Service unless Recipient withdraws or amends its request to terminate a Terminated Service within five (5) Business Days of receipt of such notice from Provider.  Recipient shall continue to be responsible for its allocation of any third party costs actually incurred after the Effective Date by Provider through the end of the Service Term which in all cases shall be the applicable full contract term for such Service (unless otherwise specified in Exhibit A).  Provider shall not be required to renew a third-party contract unless (i) specifically stated on Exhibit A as being required to be renewed, or (ii) otherwise agreed by the relevant Provider and Recipient(s) (including agreement regarding allocation of payment), prior to the date of any required notice of such renewal.

7.3       Expenses and Compensation After Termination.  In the event that this Agreement is terminated with respect to certain Services prior to the expiration of the Term as set forth in Section 7.2, Provider shall continue to be entitled to receive all undisputed Fees for such Terminated Services rendered prior to such termination that have not already been paid in full, together with any other amounts due to Provider hereunder.  Within thirty (30) days after receipt of the final invoice sent by Provider following termination of this Agreement, Recipient shall promptly remit to Provider all Fees or other amounts due hereunder.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES

8.1       RECIPIENT ACKNOWLEDGES AND AGREES THAT ALL SERVICES WILL BE PROVIDED BY PROVIDER "AS IS, WHERE IS AND WITH ALL FAULTS", THAT RECIPIENT ASSUMES ALL RISKS AND LIABILITIES ARISING FROM OR RELATING TO THE USE OR RELIANCE UPON THE SERVICES, AND THAT PROVIDER (ON BEHALF OF ITSELF, ITS AFFILIATES AND SUBCONTRACTORS) MAKES NO (AND HEREBY EXPRESSLY DISCLAIMS AND NEGATES ANY AND ALL) WARRANTIES OR REPRESENTATIONS OR CONDITIONS REGARDING THE SERVICES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO QUALITY, PERFORMANCE, COMMERCIAL UTILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, TITLE, PERFORMANCE, RESULTS OR REGARDING THE CONDITION, DESIGN OR WORKMANSHIP OF THE SERVICES OR THAT THE SERVICES WILL BE FREE FROM DEFECTS OR IMPERFECTIONS, REGARDLESS OF WHETHER SUCH REPRESENTATION OR WARRANTY IS ORAL OR WRITTEN, EXPRESS, IMPLIED OR STATUTORY OR ALLEGEDLY ARISING FROM ANY USAGE OR FROM ANY COURSE OF DEALING; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT LIMIT PROVIDER'S EXPRESS OBLIGATIONS, REPRESENTATIONS AND WARRANTIES UNDER THIS AGREEMENT OR THE APPLICABLE PURCHASE AGREEMENT.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH PARTY SHALL BE SOLELY RESPONSIBLE FOR ITS RESPECTIVE COMPLIANCE WITH APPLICABLE LAW, AND NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS A REPRESENTATION OR WARRANTY BY PROVIDER THAT THE SERVICES WILL ALLOW RECIPIENT TO COMPLY WITH LAW OR ARE SUFFICIENT TO SATISFY ANY OF RECIPIENT'S OBLIGATIONS UNDER APPLICABLE LAW.

## ARTICLE IX
## LIMITATION OF LIABILITY

9.1      NOTWITHSTANDING ANY PROVISION OF THE PURCHASE AGREEMENTS TO THE CONTRARY, EXCEPT IN THE EVENT OF ANY FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, OR BREACH OF ARTICLE V (CONFIDENTIAL INFORMATION), NO PARTY (INCLUDING SUCH PARTY'S AFFILIATES AND SUBCONTRACTORS)  SHALL BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES (INCLUDING LOST OR ANTICIPATED REVENUES, LOSS OF PROFITS, LOST OR ANTICIPATED SAVINGS, LOSS OF BUSINESS OPPORTUNITY OR INJURY TO GOODWILL RELATING TO THE SAME AND ATTORNEY'S FEES) ARISING FROM ANY CLAIM RELATING TO THIS AGREEMENT OR ANY OF THE SERVICES TO BE PROVIDED HEREUNDER OR THE PERFORMANCE OF OR FAILURE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT, WHETHER SUCH CLAIM IS BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE, AND REGARDLESS OF WHETHER SUCH DAMAGES ARE FORESEEABLE OR AN AUTHORIZED REPRESENTATIVE OF PROVIDER IS ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES.  EXCEPT IN THE EVENT OF ANY FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, OR BREACH OF ARTICLE V (CONFIDENTIAL INFORMATION), EACH PARTY'S MAXIMUM LIABILITY UNDER OR PURSUANT TO THIS AGREEMENT IS STRICTLY LIMITED IN THE AGGREGATE TO THE TOTAL AMOUNTS PAID OR PAYABLE BY RECIPIENT PURSUANT TO THE TERMS OF THIS AGREEMENT.

