**Exhibit 1**

**APA**

**PROJECT MERCURY**
**EXECUTION VERSION**

---

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**ZEN JV, LLC, AS THE SELLER,**

**EACH OF THE AFFILIATES OF THE SELLER LISTED ON <u>SCHEDULE I</u>**

**AND**

**BOLD HOLDINGS LLC, AS THE BUYER**


**DATED AS OF JULY 27, 2025**

---

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ..................................................................................................6

    Section 1.1    Definitions.........................................................................6
    Section 1.2    Construction ......................................................................18

ARTICLE II PURCHASE AND SALE ..............................................................................19

    Section 2.1    Purchase and Sale of Assets.............................................19
    Section 2.2    Excluded Assets ...............................................................21
    Section 2.3    Assumed Liabilities .........................................................23
    Section 2.4    Excluded Liabilities .........................................................23
    Section 2.5    Assumption and Assignment of Certain Contracts..........25
    Section 2.6    Designation of Assets and Liabilities ..............................26
    Section 2.7    Consents to Certain Assignments.....................................27
    Section 2.8    Wrong Pockets .................................................................27

ARTICLE III PURCHASE PRICE; DEPOSIT ..................................................................28

    Section 3.1    Purchase Price ..................................................................28
    Section 3.2    Deposit Escrow ................................................................28
    Section 3.3    Allocation.........................................................................29

ARTICLE IV THE CLOSING .............................................................................................30

    Section 4.1    Time and Place of the Closing..........................................30
    Section 4.2    Deliveries by the Seller....................................................30
    Section 4.3    Deliveries by the Buyer ...................................................31

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLING
ENTITIES ...........................................................................................................................31

    Section 5.1    Organization, Standing and Corporate Power .................31
    Section 5.2    Subsidiaries......................................................................32
    Section 5.3    Authority; Execution and Delivery; Enforceability..................................32
    Section 5.4    No Conflicts.....................................................................32
    Section 5.5    Legal Proceedings and Orders .........................................33
    Section 5.6    Permits .............................................................................33
    Section 5.7    Compliance with Law.......................................................33
    Section 5.8    Absence of Certain Developments....................................34
    Section 5.9    Financial Statements.........................................................34
    Section 5.10    Employee Benefit Plans....................................................34
    Section 5.11    Material Contracts............................................................36
    Section 5.12    Intellectual Property; Information Technology .................37

i

Section 5.13 Data Privacy...............................................................................38
Section 5.14 Taxes...........................................................................................38
Section 5.15 Insurance.....................................................................................39
Section 5.16 Title to Assets; Real Property .....................................................39
Section 5.17 Environmental Matters................................................................39
Section 5.18 Brokers.........................................................................................39
Section 5.19 OFAC; Foreign Corrupt Practices Act; Anticorruption Laws ..................39
Section 5.20 Material Customers; Material Suppliers .....................................40
Section 5.21 Affiliate Transactions..................................................................40
Section 5.22 Employment Matters....................................................................41

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF THE BUYER ........................41

Section 6.1 Organization and Good Standing...............................................41
Section 6.2 Authority Relative to this Agreement ........................................42
Section 6.3 No Violation; Consents...............................................................42
Section 6.4 Legal Proceedings and Orders ...................................................43
Section 6.5 Brokers.........................................................................................43
Section 6.6 Solvency.......................................................................................43
Section 6.7 Financial Capability ...................................................................43
Section 6.8 Certain Arrangements .................................................................43

ARTICLE VII COVENANTS OF THE PARTIES.................................................................44

Section 7.1 Conduct of Business of Selling Entities.....................................44
Section 7.2 Conduct of Business of the Buyer .............................................45
Section 7.3 Access to and Delivery of Information; Maintenance of Records............46
Section 7.4 Expenses ......................................................................................48
Section 7.5 Further Assurances......................................................................48
Section 7.6 Public Statements; Confidentiality ............................................48
Section 7.7 Non-Competition ........................................................................49
Section 7.8 Employee Matters .......................................................................50
Section 7.9 Privacy Matters ..........................................................................52
Section 7.10 Tax Matters .................................................................................52
Section 7.11 Submission for Bankruptcy Court Approval ..............................53
Section 7.12 Overbid Procedures; Adequate Assurance.................................54
Section 7.13 [Reserved]...................................................................................54
Section 7.14 Transfer of Purchased Assets......................................................54
Section 7.15 Intellectual Property Matters......................................................55
Section 7.16 Purchased Assets "AS IS;" Certain Acknowledgements...........56
Section 7.17 Release .........................................................................................57
Section 7.18 Limitation of Damages ...............................................................58
Section 7.19 Transition Services......................................................................58
Section 7.20 Withholding ................................................................................59

ii

ARTICLE VIII CONDITIONS TO CLOSING ..................................................................59

Section 8.1    Conditions to Each Party's Obligations to Effect the Closing ..................59
Section 8.2    Conditions to Obligations of the Buyer ...............................................60
Section 8.3    Conditions to Obligations of the Selling Entities ......................................61
Section 8.4    Frustration of Closing Conditions ...............................................................61

ARTICLE IX TERMINATION; WAIVER ............................................................................61

Section 9.1    Termination ...............................................................................................61
Section 9.2    Procedure and Effect of Termination .........................................................63
Section 9.3    Extension; Waiver ......................................................................................64

ARTICLE X MISCELLANEOUS PROVISIONS ...............................................................64

Section 10.1    Amendment and Modification ...................................................................64
Section 10.2    Survival ......................................................................................................64
Section 10.3    Notices ........................................................................................................64
Section 10.4    Assignment ................................................................................................66
Section 10.5    Severability ................................................................................................67
Section 10.6    Governing Law ..........................................................................................67
Section 10.7    Acknowledgement and Release; Non-Recourse ........................................67
Section 10.8    Submission to Jurisdiction; WAIVER OF JURY TRIAL .........................68
Section 10.9    Counterparts ...............................................................................................68
Section 10.10  Incorporation of Schedules and Exhibits ....................................................69
Section 10.11  Entire Agreement .......................................................................................69
Section 10.12  Specific Performance ..................................................................................69
Section 10.13  Bulk Sales or Transfer Laws ......................................................................69
Section 10.14  Seller Disclosure Schedule .........................................................................69
Section 10.15  Privileged Communications ........................................................................70
Section 10.16  Mutual Drafting; Headings; Information Made Available .......................71
Section 10.17  Approval of the Bankruptcy Court    71

321114774 v38

<u>SCHEDULES</u>

Schedule I            Other Selling Entities

<u>EXHIBITS</u>

Exhibit A            Form of Escrow Agreement

iv

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (as amended, modified or supplemented from time to time, this "Agreement") is made and entered into as of July 27, 2025, by and among Zen JV, LLC, a Delaware limited liability company (the "Seller"), the Affiliates of the Seller listed on Schedule I (such Affiliates, together with the Seller, the "Selling Entities"), Bold Holdings LLC, a Puerto Rico limited liability company (the "Buyer"). Each of the Selling Entities and the Buyer are referred to herein as a "Party" and collectively as the "Parties." Capitalized terms used but not otherwise defined herein have the meanings set forth in Article I.

## RECITALS

**WHEREAS,** on June 23, 2025, Seller has entered into an escrow agreement attached hereto as Exhibit A (the "Escrow Agreement") with Citibank, N.A. (the "Escrow Agent");

**WHEREAS,** the Seller and the other Debtor Entities commenced voluntary cases under the Bankruptcy Code in the Bankruptcy Court on June 24, 2025 (such filing date, the "Petition Date");

**WHEREAS,** each of the Seller and the other Debtor Entities continues to be in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

**WHEREAS,** subject to the approval of the Bankruptcy Court, the Buyer desires to purchase from the Selling Entities, and the Selling Entities desire to sell to the Buyer, certain of the Selling Entities' assets related to the Business, and the Buyer desires to assume from the Selling Entities, certain specified liabilities, in each case pursuant to the terms and subject to the conditions set forth herein;

**WHEREAS,** the Selling Entities and the Buyer have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Selling Entities to the Buyer shall be effected pursuant to, among others, section 363 of the Bankruptcy Code; and

**WHEREAS,** in connection with the Bankruptcy Case and subject to the terms and conditions contained herein, following entry of the Sale Order finding the Buyer as the prevailing bidder at the Auction, the Selling Entities shall sell and transfer to the Buyer, and the Buyer shall purchase and acquire from the Selling Entities, pursuant to, among others, section 363 of the Bankruptcy Code, the Purchased Assets, and the Buyer shall assume from the Selling Entities the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

DM3\11606492.2

321114774 v38

**ARTICLE I**
**DEFINITIONS**

Section 1.1    Definitions.    A defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined.  As used in this Agreement, the following terms have the meanings specified below:

"Accounting Firm" has the meaning given to such term in Section 3.3.

"Accounts Receivable" means any and all (a) accounts receivable, notes receivable, trade receivables and other amounts receivable generated by the Business or owed to the Selling Entities (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all causes of action pertaining to the collection of amounts payable, or that may become payable, to the Selling Entities with respect to products sold or services performed on or prior to the Closing Date and (b) license and royalty receivables payable, or that may become payable, to the Selling Entities with respect to products sold or services performed on or prior to the Closing Date.

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person; provided that, other than in the case of the definition of "Seller Related Parties" and for purposes of Section 2.2(c), Section 7.6, Section 7.7, Section 7.15, Section 7.17, Section 10.7, in no event shall the Seller, the Selling Entities, or any of their respective Subsidiaries be considered an Affiliate of Apollo Global Management, Inc. ("Apollo") or any portfolio company or investment fund affiliated with or managed by affiliates of Apollo, nor shall Apollo or any portfolio company or investment fund affiliated with or managed by affiliates of Apollo, be considered to be an Affiliate of the Seller, the Selling Entities or any of their respective Subsidiaries.  For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the management or affairs of another Person by reason of ownership of the voting stock, general partner or managing member, or Contract or otherwise.

"Agreement" has the meaning given to such term in the Preamble hereto.

"Allocation" has the meaning given to such term in Section 3.3.

"Anticorruption Laws" means all Laws of any jurisdiction applicable to the Selling Entities, or the Business from time to time concerning or relating to bribery or corruption.

"Assignment and Assumption Agreement" means one or more Assignment and Assumption Agreements to be executed and delivered by the Buyer, and the Selling Entities at the Closing, in form and substance reasonably acceptable to the Buyer and the Seller.

"Assumed Agreements" has the meaning given to such term in Section 2.1(c).

"Assumed Liabilities" has the meaning given to such term in Section 2.3.

6

"<u>Assumption Approval</u>" has the meaning given to such term in <u>Section 2.5(g)</u>.

"<u>Auction</u>" has the meaning given to such term in the Bidding Procedures.

"<u>Balance Sheet Date</u>" has the meaning given to such term in <u>Section 5.9(a)</u>.

"<u>Bankruptcy Case</u>" means the Seller's and the Debtor Entities' cases commenced under Chapter 11 of the Bankruptcy Code jointly administered under Case No. 25-11195 (JKS) in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

"<u>Bankruptcy Court</u>" means United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Bankruptcy Case.

"<u>Bidding Procedures</u>" means the bidding procedures approved pursuant to the Bidding Procedures Order.

"<u>Bidding Procedures Motion</u>" means the motion filed at Docket Number 28 in the Bankruptcy Case.

"<u>Bidding Procedures Order</u>" means the order of the Bankruptcy Court approving the Bidding Procedures Motion and the Bidding Procedures.

"<u>Bill of Sale</u>" means one or more Bills of Sale to be executed and delivered by the Selling Entities to the Buyer at the Closing, in form and substance reasonably acceptable to the Buyer and the Seller.

"<u>Business</u>" the Monster Core Business and the CB Business, in each case, as conducted by the Selling Entities as of the date hereof in the United States but excluding the business of the Non-Core Businesses. For the avoidance of doubt, the Business includes any personnel, infrastructure, systems, or assets, regardless of location, that materially support sales, account management, marketing, technical operations, or other functions of the Business that do not fall under the business of the Non-Core Businesses.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York.

"<u>Business IP</u>" means, collectively, the Job-Board Technology and all other all Seller IP that is not an Excluded Asset.

"<u>Business Marks</u>" means all Trademarks in all classes of goods and services containing, in whole or in part, the names, terms or logos listed on <u>Section 1.1(b)</u> of the Seller Disclosure Schedule, or any combinations or variation thereof.

"<u>Business Names</u>" means CareerBuilder and Monster.

7

"<u>Buyer</u>" has the meaning given to such term in the Preamble hereto, including any Designated Buyer pursuant to Section 10.4(b).

"<u>Buyer Default Termination</u>" has the meaning given to such term in <u>Section 3.2</u>.

"<u>Buyer Fundamental Representations</u>" has the meaning given to such term in <u>Section 8.3(b)</u>.

"<u>Buyer Related Parties</u>" means, collectively, the Buyer and its Affiliates and each of their respective directors, officers, managers, employees, owners, advisors and representatives.

"<u>Buyer Releasing Party</u>" has the meaning given to such term in <u>Section 7.17(a)</u>.

"<u>Buyer Transition Services</u>" has the meaning given to such term in <u>Section 7.19(a)</u>.

"<u>Cash</u>" means any cash and cash equivalents (including checks, deposits, demand deposits, money markets or similar accounts, escrow accounts, checking account balances, marketable securities, short-term instruments, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts or deposits, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held by or on behalf of any Person), including all cash and cash equivalents posted to support letters of credit, performance bonds or other similar obligations, in each case calculated in accordance with the accounting principles or standards used to prepare the Seller Financial Statements.

"<u>Cash Purchase Price</u>" means an amount equal to (a) twenty eight million three hundred seventy six thousand dollars ($28,376,000) <u>minus</u> (b) the Deposit.  For the purposes of the definition of "<u>Cash Purchase Price</u>", the "<u>Deposit</u>" shall include all interest accrued on the amount deposited by the Buyer into escrow with the Escrow Agent pursuant to <u>Section 3.2</u>.

"<u>CB Business</u>" means the business of the Selling Entities to the extent conducted in connection with an online, or other digital and mobile job advertising platform allowing and connecting Persons in the recruitment industry, providing applicant search and screening services, including job postings, employers branding, resume database access, employee search and screening services, organizing job fairs, leveraging digital, social and mobile solutions, including through careerbuilder.com and other job advertising websites.

"<u>Claim</u>" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

"<u>Closing</u>" has the meaning given to such term in <u>Section 4.1</u>.

"<u>Closing Date</u>" has the meaning given to such term in <u>Section 4.1</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Confidentiality Agreement</u>" means the letter agreement, by and between the Seller and the Buyer, dated June 30, 2025.

8

"Consent" means any approval, consent, ratification, designation, permission, clearance, waiver or other authorization.

"Contract" means, with respect to any Person, any written lease, sublease, contract, deed of trust, deed to secure debt, note, bond, indenture, guarantee, mortgage, license, sublicense or other legally enforceable agreement, instrument or obligation to which such Person is a party or by which such Person is bound.

"Contract Notice Period" has the meaning given to such term in Section 2.5(d).

"Cure Payments" has the meaning given to such term in Section 2.5(f).

"Cure Schedule" has the meaning given to such term in Section 7.11(b).

"D&O Claims" means all rights, claims and causes of action against any current or former director, officer, equityholder or Transferred Employee of any Selling Entity and all rights, claims and causes of action under director and officer, fiduciary, employment practices and similar insurance policies maintained by any Selling Entity.

"Debtor Entities" means (a) the Seller, (b) Monster Worldwide LLC, (c) Military Advantage, LLC, (d) FastWeb, LLC, (e) Monster Government Solutions, LLC, (f) Camaro Acquisition, LLC, (g) CareerBuilder, LLC, (h) CareerBuilder France Holding LLC, (i) CareerBuilder Government Solutions LLC and (j) Luceo Solutions, LLC.

"Deposit" has the meaning given to such term in Section 3.2.

"DIP Obligations" has the meaning given to such term in the DIP Order.

"DIP Order" means an order of the Bankruptcy Court approving, among other things, the Debtor Entities' use of cash collateral and entry into any debtor-in-possession financing facility, including the interim order at Docket Number 56 in the Bankruptcy Case and any related "final order" entered by the Bankruptcy Court.

"Documentary Materials" has the meaning given to such term in Section 2.1(g).

"Domains" has the meaning given to such term in Section 7.15(b).

"Employees" means all employees of the Selling Entities, including those on disability or a leave of absence, whether paid or unpaid, relating to the Business.

"Encumbrance" means any charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, encroachment or similar restriction or other encumbrance affecting any right or title to the Purchased Assets.

"Enforceability Exceptions" has the meaning given to such term in Section 5.11(b).

9

"Environmental Laws" means Laws relating to pollution, natural resources, Hazardous Materials, or the protection of the environment or to occupational health and safety.

"Environmental Permits" means any permit, certificate, consent, registration, notice, approval, identification number, license or other authorization required under any applicable Environmental Law.

"ERISA" has the meaning given to such term in Section 5.10(a).

"ERISA Affiliate" has the meaning given to such term in Section 5.10(d).

"Escrow Agent" has the meaning given to such term in Section 3.2.

"Escrow Agreement" has the meaning given to such term in Section 3.2.

"Excluded Assets" has the meaning given to such term in Section 2.2.

"Excluded Liabilities" has the meaning given to such term in Section 2.4.

"FCPA" has the meaning given to such term in Section 5.19(b).

"Final Allocation" has the meaning given to such term in Section 3.3.

"Fraud" means an act committed by (a) the Selling Entities, in the making to the Buyer of the representations and warranties expressly contained in Article V (as qualified by the Seller Disclosure Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 8.2(c), and (b) the Buyer, in the making to the Selling Entities of the representations and warranties expressly contained in Article VI (in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 8.3(c), in any such case, requires (i) a false representation or warranty of material fact made in such representation; (ii) with Knowledge that such representation or warranty is false; (iii) with an intention to induce the Party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) that Party, in justifiable reliance upon such false representation or warranty, takes or refrains from taking action; and (v) causing such Party to suffer damage by reason of such reliance (and does not in any case include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" means any transnational, federal, municipal, state, provincial, local or foreign governmental, quasi-governmental, administrative or regulatory authority, department, agency, board, bureau, commission or body (including any court, arbitral body or similar tribunal), including the Bankruptcy Court.

"Governmental Authorization" means any Permit or Consent issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"Hazardous Materials" means any material, substance or waste that is listed, classified, regulated, characterized or otherwise defined as "hazardous," "toxic," "radioactive," a "pollutant," or "contaminant," (or words of similar intent or meaning) under any Environmental Laws, including any quantity of asbestos in any form, urea formaldehyde, PCBs, radon gas, mold, crude oil or any fraction thereof, all forms of natural gas, petroleum products, petroleum breakdown products, petroleum by-products or petroleum derivatives.

"Intellectual Property" means intellectual or proprietary rights, which may exist or be created under the Laws of any jurisdiction in the world, including all: (a) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, and moral and similar attribution rights; (b) Trademarks; (c) proprietary rights in internet domain names and IP addresses; (d) trade secret rights; (e) patents, industrial design and other industrial property rights; (f) software and firmware, data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation, internally developed automation scripts, administrative tools, and other non-commercial code used in operating or maintaining the Business, in each case whether or not registered; (g) rights in or relating to any and all registrations, issuances, provisionals, reissuances, continuations, continuations-in-part, revisions, substitutions, reexaminations, renewals, extensions, combinations, divisions, and reissues of, and applications for, any of the foregoing rights; and (h) rights to prosecute, sue, enforce, or recover or retain damages, costs, or attorneys' fees with respect to the past, present and future infringement, misappropriation, dilution, unauthorized use or disclosure, or other violation of any of the foregoing.

"IP Assignment Agreements" means the Intellectual Property Assignment Agreements to be executed and delivered by the Selling Entities and the Buyer, in form and substance reasonably acceptable to the Buyer and the Seller.

"IRS" means the U.S. Internal Revenue Service.

"IT Systems" means any and all information, payment and communications technologies owned and controlled by the Selling Entities and material to the conduct of the Business, including all computers, hardware, software (whether in object or source code form), databases, servers, workstations, routers, hubs, switches, data communication lines, networks and all other information technology systems, included therein.

