**<u>Exhibit 2</u>**

**Form TSA**

**Transition Services Agreement**

This Transition Services Agreement (this "Agreement") is made and entered into as of [ ● ], 2025 (the "Effective Date"), by and among Zen, JV, LLC (the "Seller"), Bold Holdings LLC ("Core Buyer"), Sherrill-Lubinski, LLC and ETI-NET INC. (collectively, "MGS Buyer") and Valnet US Inc. ("MMP Buyer"). The Seller, Core Buyer, MGS Buyer and MMP Buyer are each individually referred to herein as a "Party" or collectively as the "Parties".

**WHEREAS**, the Seller and the other Selling Entities (as defined in the applicable Purchase Agreement (as defined below)) are party to (i) that certain Asset Purchase Agreement, dated July 22, 2025 with Core Buyer, (ii) that certain Amended and Restated Stalking Horse Agreement, dated July 17, 2025 with MGS Buyer and (iii) that certain Asset Purchase Agreement, dated July 17, 2025 with MMP Buyer (each such Agreement, individually, a "Purchase Agreement" and, collectively, the "Purchase Agreements");

**WHEREAS**, each of the Parties specified in Exhibit A as a provider (each such Party, a "Provider") has agreed to provide, and to cause certain of its Affiliates and third-party providers to provide, to each of the Parties specified in Exhibit A as a recipient (each such Party, a "Recipient") and its Affiliates during the Term (as defined below) certain services of a type provided by the Seller or its Affiliates and its Personnel to the applicable Business of each Recipient prior to the Closing and set forth on Exhibit A;

**WHEREAS**, the Parties desire to enter into this Agreement simultaneously with the Closing of the transactions contemplated by the Purchase Agreements;

**NOW THEREFORE**, in consideration of the foregoing and of the representations, warranties, covenants and agreements of the Parties contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    Definitions. A defined term has its defined meaning throughout this Agreement and in each Exhibit to this Agreement regardless of whether it appears before or after the place where it is defined. As used in this Agreement, the following terms have the meanings specified below:

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person; provided that in no event shall the Seller be considered an Affiliate of Apollo Global Management, Inc. ("Apollo") or any portfolio company or investment fund affiliated with or managed by affiliates of Apollo, nor shall Apollo or any portfolio company or investment fund affiliated with or managed by affiliates of Apollo, be considered to be an Affiliate of Seller. For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the management or affairs of another Person by reason of ownership of voting stock, as general partner or managing member or by contract or otherwise.

"Bankruptcy Case" means the Seller's and certain of its Affiliates' cases commenced under Chapter 11 of the Bankruptcy Code jointly administered under Case No. 25-11195 in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

1

"Bankruptcy Court" means United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Bankruptcy Case.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York.

"Businesses" mean (i) with respect to Core Buyer, (x) the business of the Seller and its Affiliates to the extent conducted in connection with the online/mobile job advertising platform connecting people in the recruitment industry, providing applicant search and screening services, including job postings, employer branding, resume database access, employee search services, leveraging digital, social and mobile solutions, through Monster.com and other websites and (y) the business of the Seller and its Affiliates to the extent conducted in connection with an online, or other digital and mobile job advertising platform allowing and connecting Persons in the recruitment industry, providing applicant search and screening services, including job postings, employers branding, resume database access, employee search and screening services, organizing job fairs, leveraging digital, social and mobile solutions, including through careerbuilder.com and other job advertising websites, in each case, as conducted by the Seller and its Affiliates as of June 23, 2025 in the United States, including, for the avoidance of doubt, any personnel, infrastructure, systems, or assets, regardless of location, that materially support sales, account management, marketing, technical operations, or other functions of such Business, (ii) with respect to MGS Buyer, the business of acting as a recruitment and workforce solution provider to the public sector, including the products and services provided under the "Monster Government Solutions" brand and the business, operations and activities conducted by the Seller and its Affiliates through what is, as of June 23, 2025, known as the "Monster Government Solutions" business unit, but excluding the Job-Board Technology, and (iii) with respect to MMP Buyer, the internet, performance marketing and advertising and fees business, as conducted through the operation of the websites FastWeb.com and Military.com, by the Seller and its Affiliates as of June 23, 2025 in the United States.  For the avoidance of doubt, each of the Businesses set forth in (i)-(iii) excludes the other two Businesses, such that there is no overlap between such Businesses.

"Closing" means the sale of assets and assumption of liabilities contemplated by the applicable Purchase Agreement.

"Governmental Authority" means any transnational, federal, municipal, state, provincial, local or foreign governmental, quasi-governmental, administrative or regulatory authority, department, agency, board, bureau, commission or body (including any court, arbitral body or similar tribunal), including the Bankruptcy Court.

"Improvements" derivative works, improvements, modifications and enhancements to the applicable Software or documentation.

"Intellectual Property" means any and all intellectual or proprietary rights, which may exist or be created under the Laws of any jurisdiction in the world, including all: (i) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, moral and similar attribution rights and copyrights and copyrightable works, whether published or unpublished, and all registrations and applications for registration thereof; (ii) any and all trade names, corporate names, logos, slogans, trade dress, trademarks, service marks, acronyms, tag-lines, and other source origin or business identifiers and general intangibles of a like nature (whether registered or unregistered), and trademark and service mark registrations and applications therefor and all goodwill associated with the foregoing, whether protected, created, or arising under the laws of the United States (including common law) or any other jurisdiction or under any international convention; (iii) proprietary rights in internet domain names, internet domain name registrations, IP addresses, social media account names and handles, and other digital identifiers, all associated with web addresses, URLs, websites and webpages, social media pages, and all content and data

2

thereon; (iv) trade secret rights including know-how, inventions and invention disclosures (whether or not patented or patentable and whether or not reduced to practice), ideas, discoveries, Improvements, technology, technical information, data, databases, data compilations and collections, tools, methods, processes, formulae, strategies, prototypes, techniques, plans, drawings, blue prints, schematics, flow charts, models, business information, customer and supplier lists and records, pricing and cost information, financial, sales, and marketing plans and proposals, and all other confidential or proprietary information; (v) patents and patent applications, industrial design and other industrial property rights; (vi) proprietary rights in Software, including computer programs, operating systems, applications, firmware, and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; (vii) rights in or relating to any and all registrations, issuances, provisionals, reissuances, continuations, continuations-in-part, revisions, substitutions, reexaminations, renewals, extensions, combinations, divisionals, and reissues of, and applications for, any of the foregoing rights; and (viii) rights to prosecute, sue, enforce, or recover or retain damages, costs, or attorneys' fees with respect to the past, present and future infringement, misappropriation, dilution, unauthorized use or disclosure, or other violation of any of the foregoing.

