**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ZEN JV, LLC, *et al.*,[1] | Case No. 25-11195 (JKS) |
| Debtors. | (Jointly Administered) |

**PROOF OF PUBLICATION**

Attached hereto as Exhibit A is the Proof of Publication for the *Notice (I) Conditional Approval of the Combined Plan and Disclosure Statement for Solicitation Purposes Only, (II) Deadline for Casting Votes to Accept or Reject the Combined Plan and Disclosure Statement, and (III) the Hearing to Consider (A) Final Approval of the Combined Plan and Disclosure Statement as Containing Adequate Information and (B) Confirmation of the Combined Plan and Disclosure Statement* as follows:

| Publication | Publication Date |
|---|---|
| **The New York Times** | **September 8, 2025** |

/s/ Randy Lowry
Randy Lowry
Omni Agent Solutions, Inc.
5955 DeSoto Avenue, Suite 100
Woodland Hills, California 91367
(818) 906-8300
*Claims, Noticing, and Administrative Agent for the Debtors*

1 The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding LLC (9339); and Military Advantage LLC (9508). The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

# **EXHIBIT A**



The New York Times
Company

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

September 8, 2025

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

9/8/2025, NY/NATL, pg B4

_______________________________________________

Larnyce Tabron

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

Chapter 11, Case No. 25-11195 (JKS)
(Jointly Administered)

Hearing Date: October 7, 2025 at 1:00 p.m. (ET)
Objection Deadline: October 1, 2025 at 12:00 p.m. (ET)

NOTICE OF (I) CONDITIONAL APPROVAL OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR SOLICITATION PURPOSES ONLY, (II) DEADLINE FOR CASTING VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND (III) THE HEARING TO CONSIDER (A) FINAL APPROVAL OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION AND (B) CONFIRMATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

PLEASE TAKE NOTICE OF THE FOLLOWING:

ADDITIONAL INFORMATION



**TECHNOLOGY**

# A.I.-Detection Tools Are on the Lookout For A.I.-Faked Receipts

By SARAH KESSLER

It wasn't long after ChatGPT began generating realistic images that Anant Kale started seeing posts on social media that explained how it could be used to generate a pretty convincing fake receipt.

That was, he recognized, his problem.

As the chief executive of AppZen, a software used by finance teams to manage expenses, he had overseen the creation of fraud-detection tools that flagged A.I.-generated receipts. But this was different.

"We were like, oh, shoot, this is too easy," he told DealBook.

AppZen immediately started developing a tool to detect fake receipts generated by chatbots. It's not the only one: The expense management app Expensify added ways to detect A.I.-generated receipts in April, and SAP Concur's automated expense-auditing tool, Verify, expanded a similar capability to all users this month.

This summer, when announcing new efforts to flag A.I.-generated receipts, Nicolas Ritz, who works on product development at the corporate travel software company Navan, summed up the dilemma:

"A.I.-generated receipts will only get better from here," he wrote. "To combat fraudulent A.I., we need to use A.I."

**Expense fraud can be a slippery slope.** Kale said it's common for employees to generate their first fake receipt to account for a legitimate expense. Maybe they lost the receipt. But when they don't get caught, they do it again. Occasionally, the fraud is egregious. AppZen once detected a batch of A.I.-generated receipts submitted by a company employee for hotels and airfare in Bangkok — a city that, upon further investigation, the employee had not visited.

The Association of Certified Fraud Examiners, which certifies about 5,000 new examiners each year, regularly asks members to

THE NEW YORK TIMES

**These A.I.-generated receipts were submitted to employers and detected as fake by the AppZen software.**

submit the largest case of occupational fraud they've investigated in the last 18 months. In the most recent survey, about 13 percent of the cases involved employees who submitted inflated or invented expenses, which can lead to criminal charges. The median loss was $50,000.

