# **EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT FOR THE
DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | : Chapter 11 |
| ZEN JV, LLC, *et al,.*[1] | : Case 25-11195 (JKS) |
| Debtors. | : (Jointly Administered) |

**DECLARATION OF SUSAN FALLON IN SUPPORT OF THE MOTION FOR AN
ORDER AUTHORIZING AND DIRECTING THE IMMEDIATE PAYMENT OF THE
ADMINISTRATIVE CLAIM OF SUSAN FALLON
PURSUANT TO 11 U.S.C. §§ 503(b)(1)(A) AND 507(a)(2)**

I, Susan Fallon, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States as follows:

1. I submit this declaration in support of the Motion for an Order authorizing and directing the immediate payment of the administrative claim of Susan Fallon pursuant to 11 U.S.C. §§ 503(b)(1)(a) and 507(a)(2) (the "Motion").

2. At all relevant times here, I was employed as a Senior Vice President, and since December 2024 GM, for Monster Government Solutions, LLC ("MGS"), which was owned by Zen JV, LLC and/or its affiliates.

3. On November 14, 2024, I received a letter from the Debtors[2], offering and documenting the terms of a transaction bonus.

4. At the time, I was aware that the Debtors were exploring a potential carve out of the MGS business in order to sell that line of business to a third-party.

---

[1] The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number (to the extent applicable), are: Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions, LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding, LLC (9339); and Military Advantage, LLC (9508) (collectively, the "Debtors"). The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

[2] Capitalized terms not otherwise defined herein are given the meaning assigned in the Motion.

5.  The Transaction Bonus Agreement identified me as a "critical member" of a core team and informed me that my services were needed to assist with the successful sale of the Company's assets, including MGS. The potential sale was referred to as "Project A."

6.  The Transaction Bonus Agreement promised me a bonus of 100% of my base salary USD, less standard withholding taxes, to be paid in a lump sum within 30 days of a successful sale so long as I met three criteria: (a) completion of the tasks asked of me in conjunction with Project A, remain employed by the Company at the time Project A was successfully concluded in the form of a sale of the assets listed therein to a third party, and (c) remain in good standing and performing throughout this period.

7.  I executed the Transaction Bonus Agreement in December 2024.[3] The Transaction Bonus Agreement was executed by the Chief Executive Officer for Monster + CareerBuilder, Jeffrey Furman.

8.  After signing the Transaction Bonus Agreement, I complied with its terms with the understanding that once the targeted sale closed, I would receive the agreed-upon bonus.

9.  The effort to carve out MGS for a sale, which was known as "Project Minerva," began in earnest in March 2024, with a very aggressive timeline. Given my unique knowledge, skill, and understanding of MGS' business and operations, and relationships with customers and partners, I had the lead role for MGS working with the Debtors and their investment banker, PJT Partners, to support the sale. I actively prepared for and led many dozens of introductory and due diligence meetings with prospective private equity and strategic buyers, as well as responding to and/or coordinating responses to follow-up questions by the prospective buyers. This included

---

[3] The Transaction Bonus Agreement is dated March 6, 2025 because the original execution version was inadvertently misplaced and could not be recovered. I did originally sign it in November 2024, but I agreed with the company to resign the Transaction Bonus Agreement in March 2025 because of the misplacement of the original.

many long nights and weekends, in addition to the regular daily responsibilities of managing the MGS business.

10.     The sale of the MGS business was highly complex and involved both technology and contractual interdependencies that required the specialized knowledge and experience I possessed.  Further, I had the relationships with counterparties that were necessary for any transition, and the experience to deftly navigate the governmental regulatory approvals necessary to consummate a sale of MGS.

11.     Upon information and belief, but for my efforts in the auction and sale process, MGS would not have sold for more than its stalking horse bid because there would not have been multiple other bidders and so my efforts directly, greatly, increased the value of the sale.  I was instrumental in securing the stalking horse bid for MGS from Valsoft Corporation, LLC for $6,000,000, and then subsequently in the multiple competing bids at auction.  The sale of MGS ultimately was approved by the Bankruptcy Court to the successful bidder for a purchase price of $13,079,000, which is over double the original stalking horse bid.  My work and efforts were critical to securing these bids and a successful auction and sale process for MGS.

12.     Additionally, my team and I at MGS performed well in the months surrounding the sale, the bankruptcy auction and the closing of the sale.  This included meeting revenue and sales goals, including the successful win of a new multi-year, multi-million dollar federal government contract, and leading and  navigating customer communications and retention during the bankruptcy process.

13.      I completed all tasks asked of me in conjunction with Project A, one of the sales that this bankruptcy was filed to achieve.

14.     I remained employed by Debtors at the time the asset sale concluded.

15. From execution of the Transaction Bonus Agreement through closing, and beyond, I remained in good standing with Debtors and continued to perform my job in a manner that exceeded expectations.

16. I believe that I directly bettered the Debtors' estate or, at a minimum helped to preserve the estate.

17. On July 23, 2025, just a few days after the auction, I was told via email by Mr. Furman that I may not receive my Transaction Bonus.

*18.* On July 25, 2025, Mr. Suhajda informed me that he was working to ensure that Debtors would honor the Transaction Bonus Agreement and pay my Transaction Bonus, as well as the bonuses owed to others on my team.

19. On August 4, 2025, I was informed that the Debtors would not be honoring the Transaction Bonus Agreement and would not pay me my Transaction Bonus. No reason or justification was provided.

20. I have received no indication that the Debtors contend I did not comply with the terms of the Transaction Bonus Agreement and am not entitled to the Transaction Bonus, only that Debtors are not in a position to honor same and would not do so.

21. I believe I am entitled to my Transaction Bonus of $305,000.00, less the standard withholding taxes.

Dated: October 14, 2025                                             */s/ Susan Fallon*
                                                                    Susan Fallon