# **EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT FOR THE
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : Chapter 11 |
| ZEN JV, LLC, *et al,.*[1] | : Case 25-11195 (JKS) |
| Debtors. | : (Jointly Administered) |

**DECLARATION OF SARAH BLANSETT IN SUPPORT OF THE MOTION FOR AN ORDER AUTHORIZING AND DIRECTING THE IMMEDIATE PAYMENT OF THE ADMINISTRATIVE CLAIM OF
<u>SARAH BLANSETT PURSUANT 11 U.S.C. §§ 503(b)(1)(A) AND 507(a)(2)</u>**

I, Sarah Blansett, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States as follows:

1. I submit this declaration in support of the Motion for an Order authorizing and directing the immediate payment of the administrative claim of Sarah Blansett pursuant 11 U.S.C. §§ 503(b)(1)(a) and 507(a)(2) (the "<u>Motion</u>").

2. At all relevant times herein, I was employed as the Publisher and Vice President for Military.com, which was owned by Zen JV, LLC and/or its affiliates.

3. On November 14, 2024, I received a letter from Jeffrey Furman, Chief Executive Officer of the Company[2], forwarded to me by the Senior Vice President and GM for FastWeb and Military.com, Mark Nelson. The letter offered and documented the terms of a transaction bonus.

---

[1] The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number (to the extent applicable), are: Zen JV, LLC (0225); Monster Worldwide LLC (6555); FastWeb, LLC; Monster Government Solutions, LLC (5762); Camaro Acquisition, LLC; CareerBuilder, LLC (6495); CareerBuilder Government Solutions, LLC (6426); Luceo Solutions, LLC (4426); CareerBuilder France Holding, LLC (9339); and Military Advantage, LLC (9508) (collectively, the "<u>Debtors</u>"). The Debtors' address is 200 N LaSalle Street #900, Chicago, IL 60601.

[2] Capitalized terms not otherwise defined herein are given the meaning assigned in the Motion.

4. At the time, I was aware that the Company was exploring a potential sale of its assets.

5. The Transaction Bonus Agreement identified me as a "critical member" of a core team and informed me that my services were needed to assist with the successful sale of the Company's assets, including Monster's IAF division. The IAF division included FastWeb & Military.com and the potential sale was referred to as "Project A."

6. The Transaction Bonus Agreement promised me a bonus of 50% of my base salary USD, to be paid in a lump sum, less standard withholding taxes, within 30 days of a successful sale so long as I met three criteria: (a) completion of the tasks asked of me in conjunction with Project A, (b) remain employed by the Company at the time Project A was successfully concluded in the form of a sale of the assets listed therein to a third party, and (c) remain in good standing and performing throughout this period.

7. I executed the Transaction Bonus Agreement on November 14, 2024. The Transaction Bonus Agreement was also executed by Mr. Furman.

8. After signing the Transaction Bonus Agreement, I eventually learned that the Company was contemplating bankruptcy.

9. After signing the Transaction Bonus Agreement, I complied with its terms with the understanding that once the targeted sale closed, I would receive the agreed upon bonus.

10. During this time, I reported to Mr. Nelson and our team was working directly to support the sale efforts. On the Petition Date, Mr. Nelson suggested to Mr. Suhajda and PJT Partners, who I understood to be overseeing the sale process/efforts, that he reach out to one of our contacts, Veterans United Home Loans ("Veterans United"), in an effort to solicit another bidder for Project A. The goal, and as part of my ongoing efforts to support the sale pursuant to my

Transaction Bonus Agreement, was that by bringing in another bidder our team could help to drive up the final sale price above the original stalking horse bid.

11. I understand that Mr. Nelson then connected Jon Galloway, the Vice President of Business Development at Veterans United with PJT Partners.

12. When the Debtors went to auction on July 17, 2025, the only bidders for the MMP Business were Valnet US, Inc. and Veterans United. As a result of the bidding war that took place between those two parties, the final sale price for the MMP Business was $27,250,000.00, which is $4,250,000.00 more than the stalking horse bid of $22,500,000.00.

13. Upon information and belief, but for our team's efforts to bring Veterans United into the auction and sale process, the MMP Business would not have sold for more than its stalking horse bid because there would not have been another bidder and so my efforts directly, greatly, increased the value of the sale.

14. Additionally, my team and I performed extremely well in the months surrounding the auction and the closing of the sale. For three consecutive months, we achieved revenue of over $3,000,000.00 for the first time in Company history and I was informed that Debtors anticipated this performance would result in better than anticipated opening AR balances post-closing.

15. I completed all tasks asked of me in conjunction with Project A, one of the sales that this bankruptcy was filed to achieve.

16. I remained employed by Debtors at the time the asset sale concluded.

17. From execution of the Transaction Bonus Agreement through closing, and beyond, I remained in good standing with Debtors and continued to perform my job in a manner that exceeded expectations.

18. I believe that I directly bettered the Debtors' estate or, at a minimum helped to preserve the estate.

19. On July 23, 2025, just a few days after the auction, Mr. Nelson was told by Mr. Furman that I and others on our team may not receive our Transaction Bonuses.

20. On July 25, 2025, Michael Suhajda, Chief Financial Officer for the Company, informed Mr. Nelson that he was working to ensure that Debtors would honor the Transaction Bonus Agreement and pay my Transaction Bonus, as well as the bonuses owed to others on my team. I was told that my Transaction Bonus would be processed in the August 1, 2025 payroll.

21. On August 1, 2025, I engaged counsel and on August 4, 2025, through counsel, I sent Debtors' counsel a written letter to demand that Debtors provide adequate assurances to ensure that the Transaction Awards, including my Transaction Bonus, would be paid.

22. Instead, on August 4, 2025 Debtors counsel informed me, through counsel, that Debtors would not be honoring the Transaction Bonus Agreement and would not pay me my Transaction Bonus.

23. I have received no indication that Debtors contend I did not comply with the terms of the Transaction Bonus Agreement and am not entitled to the Transaction Bonus, only that Debtors are not in a position to honor same and would not do so.

24. I believe I am entitled to my Transaction Bonus of $94,500.00.

Dated: October 14, 2025                                         /s/ Sarah Blansett
                                                                Sarah Blansett