## ARTICLE X
## INDEMNIFICATION

10.1     <u>Recipient Indemnity</u>.  Recipient shall indemnify Provider and each of its Affiliates against all damages, losses, liabilities and costs (including reasonable outside legal fees and expenses) attributable to any third-party claims arising from or relating to (a) violation of applicable Law by Recipient or its Affiliates in connection with the receipt of Services or (b) Recipient's fraud, willful misconduct or gross negligence in connection with Recipient's conduct under this Agreement, except to the extent that such damages, losses, liabilities or costs are indemnifiable by Provider hereunder.

10.2     <u>Provider Indemnity</u>.  Provider shall indemnify Recipient and each of its Affiliates against all damages, losses, liabilities and costs (including reasonable outside legal fees and expenses) attributable to any third-party claims arising from or relating to (a) violation of applicable Law by Provider or its Affiliates in connection with the provision of Services or (b) Provider's fraud, willful misconduct or gross negligence in connection with Provider's conduct under this Agreement, except to the extent that such damages, losses, liabilities or costs are indemnifiable by Recipient hereunder.

10.3     <u>Indemnification Procedures</u>.  With respect to any claim requiring indemnification pursuant to this <u>Section 10.3</u>, the Party seeking indemnification (the "<u>Indemnified Party</u>") agrees (i) to send the other Party (the "<u>Indemnifying Party</u>") written notice of such claim promptly after receiving written notice of the same; (ii) to give the Indemnifying Party authority to proceed as contemplated herein; and (iii) at the Indemnifying Party's expense, to give the Indemnifying Party proper and reasonable information and assistance to settle and/or defend any such claim; provided, however, the Indemnifying Party shall not be entitled to settle or compromise any such asserted claim, suit or proceeding without the prior written consent the Indemnified Party if it is required to admit fault or would subject the Indemnified Party to any liability or business restriction.

## ARTICLE XI
## MISCELLANEOUS

11.1     <u>Assignment</u>.  Except as expressly permitted by this Agreement, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any Party (whether by operation of Law or otherwise) without the prior written consent of the other Parties, and any such assignment shall be null and void.  No assignment by any Party shall relieve such Party of any of its obligations hereunder.  Any attempted or purported assignment in violation of this <u>Section 11.1</u> will be deemed void ab initio.  Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, including, in the case of the Seller, the trustee in the Bankruptcy Case. Notwithstanding the foregoing, the Seller may assign some or all of its respective rights or delegate some or all of its respective obligations hereunder to a chapter 7 trustee, chapter 11 trustee, liquidating trust, liquidating trustee, or any other successor entities pursuant to a chapter 11 plan confirmed by the Bankruptcy Court, provided that no such assignment will result in incremental unreimbursed withholding or other Taxes which may be economically borne by the Seller or any of its Affiliates.  Notwithstanding the other provisions of this <u>Section 11.1</u>, this Agreement shall be assignable by a party in connection with a merger, sale of substantially all of its assets or outstanding capital stock or other sale transaction.

11.2     <u>Force Majeure</u>.  In the event that war, terrorist act, fire, explosion, natural disaster, accident, strike, riot, labor dispute, act of governmental authority, act of God, pandemic or other contingency beyond the control of Provider causes any cessation or interruption of Provider's performance hereunder, performance by Provider shall be temporarily excused for the period of the disability, without liability.  In the event that Provider is excused from providing Services in accordance with the terms of this <u>Section 11.2</u> for a period exceeding thirty (30) consecutive calendar days, the Provider or the Recipient of the affected Services may terminate this Agreement (but only with respect to the affected Services) upon written notice to such other Party of such termination without prejudice.

11.3     <u>Construction</u>.  The definitions in the body of this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The words "herein", "hereof" and "hereunder" and words of similar import refer to this Agreement (including the Exhibits to this Agreement) in its entirety and not to any part hereof unless the context shall otherwise require.  All references herein to Articles, Sections, and Exhibits shall be deemed references to Articles and Sections of, and Exhibits to, this Agreement unless the context shall otherwise require.  Unless the context shall otherwise require, any references to this Agreement, any other agreement or other instrument or statute or regulation are to it as amended and supplemented from time to time (and, in the case of a statute or regulation, to any successor provisions).  Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Any reference in this Agreement to a "day" or a number of "days" (without explicit reference to Business Days) shall be interpreted as a reference to a calendar day or number of calendar days.  If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action may be deferred until the next Business Day.