"Job-Board Technology" means the proprietary software (including in source code and object code form, together with all documentation) used by both the Business and the Non-Core Business which enables a job advertising platform consisting of applicant search and screening services, including job postings, employers branding, resume database access, and employee search services.

"Knowledge" means, as to a particular matter, the actual knowledge, or such knowledge such person would be expected to have after reasonable investigation, of, (a) with respect to the Buyer, James Freundlich and Gary Hsueh, and (b) with respect to any Selling Entity, Jeffrey Furman, Michael Suhajda and Dinesh Arora.

11

"Law" means any federal, state, local, municipal or foreign law, statute, legislation, common law, rule, regulation, ruling, directive or other similar requirement having the effect of law issued, enacted, adopted, promulgated, implemented or otherwise put into effect by any Governmental Authority.

"Liability" means any indebtedness, obligation, commitment, lien, loss, damage, claim, fine, penalty, judgment, duty, responsibility, expense (including reasonable attorneys' fees and reasonable costs of investigation and defense) or liability of any nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, direct or indirect, fixed, absolute or contingent, matured or unmatured, ascertained or ascertainable, disputed or undisputed, secured or unsecured, joint or several, vested or unvested, due or to become due, executory, determined or determinable, whether in contract, tort, negligence, strict liability, or otherwise and whether or not the same would be required to be reflected in financial statements or disclosed in the notes thereto.

"Material Adverse Effect" means any matter, event, change, condition, circumstance, development, occurrence or effect that has had, individually or in the aggregate, a material adverse effect on the Purchased Assets and the Assumed Liabilities, taken as a whole; *provided, however*, that none of the following events, changes, conditions, circumstances, developments, occurrences or effects shall be taken into account, individually or in the aggregate, in determining whether a "Material Adverse Effect" has occurred: (a) the announcement of the signing of this Agreement or the filing of the Petitions (including any action or inaction by the customers, suppliers, landlords, employees, consultants of the Selling Entities and their respective Affiliates as a result thereof) or compliance with any obligation (including any obligation to not take action) expressly required by this Agreement; (b) (i) the commencement or pendency of the Bankruptcy Case, (ii) any objections in the Bankruptcy Court to (A) this Agreement or any of the Transactions or thereby, (B) the Sale Order or the reorganization of the Selling Entities and their Affiliates pursuant to the Sale Order, (C) the Bidding Procedures Motion or the Bidding Procedures Order or (D) the assumption or rejection of any Assumed Agreements, provided that such action is not inconsistent with the terms of this Agreement, or (iii) any Order of the Bankruptcy Court or any actions or omissions of the Debtor Entities in compliance therewith; (c) the announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of the Buyer or the Buyer's plans with respect to the Purchased Assets and the Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of the Selling Entities with employees, customers, lessors, suppliers, distributors, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (d) (i) actions or omissions taken or not taken by or on behalf of the Selling Entities or any of their respective Affiliates at the express written request of the Buyer or its Affiliates or (ii) the failure to take any action if such action is expressly prohibited by this Agreement; (e) actions taken by the Buyer or its Affiliates; (f) failure of any Selling Entity to meet any internal or published projections, forecasts, budgets, estimates, performance metrics, operating statistics or predictions (it being understood that the foregoing shall not preclude any assertion that the facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect should be deemed to constitute, or be taken into account in determining whether there has been, or would reasonably be expected to be, a Material Adverse Effect); (g) changes in applicable Law or GAAP; (h) volcanoes, tsunamis, earthquakes, fires, floods, storms, hurricanes, tornadoes, severe weather

conditions, power outages or electrical blackouts or other natural disasters; (i) changes in domestic, regional foreign of global economic conditions, tariffs, securities, currency exchange rates or United States or international debt or equity markets, in each case unless such changes have a disproportionate impact on the Selling Entities than on other businesses in the industry; (j) events or conditions generally affecting the industry or markets in which the Selling Entities operate, in each case unless such events or conditions have a disproportionate impact on the Selling Entities than on other businesses in the industry; (k) geopolitical conditions or any outbreak or escalation of hostilities, acts of terrorism or war, civil unrest, regional, national or international emergency or any action taken by any Governmental Authority, including any action taken in response to any of the foregoing and sanctions or similar restrictions imposed in connection with the dispute between the Russian Federation and Ukraine or the disputes between or among Israel, Hamas, Hezbollah, Lebanon, Yemen, Iran and other Persons in the Middle East; and (l) any pandemic or epidemic, including outbreaks or additional waves of outbreaks and any escalation or worsening thereof, of any contagious diseases and any direct or indirect consequence thereof.

"Material Contract" has the meaning given to such term in Section 5.11(a).

"Material Customers" has the meaning given to such term in Section 5.20(a).

"Material Suppliers" has the meaning given to such term in Section 5.20(b).

"Monster Core Business" means the business of the Selling Entities to the extent conducted in connection with the online/mobile job advertising platform connecting people in the recruitment industry, providing applicant search and screening services, including job postings, employer branding, resume database access, employee search services, leveraging digital, social and mobile solutions, through Monster.com and other websites.

"Non-Core Businesses" means the business of (i) acting as a recruitment and workforce solution provider to the public sector, and (ii) internet advertising & fees business through the websites Military.com and FastWeb.com, in each case, as conducted as of the date hereof.

"Non-Real Property Contracts" means the Contracts (including any open purchase orders) primarily related to the Business to which any Selling Entity is a party other than the Real Property Leases.

"Non-Released Parties" means the Prepetition Secured Parties (as defined in the DIP Order), Affiliates of the Prepetition Secured Parties, equityholders of the Debtor Entities, Affiliates of the equityholders of the Debtor Entities, the Debtor Entities' non-debtor Affiliates, the Debtor Entities' Subsidiaries, and Representatives of the Debtor Entities and any of the foregoing.

"OFAC" has the meaning given to such term in Section 5.19(a).

"Offered Employee" has the meaning given to such term in Section 7.8(a).

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or other award made, issued, entered or rendered by or with any Governmental

Authority, whether preliminary, interlocutory or final, including any Order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"Ordinary Course of Business" means, with respect to the Business, the ordinary and usual course of day-to-day operations of the Business (including acts and omissions of the Selling Entities and their Affiliates in respect of the Business in the ordinary and usual course), including as to nature, frequency, timing and magnitude, through the date hereof, consistent with past practice and operations, including during the pendency of the Bankruptcy Case.

"Outside Date" has the meaning given to such term in Section 9.1(g).

"Party" or "Parties" has the meaning given to such term in the Preamble hereto.

"Permits" has the meaning given to such term in Section 5.6.

"Permitted Encumbrances" means: (a) liens for Taxes, special assessments or other governmental charges not yet delinquent or that are being contested in good faith or the non-payment of which is permitted or required by the Bankruptcy Code, (b) statutory liens and rights of set-off of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen, customs brokers or agencies, suppliers and materialmen, and other Encumbrances imposed by Law, in each case for amounts not yet delinquent or that are being contested in good faith or such Encumbrances which have been filed of record but which have been bonded over or otherwise insured against, (c) deposits securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits (other than valid obligations incurred in respect of any defined benefit pension plan), (ii) the performance of bids, tenders, leases, Contracts (other than for payment of money), statutory obligations, licenses and other similar obligations, or (iii) obligations on performance, surety or appeal bonds, (d) licenses of or other grants of rights to use Intellectual Property in the Ordinary Course of Business, (e) Encumbrances that are Laws, zoning regulations, building codes, entitlements and easements and similar Encumbrances, and other similar matters affecting title to such real property and other title defects which do not have a Material Adverse Effect on the current use by the Selling Entities of the real property subject thereto, (f) Encumbrances contained in or created by the Assumed Agreements, (g) Encumbrances to be released at or prior to Closing and (h) the Encumbrances disclosed on Section 1.1(d) of the Seller Disclosure Schedule.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or Governmental Authority.  References to any Person include such Person's successors and permitted assigns.

"Personal Information" means any information that is considered "personally identifiable information," "personal information," "personal data," or any similar term by any applicable Privacy Laws.

"Petition" means the voluntary petition under Chapter 11 of the Bankruptcy Code filed by the Debtor Entities with the Bankruptcy Court.

14

"<u>Petition Date</u>" has the meaning given to such term in the Recitals.

"<u>Post-Closing Tax Period</u>" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any taxable period ending on or prior to the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"<u>Privacy Laws</u>" means any applicable Laws relating to the processing of Personal Information, data security, data breach notification, and the cross-border transfer of Personal Information.

"<u>Privacy Policy</u>" means any published policy, notice or statement relating to privacy or the processing of Personal Information.

"<u>Privileged Communications</u>" means any attorney-client communications, confidences, files, work product or other communications related to matters for which the Seller has engaged Latham & Watkins LLP or Richards, Layton & Finger, PA in connection with a possible negotiated sale of all or substantially all of the assets or outstanding equity, or any merger, consolidation, refinancing or similar transaction involving any of the Selling Entities and a third party, whether such negotiated transaction occurs out-of-court or pursuant to a state or federal bankruptcy or insolvency proceeding, or any financing transaction.

"<u>Proceeding</u>" has the meaning given to such term in <u>Section 5.5</u>.

"<u>Professional Services</u>" has the meaning given to such term in <u>Section 2.4(b)</u>.

"<u>Purchase Price</u>" has the meaning given to such term in <u>Section 3.1(a)</u>.

"<u>Purchased Assets</u>" has the meaning given to such term in <u>Section 2.1</u>.

"<u>Purchased Avoidance Actions</u>" has the meaning given such term in Section 2.1(q).

"<u>Real Property Leases</u>" means all leases, subleases and other occupancy Contracts with respect to real property pursuant to which any Selling Entity is a party listed or described on <u>Section 1.1(e)</u> of the Seller Disclosure Schedule.

"<u>Registered IP</u>" means all Seller IP that is registered, filed or issued under the authority of, with or by any Governmental Authority and all applications for any of the foregoing.

"<u>Regulatory Laws</u>" has the meaning given to such term in <u>Section 7.7(b)</u>.

"<u>Release</u>" means disposing, discharging, injecting, spilling, leaking, pumping, pouring, leaching, dumping, emitting, escaping or emptying into or upon the indoor or outdoor environment, including any soil, sediment, subsurface strata, surface water, drinking water, ground water, ambient air, the atmosphere or any other media.

15

"Representatives" means, with respect to a particular Person, any director, officer, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, consultants, financial advisors and agents and restructuring advisors.

"Restricted Business" means any business that is competitive with the Business.

"Retained Records" has the meaning given to such term in Section 2.2(c).

"Sale Hearing" means the hearing at which the Bankruptcy Court considers entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court in form and substance reasonably acceptable to the Seller and the Buyer, which shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Selling Entities of this Agreement, (ii) the sale of the Purchased Assets to the Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances) and (iii) the performance by the Selling Entities of their respective obligations under this Agreement, (b) authorize each of the Selling Entities and the Buyer to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Encumbrances that any Person has with respect to the Purchased Assets, and (c) order that the Buyer is receiving good and marketable title to all of the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances).

"Seller" has the meaning given to such term in the Preamble hereto.

"Seller Compensation and Benefit Program" has the meaning given to such term in Section 5.10(a).

"Seller Disclosure Schedule" has the meaning given to such term in the Preamble to Article V.

"Seller Financial Statements" has the meaning given to such term in Section 5.9(a).

"Seller Fundamental Representations" has the meaning given to such term in Section 8.2(b).

"Seller IP" means all Intellectual Property (including the goodwill of the Selling Entities) owned by the Selling Entities.

"Seller Related Party" means, collectively, the Selling Entities, their respective Affiliates and shareholders, and their respective directors, officers, managers, shareholders, partners, employees, owners, advisors and representatives.

"Seller Transition Services" has the meaning given to such term in Section 7.19(b).

"Selling Entities" has the meaning given to such term in the Preamble hereto.

16

"<u>Service Provider</u>" has the meaning given to such term in <u>Section 5.10(a)</u>.

"<u>Shared Contracts</u>" means all Contracts of any Selling Entity or any of its Affiliates that are related to, used in or held for use in connection with the Business, but are not exclusively related to, or exclusively used or held for use in connection with the Business.

"<u>Straddle Period</u>" means any taxable period that includes, but does not end on, the Closing Date.

"<u>Subsidiary</u>" means, with respect to any Person, (a) any corporation or similar entity of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation or similar entity, is held, directly or indirectly by such Person and (b) any partnership, limited liability company or similar entity of which (i) such Person is a general partner or managing member or has the power to direct the policies, management or affairs or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"<u>Tax</u>" means all U.S. federal, state, local or non-U.S. income, gross receipts, capital gains, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, alternative or add-on minimum, estimated, or similar taxes imposed by any Governmental Authority (to the extent the foregoing are taxes or in the nature of a tax), and including any interest, penalty, or addition thereto.

"<u>Tax Return</u>" means any return, claim for refund, declaration, report, statement, information return or other similar document (including any related or supporting information, amendments, schedule or supplements of any of the foregoing) required to be filed with any Governmental Authority with respect to Taxes.

"<u>Third-Party</u>" means a Person other than the Buyer or an Affiliate of the Buyer.

"<u>Third-Party Buyer</u>" means an acquiror of any Non-Core Business.

"<u>Third-Party Sale</u>" a sale of all or substantially all of the Purchased Assets to a Third-Party.

"<u>Trademarks</u>" means any and all trade names, corporate names, logos, slogans, trade dress, trademarks, service marks, domain names, URLs and other source or business identifiers and general intangibles of a like nature, and trademark and service mark registrations and applications therefor and all goodwill associated with the foregoing, whether protected, created, or arising under the laws of the United States (including common law) or any other jurisdiction or under any international convention.

"<u>Transaction Documents</u>" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale, the IP Assignment Agreements, the Transition Services Agreement,

17

the Escrow Agreement, and any other Contract to be entered into by the Parties in connection with the Transactions.

"<u>Transactions</u>" means the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of the Purchased Assets in exchange for the Purchase Price and the assumption of the Assumed Liabilities.

"<u>Transfer Taxes</u>" has the meaning given to such term in <u>Section 7.10(a)</u>.

"<u>Transferred Employees</u>" has the meaning given to such term in <u>Section 7.8(a)</u>.

"<u>Transition Services Agreement</u>" means an agreement among the Buyer, the Seller and/or each Third-Party Buyer as further described in <u>Section 7.19</u>.

"<u>Union</u>" means a labor union, trade union, works council or any other employee representative body.

"<u>WARN Act</u>" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (1988) and any similar Laws, including Laws of any country, state or other locality that is applicable to a termination of employees.

"<u>Wind-Down</u>" has the meaning given to such term in <u>Section 7.15</u>.

Section 1.2    <u>Construction</u>.  The terms "hereby," "herein," "hereto," "hereunder" and any similar terms as used in this Agreement refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  The terms "including," "includes" or similar terms when used herein shall mean "including, without limitation", and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.  The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.  The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, if applicable, and such phrase does not mean simply "if".  The word "will" shall be construed to have the same meaning as the word "shall". Any reference to "days" means calendar days unless Business Days are expressly specified. References to "written" or "in writing" include in electronic form.  The meaning of defined terms shall be equally applicable to the singular and plural forms of the defined terms, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require. Any reference to any federal, state, provincial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Unless otherwise indicated, references to (a) Articles, Sections, Schedules and Exhibits refer to Articles, Sections, Schedules and Exhibits of and to this Agreement, (b) references to $ (dollars) are to United States Dollars and (c) a Contract means such Contract as amended from time to time. Any reference to any Person shall include such Person's successors and assigns.  All accounting terms used in this Agreement and not otherwise defined herein have the meanings assigned to them under GAAP.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.  All references

18

to dates and times herein, except as otherwise specifically noted, shall refer to New York City time.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of Assets</u>.  Pursuant to the Bankruptcy Code and on the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Selling Entities shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall purchase and acquire from the Selling Entities, all of the Selling Entities' right, title and interest, free and clear of all Liabilities and Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances), in and to all of the properties, rights, interests and other tangible and intangible assets of the Selling Entities of every nature related to or used in the Business (wherever located, whether real, personal or mixed, whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any assets acquired by the Selling Entities after the date hereof but prior to the Closing (collectively, the "<u>Purchased Assets</u>"); *provided, however*, that notwithstanding anything to the contrary herein, the Purchased Assets shall not include any Excluded Assets.  Without limiting the generality of the foregoing, the Purchased Assets shall include all of the Selling Entities' right, title and interest in and to the following (except to the extent listed as, or otherwise constituting, an Excluded Asset):

(a)    all Accounts Receivable, except as set forth in <u>Section 2.2(g)</u>;

(b)    (i) all royalties, advances, prepaid assets, security and other deposits, prepayments and other current assets relating to the Business, the Assumed Agreements, or (ii) any other prepaid and deferred items relating to the Business or the Purchased Assets (including all prepaid rentals and unbilled charges, fees, deposits, and prepaid balances, credits, or deposits with AWS, Azure, GCP, or other infrastructure vendors that support the Business), in each case of the Selling Entities as of the Closing other than the Cash as provided in <u>Section 2.2(a)</u>;

(c)    all Non-Real Property Contracts listed on <u>Section 2.1(c)</u> of the Seller Disclosure Schedule (as amended from time to time in accordance with <u>Section 2.5</u> hereof, the "<u>Assumed Agreements</u>") designated by the Buyer for assumption and assignment and assumed and assigned to the Buyer pursuant to <u>Section 2.5</u>;

(d)    Business Marks;

(e)    all Business IP;

(f)    all items of machinery, equipment, supplies, and other tangible personal property and fixed assets owned by the Selling Entities as of the Closing, in each case related to the Business, but only to the extent set forth on <u>Section 2.1(f)</u> of the Seller Disclosure Schedule;

(g)    all books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items of the Selling Entities as of the Closing (except as otherwise described in <u>Section 2.2</u>), including Tax Returns, customer, distributor, supplier and vendor lists, mailing lists and employer and jobseeker

19

databases, lists and information, in each case to the extent related to the Business (collectively, the "Documentary Materials");

(h)     all goodwill associated with, or relating to, the Business or the Purchased Assets;

(i)     all rights to the websites, domain names, telephone and facsimile numbers, e-mail addresses, mobile applications and social media accounts with X (Twitter), Facebook, Instagram, TikTok and other social media companies that comprise or are incorporated in or necessary for or used or previously used or held for use in connection with the operation or conduct of the Business, including all IT Systems, software, databases, content, text, graphics, pictures, tools, code, log files, usernames, passwords and other log-in information (e.g. security questions and answers and related linkages) and other materials, information and items contained or incorporated in or used or held for use in conjunction therewith, historical usage and analytics data (including clickstream logs, traffic reports, conversion metrics, and marketing attribution data) and all diagrams, data, specifications, user manuals, instructional materials and other documentation, information and data relating to such internet websites and mobile applications or any planned upgrades, modifications or improvements of such internet websites or mobile applications used by each Selling Entity related to the Business;

(j)     all user accounts (including login credentials, history, saved settings, and similar items) associated with job seekers and employer clients on the CareerBuilder and Monster platforms, and all user resumes in the databases of the Selling Entities;

(k)     all rights of the Selling Entities under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current Employees, former Employees, Service Providers, or current or former directors, consultants, independent contractors and agents of any of the Selling Entities, in each case to the extent related to the Business;

(l)     all of the rights and benefits accruing under all Permits, all deposits and prepaid expenses held by third parties and/or, to the extent transferable, any Governmental Authority and, to the extent transferable, all bank and deposit accounts of the Business;

(m)     [reserved];

(n)     any credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff (other than against the Selling Entities) arising out of or relating to any of the Purchased Assets as of the Closing, except for any Accounts Receivable;

(o)     any rights, claims or causes of action as of the Closing of any Selling Entity (including any D&O Claims) relating to or arising against counterparties to any Assumed Agreement in respect of the assets, properties, conduct of business or operations of such Selling Entity that arise from and after the Petition Date or relate to events, facts and circumstances first existing after the Petition Date, in each case to the extent related to the Business and excluding any rights, claims or causes of action that relate to any Excluded Assets or Excluded Liabilities and excluding any Accounts Receivable;

20

(p)    all claims (including claims for infringement or misappropriation or other violation of Business IP) and causes of action of the Selling Entities against Persons other than the Selling Entities (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by the Selling Entities (regardless of whether such rights are currently exercisable) to the extent related to the Purchased Assets and the Business, in each case excluding (i) any rights, claims or causes of action to the extent relating to any Excluded Assets or Excluded Liabilities, (ii) any Accounts Receivable or (iii) any rights, claims or causes of action in respect of Section 2.1(o);

(q)    all preference or avoidance claims and actions of the Debtor Entities (including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar applicable Law), solely to the extent related to the Purchased Assets and the Business (the "Purchased Avoidance Actions"); for the avoidance of doubt, the Purchased Assets shall not include preference claims or avoidance claims and actions (including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar applicable Law) against any Non-Released Parties.  Notwithstanding the foregoing, neither the Buyer, nor any Person claiming by, through or on behalf of the Buyer (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute, or commence an action based on, assert, sell, convey, assign, or file any claim that relates to the Purchased Avoidance Actions, or assert or use any such Purchased Avoidance Actions for defensive purposes; and

(r)    the assets listed on Section 2.1(r) of the Seller Disclosure Schedule.