"Job-Board Technology" means the proprietary software (including in source code and object code form, together with all documentation) which enables a job advertising platform consisting of applicant search and screening services, including job postings, employers branding, resume database access, and employee search services.

"Law" means any federal, state, local, municipal or foreign law, statute, legislation, common law, rule, regulation, ruling, directive or other similar requirement having the effect of law issued, enacted, adopted, promulgated, implemented or otherwise put into effect by any Governmental Authority.

"Software" means computer programs, operating systems, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof.

"Tax" means all U.S. federal, state, local or non-U.S. income, gross receipts, capital gains, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, alternative or add-on minimum, estimated, or similar taxes imposed by any Governmental Authority (to the extent the foregoing are taxes or in the nature of a tax), and including any interest, penalty, or addition thereto.

## ARTICLE II
## SERVICES

2.1     Services.

(a)     Services.  Provider agrees to provide, or cause to be provided, as applicable, those services that were provided to the Businesses by the Seller or its Affiliates prior to Closing as set forth on Exhibit A attached hereto and incorporated by reference herein for substantially the same purpose and in substantially the same manner as used by such Business prior to Closing (collectively, the "Services") in exchange for payment of the Fees (as defined below) and on the terms and subject to the conditions set forth in this Agreement.  The Services are for the benefit of, and may only be used by, Recipient and its Affiliates in the operation of its respective Business.  Subject to third party limitations and restrictions, Recipient shall be entitled to allow any Person, other than Recipient or one if its Affiliates, that is engaged as a contractor, subcontractor or otherwise by Recipient to perform work or provide any goods or services to or on behalf of Recipient (such Person, a "Third-Party Recipient") to access the Services to the extent

3

required or reasonably useful to perform any work or provide any goods or services to or on behalf of Recipient.  Recipient shall procure that each relevant Affiliate or Third-Party Service Recipient complies with the applicable terms of this Agreement and shall be liable for the acts and omissions of any such Third-Party Recipient. The termination of a third-party contract for a reason other than Provider's breach or Provider's termination of such contract shall terminate Provider's obligation to provide the corresponding Service, provided that (i)  Provider  uses commercially reasonable efforts to find a replacement third-party service within a reasonable time period designed to minimize disruption; and (ii) Provider uses, commercially reasonable efforts to prevent and/or seek available remedies in connection with such termination.

      2.2      <u>Program Coordinator</u>. Each of the Parties shall nominate one representative set forth on <u>Exhibit B</u> hereto to act as the primary contact person for the coordination of this Agreement and the Services (the "<u>Program Coordinators</u>").  Each of the Parties agree that all communications relating to the provision of the Services shall be directed to the applicable the Program Coordinators, and each of the Parties may treat an act of the Program Coordinator of the other Parties as being authorized by such other Party; <u>provided</u>, <u>however</u>, that no such Program Coordinator has authority to amend this Agreement.  Each Party shall advise the other Parties in writing of any change in any Program Coordinator.

      2.3      <u>Conditions</u>.

      (a)      <u>Access by Provider and Cooperation</u>.  To the extent reasonably necessary for the provision of the Services, Recipient shall grant Provider reasonable access to Recipient's facilities, subject to Recipient's reasonable facility access and security policies and procedures that are generally applicable to Recipient's employees or service providers which are provided to Provider in writing in advance. Provider will comply with said facility access and security policies and procedures.  Recipient shall cooperate with Provider as is reasonably necessary to carry out the Services, including providing such access to systems, networks, data and other confidential information as is reasonably necessary in connection with the provision of such Services.  Provider shall be excused from performing its obligations hereunder to the extent hindered by Recipient's failure to provide such access and cooperation in connection with such obligations; <u>provided</u>, <u>however</u>, Provider shall notify Recipient in writing of any such failure, and Recipient shall have ten (10) Business Days to cure such failure.

      (b)      <u>Quality</u>.  Provider shall provide the Services (including with respect to Core Buyer as the Provider, the Job-Board Technology), and shall cause the Services to be provided, substantially in the same manner and with the same nature, quality and timeliness in which they were provided prior to Closing (the "<u>Service Standard</u>").  Provider agrees to assign sufficient resources and qualified personnel as are reasonably required to perform the Services in accordance with the standards set forth in the preceding sentence.  For the avoidance of doubt, and by way of example, with respect to the Job Board Technology, Provider shall provide ongoing maintenance of the Job-Board Technology in a commercially reasonable manner. It being understood that the Provider shall not be required to make any improvements to the Job Board Technology during the 12-month term specified in Section 4.2.

      (c)      <u>Required Consents</u>.  To the extent Provider is required to obtain any third-party consents or pay cure costs in order to provide the Services, Provider shall use commercially reasonable efforts to obtain such consent, and any and all costs and expenses associated with obtaining such consents shall be borne by Provider.  In the event that such a third-party consent is not obtained by Provider (despite Provider using its commercially reasonable efforts), or has expired, is terminated or revoked (despite Provider using its commercially reasonable efforts to avoid such expiration, termination or revocation) during the Service Term of the relevant Service, Provider shall notify Recipient as soon as reasonably practicable and use commercially reasonable efforts to procure, at Provider's cost, an alternative

4

arrangement for continuing the provision of the relevant Service in substantially the same manner and shall reasonably cooperate with Recipient in connection therewith.

2.4     Personnel.  Provider may provide all or part of the Services through its employees, subcontractors, consultants, an outsourcing or other third-party provider arrangement or through one or more of its Affiliates (collectively "Personnel").  Subject to the Service Standard, Provider will have the right, in its sole discretion, to (i) designate which Personnel it will assign to perform the Services and (ii) remove and replace such Personnel at any time.  Provider will remain liable for the acts and omissions of its Personnel in their performance hereunder as if they were the acts and omissions of Provider, including any breach of this Agreement by any Personnel.  All Personnel of Provider shall be deemed for all purposes (including compensation and employee benefits) to be employees or representatives solely of Provider and not to be employees or representatives of Recipient.  In performing their respective duties hereunder, all such Personnel of Provider shall be under the direction, control and supervision of Provider (and not of Recipient).