**Fake receipts make it easier.** About 30 percent of fraudulent receipts that AppZen catches are now generated by A.I. chatbots, rather than through an image editor or a template service, the company said, and the number of fraudulent receipts it catches overall has increased about 30 percent since May 2024. Expensify said it detects hundreds of A.I.-generated receipts each month, out of the millions of receipts it processes. SAP Concur flagged about 1 percent of receipts audited by Verify as potentially generated by A.I.

"I have definitely heard from members and other anti-fraud experts that A.I. is directly resulting in not only an increase in this type of fraud by volume, but also making this type of fraud more difficult to detect," Mason Wilder, the research director at the fraud examiners association, told DealBook.

**Convincing fakes have sparked a new tech escalation.** Not entirely dissimilar from when, say, home printers created a need for new expense-fraud-detection methods, software companies have built an arsenal of methods for catching a new tier of fake receipts generated by A.I.

Chatbots leave a fingerprint in the metadata of the images they generate, but if an employee takes a photo or screenshot of the image, that signal disappears.

An algorithm can compare A.I.-created receipts with real receipts from the same vendor. It might pick up on slight differences in font or spacing, for example, that a human eye wouldn't.

Like many expense-auditing software tools, AppZen has relied on identifying suspicious patterns — like spending that is unusual for the time of day or employee's role — to flag receipts that warrant a closer look. Those suspicious receipts are submitted to its newer second layer of auditing, which looks for patterns that signal that a chatbot may have produced them. While generating restaurant receipts, for example, did the employee always ask the chatbot to use the same server name, or dish order?

It's not a single technique that can detect such receipts, Kale said: "It has to be layers and layers. It's a cat-and-mouse game."

**DealBook/**

DealBook helps you make sense of the day's most important business and policy headlines. Sign up for the newsletter at **nytimes.com/dealbook**

# *Builder.ai's Bust Indicates Hot Air in the A.I. Boom*

FROM FIRST BUSINESS PAGE

have been called an A.I. company at all is up for debate. Artificial intelligence is an ambiguous term. Attaching the A.I. label to a start-up can involve a considerable degree of hope and presumption, and sometimes outright deception.

Earlier this year, the Securities and Exchange Commission charged a San Francisco couple with fraud, saying they had duped investors in their A.I. chat company. In New York, prosecutors charged an entrepreneur with defrauding investors in his shopping app, whose A.I. turned out to be contractors in the Philippines.

"Fake A.I. has long been pervasive in Silicon Valley, but with the bubble it's really taken off," said David Gerard, who runs the popular debunking site Pivot to A.I. "If you want funding, you just say a bunch of A.I. words — 'machine learning' and 'large language models' and 'This is the future.' You don't have to actually have A.I."

Builder, founded in 2016 as Engineer.ai, provided a platform where businesses could go to get apps and other software tools built for them. For the first few years, it did not do a hard sell on artificial intelligence. Sachin Dev Duggal, the chief executive, used 150 words to promote the company in 2018 when it got its first big venture investment. "A.I." wasn't among them.

That year, there were fewer than 15,000 web addresses ending with ".ai." Originally developed for the Caribbean island of Anguilla, the .ai top-level domain has become popular with start-ups that want to imply they understand artificial intelligence.

About 1,500 .ai addresses were created every day this summer, according to Domain Name Stat. At the current pace, the total number of .ai addresses will pass one million by Thanksgiving. By rough comparison, the number of online ventures founded in the late 1990s dot-com era is estimated at 10,000.

Builder's fourth — and what turned out to be last — funding round was led by the Qatar Investment Authority, a sovereign wealth fund, in 2023. This time, the third word of the news release, right after the company's name, was A.I.

Investors poured a total of $450 million into the company. Besides Qatar, they included SoftBank's DeepCore incubator, Microsoft, the Hollywood investor Jeffrey Katzenberg, the Palo Alto Networks chief executive Nikesh Arora and the New York venture firm Insight Partners. None would comment for this article.

## 'It's Basically Magic'

Builder's strategy was to become so ubiquitous as to seem inevitable.

For all the supposed life-changing nature of A.I., what often drives success is old-fashioned publicity. "In the A.I. chatbot race, consistent media coverage isn't just noise — it's fuel for adoption and growth," One Little Web, a Bangladeshi consultancy, recently said in announcing its latest study.