11.4     <u>Notices</u>.  All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) when sent if delivered or transmitted by email (provided, no "bounce back" or notice of non-delivery is generated), (c) upon receipt after dispatch by registered or certified mail, return receipt requested on postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

12

(a)    if to the Seller:

        Zen JV, LLC
        c/o Apollo Management X, L.P.
        9 West 57th Street
        43rd Floor
        New York, New York 10019
        Attn: Robert Kalsow-Ramos
                Maxwell David
                Whitney Chatterjee

       Email: rkalsow-ramos@apollo.com
              mdavid@apollo.com
              wchatterjee@apollo.com

       with a mandated copy (which shall not constitute notice) to:

       Latham & Watkins LLP
       1271 Avenue of the Americas New York, NY 10020
       Attention:     Ray Schrock
                    Candace Arthur
                    Rick Press
                    Michael Anastasio

       Email: ray.schrock@lw.com
            candace.arthur@lw.com
            eric.press@lw.com
            michael.anastasio@lw.com

       with a mandated copy (which shall not constitute notice) to:

       Richards, Layton & Finger, PA
       920 N. King St.
       Wilmington, DE 19801
       Attn: Zachary Shapiro
       Email: shapiro@rlf.com

(b)    if to Core Buyer:

       BOLD Holdings LLC
       City View Plaza II,
       48 Road 165, Suite 6000
       Guaynabo, Puerto Rico 00968-8060
       Attn: Gary Hsueh and Legal;
       Email: gary.hsueh@bold.com, legal@bold.com

       with a mandated copy (which shall not constitute notice) to:

       Cooley, LLP
       500 Boylston Street, 14th Floor

Boston, MA 02116
Attn: Miguel J. Vega; Daniel Shamah; Michael Klein
Email: mvega@cooley.com; dshamah@cooley.com; mklein@cooley.com

(c)    if to MGS Buyer:

Sherrill-Lubinski, LLC
871 Marlborough Ave Suite 100
Riverside, CA 92507 USA
Attn: Legal Department
Email: legal@partnerone.com

and to

ETI-NET INC.
203-6900 Boulevard Arthur Sauve, laval
Quebec, H7R3X9
Attn: Legal Department
Email: legal@partnerone.com

with a mandated copy (which is required to constitute notice) to:

Foley & Lardner LLP
1000 Louisiana Street, Suite 2000
Houston, TX 77002
Attn: John Melko
Email: jmelko@foley.com;

and to:

Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Attn: Jake Gordon
Email: jgordon@foley.com

(d)    if to MMP Buyer:

Valnet US Inc.
7405 Transcanada Highway, Suite 100
Saint-Laurent, Quebec H4T 1Z2
Attn: Yury Smagorinsky; Rony Arzoumanian
Email: yury.s@valnetinc.com; rony.a@valnetinc.com

with a mandated copy (which shall not constitute notice) to:

Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Attn: Steven Boender
Email: steven.boender@stoel.com

14

or to such other address as any Party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated or personally delivered.  Any Party may notify any other Party of any changes to the address or any of the other details specified in this Section 11.4; *provided* that such notification shall only be effective on the date specified in such notice or five (5) Business Days after the notice is given, whichever is later.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

11.5    Disputes.  All disputes arising hereunder, including disputes involving compliance with Section 2.6, shall be first considered in person, by teleconference or by video conference by the Program Coordinators in good faith within fifteen (15) days after receipt of written notice from a Party specifying the nature of the dispute.  If the dispute cannot be resolved by the Program Coordinators within fifteen (15) days of the receipt of such notice, the matter shall be referred to Jesse DelConte (delconte@alixpartners.com, representing the Seller), [ ● ] (representing Core Buyer), Joe Berkowitz (jberkowitz@partnerone.com, representing MGS Buyer) or Yury Smagorinsky (yury.s@valnetinc.com, representing MMP Buyer), as applicable, who shall cooperate in good faith to resolve such dispute within seven (7) days of the referral.  If the dispute cannot be resolved by such persons within such time period, any disputing Party may seek to resolve the dispute in accordance with Section 11.6(b). The Program Coordinators and such representatives may be amended from time to time to another person of substantially equivalent seniority upon notice to the other Parties.

11.6    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply or disputes involving Section 2.6, this Agreement, and all claims and causes of action arising out of, based upon, or related to this Agreement or the negotiation, execution or performance hereof, shall be governed by, and construed, interpreted and enforced in accordance with, the Laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any Laws other than the Laws of the State of Delaware.