Section 2.2    Excluded Assets.  Notwithstanding any provision herein to the contrary, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a)    all Cash of the Selling Entities as of the Closing;

(b)    any records, documents or other information relating to current or former Employees that are not Transferred Employees, and any materials to the extent containing information about any Employee (including any Transferred Employee), disclosure of which would violate applicable Law or such Employee's reasonable expectation of privacy;

(c)    the Selling Entities' (i) minute books and other corporate books and records relating to their organization and existence and the Selling Entities' books and records relating to Taxes of the Selling Entities, including Tax Returns filed by or with respect to the Selling Entities but excluding those Tax Returns solely relating to the Purchased Assets (provided that Selling Entities can make copies of such Tax Returns for use in connection with Selling Entities' tax matters), (ii) books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items exclusively relating to any Excluded Assets or Excluded Liabilities, and (iii) all correspondences or communications prior to the Closing among the Seller and any of its Affiliates and their respective Representatives and their counsel or any other third party that relate to the negotiation of Transactions or any other transaction relating to the sale of the assets of the Seller or any of their Affiliates outside of the

21

Ordinary Course of Business (including any archival copies of such communications) (this clause (iii), the "Retained Records");

(d)      the Selling Entities' rights under this Agreement and the other Transaction Documents, and all cash and non-cash consideration payable or deliverable to the Selling Entities pursuant to the terms and provisions hereof;

(e)      any Contracts other than the Assumed Agreements;

(f)      all rights, claims and causes of action of any Selling Entity and all rights of indemnity, warranty rights, rights of contribution, rights to refunds or prepayments, rights of reimbursement and other rights of recovery, including rights to insurance proceeds (including in all cases the proceeds of D&O Claims), of any Selling Entity (regardless of whether such rights are currently exercisable), in each case (i) to the extent related to any Excluded Asset or Excluded Liability or (ii) not related to the Purchased Assets; for the avoidance of doubt, the Excluded Assets shall include commercial tort claims and all other claims, causes of action, lawsuits, judgements, privileges, counterclaims, defenses, rights of recovery, rights of setoff, rights of subrogation, and all other rights of any kind of the Debtor Entities against any Non-Released Parties;

(g)      intercompany Accounts Receivable and other amounts receivable of any Selling Entity owed to it, and any other intercompany obligations owed to any Selling Entity, by any other Selling Entity, or any of their respective Affiliates;

(h)      all Seller Compensation and Benefit Programs, all stock option, restricted stock or other equity-based benefit plans of the Selling Entities, and the Selling Entities' right, title and interest in any assets of or relating thereto;

(i)      all preference or avoidance claims and all other causes of action of the Selling Entities (including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar applicable Law) to the extent not constituting Purchased Avoidance Actions; for the avoidance of doubt, the Excluded Assets shall include preference claims or avoidance claims and actions (including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar applicable Law) against any Non-Released Parties;

(j)      all Tax refunds, overpayments, credits or other attributes with respect to Taxes that are Excluded Liabilities;

(k)      (i) a "tail" policy providing directors' and officers' liability insurance coverage for the benefit of those Persons who are covered by the Selling Entities' directors' and officers' liability insurance policies as of the date hereof or at the Closing with respect to matters occurring prior to the Closing;

(l)      the Selling Entities' right, title and interest to the other assets, if any, set forth in Section 2.2(l) of the Seller Disclosure Schedule;

(m)     (i) all current and prior insurance policies of the Selling Entities, including for the avoidance or doubt all director and officer insurance policies, and (ii) all rights and benefits of any nature of the Selling Entities with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(n)     all items of machinery, equipment, supplies, and other tangible personal property and fixed assets owned by the Selling Entities as of the Closing, in each case related to the Business, other than as set forth on Section 2.1(f) of the Seller Disclosure Schedule;

(o)     any assets, including Intellectual Property, that are primarily related to any of the Non-Core Businesses and are not material to the Business, it being understood that Business Marks are material to the Buyer and are not Excluded Assets;

(p)     any shares of capital stock, equity interests or any other securities of any of the Selling Entities or any of its Affiliates; and

(q)     any other assets not related to the Business.

Section 2.3     Assumed Liabilities.  Subject to the terms and conditions of this Agreement, effective as of the Closing, the Buyer shall assume and agree to pay, perform and discharge when due in accordance with their respective terms the Assumed Liabilities.  For purposes of this Agreement, "Assumed Liabilities" means, without duplication, only the following Liabilities (to the extent not paid prior to the Closing):

(a)     all Liabilities of the Selling Entities primarily related to the Business arising under the Assumed Agreements, but only to the extent that such Liabilities arise and relate to periods after the Closing Date (with the exception of the Cure Payments);

(b)     any Liability for Taxes with respect to the portion of a Straddle Period beginning after the Closing Date (as determined in accordance with Section 7.10(b)); and

(c)     the Cure Payments.

Section 2.4     Excluded Liabilities.  Notwithstanding anything to the contrary herein, the Buyer shall not assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Proceeding against, the Selling Entities, other than the Assumed Liabilities whether existing on the Closing Date or arising thereafter as a result of, or in connection with, any act, omission, or circumstances taking place prior to the Closing (all such Liabilities that the Buyer is not assuming being referred to collectively as the "Excluded Liabilities").  The Excluded Liabilities include the following, other than the Assumed Liabilities:

(a)     all Liabilities for Taxes (i) with respect to the Purchased Assets for any Pre-Closing Tax Period (as determined in accordance with Section 7.10(b)) and (ii) of the Selling Entities of any kind or description, including any Liability for Taxes of the Selling Entities (or any stockholder or Affiliate of the Selling Entities) that becomes a Liability of the Buyer under any

23

common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law;

(b)    all Liabilities of the Selling Entities relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services"), and any pre-Petition or post-Petition Claims for such Professional Services;

(c)    all Liabilities of the Selling Entities with respect to current and former Employees, Service Providers, and current and former directors and officers of the Selling Entities (including Liabilities under or relating to any Seller Compensation and Benefit Program and any workers compensation related Liabilities) other than Liabilities that are incurred or arise on or following the Closing Date with respect to Buyer's employment of the Transferred Employees;

(d)    (i) the Liabilities of the Selling Entities arising under the Assumed Agreements to the extent such Liabilities arise prior to the Closing Date (including, without limitation, any liabilities relating to customer pre-paid amounts prior to the Closing Date or resulting deferred revenue in connection with such Assumed Agreements); and (ii) all other Liabilities arising out of the conduct of the Business or relating to the Purchased Assets (other than the Liabilities arising under the Assumed Agreements) to the extent such Liabilities arise prior to the Closing or relate to events, facts and circumstances first existing prior to the Closing, in the case of each of clauses (i) and (ii), other than any Cure Payments and any Assumed Liabilities;

(e)    all Liabilities to the extent relating to Excluded Assets;

(f)    all Liabilities of any Selling Entity in respect of indebtedness for borrowed money;

(g)    all Liabilities of any Selling Entity to any current, former or prospective shareholder or other holder of equity securities or equity-linked securities of such Selling Entity, including all Liabilities of such Selling Entity related to the right to or issuance of any capital stock or other equity securities or the payment of any dividend or other distribution on or in respect of any capital stock or other equity securities;

(h)    any Liabilities under (i) any Contracts other than the Assumed Agreements or (ii) any other Contracts which are not validly and effectively assigned to the Buyer pursuant to this Agreement;

(i)    any trade accounts payable of the Selling Entities, other than the Cure Payments;

(j)    any Liabilities arising out of, in respect of or in connection with the failure by any Selling Entity or any of its Affiliates to comply with any Law or Order;

(k)    any Liabilities specified in the Agreements as being the responsibility of the Selling Entities, including, without limitation, all Liabilities relating to the WARN Act; and

(l)    the Liabilities listed on Section 2.4(k) of the Seller Disclosure Schedule.

24

Section 2.5    <u>Assumption and Assignment of Certain Contracts</u>.  The Sale Order shall provide, if the Buyer elects to acquire any Assumed Agreements, for the assumption by the Buyer, and the Sale Order shall, to the extent permitted by Law, provide for the assignment by the Selling Entities to the Buyer, effective upon the Closing, of the Assumed Agreements on the terms and conditions set forth in the remainder of this <u>Section 2.5</u>.  Nothing in this <u>Section 2.5</u> obligates the Buyer to acquire by assignment or otherwise any Assumed Agreements.

(a)    The Debtor Entities shall use commercially reasonable efforts to provide timely and proper written notice of the Sale Hearing to all parties to any executory Contracts to which any Debtor Entity is a party that are (or may be) potential Assumed Agreements and, if the Buyer elects to acquire any Assumed Agreements, take all other actions reasonably necessary to cause such Contracts to be assumed by the Debtor Entities and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code. If the Buyer elects to acquire any Assumed Agreements, at the Closing, the Debtor Entities shall assign to the Buyer the Assumed Agreements designated by the Buyer and that may be assigned by any such Debtor Entity to the Buyer pursuant to sections 363 and 365 of the Bankruptcy Code. <u>Section 2.5(a)</u> of the Seller Disclosure Schedule sets forth the Seller's good faith estimate (on a Contract by Contract basis) as of the date of this Agreement of the amounts necessary to cure defaults, if any, with respect to each counterparty to any of the Contracts set forth on <u>Section 2.1(c)</u> of the Seller Disclosure Schedule, in each case as determined by the Seller based on the Seller's books and records and good faith judgment.  The Seller shall provide an update of such good faith estimate not less than two (2) Business Days prior to the Closing Date.

(b)    From and after the date of this Agreement until the day prior to the Closing (the "<u>Designation Deadline</u>"), the Buyer may, in its sole discretion, designate any executory Contract of any Selling Entity, whether or not listed on <u>Section 2.1(c)</u> of the Seller Disclosure Schedule as an Assumed Agreement as applicable, or designate any such Contract not to be an Assumed Agreement, as applicable, in each case by providing written notice of such designation or removal to the Seller; *provided*, that any executory Contract not designated by the Buyer as an Assumed Agreement by the Designation Deadline shall be deemed not to be an Assumed Agreement, as applicable.  Upon such designation or deemed designation, <u>Section 2.1(c)</u> of the Seller Disclosure Schedule shall automatically be deemed to be amended to include or remove, as applicable, such Contract as an Assumed Agreement, without any adjustment to the Purchase Price (other than any Cure Payment).

(c)    In the case of any amendment by the Buyer of <u>Section 2.1(c)</u> of the Seller Disclosure Schedule pursuant to <u>Section 2.5(b)</u>, the Seller shall give notice to the other parties to any Contract to which such amendment relates of the removal or addition of such Contract from <u>Section 2.1(c)</u> of the Seller Disclosure Schedule.

(d)    From and after the date of this Agreement until the Closing, subject to providing the Buyer with not less than three (3) Business Days prior written notice ("<u>Contract Notice Period</u>"), the Seller may move to reject any Contract which is not an Assumed Agreement; *provided, however*, that the Buyer may, at any time during or after the Contract Notice Period, designate such Contract as an Assumed Agreement in accordance with <u>Section 2.5(b)</u> and the Seller shall not thereafter reject or seek to reject such Contract; *provided*, *further*, that the Seller

25

may move to reject any such Contract if the Buyer does not so designate such Contract within the applicable Contract Notice Period.

(e)     The Debtor Entities shall file the Cure Schedule no later than the deadline established by the Bidding Procedures Order. Pursuant to the Bidding Procedures Order, the Bankruptcy Court shall deem any non-debtor party to a Contract included on the Cure Schedule that does not timely file an objection with the Bankruptcy Court pursuant to the procedures set forth in the Bid Procedures Order and prior to the applicable deadline set forth in the Bid Procedures Order to have (i) waived any objection to the Cure Schedule and (ii) given any required Consent to the assumption of such Contract by the Debtor Entity and assignment to the Buyer if, and to the extent that, pursuant to the Sale Order or other order of the Bankruptcy Court, the applicable Debtor Entity is authorized to assume and assign the Contract to the Buyer and the Buyer is authorized to accept such Assumed Agreement pursuant to section 365 of the Bankruptcy Code.

(f)     In connection with the assumption and assignment to the Buyer of any Assumed Agreement pursuant to this Section 2.5, in addition to the Purchase Price, the Buyer shall pay all of the cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all monetary defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Agreements (such amounts, collectively, the "Cure Payments"); *provided*, that to the extent such Cure Payments are not made prior to the Closing, all Liabilities related to such Cure Payments shall be assumed by the Buyer at the Closing as Assumed Liabilities. No Selling Entities shall have any liability for such Cure Payments.

(g)     If the Buyer elects to acquire any Assumed Agreements, the Seller shall use its commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Agreements to designated by the Buyer (the "Assumption Approval") on the terms set forth in this Section 2.5. In the event the Selling Entities are unable to assign any such Assumed Agreement to the Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use commercially reasonable efforts prior to the Closing to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations from Governmental Authorities and third parties necessary to assume and assign such Assumed Agreement to the Buyer; *provided, however*, that the Seller shall not be required to pay any amount or incur any obligation to any Person from whom any such Consent or Governmental Authorization may be required in order to obtain such Consent.

(h)     Notwithstanding the foregoing, a Contract shall not be an Assumed Agreement hereunder and shall not be assigned to or assumed by the Buyer if such Contract (i) is rejected by a Debtor Entity or terminated by a Selling Entity or the other party thereto, or terminates or expires by its terms, prior to the Closing and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to the Buyer of the Debtor Entities' rights under such Contract, if such Consent or Governmental Authorization has not been obtained prior to the Closing.

Section 2.6     Designation of Assets and Liabilities.  At any time on or prior to the fourth (4th) Business Day prior to the Closing, the Buyer may, in its sole discretion by written notice to the Seller, (a) designate any of the Purchased Assets as additional Excluded Assets and/or

26

(b) designate any of the Excluded Liabilities as additional Assumed Liabilities, which notice shall set forth in reasonable detail the assets or Liabilities so designated; *provided*, that there shall be no increase or reduction in the Purchase Price in connection with any such designation by the Buyer. Notwithstanding any other provision hereof, the Liabilities of the Selling Entities under or related to any Purchased Asset excluded under this paragraph shall constitute Excluded Liabilities.

Section 2.7    <u>Consents to Certain Assignments</u>.  If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the commercially reasonable efforts of the Selling Entities and the Buyer pursuant to <u>Section 2.5(g)</u>, any Consent or Governmental Authorization is not obtained prior to Closing and as a result thereof the Buyer shall be prevented by a third party from receiving the rights and benefits with respect to a Purchased Asset intended to be transferred hereunder, or (ii) any Purchased Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Selling Entities shall, prior to the closing of the Bankruptcy Case and subject to any approval of the Bankruptcy Court that may be required and at the request of the Buyer, cooperate with the Buyer in any lawful and commercially reasonable arrangement under which the Buyer would, to the extent practicable, obtain (for no additional cost or consideration) substantially similar economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer, and the Buyer shall assume any related burden and obligation with respect to such Purchased Asset to the extent such burden and obligation would constitute an Assumed Liability if such Purchased Asset was transferred at Closing; *provided*, that the Selling Entities' cooperation obligations contemplated by this <u>Section 2.7</u> shall not include any obligation by any Selling Entity or any of its Affiliates to pay money (advance or otherwise) to any third party or to incur out-of-pocket expenses unless the Buyer funds such amounts; *provided*, *further*, that the Buyer shall indemnify and hold harmless all Seller Related Parties from and against any and all Liabilities suffered or incurred by them in connection with the provision of any such cooperation provided or any such activities taken in connection therewith.  The Buyer shall cooperate with the Selling Entities in order to enable the Selling Entities to provide to the Buyer the benefits contemplated by this <u>Section 2.7</u>.  The Selling Entities shall as promptly as practicable pay to the Buyer when received all monies received by the Selling Entities attributable to such Purchased Asset from and after the Closing Date and the Buyer shall promptly pay the Selling Entities for all reasonable and documented out-of-pocket costs incurred by the applicable Selling Entities associated with, arising or resulting from such arrangement.

Section 2.8    <u>Wrong Pockets</u>.

(a)    If, after the Closing, the Buyer or any Selling Entity or their Affiliates becomes aware that any Purchased Asset has not been transferred or delivered to the Buyer or its Affiliates or that any right, property or asset forming part of the Excluded Assets has been transferred to the Buyer, (i) such Party and their Affiliates shall promptly notify the other applicable Party and take such steps as may be required to transfer and deliver, or cause to be transferred and delivered, such Purchased Asset or such Excluded Asset to the other Party, at no additional charge to the receiving party, and (ii) the Selling Entities shall execute such documents or instruments of conveyance or assumption and take such further acts which are reasonably necessary or desirable to effect the transfer of such Purchased Asset to the Buyer.

27

(b)      If, after the Closing, the Buyer or any Selling Entity or their Affiliates becomes aware that any Excluded Asset has been transferred or delivered to the Buyer or its Affiliates, the Buyer and its Affiliates shall promptly take such steps as may be required to transfer and deliver, or cause to be transferred and delivered, such assets to the applicable acquiror of the applicable Non-Core Business at the expense of the Party seeking the transfer.  The Selling Entities shall agree to an equivalent provision of this Section 2.8 in all other agreements to be entered into with other parties in respect of the sale of any Non-Core Business.

(c)      If, on or after the Closing Date, either party shall receive any payments or other funds due to the other Party or any of its Affiliates, then the party receiving such funds shall promptly notify the other Party and forward such funds to the proper party.  If, after the Closing Date, either Party shall receive any invoice from a third party with respect to any accounts payable of the other Party, then the party receiving such invoice shall promptly deliver such invoice to the proper Party.

## ARTICLE III
## PURCHASE PRICE; DEPOSIT

Section 3.1      Purchase Price.

(a)      The consideration for the sale and transfer of the Purchased Assets from the Selling Entities to the Buyer shall be: (i) an amount in cash equal to the Cash Purchase Price (including the Deposit) and (ii) the assumption of the Assumed Liabilities by execution of the Assignment and Assumption Agreement (collectively, the "Purchase Price").

(b)      On the Closing Date, the Buyer shall pay to the Seller or its designee(s), by wire transfer of immediately available funds to an account or series of accounts designated by the Seller prior to the Closing, an amount or amounts in cash equal, in the aggregate, to the Cash Purchase Price (including the Deposit, which shall be paid to the Seller in accordance with Section 3.2).