2.5     Compliance with Law.  Provider shall provide, and shall procure that each relevant Affiliate or third party, as applicable, provides, all Services in compliance with applicable Law; provided that Provider shall not provide, and shall not be obligated to cause to provide, any Service to the extent that the provision of such Service would require Provider, its Affiliates or subcontractors, or any of their respective officers, directors, employees, agents or representatives to violate any applicable Law, any published privacy policies or Contract to which Provider, its Affiliates or subcontractors (as applicable) are party.

2.6     Wrong Pockets.

(a)     If any Party or its Affiliates becomes aware that (i) any right, property or asset forming part of the Purchased Assets (as defined in the applicable Purchase Agreement) has not been transferred or delivered to the applicable Buyer in error or (ii) any right, property or asset forming part of the Excluded Assets (as defined in the applicable Purchase Agreement) has been transferred or delivered to the wrong Party or its Affiliates in error, then (i) such Party or its Affiliates, as applicable, shall promptly notify the other Parties and the Parties (and their Affiliates) shall take such steps, as soon as reasonably possible, as may be required to transfer and deliver, or cause to be transferred and delivered, such Purchased Asset or Excluded Asset, as applicable, to the correct applicable Party, at the expense of the Party seeking the transfer and/or delivery and (ii) the Parties shall execute such documents or instruments of conveyance or assumption and take such further acts which are reasonably necessary or desirable to effect the transfer of such Purchased Asset or Excluded Asset, as applicable, to the correct Party.

(b)     If, on or after the Effective Date, any Party shall receive any payments or other funds due to another Party or any of its Affiliates (as reasonably determined by the receiving Party), then the Party receiving such funds shall promptly notify the other Party and forward such funds to the proper Party or its Affiliate.  If, after the Effective Date, either Party shall receive any invoice from a third party with respect to any accounts payable of another Party, then the Party receiving such invoice shall promptly deliver such invoice to the proper Party.

**ARTICLE III**
**COMPENSATION FOR SERVICES**

3.1     Fees.

(a)    Recipient agrees, in consideration for the performance of the Services by Provider, to pay to Provider such Recipient's applicable allocation set forth in <u>Exhibit A</u> of (i) all direct third party costs, and (ii) in the case of Services provided by Provider employees, the fully burdened costs of all such employees required to be retained by Provider in order to provide such Service as set forth on <u>Exhibit A</u>. The Fees will be passed-through by Provider at costs without any markup and are exclusive of any and all value-added, excise, sales, goods and services and other similar taxes, and any related interest and penalties, in each case, imposed on or payable with respect to the Fees payable by, or Services provided to, Recipient ("<u>Sales Taxes</u>").  Recipient shall bear and be solely responsible for the payment of Sales Taxes, subject to the receipt of a valid invoice to the extent required by Law to be issued in connection with such Sales Taxes.

(b)    If any withholding or deduction from any payment under this Agreement by a Recipient to Provider in relation to any Service is required in respect of any Taxes pursuant to any applicable Law, Recipient will: (i) make any such required withholding or deduction from the amount payable to Provider and (ii) timely pay the withheld or deducted amount referred to in clause (i) to the relevant Governmental Authority in accordance with applicable Law; and (iii) promptly forward to Provider a withholding tax certificate or other available documentation evidencing such payment by Recipient to the Governmental Authority.

(c)    For the avoidance of doubt, Provider is solely responsible for the payment of all Taxes based on the net income of Provider arising out of the receipt of the Fees paid to Provider pursuant to this Agreement.

(d)    Recipient and Provider will take reasonable steps to cooperate to minimize the imposition of, and the amount of, any Taxes incurred in connection with this Agreement.

3.2    <u>Invoicing and Payment</u>.  Within thirty (30) days following the end of each calendar month during the Term, Provider shall deliver to Recipient a detailed invoice setting forth the Services provided and the Fees incurred for each of the Services provided, or caused to be provided, by Provider to Recipient during the prior calendar month (collectively, the "<u>Monthly Amounts</u>").  Each invoice shall be accompanied by supporting documentation for the Fees reasonably sufficient to enable Recipient to verify the information contained in such invoice.  Recipient shall pay to Provider the undisputed Monthly Amounts reflected in an invoice therefor within thirty (30) days following Recipient's receipt of such invoice; <u>provided</u>, however, if the Agreement is terminated prior to the expiration of any such payment deadline, then Recipient shall pay Provider for any Services that have been performed as of the date of such termination.

## ARTICLE IV
## DATA AND INTELLECTUAL PROPERTY

4.1    <u>Ownership of Data</u>.  Recipient shall own all right, title and interest in and to all data generated on its or its Affiliates' behalf in the performance of the Services.

4.2    <u>License Grants</u>.  Subject to the terms and conditions of this Agreement, Core Buyer hereby grants to MGS Buyer and MMP Buyer a nonexclusive, worldwide, royalty-free, fully paid-up, non-transferable (except in accordance with <u>Section 11.1</u>), non-sublicensable license to use, for twelve (12) months, the Job-Board Technology for substantially the same purpose and in substantially the same manner that the applicable Businesses used the Job-Board Technology prior to Closing.  To the extent necessary for Recipient to receive the full benefit of the Services and the Provider to provide the Services in accordance with this Agreement, each Provider and Recipient hereby grants to the other, a non-exclusive license to reproduce, modify, prepare derivative works of, and otherwise use the Intellectual Property used in connection with the provision or receipt of the Services.  Such license may be exercised only to the extent

6

and for the duration necessary for Provider to provide, and Recipient to receive, the applicable Service as permitted by this Agreement, subject to any third-party license terms and restrictions that are placed on the licensor, as communicated to the licensee.

       4.3      <u>Ownership of Intellectual Property</u>.  As between the Parties, Core Buyer retains all right, title, and interest, including all Intellectual Property rights, in and to the Job-Board Technology and any Improvements thereto.  Except as set forth in <u>Section 4.2</u> or otherwise agreed by the Parties in writing, Provider (including its Affiliates) and Recipient shall each retain all right, title and interest in and to their respective Intellectual Property rights, and no other license (other than to the extent necessary for the provision or the receipt of the Services) or other right, express or implied, is granted hereunder (by implication, estoppel or otherwise) by any Party to its Intellectual Property rights.  Provider and Recipient shall execute or cause the execution of any documents, provide such cooperation, and take or cause the taking of any other actions reasonably requested by the other Party to effectuate the purposes of this <u>Section 4.3</u>, including the assignment of any rights hereunder.