Builder took the notion to heart. It poured money not into product development, but into promotion. Last fall, the company was at the Web Summit conference in Lisbon. It was a Gold Partner, the second highest level of partnership, at the TechCrunch Disrupt conference in San Francisco. It was at the Gitex Global conference in Dubai.

At these events, the company showcased "Natasha," which it

STEPHEN MCCARTHY/SPORTSFILE

**Sachin Dev Duggal, the founder of Builder.ai, at the Web Summit Qatar in 2024. He called himself "chief wizard."**

called the first A.I. program manager. The product was designed to make building a website or an app as easy as ordering a pizza. Tell Natasha what you want, and she will create it.

"I know what you're saying: How's all this even possible?" Natasha asked in an ad. Then she whispered: "It's basically magic."

In 2024, as the A.I. frenzy swelled, Builder spent about $42 million on promoting itself, or 80 percent of its revenue, according to internal documents reviewed by The New York Times. Brand spending quadrupled during the year as the number of employees rose to 1,500.

Mr. Duggal, the chief executive, called himself Builder's "chief wizard." He was a familiar figure at conferences and on television wearing his lucky sweater, a memorable multihued effort that reinforced his personal brand.

He spoke confidently about the global liberation that A.I. would offer. "What you're seeing with A.I. is a shift that is allowing the more creative part of human nature to kick in," he said in a 2023 CNBC interview. He declined to be interviewed for this article and his public relations team did not provide a comment.

Software programming used to be laborious and highly skilled work, something that could be done only by trained coders. The notion that you can create software without programming is called "no code coding" or, in a newly coined term, "vibe coding." You simply trust the A.I.

The magic worked on some media. Fast Company's ranking of Builder as the third most innovative company in A.I. put it six spots ahead of Nvidia, now the most highly valued company in the world. Fast Company said that while there was a small entry fee, the companies were judged on the basis of their applications.

Fast Company commended Builder for cementing "a new partnership with JPMorgan Chase to sell Builder products to the financial services giant's customer bases." A spokeswoman for the bank said Builder was never a vendor. A Fast Company spokeswoman called Builder's selection "unfortunate."

In 2024, Mr. Duggal received the EY Entrepreneur of the Year Award in Britain. The award, the organizers said, was given to those who demonstrate "courage, perseverance and resilience to overcome significant obstacles."

Mr. Duggal then competed in the global competition, which is accompanied by Academy Award-type glitz. He did not win. An EY spokeswoman declined to comment.

## 'Smoke and Mirrors'

Mr. Duggal, who is British, was a serial entrepreneur who began 20 years ago with desktop visualization software, created a photo-sharing app and then in 2016 founded Engineer.ai. In 2018, he brought in an American executive, Robert Holdheim, to run the business.

Mr. Holdheim lasted only a few months. In February 2019, he filed suit in Los Angeles against Engineer.ai and Mr. Duggal, saying he had been fired for pointing out problems at the start-up.

The lawsuit said the company had two sets of books, one with fake numbers for investors, one with the real numbers. Engineer.ai had only a handful of customers, and most were unhappy with the product, the suit said. Drawing explicit comparisons to Elizabeth Holmes and her medical start-up, Theranos, Mr. Holdheim said in his lawsuit that the start-up was all "smoke and mirrors."

Mr. Holdheim said in his suit that he had confronted Mr. Duggal on this point. The chief executive responded, he said, by saying everyone did it.

"Every tech start-up exaggerates to get financing — it's the money that allows us to develop the technology," Mr. Duggal was quoted as saying.

The lawsuit also claimed that Mr. Duggal had scorned the traditional frugality of start-ups in favor of a lavish lifestyle at company expense, including importing a personal chef from Greece during a visit to Los Angeles.

Engineer.ai denied the accusations. In October 2019, the company rebranded as Builder.ai. Mr. Holdheim said he had received a settlement, the terms of which are not public. Neither the lawsuit nor a 2019 Wall Street Journal article poking holes in Builder's A.I. capabilities dented the company's rise over the next few years. Mr. Holdheim declined to comment.