(b)    Any action, claim, suit or Proceeding arising out of, based upon or relating to Section 2.6 of this Agreement shall be brought solely in the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court).  Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) in respect of any action, claim, suit or Proceeding arising out of, based upon or relating to Section 2.6 of this Agreement and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided, however*, that, if the Bankruptcy Case is closed or dismissed, any action, claim, suit or Proceeding arising out of, based upon or relating to Section 2.6 of this Agreement and any other action claim suit or Proceeding arising out of this Agreement shall be heard in, and the Parties hereto irrevocably (i) consent to submit to the exclusive jurisdiction of the Delaware Court of Chancery or any Federal court located in the State of Delaware, for the purposes of any Action arising out of this Agreement, (ii) waive any objection to the laying of venue of any Action brought in such court, (iii) waive and agree not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum, and (iv) agree that service of process or of any other papers upon such Party by registered mail at the address to which notices are required to be sent to such Party under Section 11.4 shall be deemed good, proper and effective service upon such Party. Each of the parties hereto irrevocably waives to the fullest extent permitted by applicable Law any and all right such party may have to trial by jury in any action, claim, suit or Proceeding (whether based in contract, tort or otherwise) between the Parties hereto arising out of, based upon or relating to this Agreement or the negotiation, execution or performance hereof. Each Party hereto (i) certifies that no representative, agent or attorney of any other Party has

15

represented, expressly or otherwise, that such Party would not, in the event of any Proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties hereto have been induced to enter into this Agreement by, among other things, the mutual waiver and certifications in this Section 11.6.

11.7    <u>Relationship of the Parties</u>.  The relationship of Provider to Recipient is that of an independent contractor and neither Provider nor its agents or employees shall be considered employees or agents of Recipient.  This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture or grant of a franchise between Provider and Recipient.

11.8    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.    Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

11.9    <u>Amendment and Modification</u>.  This Agreement may be amended, modified or supplemented only by a written instrument signed by each of the Parties that are, at the time of the proposed amendment, modification or supplementation, Providers or Recipients under this Agreement with respect to the Service or term being so amended, modified or supplemented.

11.10    <u>Waiver</u>.  Any Party to this Agreement may, (a) extend the time for the performance of any of the obligations or other acts of the other Parties, (b) waive any inaccuracies in the representations and warranties of the other Parties contained herein or in any document delivered by the other Parties pursuant hereto, or (c) waive compliance with any of the agreements of the other Parties or conditions to such Parties' obligations contained herein, in each case to the extent that such Party is a Provider or Recipient under this Agreement with respect to the applicable service at the time of such extension or waiver, as the case may be.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of any Party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

11.11    <u>Mutual Drafting; Headings</u>.  The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent.  If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.   The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

11.12    <u>Publicity</u>.  No Party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or otherwise communicate with any news media in respect of this Agreement without the prior written consent of the other Parties; <u>provided</u> that the Parties may disclose such matters to their respective employees, accountants, advisors and other representatives as necessary in connection with the ordinary conduct of their respective businesses (so long as such Persons

agree to, or are bound by contract or professional or fiduciary obligations to, keep the terms of this Agreement confidential and so long as the Parties shall be responsible to the other Parties hereto for breach of this <u>Section 11.12</u> or such confidentiality obligations by the recipients of its disclosure); provided, further, that each Party and its Affiliates may disclose that the Parties have entered into a transitional services arrangement from time to time to its employees, customers, suppliers and any other Person as the requirements of any contract to which such Party is a party (so long as such Persons agree to, or are bound by contract or professional or fiduciary obligations to, keep the terms of this Agreement confidential and so long as the Parties shall be responsible to the other Parties hereto for breach of this <u>Section 11.12</u> or such confidentiality obligations by the recipients of its disclosure).

11.13    <u>Expenses</u>.  Except as otherwise specified in this Agreement, each Party shall be solely responsible for all costs and expenses incurred by it in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement.

11.14    <u>No Right of Setoff</u>.  Each of the Parties hereto hereby acknowledges that it shall have no right under this Agreement to offset any amounts owed (or to become due and owing) to another Party hereto, whether under this Agreement, the Purchase Agreements or otherwise, against any other amount owed (or to become due and owing) to it by another Party hereto.

11.15    <u>Entire Agreement</u>.  This Agreement and the Purchase Agreements constitute the entire agreement of the Parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings among the Parties with respect thereto.