Section 3.2      Deposit Escrow.  Buyer shall (i) concurrently with the execution of this Agreement, deposit, immediately into escrow with the Escrow Agent an amount equal to 10% of the Cash Purchase Price, and (ii) deposit any additional amounts required to be deposited following the Auction pursuant to the terms of the Bidding Procedures Order (the amounts so deposited pursuant to the foregoing clauses (i) and (ii), together with any interest accrued thereon prior to the Closing Date, the "Deposit") by wire transfer of immediately available funds pursuant to the terms of this Agreement and the Escrow Agreement; *provided*, that the Seller's right to receive the Deposit in accordance with the terms of this Agreement shall be subject to the liens securing the DIP Obligations.  The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any of the Parties.  The Deposit shall become payable to the Seller upon the earlier of (i) the Closing, (ii) the termination of this Agreement by (A) the Seller pursuant to Section 9.1(d) or Section 9.1(h), or (B) the Buyer pursuant to Section 9.1(g) at a time when the Seller could have terminated this Agreement pursuant to Section 9.1(d) (any such termination described in the foregoing clauses (ii)(A) or (ii)(B), a "Buyer Default Termination") or (iii) the event of Fraud by any Buyer Related Party.  If the Closing occurs, the Seller shall instruct the Escrow Agent to deliver no later than the Closing Date the Deposit to an account

28

designated by the Seller by wire transfer of immediately available funds as payment of a portion of the Purchase Price.  If the Deposit becomes payable to the Seller by reason of a Buyer Default Termination, then either (A) Seller shall instruct the Escrow Agent to disburse, or (B) the Seller shall deliver to the Escrow Agent a final and non-appealable written Order from a court of competent jurisdiction directing the Escrow Agent to disburse, the Deposit to the Seller, in each case in accordance with the Escrow Agreement, and the Escrow Agent shall, within two (2) Business Days after receiving such written instruction or Order, as the case may be, disburse the Deposit to an account designated by the Seller by wire transfer of immediately available funds to the account designated in writing by the Seller to be retained by the Seller for its own account.  If this Agreement or the transactions contemplated herein are terminated other than for a termination which constitutes a Buyer Default Termination, the Seller shall instruct the Escrow Agent to, and the Escrow Agent shall, within two (2) Business Days after such instruction, return to the Buyer the Deposit by wire transfer of immediately available funds to the account designated in writing. The Escrow Agent's escrow fees and charges shall be paid by the Seller.  Notwithstanding anything herein or in the Escrow Agreement to the contrary, Seller shall not instruct the Escrow Agent to disburse the Deposit to Seller following a purported Buyer Default Termination or Fraud by a Buyer Related Party unless either (i) Buyer consents in writing to such disbursement, or (ii) a final non-appealable order of any court of competent jurisdiction has directed such disbursement.

Section 3.3    Allocation.  The Seller shall, not later than sixty (60) days after the Closing Date, prepare and deliver to the Buyer an allocation of the Purchase Price (and the Assumed Liabilities and other relevant items, to the extent properly taken into account for Tax purposes) among the Purchased Assets (the "Allocation") in accordance with Section 1060 of the Code, the Treasury Regulations thereunder and other applicable Law for the Buyer's review and approval (such approval not to be unreasonably withheld, conditioned or delayed).  The Allocation shall be conclusive and binding on the Parties unless the Buyer notifies the Seller in writing that the Buyer objects to one or more items reflected in the Allocation, and specify the reasonable basis for such objection, within ten (10) days after delivery to the Buyer of the Allocation.  In the case of such an objection, the Seller and the Buyer shall negotiate in good faith to resolve any disputed items. Any resolution by the Seller and the Buyer shall be conclusive and binding on the parties once set forth in writing (any such conclusive and binding Allocation, the "Final Allocation").  If the Seller and the Buyer are unable to resolve all disputed items within fifteen (15) days after the delivery of the Buyer's written objection to the Seller, the Buyer and the Seller shall jointly retain a mutually agreed independent internationally recognized accounting firm (the "Accounting Firm") (which may in turn select an appraiser, if needed) to resolve any disputed item(s).  The costs, fees and expenses of the Accounting Firm shall be borne one-half by the Buyer and one-half by the Selling Entities.  The Accounting Firm shall resolve any such dispute within thirty (30) days after the retention, and the Final Allocation shall be adjusted to reflect any such resolution of any disputed item(s).  The Parties agree to (and shall cause their affiliates to) file all Tax Returns (including the filing of IRS Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the date of the Closing) consistent with, and shall not take any position in connection with Tax matters that is inconsistent with, the Final Allocation unless otherwise required by a final determination within the meaning of Section 1313 of the Code or any corresponding provision of state, local or non-U.S. Law, or as the Buyer or the Seller (as applicable) determines is necessary to settle a dispute with a Tax authority after making a good faith effort to defend the Final Allocation.  In the event that a Governmental Authority disputes the Final Allocation, the Party

29

receiving notice of such dispute shall promptly notify the other Party hereto, and the Seller and the Buyer shall, and shall cause their respective Affiliates to, use their reasonable best efforts to defend such Final Allocation in any applicable proceeding.   Notwithstanding the foregoing, in administering the Bankruptcy Case, the Bankruptcy Court shall not be required to apply the Final Allocation, and neither the Debtor Entities, nor any other parties in interest, shall be bound by such Final Allocation, for purposes of determining the manner in which the Purchase Price should be allocated either, as between the Selling Entities and their respective estates, or as among the Purchased Assets themselves, for non-tax purposes.

## ARTICLE IV
## THE CLOSING

Section 4.1    Time and Place of the Closing.    Upon the terms and subject to the satisfaction or, to the extent permitted by applicable Law, waiver of the conditions contained in Article VIII of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place (i) remotely by electronic exchange of counterpart signature pages or (ii) at the offices of Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, at 8:00 a.m. (eastern time) as promptly as practicable, and at no time later than the third (3rd) Business Day following the date on which the conditions set forth in Article VIII have been satisfied or, to the extent permitted by applicable Law, waived by the applicable Party in writing (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of such conditions at or prior to the Closing) or at such other place and time as the Buyer and the Seller may mutually agree.  The date on which the Closing actually occurs is herein referred to as the "Closing Date."

Section 4.2    Deliveries by the Seller.   At or prior to the Closing, the Seller shall deliver or cause to be delivered the following to the Buyer:

(a)    the Bill of Sale, duly executed by the Selling Entities;

(b)    if the Buyer designates any Contracts for assumption and assignment, the Assignment and Assumption Agreement, duly executed by the Selling Entities;

(c)    the IP Assignment Agreements, duly executed by the applicable Selling Entities;

(d)    the Transition Services Agreement, in form and substance consistent with the principles as set forth in Section 7.19, duly executed by the applicable Selling Entities, their Affiliates and any other purchaser of assets of the Selling Entities, as applicable;

(e)    a copy of the Sale Order as entered by the Bankruptcy Court;

(f)    the certificate contemplated by Section 8.2(c);

(g)    a properly executed IRS Form W-9 from each Selling Entity (or, if applicable, its regarded owner for U.S. federal income tax purposes); and

30

(h)    usernames, passwords and other log-in information (e.g. security questions and answers and related linkages) for any internet websites, mobile applications and social media accounts included in the Purchased Assets.

Section 4.3    <u>Deliveries by the Buyer</u>.  At or prior to the Closing, the Buyer shall deliver or cause to be delivered the following to the Seller:

(a)    the Cash Purchase Price (other than the Deposit), payable in accordance with <u>Section 3.1(b)</u>;

(b)    the Deposit in accordance with <u>Section 3.2</u>;

(c)    the Bill of Sale, duly executed by the Buyer;

(d)    if the Buyer designates any Contracts for assumption and assignment, the Assignment and Assumption Agreement, duly executed by the Buyer;

(e)    the Transition Services Agreement, in form and substance consistent with the principles as set forth in <u>Section 7.19</u>, duly executed by the Buyer;

(f)    the IP Assignment Agreements, duly executed by the Buyer;

(g)    written evidence that is sufficient to the Selling Entities in their reasonable discretion, that the Buyer or one of its Affiliates has offered employment to at least 350 employees of the Business, with 116 such offers of employment being made to the U.S. employees of the Business, in accordance with <u>Section 7.8(a)</u>; and

(h)    the certificate contemplated by <u>Section 8.3(c)</u>.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLING ENTITIES

Except (a) as set forth in the disclosure schedule delivered by the Seller to the Buyer (the "<u>Seller Disclosure Schedule</u>") on the date hereof (with specific reference to the representations and warranties in this <u>Article V</u> to which the information in such schedule relates; *provided*, *however*, that, disclosure in the Seller Disclosure Schedule as to a specific representation or warranty shall qualify any other sections of this <u>Article V</u> to the extent (notwithstanding the absence of a specific cross reference) it is reasonably apparent from the face of such disclosure that such disclosure relates to such other sections) and (b) such exceptions that result from the filing and commencement of the Bankruptcy Case, including the entry of the Sale Order and any other Orders of the Bankruptcy Court necessary to consummate the Transactions, each Selling Entity hereby represents and warrants to the Buyer (in the case of any assets or liabilities of the Selling Entities, solely with respect to the Purchased Assets and Assumed Liabilities) as follows:

Section 5.1    <u>Organization, Standing and Corporate Power</u>.  Each Selling Entity is a corporation or other entity duly organized, validly existing and, to the extent applicable, in good standing (or its equivalent) under the laws of the jurisdiction of its incorporation or organization and has the requisite corporate or other entity power and authority to own or lease all of its

properties and assets and to carry on its business as it is now being conducted.  Prior to the commencement of the Bankruptcy Case, each Debtor Entity is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified, has not had, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.2    Subsidiaries.  Reserved.

Section 5.3    Authority; Execution and Delivery; Enforceability.  Each of the Selling Entities has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform and comply with each of its obligations hereunder and thereunder and, upon entry and effectiveness of the Sale Order, in accordance with the terms hereof and thereof, will have all necessary corporate or similar authority to consummate the Transactions.  The execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which any Selling Entity is a party, the performance and compliance by the Selling Entities with each of their obligations herein and therein, and the consummation by it of the Transactions have been duly and validly authorized and approved by all necessary corporate or other action on the part of the Selling Entities, and no other corporate or other Proceedings on the part of the Selling Entities and no other stockholder votes are necessary to authorize the execution of this Agreement or the other Transaction Documents, or the performance or consummation by the Selling Entities of the Transactions. Each Selling Entity has duly and validly executed and delivered this Agreement and will (as of the Closing) duly and validly execute and deliver the other Transaction Documents to which it is a party and, assuming the due authorization, execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is party, and by the other parties to the Transaction Documents, this Agreement constitutes and the other Transaction Documents will constitute (as of the Closing) legal, valid and binding obligations of each Selling Entity, enforceable against such Selling Entity in accordance with its terms, subject in all cases to approval by the Bankruptcy Court.

Section 5.4    No Conflicts.

(a)    The authorization, execution and delivery of this Agreement and the other Transaction Documents does not and will not, and the performance by the Selling Entities of this Agreement and the other Transaction Documents will not, except to the extent excused by or unenforceable as a result of the filing of the Bankruptcy Case and except for the entry and effectiveness of the Sale Order, with or without notice, lapse of time or both, (i) conflict with or violate any provision of any Selling Entity's organizational or governing documents, (ii) assuming that all consents, approvals, authorizations and permits described in Section 5.4(b) have been obtained and all filings and notifications described in Section 5.4(b) have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law, Permit or Order applicable to any Selling Entity or by which any property or asset of any Selling Entity is bound or affected or (iii) except as set forth in Section 5.4(a) of the Seller Disclosure Schedule, require any consent or approval under, result in any breach of or any loss of any benefit under, constitute a change of control or default (or an event which with notice or lapse of time or both would become a default) under or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of a Encumbrance (other than a Permitted

32

Encumbrance), in each case on or with respect to any Purchased Assets pursuant to or under, any Material Contract or material Permit to which any Selling Entity is party, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which are not, individually or in the aggregate, material to the Business.

(b)     Assuming the accuracy of the representations and warranties of the Buyer in Section 6.3(a), the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents does not and will not, and the consummation by the Selling Entities of the Transactions and compliance by the Selling Entities with any of the terms or provisions hereof will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i)  compliance with any applicable requirements under the Regulatory Laws, and (ii) the entry of the Sale Order by the Bankruptcy Court.

Section 5.5     Legal Proceedings and Orders.  Except as described in Section 5.5 of the Seller Disclosure Schedule, other than in connection with the Bankruptcy Case, there is no pending or, to the Knowledge of the Seller, threatened action, suit, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) or investigation pending or being heard by or before, or otherwise involving, any Governmental Authority, arbitrator, arbitration panel or any other Person (each a "Proceeding") against or affecting the Selling Entities, and as of the date hereof, no Person has commenced or, to the Knowledge of the Seller, threatened in writing to commence any Proceeding (a) that relates to and would reasonably be expected to materially and adversely affect any of the Purchased Assets, or (b) that would reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with any of the transactions contemplated by this Agreement.  To the Knowledge of the Seller, except as described in Section 5.5 of the Seller Disclosure Schedule, there is no Order to which any of the Selling Entities or any of the Purchased Assets is subject (a) that relates to and would reasonably be expected to materially and adversely affect any of the Purchased Assets, or (b) that would reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with any of the transactions contemplated by this Agreement.

Section 5.6     Permits.  Except as set forth in Section 5.6 of the Seller Disclosure Schedule, other than in connection with or as a result of the Bankruptcy Case, each of the Selling Entities, has all material federal, state, provincial, local and foreign governmental licenses, franchises, permits, certificates, registrations, consents, certificates, rights, agreements, approvals, orders, exemptions, billing, qualifications and authorizations ("Permits") necessary for the conduct of their business and the use of their properties and assets, as presently conducted and used, and each of the Permits is valid, subsisting and in full force and effect, except as are not material to the Business.

Section 5.7     Compliance with Law.  Each of the Selling Entities is in material compliance and, for the preceding five (5) years, has been in material compliance with all Laws and Orders relating to the Purchased Assets (including the use thereof), except (a) for such past noncompliance as has been remedied and imposes no continuing current or future obligations or costs on such Selling Entity, or (b) as set forth in Section 5.7 of the Seller Disclosure Schedule. None of the Selling Entities has received any written citation, complaint, Order, or other communication since January 1, 2020 from a Governmental Authority that alleges that such

33

Selling Entity is not in compliance with any Law or Order, except where any non-compliance, individually or in the aggregate, is not material to the Business.

Section 5.8    <u>Absence of Certain Developments</u>.  Since the Balance Sheet Date, (a) no Material Adverse Effect has occurred, and (b) except as set forth in <u>Section 5.8</u> of the Seller Disclosure Schedule and other than in connection with the Bankruptcy Case, the Business been conducted, in all material respects in the Ordinary Course of Business.

Section 5.9    <u>Financial Statements</u>.

(a)    <u>Section 5.9(a)</u> of the Seller Disclosure Schedule contains: (i) the Business's consolidated unaudited balance sheet as of March 31, 2025 (such date, the "<u>Balance Sheet Date</u>"), and the related statements of income for the three (3)-month period then ended, and (ii) the Business's consolidated unaudited balance sheet and statements of income for the fiscal year ended December 31, 2024 (all such financial statements referred to in (i) and (ii), the "<u>Seller Financial Statements</u>").  Except as set forth on <u>Section 5.9(a)</u> of the Seller Disclosure Schedule, the Seller Financial Statements present fairly in all material respects the financial condition and results of operations of the Selling Entities as of the times and for the periods referred to therein in all material respects in accordance with GAAP, consistently applied (subject in the case of the unaudited financial statements to (x) the absence of footnote disclosures and other presentation items, and (y) changes resulting in year-end adjustments).Section 5.9(a) of the Seller Disclosure Schedule is qualified by the fact that throughout the period covered by the Seller Financial Statements, (i) the Business has not operated as a standalone entity, but rather as a line of business intermingled with the Non-Core Businesses, (ii) the Seller Financial Statements includes allocated figures as between the Business and the Non-Core Businesses and (iii) the Seller Financial Statements are not necessarily indicative of what the results of operations or financial position of the respective Non-Core Businesses will be in the future.

(b)    The Selling Entities do not have any Liabilities required by GAAP to be reflected or reserved on a consolidated balance sheet of the Seller (or the notes thereto) except (i) as disclosed, reflected or reserved against in the most recent balance sheet included in the Seller Financial Statements or the notes thereto, (ii) for Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date, (iii) for Liabilities arising out of or in connection with this Agreement or the other Transaction Documents, the Transactions or disclosed in <u>Section 5.9(b)</u> of the Seller Disclosure Schedule, (iv) for Liabilities that, individually or in the aggregate, are not material in amount, or (v) Liabilities that will be or are Liabilities of the Selling Entities as debtors in the Bankruptcy Case, and that will not result in any Encumbrance (other than a Permitted Encumbrance) on the Purchased Assets following the entry of the Sale Order.

Section 5.10    <u>Employee Benefit Plans</u>.

(a)    <u>(a)</u> of the Seller Disclosure Schedule sets forth a true and complete list of each material (i) "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), whether or not subject to ERISA, (ii) end of service or severance, termination protection, retirement, pension, profit sharing, deferred compensation, phantom, equity or equity-based, health or welfare, employment, independent contractor, vacation, change in control, transaction, retention, bonus or other incentive, fringe

34

benefit, paid time off or similar plan, agreement, arrangement, program or policy, or (iii) other plan, Contract, policy or arrangement providing compensation or benefits, in each case whether or not written, in the case of clauses (i)-(iii), that is sponsored, maintained, administered, contributed to or entered into by any Selling Entity, for the benefit of any of its current or former directors, officers, employees or individual independent contractors (each, a "Service Provider") has any direct or indirect liability (the "Seller Compensation and Benefit Programs").  No Seller Compensation and Benefit Program that is subject to Laws of any jurisdiction other than the United States is a defined benefit pension plan.

(b)     Each Seller Compensation and Benefit Program has been administered in accordance with its terms and all applicable Laws in all material respects, including ERISA and the Code.

(c)     Each Seller Compensation and Benefit Program that is intended to be qualified under Section 401(a) of the Code has received or is the subject of a favorable determination, opinion or advisory letter from the IRS regarding its tax-qualified status.

(d)     Neither the Selling Entities nor any trade or business that, together with any Selling Entity, would be deemed a single employer within the meaning of Section 4001 of ERISA (an "ERISA Affiliate") or other applicable Laws maintains, contributes to, or sponsors (or has in the past six years maintained, contributed to or sponsored), or otherwise has any liability in respect of, a multiemployer plan as defined in Section 3(37) of ERISA or plan subject to Title IV or Section 302 of ERISA or Section 412 of the Code or other applicable Laws.  No Seller Compensation and Benefit Program provides post-employment health or welfare benefits for any current or former director, officer, employee or individual independent contractor of any Selling Entity (or their dependents), in any jurisdiction, other than as required under Section 4980B of the Code at the participant's sole expense or as required by other applicable Law.

(e)     No amount that would be received (whether in cash or property or the vesting of property), as a result of the consummation of the transactions contemplated by this Agreement (alone or in conjunction with any other event, including any termination of employment), by any Transferred Employee who is a "disqualified individual" (as such term is defined in proposed Treasury Regulation Section 1.280G-1) under any Seller Compensation and Benefit Program would reasonably be expected to be characterized as an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code).  No Seller Compensation and Benefit Program provides for the gross-up or reimbursement of Taxes of any Transferred Employee under Section 4999 or Section 409A of the Code.

(f)     None of the Selling Entities is a party to, or otherwise bound by, any collective bargaining agreement or other Contract with a Union with respect to the Business.  No Employee (in such capacity) is represented by a Union.  To the Knowledge of the Seller, there are no Union organizing activities or demands of any Union for recognition or certification pending or threatened against any Selling Entity, and there have been no such activities or demands for the past three (3) years prior to the date hereof, in each case relating to the Business.

Section 5.11    Material Contracts.