**ARTICLE V**
**CONFIDENTIAL INFORMATION**

       5.1      For purposes of this Agreement, "<u>Confidential Information</u>" shall mean any non-public proprietary information disclosed by a Party to another Party in the performance hereunder, including methods of operation, customers, customer lists, products, prices, fees, costs, technology, inventions, trade secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; <u>provided</u>, <u>however</u>, "<u>Confidential Information</u>" does not include, and there shall be no obligation hereunder with respect to, information that (a) is or becomes generally available to the public, other than as a result of a disclosure not otherwise permissible hereunder, (b) is subsequently acquired by a Party from third-party sources not in breach of any confidentiality obligation of which such Party is aware, (c) is independently developed by a Party without use of or any reference to the confidential information of another Party, or (d) was already lawfully known by a Party receiving the Confidential Information prior to its disclosure to that Party from another Party.  The Parties shall, and shall cause their respective Affiliates, Third-Party Recipients, and representatives to, keep confidential this Agreement and all Confidential Information provided to it by or on behalf of a Party or otherwise obtained by it in connection with this Agreement and/or any of the transactions contemplated by it and not disclose such Confidential Information to any third-party; provided, however, that a Party may disclose Confidential Information to its and its Affiliates' officers, directors, employees, representatives, and contractors who have a need to know such information in connection with the receipt or provision of Services and who have been informed of the confidential nature of the Confidential Information and have agreed to keep such information confidential and not to use such information except in accordance with the terms of this Agreement.  Notwithstanding the foregoing, the Parties and their respective officers, directors, employees or Affiliates shall have no obligation to keep confidential any Confidential Information if and to the extent disclosure thereof is specifically required by applicable Law; <u>provided</u>, <u>however</u>, that in the event disclosure is required by applicable Law, the Party required to disclose shall, to the extent reasonably possible and legally permissible, (x) provide the other Party with prompt written notice of such requirement prior to making any disclosure so that the other Party may seek an appropriate protective order, (y) disclose only that information that is required to be furnished, and (z) use its best endeavours to obtain assurance that such disclosed Confidential Information will be accorded confidential treatment.

7

## ARTICLE VI
## IT AND COMPUTER SYSTEMS AND SERVICES

6.1     Use of Systems.  In connection with the provision of the Services hereunder, Recipient may have access to one or more systems of Provider, including computer systems and Software, data processing systems and communication systems of Provider, as identified on Exhibit A (collectively, the "Systems").  Recipient acknowledges that its use of the Systems may provide Recipient with access to Confidential Information or other data or information that is not related to the business of Recipient, and Recipient agrees that Recipient shall not use any Systems to access any such Confidential Information or other data or information not related to the business of Recipient.

6.2     Employee Access to Systems.  Recipient shall use commercially reasonable efforts to (i) ensure that only those of its personnel who are specifically authorized by Recipient or its Affiliates in accordance with this Agreement to have access to the Systems gain such access, and (ii) prevent unauthorized access, use, destruction, alteration or loss of information contained therein.  Recipient shall (i) inform its personnel using any of the Systems of the use restrictions set forth in this Article VI and require them to abide by the terms of this Article VI and (ii) be responsible for any use of such Systems in violation of this Article VI by any of its personnel.

6.3     Policies.  While using any Systems of Provider, Recipient shall adhere in all material respects to Provider's written policies, procedures and requirements (including policies with respect to protection of proprietary information) as well as any applicable third-party agreements, in each case regarding the use of such Systems as in effect from time to time and provided in advance in writing to Recipient. Without limiting the foregoing, Recipient shall not tamper with, compromise or circumvent any security or audit measures employed by Provider with respect to the Systems.  If, at any time, Provider determines in its good faith business judgment that any personnel of Recipient has attempted to circumvent, or has circumvented, any of the written security policies, procedures or requirements of Provider or its Affiliates or has engaged in activities that may reasonably lead to the unauthorized access, use, destruction, alteration or loss of data, information or Software, then, notwithstanding anything in this Agreement to the contrary, Provider may, without any liability whatsoever under this Agreement or otherwise, immediately terminate such personnel's access to the applicable Systems.

6.4     Remediation.  Recipient shall use commercially reasonable efforts to prevent the introduction or transmission of any viruses, worms, malware, adware, ransomware, malicious code, data bombs or any other similar threats into the Systems, or permit any unauthorized access, breach or exfiltration of any Systems, or otherwise cause any breach or vulnerability in any of the Systems, in each case, caused directly by Recipient or any of Recipient's or its Affiliates' or Third-Party Recipients' personnel.  In the event that any of the foregoing occurs, Provider or its Affiliates may take any and all actions to eliminate, remediate or otherwise address, in Provider's reasonable discretion, any such threat, vulnerability or unauthorized access, breach or exfiltration and Provider's reasonable and documented costs associated with such elimination and remediation shall be reimbursed by Recipient.

6.5     Recipient's IT Systems.  Provider will not access Recipient's information technology systems except to provide the Services.  To the extent Provider will need to access Recipient's information technology systems to provide the Services, Provider shall use commercially reasonable efforts to (i) ensure that only those of its personnel who are specifically authorized by Provider or its Affiliates in accordance with this Agreement to have access to said systems gain such access, and (ii) prevent unauthorized access, use, destruction, alteration or loss of information contained therein.  Provider shall (i) inform its personnel using any of said systems of the use restrictions set forth in this Article VI and require them to abide by the terms of this Article VI and (ii) be responsible for any use of said systems in violation of this Article VI by any of its personnel.  While using any said systems, Provider shall adhere in all material respects to

Recipient's written policies, procedures and requirements (including policies with respect to protection of proprietary information) as well as any applicable third-party agreements, in each case regarding the use of such systems as in effect from time to time and provided in advance in writing to Provider. Without limiting the foregoing, Provider shall not tamper with, compromise or circumvent any security or audit measures employed by Recipient with respect to said systems. If, at any time, Recipient determines in its good faith business judgment that any personnel of Provider has attempted to circumvent, or has circumvented, any of the written security policies, procedures or requirements of Recipient or its Affiliates or has engaged in activities that may reasonably lead to the unauthorized access, use, destruction, alteration or loss of data, information or software, then, notwithstanding anything in this Agreement to the contrary, Recipient may, without any liability whatsoever under this Agreement or otherwise, immediately terminate such personnel's access to the applicable systems. Provider shall use commercially reasonable efforts to prevent the introduction or transmission of any viruses, worms, malware, adware, ransomware, malicious code, data bombs or any other similar threats into the systems, or permit any unauthorized access, breach or exfiltration of any of Recipient's information technology systems, or otherwise cause any breach or vulnerability in any of said systems, in each case, caused directly by Provider or any of Provider's or its Affiliates' or third-party recipients' personnel. In the event that any of the foregoing occurs, Recipient or its Affiliates may take any and all actions to eliminate, remediate or otherwise address, in Recipient's reasonable discretion, any such threat, vulnerability or unauthorized access, breach or exfiltration and Recipient's reasonable and documented costs associated with such elimination and remediation shall be reimbursed by Provider.