One factor helping Builder along was the Covid pandemic and its restrictions.

"Normally when you invest, you spend time with the business," said Mr. Ratia, the current chief executive. "Covid made that impossible. The Builder.ai story took off during the pandemic."

In 2023, Microsoft invested $30 million in Builder. Microsoft said the collaboration would bring the "combined power of both companies to businesses around the world." Builder's small business clients would use Microsoft's cloud storage.

A Microsoft spokeswoman said the company "doesn't have anything to share at this time."

AMRITA CHANDRADAS FOR THE NEW YORK TIMES

> ***'Builder should be a warning sign for investors, for employees, for executives.'***
>
> Manpreet Ratia, who was brought into Builder.ai as C.E.O. to try to salvage the company.

Last winter, Builder's board, trying to determine why the company had little cash despite supposedly fast growth, found that revenue was drastically overstated, according to internal documents and two people who spoke about the finances on the condition of anonymity because of legal sensitivities.

The company's revenue for the 2023 fiscal year was reported as $157 million but was actually $42 million, according to one of the people and the internal documents. In the 2024 fiscal year, the gap widened, with reported revenue of $217 million against $51 million in reality. Builder also was not paying its bills. It owed Amazon Web Services $75 million, the person said.

After the board investigation, Mr. Duggal stepped down. Mr. Ratia, who works for an early Builder investor, Jungle Ventures, had plans to fix the company. But when the creditors lost faith, filing for Chapter 7 bankruptcy was the only option.

"I'm the only one left standing," Mr. Ratia said.

In May, a social media account with no apparent connection to Builder posted that the company's A.I. did not exist: "The Natasha neural network turned out to be 700 Indian programmers." The accusation, which was widely circulated, sparked an instant joke in the tech community: At Builder, "A.I." meant "Actually, Indians."

Mr. Ratia, a Builder board member since early 2024, pushed back on the accusation.

"The A.I. was real," he wrote on LinkedIn in June. "It wasn't a gimmick. It wasn't smoke and mirrors. It was a sophisticated, production-grade system." His defense made little headway.

In an interview, Mr. Ratia said the confusion was at least partly Builder's fault.

"Builder didn't do a good job in defining A.I.," he said. "Depending on your audience, you tend to overmarket yourself a bit. Was A.I. being used to assist the work of human beings? Yes. Was A.I. replacing human beings? No."

Since OpenAI introduced ChatGPT in 2022 and created a sensation, the pressure — or perhaps the temptation — for companies to describe something as artificial intelligence is often irresistible.

"A.I. sells, and automation does not," Mr. Ratia said.

## More Magic

As Builder was unraveling, the final moments of Nate, a New York A.I. start-up, also played out.

Nate was a shopping app that streamlined purchases by letting users skip the process of checking out on e-commerce sites. Thanks to A.I., shopaholics would save valuable minutes each day. Investors ponied up $40 million in spring 2020, just as the pandemic was making it seem all shopping would be virtual.

Albert Saniger, Nate's chief executive, told investors that the company's "deep learning models" used a mix of "long short-term memory, natural language processing and reinforcement learning." Nate described itself as "the magic shopping app."

In 2022, the tech news site The Information published an article that said Nate was not using A.I. at all but having contractors in the Philippines manually complete each sale. That attracted the interest of regulators.

In April, the U.S. attorney's office for the Southern District of New York indicted Mr. Saniger on fraud charges, saying he lied to investors about the use of A.I. Court records do not list a plea or a defense lawyer. Mr. Saniger, a partner at the New York venture firm Buttercore, did not respond to a request for comment.

Another A.I. case is slowly moving forward in the U.S. District Court in San Francisco. In January, the Securities and Exchange Commission charged Alexander Beckman, who ran an A.I. sports chat company called GameOn, and his wife, Valerie Lau Beckman, a lawyer who worked for a venture capital firm, with fraud.