11.16    <u>No Third-Party Beneficiaries</u>.  Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties hereto, any right or remedies under or by reason of this Agreement.

11.17    <u>Counterparts</u>.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a photographic, photostatic, facsimile, portable document format (.pdf), DocuSign, electronic signature or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No Party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail or that any signature is in facsimile or electronic format (including .pdf or DocuSign) as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

11.18    <u>Approval of the Bankruptcy Court</u>.  Notwithstanding anything herein to the contrary, any and all rights, interests or obligations under this Agreement are subject to approval of the Bankruptcy Court.

*Remainder of page left intentionally blank.*

RLF1 33350760v.2

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

SELLER:

Zen, JV, LLC

By: _____

Name:
Title:

*[Signature Page to Transition Services Agreement]*

CORE BUYER:

Bold Holdings LLC

By: _____

Name:
Title:

*[Signature Page to Transition Services Agreement]*

MGS BUYER:

Sherrill-Lubinski, LLC

By: _____
       Name:
       Title:

ETI-NET inc.

By: _____
       Name:
       Title:

*[Signature Page to Transition Services Agreement]*

MMP BUYER:

Valnet US Inc.


By: _____
Name:
Title:

**<u>Exhibit A</u>**
**Services**

RLF1 33350760v.2

**<u>Exhibit B</u>**
**Program Coordinators**

MGS Buyer: Susan Fallon, [susan.fallon@monster.com]

Core Buyer: [ ● ]

MMP Buyer:  Rony Arzoumanian, rony.a@valnetinc.com

Seller: John Creighton, jcreighton@alixpartners.com

Exhibit B - 1

**Exhibit C**

**DATA PROCESSING ADDENDUM**

1.  **General**. Provider and Recipient agree to fully comply with and provide the level of privacy protection required by all applicable laws and regulations governing the privacy, security, storage, transfer, and respective use of Personal Data, including without limitation, *where applicable*, the California Consumer Privacy Act of 2018, as amended, including by the California Privacy Rights Act ("CCPA") (collectively, the "Data Protection Laws"). For Personal Data subject to a Data Privacy Law, if a provision of this Addendum conflicts with the relevant Data Privacy Law, the Data Privacy Law will prevail. Provider must not access, collect, store, retain, transfer, use, or otherwise Process in any manner any Personal Data, except: (i) in the interest and on behalf of Recipient; (ii) as directed in writing by authorized personnel of Recipient; or (iii) as otherwise allowed or required by applicable Data Privacy Laws. "Process" or its equivalent is defined by the applicable Data Protection Laws. Provider must implement and maintain reasonable and appropriate technical and organizational measures designed to ensure the confidentiality, integrity, and availability of personal data, and in no event shall such measures be less than those in place by the Business as of immediately prior to the Closing.

2.  **CCPA**. Terms defined in the CCPA, including personal information, business purposes, collect, sell, and share, carry the same meaning in this Addendum. If Provider is processing personal information as within the scope of the CCPA, Provider agrees to the following further commitments to Recipient: (a) Provider will not sell or share the personal information it collects pursuant to this Addendum; (b) Provider will not retain, use, or disclose the personal information it collects pursuant to this Addendum for any purposes (including a commercial purpose) other than to provide the Services or as otherwise permitted by the CCPA; (c) Provider will not retain, use, or disclose the personal information it collects pursuant to this Addendum outside of the direct business relationship between Provider and Recipient. Provider will not combine the personal information that the Provider receives from, or on behalf of, Recipient with personal information that it receives from, or on behalf of, another person or persons, or collects from its own interaction with the consumer. Provider certifies that it understands these restrictions and will comply with them. Provider must promptly comply, to the extent required by any applicable Data Protection Laws, with any Recipient request or instruction requiring the Provider to provide, amend, transfer, or delete the personal information, or to stop, mitigate, or remedy any unauthorized processing. Recipient may monitor the Provider's compliance with this Addendum through reasonable measures, including, but not limited to, ongoing manual reviews and automated scans and regular assessments, audits, or other technical and operational testing at least once every 12 months; provided, that any routine onsite audits shall be limited to once per year, unless: (a) otherwise required by a Governmental Authority (including under applicable FedRAMP or any similar federal or state requirements, or any other Permits or compliance standards required by such party to operate its Business in substantially the same manner as prior to Closing), (b) is otherwise required to comply with the terms of any contracts of such party with a third party (e.g., customer contracts), or (c) there is one or more identified instance of non-compliance with this Exhibit C that is identified prior to such audit or as a result of such audit.

Exhibit C - 1