(a)    Section 5.11(a) of the Seller Disclosure Schedule sets forth a list of each Material Contract as of the date of this Agreement, in each case identifying with specificity which category or categories of this Section below such Material Contract is included.  For purposes of this Agreement, "Material Contract" means any of the following types of the Contracts to which a Selling Entity is a party or by which a Selling Entity is bound:

(i)    any Contract for the employment of any officer, individual employee or other person on a full-time or consulting basis providing for base compensation in excess of $150,000 per annum or that is not terminable by such Selling Entity without cause upon notice of thirty (30) days or less;

(ii)    any license of any Intellectual Property that involves payments (by or to any Selling Entity) in excess of $100,000 per annum and is not terminable by such Selling Entity without cause or continuing liability upon notice of thirty (30) days or less (other than non-exclusive licenses to customers in the Ordinary Course of Business);

(iii)    any Contract or group of related Contracts with the same party or related parties for the purchase of products or services, in either case, under which the aggregate undelivered balance of such products and services has a selling price in excess of $250,000 and which is not terminable by such Selling Entity without cause or continuing liability upon notice of sixty (60) days or less;

(iv)    any Contract that contains any provision (A) limiting, in any material respect, the right of the Selling Entities to engage in any business, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than a Contract that can be terminated without cause or continuing liability upon notice of sixty (60) days or less;

(v)    any Contract of the Business relating to any acquisition or disposition by such Selling Entity of any business (whether by asset or stock purchase or otherwise) or any merger, consolidation or similar business combination transaction, in each case, pursuant to which such Selling Entity has any remaining obligations, and specifically identifying any outstanding obligation to pay purchase price or any other amounts, including any contingent obligation to make such payments in excess of $25,000;

(vi)    any Real Property Leases of real property of the Business located in the U.S. pursuant to which any Selling Entity is a party;

(vii)    any Contract with any Material Customer or Material Supplier; or

(viii)    any material joint venture or partnership Contract.

(b)    As soon as reasonably practicable, and in any event at least five (5) days prior to the Closing, the Seller has provided the Buyer with a correct and complete copy of each

36

Material Contract (including all amendments thereto and all waivers granted by any party thereunder). Each Material Contract is a valid and binding obligation of each Selling Entity party thereto, as applicable, and, to the Knowledge of the Seller, the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, (i) as such enforceability may be limited by (a) bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) general equitable principles, whether considered in a proceeding at law or in equity (such exceptions described in the foregoing clauses (a) and (b), collectively, the "Enforceability Exceptions"), (ii) as set forth in Section 5.11(b) of the Seller Disclosure Schedule or (iii) as would not be material to the Business.

(c)     None of the Selling Entities is, and to the Knowledge of the Seller, the other parties thereto are not, in breach of the Material Contracts, and none of the Selling Entities has waived any material rights under any Material Contracts, except, in each case, (i) as a result of the Bankruptcy Case, (ii) as set forth in Section 5.11(c) of the Seller Disclosure Schedule, (iii) as may be cured upon entry of the Sale Order and payment of the Cure Payments, or (iv) for Contracts that are not Assumed Agreements that have been or will be rejected in the Bankruptcy Case.

Section 5.12   Intellectual Property; Information Technology.

(a)     Section 5.12(a) of the Seller Disclosure Schedule sets forth, as of the date of this Agreement, a complete and accurate list of all (i) Registered IP, including the Business Marks, (ii) domain names included in the Business IP, and (iii) Trademarks included in the Business IP that are not registered but that are material to the operation of the Business. Except as identified on Section 5.12(a) of the Seller Disclosure Schedule, none of the Registered IP is involved in any opposition, cancellation, nullity, reissue, reexamination or other proceeding or action challenging the validity, enforceability or ownership of such Registered IP.

(b)     The Business IP together with all Intellectual Property licensed or made available to the Selling Entities pursuant to the Assumed Agreements include all of the material Intellectual Property necessary and sufficient to enable the Buyer to conduct the Business from and after Closing in substantially the same manner as currently conducted by the Seller and its Subsidiaries.

(c)     None of the Selling Entities is infringing, misappropriating, diluting, or otherwise violating any material Intellectual Property rights of any Person. There is no material Proceeding pending and none of the Selling Entities has received any material charge, complaint, claim, demand, or notice since January 1, 2020 (or earlier, if presently not fully resolved) alleging: either (i) any such infringement, misappropriation, dilution, or violation or (ii) challenging the use, validity, ownership, or enforceability of any Business IP.

(d)     To the Knowledge of the Seller, no Person is infringing, misappropriating, diluting or otherwise violating any material Business IP. No Selling Entity has made or asserted any charge, complaint, claim, demand or notice since January 1, 2020 alleging any such infringement, misappropriation, dilution, or violation.

37

(e)      The IT Systems operate, in all material respects, as required for the continued operation of the Business in the substantially same manner as they have operated during the one-year period prior to the execution of this Agreement.

Section 5.13    <u>Data Privacy</u>.  The Selling Entities are in material compliance with all applicable: (i) externally published policies relating to the Selling Entities' processing of Personal Information, and (ii) terms of any agreements to which the Selling Entities are bound relating to the processing of Personal Information by the Selling Entities.  The Selling Entities implement and maintain commercially reasonable safeguards designed to protect Personal Information stored in its information technology systems as required by applicable Privacy Laws.

Section 5.14    <u>Taxes</u>.

(a)      all material Tax Returns relating to the Business or the Purchased Assets that are required by applicable Law to be filed by or with respect to any Selling Entity have been timely filed (taking into account any extension of time within which to file), and all such Tax Returns are true, complete, and accurate in all material respects;

(b)      each of the Selling Entities has timely paid all material Taxes relating to the Business or the Purchased Assets due and owing by it, including any material Taxes required to be withheld from amounts owing to, or collected from, any employee, creditor, or other third party, other than Taxes not due as of the date of the filing of the Bankruptcy Case as to which subsequent payment was not required by reason of the Bankruptcy Cases or Taxes that are being contested in good faith in appropriate Proceedings;

(c)      no deficiencies for material Taxes relating to the Business or the Purchased Assets have been claimed, proposed or assessed by any Governmental Authority in writing against the Selling Entities except for deficiencies which have been fully satisfied by payment, settled or withdrawn or adequately reserved for in accordance with GAAP on the Seller Financial Statements;

(d)      there are no audits, examinations, investigations or other proceedings ongoing or pending against or with respect to the Selling Entities with respect to any material Taxes relating to the Business or the Purchased Assets and no written notification has been received by the Selling Entities that such an audit, examination, investigation or other proceeding has been proposed;

(e)      there are no Encumbrances for material Taxes relating to the Business or the Purchased Assets upon any property or assets of the Selling Entities, except for Permitted Encumbrances; and

(f)      No claim has been made by any Governmental Authority (i) in any jurisdiction where any Selling Entity does not file material Tax Returns that it is, or may be, subject to Tax by that jurisdiction or (ii) in a jurisdiction where any Selling Entity has previously filed any material Tax Return that the Seller is or may be subject to additional Taxes.

38

Section 5.15    Insurance.  The Selling Entities are insured with policies in such amounts and with such deductibles and covering such risks as such Selling Entities reasonably believe are generally deemed adequate and customary for their respective industries, except as would not be material to the Business.  Except as set forth in Section 5.15 of the Seller Disclosure Schedule, all premiums due and payable under the applicable insurance policies of the Selling Entities primarily relating to the Business have been timely paid as of the date of this Agreement.  No Selling Entity has been denied in writing any insurance coverage for which it has applied, except as would not have, or would not reasonably be expected to have, a Material Adverse Effect.

Section 5.16    Title to Assets; Real Property.

(a)    The Selling Entities have good and valid title to, or have good and valid leasehold interests in, all tangible personal property that is included in the Business, including the Purchased Assets (other than the Excluded Assets), free and clear of all Encumbrances other than Permitted Encumbrances, and except (i) to the extent that such Encumbrances will not be enforceable against such tangible personal property following the Closing in accordance with the Sale Order, (ii) as set forth in Section 5.16(a) of the Seller Disclosure Schedule, (iii) or would not be material to the Business.

(b)    None of the Selling Entities owns any real property.

Section 5.17    Environmental Matters.

(a)    None of the Selling Entities has received any written notification of any material allegation of actual or potential responsibility for any Release or threatened Release regarding any Hazardous Materials, the subject matter of which has not been resolved.

(b)    None of the Selling Entities has any material unresolved obligations pursuant to any consent decree or consent order or is otherwise subject to any material unresolved obligations pursuant to any Order, judgment, decree, or judicial or administrative order, in each case, relating to compliance with Environmental Laws, Environmental Permits or to the investigation, sampling, monitoring, treatment, remediation, response, removal or cleanup of Hazardous Materials.

(c)    No Selling Entity has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, released, nor, to the Knowledge of the Seller, exposed any Person to, any Hazardous Materials except (i) in compliance in all material respects with Environmental Laws or (ii) as would not be material to the Business.

Section 5.18    Brokers.  Except as set forth in Section 5.18 of the Seller Disclosure Schedule, all of which will be paid by the Seller and not the responsibility of the Buyer, none of the Selling Entities have used any investment banker, broker, finder or similar agent in connection with the Transactions, and no Person is entitled to any investment banker, brokerage, financial advisory, finder's or other similar fee or commission payable by any Selling Entity in connection with the Transactions.

Section 5.19    OFAC; Foreign Corrupt Practices Act; Anticorruption Laws.

39

(a)      No Selling Entity or, to the Knowledge of the Seller, any director, officer, or employee acting on behalf of such Selling Entity, is currently, or during the past five (5) years prior to the date hereof has been, subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

(b)      No Selling Entity or, to the Knowledge of the Seller, any director, officer, agent, employee or other person acting on behalf of such Selling Entity has, in the course of its actions for, or on behalf of, such Selling Entity (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any domestic government official "foreign official" (as defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (collectively, the "FCPA")) or employee from corporate funds; (iii) violated or is in violation of any provision of the FCPA or any applicable non-U.S. anti-bribery statute or regulation; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

(c)      The Selling Entities have implemented and maintain in effect policies and procedures that are designed to ensure material compliance by the Selling Entities with Anticorruption Laws.

Section 5.20    Material Customers; Material Suppliers.

(a)      Section 5.20(a) of the Seller Disclosure Schedule sets forth a list of the ten largest customers (measured by revenue) of the Selling Entities, taken as a whole (collectively, the "Material Customers") during the twelve (12) month period ended May 31, 2025. Except as set forth in Section 5.20(a) of the Seller Disclosure Schedule, there has been no written or, to the Knowledge of the Seller, oral notice received from any such party of any termination, cancellation or limitation of, or any materially adverse modification or change in, the business relationship of the Selling Entities with any Material Customer.

(b)      Section 5.20(b) of the Seller Disclosure Schedule sets forth a list of the one hundred largest vendors and suppliers (excluding fees for Professional Services) of the Selling Entities, taken as a whole (collectively, the "Material Suppliers") during the twelve (12) month period ended May 31, 2025. Except as set forth in Section 5.20(b) of the Seller Disclosure Schedule, there has been no written or, to the Knowledge of the Seller, oral notice received from any such party of any termination, cancellation or limitation of, or any materially adverse modification or change in, the business relationship of the Selling Entities with any Material Suppliers.

Section 5.21    Affiliate Transactions.   Except as set forth in Section 5.21 of the Seller Disclosure Schedule, no Affiliate of the Seller (other than the Selling Entities), or any officer or director of the Selling Entities (a) is a party to any agreement or transaction with the Selling Entities having a potential or actual value or a contingent or actual liability exceeding $50,000, other than (i) loans and other extensions of credit to directors and officers of the Selling Entities for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course of Business, (ii) employment arrangements in the Ordinary Course of Business and (iii) the Seller Compensation and Benefit Programs, (b) has any interest in any material property used

40

in the Business, or (c) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a supplier or customer of the Selling Entities.

Section 5.22    Employment Matters.

(a)    Section 5.20(a) of the Seller Disclosure Schedule contains a list of all persons who are employees, independent contractors or consultants of the Business as of immediately prior to the date of this Agreement, including any employee who was on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth for each such individual the following:  (i) name or employee number; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; (vi) a description of the fringe benefits provided to each such individual as of immediately prior to the Closing Date (other than pursuant to Seller Compensation and Benefit Programs listed on Section 5.10(a) of the Seller Disclosure Schedule); and (vii) the location where such person performs services for the Business.  As of the date hereof, all compensation, including wages, commissions and bonuses overdue and payable to all employees, independent contractors or consultants of the Business for services performed on or prior to the date hereof have been paid in full and there are no material outstanding agreements, understandings or commitments of Seller with respect to any compensation, commissions or bonuses.

(b)    Selling Entities are and have been for the past three (3) years in material compliance with all applicable Laws pertaining to employment and employment practices, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance.  All individuals characterized and treated by the Selling Entities as consultants or independent contractors are properly treated as independent contractors under all applicable Laws in all material regards.  All employees of the Selling Entities classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified in all material regards.  There are no Proceedings against any Selling Entity pending, or to Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern or independent contractor of the Selling Entities, including any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wages and hours or any other employment related matter arising under applicable Laws.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Selling Entities as follows:

Section 6.1    Organization and Good Standing.    The Buyer is a corporation duly organized, validly existing and, to the extent applicable, in good standing (or its equivalent) under

the jurisdiction of its incorporation or organization and has the requisite corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is being conducted on the date hereof. The Buyer is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except for those licenses or qualifications the absence of which would not prevent or materially delay the consummation of the Transactions.

Section 6.2    <u>Authority Relative to this Agreement</u>. The Buyer has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is party, to perform and comply with each of its obligations hereunder and thereunder and to consummate the Transactions. The execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is party, the performance and compliance by the Buyer with each of its obligations herein and therein and the consummation by the Buyer of the Transactions have been duly and validly authorized and approved by all necessary corporate or other action on the part of the Buyer and no other corporate or other proceedings on the part of the Buyer and no stockholder votes are necessary to authorize this Agreement, the other Transaction Documents to which it is party or the performance or consummation by the Buyer of the Transactions. The Buyer has duly and validly executed and delivered this Agreement, and the other Transaction Documents to which it is party will be duly executed and delivered by the Buyer and, assuming the due and valid authorization, approval, execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents, this Agreement and the other Transaction Documents to which the Buyer is party constitutes or will constitute the Buyer's legal, valid and binding obligation, enforceable against the Buyer in accordance with its terms, subject to the Enforceability Exceptions.

Section 6.3    <u>No Violation; Consents</u>.

(a)    The authorization, execution and delivery of this Agreement or the other Transaction Documents by the Buyer do not and will not, and the performance by the Buyer of this Agreement and the other Transaction Documents to which it is party will not, with or without notice, lapse of time or both, (i) conflict with or violate any provision of the organizational documents of the Buyer, (ii) assuming that all consents, approvals, authorizations and permits described in <u>Section 6.3(b)</u> have been obtained and all filings and notifications described in <u>Section 6.3(b)</u> have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law or Order applicable to the Buyer or its Affiliates, or by which any property or asset of the Buyer is bound or affected or (iii) require any consent or approval under, result in any breach of or any loss of any benefit under, constitute a change of control or default (or an event which with notice or lapse of time or both would become a default) under or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of an Encumbrance on any property or asset of the Buyer, pursuant to, any Contract or Permit to which the Buyer is a party, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which would not reasonably be expected, individually or in the aggregate, to prevent or materially delay the consummation of the Transactions.

42

(b)      Assuming the accuracy of the representations and warranties of the Selling Entities in Section 5.4(a), the execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is party does not and will not, and the consummation by the Buyer of the Transactions and compliance by the Buyer with any of the terms or provisions hereof will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) compliance with any applicable requirements under the Regulatory Laws, (ii) the entry of the Sale Order by the Bankruptcy Court or (iii) such other Consents where failure to obtain such Consents would not reasonably be expected, individually or in the aggregate, to prevent or materially delay the Transactions.

Section 6.4      Legal Proceedings and Orders.  Except for the Bankruptcy Case, there is no Proceeding pending, or, to the Knowledge of the Buyer, threatened that, individually or in the aggregate, would reasonably be expected to prevent or materially delay the Transactions, and the Buyer is not subject to any outstanding Order that, individually or in the aggregate, would reasonably be expected to prevent or materially delay the Transactions.

Section 6.5      Brokers.  The Buyer has not used any investment banker, broker, finder or similar agent in connection with the Transactions, and no Person is entitled to any investment banker, brokerage, financial advisory, finder's or other similar fee or commission payable by the Buyer or any of its Affiliates in connection with the Transactions.  Any such fees shall be paid in full by the Buyer.

Section 6.6      Solvency.  Immediately after giving effect to the Transactions, the Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of the Buyer or the Seller.  In connection with the Transactions, the Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 6.7      Financial Capability.  The Buyer (a) has as of the date hereof, and on the Closing Date will have, sufficient funds available to pay the Purchase Price, including the Assumed Liabilities, and any expenses incurred by the Buyer in connection with the Transactions, (b) has as of the date hereof, and on the Closing Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and the other Transaction Documents, and (c) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

Section 6.8      Certain Arrangements.  As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between the Buyer, on the one hand, and any Affiliate or member of the management of the Selling Entities or their respective board of directors or board of managers (or applicable governing body of any Affiliate of the Selling Entities), any holder of equity or debt securities of the Selling Entities, or any lender or creditor of the Selling Entities or any of their Affiliates, on the other hand, (a) relating in any way to the acquisition of the Purchased Assets, the assumption of the Assumed Liabilities or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect

43

adversely the ability of the Selling Entities to entertain, negotiate or participate in any of the Transactions.

## ARTICLE VII
## COVENANTS OF THE PARTIES

Section 7.1    Conduct of Business of Selling Entities.  Except (u) as set forth on Section 7.1 of the Seller Disclosure Schedule, (v) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (w) as required by applicable Law, Order or a Governmental Authority, (x) to the extent related to an Excluded Asset or an Excluded Liability, (y) as contemplated or required by the terms of any Transaction Document, or (z) as otherwise consented to in writing by the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms:

(a)    each of the Selling Entities shall, use commercially reasonable efforts to (taking into account in each case (A) the fact that the Bankruptcy Case has commenced, (B) the fact that the Business will be operated while in bankruptcy, (C) the fact that the operation of the Business may require additional financing, and (D) the fact that the continuing operation of the Business, including payments to suppliers, will be subject to the approval of the Bankruptcy Court) (i) operate the Business in the Ordinary Course of Business and (ii) preserve in all material respects the Purchased Assets; and

(b)    the Selling Entities shall not:

(i)    acquire any material assets, securities, properties, interests or businesses for the conduct of the Business, tangible or intangible, other than in the Ordinary Course of Business (including in respect of any Accounts Receivable);

(ii)    sell, lease (as lessor), transfer or otherwise dispose of any Purchased Asset, or permit any Purchased Asset to become subject to any additional Encumbrance, other than (A) Permitted Encumbrances, (B) Encumbrances arising under any Order of the Bankruptcy Court relating to the use of cash collateral (as defined in the Bankruptcy Code) or (C) Encumbrances arising under any Order of the Bankruptcy Court relating to any debtor-in-possession financing of the Selling Entities or any Purchased Assets in each case, except for (1) non-exclusive licenses of Business IP granted in the Ordinary Course of Business, (2) the collection of receivables or the payment of payables in the Ordinary Course of Business, (3) the use of prepaid assets or amounts and Documentary Materials in the Ordinary Course of Business and (4) the replication and transfer of any software or data that is an Excluded Asset;

(iii)    incur or make any capital expenditures that would be an Assumed Liability;

(iv)    amend in any material respect or voluntarily terminate any Assumed Agreement (or waive any material provision of); *provided*, that no Selling Entity shall be

44

required to enter into any extension or amendment with respect to any Assumed Agreement that would otherwise terminate prior to the Closing;

(v)    merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(vi)    amend the certificate of incorporation, bylaws or comparable organizational documents of any Selling Entity in a manner that impede or materially delay the Selling Entities' ability to consummate the Transactions;

(vii)    incur any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness, in each case that would constitute an Assumed Liability, other than (A) the DIP Obligations, (B) in accordance with the DIP Order or (C) accounts payable or other amounts payable in the Ordinary Course of Business;

(viii)    make any loans, advances or capital contributions to, or investments in, any other Person (other than any other Selling Entity) with respect to the Business;

(ix)    make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP (or any interpretation thereof);

(x)    make any material change in any methods by which Accounts Receivable are collected, including any offers to accept a reduced amount in exchange for accelerated payment outside the Ordinary Course of Business;

(xi)    commence, settle or propose to settle any Proceedings that could reasonably be expected to materially diminish the value of the Purchased Assets or impair title thereto, in each case other than any (A) Proceeding in respect of which any related liability is covered in full by an insurance policy or (B) any Proceeding that would otherwise be settled in the Ordinary Course of Business;

(xii)    materially change any Tax accounting elections, methods, principles or practices relating to the Business or the Purchased Assets, except insofar as may be required by applicable Law or GAAP or other generally accepted accounting principles applicable to any Selling Entity (or any interpretation thereof);

(xiii)    adopt, commence contributions, terminate, withdraw from, or amend (other than as required by law) any Seller Compensation and Benefit Program; or

(xiv)    authorize any of the foregoing, or commit or agree to do any of the foregoing.