6.6     Data Processing Addendum. Provider will comply with the Data Processing Addendum set out in Exhibit C.

## ARTICLE VII
## TERM AND TERMINATION

7.1     Term. The term of this Agreement shall begin on the date hereof and shall remain in full force and effect, unless sooner terminated pursuant to Section 7.2, for so long as a Service described in Exhibit A remains in effect pursuant to the terms therein (the "Term", and the period specified as the service term for each Service set out in Exhibit A, the "Service Term"), provided, however, that (i) no Service will exceed a date that is twelve (12) months after the Effective Date, (ii) the license to the Job-Board Technology will continue for the period set forth in Section 4.2 notwithstanding any expiration of the Term and (iii) Section 2.6 and Articles IV, V, VII, VIII, IX, and X shall survive the expiration of the Term or the termination of this Agreement.

7.2     Termination.

(a)     In the event of an uncured material breach of this Agreement by either Provider or Recipient, the affected non-breaching Party may terminate this Agreement (but only with respect to the Service(s) to which such breach relates) upon written notice to the breaching Party specifying in reasonable detail the nature of such breach, subject to the following: (i) the breaching Party and affected non-breaching Party shall first engage in the dispute resolution process set forth in Section 11.5; and (ii) in the event that the breaching Party and affected non-breaching Party agree that a material breach has occurred, then the breaching Party shall have a period of forty-five (45) days to cure such breach; provided, that if the breaching Party is working in good faith to resolve such breach and such breach cannot be resolved within such initial forty-five (45) day period, the breaching Party shall have an additional forty-five (45) days to cure such breach (provided that the breaching Party gives the affected non-breaching Party a written notice as soon as practicable of its exercise of such option and certifying that it is working in good faith to resolve such breach).

(b)      Recipient may terminate its right to receive any Service upon not less than fifteen (15) days' written notice to Provider (unless a shorter time is mutually agreed upon amongst the applicable Recipient and Provider or as otherwise provided on Exhibit A) setting forth the Service(s) that Recipient desires to terminate (such Service, a "Terminated Service"); provided that if the provision of another Service is dependent on the continued provision of the Terminated Service and not specified in Exhibit A as an interdependent Service, then Provider shall provide written notice thereof within five (5) Business Days of receipt of the request to terminate a Terminated Service from Recipient, then Recipient shall terminate both the Terminated Service and such other Service unless Recipient withdraws or amends its request to terminate a Terminated Service within five (5) Business Days of receipt of such notice from Provider.  Recipient shall continue to be responsible for its allocation of any third party costs actually incurred after the Effective Date by Provider through the end of the Service Term which in all cases shall be the applicable full contract term for such Service (unless otherwise specified in Exhibit A).  Provider shall not be required to renew a third-party contract unless (i) specifically stated on Exhibit A as being required to be renewed, or (ii) otherwise agreed by the relevant Provider and Recipient(s) (including agreement regarding allocation of payment), prior to the date of any required notice of such renewal.

7.3      Expenses and Compensation After Termination.  In the event that this Agreement is terminated with respect to certain Services prior to the expiration of the Term as set forth in Section 7.2, Provider shall continue to be entitled to receive all undisputed Fees for such Terminated Services rendered prior to such termination that have not already been paid in full, together with any other amounts due to Provider hereunder.  Within thirty (30) days after receipt of the final invoice sent by Provider following termination of this Agreement, Recipient shall promptly remit to Provider all Fees or other amounts due hereunder.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES

8.1      RECIPIENT ACKNOWLEDGES AND AGREES THAT ALL SERVICES WILL BE PROVIDED BY PROVIDER "AS IS, WHERE IS AND WITH ALL FAULTS", THAT RECIPIENT ASSUMES ALL RISKS AND LIABILITIES ARISING FROM OR RELATING TO THE USE OR RELIANCE UPON THE SERVICES, AND THAT PROVIDER (ON BEHALF OF ITSELF, ITS AFFILIATES AND SUBCONTRACTORS) MAKES NO (AND HEREBY EXPRESSLY DISCLAIMS AND NEGATES ANY AND ALL) WARRANTIES OR REPRESENTATIONS OR CONDITIONS REGARDING THE SERVICES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO QUALITY, PERFORMANCE, COMMERCIAL UTILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, TITLE, PERFORMANCE, RESULTS OR REGARDING THE CONDITION, DESIGN OR WORKMANSHIP OF THE SERVICES OR THAT THE SERVICES WILL BE FREE FROM DEFECTS OR IMPERFECTIONS, REGARDLESS OF WHETHER SUCH REPRESENTATION OR WARRANTY IS ORAL OR WRITTEN, EXPRESS, IMPLIED OR STATUTORY OR ALLEGEDLY ARISING FROM ANY USAGE OR FROM ANY COURSE OF DEALING; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT LIMIT PROVIDER'S EXPRESS OBLIGATIONS, REPRESENTATIONS AND WARRANTIES UNDER THIS AGREEMENT OR THE APPLICABLE PURCHASE AGREEMENT.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH PARTY SHALL BE SOLELY RESPONSIBLE FOR ITS RESPECTIVE COMPLIANCE WITH APPLICABLE LAW, AND NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS A REPRESENTATION OR WARRANTY BY PROVIDER THAT THE SERVICES WILL ALLOW RECIPIENT TO COMPLY WITH LAW OR ARE SUFFICIENT TO SATISFY ANY OF RECIPIENT'S OBLIGATIONS UNDER APPLICABLE LAW.