Prosecutors described in court filings a "brazen and wide-ranging" scheme that included fabricated audit reports, fake bank statements, fake revenue, stolen identities and the diversion of millions of GameOn dollars to pay personal expenses, including the couple's wedding and their house.

Investors lost at least $60 million, the government said. Mr. Beckman and Ms. Lau Beckman pleaded not guilty. Their lawyers did not respond to requests for comment.

Builder, meanwhile, is being investigated by prosecutors for the Southern District of New York, three people with knowledge of the company said. A spokesman for the prosecutors did not return a call for comment.

Mr. Duggal, Builder's founder, has moved on. In May, he announced on Instagram that he was now a consultant, "opening up 1:1 time" to share what he had learned about A.I. But if you go to his consultant page, there's nothing there.

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: ZEN JV, LLC, *et al.*,[1] Debtors. ) Chapter 11, Case No. 25-11195 (JKS) (Jointly Administered)

**Hearing Date: October 7, 2025 at 1:00 p.m. (ET)**
**Objection Deadline: October 1, 2025 at 12:00 p.m. (ET)**

**NOTICE OF (I) CONDITIONAL APPROVAL OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR SOLICITATION PURPOSES ONLY, (II) DEADLINE FOR CASTING VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND (III) THE HEARING TO CONSIDER (A) FINAL APPROVAL OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION AND (B) CONFIRMATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On August 19, 2025, Zen JV, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed the *Debtors' Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [Docket No. 305] with the United States Bankruptcy Court for the District of Delaware (the "**Court**").

2. On September 4, 2025, Zen JV, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed the *Debtors' Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [Docket No. 336] (as may be amended, modified and/or supplemented, the "**Combined Plan and Disclosure Statement**") with the Court.[2]

3. On September 4, 2025, the Court entered an order [Docket No. 335] (the "**Conditional Approval and Procedures Order**") conditionally approving the Combined Plan and Disclosure Statement for solicitation purposes only.

4. A hearing (the "**Confirmation Hearing**") to consider final approval of the Combined Plan and Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and confirmation of the Combined Plan and Disclosure Statement will be held before The Honorable J. Kate Stickles, United States Bankruptcy Judge, on the 5th floor of the Court, Courtroom 6, 824 North Market Street, Wilmington, DE 19801, **on October 7, 2025 at 1:00 p.m. (prevailing Eastern Time)**. The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtors in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing or as indicated in any notice or agenda filed with the Court.

5. Objections to confirmation of the Combined Plan and Disclosure Statement, including any objection to the adequacy of the disclosures, if any, must: (a) be in writing; (b) be filed with the Court by no later than **12:00 p.m. (prevailing Eastern Time) on October 1, 2025** (the "**Confirmation Objection Deadline**"); and (c) and served on: (i) counsel to the Debtors: (1) Latham & Watkins LLP, (x) 1271 Avenue of the Americas, New York, New York 10020, Attn: Ray C. Schrock (ray.schrock@lw.com) and Candace M. Arthur (candace.arthur@lw.com) and (y) 330 North Wabash Avenue, Suite 2800 Chicago, IL 60611, Attn: Jonathan Gordon (jonathan.gordon@lw.com), and (2) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Daniel J. DeFranceschi (defranceschi@rlf.com) and Zachary I. Shapiro (shapiro@rlf.com); (ii) counsel to the Prepetition Term Loan Agent, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 1000, Attn: Ronald A. Hewitt (hewitt@sewkis.com); (iii) counsel to the Required Prepetition Term Loan Lenders, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022, Attn: Adam C. Harris (adam.harris@srz.com); (iv) counsel to the Prepetition Noteholders, Jones Day, 1221 Peachtree Street, N.E., Suite 400, Atlanta, Georgia 30361, Attn: Daniel J. Merrett (dmerrett@jonesday.com); and (v) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Linda J. Casey (Linda.Casey@usdoj.gov).