Section 7.2    Conduct of Business of the Buyer.  The Buyer agrees that, between the date of this Agreement and the Closing, it shall not, and shall cause its Affiliates not to, directly or indirectly, take any action that would, or would reasonably be expected to, individually or in the aggregate, prevent or impede, interfere with or delay the consummation of the Transactions, except

45

as required by any Order of the Bankruptcy Court, as required by applicable Law, or as otherwise consented to in writing by the Seller.

Section 7.3    Access to and Delivery of Information; Maintenance of Records.

(a)    From the entry of the Sale Order until the earlier of the Closing and the termination of this Agreement, to the extent permitted by applicable Law, the Selling Entities shall, during ordinary business hours and upon reasonable prior notice (i) give the Buyer and the Buyer's Representatives reasonable access to the Seller's accountants, counsel, financial advisors and other authorized outside representatives, officers and senior management in their respective principal places of business, all books, records and other documents and data in the locations in which they are normally maintained, and all offices and other facilities of the Selling Entities related to the Business; *provided, however*, that, in connection with such access, the Buyer and the Buyer's Representatives shall use commercially reasonable efforts to minimize disruption to the Business and not disrupt the Bankruptcy Case and the Auction; *provided, further,* that in connection with the Buyer's and/or the Buyer's Representatives' access of such offices and other facilities, the Buyer and/or the Buyer's Representatives shall be accompanied at all times by a representative of the Selling Entities unless the Seller otherwise agrees, shall not materially interfere with the use and operation of such offices and other facilities, and shall comply with all reasonable safety and security rules and regulations for such offices and other facilities, (ii) permit the Buyer and the Buyer's Representatives to make such reasonable inspections and copies of all books, records and other documents of the Selling Entities related to the Business as the Buyer may reasonably request and (iii) promptly, and in no event later than five (5) days prior to the Closing, furnish the Buyer with true, correct and complete copies of all documents and instruments referenced in the Seller Disclosure Schedule (including all Material Contracts), together with such other reasonably available financial and operating data and other information as the Buyer and the Buyer's Representatives may from time to time reasonably request.  Notwithstanding anything to the contrary set forth in this Section 7.3, no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client, attorney work product or other privilege, or would reasonably be expected to breach or violate any Contract to which any Selling Entity is a party (or is bound by or whose assets or properties are bound by or subject to) or any applicable Law.  The Buyer agrees to, and will cause its Representatives to, sign any reasonable access letters required in connection with any such provision of information or access or the conduct of any such investigation or examination contemplated by this Section 7.3(a) and Section 7.3(b).  Notwithstanding anything to the contrary herein, in no event shall any of the Selling Entities or their respective Affiliates be required to provide the Buyer or any of its Affiliates or their respective Representatives with access to or copies of any trade secrets related to the Business at any time prior to the Closing (except to the extent such trade secrets are referenced in the Seller Disclosure Schedule).

(b)    Between the Closing Date and the complete dissolution and liquidation of the Selling Entities, the Buyer and the Buyer's Representatives shall have reasonable access to the Selling Entities' books and records, including all information pertaining to the Assumed Agreements, in the possession of the Selling Entities to the extent that (i) such books, records and information relate to any period prior to the Closing Date and are not already in the possession of the Buyer or the Buyer's Representatives and (ii) such access is reasonably required by the Buyer in connection with the Assumed Liabilities, the operation of the Business following the Closing or

46

the Purchased Assets. Such access shall be afforded by the Seller upon receipt of reasonable advance notice and during normal business hours and without undue disruption to its business or that of any other Selling Entity. If any of the Selling Entities shall desire to dispose of any books and records constituting Excluded Assets prior to its dissolution, the Seller shall (x) give the Buyer at least thirty (30) days prior written notice of such disposition and (y) give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records exclusively relating to the Purchased Assets and the Assumed Liabilities as the Buyer may select and/or to copy at the Buyer's sole cost and expense such books and records exclusively relating to the Purchased Assets and the Assumed Liabilities as the Buyer may select. Notwithstanding anything to the contrary set forth in this Section 7.3(b), no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client, attorney work product or other privilege, or would breach or violate any Contract to which any Selling Entity is a party (or is bound by or whose assets or properties are bound by or subject to) or any applicable Law (including the Retained Records).

(c)     Between the Closing Date and the complete dissolution and liquidation of the Selling Entities, the Selling Entities and their Representatives shall have reasonable access to all of the books and records of the Selling Entities delivered to the Buyer at Closing or pursuant to Section 7.3(b) above, including all Documentary Materials and all other information pertaining to the Assumed Agreements to the extent that (i) such books, records and information relate to any period prior to the Closing Date or the winding down of any of the remaining business, assets or liabilities of the Selling Entities, the dissolution and liquidation of the Selling Entities, the performance of the obligations of the Selling Entities hereunder and under the other Transaction Documents or any Excluded Asset or Excluded Liability and (ii) such access is reasonably required by the Debtor Entities in connection with the Bankruptcy Case, the Excluded Liabilities or the Excluded Assets. Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours and without undue disruption to its business, and the Buyer shall permit the Selling Entities and their Representatives to make such reasonable copies of such books, records and information as they may reasonably request.

(d)     Between the Closing Date and the complete dissolution and liquidation of the Selling Entities, upon receipt by Buyer of reasonable advance notice and during normal business hours the Selling Entities and their Representatives shall have reasonable access to, and the reasonable assistance of, any Transferred Employees in connection with the winding down of any remaining business and assets of the Selling Entities, the dissolution and liquidation of the Selling Entities, and the performance of the obligations of the Selling Entities hereunder and under the other Transaction Documents, and the Buyer shall cooperate, to the extent reasonably requested, therewith; *provided, however*, that such assistance does not interfere in any material respect with the operation of the Business following the Closing; and *provided, further,* that should the Selling Entities request assistance above and beyond that contemplated by this Section 7.3(d) (e.g., as to the incurrence by the Buyer of out-of-pocket expenses), the Buyer will cooperate reasonably with the Selling Entities subject to the Selling Entities' reimbursement of such actual out-of-pocket expenses.

(e)     Except as expressly contemplated by this Agreement, the Buyer and its Affiliates and their respective Representatives (including counsel, accountants and financial advisors) shall not contact any officer, manager, director, employee, customer, supplier, lessee,

47

lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of the Selling Entities prior to the Closing with respect to the Selling Entities, the Business or the Transactions, without the prior written consent of the Seller for each such contact.

(f)    All information obtained by the Buyer or the Buyer's Representatives pursuant to this Section 7.3 shall be subject to the terms of the Confidentiality Agreement.

Section 7.4    Expenses.    Except to the extent otherwise specifically and expressly provided in this Agreement or in the Sale Order, whether or not the Transactions are consummated, all costs and expenses incurred in connection with this Agreement and the Transactions shall be borne by the Party incurring such costs and expenses.

Section 7.5    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with its terms, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions.

(b)    From time to time, on or after the Closing Date until the dissolution and liquidation of the Selling Entities, as and when requested by either Party and at such requesting Party's expense, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Purchased Assets that may be in the possession of the Selling Entities or their Affiliates to the Buyer).

(c)    Except as set forth herein, nothing in this Section 7.5 shall (i) require any party to make any expenditure or incur any obligation on their own or on behalf of any other party, (ii) prohibit any Selling Entity from ceasing operations or winding up its affairs following the Closing, or (iii) prohibit the Selling Entities from taking such actions as are necessary to conduct the Auction, as are required by the Bankruptcy Court or as would otherwise be permitted under Section 7.1.

Section 7.6    Public Statements; Confidentiality.    Unless (a) in the reasonable judgment of the disclosing Party after consultation with counsel, otherwise required by or necessary to comply with applicable Law, the rules or regulations of any applicable securities exchange or as may be requested by a Governmental Authority (provided that, to the extent reasonably practicable and legally permissible, the disclosing party consults with the other party prior to making such disclosure), (b) except for disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and any filings or notices related thereto, or (c) except for any such press release or announcement that is consistent with previous public statements made jointly by or otherwise agreed between the Buyer and the Selling Entities, the Buyer, on the one hand, and the Selling Entities, on the other hand, shall consult with and provide each other the opportunity to review and comment before issuing any press release or otherwise making any public statement

48

with respect to this Agreement, the Transactions or the activities and operations of the other Parties and shall not issue any such release or make any such statement without the prior written consent of the Seller or the Buyer, respectively (such consent not to be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing and subject to Section 7.3(f), the parties and their Affiliates may, without such consultation or consent, in the ordinary course of business make confidential communications to existing or prospective general and limited partners, equity holders, members, managers and investors of such Person or any Affiliates of such Person, in each case, who are subject to customary confidentiality restrictions. From and after the Closing, the Selling Entities shall, and each of them shall cause its and their respective Affiliates and Representatives to, hold in confidence any and all confidential or proprietary information concerning the Business and the Purchased Assets, whether written or oral, except to the extent that such information is generally available to and known by the public through no fault of such Selling Entity or any of its or their Affiliates or Representatives. If the Selling Entities or any of its or their Affiliates or Representatives are compelled to disclose any such information by judicial or administrative process or by other requirements of Law, such Person shall (if permitted by Law) promptly notify the Buyer in writing and shall disclose only that portion of such information which such Person is advised by its counsel in writing is legally required to be disclosed; *provided* that such Person shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information at Buyer's cost. Nothing herein shall restrict any communications made by the Buyer after the Closing.

Section 7.7     Non-Competition.

(a)     For a period of three (3) years commencing on the Closing Date, the Selling Entities shall not, and shall cause their Affiliates not to, directly or indirectly, (i) engage in or assist others in engaging in any Restricted Business anywhere in North America; (ii) participate in any way in or in any way have any interest of any nature whatsoever (financial or otherwise) in any Person that engages directly or indirectly in any Restricted Business anywhere in North America in any capacity, including as a partner, shareholder, member, officer, director, manager, employee, principal, investor, advisor, lender, guarantor, agent, trustee or consultant; (iii) call upon, solicit, divert, attempt to solicit or divert, or conduct or carry on any business with any of the current or potential customers of the Business for the benefit of any Restricted Business; or (iv) interfere or attempt to interfere with any business relationship between the Buyer and any current or potential customer or supplier of the Buyer or any other Person with which the Buyer has a business relationship.

(b)     Each of the Selling Entities and their Affiliates acknowledges that a breach or threatened breach of this Section 7.7 would give rise to irreparable harm to the Buyer, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach of any such obligations, the Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

49

(c)     The Selling Entities and their Affiliates acknowledge that the restrictions contained in this Section 7.7 are reasonable and necessary to protect the legitimate interests of the Buyer and constitute a material inducement to the Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement.  In the event that any covenant contained in this Section 7.7 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this Section 7.7 and each provision hereof are severable and distinct covenants and provisions.  The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

Section 7.8     Employee Matters.

(a)     The Buyer (which for purposes of this Section 7.8 shall be deemed to include its Affiliates) shall offer employment to at least 350 full time employees of the Business, with 116 such offers of employment being made to the U.S. employees of the Business, on terms and conditions that are substantially equivalent to market terms for employment for the Seller Entities' industry, unless such employee's terms and conditions of employment with the Seller Entities is less favorable than such market terms, in which case Buyer may offer employment on substantially equivalent terms currently applicable to each such employee with the applicable Seller Entity (the "Required Offered Employees").  To allow Buyer to prepare such offers of employment, engagement, or services the Seller shall, except to the extent restricted by applicable Law, provide, within two (2) business days following the closing of the Auction, (i) a full employee census including each employee's name, salary, title, email, existing reporting structure, and other employee information reasonably requested by Buyer; (ii) a full list of independent contractors, including contractor's name, payment schedule, role, and any key contract terms; and (iii) any written agreements with independent contractors who provide services to the applicable Selling Entity.  The Buyer may, at the Buyer's sole discretion, offer to any or all current or former other U.S. and ex-U.S. employees and/or independent contractors of the Business on such terms and conditions as the Buyer may, in its sole discretion, determine (each such Employee, together with the Required Offered Employees, an "Offered Employee").  The Seller shall bear any and all obligations and liability under the WARN Act and any other applicable Laws pertaining to plant closings, relocations, mass layoffs or employment losses resulting from the Seller's termination of employees of the Business.  Each Offered Employee who accepts such an offer of employment with the Buyer is referred to herein as a "Transferred Employee", and the Selling Entities shall terminate all Transferred Employees, effective as of the later of the close of business on day prior to the Closing Date, or the day such Transferred Employee is due to start work with the Buyer. Buyer agrees that each offer pursuant to this Section 7.8(a) shall provide for sufficiently comparable employment as in effect immediately prior to Closing so as to not constitute an "employment loss" (as defined under the WARN Act) for the applicable Offered Employee.

(b)     The Selling Entities shall be solely responsible, and the Buyer shall have no obligations whatsoever, for any pre-Closing compensation or other amounts payable to any current

50

or former employee, officer, director, independent contractor or consultant of the Selling Entities, including hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay, and the Selling Entities shall pay all such amounts to all entitled persons.  The Buyer shall be solely responsible for any post-Closing compensation or benefits payable to any Transferred Employee in connection with their employment with the Buyer.

(c)    For all periods prior to employment with the Buyer, the Selling Entities shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Selling Entities or the spouses, dependents or beneficiaries thereof.  For all periods prior to employment with the Buyer, the Selling Entities also shall remain solely responsible for all workers' compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Selling Entities.  The Selling Entities shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.  The Buyer shall be solely responsible for the satisfaction of all claims that arise post-Closing with respect to Buyer's employment of any Transferred Employee.

(d)    To the extent required to allow Buyer to satisfy any obligations to provide continuation coverage under COBRA to "M&A Qualified Beneficiaries" as defined in 26 C.F.R. 54.4980B-9, Q&A4(a) with respect to the Purchased Assets, prior to the date that Seller terminates its group health plans subject to COBRA, Seller shall provide to Buyer a list of "M&A Qualified Beneficiaries" as defined in 26 C.F.R. 54.4980B-9, Q&A4(a), specifically with respect to the Purchased Assets, including for each M&A Qualified Beneficiary (i) full name, (ii) the last known address, (iii) the type of "qualifying event" (as defined in Section 4980B(f)(3) of the Code) and the date on which such qualifying event occurred or will occur, (iv) the date on which notice of such qualifying event was provided to each such individual (as required by Section 4980B(f)(6)(D) of the Code), (v) the date on which each such individual lost or will lose coverage under any Seller Compensation and Benefit Program subject to COBRA as a result of such qualifying event (absent an election to continue coverage under COBRA), (vi) the date on which each such individual elected continuation coverage under any Seller Compensation and Benefit Program that is subject to COBRA (or, with respect to any such individual who has not yet elected such continuation coverage, the date on which such individual's election period will expire), (vii) a description of the continuation coverage elected (or entitled to be elected) by each such individual, and (viii) all other information that may be requested by Buyer's group health plans in order to provide COBRA.

(e)    Nothing in this Agreement is intended to (i) be treated as an amendment to any particular Seller Compensation and Benefit Program, (ii) prevent the Buyer or its Affiliates from amending or terminating any of its benefit plans, in accordance with its terms, (iii) prevent the Buyer or its Affiliates, after the Closing, from terminating the employment of any Transferred Employee or other Service Provider, or (iv) create any third party beneficiary rights in any Employee or Service Provider, any beneficiary or dependent thereof, or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any Employee or Service Provider or under any Seller Compensation and Benefit Program or any other plan maintained by the Buyer or its Affiliates.

Section 7.9    <u>Privacy Matters</u>.  From and after the Closing Date, with respect to the Personal Information included in the Purchased Assets, Buyer agrees: (i) it shall only use or otherwise process any Personal Information in compliance, in all material respects, with all applicable Privacy Laws; (ii) subject to the following sentence, it shall only use, disclose, or otherwise process Personal Information in accordance with the relevant Seller Privacy Policy in all material respects; (iii) to be the Selling Entities successor-in-interest; and (iv) it shall be responsible for any violation by Buyer of the relevant Seller Privacy Policy following the Closing Date. Prior to processing any Personal Information in a materially different manner than set forth in the relevant Seller Privacy Policy or effectuating a different Privacy Policy, the Buyer will notify impacted individuals to the extent required by applicable Privacy Laws. The Buyer shall implement, maintain and comply with reasonable measures designed to protect such Personal Information against accidental, unlawful or unauthorized access, use, loss, exfiltration, disclosure, alteration, destruction, encryption, or compromise.

Section 7.10    <u>Tax Matters</u>.

(a)    Any sales, use, goods and services, harmonized sales, property transfer or gains, documentary, stamp, registration, recording, value added, or similar Tax payable in connection with the sale or transfer of the Purchased Assets and the assumption of the Assumed Liabilities ("<u>Transfer Taxes</u>") shall be borne and paid by the Seller.  The Seller shall pay any Transfer Taxes either to the appropriate Selling Entities or to the relevant Governmental Authorities as required by applicable Law.  The Selling Entities and the Buyer shall (and shall cause their respective Affiliates to) use their commercially reasonable efforts and cooperate in good faith to minimize the incidence of any Transfer Taxes.  The Seller shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes to the extent permitted under applicable Tax Law.

(b)    For purposes of this Agreement, all Taxes and Tax Liabilities with respect to the Business and the Purchased Assets that relate to the Straddle Period shall be apportioned between the Pre-Closing Tax Period and Post-Closing Tax Period, (i) in the case of property and similar Taxes, on a per diem basis and (ii) in the case of all other Taxes (other than Transfer Taxes), as though the taxable year terminated as of the close of business on the Closing Date.

(c)    The Seller and the Buyer agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance as is reasonably necessary for the filing of Tax Returns, the making of any election relating to Taxes, the preparation for any audit or other proceeding by Governmental Authority and the prosecution or defense of any claim, suit or other proceeding relating to any Tax.  Such information and assistance shall include providing reasonable access to any of the books and records of the Selling Entities retained by the Selling Entities or delivered to the Buyer at Closing or provided pursuant to <u>Section 7.3(b)</u>.  Access to books and records shall be afforded upon receipt of reasonable advance notice and during normal business hours.

(d)    The Parties agree to treat any payment made from one Party to another pursuant to this Agreement that is not reflected as part of the Purchase Price under this Agreement as an adjustment to the Purchase Price for all income Tax purposes, unless otherwise required by applicable Law.

52

(e)     Notwithstanding anything to the contrary contained herein, the Buyer and Seller intend that, for income Tax purposes, the Buyer is not assuming any deferred revenue obligations with respect to the Business or any of the Purchased Assets that give rise to taxable income of the Buyer or any of its Affiliates under the principles of James M. Pierce Corp., 326 F.2d 67 (8th Cir. 1964), provided, however, this Section 7.10(e) shall not affect in any manner the Buyer's Cure Payment obligations contained in this Agreement, including under <u>Section 2.5</u>.

Section 7.11    <u>Submission for Bankruptcy Court Approval</u>.

(a)     All of the Parties shall use their respective commercially reasonable efforts to have the Sale Hearing no later than July 31, 2025 and to have the Sale Order entered no later than three (3) Business Days after the conclusion of the Sale Hearing.  The Buyer agrees that it will promptly take such actions as are reasonably requested by the Debtor Entities to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Buyer under this Agreement and any Assumed Agreements and demonstrating that the Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. The Debtor Entities shall give notice under the Bankruptcy Code of the request for entry of the Sale Order to all Persons entitled to such notice, including all Persons that have asserted Encumbrances in the Purchased Assets and all non-debtor parties to the Assumed Agreements, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement or the Transactions.  The Debtor Entities shall be responsible for making all appropriate filings relating to this Agreement or the Transactions with the Bankruptcy Court, which filings shall be submitted to the Buyer at least one (1) Business Day prior to their filing with the Bankruptcy Court for the Buyer's prior review and approval.