## ARTICLE IX
## LIMITATION OF LIABILITY

9.1     NOTWITHSTANDING ANY PROVISION OF THE PURCHASE AGREEMENTS TO THE CONTRARY, EXCEPT IN THE EVENT OF ANY FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, OR BREACH OF ARTICLE V (CONFIDENTIAL INFORMATION), NO PARTY (INCLUDING SUCH PARTY'S AFFILIATES AND SUBCONTRACTORS)  SHALL BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES (INCLUDING LOST OR ANTICIPATED REVENUES, LOSS OF PROFITS, LOST OR ANTICIPATED SAVINGS, LOSS OF BUSINESS OPPORTUNITY OR INJURY TO GOODWILL RELATING TO THE SAME AND ATTORNEY'S FEES) ARISING FROM ANY CLAIM RELATING TO THIS AGREEMENT OR ANY OF THE SERVICES TO BE PROVIDED HEREUNDER OR THE PERFORMANCE OF OR FAILURE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT, WHETHER SUCH CLAIM IS BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE, AND REGARDLESS OF WHETHER SUCH DAMAGES ARE FORESEEABLE OR AN AUTHORIZED REPRESENTATIVE OF PROVIDER IS ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES.  EXCEPT IN THE EVENT OF ANY FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, OR BREACH OF ARTICLE V (CONFIDENTIAL INFORMATION), EACH PARTY'S MAXIMUM LIABILITY UNDER OR PURSUANT TO THIS AGREEMENT IS STRICTLY LIMITED IN THE AGGREGATE TO THE TOTAL AMOUNTS PAID OR PAYABLE BY RECIPIENT PURSUANT TO THE TERMS OF THIS AGREEMENT.

## ARTICLE X
## INDEMNIFICATION

10.1     <u>Recipient Indemnity</u>.  Recipient shall indemnify Provider and each of its Affiliates against all damages, losses, liabilities and costs (including reasonable outside legal fees and expenses) attributable to any third-party claims arising from or relating to (a) violation of applicable Law by Recipient or its Affiliates in connection with the receipt of Services or (b) Recipient's fraud, willful misconduct or gross negligence in connection with Recipient's conduct under this Agreement, except to the extent that such damages, losses, liabilities or costs are indemnifiable by Provider hereunder.

10.2     <u>Provider Indemnity</u>.  Provider shall indemnify Recipient and each of its Affiliates against all damages, losses, liabilities and costs (including reasonable outside legal fees and expenses) attributable to any third-party claims arising from or relating to (a) violation of applicable Law by Provider or its Affiliates in connection with the provision of Services or (b) Provider's fraud, willful misconduct or gross negligence in connection with Provider's conduct under this Agreement, except to the extent that such damages, losses, liabilities or costs are indemnifiable by Recipient hereunder.

10.3     <u>Indemnification Procedures</u>.  With respect to any claim requiring indemnification pursuant to this <u>Section 10.3</u>, the Party seeking indemnification (the "<u>Indemnified Party</u>") agrees (i) to send the other Party (the "<u>Indemnifying Party</u>") written notice of such claim promptly after receiving written notice of the same; (ii) to give the Indemnifying Party authority to proceed as contemplated herein; and (iii) at the Indemnifying Party's expense, to give the Indemnifying Party proper and reasonable information and assistance to settle and/or defend any such claim; provided, however, the Indemnifying Party shall not be entitled to settle or compromise any such asserted claim, suit or proceeding without the prior written consent the Indemnified Party if it is required to admit fault or would subject the Indemnified Party to any liability or business restriction.

**ARTICLE XI**
**MISCELLANEOUS**

11.1     Assignment.  Except as expressly permitted by this Agreement, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any Party (whether by operation of Law or otherwise) without the prior written consent of the other Parties, and any such assignment shall be null and void.  No assignment by any Party shall relieve such Party of any of its obligations hereunder.  Any attempted or purported assignment in violation of this Section 11.1 will be deemed void ab initio.  Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, including, in the case of the Seller, the trustee in the Bankruptcy Case. Notwithstanding the foregoing, the Seller may assign some or all of its respective rights or delegate some or all of its respective obligations hereunder to a chapter 7 trustee, chapter 11 trustee, liquidating trust, liquidating trustee, or any other successor entities pursuant to a chapter 11 plan confirmed by the Bankruptcy Court, provided that no such assignment will result in incremental unreimbursed withholding or other Taxes which may be economically borne by the Seller or any of its Affiliates.  Notwithstanding the other provisions of this Section 11.1, this Agreement shall be assignable by a party in connection with a merger, sale of substantially all of its assets or outstanding capital stock or other sale transaction.

11.2     Force Majeure.  In the event that war, terrorist act, fire, explosion, natural disaster, accident, strike, riot, labor dispute, act of governmental authority, act of God, pandemic or other contingency beyond the control of Provider causes any cessation or interruption of Provider's performance hereunder, performance by Provider shall be temporarily excused for the period of the disability, without liability.  In the event that Provider is excused from providing Services in accordance with the terms of this Section 11.2 for a period exceeding thirty (30) consecutive calendar days, the Provider or the Recipient of the affected Services may terminate this Agreement (but only with respect to the affected Services) upon written notice to such other Party of such termination without prejudice.

11.3     Construction.  The definitions in the body of this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The words "herein", "hereof" and "hereunder" and words of similar import refer to this Agreement (including the Exhibits to this Agreement) in its entirety and not to any part hereof unless the context shall otherwise require.  All references herein to Articles, Sections, and Exhibits shall be deemed references to Articles and Sections of, and Exhibits to, this Agreement unless the context shall otherwise require.  Unless the context shall otherwise require, any references to this Agreement, any other agreement or other instrument or statute or regulation are to it as amended and supplemented from time to time (and, in the case of a statute or regulation, to any successor provisions).  Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Any reference in this Agreement to a "day" or a number of "days" (without explicit reference to Business Days) shall be interpreted as a reference to a calendar day or number of calendar days.  If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action may be deferred until the next Business Day.