6. Pursuant to the Conditional Approval and Procedures Order, the Court approved the use of certain materials in the solicitation of votes to accept or reject the Combined Plan and Disclosure Statement and certain procedures for the tabulation of votes to accept or reject the Combined Plan and Disclosure Statement. If you are a Holder of a Claim against the Debtors as of **September 3, 2025** and are entitled to vote, then you have received with this Notice a ballot form (a "**Ballot**") and instructions for completing the Ballot.

7. For a vote to accept or reject the Combined Plan and Disclosure Statement to be counted, the Holder of a Claim must complete all required information on the Ballot, execute the Ballot and return the completed Ballot in accordance with the instructions so that it is received by **4:00 p.m. (prevailing Eastern Time) on October 1, 2025** (the "**Voting Deadline**"). Any failure to follow the instructions included with the Ballot or to return a properly completed Ballot so that it is actually received by the Voting Deadline may disqualify such Ballot and vote on the Combined Plan and Disclosure Statement. **You may also be eligible to submit a Ballot electronically. If you wish to do so, please visit the following web address and follow the instructions on that web address**: *https://omniagentsolutions.com/CareerBuilderMonster*. The rules and procedures for the tabulation of the votes are outlined in the Conditional Approval and Procedures Order.

**ARTICLE XII OF THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE COMBINED PLAN AND DISCLOSURE STATEMENT CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER. FOR YOUR CONVENIENCE, SUCH PROVISIONS ARE SET FORTH ON EXHIBIT 1 HERETO. FOR THE AVOIDANCE OF DOUBT, TO THE EXTENT ANY PROVISION OF THIS NOTICE CONFLICTS WITH THE TERMS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, THEN THE TERMS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT WILL CONTROL.**

8. Pursuant to the Conditional Approval and Procedures Order, you may not have received a copy of the Combined Plan and Disclosure Statement. However, copies of the Combined Plan and Disclosure Statement, the Conditional Approval and Procedures Order, and other materials contained in the Solicitation Packages may be obtained and/or are available for review without charge at the website of Omni Agent Solutions, Inc. (the "**Balloting Agent**"), *https://omniagentsolutions.com/CareerBuilderMonster*, or by contacting the Balloting Agent by email, at CareerBuilderMonsterInquiries@OmniAgnt.com.

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. Should you have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials), please feel free to contact the Balloting Agent by: (a) calling the restructuring hotline at (818) 924-2298 (US & Canada toll free) or (818) 841-0525 (International); (b) visiting the restructuring website at: https://www.omniagentsolutions.com/CareerBuilderMonster-Ballots, or using the QR Code below; and/or (c) writing to Zen JV, LLC Ballot Processing c/o Omni Agent Solutions, Inc., 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.txnb.uscourts.gov. Please be advised that the Balloting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Combined Plan and Disclosure Statement.

Dated: September 4, 2025, Wilmington, Delaware, */s/ Zachary I. Shapiro*, **LATHAM & WATKINS LLP,** Ray C. Schrock (admitted *pro hac vice*), Candace M. Arthur (admitted *pro hac vice*), 1271 Avenue of the Americas, New York, New York 10020, Telephone: (212) 906-1200, Facsimile: (212) 751-4864, Email: ray.schrock@lw.com, candace.arthur@lw.com -and- Jonathan C. Gordon (admitted *pro hac vice*), 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Telephone: (312) 876-7700, Facsimile: (312) 993-9767, Email: jonathan.gordon@lw.com -and- **RICHARDS, LAYTON & FINGER, P.A.,** Daniel J. DeFranceschi (No. 2732), Zachary I. Shapiro (No. 5103), Huiqi Liu (No. 6850), Clint M. Carlisle (No. 7313), Colin A. Meehan (No. 7237), One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Telephone: (302) 651-7700, Facsimile: (302) 651-7701, Email: defranceschi@rlf.com, shapiro@rlf.com, liu@rlf.com, carlisle@rlf.com, meehan@rlf.com, *Co-Counsel for Debtors and Debtors in Possession*

1 The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number (to the extent applicable), are: Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions, LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding, LLC (9339); and Military Advantage, LLC (9508). The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

2 Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Combined Plan and Disclosure Statement.