(b)     An initial list of the agreements, contracts and other leases that may ultimately constitute the Assumed Agreements (as amended, modified or supplemented from time to time, the "<u>Cure Schedule</u>") shall be filed no later than the deadline established by the Bidding Procedures Order.  The Cure Schedule shall describe the potential Assumed Agreements in sufficient detail to provide adequate notice to the non-debtor parties to such Contracts.  Upon revision of <u>Section 2.1(c)</u> of the Seller Disclosure Schedule in accordance with <u>Section 2.5(b)</u>, the Seller shall add any Assumed Agreements, respectively, to the Cure Schedule or remove any Assumed Agreements from such exhibit, as applicable.  The Cure Schedule shall set forth the amounts necessary to cure defaults under each Assumed Agreement shown thereon, as reasonably determined in good faith by the Seller.  In cases in which the Seller is unable to establish that a default exists, the relevant cure amount shall be set at $0.00.

(c)     Each Debtor Entity and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect, the Bankruptcy Court's entry of the Sale Order.

(d)     If the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification,

53

modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order and the Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Selling Entities and the Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion, in each case, that will facilitate consummation of the Transactions.  In no event will the Closing occur until such appeal, petition or motion is resolved to the Buyer's reasonable satisfaction.

Section 7.12    <u>Overbid Procedures; Adequate Assurance</u>.

(a)    [Reserved.]

(b)    The bidding procedures to be employed with respect to this Agreement and any Auction shall be those set forth in the Bidding Procedures Order.  The Buyer agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order (including the terms relating to the backup bidders) as approved by the Bankruptcy Court.

(c)    [Reserved.]

(d)    The Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by the Buyer of each Assumed Agreement.  The Buyer agrees that it will, and will cause its Affiliates to, promptly take all actions required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Agreements, including furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making the Buyer's Representatives available to testify before the Bankruptcy Court.

(e)    [Reserved.]

(f)    Nothing in this Agreement, including this <u>Section 7.12,</u> shall require any director or officer of any Selling Entity to violate their fiduciary duties to such Selling Entity.  No action or inaction on the part of any director or officer of any Selling Entity that such director or officer reasonably believes is required by their fiduciary duties to such Selling Entity shall be limited or precluded by this Agreement; *provided, however,* that no such action or inaction shall prevent the Buyer from exercising any termination rights it may have hereunder as a result of such action or inaction.

Section 7.13    <u>[Reserved]</u>.

Section 7.14    <u>Transfer of Purchased Assets</u>.    The Buyer will make all necessary arrangements for the Buyer to take possession of the Purchased Assets, and, at the Buyer's expense, to transfer the same to a location owned or operated by the Buyer, to the extent necessary, as promptly as practicable following the Closing, and the Seller shall fully cooperate with all such efforts, and shall promptly transfer on the Closing Date all Purchased Assets that may be delivered by electronic means.  Without limiting the foregoing, Seller Entities shall promptly take all actions and execute and deliver all documents necessary to effectuate the transfer of ownership and control of all Trademarks, domain names and social media accounts included in the Purchased Assets to

Buyer, and cause such domain names to be registered in the name of the Buyer (or its designee) with the appropriate domain name registrar.

Section 7.15   Intellectual Property Matters.

(a)   Name Changes.  Promptly (but in no event later than one hundred twenty (120) days) following the Closing Date (or such reasonable longer period as reasonably necessary to effectuate the orderly wind-down of Selling Entities in accordance with applicable law (the "Wind-Down") or any dissolution of such entity if a Selling Entity is winding down or dissolving), the Selling Entities shall, and shall cause their respective Affiliates to, use commercially reasonable efforts to obliterate, mask or remove all Business Names from all public facing assets that are owned by (or in the possession, custody, or control of) the Selling Entities or any of their respective Affiliates.  The Seller and its Affiliates shall be permitted to use the Business Names (a) as a former name for legal and noticing purposes in connection with the Bankruptcy Case in other legal documents, in connection with the filing of Tax Returns and for the Wind-Down or in other legal documents related to the foregoing and (b) to otherwise reference the historic relationship between the Seller, its Affiliates and the Business.

(b)   License to Business Marks.  The Buyer hereby grants to the Seller a limited, non-exclusive, non-sublicensable (except to any Third-Party Buyer), royalty-free and fully-paid license to use the Business Marks for six (6) months from the Closing (the "Trademark Transition Period") solely in connection with the operation of the Non-Core Business in substantially the same manner as the Business Marks were used by or on behalf of the Seller or any of their Affiliates in connection with the Non-Core Businesses during the twelve (12) month period prior to the date hereof.  During the Trademark Transition Period, the applicable Third-Party Buyer shall, subject to Seller's (or the applicable Third-Party Buyer's) payment (or reimbursement) of any maintenance or similar costs therefore, (i) be listed as the administrative contact for any domains registered to Buyer that contain a Business Mark but are primarily related to a Non-Core Business (each, a "Domain"), (ii) have the right to reprogram such Domain, such that a visitor to the Domain may be redirected, with or without user intervention, to a separate website page, as designated by the applicable Third-Party Buyer, and (iii) have the right to reprogram the Domain, such that all emails sent to the Domain will be automatically redirected or forwarded to a separate email account, as designated by the Seller or its designated subsequent acquiror of a Non-Core Business. The Seller acknowledges and agrees that the Buyer may continue to own and remain the registrant of each Domain and shall reasonably and in good faith cooperate to permit the Seller or its designated subsequent acquiror of a Non-Core Business, to use such Domain as contemplated by this Agreement.  For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, the applicable Third-Party Buyer shall have the right to continue to use the domain names listed in the Transition Services Agreement that have been exclusively used in any Non-Core Business that includes the word "monster" even after the expiration of the Trademark Transition Period for the periods specified for such Domains in the Transition Services Agreement, solely for purposes of redirecting users who visit that domain name to another domain name that does not include the word "monster" and relates to the Non-Core Businesses, and the Buyer hereby grants to Seller and its Affiliates, its and their respective successors and assigns, with effect from and after the Closing, a limited, sublicensable, perpetual, non-exclusive license and right to register and maintain such domains solely for such purposes.

55

Section 7.16    Purchased Assets "AS IS;" Certain Acknowledgements.

(a)    The Buyer agrees, warrants and represents that, except as otherwise expressly provided in this Agreement or in the Sale Order (i) the Buyer is purchasing the Purchased Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on the Buyer's own investigation of the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities and the Business, and (ii) neither the Selling Entities nor any of the Seller's Representatives has made, and the Buyer has not relied on, any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Business, the financial performance of the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Business, or the physical condition of the Purchased Assets, except as expressly set forth in Article V (as modified by the Seller Disclosure Schedule) or in the other Transaction Documents.  The Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by the Selling Entities and the Buyer after good-faith arms-length negotiation in light of the Buyer's agreement to purchase the Purchased Assets "AS IS" and "WITH ALL FAULTS." The Buyer agrees, warrants and represents that, except for the express representations and warranties of the Selling Entities set forth in Article V of this Agreement (as modified by the Seller Disclosure Schedule) or in the other Transaction Documents or in the Sale Order, the Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that the Buyer assumes all risks with respect thereto.  EXCEPT AS SET FORTH IN ARTICLE V OF THIS AGREEMENT (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULE) OR IN THE OTHER TRANSACTION DOCUMENTS OR SALE ORDER, THE SELLING ENTITIES MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE BUSINESS OR THE SELLING ENTITIES, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, THE EXCLUDED ASSETS, THE EXCLUDED LIABILITIES OR THE BUSINESS.  Notwithstanding the foregoing, nothing herein shall limit the Selling Entities' Liability in the event of Fraud or a breach of any covenant.

(b)    The Buyer acknowledges and agrees that it has had an opportunity to discuss the Business with the management of the Seller and has been afforded the opportunity to ask questions of and receive answers from management of the Seller.  In connection with the investigation by the Buyer, the Buyer has received or may receive from the Selling Entities certain projections, forward-looking statements and other forecasts and certain business plan information. The Buyer acknowledges and agrees neither the Selling Entities nor any other Person will have or be subject to any Liability or indemnification obligation to the Buyer or any other Person resulting from the distribution to, or use by, the Buyer or any of its Affiliates or any of the Buyer's Representatives of any information provided to the Buyer or any of its Affiliates or any of the Buyer's Representatives by the Selling Entities or any of the Seller's Representatives, including any information, documents, projections, forward-looking statements, forecasts or business plans or any other material made available in any "data room," any confidential information memoranda or any management presentations in expectation of or in connection with the Transactions.

56

(c)     Except for the representations and warranties contained in <u>Article V</u> (as modified by the Seller Disclosure Schedule), the other Transaction Documents and the Sale Order, the Buyer acknowledges that none of the Selling Entities nor any other Person on behalf of any Selling Entity makes any express or implied representation or warranty with respect to the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Business, or with respect to any information provided to the Buyer or any of its Affiliates or any Representative of the Buyer, and the Selling Entities hereby disclaim any other representations or warranties made by the Selling Entities or any other Person with respect to the execution and delivery of this Agreement, the other Transaction Documents, the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities, the Business or the Transactions.  The Buyer has not relied on any representation, warranty or other statement by any Person on behalf of the Selling Entities, other than the representations and warranties of the Selling Entities expressly contained in <u>Article V</u> (as modified by the Seller Disclosure Schedule).  The Buyer acknowledges and agrees that the representations and warranties set forth in <u>Article V</u> (as modified by the Seller Disclosure Schedule) the other Transaction Documents and the Sale Order, are made solely by the Selling Entities, and no Affiliate of the Selling Entities, Representative of the Seller or other Person shall have any responsibility or Liability related thereto.

Section 7.17   <u>Release</u>.

(a)     Effective as of the Closing, the Buyer, on behalf of itself and the Buyer Related Parties (each, a "<u>Buyer Releasing Party</u>") hereby unconditionally and irrevocably and forever releases and discharges the Seller Related Parties and their respective present or former directors, managers, shareholders, partners, officers, employees, owners, advisors, representatives or agents (each, a "<u>Seller Released Party</u>"), of and from, and hereby unconditionally and irrevocably waive and dismiss, with prejudice, any and all claims, debts, losses, expenses, proceedings, covenants, liabilities, suits, judgments, damages, actions and causes of action, obligations, accounts, and liabilities of any kind or character whatsoever, known or unknown, suspected or unsuspected, in contract, direct or indirect, at law or in equity, with respect to the D&O Claims that such Buyer Releasing Party ever had, now has or ever may have or claim to have against any Seller Released Party, for or by reason of any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising prior to the Closing with respect of the management or operation of the Business; provided, that nothing in this <u>Section 7.17</u> shall release, waive, discharge, relinquish or otherwise affect the rights or obligations of any party hereto to the extent arising out of this Agreement or the Transaction Documents.  The Buyer hereby covenants to, and to cause each other Buyer Releasing Party to, not sue any Seller Released Party in any Proceeding for any of the items released in the preceding sentence, and the Buyer agrees that in the event that any such Proceeding shall be commenced, the covenant not to sue contained in this <u>Section 7.17(a)</u> shall constitute a complete defense to any such Proceeding so instituted.

(b)     The Buyer, on behalf of itself and the other Buyer Releasing Parties, expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims covered by Section 7.17(a).  The Buyer, on behalf of itself and the other Buyer Releasing Parties, understands the significance of this release of unknown claims and waiver of statutory protection against a release of unknown claims, and acknowledges and agrees that this waiver is an essential and material term of this Agreement.  The Buyer, on behalf of itself and the

57

other Buyer Releasing Parties, acknowledges that each Seller Released Party will be relying on the waivers and releases provided in this <u>Section 7.17</u> in connection with entering into this Agreement and that this <u>Section 7.17</u> is intended for the benefit of, and will grant express third party beneficiary rights to each Seller Released Party to enforce this <u>Section 7.17</u>.

(c)     Notwithstanding anything to the contrary herein or otherwise, each beneficiary of a release under this <u>Section 7.17</u> shall be an express third party beneficiary of this <u>Section 7.17</u> with the full power to enforce the terms of this <u>Section 7.17</u> as if it were a party to this Agreement for such purpose.

Section 7.18   <u>Limitation of Damages</u>.    NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, NO PARTY SHALL BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES (INCLUDING LOSS OF REVENUE, INCOME OR PROFITS BUT ONLY TO THE EXTENT THE SAME ARE NOT DIRECT DAMAGES), DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY OF ANY OTHER PARTY OR ANY OF SUCH PARTY'S AFFILIATES, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT SUCH LIMITATIONS SHALL NOT LIMIT ANY PARTY'S RIGHT TO RECOVER CONTRACT DAMAGES IN CONNECTION WITH THE OTHER PARTY'S FAILURE TO CLOSE IN VIOLATION OF THIS AGREEMENT.

Section 7.19   <u>Transition Services</u>.  From and after the date hereof, the Seller and the Buyer shall negotiate in good faith with each Third-Party Buyer a Transition Services Agreement whereby:

(a)     the Buyer shall provide to the applicable Third-Party Buyer, with respect to the Non-Core Businesses, (i) a license for no less than twelve (12) months to use the Job-Board Technology in substantially the same manner used in the Non-Core Businesses as of Closing, and (ii) information technology services (including maintenance and updates in the ordinary course of business) that were provided by the Seller or its Affiliates with respect to the Non-Core Business prior to Closing and are necessary to permit the applicable Third-Party Buyer to operate the products and services of the Non-Core Business in substantially the same manner as operated as of Closing (but for the avoidance of doubt, not including any back-office, corporate or administrative services) for no less than twelve (12) months, in each case for fees equal to the provider's cost of providing the service without any mark-up (the "<u>Buyer Transition Services</u>"), and

(b)     the applicable Third-Party Buyer shall provide to the Buyer, with respect to the Business, information technology services (including maintenance and updates in the ordinary course of business) that were provided by the Seller or its Affiliates with respect to the Business prior to Closing and are necessary to permit the Buyer to operate the products and services of the Business in substantially the same manner as operated as of Closing (but for the avoidance of doubt, not including any back-office, corporate or administrative services) for fees equal to the provider's cost of providing the service without any mark-up (the "<u>Seller Transition Services</u>").

From and after the date hereof, the Seller and its Affiliates shall, and shall coordinate with all Third-Party Buyers to, negotiate the Transition Services Agreement in good faith and document the Seller Transition Services and Buyer Transition Services (and any other services which may be agreed among the Buyer and each Third-Party Buyer) in schedules to be attached thereto. . To provide the services under the Transition Services Agreement, unless Buyer and Third Party Buyers otherwise agree in writing, Buyer agrees to have all Contracts required for Buyer to provide such services be Assumed Agreements at the Closing. In the event of a conflict between this Agreement and the Transition Services Agreement, the terms of the Transition Services Agreement shall control.

Section 7.20    Withholding. Notwithstanding anything herein to the contrary, any Selling Entity, the Buyer or any of their respective Affiliates shall be entitled to deduct and withhold from any amounts payable by them pursuant to this Agreement such amounts (and only such amounts) as it is required to deduct and withhold with respect to such payment under any provision of U.S. federal, state, local or non-U.S. Tax Law. The withholding party shall notify the other party of its intention to deduct or withhold no later than five (5) Business Days prior to any such deduction or withholding, and shall cooperate in good faith with such other party and its Affiliates to minimize any such deduction and withholding. Any amounts so deducted and withheld in accordance with this Section 7.20 and timely paid over to the appropriate Governmental Authority shall be treated for all purposes of this Agreement as having been paid to the Party that would otherwise have received such amount but for the required deduction or withholding.

Section 7.21    Shared Contracts. From the date hereof until the Closing Date, the Selling Entities and the Buyer shall use commercially reasonable efforts without cost to the Selling Entities to identify in writing all Shared Contracts. At the Buyer's request, each Selling Entity shall, and shall cause its respective Affiliates to use commercially efforts without cost to the Selling Entities or their Affiliates to assist Buyer with replacing the Shared Contracts effective as of the Closing Date or as promptly as practicable thereafter, with separate contracts with the applicable parties to such Shared Contracts that (i) have substantially similar terms as the Shared Contracts being replaced except that they apply only to the Business or only to Seller's other businesses; and (ii) provide that the Buyer shall receive such rights and assume such obligations as are substantially similar to those rights and obligations used in the Business under the Shared Contract. Buyer may lead the negotiations for, and shall approve, any such replacement contract.

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.1    Conditions to Each Party's Obligations to Effect the Closing. The respective obligations of each Party to consummate the Closing shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver in a joint writing by the Buyer and the Seller, at or prior to the Closing, of the following conditions:

(a)    (i) no Law or final, non-appealable Order shall have been enacted, entered, promulgated, adopted, issued or enforced by the Bankruptcy Court or any other Governmental Authority having competent jurisdiction that is then in effect and has the effect of making the

transactions contemplated by this Agreement illegal or otherwise prohibiting the consummation of the transactions contemplated hereby, and (ii) no temporary restraining order, preliminary or permanent injunction or other Order issued by any court of competent jurisdiction or other similar legal restraint shall be in effect that has the effect of prohibiting the consummation of any of the transactions contemplated by this Agreement;

(b)      the Bankruptcy Court shall have entered a Sale Order and such Sale Order shall be final, non-appealable, unstayed and in full force and effect.

Section 8.2      Conditions to Obligations of the Buyer.  The obligation of the Buyer to consummate the Closing shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver at or prior to the Closing of the following additional conditions:

(a)      the Selling Entities shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Selling Entities on or prior to the Closing Date;

(b)      (i) the representations and warranties of the Selling Entities set forth in Article V (other than the Seller Fundamental Representations and the representations and warranties set forth in Section 5.8 (*Absence of Certain Developments*)), disregarding for these purposes any exception in such representations and warranties relating to materiality or a Material Adverse Effect, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date), except for such failure to be true and correct would not reasonably be expected to have a Material Adverse Effect, (ii) the representations and warranties set forth in Section 5.1 (*Organization, Standing and Corporate Power*), Section 5.3 (*Authority; Execution and Delivery; Enforceability*) and Section 5.18 (*Brokers*) (collectively, the "Seller Fundamental Representations"), shall be true and correct in all respects, except with respect to de minimis matters, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date) and (iii) the representations and warranties set forth in Section 5.8 (*Absence of Certain Developments*) shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c)      the Buyer shall have received a certificate from an officer of the Seller to the effect that the conditions set forth in Sections 8.2(a) and (b) have been satisfied; and

(d)      the Buyer shall have received the other items to be delivered to it pursuant to Section 4.2.

Any condition specified in this Section 8.2 may be waived by the Buyer; *provided, however*, that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

Section 8.3    <u>Conditions to Obligations of the Selling Entities</u>.  The obligation of the Selling Entities to consummate the Closing shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver at or prior to the Closing of the following additional conditions:

(a)    the Buyer shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date;

(b)    (i) the representations and warranties of the Buyer set forth in <u>Article VI</u> (other than the Buyer Fundamental Representations), disregarding for these purposes any exception in such representations and warranties relating to materiality, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date), except for such failures to be true and correct as would not reasonably be expected to have a material adverse effect on the Buyer or its ability to consummate the Transactions, and (ii) the representations and warranties set forth in <u>Section 6.1</u> (*Organization and Good Standing*), <u>Section 6.2</u> (*Authority Relative to this Agreement*) and <u>Section 6.5</u> (*Brokers*) (collectively, the "<u>Buyer Fundamental Representations</u>"), disregarding for these purposes any exception in such representations and warranties relating to materiality, shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date);

(c)    the Seller shall have received a certificate from an officer of the Buyer to the effect that the conditions set forth in <u>Section 8.3(a)</u> and <u>(b)</u> have been satisfied; and

(d)    the Seller shall have received the other items to be delivered to it pursuant to <u>Section 4.3</u>.

Any condition specified in this <u>Section 8.3</u> may be waived by the Seller; *provided*, *however*, that no such waiver shall be effective against the Seller unless it is set forth in a writing executed by the Seller.