11.4     Notices.  All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) when sent if delivered or transmitted by email (provided, no "bounce back" or notice of non-delivery is generated), (c) upon receipt after dispatch by registered or certified mail, return receipt requested on postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

12

(a)    if to the Seller:

        Zen JV, LLC
        c/o Apollo Management X, L.P.
        9 West 57th Street
        43rd Floor
        New York, New York 10019
        Attn: Robert Kalsow-Ramos
              Maxwell David
              Whitney Chatterjee

      Email: rkalsow-ramos@apollo.com
            mdavid@apollo.com
            wchatterjee@apollo.com

      with a mandated copy (which shall not constitute notice) to:

      Latham & Watkins LLP
      1271 Avenue of the Americas New York, NY 10020
      Attention:      Ray Schrock
                   Candace Arthur
                   Rick Press
                   Michael Anastasio

      Email: ray.schrock@lw.com
            candace.arthur@lw.com
            eric.press@lw.com
            michael.anastasio@lw.com

      with a mandated copy (which shall not constitute notice) to:

      Richards, Layton & Finger, PA
      920 N. King St.
      Wilmington, DE 19801
      Attn: Zachary Shapiro
      Email: shapiro@rlf.com

(b)    if to Core Buyer:

      BOLD Holdings LLC
      City View Plaza II,
      48 Road 165, Suite 6000
      Guaynabo, Puerto Rico 00968-8060
      Attn: Gary Hsueh and Legal;
      Email: gary.hsueh@bold.com, legal@bold.com

      with a mandated copy (which shall not constitute notice) to:

      Cooley, LLP
      500 Boylston Street, 14th Floor

Boston, MA 02116
Attn: Miguel J. Vega; Daniel Shamah; Michael Klein
Email: mvega@cooley.com; dshamah@cooley.com; mklein@cooley.com

(c)      if to MGS Buyer:

Sherrill-Lubinski, LLC
871 Marlborough Ave Suite 100
Riverside, CA 92507 USA
Attn: Legal Department
Email: legal@partnerone.com

and to

ETI-NET INC.
203-6900 Boulevard Arthur Sauve, laval
Quebec, H7R3X9
Attn: Legal Department
Email: legal@partnerone.com

with a mandated copy (which is required to constitute notice) to:

Foley & Lardner LLP
1000 Louisiana Street, Suite 2000
Houston, TX 77002
Attn: John Melko
Email: jmelko@foley.com;

and to:

Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Attn: Jake Gordon
Email: jgordon@foley.com

(d)      if to MMP Buyer:

Valnet US Inc.
7405 Transcanada Highway, Suite 100
Saint-Laurent, Quebec H4T 1Z2
Attn: Yury Smagorinsky; Rony Arzoumanian
Email: yury.s@valnetinc.com; rony.a@valnetinc.com

with a mandated copy (which shall not constitute notice) to:

Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Attn: Steven Boender
Email: steven.boender@stoel.com

or to such other address as any Party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated or personally delivered.   Any Party may notify any other Party of any changes to the address or any of the other details specified in this <u>Section 11.4</u>; *provided* that such notification shall only be effective on the date specified in such notice or five (5) Business Days after the notice is given, whichever is later.   Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

11.5     <u>Disputes</u>.  All disputes arising hereunder, including disputes involving compliance with <u>Section 2.6</u>, shall be first considered in person, by teleconference or by video conference by the Program Coordinators in good faith within fifteen (15) days after receipt of written notice from a Party specifying the nature of the dispute.  If the dispute cannot be resolved by the Program Coordinators within fifteen (15) days of the receipt of such notice, the matter shall be referred to Jesse DelConte (delconte@alixpartners.com, representing the Seller), [ ● ] (representing Core Buyer), Joe Berkowitz (jberkowitz@partnerone.com, representing MGS Buyer) or Yury Smagorinsky (yury.s@valnetinc.com, representing MMP Buyer), as applicable, who shall cooperate in good faith to resolve such dispute within seven (7) days of the referral.  If the dispute cannot be resolved by such persons within such time period, any disputing Party may seek to resolve the dispute in accordance with <u>Section 11.6(b)</u>. The Program Coordinators and such representatives may be amended from time to time to another person of substantially equivalent seniority upon notice to the other Parties.

11.6     <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply or disputes involving <u>Section 2.6</u>, this Agreement, and all claims and causes of action arising out of, based upon, or related to this Agreement or the negotiation, execution or performance hereof, shall be governed by, and construed, interpreted and enforced in accordance with, the Laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any Laws other than the Laws of the State of Delaware.

(b)     Any action, claim, suit or Proceeding arising out of, based upon or relating to <u>Section 2.6</u> of this Agreement shall be brought solely in the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court).  Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) in respect of any action, claim, suit or Proceeding arising out of, based upon or relating to <u>Section 2.6</u> of this Agreement and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided*, *however*, that, if the Bankruptcy Case is closed or dismissed, any action, claim, suit or Proceeding arising out of, based upon or relating to <u>Section 2.6</u> of this Agreement and any other action claim suit or Proceeding arising out of this Agreement shall be heard in, and the Parties hereto irrevocably (i) consent to submit to the exclusive jurisdiction of the Delaware Court of Chancery or any Federal court located in the State of Delaware, for the purposes of any Action arising out of this Agreement, (ii) waive any objection to the laying of venue of any Action brought in such court, (iii) waive and agree not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum, and (iv) agree that service of process or of any other papers upon such Party by registered mail at the address to which notices are required to be sent to such Party under Section 11.4 shall be deemed good, proper and effective service upon such Party. Each of the parties hereto irrevocably waives to the fullest extent permitted by applicable Law any and all right such party may have to trial by jury in any action, claim, suit or Proceeding (whether based in contract, tort or otherwise) between the Parties hereto arising out of, based upon or relating to this Agreement or the negotiation, execution or performance hereof. Each Party hereto (i) certifies that no representative, agent or attorney of any other Party has

represented, expressly or otherwise, that such Party would not, in the event of any Proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties hereto have been induced to enter into this Agreement by, among other things, the mutual waiver and certifications in this Section 11.6.

11.7    <u>Relationship of the Parties</u>.  The relationship of Provider to Recipient is that of an independent contractor and neither Provider nor its agents or employees shall be considered employees or agents of Recipient.  This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture or grant of a franchise between Provider and Recipient.

11.8    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.   Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

11.9    <u>Amendment and Modification</u>.   This Agreement may be amended, modified or supplemented only by a written instrument signed by each of the Parties that are, at the time of the proposed amendment, modification or supplementation, Providers or Recipients under this Agreement with respect to the Service or term being so amended, modified or supplemented.