Section 8.4    <u>Frustration of Closing Conditions</u>.  None of the Selling Entities or the Buyer may rely on or assert the failure of any condition set forth in <u>Article VIII</u> to be satisfied if such failure was proximately or primarily caused by such Party's failure to comply with this Agreement in all material respects.

## ARTICLE IX
## TERMINATION; WAIVER

Section 9.1    <u>Termination</u>.  Subject to <u>Section **Error! Reference source not found.**</u>, this Agreement may be terminated at any time prior to the Closing by:

(a)      mutual written consent of the Seller and the Buyer;

(b)      the Seller or the Buyer, if (i) there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or (ii) consummation of the Transactions would violate any nonappealable final Order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction; *provided*, that the Party seeking to terminate this Agreement pursuant to this Section 9.1(b) shall have used its reasonable best efforts to challenge such Law, order, decree or judgment; *provided*, *further*, that no termination may be made by a Party under this Section 9.1(b) if the issuance of such Order, decree or judgment was primarily attributable to such Party's breach of any of its representation, warranties, covenants or agreements hereunder;

(c)      the Seller or the Buyer, if following the entry of the Bidding Procedures Order but prior to the entry of Sale Order, the Bidding Procedures Order ceases to be in full force and effect, or is revoked, rescinded, vacated, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(d)      the Seller, if:

(i)      any of the representations and warranties of the Buyer contained in Article VI shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date prior to the Closing Date (as if made on and as of such date prior to the Closing Date), such that the condition set forth in Section 8.3(b) would not then be satisfied; or

(ii)      the Buyer shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Buyer prior to the Closing Date, such that the condition set forth in Section 8.3(a) would not then be satisfied;

*provided, however*, that if an inaccuracy in any of the representations and warranties of the Buyer or a failure to perform or comply with a covenant or agreement by the Buyer is curable by the Buyer within thirty (30) days after the date of written notice from the Seller to the Buyer of the occurrence of such inaccuracy or failure, then the Seller may not terminate this Agreement under this Section 9.1(d) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Buyer or during the thirty (30) day period commencing on the date of delivery of such notice or (y) following such thirty (30) day period, if such inaccuracy or failure shall have been fully cured during such thirty (30) day period; *provided*, *further*, that that no termination may be made by the Seller under this Section 9.1(d) if the Seller is in breach of any of its representations, warranties, covenants or agreements hereunder that would give rise to a failure of a condition set forth in Section 8.1 or Section 8.2;

(e)      the Buyer, if:

(i)      any of the representations and warranties of the Selling Entities contained in Article V shall be inaccurate as of the date of this Agreement, or shall have

become inaccurate as of a date prior to the Closing Date (as if made on and as of such date prior to the Closing Date), such that the condition set forth in Section 8.2(b) would not then be satisfied; or

        (ii)     the Selling Entities shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Selling Entities prior to the Closing Date, such that the condition set forth in Section 8.2(a) would not then be satisfied;

*provided, however*, that if an inaccuracy in any of the representations and warranties of the Selling Entities or a failure to perform or comply with a covenant or agreement by any of the Selling Entities is curable by it within thirty (30) days after the date of written notice from the Buyer to the Seller of the occurrence of such inaccuracy or failure, then the Buyer may not terminate this Agreement under this Section 9.1(e) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Seller or during the thirty (30) day period commencing on the date of delivery of such notice or (y) following such thirty (30) day period, if such inaccuracy or failure shall have been fully cured during such (30) day period; *provided, further*, that that no termination may be made by the Buyer under this Section 9.1(e) if the Buyer is in breach of any of its representations, warranties, covenants or agreements hereunder that would give rise to a failure of a condition set forth in Section 8.1 or Section 8.3;

        (f)     the Buyer or the Seller, if (i) a Third-Party Sale is consummated or (ii) the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the Transactions;

        (g)     the Buyer or the Seller, if the Closing has not occurred on or prior to 5:00 p.m. Eastern Time, on September 15, 2025 (the "Outside Date"); *provided*, that the right to terminate this Agreement under this Section 9.1(g) shall not be available to any Party if such Party is then in breach of this Agreement and such breach is the primary cause of the failure of the Closing to occur prior to such date; or

        (h)     the Seller, if (i) all of the conditions set forth in Section 8.1 and Section 8.2 have been satisfied or waived (other than those conditions to Closing that by their terms or their nature are to be satisfied at the Closing, but subject to such conditions being satisfied assuming a Closing would occur), (ii) the Seller has confirmed in writing that it is ready, willing and able to consummate the Closing, and (iii) the Buyer has failed to consummate the Closing by the date the Closing is required to have occurred pursuant to Section 4.1.

    Section 9.2    Procedure and Effect of Termination.  In the event of termination of this Agreement by either the Seller or the Buyer pursuant to Section 9.1, written notice thereof shall forthwith be given by the terminating Party to the other Party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the Parties; *provided, however*, that (a) no party shall be relieved of or released from any Liability arising from any intentional breach by such party of any provision of this Agreement, (b) no Party shall be relieved of, or released from, any Liability arising from Fraud by such Party, and (c) this Section 9.2, Section 3.2, Section 7.3(e), Article X (other than Section 10.12) and the

Confidentiality Agreement shall remain in full force and effect and survive any termination of this Agreement.

Section 9.3    Extension; Waiver.  At any time prior to the Closing, the Seller (on behalf of each of the Selling Entities), on the one hand, or the Buyer, on the other hand, may, to the extent permitted by applicable Law (a) extend the time for the performance of any of the obligations or other acts of the Buyer (in the case of an agreed extension by the Seller) or the Seller (in the case of an agreed extension by the Buyer), (b) waive any inaccuracies in the representations and warranties of the Buyer (in the case of a wavier by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein or in any document delivered pursuant hereto, (c) waive compliance with any of the agreements of the Buyer (in the case of a wavier by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein, or (d) waive any condition to its obligations hereunder.  Any agreement on the part of the Seller, on the one hand, or the Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of the Seller or the Buyer, as applicable.  The failure or delay of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any rights hereunder.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

Section 10.1    Amendment and Modification.  This Agreement may be amended, modified or supplemented only by a written instrument signed by the Seller, on behalf of each of the Selling Entities, and the Buyer.

Section 10.2    Survival.  None of the representations and warranties of the Parties in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules or Exhibits attached hereto shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing.  None of the covenants or agreements of the Parties in this Agreement shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such covenant or agreement from or after the Closing, other than (a) the covenants and agreements of the Parties contained in Article III, Article IV, Article VII and this Article X (b) those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Closing, which shall survive the consummation of the Transactions until fully performed in accordance with their respective terms, (c) any rights or remedies of any Person for breach of any such surviving covenant or agreement and (d) any Liability on account of Fraud.

Section 10.3    Notices.  All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) when sent if delivered or transmitted by email (*provided*, no "bounce back" or notice of non-delivery is generated), (c) upon receipt after dispatch by registered or certified mail, return receipt requested on postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

64

(a)    If to any Selling Entity or the Selling Entities, to:

Zen JV, LLC
c/o Apollo Management X, L.P.
9 West 57th Street
43rd Floor
New York, New York 10019
Attention:    Robert Kalsow-Ramos
                Maxwell David;
                Whitney Chatterjee

Email: rkalsow-ramos@apollo.com
       mdavid@apollo.com
       wchatterjee@apollo.com

with a mandated copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:    Ray Schrock
                Candace Arthur
                Rick Press
                Michael Anastasio

Email: ray.schrock@lw.com
       candace.arthur@lw.com
       eric.press@lw.com
       michael.anastasio@lw.com

with a mandated copy (which shall not constitute notice) to:

Richards, Layton & Finger, PA
920 N. King St.
Wilmington, DE 19801
Attention:    Zachary Shapiro
                Mark Kurtz
Email:        Shapiro@rlf.com
                kurtz@rlf.com

(b)    If to the Buyer, to:

BOLD Holdings LLC
City View Plaza II,
48 Road 165, Suite 6000
Guaynabo, Puerto Rico 00968-8060
Attn: Gary Hsueh and Legal;
Email: gary.hsueh@bold.com, legal@bold.com

with a mandated copy (which shall not constitute notice) to:

Cooley, LLP
500 Boylston Street, 14th Floor
Boston, MA 02116
Attn: Miguel J. Vega; Daniel Shamah; Michael Klein
Email: mvega@cooley.com; dshamah@cooley.com; mklein@cooley.com

or to such other address as any party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated or personally delivered. Any Party may notify any other Party of any changes to the address or any of the other details specified in this Section 10.3; *provided* that such notification shall only be effective on the date specified in such notice or five (5) Business Days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 10.4    Assignment.    Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any Party (whether by operation of Law or otherwise) without the prior written consent of the other Parties, and any such assignment shall be null and void. No assignment by any Party shall relieve such Party of any of its obligations hereunder. Any attempted or purported assignment in violation of this Section 10.4 will be deemed void *ab initio*. Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, including, in the case of the Selling Entities, the trustee in the Bankruptcy Case. Notwithstanding the foregoing: (i) the Selling Entities may assign some or all of their respective rights or delegate some or all of their respective obligations hereunder to a chapter 7 trustee, chapter 11 trustee, liquidating trust, liquidating trustee, or any other successor entities pursuant to a chapter 11 plan confirmed by the Bankruptcy Court, and (ii) after the Closing, the Buyer may assign some or all of its rights or delegate some or all of its obligations hereunder to any Person that acquires all or substantially all of the Buyer's assets or outstanding equity; *provided*, that that no such assignment or delegation will result in incremental unreimbursed withholding or other Taxes for which the Seller or any of its Affiliates may be responsible. For the avoidance of doubt, the limitations in this Section 10.4(a) shall not apply to Buyer's designation of one or more Designated Buyers pursuant to Section 10.4(b).

(b)    Prior to the Closing, Buyer shall be entitled to designate, by written notice to the Selling Entities no later than two (2) Business Days prior to the Closing Date, one or more Affiliates to (i) purchase the Purchased Assets and pay the corresponding Purchase Price amount,

(ii) assume Assumed Liabilities, or (iii) take title directly to any Purchased Asset (any such Affiliate that shall be designated in accordance with this clause, a "Designated Buyer"), and, to the extent of any such designation, this Agreement shall be binding upon each of such Affiliates, their successors and permitted assigns, which shall be treated as Buyer to such extent hereunder; provided that Buyer shall remain primarily liable until the transfer to any such Designated Buyer and the satisfaction by such Designated Buyer of any related obligations or other Liabilities hereunder, and no such delegation or assignment shall be permitted under this Section 10.4(b) if such assignment or delegation will result in incremental unreimbursed withholding or other Taxes for which the Seller or any of its Affiliates may be responsible.

Section 10.5    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 10.6    Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and all claims and causes of action arising out of, based upon, or related to this Agreement or the negotiation, execution or performance hereof, shall be governed by, and construed, interpreted and enforced in accordance with, the Laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any Laws other than the Laws of the State of Delaware.

Section 10.7    Acknowledgement and Release; Non-Recourse.

(a)    Each party acknowledges that parties to this Agreement are the sole Persons bound by, or liable with respect to, the obligations and Liabilities of the parties under this Agreement and the other Transaction Documents, and that no Affiliate of any party or any of their respective subsidiaries or any current or former officer, director, stockholder, agent, attorney, employee, representative, advisor or consultant of any party or any such other Person shall be bound by, or liable with respect to, any aspect of this Agreement, the other Transaction Documents and the Transactions; provided, however, that no Person shall be relieved of, or released from, any Liability arising from Fraud by such Person.  This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and no other Person that is not a party hereto shall have any liability for any Liabilities of the parties to this Agreement or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, the Transactions or in respect of any oral representations made or alleged to be made in connection herewith.  In no event shall any party hereto or any of its Affiliates, and the Parties hereby agree not to and to cause their respective Affiliates not to, seek to enforce this Agreement against, make any claims for breach of

67

this Agreement against, or seek to recover monetary damages from, any Person not a party to this Agreement.

(b)      Notwithstanding anything to the contrary herein or otherwise, each beneficiary of this <u>Section 10.7</u> shall be an express third party beneficiary of this <u>Section 10.7</u> with the full power to enforce the terms of this <u>Section 10.7</u> as if it were a party to this Agreement for such purpose.

Section 10.8    <u>Submission to Jurisdiction; WAIVER OF JURY TRIAL</u>.

(a)      Any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be brought solely in the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court). Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) in respect of any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder, and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided, however*, that, if the Bankruptcy Case is closed or dismissed, any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or the Transactions shall be heard and determined solely in a state or federal court located in New Castle County, Delaware and any state appellate court therefrom within the State of Delaware. Each Party hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such action, claim, suit or Proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with <u>Section 10.3</u>, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, action or Proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or Proceeding is improper or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts. Each Party agrees that notice or the service of process in any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder or thereunder, shall be properly served or delivered if delivered in the manner contemplated by <u>Section 10.3</u>.

(b)      EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT SUCH PARTY MAY HAVE TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) BETWEEN THE PARTIES HERETO ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF OR THEREOF.

Section 10.9    <u>Counterparts</u>. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated

68

hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a photographic, photostatic, facsimile, portable document format (.pdf), DocuSign, electronic signature or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail or that any signature is in facsimile or electronic format (including .pdf or DocuSign) as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 10.10  <u>Incorporation of Schedules and Exhibits</u>.    All Schedules, the Seller Disclosure Schedule and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 10.11  <u>Entire Agreement</u>.  This Agreement (including all Schedules, the Seller Disclosure Schedule and all Exhibits), the Confidentiality Agreement and the other Transaction Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the Parties with respect thereto.

Section 10.12  <u>Specific Performance</u>.  Each party agrees that irreparable damage may occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement.  It is accordingly agreed that, subject to <u>Section 3.2</u>, (i) each party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by the other and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which such party is entitled, at law or in equity, (ii) each party waives any requirement for the securing or posting of any bond in connection with the obtaining of any specific performance or injunctive relief and (iii) each party will waive, in any action for specific performance, the defense of adequacy of a remedy at Law.  No party's pursuit of specific performance at any time will be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party in the case of a breach of this Agreement.

Section 10.13  <u>Bulk Sales or Transfer Laws</u>.  The Buyer hereby waives compliance by the Selling Entities with the provisions of the bulk sales or transfer Laws of all applicable jurisdictions.

Section 10.14  <u>Seller Disclosure Schedule</u>.  The Seller Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement, and it is expressly understood and agreed that (a) the disclosure of any fact or item in any section of the Seller Disclosure Schedule shall be deemed disclosure with respect to any other Section or subsection of the Seller Disclosure Schedule to the extent the applicability of the disclosure to such other Section or subsection is readily apparent on the face of such disclosure without the need for a cross-reference, (b) the disclosure of any matter or item

in the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, (c) the mere inclusion of an item in the Seller Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception, any violation of Law or breach of Contract or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect, (d) the information and disclosures contained therein shall not be construed or otherwise deemed to constitute, any representation, warranty, covenant or obligation of the Selling Entities or any other Person except to the extent explicitly provided in this Agreement, and (e) the disclosures set forth in the Seller Disclosure Schedule shall not be deemed to expand the scope of any, or create any new, representation, warranty, covenant or agreement set forth herein. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Seller Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Seller Disclosure Schedule or Exhibits hereto is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on the Seller Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Seller Disclosure Schedule and Exhibits hereto is disclosed solely for purposes of this Agreement. The Selling Entities may (but shall not be obligated to) supplement or amend those portions of the Seller Disclosure Schedule to reflect (i) any fact, event or condition arising after the date hereof and prior to the Closing which, if existing or occurring as of the date of this Agreement, would have been required to be described in the Seller Disclosure Schedule in order to avoid any representation or warranty of the Selling Entities contained in this Agreement from being untrue or inaccurate and (ii) any fact, event or condition which first became known to a Knowledge party of any Selling Entity listed in clause (b) of the definition of "Knowledge" after the date hereof which, if known to such person prior to the date of this Agreement, would have been required to be described in the Seller Disclosure Schedule in order to avoid any representation or warranty of the Selling Entities contained in this Agreement which is subject to the Knowledge of the Seller or any other Selling Entity from being untrue or inaccurate; provided, however, that no amendment to the Seller Disclosure Schedule shall have the effect of removing any Purchased Assets without Buyer's written consent, not to be unreasonably withheld, delayed or conditioned. No such supplement or amendment of the Seller Disclosure Schedule shall be deemed to cure the breach of any such representation or warranty and amend and/or supplement the Seller Disclosure Schedule, as applicable, for all purposes hereunder, except for purposes of determining whether or not the condition set forth in <u>Section 8.2(b)</u> has been satisfied. Notwithstanding the foregoing, any such supplement or amendment under this <u>Section 10.14</u> that would reasonably be expected to have a Material Adverse Effect shall give Buyer the right to terminate this Agreement.

Section 10.15  <u>Privileged Communications.</u>

(a)    The Selling Entities and the Buyer hereby acknowledge and agree that notwithstanding any provision of this Agreement, neither the Buyer nor any of its Affiliates shall have access to (and each hereby waives any right of access it may otherwise have with respect to) any Privileged Communications, whether or not the Closing occurs.  Without limiting the generality of the foregoing, the Buyer hereby acknowledges and agrees, upon and after the Closing: (i) neither the Buyer nor any of its Affiliates shall be a holder of, or have any right, title or interest to the Privileged Communications, (ii) only the Selling Entities shall hold property rights in the Privileged Communications and shall have the right to waive or modify such property rights and (iii) the Selling Entities shall have no duty whatsoever to reveal or disclose any Privileged Communications to the Buyer or any of its Affiliates.

(b)    To the extent that any Privileged Communications are disclosed or made available to the Buyer, the Parties hereby agree (i) that the disclosure, receipt and/or review of such Privileged Communication is entirely inadvertent and shall not waive, modify, limit or impair in any form or fashion the protected nature of the Privileged Communications, (ii) it is their desire, intention and mutual understanding that the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, common interest privilege, work product doctrine or other applicable privilege and (iii) the Selling Entities shall have the right in their sole discretion and at any time to require the return and/or destruction of the Privileged Communications.

Section 10.16  Mutual Drafting; Headings; Information Made Available.  The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.  To the extent this Agreement refers to information or documents to be made available (or delivered or provided) to the Buyer or its Representatives, the Selling Entities shall be deemed to have satisfied such obligation if the Seller or any of its Representatives has made such information or document available (or delivered or provided such information or document) to the Buyer or any of its Representatives, whether in an electronic data room, via electronic mail, in hard copy format or otherwise.

Section 10.17  Approval of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, any and all rights, interests or obligations under this Agreement are subject to approval of the Bankruptcy Court.

Section 10.18  Buyer Guarantee.  In the event that Buyer designates a Designated Buyer pursuant to Section 10.4(b), Buyer hereby guarantees to the Seller, on the terms and conditions set forth herein, the due and punctual payment and performance, of (a) the Purchase Price and the Deposit, if and when due in accordance with Article III of this Agreement, and (b) all of the other obligations of Buyer under this Agreement.

71

\* \* \* \* \*

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above.

**<u>SELLER</u>**

**ZEN JV, LLC**

By: _____
Name: Jeffrey Furman
Title: Authorized Signatory

**<u>AFFILIATES OF SELLER</u>**

**MONSTER WORLDWIDE, LLC**
**CAMARO ACQUISITION, LLC**
**CAREERBUILDER, LLC**
**CAREERBUILDER FRANCE HOLDING, LLC**
**CAREERBUILDER GOVERNMENT SOLUTIONS LLC**
**LUCEO SOLUTIONS, LLC**

By: _____
Name: Jeffrey Furman
Title: Authorized Signatory

[Signature Page to Project Mercury Asset Purchase Agreement]

**BUYER**

**BOLD HOLDINGS LLC**

By: _____

Name: Gary Hsueh
Title: Chief Financial Officer

## **Schedule I**

1. Zen JV, LLC

2. Monster Worldwide LLC

3. Camaro Acquisition LLC

4. CareerBuilder, LLC

5. CareerBuilder France Holding LLC

6. CareerBuilder Government Solutions LLC

7. Luceo Solutions, LLC