11.10    <u>Waiver</u>.  Any Party to this Agreement may, (a) extend the time for the performance of any of the obligations or other acts of the other Parties, (b) waive any inaccuracies in the representations and warranties of the other Parties contained herein or in any document delivered by the other Parties pursuant hereto, or (c) waive compliance with any of the agreements of the other Parties or conditions to such Parties' obligations contained herein, in each case to the extent that such Party is a Provider or Recipient under this Agreement with respect to the applicable service at the time of such extension or waiver, as the case may be.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of any Party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

11.11    <u>Mutual Drafting; Headings</u>.  The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent.  If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.   The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

11.12    <u>Publicity</u>.  No Party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or otherwise communicate with any news media in respect of this Agreement without the prior written consent of the other Parties; <u>provided</u> that the Parties may disclose such matters to their respective employees, accountants, advisors and other representatives as necessary in connection with the ordinary conduct of their respective businesses (so long as such Persons

16

agree to, or are bound by contract or professional or fiduciary obligations to, keep the terms of this Agreement confidential and so long as the Parties shall be responsible to the other Parties hereto for breach of this <u>Section 11.12</u> or such confidentiality obligations by the recipients of its disclosure); provided, further, that each Party and its Affiliates may disclose that the Parties have entered into a transitional services arrangement from time to time to its employees, customers, suppliers and any other Person as the requirements of any contract to which such Party is a party (so long as such Persons agree to, or are bound by contract or professional or fiduciary obligations to, keep the terms of this Agreement confidential and so long as the Parties shall be responsible to the other Parties hereto for breach of this <u>Section 11.12</u> or such confidentiality obligations by the recipients of its disclosure).

11.13    <u>Expenses</u>.  Except as otherwise specified in this Agreement, each Party shall be solely responsible for all costs and expenses incurred by it in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement.

11.14    <u>No Right of Setoff</u>.  Each of the Parties hereto hereby acknowledges that it shall have no right under this Agreement to offset any amounts owed (or to become due and owing) to another Party hereto, whether under this Agreement, the Purchase Agreements or otherwise, against any other amount owed (or to become due and owing) to it by another Party hereto.

11.15    <u>Entire Agreement</u>.  This Agreement and the Purchase Agreements constitute the entire agreement of the Parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings among the Parties with respect thereto.

11.16    <u>No Third-Party Beneficiaries</u>.  Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties hereto, any right or remedies under or by reason of this Agreement.

11.17    <u>Counterparts</u>.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a photographic, photostatic, facsimile, portable document format (.pdf), DocuSign, electronic signature or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No Party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail or that any signature is in facsimile or electronic format (including .pdf or DocuSign) as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

11.18    <u>Approval of the Bankruptcy Court</u>.  Notwithstanding anything herein to the contrary, any and all rights, interests or obligations under this Agreement are subject to approval of the Bankruptcy Court.

*Remainder of page left intentionally blank.*

RLF1 33350760v.2

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

SELLER:

Zen, JV, LLC

By: _____
          Name:
          Title:

*[Signature Page to Transition Services Agreement]*

CORE BUYER:

Bold Holdings LLC

By: _____
Name:
Title:

*[Signature Page to Transition Services Agreement]*

MGS BUYER:

Sherrill-Lubinski, LLC

By: _____
     Name:
     Title:

ETI-NET inc.

By: _____
     Name:
     Title:

*[Signature Page to Transition Services Agreement]*

MMP BUYER:

Valnet US Inc.


By: _____
    Name:
    Title:

*[Signature Page to Transition Services Agreement]*

**Exhibit A**
**Services**

RLF1 33350760v.2

**<u>Exhibit B</u>**
**Program Coordinators**

MGS Buyer: Susan Fallon, [susan.fallon@monster.com]

Core Buyer: [ ● ]

MMP Buyer:  Rony Arzoumanian, rony.a@valnetinc.com

Seller: John Creighton, jcreighton@alixpartners.com

Exhibit B - 1

**Exhibit C**

**DATA PROCESSING ADDENDUM**

1.    **General**. Provider and Recipient agree to fully comply with and provide the level of privacy protection required by all applicable laws and regulations governing the privacy, security, storage, transfer, and respective use of Personal Data, including without limitation, *where applicable*, the California Consumer Privacy Act of 2018, as amended, including by the California Privacy Rights Act ("CCPA") (collectively, the "Data Protection Laws"). For Personal Data subject to a Data Privacy Law, if a provision of this Addendum conflicts with the relevant Data Privacy Law, the Data Privacy Law will prevail. Provider must not access, collect, store, retain, transfer, use, or otherwise Process in any manner any Personal Data, except: (i) in the interest and on behalf of Recipient; (ii) as directed in writing by authorized personnel of Recipient; or (iii) as otherwise allowed or required by applicable Data Privacy Laws. "Process" or its equivalent is defined by the applicable Data Protection Laws. Provider must implement and maintain reasonable and appropriate technical and organizational measures designed to ensure the confidentiality, integrity, and availability of personal data, and in no event shall such measures be less than those in place by the Business as of immediately prior to the Closing.

2.    **CCPA**. Terms defined in the CCPA, including personal information, business purposes, collect, sell, and share, carry the same meaning in this Addendum. If Provider is processing personal information as within the scope of the CCPA, Provider agrees to the following further commitments to Recipient: (a) Provider will not sell or share the personal information it collects pursuant to this Addendum; (b) Provider will not retain, use, or disclose the personal information it collects pursuant to this Addendum for any purposes (including a commercial purpose) other than to provide the Services or as otherwise permitted by the CCPA; (c) Provider will not retain, use, or disclose the personal information it collects pursuant to this Addendum outside of the direct business relationship between Provider and Recipient. Provider will not combine the personal information that the Provider receives from, or on behalf of, Recipient with personal information that it receives from, or on behalf of, another person or persons, or collects from its own interaction with the consumer. Provider certifies that it understands these restrictions and will comply with them. Provider must promptly comply, to the extent required by any applicable Data Protection Laws, with any Recipient request or instruction requiring the Provider to provide, amend, transfer, or delete the personal information, or to stop, mitigate, or remedy any unauthorized processing. Recipient may monitor the Provider's compliance with this Addendum through reasonable measures, including, but not limited to, ongoing manual reviews and automated scans and regular assessments, audits, or other technical and operational testing at least once every 12 months; provided, that any routine onsite audits shall be limited to once per year, unless: (a) otherwise required by a Governmental Authority (including under applicable FedRAMP or any similar federal or state requirements, or any other Permits or compliance standards required by such party to operate its Business in substantially the same manner as prior to Closing), (b) is otherwise required to comply with the terms of any contracts of such party with a third party (e.g., customer contracts), or (c) there is one or more identified instance of non-compliance with this Exhibit C that is identified prior to such audit or as a result of such audit.

Exhibit C - 1